# EXHIBIT A



*Filed and Attested by the Office of Judicial Records 11 MAR 2025 04:47 pm C. SMITH*

**WHITE AND WILLIAMS LLP**
BY:   Edward M. Koch, Esquire
       Laura Rossi, Esquire
       Pa. Id. Nos. 76337/322763
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103
215-864-6319/6366
koche@whiteandwilliams.com
rossil@whiteandwilliams.com

*Attorneys for Garnishee,*
*Evanston Insurance Company*

| | | |
|---|---|---|
| MATTHEW SELBOVITZ | : | PHILADELPHIA COUNTY |
|                Plaintiff, | : | COURT OF COMMON PLEAS |
| | : | |
|    v. | : | APRIL TERM, 2019 |
| | : | |
| STREAMLINE SOLUTIONS, LLC ET AL. | : | NO. 01575 |
| | : | |
|                Defendants. | : | |
| | : | |
| | : | |

| | | |
|---|---|---|
| DANIEL KIRK and CLARISA KIRK | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
|                Plaintiffs, | : | |
| | : | SEPTEMBER TERM, 2019 |
|    v. | : | |
| | : | NO. 001353 |
| NINETEENTH STREET DEVELOPMENT LLC, et, al. | : | |
| | : | |
|                Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| DAVID BUTERA | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
|                Plaintiff, | : | |
| | : | SEPTEMBER TERM, 2019 |
|    v. | : | |
| | : | NO. 001268 |
| NINETEENTH STREET DEVELOPMENT LLC, et al. | : | |
| | : | |
|                Defendants. | : | |
| | : | |
| | : | |

Case ID: 190901353

| | |
|---|---|
| NICHOLAS AUGER | : PHILADELPHIA COUNTY |
| | : COURT OF COMMON PLEAS |
| Plaintiff, | : |
| | : SEPTEMBER TERM, 2019 |
| v. | : |
| | : NO. 001351 |
| NINETEENTH STREET DEVELOPMENT LLC, | : |
| et, al. | : |
| | : |
| Defendants. | : |
| | : |
| | : |

## <u>NOTICE TO PLEAD</u>

You are hereby notified to file a written response to the enclosed New Matter pursuant to Pa.

R. C. P. 3145 within twenty (20) days from service hereof or a judgment may be entered against you.

**WHITE AND WILLIAMS LLP**

By: */s/ Edward M. Koch*
Edward M. Koch, Esquire
Laura Rossi, Esquire
Pa. Id. Nos. 76337/322763
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
215-864-6319/6366

*Attorneys for Garnishee,*
*Evanston Insurance Company*

Dated: March 11, 2025

- 2 -

Case ID: 190901353

## ANSWER OF EVANSTON INSURANCE COMPANY TO
## REVISED INTERROGATORIES TO GARNISHEE AND NEW MATTER

Plaintiffs Nickolas Auger, David Butera, Daniel Kirk and Clarisa Kirk, Matthew Selbovitz, (collectively "Plaintiffs") filed a Praecipe to Issue a Writ of Execution against Evanston Insurance Company ("Evanston") on February 10, 2025 with enclosed Interrogatories in Attachment to Garnishee Evanston Insurance Company. On February 12, 2025, Plaintiffs filed Revised Interrogatories in Attachment to Garnishee Evanston Insurance Company ("Revised Garnishment Interrogatories") under each of four lawsuits captioned as:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit").

(collectively the "Lawsuits").

The Revised Garnishment Interrogatories filed under each docket number are identical. Evanston was served with the Revised Garnishment Interrogatories on February 19, 2025. Evanston answers the Revised Garnishment Interrogatories as follows:

1. **Please provide a detailed explanation of the terms, conditions, exclusions and exceptions set forth in the Evanston Commercial Lines Insurance Policy No. 3C42330 for the policy period November 1, 2017 to November 1, 2018 (hereinafter "the Insurance Policy") under which the Insureds Streamline Solutions, LLC and/or Nineteenth Street Development, LLC made a claim for indemnification in the above-captioned cases. Kindly also produce a true and correct copy of said insurance policy.**

   **Answer**: Evanston objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Evanston further objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome. Notwithstanding that without waiving any objections, Evanston has agreed to produce copies of coverage determination letters issued to Streamline Solutions, LLC ("Streamline") and Nineteenth Street Development, LLC ("Nineteenth Street") setting forth, among other things, the basis for Evanston's disclaimer of indemnity in connection with the Lawsuits. Evanston has also agreed to produce a copy of the Policy No. 3C42330. *See* documents attached in support of New Matter. As noted in the coverage determination letters, upon receiving notice of the Lawsuits, Evanston began providing a defense subject to a full reservation of rights, under Policy No. 3C42330 (the "Policy," for purposes of this submission), to Streamline (a

Case ID: 190901353

named insured under the Policy), and Nineteenth Street (who tendered its defense as an additional insured under the Policy). Evidence presented at trial, as supported by allegations in the Complaints, and evidence gathered in the investigation of the claim, has established that there is ***no coverage*** available for any of the claims and related damages awarded to date under the 2017-2018 Evanston Primary Policy—or any other Evanston Policies—because, among other things:

- The first manifestation dates of "property damage" for which damages were awarded predate all of the Evanston Policies, as demonstrated by trial testimony. Per applicable Pennsylvania case law, coverage is provided by the policy in effect when the property damage first manifested. Since the first manifestation dates of "property damage" for which damages were awarded predate all of the Evanston Policies (as demonstrated by trial testimony provided by Plaintiffs) there is no coverage under those policies.

- Even if any property damage had first manifested within any of the Evanston Policy periods, damages awarded for faulty construction itself are not covered by the Evanston Policies as they do not constitute "property damage" caused by an "occurrence."

- Various claims asserted by Plaintiffs (and any corresponding verdict award), including breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and Unfair Trade Practices and Consumer Protection Law ("UTPCPL") are not covered by the Evanston Policies because they do not involve "property damage" caused by an "occurrence."

- Punitive damages awarded are excluded from coverage under the Evanston Policies.

- In addition to the above, exclusions in the Evanston Policies would further bar coverage for the damages awarded by the jury including but not limited to the following:

  o *Exclusion - Exterior Insulation and Finish System Endorsement*: Coverage for damages awarded in the jury verdict concerning faulty construction of the exterior envelope of the homes which led to water infiltration and moisture and would be further barred by this exclusion.

  o *Damage to Property exclusion*: No coverage is available for any damages awarded to the extent Streamline and/or Nineteenth Street knew or should have reasonably known of hazards that led to the property damages to the homes at issue in Lawsuits.

- 4 -

Case ID: 190901353

- *Damage to Your Product Exclusion*: Coverage for damages awarded would also be barred to the extent they arose from Streamline or Nineteenth Street's product.

- *Damage to Your Work Exclusion*: Coverage for damages would also be barred to the extent they arose from Streamline or Nineteenth Street's work.

- *Damage to Impaired Property or Property Not Physically Injured Exclusion*: Plaintiffs were awarded damages for the defects in their homes as well as loss of enjoyment of their respective homes because of the defects in the work and/or, including for Streamline and/or Nineteenth Street's failure to perform its contractual obligations. Coverage would also be barred for damages awarded to restore, repair, or replace any part of the properties because Streamline's work was incorrectly performed.

- *Exclusion - Organic Pathogens and Legionellae Endorsement*: Auger, Selbovitz, the Kirks, and Butera each sought damages for faulty construction that led to water infiltration into their homes and mold growth. Evanston has no obligation to indemnify Streamline and/or Nineteenth Street for any damages awarded to monitor, abate, clean up, test, remediate, treat or in any way respond to the effects of "fungi," bacteria, organic pathogens or bio-organic growth.

- *Exclusion – Continuous or Progressive Injury of Damages*: Auger, Selbovitz, the Kirks, and Butera each seeks redress for property damage that first began prior to the Evanston Primary Policy periods. Those damages are barred by this exclusion.

2. **What specific provision or provisions in the Insurance Policy do you allege have breached, violated or otherwise not met which you contend supports your refusal to indemnify the Insureds for Plaintiffs' claims?**

   **Answer**: *See* response to Interrogatory no. 1.

3. **When was the Insureds' claim for indemnification first submitted to You?**

   **Answer**: Evanston issued a letter acknowledging Streamline's request for a defense in connection with the Lawsuits in July 2020. Evanston received a request for indemnity from Nineteenth Street's personal counsel on July 5, 2023. Evanston understands that judgments in the Lawsuits were entered on or about November 22, 2025.

- 5 -

Case ID: 190901353

4. **Provide a detailed chronology of all communications, including e-mails, letters, notes and any other forms of correspondence between You and the Insureds regarding the Plaintiffs' claim against the Insureds and your refusal to indemnify the Insureds after judgment/verdict was entered against the Insureds, including but not limited to any previously-issued reservation of rights letter. Kindly also produce a true and correct copy of each and every such reservation of rights letter.**

**Answer:** Evanston objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Moreover, Evanston objects to this Interrogatory to the extent it seeks privileged information. Evanston also objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of the foregoing objections, below is a chronology of coverage determination letters issued in connection with the Lawsuits to Streamline and Nineteenth Street. Evanston agrees to provide copies of these letters:

**Streamline:**

- *July 14, 2020* (Evanston's reservation of rights letter)
- *December 14, 2022* (Evanston's supplemental reservation of rights)
- *August 10, 2023* (Evanston's partial denial of coverage and supplemental reservation of rights in light of jury verdict)
- *February 15, 2024* (Evanston's denial of coverage as to jury verdict damages with continuing defense subject to a full reservation of rights pending decision by the court on outstanding UTPCPL claim)
- *February 24, 2025* (Evanston's denial of coverage and indemnity in light of final verdict on all counts)

**Nineteenth Street:**

- *December 14, 2022* (Evanston's reservation of rights)
- *September 21, 2023* (letter response to coverage counsel with Evanston's partial denial of coverage and supplemental reservation of rights in light of jury verdict)
- *February 15, 2024* (Evanston's denial of coverage as to jury verdict damages with continuing defense subject to a full reservation of rights pending decision by the court on outstanding UTPCPL claim)
- *March 10, 2025* (Evanston's denial of coverage and indemnity in light of final verdict on all counts)

5. **Identify the person within Your Company who was directly responsible for handling the Insureds' claim for indemnification and state the person's position and role.**

**Answer**: Evanston objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. *See also* October 30, 2023, Order, Case No. 2210-02193, *Becker v. Streamline Solutions, LLC*. Moreover, Evanston objects to this Interrogatory to the extent it seeks privileged information. Evanston

Case ID: 190901353

also objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence.

6. **Identify each and every document, report, memorandum and correspondence, including electronically-stored indemnification, that supports Your decision to deny the Insureds' claim for indemnification. In the alternative, kindly produce each and every such document, report, memorandum and correspondence, including electronically-stored information, that supports Your decision to deny the Insureds' claim for indemnification.**

   **Answer**: Evanston objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. *See also* October 30, 2023, Order, Case No. 2210-02193, *Becker v. Streamline Solutions, LLC*. Moreover, Evanston objects to this Interrogatory to the extent it seeks privileged information. Evanston also objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of the foregoing objections, in response to this Interrogatory, Evanston refers Plaintiffs to the testimony provided at the underlying trial and copies of coverage determination letters produced in response to these interrogatories and in support of Evanston's New Matter. Please also refer to exhibits to new matters submitted herein. Evanston will not be producing full copies of documents or transcripts from the underlying trial cited in its coverage determination letters as Plaintiffs, who participated to the proceedings, are already in possession of said documents.

7. **State the basis for Your refusal to indemnify the Insureds for Plaintiffs' claims following the entry of judgment against the Insureds. Please explain in detail Your reasons for failing to pay Plaintiffs' claims.**

   **Answer**: Evanston objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Moreover, Evanston objects to this Interrogatory as overly burdensome and repetitive. Evanston also objects to the phrasing of this Interrogatory. Subject to and without waiver of the foregoing objections, in response to this Interrogatory, please see answer to Interrogatory no. 1.

8. **Has any lawsuit or other legal action been instituted against Your Company by the Insureds, or either of them, seeking indemnification for Plaintiffs' claims? If so, please identify the court, term and docket number of said case and the date filed and date[d] served upon You.**

   **Answer**: No.

9. **Identify all individuals within Your Company who have knowledge of the Insureds' claim for indemnification and Identify those individuals who participated in the decision to deny coverage for Plaintiffs' claims.**

   **Answer**: Evanston objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. *See also* October

Case ID: 190901353

30, 2023, Order, Case No. 2210-02193, *Becker v. Streamline Solutions, LLC*. Moreover, Evanston objects to this Interrogatory to the extent it seeks privileged information. Evanston also objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome because it is unlimited in time and scope. Evanston further objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence.

10. **Identify each bank and any other financial institution account in which You maintain funds of Your Company and state the amount in each said account as of the date of service of these interrogatories.**

   **Answer**: Evanston objects to this Interrogatory as it seeks information not relevant to the matters at issue. Evanston also objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Evanston further objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence. Moreover, Evanston further objects to this interrogatory as it is overly broad and unduly burdensome. Additionally, Evanston objects to this Interrogatory to the extent it seeks privileged information.

12. **Identify each real estate property owned by Your Company as of the date of service of these Interrogatories and state the address and most recent determination of the fair market value of each property.**

   **Answer**: Evanston objects to this Interrogatory as it seeks information not relevant to the matters at issue. Evanston also objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Evanston further objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence, Moreover, Evanston further objects to this interrogatory as it is overly broad and unduly burdensome. Additionally, Evanston objects to this Interrogatory to the extent it seeks privileged information.

13. **State the total number of persons and entities located in the Commonwealth of Pennsylvania that were insured by Your Company for each year from 2015 to the present.**

   **Answer**: Evanston objects to this Interrogatory as it seeks information not relevant to the matters at issue. Evanston also objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Evanston further objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence. Moreover, Evanston further objects to this interrogatory as it is overly broad and unduly burdensome. Additionally, Evanston objects to this Interrogatory to the extent it seeks privileged information.

Case ID: 190901353

**14.** **State the total number of premium earned by Your Company from 2015 to the present on all Commercial Lines Insurance Policies issued in the Commonwealth of Pennsylvania during that ten-year period from 2015 to the present.**

> **Answer:** Evanston objects to this Interrogatory is seeks information not relevant to the matters at issue. Evanston also objects to this Interrogatory to the extent it seeks information beyond the scope of garnishment proceedings pursuant to applicable Pennsylvania rules. Evanston further objects to this Interrogatory on the grounds that it does not seek information that is relevant or likely to lead to the discovery of relevant or admissible evidence. Moreover, Evanston further objects to this interrogatory as it is overly broad and unduly burdensome. Additionally, Evanston objects to this Interrogatory to the extent it seeks privileged information.

## NEW MATTER

### A. FACTS COMMON TO ALL NEW MATTERS

1. Plaintiffs filed four separate civil actions against a number of defendants including Streamline and/or Nineteenth Street, which were then consolidated for purposes of trial (collectively the "Lawsuits"):

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit").

2. Plaintiffs all alleged that Streamline and Nineteenth Street, among other Defendants, improperly constructed their homes, located at:

- Auger:     1367 Crease Street, Philadelphia, PA ("Auger Home")
- Selbovitz:     1369 Crease Street, Philadelphia, PA ("Selbovitz Home")
- Kirk:     1371 Crease Street, Philadelphia, PA ("Kirk Home")
- Butera:     1373 Crease Street, Philadelphia, PA ("Butera Home"),

which led to water infiltration, including mold growth (collectively, the "Project").

### THE AUGER HOME

3. Per the Auger Complaint, Plaintiff Nickolas Auger purchased a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 ("Auger Home"). **Ex. 1**, Auger Compl., ¶1.

Case ID: 190901353

4.      Auger purchased the Auger Home in May 2015 and took possession on May 29, 2015. *Id.* ¶¶9, 13, 59.

5.      At the initial inspection, on May 11 2015, certain items were noted as needing to be fixed and were added to a punch list prior to closing.  *See* **Ex. 2**, *Excerpt of Trial Exhibit* P-22, Apex Report, pg. 2.

6.      According to Mr. Auger's testimony at trial, on June 13, 2023, these items included: "properly caulk and seal the windows and doors throughout to assure watertight condition" and "seal the opening in the siding materials in the stucco and the walls around the roof deck." *See* **Exhibit 3***, Excerpt of Trial Transcript,*[1] June 13, 2023, 16:4-16.

7.      The report noted:

> There is staining and evidence of leaking around the rear basement window, at the right side of the basement ceiling and at the 2nd floor front living room windows.  Pin pointing the source of leaking can be difficult and typically requires several repairs prior to eliminating the concerns.  Determine the source and make any needed repairs.  Once the leaking is determined to be inactive, repairs can be made to the finished materials…

*See* **Ex. 2**, pg. 9.

8.      The report further states that "several of the windows and doors are not adequately sealed throughout the exterior." *Id.*, pg. 5.

9.      Mr. Auger understood that these items would be fixed prior to closing.  *See Ex. 3, Trial Transcript*, June 13, 2023, 16-17.

10.     However, Mr. Auger testified that did not recall anyone from Streamline specifically going to fix any of the items pointed out in the initial inspection report and the punch list. *Id.* 17:1-10.

---

[1] Evanston only encloses excerpts of exhibits and transcripts from the underlying trial since the parties, who participated to the proceedings, are already in possession of the documents.

Case ID: 190901353

11. In 2018, Mr. Selbovitz informed Mr. Auger of issues he was experiencing at his home. This surprised Mr. Auger because he "hadn't experienced any of the same troubles." *Id*. 23:11-24.

12. Mr. Auger obtained an exterior cladding inspection in September 2018 "to make sure that the property that [he] was living in was safe." *Id*. 24:5-23.

13. The Lunny report, as alleged in the Auger Complaint, found "elevated moisture readings" throughout the house. *See* Ex. 1, Compl. ¶70.

14. It also noted [m]ultiple installation deficiencies exist with the stucco system, windows, door & system penetrations." *Id*.

15. Per the Auger Complaint, the report found the following construction defects with respect to the Auger Home, including but not limited to:

    a. Poor detail/flashing between stucco and brick
    b. Stucco thickness of ½", less than the required 7/8" thickness
    c. Incorrect window flange configuration on all windows
    d. No visible through-wall flashing in brick
    e. Vents not flashed or sealed
    f. Missing kickout diverter on the roof
    g. Improper flashing at intersection of stucco and rooftop deck
    h. Backer rod and sealant missing around doors
    i. Improperly flashed light fixtures
    j. Lack of movement joints
    k. Missing weep screed
    l. Missing flashing at dissimilar materials
    m. Missing flashing around windows.

Ex. 1, Compl., ¶69.

16. And further, the following damage was reported to the Auger Home:

    a. Elevated moisture readings
    b. Interior moisture penetration/staining
    c. Bulging of exterior cladding
    d. Cracks in the cladding
    e. Surface staining
    f. Potential Mold growth

*Id*., ¶70.

Case ID: 190901353

17.     Stucco inspection and moisture analysis performed at the Auger Home, revealed that there were significant water intrusion issues.  As stated in the Auger Complaint, the "Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion, water damage, rot, and mold infestation."  *Id.*

## THE SELBOVITZ HOME

18.     Per the Selbovitz Complaint, Plaintiff Matthew Selbovitz purchased a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 ("Selbovitz Home").  **Ex. 4**, Selbovitz Compl., ¶1.

19.     According to the Selbovitz Complaint, Plaintiff purchased the Home in May 2015 and took possession on June 4, 2015. *Id.* at ¶13, 59.

20.     Per the testimony provided by Matthew Selbovitz at trial on June 6, 2023, damages to the Selbovitz Home first manifested in late June 2015.  Mr. Selbovitz specifically testified:

> Q.     All right.  How soon after moving in did you start having problems?
>
> A.     Within around two weeks, three weeks.
>
> Q.     What happened?
>
> A.     I started to see leaks forming.  I cannot recall if it was from the roof or the large window in the front living room, but it started in one of those two places.
>
> Q.     Okay.  Did you end up having leaks in both places?
>
> A.     Yes.

*See* **Exhibit 5**, *Excerpts of Trial Transcript*, June 6, 2023, pg. 129:12-15.

Case ID: 190901353

21. After first noticing a leak, Mr. Selbovitz attested that he communicated with "Harriet" – who he understood to work for Nineteenth Street – multiple times, including in July 2015, to make her aware of the problem. *Id*. at 129-132.

22. Mr. Selbovitz further testified that at the time he communicated with her, "there were so many leaks coming from the roof and the window. And [he] remembered that in [his] original home inspection we had seen some staining on the windowsill and didn't think much of it, but then when it started to leak like that, [he] realized that it must have been leaking for quite some time already." *Id*. 129:24-130:6.

23. According to Mr. Selbovitz, some repairs were performed, but in early 2016, issues with the windows presented again. *Id*. 140-141.

24. In 2016, Mr. Selbovitz once again hired a home inspector and shared the resulting report and punch list with Streamline. *Id*. at 143:23-144-25.

25. This inspection, as testified by Mr. Selbovitz "was not just for the window. It was for all of the other leaks occurring in the home." *Id*. at 180:1-3.

26. The inspection report, dated May 12, 2016, found among other things:

> It was reported that the 2nd floor front and center casement windows have previously leaked. Repairs were reportedly performed at the window, and there are currently no signs of any active leaking.

*See* **Ex. 6**, *Excerpt of Trial Exhibit*, P-37, pg. 1.

27. Because of issues he was experiencing, Mr. Selbovitz hired Lunny Building diagnostics to perform a Moisture Inspection of his home on July 31, 2018. Ex. 4, ¶69.

28. The report found the following construction defects and damage to property with respect to the Selbovitz Home, including:

    a. Missing/deficient weep screed
    b. Improper sill flashing detail

- 13 -

Case ID: 190901353

  c. Stucco thickness of ½" less than the required 7/8" thickness
  d. Improper window flange configuration
  e. Missing movement joints
  f. Improper transition detail
  g. Missing through-wall flashing
  h. Improper integration of dissimilar materials
  i. Missing sealant around penetrations, windows and doors

*Id.* at ¶70.

29. The report found preliminary evidence of damages to the Selbovitz Home including:

  a. Elevated moisture readings
  b. Interior staining and active leaking
  c. Bulged and cracked exterior cladding
  d. Staining on the stucco
  e. Stucco delamination
  f. Mold growth

*Id.* at ¶71.

## THE KIRK HOME

30. Per the Kirk Complaint, Plaintiffs Daniel and Clarisa Kirk purchased a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 ("Kirk Home"). **Ex., 7**, Kirk Compl. at ¶1.

31. According to the Kirk Complaint, Plaintiffs purchased the Kirk Home in May 2015 and took possession on May 29, 2015. *Id.* at ¶¶9, 13, 59.

32. As alleged, "After closing on and moving into the Home, Plaintiffs later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Home that led to consequential damage to parts of the Home other than the exterior envelopes of the Home, as well as the interior contents of the [Kirk] Home." *Id.* at ¶25.

33. According to testimony provided by Clarissa Kirk at trial on June 5, 2023, damages for which Plaintiffs seek redress first manifested in July 2015. Mrs. Kirk stated:

  Q. How long did you go in the home without any problems?

Case ID: 190901353

> A.    I mean, we had – the first time we had a leak was less than two months into the home.
>
> Q.    All right.
>
> A.    In July, early July.

*See* **Exhibit 8**, *Excerpt of Trial Transcript*, June 5, 2023, 88:13-18.

34.    Per the testimony provided, upon first noticing water intrusion, the Kirks contacted their realtor via email, on July 9, 2015. *See id.*, 91:1-4.

35.    In her testimony Mrs. Kirk described the damages that they first noticed:

> Q.    And tell me what happened right before – what precipitated this email?
>
> A.    The front left window in our living room. There was water at the top of the window, I think it's called transom. Water just started to come in, so of course, you know, that's concerning. We took a video and pictures and we knew we had warranty. So we sent our photos and video to the realtor and said can you please pass this on so they could come and take a look.

*See Id.,* 89:1-10.

36.    Mrs. Kirk further testified that Streamline went to the home a number of times to attempt to resolve the issue, but "the water ultimately was still coming in." *Id.* 96:4-7.

37.    She noted some of the work done by Streamline:

> A.    So there was a sealant applied. That was the repair they made. And then they also determined that there was a gap, our window wasn't installed correctly.

*Id.* 98:23-99:1.

38.    In 2016, the Kirks had the Home inspected again. Ex., 7*,* Kirk Compl., ¶103-104. The Kirks subsequently sent the findings in the report, specifically relating to stucco and requested repairs. *Id.* 104-110. However, the leaks did not stop after Streamline performed repairs. *Ex.* 8, 111:12-21.

Case ID: 190901353

39. Because of the issues that their neighbors were experiencing the Kirks hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018. As alleged in the Kirk Complaint, the diagnostics preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including:

a. Lack of flashing on the brick veneer
b. Missing movement joints
c. Missing window flashing
d. Improper flashing detail at intersection of dissimilar material
e. Missing drainage detail
f. Stucco thickness of 1/2", less than the required 7/8" thickness;
g. Missing drip edge; and
h. Missing kickout diverters.

Ex. 7, Kirk Compl. ¶71.

40. The diagnostics found preliminary evidence of damages to the Kirks Home including:

a. Elevated moisture readings around windows and doors
b. Areas of soft, no resistance, decayed, and deteriorated sheathing
c. Cracks in the cladding
d. Bulges in the cladding
e. Efflorescence on the cladding

*Id.* at ¶72.

## THE BUTERA HOME

41. As alleged in the Butera Complaint, Plaintiff David Butera owns a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125 ("Butera Home"). **Ex. 9**, Butera Compl. ¶1.

42. According to the Butera Complaint, Butera purchased the Butera Home on June 12, 2015 and took possession on July 23, 2015. *Id.* at ¶¶9, 57, 59.

43. During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Mr. Butera to have defendants, including Streamline perform further inspection of the windows. Mr. Butera was subsequently assured by Defendants that the windows were fine. *Id.* at ¶64.

- 16 -

Case ID: 190901353

44. In his testimony at trial, Mr. Butera confirmed that issues were raised during the initial inspection of the home which produced a report dated June 19th, 2015, prior to closing. Specifically, the report noted that "[l]ocalized damage of the stucco exterior wall should be repaired." *See* **Exhibit 10**, *Excerpt Trial Transcript,* June 8, 2023, 90:9-12.

45. The inspection report, dated June 19, 2015 found leaks in the basement and "water staining" at the window sill in the master bedroom. **Exhibit 11**, *Excerpt Trial Exhibit* P-48, pg. 3.

46. On June 21, 2015, Liz Pierce, Butera's wife wrote to their realtor outlining items that would need to be repaired and addressed in order for them to move forward with purchasing the property. This email listed – almost verbatim- the concerns outlined in the first home report:

> Hi Ame,
>
> Sorry for the late response but we wanted to make sure we were making the right decision. We definitely like 1373 Crease and need to have the following items addressed in order to move forward/to compensate for misrepresentation of square footage. Can you please add this to your list and send to the seller?
>
> First and foremost is an extension of the inspection contingency period to allow for stucco inspection and further a/c inspection as described in the inspection report. The buyers reserve the right to walk away in the event of an inconclusive or negative report from the inspectors.
>
> Additionally:
>
> High quality Washer/Dryer
> Upgraded pedestal sink that matches décor of bathroom on 1st floor
> Stainless Steel Dishwasher as advertised
> Move doorbell somewhere not in the center of the living room wall/somewhere less obtrusive
>
> The following fixes from the inspection report:
>
> Localized damage of the stucco exterior walls should be repaired. There is extra risk of hidden damage in such areas caused by previous or present leaks that should be sealed. The installation of the stucco may be improper in locations and should be further investigated by a

- 17 -

Case ID: 190901353

qualified, licensed stucco inspector/ contractor prior to the end of the inspection contingency period.

The temperature drop measured across the evaporator coil of the air conditioning system is lower than typical. Repairs are needed. A qualified heating and cooling technician should be consulted to further evaluate this condition and the remedies available prior to the end of the inspection contingency period.

The electric eye sensor at the garage door opener should be lowered to within 6 inches of the garage floor to assure safe operation.

Installation of operating CO detectors on all levels and in the bedrooms A return air vent is situated close to the furnace. This arrangement is a safety concern, as it could in some conditions send furnace exhaust in the living area, causing a carbon monoxide hazard. It should be properly sealed.

It is suspected that there is an insufficient supply of combustion air for the water heater. Improvement is usually straightforward and should be high priority for safety reasons. Installation of additional grilles at the door or wall is requested.

…

Repair the basin trap in the master bathroom

…

Water staining was observed at the window sill in the master bedroom. This should be further investigated and improved as needed prior to closing.

The email was signed by David Butera. *See* **Exhibit 12**, Trial Exhibit, P-52 *(excerpt); see also Excerpt*

*Trial Transcript,* June 8, 2023, 90:9-12.

47. On June 24, 2015, David Butera emailed a list of items to be repaired to his realtor.

This list resulted from the stucco inspection/were items that the inspector recommended.

"?X Front elevation has a combination o brick and siding at the "box bay" window. Some brick to stucco transitions have few sections of missing, continuous mortar. Apply sealant to prevent moisture intrusion at these areas.

?X Windows in rear reflected sealant application BELOW the window sills at all 2nd floor locations, but was not evident or remaining window. Builder to consult with window manufacturer/Installer to determine if this method is a requirement or was this an error in applying the sealant

- 18 -

Case ID: 190901353

at the location. IF it was an error, the seller should fix. If this was a requirement, please provide notice in writing.

?X Several windows noted some missing mortar at seams. Maintain/fix with matching stucco product and/or sealant.

?X Cracks were noted near the roof on the front of the building where 1373 joins the mortar of 1375. Seal/repair these cracks.

?X Cracks were noted on the pilot house between the stucco and door frame. Seal/repair these cracks.

….

*See Ex.* 12. *See also* Ex. 10. *Excerpt Trial Transcript,* June 8, 2023, 90:9-12.

48. In an email from David Butera on July 1, 2015 to Ame Goldman:

Just signed it. As far as the window repair, we want to get moving on that as soon as we can to prevent further damage. Please relay this to Jim so we can make arrangements ASAP.

*Id.*

49. In an email from the Butera's realtor Ame Goldman, on July 2, 2015 she stated:

He received and presented. Asked if Seller could fix leak. I explained our concerns on that, he is waiting for a response from Seller. He does not believe any of other points will be an issue…

*Id.*

49. In an email from July 2, 2015, Jim Onesti, Mr. Butera's realtor from Berkshire Hathaway emailed Harriet and Sean Frankel of Nineteenth Street, requesting the "seller to credit buyer for window leak/repair… buyer is assuming you are not fixing but I believe you are fixing it or may have already fixed it." *See* **Ex. 13**, *Excerpt Trial Exhibit*, P-70.

50. In 2018, Mr. Butera noticed leaks in his home. *Id*. at 101:5-6. In his trial testimony, he described the leaks as follows:

Q. So when you first noticed the leak, where was it?

A. It was right at the pilot house, which is the stairwell that goes up to the roof deck.

- 19 -

Case ID: 190901353

Q. Okay. And what was the problem?

A. There was water staining and at that point dripping as well.

Q. Okay. And the problems stated to get worse?

A. They did.

Q. Tell me about it.

A. So there was additional water stains in other places of the house.

Q. Where?

A. In the kitchen, the windows, at the back of the house. There was staining on just the whole outside of – the inside of the house but surrounding the window frames. There was additional leaking from the pilot house that would come and go with rain and just kind of unpredictably. There was staining and water dripping from the pilot house. I believe the front window also had some dripping on the sill. But it was mainly those three place I believe.

*See* Ex. 10*, Excerpt Trial Transcript*, June 8, 2023, 104:13-105:1-15.

51. As testified, issues at the Butera Home worsened with time and leaks appeared in the same locations first noticed in 2015:

Q. Did your issues remain just water or did it get worse.

A. It got a lot worse

Q. Tell me about it.

A. So there were more water issues and more leaking in the pilot house. And then there was also ultimately leaking by the front master bedroom window, so the front of the house. And then we got the call that there was stuff growing on the ceiling on the third floor.

Q. A call from your tenant?

A. Yes.

Case ID: 190901353

*Id.* at 108:18-109:6.

52.     Per the Butera Complaint, Butera hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Butera Home on September 15, 2018, because his neighbors were experiencing some issues.  Ex. 9, Butera Compl., ¶69.

53.     The report found the following construction defects:

    a.  Missing/deficient weep screed;
    b.  Missing head flashing around windows;
    c.  Stucco thickness of 1/2", less than required 7/8' thickness;
    d.  Missing movement joints;
    e.  Improper transition detail;
    f.  Missing drip edge;
    g.  Missing mull cap on windows;
    h.  Missing flashing on rear deck;
    i.  Improper integration of dissimilar materials; and
    j.  Kickout diverter not installed.

*Id.* ¶70.

54.     The report also found preliminary evidence of damage as direct and proximate result of the construction defects including: (a) Elevated moisture readings; (b) Interior staining; (c) gaps at intersection of exterior cladding; (d) Staining on the stucco; and (e) Mold growth. *Id.* at ¶71.

## TRIAL AND AWARDED DAMAGES

55.     The Lawsuits alleged the following claims: (I) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of Implied Warranty of Workmanlike Construction; (IV) Breach of the Implied Warranty of Habitability; (V) Negligence; (VI) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VII) Negligent Misrepresentation; (VIII) Breach of Contract.

Case ID: 190901353

56.	The Lawsuits proceeded to trial in June 2023.[2]

57.	On June 16, 2023, the jury awarded damages as follows:

**COMPENSATORY DAMAGES**

| PLAINTIFF | TOTAL COMPENSATORY DAMAGES | NINETEENTH STREET | STREAMLINE |
|---|---|---|---|
| Auger | $240,557.00 | $24,055.70 | $216,501.30 |
| Selbovitz | $234,109.00 | $105,349.05 | $128,759.95 |
| Kirk | $305,029.00 | $137,263.05 | $167,765.95 |
| Butera | $226,857.00 | $102, 085.65 | $124,771.35 |
| **TOTAL** | **$1,006,552.00** | **$368,753.45** | **$637,798.55** |

**PUNITIVE DAMAGES**

| PLAINTIFF | TOTAL PUNITIVE DAMAGE | NINETEENTH STREET | STREAMLINE |
|---|---|---|---|
| Auger | $590,000,00 | $0 | $590,000,00 |
| Selbovitz | $550,000.00 | $0 | $550,000.00 |
| Kirk | $525,000.00 | $0 | $525,000.00 |
| Butera | $515,000.00 | $15,450.00 | $499,550.00 |

*See* **Ex. 14,** Jury verdicts, Kirk, Butera, Auger, and Selbovitz.

58.	The jury did not rule on Plaintiffs' UTPCPL claims.

59.	On October 31, 2024 the Court awarded the following amounts in connection with the

UTPCPL claims in each of the Lawsuits:

*Butera*

Compensatory damages:
- 19th Street: $102,085.65
- Streamline: $124,771.35

Fees and Costs:
- 19th Street: $55,176.02

---

[2] Evanston petitioned to intervene for the sole purpose of submitting special jury interrogatories that would allow the jury to separate potentially covered damages from damages that are more clearly excluded from coverage under the Policy.  The petition was denied by the Court on June 8, 2023.

Case ID: 190901353

- Streamline: $55,176.01

*Kirk*

Compensatory damages:
- 19th Street: $137,263.05
- Streamline: $167,765.95

Fees and Costs:
- 19th Street: $52,850.97
- Streamline: $52,850.98

*Auger*

Compensatory damages:
- 19th Street: $24,055.70
- Streamline: $216,501.30

Fees and Costs:
- 19th Street: $53,637.63
- Streamline: $53,637.63

*Selbovitz*

Compensatory damages:
- 19th Street: $105,349.05
- Streamline:$128,759.95

Fees and Costs
- 19th Street:$53,592.55
- Streamline: $53,592.54

*See* **Ex. 15**, Oct. 31, 2024.

60. As related to the compensatory damages awarded for UTPCPL violations, the Court specified that "[b]ecause these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here for each of the four Plaintiffs." *Id.*

61. A praecipe to enter judgments in the Lawsuits was filed by Plaintiffs on November 22, 2025.

- 23 -

Case ID: 190901353

<u>**THE EVANSTON POLICIES**</u>[3]

62.     Evanston issued a primary Commercial General Liability (CGL) policy to first named insured "Lion Construction, LLC DBA Streamline Solutions, LLC, 1508-22 Masher Street LLC" policy number 3C42330 in effect between November 1, 2017 to November 1, 2018 ("2017-2018 Evanston Primary Policy"). A true and correct copy of this policy is attached as **Exhibit 16.**

63.     Evanston also issued a primary CGL policy to first named insured "Lion Construction Management, LLC," policy number MKLV7PBC000002 in effect between November 1, 2018 to November 1, 2019 ("2018-2019 Evanston Primary Policy").  A true and correct copy of this policy is attached as **Exhibit 17.**

64.     Evanston issued four excess policies that were in effect between November 1, 2016 to November 2020, as follows (collectively, "2016-2020 Evanston Excess Policies"):

a.  Policy number MKLVIEULI00396 issued to "Lion Construction, LLC/Streamline Solutions LLC," in effect between November 1, 2016 to November 1, 2017 ("2016-2017 Evanston Excess Policy"). A true and correct copy of this policy is attached as **Exhibit 18.**

b.  Policy number MKLV1EUL101129 issued to "Lion Construction, LLC,"[4] for the policy period November 1, 2017 to November 1, 2018 ("2017-2018 Evanston Excess Policy"). A true and correct copy of this policy is attached as **Exhibit 19**.

---

[3] All of the policies discussed in this subsection are collectively referred to as the "Evanston Policies."

[4] This policy and the remaining excess policies provide that you are an insured if you qualify as an insured under the "underlying insurance."

Case ID: 190901353

c. Policy number MKLV7EUL100475 issued to "Lion Construction, LLC," for the policy period November 1, 2018 to November 1, 2019 (the "2018-2019 Evanston Excess Policy"). A true and correct copy of this policy is attached as **Exhibit 20.**

d. Policy number MKLV7EUL101098 issued to Lion Construction Management, LLC, for the policy period November 1, 2019 to November 1, 2020 ("2019-2020 Evanston Excess Policy"). A true and correct copy of this policy is attached as **Exhibit 21**.

**1. THE EVANSTON PRIMARY POLICY**

65. The Insuring Agreement of the 2017-2018 Evanston Primary Policy[5]:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

\*\*\*

---

[5] The following language quotes excerpts from the 2017-2018 Evanston Primary Policy under which Evanston provided a defense to Streamline and Nineteenth Street in the Lawsuits. The cited language from the 2017-2018 Evanston Primary Policy is virtually identical to that of the 2018-2019 Evanston Primary Policy, unless otherwise noted. Evanston does not understand the 2018-2019 Evanston Primary Policy to be at issue. However, Evanston's coverage position and related reservation of rights apply to the 2018-2019 as well unless otherwise stated.

Case ID: 190901353

b. This insurance applies to "bodily injury" and "property damage" only if:

*** 

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

*See* Ex. 16.[6]

66. The 2017-2018 Evanston Primary Policy specifically excludes coverage for contractual liability, such as for breach of contract and breach of express or implied warranties.

67. The 2017-2018 Evanston Primary Policy also excludes from coverage claims for "Damage to Property" that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

68. The 2017-2018 Evanston Primary Policy also excludes from coverage claims for Damage to "Your Product" arising out of it or any part of it.

---

[6] The Evanston Policies are subject to a per occurrence deductible as noted in the endorsement titled "Deductible Endorsement", MEGL 0048 03 13.

- 26 -

Case ID: 190901353

69. The 2017-2018 Evanston Primary Policy also excludes from coverage claims for Damage to "Your Work" arising out of it or any part of it and included in the "products-completed operations hazard."

70. The 2017-2018 Evanston Primary Policy also excludes from coverage claims for Damage to Impaired Property or Property Not Physically Injured. This Exclusion provides in part that the insurance does not apply to:

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

(1) A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

71. The 2017-2018 Evanston Primary Policy also provides that this insurance does not apply to:

Organic Pathogens

(1) "Bodily injury", "property damage" [], including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth including, but not limited to:

(a) Actual, alleged or threatened inhalation of, ingestion of, contact with exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from "fungi", bacteria, organic pathogens or bio-organic growth;

(b) Systemic chemical poisoning from "fungi", bacteria, organic pathogens or bio-organic growth; and

(c) Warnings, instructions, recommendations or advice given, or which should have been given, regarding

- 27 -

Case ID: 190901353

"fungi", bacteria, organic pathogens or bio-organic growth.

Paragraph (a) applies regardless of the source or location of the "fungi" bacteria, organic pathogens or bio-organic growth.

(2) Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi", bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.

As used in this endorsement, "fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.

72. The 2017-2018 Evanston Primary Policy includes an endorsement titled *Exclusion - Exterior Insulation and Finish System"* which bars coverage for "property damage" "arising out of, caused by, or attributable to" whether in whole or in part," to:

1. The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

The Endorsement defines "Exterior insulation and finish system" as:

…non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

- 28 -

Case ID: 190901353

1.      A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

2.      The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

3.      A reinforced or unreinforced base coat;

4.      A finish coat providing surface texture to which color may be added; and

5.      Any flashing, caulking or sealant used with the system for any purpose.

73.    The 2017-2018 Evanston Primary Policy further excludes coverage for "property damage" that "[f]irst occurred, first began to occur, or is alleged to have first occurred…prior to the effective date of this policy" in an endorsement titled "Exclusion – continued or progressive injury or damage."

74.    The 2017-2018 Evanston Primary Policy also does not provide coverage for punitive, exemplary, multiplied or other non-compensatory damages, including fines, penalties or sanctions imposed by law.

75.    The 2017-2018 Evanston Primary Policy limits coverage available to Additional Insureds in an endorsement titled "Additional Insured- Owners, Lessees, or Contractors – Scheduled Person or Organization" stating:

> This endorsement modifies insurance provided under the following:
> Commercial General Liability Coverage Part:
>
> * * *
>
> A. Section II- Who is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", or "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> 1.    Your acts or omissions; or
>
> 2.    The acts or omissions of those acting on your behalf;

- 29 -

Case ID: 190901353

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1.      The insurance afforded to such additional insured only applies to the extent permitted by law; and

2.      If coverage provided to the additional insured is required by a contract of agreement, the insurance afforded to such additional insured will not be broader than that which you are required by contract or agreement to provide for such additional insured.

B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1.      All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed;

or

2.      That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

* * *

2.      **THE EVANSTON EXCESS POLICIES**

76.     The Insuring Agreement for the 2016-2020 Evanston Excess provides that:

1.      We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

***

4.      We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such

- 30 -

Case ID: 190901353

claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend ends when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

\*\*\*

76. The 2016-2020 Evanston Excess Policies also provide coverage is subject "to the same terms, conditions, agreements, exclusions, and definitions as the 'underlying insurance'" except "[w]ith respect to any provisions to the contrary contained in this policy."

77. As such, each of the 2016-2020 Evanston Excess Policies incorporates by reference the terms of the "underlying insurance" unless contrary to the provisions included in that excess policy.

78. As to exclusions, the 2016-2020 Evanston Excess Policies expressly state that "The exclusions applicable to the 'underlying insurance' also apply to this policy."

79. The 2016-2020 Evanston Excess Policies also contain additional similar business risk exclusions, Fungi or Bacterial, EIFS Exclusions and punitive damages exclusions as those contained in the 2017-2019 Evanston Primary Policies, which apply to limit or fully preclude coverage.

80. The term "underlying insurance" is defined by the 2016-2020 Evanston Excess Policies to mean:

> [T]he policies or self-insurance shown in the Schedule Of Underlying Insurance, any replacements thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued replacements of policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.

81. The 2016-2020 Excess Policies also exclude damages to "Exterior Insulation and Finish System" and provides:

- 31 -

Case ID: 190901353

This policy does not apply to:

**Exterior Insulation And Finish System**

Any liability included in the "products-completed operations hazard" and arising out of:

a. The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:

(1) An "exterior insulation and finish system" or any part thereof; or
(2) Any substantially similar system or any part thereof, Including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system.

b. Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.

B. The following is added to the Definition section:

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

a. A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;
b. The adhesive and or mechanical fasteners used to attach the insulation board to the substrate;
c. A reinforced base coat;
d. A finish coat providing surface texture and color; or
e. Any flashing, caulking or sealant used with the system for any purpose.

82. The 2016-2020 Excess Policies also provides that this insurance does not apply to:

**Fungi or Bacteria**

a. Any liability arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

Case ID: 190901353

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.

\* \* \*

B. The following is added to the Definitions section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

83. The 2016-2020 Excess Policies further excludes "Damage to Property" as stated below:

This policy does not apply to:

**Damage to Property**

Property damage to:

\* \* \*

e. Premises you sell, give away or abandon, if the property damage arises out of any part of those premises and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

84. The 2016-2020 Excess Policies also provides that this insurance does not apply to "Contractor's Services" as stated below:

This policy does not apply to:

Damage to Property

Property damage to:

\* \* \*

b. Property being installed or erected by or for any insured; or

c. That particular part of real property on which work is being performed by or for any insured.

Case ID: 190901353

85.     The 2016-2020 Excess Policies also excludes punitive or exemplary damages from coverage.

**EVANSTON DEFENDED STREAMLINE AND NINETEENTH STREET IN THE LAWSUITS SUBJECT TO FULL AND COMPLETE RESERVATIONS OF RIGHTS**

86.     Evanston provided a defense to Streamline and Nineteenth Street in the Lawsuits under the 2017-2018 Evanston Primary Policy, subject to a full reservation of rights.

87.     On July 14, 2020, Evanston issued a reservation of rights letter to Streamline.  ***See* Ex. 22**.

88.     On December 14, 2022, Evanston issued a letter to Streamline supplementing its reservation of rights.  **Ex. 23.**

89.     On December 14, 2022, Evanston also supplemented its reservation of rights to Nineteenth Street. **Ex. 24.**

90.     On August 10, 2023, Evanston issued a partial denial of coverage and supplemental reservation of rights in light of jury verdict to Streamline.  **Ex. 25.**

91.     On September 21, 2023, in response to personal counsel to Nineteenth Street's correspondence, Evanston issued a letter further supplementing its previously issued reservation of rights in light of the jury verdict.  **Ex. 26.**

92.      On February 15, 2024, Evanston issued a coverage position letter to Streamline disclaiming coverage for damages awarded by the jury based on information that came to light during trial that confirmed that the damages at issue first manifested in 2015, ***before*** any of the Evanston's policies periods.  In the letter, Evanston agreed to continue providing a defense pending decision on the remaining UTPCPL claim to be decided by the court, but reserved the right to deny coverage for those damages as well.  **Ex. 27.**

93.     Evanston sent a letter noting the same to Nineteenth Street on the same date.  **Ex. 28.**

Case ID: 190901353

94.     On February 24, 2025, Evanston issued a disclaimer of indemnity coverage position letter to Streamline, in light of the October 31, 2024 verdict issued by the Court and Praecipe to Enter Judgment in the Lawsuits filed on or around November 22, 2024. **Ex. 29.**

**95.**     On March 10, 2025, Evanston issued a disclaimer of indemnity coverage position letter to Nineteenth Street, in light of the October 31, 2024 verdict issued by the court and praecipe to enter judgment in the Lawsuits filed on or around November 22, 2024. **Ex. 30.**

96.     Evanston has not been provided with any information that would trigger coverage under the Excess Policies or the 2018-2019 Evanston Primary Policy.

**NEW MATTER PURSUANT TO PA. R. CIV. P. 3145(b)(2) AS TO STREAMLINE (FIRST MANIFESTATION, NO OCCURRENCE, AND EXCLUSIONS)**

97.     Evanston realleges and incorporates by reference each of the foregoing paragraphs above as though fully set forth herein.

98.     Based on testimony provided by Plaintiffs at trial, "property damage" for which damages were awarded first manifested outside the 2017-2018 Evanston Primary Policy Period:

99.     According to the trial testimony provided by each of the Plaintiffs in the Lawsuits, damages first manifested in or before July 2015:

| PLAINTIFF | DATE DAMAGES FIRST MANIFESTED |
|---|---|
| Auger | May 2015 |
| Butera | June, 2015 |
| Kirk | July 2015 |
| Selbovitz | July 2015 |

100.     The earliest Primary Policy issued by Evanston to Streamline is for the period of November 1, 2017-November 1, 2018.

101.     There is no coverage for "property damage" that does not first manifest during the policy period of the 2017-2018 Evanston Primary Policy.

102.     The Jury Award did not find damages because of an "occurrence" against Streamline

Case ID: 190901353

under the terms of the 2017-2018 Evanston Primary Policy.

103. Streamline was found liable for breach of contract, breach of express and implied warranties and violations of the UTPCPL.

104. Breach of contract, breach of express and implied warranties, and deceptive trade practices are not an "occurrence" under the 2017-2018 Evanston Primary Policy.

105. Faulty workmanship is not an "occurrence" under the 2017-2018 Evanston Primary Policy.

106. One or more exclusions set out in the 2017-2018 Evanston Primary Policy bars or limits coverage for the damages awarded.

107. To the extent that the damages awarded were for correction or repair of water infiltration that caused mold, the 2017-2018 Evanston Primary Policy excludes from coverage "property damage" in any way involving "fungi," bacteria, organic pathogens or bio-organic growth.

108. To the extent damages awarded arose out of or were caused by exterior insulation or the faulty construction of the exterior envelope of the homes, those damages are further excluded by the Exclusion - Exterior Insulation and Finish System Endorsement.

109. There is no coverage for "property damage" that "[f]irst occurred, first began to occur, or is alleged to have first occurred" prior to the effective date of the 2017-2018 Evanston Primary Policy.

110. There is no coverage under the 2017-2018 Evanston Primary Policy for "'property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."

111. There is no coverage for damage to Streamline's work or product.

112. As alleged in the Lawsuits, Streamline was involved in the construction of the homes,

Case ID: 190901353

accordingly the homes were Streamline's work.

113. There is no coverage under the 2017-2018 Evanston Primary Policy for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

114. Evanston's defense of Streamline in the Lawsuits was provided under a full reservation of rights, including the right to deny indemnification for any or all of the award entered that was not covered under the terms of the Evanston Policies.

115. The 2018-2019 Evanston Primary Policy does not provide coverage for damages awarded because the "property damage" for which damages were awarded first manifested in 2015. Even if the policy were found to apply, there would still be no coverage for the same reasons for which there is no coverage under the 2017-2018 Evanston Primary Policy.

116. The underlying insurance to the 2016-2020 Excess Policies did not defend the Lawsuits and there is no indication that the underlying insurance has exhausted to potentially trigger the 2016-2020 Excess Policies. Moreover, "property damage" for which damages were awarded also first manifested before the Excess Policy periods.

117. Additional exclusions under the 2016-2020 Excess Policy further bar coverage including exclusions barring damages for Exterior Insulation and Finish System, damages involving "fungi" or "Bacteria." The 2016-2020 Excess Policies also excludes coverage of damage to properties sold by Streamline to the extent damages arose from the premises and occurred from hazards known to Streamline at the time of the property transfer and recovery of damages for property being installed for Streamline.

118. Evanston has no obligation to indemnify Streamline under any of the Evanston Policies.

119. Evanston has no obligation to indemnify Streamline for the damages awarded in the

Case ID: 190901353

Lawsuits.

WHEREFORE, Garnishee, Evanston Insurance Company, respectfully requests that the Court dissolve the Writ of Execution against Evanston with prejudice, enter judgment in its favor, and award attorney's fees and costs as allowable by law.

**NEW MATTER PURSUANT TO PA. R. CIV. P. 3145(b)(2) AS TO NINETEENTH STREET
(FIRST MANIFESTATION, NO OCCURRENCE, AND EXCLUSIONS)**

119. Evanston realleges and incorporates by reference each of the foregoing paragraphs above as though fully set forth herein.

120. Based on testimony provided by Plaintiffs at trial, "property damage" for which damages were awarded first manifested outside the 2017-2018 Evanston Primary Policy Period:

121. According to the trial testimony provided by each of the Plaintiffs in the Lawsuits, damages first manifested in or before July 2015:

| PLAINTIFF | DATE DAMAGES FIRST MANIFESTED |
|---|---|
| Auger | May 2015 |
| Butera | June, 2015 |
| Kirk | July 2015 |
| Selbovitz | July 2015 |

122. The earliest CGL Policy issued by Evanston to Streamline is for the period of November 1, 2017-November 1, 2018.

123. There is no coverage for "property damage" that does not first manifest during the policy period of the 2017-2018 Evanston Primary Policy.

124. The Jury Award did not find damages because of an "occurrence" against Nineteenth Street under the terms of the 2017-2018 Evanston Primary Policy.

125. Nineteenth Street was found liable for breach of contract, breach of express, and implied warranties and violations of the UTPCPL.

126. Breach of contract, breach of express and implied warranties, and deceptive trade

Case ID: 190901353

practices are not an "occurrence" under the 2017-2018 Evanston Primary Policy.

127. Faulty workmanship is not an "occurrence" under the 2017-2018 Evanston Primary Policy.

128. One or more exclusions set out in the 2017-2018 Evanston Primary Policy bars or limits coverage for the damages awarded.

129. To the extent that the damages awarded were for correction or repair of water infiltration that caused mold, the 2017-2018 Evanston Primary Policy excludes from coverage "property damage" in any way involving "fungi," bacteria, organic pathogens or bio-organic growth.

130. To the extent damages awarded arose out of or were caused by exterior insulation or the faulty construction of the exterior envelope of the homes, those damages are further excluded by the Exclusion - Exterior Insulation and Finish System Endorsement.

131. There is no coverage for "property damage" that "[f]irst occurred, first began to occur, or is alleged to have first occurred prior to the effective date of the 2017-2018 Evanston Primary Policy.

132. There is no coverage under the 2017-2018 Evanston Primary Policy for "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."

133. There is no coverage for damage to Nineteenth Street's work or product.

134. As alleged in the Lawsuits, Nineteenth Street was involved in the construction of the Homes, accordingly the Homes were Nineteenth Street's work.

135. There is no coverage under the 2017-2018 Evanston Primary Policy for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

Case ID: 190901353

136. Evanston denies coverage for damages awarded to the extent coverage available to Nineteenth Street is further limited by the terms of the Additional Insured – owners, Lessees or Contractors – Scheduled Persons or Organizations Endorsement.

137. Evanston's defense of Nineteenth Street in the Lawsuits was provided under a full reservation of rights, including the right to deny indemnification for any or all of the award entered that was not covered under the terms of the Evanston Policies.

138. The 2018-2019 Evanston Primary Policy does not provide coverage for damages awarded because the "property damage" for which damages were awarded first manifested in 2015. Even if the policy were found to apply, there would still be no coverage for the same reasons for which there is no coverage under the 2017-2018 Evanston Primary Policy.

139. The underlying insurance to the 2016-2020 Excess Policies did not defend the Lawsuits and there is no indication that the underlying insurance has exhausted to potentially trigger the 2016-2020 Excess Policies. Moreover, "property damage" for which damages were awarded also first manifested before the Excess Policy periods.

140. Additional exclusions under the 2016-2020 Excess Policy further bar coverage including exclusions barring damages for Exterior Insulation and Finish System, damages involving "fungi" or "Bacteria." The 2016-2020 Excess Policies also excludes coverage of damage to properties sold by the Insured to the extent damages arose from the premises and occurred from hazards known to the Insured at the time of the property transfer and recovery of damages for property being installed for Insured.

141. Evanston has no obligation to indemnify Nineteenth Street under any of the Evanston Policies.

142. Evanston has no obligation to indemnify Nineteenth Street for the damages

Case ID: 190901353

awarded in the Lawsuits.

WHEREFORE, Garnishee, Evanston Insurance Company, respectfully requests that the Court dissolve the Writ of Execution against Evanston with prejudice, enter judgment in its favor, and award attorney's fees and costs as allowable by law.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

*/s/ Edward M. Koch*

BY:   Edward M. Koch, Esquire
Laura Rossi, Esquire
Pa. Id. Nos. 76337/322763
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103
215-864-6319/6366
*Attorneys for Garnishee,*
*Evanston Insurance Company*

Dated:  March 11, 2025

Case ID: 190901353

**<u>VERIFICATION</u>**

The undersigned, Belinda Skeen, is employed as a claims manager by Markel Service, Incorporated, claim service manager for Evanston Insurance Company ("Evanston"), and in that capacity is authorized to make this verification on behalf of Evanston.  The undersigned verifies that the facts set forth in the foregoing Answer of Evanston Insurance Company to Interrogatories to Garnishee are true and correct to the best of her knowledge, information, and belief.

The undersigned makes this verification subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

*/s/Belinda Skeen*

Belinda Skeen

Dated: March 11, 2025

# CERTIFICATE OF SERVICE

I, Laura Rossi, Esquire, certify that I served a true and correct copy of the foregoing, Answer and New Matter of Evanston Insurance Company To Interrogatories To Garnishee, on this date, upon all attorneys of record via the court's electronic filing system, and via certified mail, per Pa. R. Civ. P. 3140, to the following:

Streamline Solutions, LLC
Attn: Michael Stillwell
1100 N. Delaware Ave. REAR
Philadelphia, PA 19125

Nineteenth Street Development, LLC
Attn: Sean Frankel
888 Redwing Lane
Huntington Valley, PA 19006

*/s/ Laura Rossi*
Laura Rossi, Esq.

Date:  March 11, 2025



*Filed and Attested by the*
*Office of Judicial Records*
*11 MAR 2025 04:47 pm*
*G. SMITH*

# EXHIBIT 1

Case ID: 190901353

**HORN WILLIAMSON LLC**

Jennifer M. Horn, Esquire
Matthew H, Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com


*Filed and Attested by the
Office of Judicial Records
11 SEP 2019 01:43 pm
A. SILIGRINI*

*Attorneys for Plaintiff*

_____

| | |
|---|---|
| NICKOLAS AUGER : | **COURT OF COMMON PLEAS** |
| 1367 Crease Street : | **PHILADELPHIA COUNTY** |
| Philadelphia, PA 19125 : | |
| : | |
| Plaintiffs : | **CIVIL ACTION** |
| : | |
| : | **SEPTEMBER 2019 TERM** |
| v. : | |
| : | **No.** |
| STREAMLINE SOLUTIONS, LLC : | |
| 1241 N. Fifth Street, First Floor : | |
| Philadelphia, PA 19122 : | |
| : | |
| and : | |
| : | |
| NINETEENTH STREET : | |
| DEVELOPMENT, LLC : | |
| 888 Red Wing Lane : | |
| Huntingdon Valley, PA 19006 : | |
| : | |
| and : | |
| : | |
| HARMAN DEUTSCH CORP. : | |
| 631 N. 12ᵗʰ Street : | |
| Philadelphia, PA 19123 : | |
| : | |
| Defendants : | |

_____

### NOTICE TO DEFEND

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objection to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the

complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFOR TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSON AT A REDUCED FEE OR NO FEE.**

<div align="center">

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

</div>

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H, Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com                    *Attorneys for Plaintiff*

_____

| | | |
|---|---|---|
| **NICKOLAS AUGER** | : | **COURT OF COMMON PLEAS** |
| **1367 Crease Street** | : | **PHILADELPHIA COUNTY** |
| **Philadelphia, PA 19125** | : | |
| | : | |
| **Plaintiffs** | : | **CIVIL ACTION** |
| | : | |
| | : | **SEPTEMBER 2019 TERM** |
| **v.** | : | |
| | : | **No.** |
| **STREAMLINE SOLUTIONS, LLC** | : | |
| **1241 N. Fifth Street, First Floor** | : | |
| **Philadelphia, PA 19122** | : | |
| | : | |
| **and** | : | |
| | : | |
| **NINETEENTH STREET** | : | |
| **DEVELOPMENT, LLC** | : | |
| **888 Red Wing Lane** | : | |
| **Huntingdon Valley, PA 19006** | : | |
| | : | |
| **and** | : | |
| | : | |
| **HARMAN DEUTSCH CORP.** | : | |
| **631 N. 12th Street** | : | |
| **Philadelphia, PA 19123** | : | |
| | : | |
| **Defendants** | : | |

_____

Usted ha sido demandado en la corte. Si desea defenderse de las reclamaciones establecidas en las páginas siguientes, usted debe actuar dentro de los veinte 20 días después de esta denuncia y sirve aviso, entrando en un aspecto escrito personalmente o por abogado y presentar por escrito ante el Tribunal sus defensas u objeción a las pretensiones establecidas contra usted. Se le advertirá que si no lo hace el caso puede proceder sin usted y un juicio puede ser en su contra por el tribunal sin más notificación reclamados en la demanda de dinero o de cualquier otra reclamación o ayuda solicitados por el demandante. Puede perder el dinero o la propiedad u otros derechos importantes a usted. USTED DEBE

Case ID: 190901353

**TOMAR ESTE DOCUMENTO A SU ABOGADO A LA VEZ. SI NO TIENES UN ABOGADO, IR A O POR TELÉFONO AL SIGUIENTE. ESTA OFICINA PUEDE PROVEER INFORMACIÓN SOBRE LA CONTRATACIÓN DE UN ABOGADO. SI USTED NO PUEDE ELLO PARA CONTRATAR A UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN LE.**

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com          *Attorneys for Plaintiff*

| | | |
|---|---|---|
| **NICKOLAS AUGER,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO.** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

### COMPLAINT

Plaintiff, by and through attorneys, Horn Williamson LLC, hereby files this Complaint, and avers as follows:

### Parties and Venue

1.      Plaintiff Nickolas Auger ("Auger") owns and resides in a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 (the "Auger Home" or "Home").

2.      Upon information and belief, Defendant Nineteenth Street Development LLC ("Nineteenth Street") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of residential homes whose principal place of business is located at 888 Red Wing Lane, Huntingdon Valley, PA 19006.

3.      Upon information and belief, Defendant Streamline Solutions, LLC ("Streamline") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of

<div align="center">3</div>

Case ID: 190901353

residential homes, whose principal place of business is located at 1241 North 5th Street, First Floor, Philadelphia, Pennsylvania 19122.

4. Defendants Nineteenth Street and Streamline are hereinafter collectively referred to as the "Builder Entities" or "Builder Defendants."

5. Upon information and belief, Defendant Harman Deutsch Corp. ("Harman") is a professional corporation performing architectural and/or design services whose principal place of business was located at 631 North 12th Street, Philadelphia, Pennsylvania 19123.

**FACTUAL BACKGROUND**

6. Plaintiff is the owner of one unit in a connected town home development having an address: 1367 Crease Street, Philadelphia, Pennsylvania 19125.

7. Upon information and belief, Nineteenth Street and Streamline developed the property on which the Auger Home is situated.

8. Upon information and belief, Nineteenth Street and Streamline advertised, marketed, constructed, and warranted the Auger Home.

9. It is believed and therefore averred that Nineteenth Street sold the Auger Home to Plaintiff.

10. It is believed and therefore averred that Streamline is a partner and/or subsidiary and/or affiliate of Nineteenth Street.

11. It is believed and therefore averred, at all times relevant hereto, that with respect to the Auger Home, Nineteenth Street and Streamline acted together for the purpose of purchasing land, obtaining zoning approvals, installing improvements and infrastructure, marketing, advertising, developing, constructing, obtaining city approval of the construction, selling, and warrantying homes, including the Auger Home.

4

Case ID: 190901353

12. It is believed and therefore averred that, at all times relevant hereto, Harman prepared architectural plans and design drawings, and performed other design and/or supervisory functions in connection with the design and construction of homes including the Auger Home.

13. In or about May 2015 Plaintiff purchased the Home that was marketed, designed, built, and sold by the Builder Entities in or about 2014 to 2015 as new-construction homes.

14. Upon information and belief, the Auger Home was built when the International Residential Building Code 2009 ("2009 IRC") or later building codes were in effect and the Builder Entities and its subcontractors were legally required to comply with the applicable 2009 IRC or later building codes when designing, constructing, developing, and furnishing the Auger Home.

15. The 2009 IRC building code specifically mandated that homes be built with a weather resistant barrier.

16. Prior to buying the Auger Home, Plaintiff reviewed and relied upon marketing materials and representations about the Home's unique and desirable features and quality of construction.

17. The Builder Entities' marketing materials induced the Plaintiff to believe the Builder Entities constructed an extremely high-quality home, constructed of the finest quality building products, and with the highest level of workmanship.

18. Believing the marketing literature and representations provided and made by the Builder Entities, and induced by and relying upon same, Plaintiff entered into an Agreement of Sale to purchase the Auger Home directly with Nineteenth Street to purchase the newly constructed home.

5

Case ID: 190901353

19. Streamline executed and provided the Plaintiff, a Builder's Warranty (the "Warranty" or the "Warranty Program"). A true and correct copy of the Warranty is attached hereto as Exhibit "A."

20. The Warranty's Introduction stated that Streamline Solutions would provide a home that would "be free of defects, will be of specified quality, and will perform properly for a period of one year." *See id.*

21. The Warranty also included a five-year roof warranty. *See id.*

22. Plaintiff reasonably relied upon this express warranty and all representations made by the Builder Entities with respect to the warranty as a material inducement for purchasing the Home.

23. Upon information and belief, at the time the Builder Entities entered into the Warranty Program and Agreement of Sale with the Plaintiff and/or predecessors in interest, the Builder Entities knowingly, intentionally, willfully, and/or recklessly engaging in, or could not have been unaware that they were engaging in defective, substandard, and unlawful construction practices in connection with the Auger Home.

24. The Builder Entities' actions (and willful inactions) violated applicable building codes and industry standards, such that it would be unconscionable, and contrary to the law and public policy of Pennsylvania, to enforce any waivers or limitations in the Warranty and/or Agreement of Sale which would operate in any way to prevent the Plaintiff from obtaining a full recovery for the damages suffered as a result of Defendants' actions, and being awarded a remedy in this action.

25. After closing on and moving into the Home, Plaintiff later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Home that led to

6

Case ID: 190901353

consequential damage to parts of the Home other than the exterior envelopes of the Home, as well as the interior contents of Home. However, Plaintiff was unable to see or understand the cause of the deterioration.

26. The Plaintiff hired certified building envelope inspectors to conduct stucco inspections and moisture analyses of the Home.

27. The stucco inspection and moisture analysis performed revealed that the Home experienced, and is currently experiencing, significant water intrusion issues and consequential damages caused by numerous construction deficiencies and defects.

28. The Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion and water damage, rot, and mold infestation.

29. Upon information and belief, the Builder Defendants knew, or should have known, that they were engaging in defective, substandard, and unlawful construction practices in connection with the Auger Home.

30. The full extent of damage to the Auger Home cannot be assessed unless more extensive destructive testing, or actual repair and remediation of the Home is performed.

31. The damage to the Home cannot be repaired without stripping the existing defective exterior envelopes and recladding all, or substantially all, portions of the Home.

32. The cost of remediating the defective construction and the cost of repair the consequential damages is in excess of $190,000.00.

33. Additional costs and damages suffered or to be suffered by the Plaintiff because of the aforementioned construction defects and consequential damage, include, but are not limited to:

    a. Alternative living expenses during remediation and repair;
    b. Damage to doors and windows;

Case ID: 190901353

c. Damage to interior framing and drywall;

d. Damage to window treatments, window sills, and interior painting;

e. Damage to landscaping, turf, driveways, sidewalks, patios and decks;

f. Interruption of use and enjoyment of the Home;

g. Permanent loss and diminution of value to the Home, even after successful remediation and repair, due to the existence of the kind of construction defects within the Development, decreasing the willingness of potential buyers to purchase the Home, and thus decreasing the marketability and market value of the Home; and

h. Such other costs and damages that may be incurred during remediation and repair of construction defects and damages that cannot be fully known until the project is underway.

34. The Builder Defendants, through their representatives, employees, and/or agents, have:

a. Represented that goods or services have characteristics, uses, and/or benefits that they do not have;

b. Represented that goods or services are of a particular standard, quality, or grade when they are of another;

c. Failed to comply with the terms of a written agreement or warranty given to the Plaintiff, prior to or after a contract for the purchase of the Home; and/or

d. Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

35. The Builder Defendants failed to comply with the terms of written Agreement of Sale and express warranties given to the Plaintiff, prior to and/or after entering into a contract for the purchase of the Home.

Case ID: 190901353

36. Plaintiff subsequently retained counsel to seek relief against the Builder Defendants for the damage to the Home caused by the Defendants' defective, substandard, and unlawful construction of the Home.

37. Through counsel, the Plaintiff requested the Builder Defendants cure their construction defects on or about November 9, 2018. A true and correct copy of the Plaintiff's Notice to Cure is attached hereto as Exhibit "B."

38. In spite of contractual obligations, and in violation of implied warranties of workmanship and habitability, and in breach of the Builder Defendants' duty of care, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiff's Notice to Cure, offer to remediate the Home, or offer to pay the Plaintiff the cost of repairing the Home.

39. The negligence or intentional malfeasance of the Builder Defendants and/or their subcontractors, in constructing certain components or elements of the Home, has been the proximate cause of consequential damage to other parts of the Home, such as:

    a. Negligently (or intentionally/recklessly improperly) installed windows, doors, and other fenestrations have allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

    b. Negligently (or intentionally/recklessly improperly) installed window and door flashing has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home;

    c. Negligently (or intentionally/recklessly improperly) installed roofing systems, including roof flashing, has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

<div align="center">9</div>

Case ID: 190901353

d. Negligently (or intentionally/recklessly improperly) installed gutter and downspout systems that are inadequate and insufficient to contain and divert water away from the exterior walls of the Home;

e. Negligently (or intentionally/recklessly improperly) installed weather barrier has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

f. Negligently (or intentionally/recklessly improperly) installed lath has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

g. Negligently (or intentionally/recklessly improperly) installed stucco has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

h. Negligently (or intentionally/recklessly improperly) installed brick has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home; and

i. Negligently inspected (or uninspected) workmanship of the Home, both during and after construction, has caused a defectively manufactured and leak-prone home to be delivered to the Plaintiff.

**FACTS COMMON TO CLAIMS AGAINST HARMAN**

40. Upon information and belief, Harman was the architect/designer that designed the Auger Home.

41. Upon information and belief, Harman prepared and stamped architectural design drawings for the Auger Home.

Case ID: 190901353

42. Upon information and belief, the Builder Defendants entered into a written contract with Harman (the "Harman Design Contract") to serve as a design professional and/or architect for several homes including the Auger Home, and to provide design documents for construction of the Home. The Plaintiff was not in privity of contract with Harman and is not in possession of the Harman Design Contract. Plaintiff expects to obtain true and correct copies of the Harman Design Contract during the discovery phase of this litigation.

43. Upon information and belief, the Harman Design Contract established a professional relationship between the Builder Defendants and Harman, who designed the Auger Home.

44. Upon information and belief, in accordance with the Harman Design Contract, Harman prepared design plans to be used for obtaining the necessary permits and for constructing the Auger Home.

45. Upon information and belief, Harman knew that the design plans and specifications prepared pursuant to the Harman Design Contract were intended to be used to construct the Auger Home, for the direct and intended benefit of the future occupants of the Home.

46. Upon information and belief, Harman supplied design plans, specifications, and information necessary to construct the Auger Home.

47. The Builder Defendants promised that the Auger Home was or would be designed and constructed in compliance with, and pursuant to, industry standards and applicable codes and regulations, and free from defects.

48. Harman owed a duty to the public, and particularly, to the future purchasers and residents of the Home, to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

11

Case ID: 190901353

49. Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public . . . or other individual who may be affected by the professional work for which [the Architect] is responsible." *See* 49 Pa. ADC § 9.151(1)-(3).

50. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See id.*

51. By submitting the design plans and specifications to the Builder Defendants to be used in the construction of the Home, Harman represented that the information they supplied would permit the Builder Defendants to construct the Auger Home in accordance with all relevant building laws and regulations.

52. Harman represented that the information they supplied pursuant to the design plans and specifications for the construction of the Auger Home, if followed during the course of construction, would result in residential structures that were habitable and free from water and moisture infiltration.

53. Ultimately, the information, *vis a vis* the design plans and specifications and other information provided by Harman, was false, defective, and deficient.

54. Harman's provision of deficient and defective design plans and specifications constituted a breach of the Harman Design Contract.

55. Harman further breached the standard of care required of professional architects in the Commonwealth of Pennsylvania.

56. Harman's false, deficient, and defective design plans and specifications resulted in the construction of defective exterior envelopes and stucco systems, and caused significant water

12

Case ID: 190901353

and moisture infiltration into the Auger Home, thereby causing significant and serious damage requiring remediation and repair.

## FACTS RELATING TO THE AUGER HOME

57. On or about April 30, 2015, Nickolas Auger and Nineteenth Street entered into an Agreement of Sale (the "Auger Sales Agreement"), whereby Nineteenth Street agreed to sell him a Home located at 1367 Crease Street, Philadelphia, Pennsylvania (the "Auger Home"), which was properly designed and constructed, in compliance with and pursuant to industry standards and applicable codes and regulations, and free from defects. A true and correct copy of the Auger Sales Agreement is attached hereto as Exhibit "C."

58. A Certificate of Occupancy on the Auger Home was issued by the City of Philadelphia on or about May 29, 2015 (the "Auger CoO"). A true and correct copy of the Auger Certificate of Occupancy is attached hereto as Exhibit "D."

59. On or about May 29, 2015, Auger took possession of his Home and Nineteenth Street provided Auger with an executed deed to the Auger Home (the "Auger Deed"). A true and correct copy of the Auger Deed is attached hereto as Exhibit "E."

60. When deciding to purchase his new Home, Auger was interested in purchasing a new construction, high-end, quality home in the Fishtown section of Philadelphia.

61. Auger looked for homes for over a month.

62. Auger chose the Home because it was new construction, which meant that it would be well-built and unlikely to suffer from issues typically experienced in older homes,

63. Auger toured the Home in or around May 2015 and submitted his Agreement of Sale.

13

Case ID: 190901353

64. As construction was being completed on the Home on or around May of 2015, Auger toured the Home with a principal of Streamline, who advised that Streamline "builds houses right" and that the construction "will be completed correctly."

65. Based on the advertisements and representations, Auger believed that the Builder Defendants stood behind their homes' quality and would remain available to address any concerns Auger may have regarding the Home.

66. Auger's confidence was bolstered by the knowledge of the Warranty, which as a first-time homebuyer, gave him peace of mind.

67. In reliance on the contents of marketing materials, the Warranty, and the representations made by the Builder Defendants' representatives and/or agents regarding the quality, construction, warranty, and customer service, Auger finalized his decision and ultimately purchased and took possession of the Home on or about May 29, 2015.

68. Years later, because of the issues similarly situated neighbors were experiencing, Auger hired Lunny Building Diagnostics ("Lunny") to perform a Building Moisture Survey of the Home on September 15, 2018. A true and correct copy of the Lunny Building Moisture Survey (the "Lunny Moisture Survey") is attached hereto as Exhibit "F."

69. Lunny preliminarily found the following construction defects with respect to the Auger Home, including but not limited to:

    a. Poor detail/flashing between stucco and brick;
    b. Stucco thickness of ½", less than the required 7/8" thickness;
    c. Incorrect window flange configuration on all windows;
    d. No visible through-wall flashing in brick;
    e. Vents not flashed or sealed;
    f. Missing kickout diverter on the roof;
    g. Improper flashing at intersection of stucco and rooftop deck;

Case ID: 190901353

h. Backer rod and sealant missing around doors;

i. Improperly flashed light fixtures;

j. Lack of movement joints;

k. Missing weep screed;

l. Missing flashing at dissimilar materials; and

m. Missing flashing around windows.

*See id.*

70. Lunny found preliminary evidence of the following damage to the Auger Home as a direct and proximate result of the above-referenced construction defects, which include, but are not limited to:

a. Elevated moisture readings;

b. Interior moisture penetration/staining;

c. Bulging of exterior cladding;

d. Cracks in the cladding;

e. Surface staining; and

f. Potential mold growth.

*See id.*

71. The Lunny Moisture Survey specifically noted that, pursuant to industry standards, and minimum Building Code requirements, the proper stucco thickness should be approximately 7/8 of an inch. According to Lunny, the stucco thickness observed was a maximum of ½ inch in some areas, indicating that the stucco thickness of the Auger Home fell far below the proper thickness of 7/8 of an inch.

72. Lunny determined that "elevated moisture readings were recorded throughout the system. Multiple installation deficiencies exist with the stucco system, windows, door and system penetrations." *Id.* at p. 17.

Case ID: 190901353

73. Lunny thus determined that "based on the number of installation deficiencies and Building Code violations full remediation of the exterior cladding system is recommended for this home at this time" *See id.*

74. Auger has not performed repairs to the stucco or building envelope on his Home.

75. Auger subsequently retained counsel to seek relief against the Builder Defendants.

76. Through counsel, Auger notified the Builder Defendants of the defects and damage to his Home. *See* Ex. B.

77. Auger anticipates that to fully remediate his home, it will cost in excess of $190,000.00.

78. Auger has satisfied all conditions precedent to filing this action.

**COUNT I**
**BREACH OF CONTRACT**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

79. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

80. The Plaintiff purchased the Home pursuant to an Agreement of Sale, whereby the Builder Defendants agreed to sell the Auger Home that was properly constructed in a reasonably workmanlike manner, free of construction defects, and that were habitable, in compliance with industry standards and local building code requirements, and inspected by the Builder Defendants' trained personnel prior to delivery.

81. The Auger Home, in fact, was not properly designed or constructed in compliance with industry standards or local building code requirements and, upon information and belief, were

Case ID: 190901353

not properly inspected by the Builder Defendants' trained personnel prior to delivery. Nor is the Home habitable, free of construction defects, and/or built in a reasonably workmanlike manner.

82. Nineteenth Street has materially breached the Plaintiff's Agreement of Sale.

83. As a direct and proximate result of the Builder Defendants' material breach of the Agreement of Sale, the Plaintiff incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in excess of $190,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

84. To the extent that the Plaintiff's Agreement of Sale was entered into by and between the Plaintiff and Nineteenth Street, and not directly with Streamline, Streamline is properly named as Defendants in connection with the cause of action in Count I, and should be held jointly and severally liable with Nineteenth Street because they acted as a common business enterprises and/or single entity in all aspects of their business

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Nineteenth Street and Streamline for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $190,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

<div align="center">

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**PLAINTIFF**
**v.**
**STREAMLINE**

</div>

85. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

Case ID: 190901353

86. The Builder's Warranty contained an express warranty from Streamline to the Plaintiff.

87. The Plaintiff reasonably relied upon the express representations and certifications of Streamline by:

 a. Entering into Agreement of Sale to purchase the Home;
 b. Giving money to the Builder Defendants and obtaining mortgage loan(s) to purchase the Home; and
 c. Moving belongings into the Home, buying furniture and making other improvements to the Home.

88. The certifications and representations made by Streamline in the Builder's Warranty constituted express warranties that the Auger Home had been built in compliance with the applicable building codes, and that the Home was habitable and built in a good, workmanlike manner and inspected by Streamline's trained personnel prior to delivery.

89. The Plaintiff reasonably relied upon the express warranties and representations made by Streamline in the Builder's Warranty as a material inducement for purchasing the Home.

90. Streamline materially breached the express warranty extended to the Plaintiff in the Builder's Warranties by failing to build the Home in strict compliance with the applicable building codes, failing to build the Home in a habitable, good, and workmanlike manner, and failing to have the Home inspected by Streamline's trained personnel prior to delivery.

91. The express warranty contained the following language: "Streamline Solutions pledges to the owner…that all material, workmanship, and/or building improvements provided for in the course of their building project will be free of defects, will be of specified quality, and will perform properly for a period of one year."

Case ID: 190901353

92. Any purported limitations in the express warranty is rendered null and void by Streamline's failure to construct the Auger Home in accordance with applicable building codes.

93. As a direct and proximate result of Streamline's material breach of the express warranty, the Plaintiff has incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $190,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Streamline, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $190,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

## COUNT III
## BREACH OF THE IMPLIED WARRANTY OF WORKMANLIKE CONSTRUCTION
### PLAINTIFF
### v.
### NINETEENTH STREET AND STREAMLINE

94. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

95. The Auger Home, built and sold by the Builder Defendants, contained, as a matter of law, an implied warranty that the Home, which the Builder Defendants marketed, developed, constructed, and sold, would be built in a reasonably workmanlike manner and free of construction defects.

96. The Plaintiff reasonably and justifiably relied upon this implied warranty.

Case ID: 190901353

97. The Builder Defendants knew that the Plaintiff would reasonably and justifiably rely upon this implied warranty.

98. The Builder Defendants failed to supervise construction of the Auger Home and/or failed to construct the Home in a workmanlike manner.

99. The Home, as built and sold by the Builder Defendants, exhibits construction defects that allow water to infiltrate the Home; the exterior envelope is wet, deteriorating and rotting, and was not built to the applicable building codes, industry standards or the contemporary community standards, and does not meet the definition of reasonable workmanship under Pennsylvania law.

100. As a result, the Builder Defendants have materially breached the implied warranty of workmanlike construction.

101. The Builder Defendants are liable to the Plaintiff for breach of implied warranty of workmanlike construction, and for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $190,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $190,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT IV**
**BREACH OF THE IMPLIED WARRANTY OF HABITABILITY**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

20

Case ID: 190901353

102. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

103. The various components comprising the exterior envelopes of the Auger Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, manufactured brick, wood and siding, were designed and installed by the Builder Defendants and/or its agents, with the intent that it serve as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

104. However, as set forth above, the various elements of the exterior envelope of the Home was defectively constructed and improperly installed.

105. The Builder Defendants impliedly warranted that the Home, which the Builder Defendants marketed, designed, constructed, supervised construction, and sold, would be constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

106. The Builder Defendants knew, or should have known, that the Plaintiff would rely upon this implied warranty.

107. The Plaintiff did, in fact, rely upon this implied warranty and such reliance was reasonable.

108. The Builder Defendants' defective construction directly and proximately caused substantial water infiltration into the Auger Home, and resultant water and/or mold damage to the Home.

109. The water damage and/or mold damage to the Home, which was caused by the Builder Defendants' acts and/or omissions, render the Home uninhabitable.

Case ID: 190901353

110. The Builder Defendants breached the implied warranty of habitability by failing to properly construct the Auger Home in a reasonable workmanlike manner and free of defects, thereby rendering the Home uninhabitable.

111. As a direct and proximate result of the Builder Defendants' breach of the implied warranty of habitability, the Plaintiff has incurred, and will continue to incur, substantial damages in an amount in excess of $190,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $190,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT V**
**NEGLIGENCE**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

112. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

113. The various components comprising the exterior envelopes of the Auger Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, and manufactured stone, were designed and/or installed by the Builder Defendants, and/or its subcontractors, with the intent that the exterior envelopes of the Home serves as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

114. However, as set forth above, the various elements of the exterior envelope of the Auger Home was negligently designed and/or negligently installed.

22

Case ID: 190901353

115. The Builder Defendants owed a duty to the Plaintiff to construct, supervise construction, and sell homes – such as the Auger Home – that were constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

116. The Builder Defendants further owed a duty to warn the Plaintiff (and/or predecessors in interest) of any latent defects in the Home at all times, including during the design and construction of the Auger Home, prior to the sale of the Home, at closing and settlement, and at all times since, including the times when the Builder Defendants discovered the defects in the building envelope and stucco systems in other homes that had the same architect/designers, construction managers, site managers, subcontractors, oversight and supervision, suppliers, and manufacturers.

117. The Builder Defendants were responsible for installing, and did install, aspects or parts of the exterior envelope of the Auger Home.

118. As a direct and proximate result of the Builder Defendants' defective, careless, and negligent performance in constructing the Auger Home, the Plaintiff has experienced attendant property damage and damage to non-defectively constructed components of the Home.

119. The damages sustained by the Plaintiff was caused by the negligent and careless acts and/or omissions of Builder Defendants in installing and performing their work in a defective manner as set forth above.

120. The negligence and carelessness of the Builder Defendants is the legal and proximate cause of the damages sustained by the Plaintiff.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants for all compensatory, consequential and incidental damages, in an amount in a total

Case ID: 190901353

amount in excess of $190,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT VI**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET. SEQ.*)**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

121. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

122. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, codified at 73 Pa.C.S.A. **§§** 201-1 *et seq.* ("UTPCPL"), provides for a private right of action for anyone who suffers any ascertainable loss of money or property as a result of any method, act or practice deemed unlawful by the UTPCPL.

123. The UTPCPL provides that unfair methods, acts or practices include:

   a. Representing that goods or services have characteristics, uses benefits or qualities that they do not have (*see* 73 Pa.C.S.A. § 201-2(4)(v));

   b. Representing that goods or services are of a particular standard, quality or grade, if they are of another (*see* 73 Pa.C.S.A. § 201-2(4)(vii));

   c. Making repairs, improvements or replacements on real property of a nature or quality inferior to or below the standard that was agreed to in writing (*see* 73 Pa.C.S.A. § 201-2(4)(xvi)); and

   d. Engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding (*see* 73 Pa.C.S.A. § 201-2(4)(xxi)).

124. The Builder Defendants have violated the UTPCPL, in that they have:

   a. Represented that Auger Home has characteristics, uses, and/or benefits that it does not have;

24

Case ID: 190901353

b. Represented that Builder Defendants' goods or services are of a particular standard, quality or grade when they are of another; and/or

c. Failed to comply with the terms of a written agreement or warranty given to the Plaintiff;

d. Made repairs to the Plaintiff's real property of a nature or quality inferior to or below the standard of that agreed to in writing; and

e. Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

125. The specific acts that constitute violations of the UTCPL by the Builder Defendants are set forth more fully above throughout this Complaint.

126. As a direct and proximate result of these unlawful acts and practices, the Builder Defendants are liable to the Plaintiff for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, as well as engineering fees, consultant fees and legal fees.

127. Pursuant to the UTPCPL, the Plaintiff is entitled to actual damages not less than $190,000.00, as well as treble damages, costs of suit, and reasonable attorneys' fees and interest incurred in the prosecution of this litigation.

128. Plaintiff, through counsel, asked the Builder Defendants to remediate the Home.

129. Despite design and construction defects, and damage to the Auger Home, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiff's requests, or make any effort to inspect, let alone repair, the Home.

130. These failures to act by the Builder Defendants violate the UTPCPL.

131. The unlawful acts and practices of the Builder Defendants have been so widespread, egregious, and pervasive, involving not only the Home of the Plaintiff herein, but, upon information and belief, also numerous other homes built by the Builder Defendants, that full treble

Case ID: 190901353

damages, plus interest costs and attorney's fees, should be awarded to the Plaintiff pursuant to 73 Pa.C.S.A. § 201-9.2(a).

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in excess of $190,000.00 as well as treble damages, costs of repair which are continuing, interest, penalties, costs of litigation, attorneys' fees, and for such relief as the Court may deem proper and necessary.

<div align="center">

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

</div>

132. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

133. The Builder Defendants made material statements and misrepresentations to the Plaintiff, orally and/or in writing, about the unique and desirable features and quality of the Home, and that the Home would be constructed in compliance with the existing building code and industry standards.

134. These communications as they pertain to the latent construction defects in the Home, were misrepresentations falsely and/or negligently made.

135. The Plaintiff materially and reasonably relied upon the Builder Defendants' misrepresentations.

136. As a direct and proximate result of these material statements and misrepresentations to the Plaintiff, the Builder Defendants are liable to the Plaintiff for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair

<div align="center">26</div>

Case ID: 190901353

and remediation and related costs and damages, which is in excess of $190,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demand judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in excess of $190,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT VIII
## BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)

## PLAINTIFF
## v.
## STREAMLINE

137. The Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

138. Nineteenth Street contracted with Streamline for the construction of the Auger Home.

139. Upon information and belief, Nineteenth Street entered into a written Contract with Streamline (the "Streamline Contract"), the substance of which included the promise that Nineteenth Street would pay Streamline in exchange for Streamline constructing the Auger Home.

140. The Plaintiff was not in privity of contract with Streamline and is not in possession of the Streamline Contract. Plaintiff expects to obtain true and correct copies of the Contract during the discovery phase of this litigation.

141. Upon information and belief, the Auger Home was constructed while the Streamline Contract was in effect.

142. Based upon information and belief of what is the likely language in the Streamline Contract, Nineteenth Street and Streamline intended Streamline would owe the same contractual duty to the Plaintiff – the owner – that Nineteenth Street did.

27

Case ID: 190901353

143. Upon information and belief, the Streamline Contract also provided additional guarantees flowing directly to the owner – the Plaintiff.

144. It was an implied condition of the Streamline Contract that the Auger Home was to be built pursuant to applicable building codes and prevailing industry standards.

145. Upon information and belief of what is the likely language in the Streamline Contract, Streamline likely represented to Nineteenth Street that Streamline would properly perform its obligations under the Contract and build the Home in a workmanlike fashion, and both Nineteenth Street and Streamline intended that the owner – the Plaintiff – benefit from the proper performance of the Contract.

146. Upon information and belief, the Streamline Contract effectuated Nineteenth Street's and Streamline's intention to construct defect-free homes for the owners – here, the Plaintiff.

147. Upon information and belief, the Streamline Contract, and the circumstances surrounding its respective performance thereof, indicates that Nineteenth Street and Streamline intended to confer the benefit of Streamline's performance upon the owner – the Plaintiff.

148. The Plaintiff, as Homeowner, is a third party beneficiary of the agreement(s) between Nineteenth Street and Streamline regarding the Home.

149. Upon information and belief, Streamline breached the Streamline Contract with Nineteenth Street by failing to properly build the Auger Home; failing to properly apply, install and/or construct certain components of the Home; failing to build the Home in a workmanlike fashion; failing to perform in accordance with applicable building codes, and failing to perform in accordance with prevailing industry standards.

28

Case ID: 190901353

150. In breach of the Streamline Contract with Nineteenth Street, the Home contains material defects, as set forth above.

151. As a direct and proximate cause of the subcontractor, Streamline's breaches and failures to properly construct the Auger Home, the Plaintiff has incurred, and will continue to incur, substantial damages in an amount in excess of $190,000.00, which include, but are not limited to, costs of repair and remediation and related costs and damages, diminution in market value, costs to repair and/or replace damaged interior finishes and personal property, as well as consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Streamline, for all compensatory, consequential and incidental damages, in amounts in excess of $190,000.00, costs of repair which are continuing, and diminution in market value of the Home, together with interest and costs, and for such relief as the Court may deem proper and necessary.

## COUNT IX
## BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)
## PLAINTIFF
## v.
## HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and HARMAN & ASSOCIATES, LLC

152. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

153. Upon information and belief, the Builder Defendants entered into the Harman Design Contract whereby Harman was to prepare and supply design plans and specifications for the Auger Home.

154. Upon information and belief, the Harman Design Contract required that Harman supply design plans and specifications for the construction of the Auger Home.

Case ID: 190901353

155. At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intent that the purchasers of the Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

156. As the seller and builder of the Auger Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Auger Home.

157. After all, Harman knew, or should have known, that the design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners, including the Plaintiff.

158. Harman knew, or should have known, that homeowner of the Auger Home would rely upon Harman's contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

159. Thus, Harman knew, could not have been unaware of, and intended that the Plaintiff was the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

160. Harman breached the Harman Design Contract when it failed to perform all of its design work within the professional standard(s) governing the practice of architecture in the Commonwealth of Pennsylvania.

161. Harman breached the Harman Design Contract because its design plans and specifications were defective and deficient as they related to the stucco systems, flashing, and window installation work performed on the Auger Home, and did not adequately or properly

30

Case ID: 190901353

design the Auger Home to adequately protect from water infiltration into the exterior envelopes of the Home.

162. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

163. As a result of Harman's false, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiff has been damaged in the aggregate amount in excess of $190,000.00, representing the estimated cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $190,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT X
## PROFESSIONAL NEGLIGENCE (THIRD PARTY BENEFICIARY)
## PLAINTIFF
## v.
## HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and
## HARMAN & ASSOCIATES, LLC

164. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

165. Upon information and belief, the Builder Defendants entered into the Harman Design Contract with Harman as the architect and/or designer, to prepare and supply design plans and specifications for the Auger Home.

166. Upon information and belief, the Harman Design Contract created a professional relationship between the Builder Defendants and Harman.

31

Case ID: 190901353

167. At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intentions that the purchaser of the Auger Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

168. As the seller and builder of the Auger Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Auger Home.

169. Similarly, Harman knew and intended that initial and subsequent purchasers of the Home benefit from the construction of the Home, which was to be built by the Builder Defendants in accordance with the design plans and specifications supplied by Harman.

170. After all, Harman knew, or should have known, that its design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners such as the Plaintiff.

171. Harman knew, or should have known, that homeowners of the homes being built – such as Plaintiff – would rely upon Harman's contractual obligations to the Builder Defendants to design the homes correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

172. During the construction process, the Plaintiff was generally aware that the Home had been designed by an architect and/or design professional.

173. The Plaintiff Homeowner relied upon Harman to satisfy its contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

32

Case ID: 190901353

174. Harman knew, could not have been unaware of, and intended the Plaintiff to be the third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

175. The Plaintiff is the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

176. Harman owed a duty to all purchasers of the homes – such as the Auger Home – to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

177. Since Harman held itself out as an architect, Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public or other individual who may be affected by the professional work for which [the Architect] is responsible."

178. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See* 49 Pa. ADC § 9.151(1)-(3).

179. In contravention of the applicable standard of care, Harman's design plans and specifications were defective and deficient, and did not comply with applicable laws and regulations, as the design plans and specifications related to the stucco systems, flashing, and window installation work performed on the Auger Home, and did not adequately design the Home to protect from water infiltration into the exterior envelope of the Auger Home.

180. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

Case ID: 190901353

181.	Thus, Harman breached the standard of care required of professional architects in Pennsylvania.

182.	Further, Harman breached the required standard of care when it held itself out as an architect in Pennsylvania.

183.	Plaintiff has been damaged in an amount in excess of $190,000.00, representing the cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C., a/k/a Harman Architects, PC, and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $190,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT XI
## NEGLIGENT MISREPRESENTATION UNDER BILT-RITE/RESTATEMENT OF TORTS (SECOND) SECTION 552
## PLAINTIFF
## v.
## HARMAN & ASSOCIATES, P.C., a/k/a HARMAN ARCHITECTS, PC and HARMAN & ASSOCIATES, LLC

184.	Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

185.	Upon information and belief, Harman was the architect, and/or held itself out as the architect and/or designer of the Auger Home.

186.	As defined by the Restatement (Second) of Torts, Section 522, and applied in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 480, 866 A.2d 270, 286 (Pa. 2005), Harman, as a professional architecture firm, or holding itself out as such, is in the business of supplying information for the guidance of others.

34

Case ID: 190901353

187. Harman supplied the design plans, specifications, and other information to the Builder Defendants pursuant to a transaction in which Harman had a pecuniary interest.

188. Harman had a duty to exercise due regard for the safety, life, and health of intended homeowners such as Plaintiff, and to perform its work and produce designs in compliance with all relevant laws, regulations, codes, and industry standards.

189. Under *Bilt-Rite*, in supplying design plans, specifications, and other information, Harman represented that the design plans and specifications were free from deficiencies and defects.

190. In supplying the information, Harman also represented that the design plans, specifications, and other information were sufficient to permit the Builder Defendants to construct the Auger Home, in accordance with all relevant laws, regulations, codes, and industry standards, and would be habitable and free from water infiltration.

191. Harman made its representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, with the intent to induce others, including the Builder Defendants and purchaser of the Auger Home, to act on that information in constructing and/or purchasing the Home.

192. The Plaintiff, as the purchaser and resident of the Home, justifiably relied upon Harman, and was made to believe that the Home was designed by competent architects and were safe, habitable, and free from defects.

193. Thus, the Plaintiff justifiably relied upon Harman's representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies.

194. Plaintiff was generally aware that the Home had been designed by an architect and/or design professional.

Case ID: 190901353

195. Harman, as the architect and/or designer of the Auger Home, knew, or should have known, that the design plans, specifications, and other information it provided to the Builder Defendants were false, incomplete, deficient, and defective.

196. However, Harman failed to exercise reasonable care to determine whether its design plans, specifications, and/or other information, were accurate and in accordance with the applicable laws and regulations.

197. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

198. Thus, Harman is liable to the Plaintiff for its negligent misrepresentations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, pursuant to the Restatement (Second) of Torts, Section 552, and as elucidated in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*.

199. As a result of Harman's false, incomplete, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiff has been damaged in amounts in excess $190,000.00, which includes but its not limited to, the cost to replace and repair the damaged exteriors and interiors of the Home, remedy the defective conditions, and prevent further damage and unsafe conditions.

Case ID: 190901353

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential, and incidental damages, in amounts in excess of $190,000.00, and for such relief as the Court may deem proper and necessary.

.

Dated: September 10, 2019

**HORN WILLIAMSON, LLC**

BY: */s/ Jennifer M. Horn, Esquire*

Jennifer M. Horn, Esquire
2 Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
*Attorneys for Plaintiff*

37

Case ID: 190901353

## <u>VERIFICATION</u>

I, Nickolas Auger, verify that the statements made in the foregoing Complaint, are true and correct to the best of my knowledge and belief; and understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

Date: 2019-03-09

Nickolas Auger

Case ID: 190901353

# EXHIBIT 2

# Home Inspection Report



1367 Crease Street
Philadelphia, Pennsylvania 19125

Case ID: 190901353
AUGER000015

# Apex Inspections, Inc.

## Table of Contents

| | |
|---|---|
| General Information | 2 |
| Definitions | 3 |
| Lots and Grounds | 3 |
| Exterior Surfaces and Components | 4 |
| Roof | 6 |
| Structure | 7 |
| Interior | 8 |
| Electrical | 9 |
| Plumbing | 11 |
| Heating | 12 |
| Cooling | 13 |
| Kitchen and Appliances | 14 |
| Surface Water Control | 14 |
| Summary | 16 |

Case ID: 190901353

## General Information

### Property Information

Property Address 1367 Crease Street
City Philadelphia State Pennsylvania Zip 19125
Building Type Townhouse/Row Home, 3 story Garage Attached

### Client Information

Client Name Nick Auger

### Inspection Company

Inspector Name  Patrick Borkowski
Company Name  Apex Inspections, Inc.
Address PO Box 63827
City Philadelphia State Pennsylvania Zip 19147
Phone: 888-927-3944
E-Mail: info@apexinspections.net
patrick.borkowski@apexinspections.net

### Conditions

Others Present Buyer(s), Buyer's Agent Property Status: Vacant, Staged
Estimated Age New Construction
Inspection Date 05/11/2015
Start Time 9:00 AM
Electric On Yes
Gas/Oil On Yes
Water On   Yes
Temperature 85 Degrees
Weather Partly cloudy Soil Conditions Dry

Case ID: 190901353

## Definitions

LIMITATIONS OF OUR FINDINGS

The inspection was conducted, and this report was prepared within the Standards of Practice and Code of Ethics as established by the American Society of Home Inspectors (ASHI), which is available upon request.

The report is based on visual observations of the property at the time of the inspection. Conditions which were not observable at the time of inspection will not be delineated herein. Other limitations that are specific to a particular section of the report are also outlined in that section.

While every reasonable effort was made to ascertain the present condition of the inspected components, this report does not, under any circumstances, constitute a guarantee or warranty of the reported conditions or the property's future condition.

COST ESTIMATES

The report may contain cost estimates for conditions defined as MATERIAL DEFECTS. Estimates herein, if any, are general in nature. The estimates are intended to define the general scope of a problem and should not be used for budgeting or negotiation. Our estimates are based on repair methods which we believe would be best suited to the problem. Estimates are obtained from previous experience of building remodeling and general knowledge. Use of alternative methods or materials will greatly alter the actual cost of any repair. When precise cost estimates are required, specific contractors should be consulted.

RELIANCE UPON THIS REPORT

This report may be relied upon, within the inspection scope limitations, only by the person(s) or entities defined as the Client on the report cover page. This report remains the property of Apex Inspections, Inc. and it is not transferable to any party other than the Client without express written consent from Apex Inspections, Inc. Use of this report by other parties for any purpose whatsoever will constitute a breach of the Inspection Agreement and will discharge Apex Inspections, Inc., of any responsibility for conditions stated in or omitted from the report.

.

## Lots and Grounds

**Exterior drains must be kept clear. The testing of exterior drains is beyond the scope of a home inspection.**

Walks: Concrete
Steps/Stoops: Concrete, Wood
Curbing: Concrete
Driveway:  Concrete
Patio: Concrete
Walls and Fencing: Vinyl Fence
Exterior Drains: Surface drain, Window well drain
Vegetation:  Trees
Grades:  Flat and low lying areas are evident around the perimeter of the property
Window Wells:  Open/accessible

### Items that require corrective action:

Sections of the fencing at the rear yard are not installed and there are no caps installed at the top of the posts. Recommend installing the fencing and caps as needed.



### Related Information:

All stairways with greater than two stairs and all elevations greater than 30 inches above grade should have hand railings for safety.  Safety railings should be a minimum of 30" high, to a maximum of 38".  The balusters or protective spindles below the handrails should have a maximum of 4 inches of spacing between each one for safety.
Step risers should not vary more than 1/2 inch from the top to the bottom of the steps.  The maximum riser height should be 8 1/4 inches. Step treads should be a minimum of 9 inches.  These rules will apply to new construction and may vary significantly in older homes.  These rules are in place for safety and to help reduce accidents as a result of awkward or uneven stairways.
Step comfort may be understood by the following rule of thumb:  The steps should be relatively comfortable if 2 times the riser height plus the

## Lots and Grounds (Continued)

depth of the tread equals about 26".  For example, assuming the risers are 8" and the treads are 9 1/2 inches:  2 times 8 plus 9 1/2" equals 25 1/2".  If we assume 5" risers, the treads will have to be approximately 16" to have a comfortable step.

The curbing is in marginal condition.  This is typical for this neighborhood, and repairs or replacement would be considered discretionary.

Maintenance and protection is needed to preserve the wood steps and extend its life.  Recommend stripping and refinishing the wood surfaces every 3 to 5 years, or as needed.
Treated lumber is recommended for repairs and/or replacement of all exterior wood surfaces.  Suggest using "ground contact" and or "foundation" grade or quality treated lumber.

Exterior wood surfaces need periodic maintenance.  Proper preparation, caulking, and painting/staining should be anticipated.  Deterioration is accelerated when painting and related maintenance is deferred.

Trim all trees and/or shrubbery away from the house to prevent physical problems and moisture concerns.  All vegetation should be a minimum of several inches to one foot away from the exterior walls of the house to allow for adequate access around the house.

There was no evidence of water penetration at the time of the inspection; however, the exterior surface/grading suggests it may become a problem. Monitor this condition to ensure there is no water penetration, and budget appropriately for repairs as concerns develop.

The following components/systems are beyond the scope of a home inspection and are specifically excluded from this report: fencing, landscape timbers, detached exterior storage sheds, lawn sprinkler systems, and all exterior bodies of water as well as their related components.

## Exterior Surfaces and Components

**The conditions behind the exterior surfaces including the capping and trim are not visible and are specifically excluded from this inspection report.**

Exterior Siding Materials: Brick, Stucco, Vinyl Siding, Wood
Exterior Trim: Metal, Vinyl, Wood

### Items that require corrective action:

The flapper in the vent cover adjacent to the rear air conditioner is sealed shut with caulk.  Recommend repairs to allow for proper operation of the vent.



The vinyl siding is not sealed on the front right corner where it meets the front brick wall.  Recommend sealing the vinyl to the brick.

Case ID: 190901353

## Exterior Surfaces and Components (Continued)

There is trim missing at the overhead garage door frame.  As a result, the door does not seal when closed.  Recommend installing the trim at the door frame as needed.



There is loose "J" channel trim at the top right exterior, visible from the roof deck.  Recommend securing the loose trim.

The trim around the exterior roof door is not sealed or painted.  Recommend sealing and painting the trim to assure water tight conditions.



Several of the windows and doors are not adequately sealed throughout the exterior.  Recommend properly caulking/sealing the windows and doors to assure water tight conditions.



There are several small openings in the stucco visible in the walls around the roof deck.  Recommend sealing the openings in the siding materials.



**Related Information:**
Regular maintenance around the exterior of the house should include properly caulking and/or sealing all windows, doors, and penetrations through the exterior walls.  Seams in siding materials, especially where different siding materials meet should also be sealed to assure water tight conditions.
Storm windows, screens and shutters are considered accessories. The presence/absence and condition are excluded from this home inspection report.
Recommend installing a chimney hood on all open chimney flues to divert water away and help protect the flues and chimney(s) from deterioration.
It is not uncommon for older homes to have one or several abandoned chimneys.  All abandoned chimneys should be properly capped/sealed at the top to assure water tight conditions.

Hairline cracking is evident in the stucco.  This is fairly common with this material; however patching and painting should be anticipated to avoid water penetration behind the finish materials.

Painting the stucco is a good recommendation.  However care is needed in both preparation and application.  The stucco should be thoroughly

Case ID: 190901353

## Exterior Surfaces and Components (Continued)

cleaned, all cracks, seams, and joints, especially around windows and doors, should be caulked and/or sealed.  The sealant should be exterior grade and compatible with the paint.  The paint chosen should be a good quality paint, designed for exterior stucco/masonry applications.

The are where the stucco siding on the side walls of the roof deck meet the opening for the drain box at the rear balcony is sealed, however considered a vulnerability.  No problems were visible at the time of inspection, however it will be necessary to monitor this area and budget for ongoing maintenance and repairs to assure water tight conditions.

There is staining on the stucco at several areas throughout the exterior.  No signs of concerns or leaking were present at the time of inspection.  Recommend monitoring the stucco.  If any concerns develop, repairs will be required.

Steel lintels above windows and doors need periodic maintenance. If lintels are allowed to rust, the steel actually expands during the oxidation process and this could cause cracking at the mortar joints in brick, block and stone walls and cracking at stucco walls.

Vinyl and aluminum siding materials expand and contract significantly due to the sun and temperature changes.  This type of siding should be hung on non corrosive nails, and should not be nailed tight to the wall.

The integrity and dependability of the style of siding installed is strongly related to the substrate and installation.  The method and materials used to wrap the structure of the house is crucial to assure water tight conditions.  We cannot determine how the exterior walls are sealed behind the vinyl siding at the time of inspection.  Complete evaluation would require removing the exposed siding materials.   Closely monitor the siding and adjacent interior surfaces for any signs of moisture/staining.  If these concerns develop, repairs will be required.

Some of the PVC vent piping at the right side exterior is sloped toward the house.  No signs of leaking or water intrusion were present at the time of inspection and the piping is sealed.  Monitor the piping and budget for ongoing maintenance to assure water tight conditions.

## Roof

**All roofs are susceptible to leaking and failure under adverse and extreme conditions.**

Method of Inspection: Roof Walked
Type: Flat/Low Sloped, Sloped
Roof Covering/Material Fiberglass Roof Surface



Approximate Age New Life Expectancy: 20 to 25 Years

**Items that require corrective action:**

**Related Information:**

Hidden damage is possible in areas where previous leaking had occurred. Intrusive investigation would be necessary to determine if there is damage and to what extent.

Roof leaks are a relatively common  occurrence, however, more than 70% of all roof leaks are due to flashing or valley failures.  Any leaking should cause you to evaluate the possibilities that the problem is due to flashings and or valleys, before the roof is assumed to be the problem.
Components such as chimneys, skylights, and walls that abut a roof and dormers are projections in a roof system.  As such, they are prone to leaking unless the flashing is installed properly.  The most dependable flashing installation is step and counter flashing.  Step  flashings are ""L"" shaped pieces which are installed under each course of  roofing where they meet a chimney or wall that abuts or goes through the roof system.  Counter flashings are installed to divert water away from the vertical portion of the step flashing.  Typically, when metal flashing is installed properly, it is dependable for 30 to 60 years.

Case ID: 190901353

## Roof (Continued)

Most flashing repairs, such as a petroleum based or asphalt roof cement, are considered temporary repairs.  Permanent flashings are typically mechanical and do not depend on adhesives/sealants for their dependability.

Fiberglass decking is typically installed over wood framed decks/balconies.  It is imperative that the framing and plywood under the deck surface be solid;  if the decking is not rigid, the fiberglass decking will crack.  Typically, this condition will occur over the seams of the plywood sheathing.  While it is not possible to access and evaluate the method of framing at the roof deck, there are no signs of cracking or damage occurring to the surface.  It will be necessary to closely monitor the fiberglass surfaces.  If any cracking does occur, not only will the decking need to be repaired/sealed, but it may also be necessary to make repairs to the framing below.  As well, periodic maintenance will be required, which should include cleaning and clearing the gutters, and re-coating the surface of the balconies.

Fiberglass roof surfaces are considered very reliable and long lasting when properly installed on a flat roof surface.  Fiberglass roofing is the only roof surface available that is rated for regular foot traffic.  Care should be given to furniture and  materials set on the fiberglass surfaces; sharp edges should not be set onto these surfaces for risk of damage.  Fiberglass roofing requires only minor maintenance, which consists of a quick inspection to determine if there are any openings, cracks, separations, and/or areas of concerns.  Any concerns notes should be repaired, followed by a new coating on all of the fiberglass surfaces to help maintain a water tight surface.

## Structure

**Structural concerns and repairs noted in this inspection report are the opinion of the home inspector based on training, knowledge of the systems, and experience.  All structural repairs should be reviewed by a structural engineer prior to completion of the work.**

Foundation: Poured/Formed Concrete
Exterior Walls: Masonry/Frame
Interior Walls: Masonry/Frame
Roof Framing: Inaccessible
Floor Structure: Inaccessible

**Items that require corrective action:**

**Related Information:**
The footing for this type of structure is below grade and not visible or accessible, and therefore is not within the scope of this review.  No claims or evaluations are made for below grade components or systems.
Minor hairline cracking is evident in most if not all foundation and exterior walls.  This type of cracking is typical, and does not pose an immediate concern.  All cracking and movement should be monitored to assure that ongoing movement and/or lateral movement does not occur.

There is no access to the framing. There are no visibly apparent deficiencies at the time of the inspection; however complete evaluation would require removal of the finished materials.

Complete evaluation of the structural components is restricted by the finished walls, floors and ceilings.  There are no visibly apparent deficiencies, however complete evaluation would require removal of the finished materials.

| Interior |
| --- |

Doors: Front Exterior Door, Rear Door, Shower/Tub Door, Balcony Door, Overhead Garage Door
Flooring: Wood, Tile
Stairs: Main, Basement
Wall and Ceiling Materials: Drywall, Tile
Window Materials: Vinyl Window Styles: Double Hung, Fixed, Casement
Fireplace: Natural Gas

**Items that require corrective action:**

There are screens missing at several of the windows.  Recommend installing screens at the windows as needed.

There are several cosmetic blemishes and unfinished areas throughout the finished materials at the interior of the house.  Recommend verifying acceptable conditions once the work is completed.

There is deteriorated/missing grout at the basement bathroom tiling.  Recommend repairs to the grout as needed.

 

The door from the main hallway to the garage is a hollow door that is not self closing.  Recommend installing a solid/fire rated door with a self closing hinge.

There is staining and evidence of leaking around the rear basement window, at the right side of the basement ceiling and at the 2nd floor front living room windows.  Pin pointing the source of leaking can be difficult and typically requires several repairs prior to eliminating the concerns.  Determine the source and make any needed repairs.  Once the leaking is determined to be inactive, repairs can be made to the finished materials.

 

There is a missing strike plate for the dead bolt lock at the front door.  Recommend installing the missing hardware.

Several of the kitchen and bathroom cabinet doors are not properly adjusted.  Recommend adjusting the doors as needed.

The glass panels on the sides of the 2nd floor hall and stairway to the 3rd floor are not installed.  Verify acceptable conditions once the work is performed.

**Related Information:**
Most of the interior and exterior windows and doors will need some minor refitting and hardware maintenance periodically.  This would be considered normal maintenance.
Minor cracking, nail pops, and aesthetic imperfections throughout wall, ceiling, and floor materials are typical.  Even if a home is just a few years old, cracking as a result of contraction and expansion, settlement, and seasonal changes will likely develop.  Although these issues may create cosmetic concerns, it is rarely related to structural issues or more significant concerns.

Case ID: 190901353
Palm-Tech Inspector, Copyright © 1998-2015, PDmB, Inc.

## Interior (Continued)

Most if not all houses will have or develop squeaky floors over time.  Squeaking is the result of wood surfaces rubbing together or the wood sliding up and down on the securing nails.  This is not a structural problem, but can be annoying.  The floor should be secured with nails, screws, glue and/or wedges, however access may be difficult.  There are many newer products available that can also help address squeaking floors that do not require the same access.  If the floors squeak and there is a desire to address the noise, consider one or several of the options listed.

All interior stairs should have handrails for safety.  Stair railings should be a minimum of 30" high, to a maximum of 38".  The balusters or vertical spindles below the handrails should have a maximum of 4" between each one for safety.

Storm doors properly installed at exterior doors, significantly reduce air infiltration, reduce energy consumption, and improve the comfort of the occupants.  From an energy perspective, they will nearly always improve the performance of a single door.

Storm windows do not significantly improve the insulating value of the primary window; however there is a considerable reduction of air loss, drafts, and condensation when they are installed.  Typically, failures occur first at the lower joints in the frame.  The average life expectancy of storm windows is 30 to 40 years.  Storm windows need replacement when operation is difficult or the frames are separating.  Storm windows are less common on newer homes and with replacement windows, as window technology allows for tighter sealing windows that offer reasonable insulation.

Ceramic, porcelain, and natural stone tile, including marble and granite are dependable, long lasting materials; however, these materials are very ridged and have a tendency to crack in some situations.  Replacing pieces is not difficult, however, matching the stone and grout may be.  Grout maintenance/replacement should be anticipated every 5 to 10 years, depending on the workmanship and type of grout used.  Consider checking with the seller to determine if extra tile was kept and stored in case replacement of some tiles was necessary.

It is not uncommon for wood flooring to swell and shrink in the changing climates.  This is common, as wood is a porous material.  No signs of swelling or shrinking were present at the time of inspection, however the flooring is new and the property is unoccupied.  Closely monitor the flooring.  If these conditions occur, repairs may be required.

Insulated glass is usually two panes of glass with dry air or an inert gas between the pieces of glass, and sealed to maintain the air or gas.  When the seals fail, air with moisture or relative humidity will enter.  If the inside to outside temperature is significantly different, the moisture vapors between the panes of glass will turn to liquid and stain the inside of the glass.  In most cases this staining is visible; however, when the failure is in its early stages it may be difficult to see the stains.  Reflection of light or the sun may also make these failures difficult or impossible to see.  In later stages of failure, these stains are relatively easy to see.  Failed seals reduce the insulating qualities of the glass to some degree; however, the loss of efficiency would be considered minimal.  The appearance of the glass may be a larger concern, especially if the location is prominent and somewhat of a focal point.  The solution to failed insulated glass seals is replacement, however urgency is dictated more by the concerns with appearance than lost insulating qualities.

## Electrical

**It is recommended that all electrical repairs be performed by a qualified electrician.**

Main Service Cable: Aluminum, Overhead Service Size: 200 Amps
Main Panel Location: Garage Panel Type: Circuit Breakers Main Service Ground: Driven Rod Ground, Main Water Service



Branch Circuit Wiring: Copper Electrical Components: Exterior Outlets, Interior Light fixtures, switches, and outlets, Low voltage components (doorbell, lighting, alarm systems, intercoms, etc), AFCI components, Ceiling fans, Exhaust Fan, Exterior Lighting, GFCI components, Garage door Opener, Smoke Detectors

**<u>Items that require corrective action:</u>**

There are double tapped circuits at the main electrical panel.  Separate these circuits and provide overload protection for both, as required.



Case ID: 190901353

## Electrical (Continued)

There is currently no electrical meter installed.  Contact the local electric company to arrange for the installation of a meter, and to assure no charges exist.



The GFCI outlet in the garage is not operational.  Recommend repairs to the outlet as needed.

The lights at the roof deck were not operational at the time of inspection.  Determine the cause and correct.

The electrical conduit is not sealed adjacent to the disconnect at the rear exterior air conditioner.  Recommend sealing/repairing the conduit.



The power supply to the gas fireplace was off at the time of inspection.  As a result, the fireplace was not tested/operated.  Verify proper operation of the fireplace prior to settlement.

**Related Information:**
Recommend installing new smoke detectors on each level and more as you may desire; especially in bedroom areas, and adjacent to combustion appliances such as heating units, water heaters, clothes dryer, fireplace, etc.
Low voltage wiring and appliances are specialized systems that require tools and equipment specific to the system for adequate testing.  Low voltage wiring, accessories, and equipment are specifically excluded from home inspections and have not been tested.  Verify acceptable conditions and proper operation of all low voltage systems and related components, prior to settlement if possible.
GFCI or "Ground Fault Circuit Interrupter" devices are inexpensive devices designed to protect people from electrical ground faults, or electrical devices coming into contact with water.  By today's standards GFCI protective devices should be installed at all wet and/or damp locations including all exterior outlets, outlets at garages, basements, and/or crawlspaces, all bathroom outlets, specialized water related devices (hot tubs, whirlpools, etc), and all kitchen outlets.  Homes that are just five years old may not meet all of these standards.  This does not suggest that homes that do not meet these standards are not safe, but that there is always room for improved safety throughout a house.  Considering most homes do not meet modern day standards, GFCI protective devices are considered an inexpensive and easy upgrade.

There are several coverplates missing at electrical boxes.  Install coverplates at all open junction boxes, switches, and outlets as required.

Case ID: 190901353

## Plumbing

**The property has reportedly been vacant for an extended period of time and the plumbing system has not been used on a regular basis. As part of our inspection, we ran water from all fixtures for a prolonged period of time.  Extended periods without regular use can cause some of the concealed plumbing components to fail.  Seals and washers dry out, valves seize, older sections of drain pipe can corrode and crack.  Likewise, the operating condition of the main drain from the house cannot be fully assessed without daily or regular use of the system.  These conditions and others may not manifest themselves in the limited time of the home inspection, and may not become apparent until some time after the system is reactivated and receives regular use.  Careful monitoring of the system for the next several months would be prudent.  Appropriate contingency repair budgeting is also recommended.**



Plumbing Drain System: Public Drain/Waste Piping: Inaccessible
Potable Water Service: Public Potable Water Service Pipe: Copper
Service Size: 1 1/4" Service Location: Front of the Basement Supply Pipe: Copper, Plastic/Pex

Water Heater Type: Natural Gas Capacity: 50 Gallon
Water Heater Age: New Life Expectancy: 12 Years
Number of Bathrooms: 4 Plumbing Appliances and Fixtures: Kitchen Sink(s), Tub/Shower, Bathroom Accessories, Bathroom Sink(s), Hose Bibb(s), Stall Shower, Toilet(s) Out of Scope: Underground and Inaccessible Pipes, Stall Shower Pan, Lawn Sprinkler Equipment, Sewage Ejection Pump

**<u>Items that require corrective action:</u>**

There is currently no water meter installed.  Contact the local water company to arrange for the installation of a water meter, and to assure no charges exist.



The main water supply piping is leaking adjacent to the meter connection and at the main shut off.  Recommend repairing the leaking piping/fittings.



The basement bathtub is slow to drain.  Recommend repairs to allow for proper operation.

The basement shower head leaks when operated.  Recommend repairs to the shower head.



Case ID: 190901353

## Plumbing (Continued)

Several of the PEX piping connections at the plumbing manifold are leaking.  Recommend repairing the leaking fittings.



The knockout cover at the clothes washer drain connection has not been removed.  Recommend removing the knockout at the washer drain connection.

**Related Information:**
Inaccessible pipes and plumbing components are specifically excluded from this report.
The temperature of domestic hot water should be set between 120 and 130 degrees for safety.
First degree burns or reddening of the skin occurs in 2 seconds at 150 degrees Fahrenheit, 6 seconds at 140 degrees and in 30 seconds at 130 degrees.
Faucet and toilet flush valves were operated, however shut off valves and other valves were not turned or tested due to the possibility of leaking.  These valves typically leak after they have been idle for some time.  They are typically used only in cases of emergency or when plumbing work is being performed.

A determination of the condition of shower pans can not be made, because the underside of these pans is not accessible.  No leaks were apparent at the time of the inspection.  These pans become more vulnerable as they age.  Repairs can be costly due to the scope of other repairs that are usually necessary along with replacement of the pan.

## Heating

**The heating system(s) was operated using normal thermostatic controls only.**
**The vent connector (flue pipe) should be checked annually to make sure that the chimney is not restricted and that the heating system will exhaust properly.**

**All heating systems require maintenance.  Depending on the type of system installed, regular maintenance, evaluation, and cleaning should be performed yearly, or more frequently as may be necessary.**

Heating System Type: Forced Air Distribution: Duct Work
Age of System: New Life Expectancy: 20 to 30 Years
Heating Fuel: Natural Gas
Additional Components: Air Filter, Thermostat

**Items that require corrective action:**

The ductwork at the air handler is excessively noisy when the system turns on and off.  This is likely a result of limited return airflow. Recommend repairs to the system as needed.

**Related Information:**

Visibility of the interior of the heating system, including comprehensive evaluation of the heat exchanger is very limited.  There is limited visibility of these areas, and access would require the heater to be partially dismantled.

Clean or replace the air filter, located at the return, every 6 to 8 weeks during the heating season to promote clean and efficient operation.

Case ID: 190901353

## Cooling

**Most manufacturers state that operation of air conditioning units when the outside ambient temperature is less than 65 degrees Fahrenheit can damage the cooling system.  If the outside temperature was below 65 degrees at the time of the inspection the cooling system(s) was not evaluated.  When it is above 65 degrees Fahrenheit for more than 12 hours, have the system evaluated, prior to settlement if possible.**

Cooling System Type: Central Cooling System
Age of System: New Life Expectancy: 8 to 15 Years
The ambient temperature difference between the supply air ducts and the return ducts should be between 12 and 20 degrees difference.  This is a non-invasive method of checking basic function of the cooling system.
Supply Duct Temperature: 57 Degrees Return Duct Temperature: 70 Degrees
Related Components: Air Filter, Thermostat

**Items that require corrective action:**

The condensate drain piping from the basement air handler terminates on top of the sump pit.  Recommend extending the drain to terminate in the pit.



**Related Information:**
Replace the air filter, located at the return, every 6 to 8 weeks during the cooling season to promote clean and efficient operation.
Keep the exterior air conditioning condensing unit clear of shrubs, debris, etc.  This will allow for proper air circulation through the coil.  This affects the efficiency as well as the life expectancy of the unit.  Manufacturers recommend minimum clearances of 2'  around the unit and 5' above the unit.

Some of the ductwork visible in the basement is not insulated. Un insulated ductwork can be problematic as it will result in heat/cooling loss throughout the house, resulting in reduced efficiency. More importantly, during the cooling mode this condition may cause excessive condensation to form on the ductwork and surrounding materials. When excessive  condensation forms, the potential for mold/mildew growth is possible, which presents health concerns. Recommend closely monitoring the ductwork and areas of finished materials around the ductwork/registers. If any signs of leaking, staining or mold/mildew form, extensive repairs will be required.

There is no vent at the top of the stairway to the roof deck.  This is common, and will result in the poor conditioning of the stairway.  Budget for repairs if/when practical.

The effectiveness for the air conditioning system to properly cool the house, primarily the 3rd floor could not be determined at the time of inspection. When the air handler for the system is located in the basement, cooling the uppers floors can be difficult. Several factors can effect the systems ability to cool areas of the home. These factors include the weather, sun exposure, insulation, ductwork configuration, airflow, system size, etc. Anticipate that the upper floors will be significantly warmer, and budget for modifying/adjusting the ductwork, registers and related components as needed.

Case ID: 190901353

## Kitchen and Appliances

Cooking Appliances: Gas Range/Oven Kitchen Exhaust System: Microwave/Exhaust Fan
Additional Kitchen Appliances: Garbage Disposal, Refrigerator, Dishwasher

**Items that require corrective action:**

**Related Information:**
All cabinets and counter tops require periodic maintenance which should include caulking and sealing counters and adjusting and lubricating doors and drawers.  Additional requirements will depend on the specific materials and manufacturers recommendations.
This inspection does not include an evaluation of the ovens ability to cook or bake evenly, accuracy of thermometers, clocks or timers, or the operation of any self-cleaning devices.

Kitchen exhaust systems include filters that require periodic cleaning or replacement.

## Surface Water Control

**Underground drains, pipes, and related components are not visible and therefore were not evaluated.  All of these items are specifically excluded from this inspection.**

Below Grade Components: Downspout Receivers, Exterior Surface Drain, Sump with Pump Surface Components: Grading, Gutters & Downspouts, Window Wells

**Items that require corrective action:**

**Related Information:**
Proper roof water management:
1.  Gutters should slope towards the downspouts, they should not be installed level.
2.  If a gutter is longer than 30', consideration should be given to making the highest point in the center and sloping the gutter down towards both ends, to two downspouts.
3.  Gutter brackets should be installed approximately 36" apart.  There are numerous types of gutter brackets.  Brackets should never be installed through the roofing materials.
4.  Downspouts should have a wall bracket for each 10' in length.  The downspout should be screwed or riveted to the gutter outlet tube.
5.  Elbows, splash blocks and downspout extensions will assist in depositing the rain water away from the walls of the house.
6.  All gutters and downspouts should be cleaned regularly.  Consideration should be given to gutter screens or diverters that will help keep leaves and debris from entering the gutters.  This is especially important where trees are close to or rise above the house.
7.  The grades in the areas of the downspouts must slope away from the house, or water from the roof will collect and is a likely cause of water penetration to below grade areas.
Well over 95% of water penetration problems into below grade areas of a home are due to surface water that is not managed properly.  When grades slope towards the walls of the house they allow water to accumulate at the walls of the house.  The worst areas are typically at downspouts, window wells, and adjacent to exterior steps.  The gutter and downspout systems also contribute to water accumulation problems.  The problem is rarely due to a high water table, because, homes are typically not built with below grade areas when the water table is high.  i.e.: Generally areas close to sea level.  In order to divert water away from the walls of the house, the soil must be dense and must slope away from the house.  The following is an outline or a guide of how to properly regrade:
1.  Remove soft or porous soils, stone or gravel, top soil, mulch and wood chips, etc. from the areas that need regrading.  Areas that need regrading will typically be the low areas where water may be accumulating.  The top soils and other soft materials can be reused when the new grades are developed.  Using stone, sand or gravel is not recommended because they do not divert water.
2.  The actual regrading can be done after the preparation outlined above.  Use dense soil, such as clay, where possible.  Dense soil will divert water, soft soils, such as top soil, will absorb water.  The newly graded areas should slope away from the house at rate of 1/2" per foot or more.  The new soil should be tamped to eliminate voids and assure that the new grades will function properly.  Example:  The new grades should be 3" or more higher at the wall than it is 6' away.
3.  After this dense soil shelf is completed, the top soil, etc. can be reinstalled.  The soft soils have two functions:  1-  They will prevent erosion of the dense soil.  2-  They are needed to grow grass and shrubs etc.
4.  In situations where this type of regrading is not a reasonable option, an interior hydrostatic pressure relief system with a sump pump may be necessary.  These systems do not stop the water penetration, however, they are an effective way to control water that enters by receiving it and discharging it to the exterior.  Some basements or crawl spaces may have elevated relative humidity with this type of system.

There is no evidence of water penetration at the time of the inspection, however the exterior surface/grading suggests it could become a

Case ID: 190901353

## Surface Water Control (Continued)

potential problem.  Monitor this condition to ensure that water penetration does not develop.  Consider upgrades to the exterior grading and water control components to reduce these concerns.


Good concrete walls are impervious to water. The concern with concrete walls in residential construction is that they normally crack from expansion and contraction as the season's change. Please note that cracks from contraction are not structurally related.
Efflorescence is caused when the sodiums from the lime leach from the concrete. High relative humidity and or moisture that may accumulate at the wall due to rain and snow cause the leaching. Efflorescence does not compromise the integrity of the structure. A properly installed wall should last 100 plus years with no maintenance.
Concerns with water accumulation at the exterior walls of the house should dictate control of surface water.  Proper grading of soil around the house and improvements awareness of the roof drainage system will reduce or eliminate this condition.
There were no visibly apparent structural deficiencies at the time of the inspection and no external evidences that any concerns exist, however, complete evaluation would require removal of the finished materials.
The efflorescence is minor at this time, however, attention to the grades and roof water control, as outlined above, is necessary to reduce or eliminate, maintain and assure that worsening conditions do not develop in the future.


Consider installing a battery back-up to the sump pump to assure continued operation in the event of a power failure.

Case ID: 190901353

# Apex Inspections, Inc.

## Summary

### Lots and Grounds



defective item
Sections of the fencing at the rear yard are not installed and there are no caps installed at the top of the posts. Recommend installing the fencing and caps as needed.

### Exterior Surfaces and Components

defective item
The flapper in the vent cover adjacent to the rear air conditioner is sealed shut with caulk.  Recommend repairs to allow for proper operation of the vent.



defective item
The vinyl siding is not sealed on the front right corner where it meets the front brick wall.  Recommend sealing the vinyl to the brick.



defective item
There is trim missing at the overhead garage door frame.  As a result, the door does not seal when closed. Recommend installing the trim at the door frame as needed.



defective item
There is loose "J" channel trim at the top right exterior, visible from the roof deck.  Recommend securing the loose trim.



defective item
The trim around the exterior roof door is not sealed or painted.  Recommend sealing and painting the trim to assure water tight conditions.



defective item
Several of the windows and doors are not adequately sealed throughout the exterior.  Recommend properly caulking/sealing the windows and doors to assure water tight conditions.

Palm-Tech Inspector, Copyright © 1998-2015, PDmB, Inc.

## Exterior Surfaces and Components (Continued)

  

defective item
There are several small openings in the stucco visible in the walls around the roof deck.  Recommend sealing the openings in the siding materials.



## Interior

defective item
There are screens missing at several of the windows.  Recommend installing screens at the windows as needed.

defective item
There are several cosmetic blemishes and unfinished areas throughout the finished materials at the interior of the house.  Recommend verifying acceptable conditions once the work is completed.

defective item
There is deteriorated/missing grout at the basement bathroom tiling.  Recommend repairs to the grout as needed.

 

defective item
The door from the main hallway to the garage is a hollow door that is not self closing.  Recommend installing a solid/fire rated door with a self closing hinge.

defective item
There is staining and evidence of leaking around the rear basement window, at the right side of the basement ceiling and at the 2nd floor front living room windows.  Pin pointing the source of leaking can be difficult and typically requires several repairs prior to eliminating the concerns.  Determine the source and make any needed repairs.  Once the leaking is determined to be inactive, repairs can be made to the finished materials.

 

defective item
There is a missing strike plate for the dead bolt lock at the front door.  Recommend installing the missing hardware.

defective item
Several of the kitchen and bathroom cabinet doors are not properly adjusted.  Recommend adjusting the doors as needed.

defective item
The glass panels on the sides of the 2nd floor hall and stairway to the 3rd floor are not installed.  Verify acceptable conditions once the work is performed.

## Summary (Continued)

### Electrical

**defective item**
There are double tapped circuits at the main electrical panel.  Separate these circuits and provide overload protection for both, as required.



**defective item**
There is currently no electrical meter installed.  Contact the local electric company to arrange for the installation of a meter, and to assure no charges exist.



**defective item**
The GFCI outlet in the garage is not operational.  Recommend repairs to the outlet as needed.

**defective item**
The lights at the roof deck were not operational at the time of inspection.  Determine the cause and correct.

**defective item**
The electrical conduit is not sealed adjacent to the disconnect at the rear exterior air conditioner.  Recommend sealing/repairing the conduit.



**defective item**
The power supply to the gas fireplace was off at the time of inspection.  As a result, the fireplace was not tested/operated.  Verify proper operation of the fireplace prior to settlement.

### Plumbing

**defective item**
There is currently no water meter installed.  Contact the local water company to arrange for the installation of a water meter, and to assure no charges exist.



**defective item**
The main water supply piping is leaking adjacent to the meter connection and at the main shut off.  Recommend repairing the leaking piping/fittings.



**defective item**
The basement bathtub is slow to drain.  Recommend repairs to allow for proper operation.

Case ID: 190901353

## Summary (Continued)

defective item
The basement shower head leaks when operated.  Recommend repairs to the shower head.



defective item
Several of the PEX piping connections at the plumbing manifold are leaking.  Recommend repairing the leaking fittings.

defective item
The knockout cover at the clothes washer drain connection has not been removed.  Recommend removing the knockout at the washer drain connection.

### Heating

defective item
The ductwork at the air handler is excessively noisy when the system turns on and off.  This is likely a result of limited return airflow. Recommend repairs to the system as needed.

### Cooling

defective item
The condensate drain piping from the basement air handler terminates on top of the sump pit.  Recommend extending the drain to terminate in the pit.



Case ID: 190901353

# EXHIBIT 3

Case ID: 190901353

# Excerpt of Trial Transcript
## June 13, 2023
## From Testimony of Nikolas Auger

**Auger v. Streamline Solutions, LLC, et al., Docket No. 190901351**
**Butera v. Streamline Solutions, LLC, et al., Docket No. 190901268**
**Kirk v. Streamline Solutions, LLC, et al., Docket No. 190901353**
**Selbovitz v. Streamline Solutions, LLC, et al., Docket No. 190401575**

**Attached Pages:**
**Trial Transcript, June 13, 2023, pg. 13-24**

33125643v.1

Case ID: 190901353

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

- - -

MATTHEW SELBOVITZ                  : APRIL TERM, 2019
                                   :
  v.                               : NO. 01575
                                   :
STREAMLINE SOLUTIONS, LLC, et al. :

- - -

DAVID BUTERA                       : SEPTEMBER TERM, 2019
                                   :
  v.                               : NO.  01268
                                   :
STREAMLINE SOLUTIONS, LLC, et al. :

- - -

NICKOLAS AUGER                     : SEPTEMBER TERM, 2019
                                   :
v.                                 : NO.  01351
                                   :
STREAMLINE SOLUTIONS, LLC          :
and HARMAN DEUTSCH CORP.           :

- - -

DANIEL KIRK and CLARISA KIRK       : SEPTEMBER TERM, 2019
                                   :
v.                                 : NO.  01353
                                   :
STREAMLINE SOLUTIONS, LLC          :
and NINETEENTH STREET              :
DEVELOPMENT and HARMAN             :
DEUTSCH CORP.                      :

- - -

June 13, 2023

- - -

---

- - -

Courtroom 650 - City Hall

Philadelphia, Pennsylvania

- - -

BEFORE:  THE HONORABLE MICHAEL ERDOS, J.,

and a Jury

- - -

REPORTED BY: JENNIFER VENNERI, RPR

TRANSCRIBED BY: TIFFANY MONASTRA, RPR

---

APPEARANCES:

HORN WILLIAMSON
     BY:   MATTHEW H. DEMPSEY, ESQUIRE
           RYAN M. LOCKMAN, ESQUIRE
           1500 JFK Boulevard, Suite 1700
           Philadelphia, PA 19102

           Counsel for Plaintiffs


BBC LAW, LLP
     BY:   CARMELO T. TORRACA, ESQUIRE
           707 White Horse Pike, Suite B8
           Absecon, NJ 08201

           Counsel for Defendants Streamline and Nineteenth

OFFIT KURMAN
     BY:   FRANKLIN C. MILLER, JR., ESQUIRE
           1801 Market Street, Suite 2300
           Philadelphia, PA 19103

           Counsel for Defendant Harman Deutsch Corp.

---

INDEX

- - -

PLAINTIFF'S EVIDENCE

- - -

| WITNESS: | DR | CR | RDR | RCR |
|---|---|---|---|---|
| NICKOLAS AUGER | | | | |
| BY MR. LOCKMAN | 7 | -- | 71 | -- |
| BY MR. TORRACA | -- | 36 | -- | -- |
| BY MR. MILLER | -- | 69 | -- | -- |

- - -

EXHIBITS

- - -

| NO. | DESCRIPTION | IDENT | IN EVD |
|---|---|---|---|
| | (None marked.) | | |

Case ID: 190901353

realtor to be addressed by way of an addendum.

Q  Okay.  Let's go to P-22.  Is this the inspection report you received?

A  Yes.

Q  It's from Apex?

A  That's correct.

Q  You just mentioned it was suggested that the issues were minor with no red flags.  Did someone tell you that?

A  To my recollection, you know, that's what I remember.

Q  From Apex or from someone else?

A  I don't recall.  I remember, like, having a conversation about it at the time, but I don't know with whom.

Q  Okay.  And then, ultimately, is it your understanding that this was passed along to Nineteenth Street?

A  That's correct.

Q  Okay.  And let's go to P-17.  What are we looking at here?

A  So this would be the addendum to the agreement of sale whereby -- I think there's also a listing of items as well.

Q  Okay.  So where this says "please see

attached two addendums listing Items 1 through 30," what was your understanding of where Items 1 through 30 came from?

A  This would have come from the Apex report.

Q  Okay.  All right.  Let's go to the next page.

All right.  So there's a list here on page 2. It's 1 through 15.  Let's go to -- I'm going to go back to that list, but next page, Items 16 through 30; correct?

A  16 through 30, correct.

Q  Okay.  Now, what we provided here -- and the copy that you have wasn't signed, but the version you have isn't signed by Nineteenth Street. Is it your understanding that they did sign this and you just don't have that copy?

A  I believe I don't have that copy.

Q  Okay.  Was it your understanding that this was entered into and agreed to by Nineteenth Street?

A  Yes.  I mean, I know that we discussed it and I'm surprised that I wouldn't have a signed copy.  I signed by way of DocuSign, but I'm not sure where their countersigned version is.

Q  Okay.  Let's go back to page 2.  If we look at No. 3, seal the vinyl siding to the right at the front right corner where it meets the front brick wall.  Again, these are issues that Apex brought to your attention?

A  Yes.

Q  Did you have any big concerns when you saw the Apex report about whether there could be problems with your home?

A  I didn't have big concerns.

Q  You did or didn't?

A  I did not have big concerns, no.

Q  Do you have any construction experience?

A  I do not, no.

Q  Do you have any architectural experience?

A  Outside of LEGOs, no.

Q  Is your answer the same for any engineering experience?

A  No real engineering, just software.

Q  Okay.  Very funny.  No physical building engineering?

A  Correct.

Q  Okay.  Were you ultimately -- let's actually go to No. 5, loose trim; No. 6, seal and paint the trim to assure watertight condition

around exterior roof door.  Do you remember seeing these items and having thoughts about whether they needed to be fixed?

A  No, I believed that they needed to be fixed and I recall conversations about them as they were being fixed.

Q  Okay.  Properly caulk and seal the windows and doors throughout to assure watertight condition.  Was that something that you understood was going to be done to your home before you ultimately closed?

A  Yes, that was my understanding.

Q  Okay.  Number 8, seal the openings in the siding materials in the stucco and the walls around the roof deck.  More things that you thought they're going to fix it?

A  That's correct.

Q  Number 13 -- last one I'll bring up -- determine the source of the leaking around the rear basement window at the right side of the basement ceiling and at the second floor front living room windows and make needed repairs.  Do you recall anyone from Streamline or Nineteenth Street actually coming out and making repairs to the items that I just now am showing you before closing?

Case ID: 190901353

A    I don't recall them specifically coming out for No. 13 in particular, but I know between the time that we provided that document there were days until closing, until the settlement, so. And because they were also working on my neighbor's properties as well. You know, there were always kind of contractors kind of coming and going. So it was my understanding that they were -- you know, while they were finishing other properties, they were also finishing mine.

Q    Was it your understanding in this period between this addendum and closing that they were actually going out and fixing the Items 1 through 30?

A    That's my understanding, correct.

Q    And that's what was represented to you?

A    That was represented to me, correct.

Q    Okay. And did you have an understanding of who was making the repairs? Was it Nineteenth Street? Was it Streamline? Did they not say?

A    I don't recall. I just know that it was suggested that they were making the repairs, but it wasn't clear to me which amorphous entity was actually doing the work.

Q    Okay. Was it important to you that they

identify and address the issues that Apex had brought up?

A    Absolutely. I mean, part of doing the inspection is we wanted the house to be kind of complete. Back to my point, I wanted new construction; I wanted it to be turnkey. These items were kind of negating that to that, so it was important that they be done.

Q    Okay. Did they also bring up at any point or did you learn that you'd be receiving a warranty at any point?

A    Yes. I can't recall exactly when I learned it, but I remember kind of throughout the process -- and I don't who made the representation, but it was these guys are going to make good on this property, there's a warranty. You know, if there's anything in this period, you know, don't hesitate to reach out. It could be something small like a nail, you know, kind of punch out to something big. Ultimately, you know, these are good guys was what was being represented to me and there's a warranty to really stand by their quality of craftsmanship.

Q    Was the mere existence of a warranty important to you?

A    Sure.

Q    Why?

A    It felt like if they were willing to put that seal of approval on it that it meant, to me anyway, that they believe in the quality of their work.

Q    Okay. And I'm sorry, I didn't hit this earlier. Let's go back to P-16, page 13.

All right. So if we look at Section 32, lines 7 to 16, they are -- they're representing that you'll be receiving a one-year building warranty; correct?

A    That's correct.

Q    Now, this says that the following are attached to the agreement. And what day -- this is from May 1st, 2015; correct?

A    Correct.

Q    All right. Let's go to P-18. Is this the warranty for your home?

A    Yes.

Q    All right. And this is dated May 27th; correct?

A    That's correct.

Q    Is it fair to say that they didn't -- they were representing to you that there would be a

warranty, but they didn't give it to you at the time of the agreement of sale; is that fair?

A    It's fair, but I don't necessarily recall exactly when I would have received that piece of paper.

Q    All right. At some point before actually taking possession of the home, you do receive the warranty; correct?

A    That is correct.

Q    Did you review it?

A    I mean, it's literally a one-pager, so I did read it.

Q    Was it -- I mean, was it important to you what was said in here?

A    Sure. I mean, ultimately it suggested kind of what was represented to me, which is, you know, they're going to stand by the work.

Q    Okay. Ultimately you closed on the home. Let's go to P-21. If we go to the date right there, May 29th, 2015, does that sound like the date you settled?

A    Yes, definitely at the end of May. That sounds right.

Q    Okay. All right. And if you look on the price that you paid, it may be a little blurry, but

let's just go -- no, a different one. Right there. That's tough to read. Was it your understanding that you would be paying -- let me show it to you. It's going to be easier. Looking at line 101 in Section J of the HUD.

A It says 590,000.

Q Okay. I want to go to P-20. Is this the deed to your home?

A Sure.

Q Okay. All right. I don't know why they handwrote a single man.

A That seems like a slap in the face.

Q Yeah, that's pretty disrespectful. All right. After you closed on the home, did you have any interaction with Streamline of any kind?

A So after we closed on the home, yes. I would have had some warranty interactions.

Q Let's go to P-24, page 6. All right. This is an email from Sean to Melissa. Was that your --

A That was my girlfriend at the time, correct.

Q Do you remember what issue you were experiencing here?

A So this was related to January 20th, 2016. January, so it was cold and our HVAC had been out. So this was trying to get that rectified because we didn't have heating, you know, in January --

Q Okay.

A -- in Philadelphia.

Q Okay. Is that why you moved to San Diego partially?

A That might be why.

Q Okay. And Kelly Hoy, did he ever come to your house?

A I'm not sure who would have come.

Q Okay. Nick@RevZilla.com, is that your email address or at least was it at the time?

A At the time it was.

Q All right. So let's just be clear. In 2015, after you got the home, did you notice any leaks?

A I didn't notice leaks.

Q Did or did not?

A I did not. Sorry.

Q Okay. In 2016, did you notice any leaks?

A I did not notice leaks in 2016 either.

Q 2017, did you notice any leaks?

A 2017, to my recollection, no leaks as well.

Q Okay. 2018, did you notice any leaks?

A Still no leaks.

Q Okay. Did you ever have leaks when you were living at the property, to your knowledge?

A To my knowledge, no, I did not have leaks.

Q Okay. Or you didn't notice them?

A Or I didn't notice them, correct.

Q All right. Did there come a time in early 2018 where you were made aware of your neighbors having issues?

A Yes. I was aware that Matt was absolutely having issues with his property. He was my next-door neighbor, and so I had learned that he was having some active leaks and troubles with his unit.

Q Matt Selbovitz?

A Correct. Matt.

Q And did that surprise you?

A I mean, it did. Because I was surprised, you know, that I hadn't experienced any of the same troubles.

Q You had or had not?

A I had not.

Q Did you ultimately have another inspection in 2018 on your home?

A I did. So in September of that year, ultimately knowing that Matt was having these issues, I kind of vacillated on the idea, you know, do I want to spend money on that inspection, I'm not actively having these issues. But at the end of the day, you know, I wanted to make sure that the property that I was living in was safe for me or potentially even the next buyer, so I decided to engage with Lunny to have a diagnostic.

Q Okay. At that point -- and let me show you the cover page of P-23.

MR. TORRACA: Objection, Your Honor.

THE COURT: That's all right. Overruled.

BY MR. LOCKMAN:

Q Is this the report you received?

A Yes.

Q Okay. I think you said September of 2018?

A That's correct.

THE COURT: Same instruction about not considering this report for the truth or

Case ID: 190901353

# EXHIBIT 4

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com



*Filed and Attested by the*
*Office of Judicial Records*
*11 SEP 2019 09:33 am*
*E. HAURIN*

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| **MATTHEW SELBOVITZ,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 1904001575** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## <u>NOTICE TO DEFEND</u>

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objection to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFOR TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSON AT A REDUCED FEE OR NO FEE.**

<div align="center">

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

</div>

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com                    *Attorneys for Plaintiff*

| | | |
|---|---|---|
| **MATTHEW SELBOVITZ,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 1904001575** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## AVISO PARA DEFENDER

 Usted ha sido demandado en la corte.  Si desea defenderse de las reclamaciones establecidas en las páginas siguientes, usted debe actuar dentro de los veinte 20 días después de esta denuncia y sirve aviso, entrando en un aspecto escrito personalmente o por abogado y presentar por escrito ante el Tribunal sus defensas u objeción a las pretensiones establecidas contra usted.  Se le advertirá que si no lo hace el caso puede proceder sin usted y un juicio puede ser en su contra por el tribunal sin más notificación reclamados en la demanda de dinero o de cualquier otra reclamación o ayuda solicitados por el demandante.  Puede perder el dinero o la propiedad u otros derechos importantes a usted.   USTED DEBE **TOMAR ESTE DOCUMENTO A SU ABOGADO A LA VEZ.  SI NO TIENES UN ABOGADO, IR A O POR TELÉFONO AL SIGUIENTE.  ESTA OFICINA PUEDE PROVEER INFORMACIÓN SOBRE LA CONTRATACIÓN DE UN ABOGADO.  SI USTED NO PUEDE ELLO PARA CONTRATAR A UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN LE.**

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| **MATTHEW SELBOVITZ,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 1904001575** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## AMENDED COMPLAINT

Plaintiff, by and through attorneys, Horn Williamson LLC, hereby files this Amended Complaint, and avers as follows:

### Parties and Venue

1. Plaintiff Matthew Selbovitz ("Selbovitz") owns and resides in a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 (the "Selbovitz Home" or "Home").

2. Upon information and belief, Defendant Nineteenth Street Development LLC ("Nineteenth Street") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of residential homes whose principal place of business is located at 888 Red Wing Lane, Huntingdon Valley, PA 19006.

3. Upon information and belief, Defendant Streamline Solutions, LLC ("Streamline") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of

1

Case ID: 190901353

residential homes, whose principal place of business is located at 1241 North 5th Street, First Floor, Philadelphia, Pennsylvania 19122.

4. Defendants Nineteenth Street and Streamline are hereinafter collectively referred to as the "Builder Entities" or "Builder Defendants."

5. Upon information and belief, Defendant Harman Deutsch Corp. ("Harman") is a professional corporation performing architectural and/or design services whose principal place of business was located at 631 North 12th Street, Philadelphia, Pennsylvania 19123.

## FACTUAL BACKGROUND

6. Plaintiff is the owner of one unit in a connected town home development having an address: 1369 Crease Street, Philadelphia, Pennsylvania 19125.

7. Upon information and belief, Nineteenth Street and Streamline developed the property on which the Selbovitz Home is situated.

8. Upon information and belief, Nineteenth Street and Streamline advertised, marketed, constructed, and warranted the Selbovitz Home.

9. It is believed and therefore averred that Nineteenth Street sold the Selbovitz Home to Plaintiff.

10. It is believed and therefore averred that Streamline is a partner and/or subsidiary and/or affiliate of Nineteenth Street.

11. It is believed and therefore averred, at all times relevant hereto, that with respect to the Selbovitz Home, Nineteenth Street and Streamline acted together for the purpose of purchasing land, obtaining zoning approvals, installing improvements and infrastructure, marketing, advertising, developing, constructing, obtaining city approval of the construction, selling, and warrantying several homes including the Selbovitz Home.

2

Case ID: 190901353

12.	It is believed and therefore averred that, at all times relevant hereto, Harman prepared architectural plans and design drawings, and performed other design and/or supervisory functions in connection with the design and construction of several homes including the Selbovitz Home.

13.	In or about May 2015 Plaintiff purchased the Home that was marketed, designed, built, and sold by the Builder Entities in or about 2014 to 2015 as new-construction homes.

14.	Upon information and belief, the Selbovitz Home was built when the International Residential Building Code 2009 ("2009 IRC") or later building codes were in effect and the Builder Entities and its subcontractors were legally required to comply with the applicable 2009 IRC or later building codes when designing, constructing, developing, and furnishing the Selbovitz Home.

15.	The 2009 IRC building code specifically mandated that homes be built with a weather resistant barrier.

16.	Prior to buying the Selbovitz Home, Plaintiff reviewed and relied upon marketing materials and representations about the Home's unique and desirable features and quality of construction.

17.	The Builder Entities' marketing materials induced the Plaintiff to believe the Builder Entities constructed an extremely high-quality home, constructed of the finest quality building products, and with the highest level of workmanship.

18.	Believing the marketing literature and representations provided and made by the Builder Entities, and induced by and relying upon same, Plaintiff entered into an Agreement of Sale to purchase the Selbovitz Home directly with Nineteenth Street to purchase the newly constructed home.

3

19. Streamline executed and provided the Plaintiff, a Builder's Warranty (the "Warranty" or the "Warranty Program"). A true and correct copy of the Warranty is attached hereto as Exhibit "A."

20. The Warranty's Introduction stated that Streamline Solutions would provide a home that would "be free of defects, will be of specified quality, and will perform properly for a period of one year." *See id.*

21. The Warranty also included a five-year roof warranty. *See id.*

22. Plaintiff reasonably relied upon this express warranty and all representations made by the Builder Entities with respect to the warranty as a material inducement for purchasing the Home.

23. Upon information and belief, at the time the Builder Entities entered into the Warranty Program and Agreement of Sale with the Plaintiff and/or predecessors in interest, the Builder Entities knowingly, intentionally, willfully, and/or recklessly engaging in, or could not have been unaware that they were engaging in defective, substandard, and unlawful construction practices in connection with the Selbovitz Home.

24. The Builder Entities' actions (and willful inactions) violated applicable building codes and industry standards, such that it would be unconscionable, and contrary to the law and public policy of Pennsylvania, to enforce any waivers or limitations in the Warranty and/or Agreement of Sale which would operate in any way to prevent the Plaintiff from obtaining a full recovery for the damages suffered as a result of Defendants' actions, and being awarded a remedy in this action.

25. After closing on and moving into the Home, Plaintiff later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Home that led to

4

consequential damage to parts of the Home other than the exterior envelopes of the Home, as well as the interior contents of Home. However, Plaintiff was unable to see or understand the cause of the deterioration.

26. The Plaintiff hired certified building envelope inspectors to conduct stucco inspections and moisture analyses of the Home.

27. The stucco inspection and moisture analysis performed revealed that the Home experienced, and is currently experiencing, significant water intrusion issues and consequential damages caused by numerous construction deficiencies and defects.

28. The Selbovitz Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion and water damage, rot, and mold infestation.

29. Upon information and belief, the Builder Defendants knew, or should have known, that they were engaging in defective, substandard, and unlawful construction practices in connection with the Selbovitz Home.

30. The full extent of damage to the Selbovitz Home cannot be assessed unless more extensive destructive testing, or actual repair and remediation of the Home is performed.

31. The damage to the Home cannot be repaired without stripping the existing defective exterior envelopes and recladding all, or substantially all, portions of the Home.

32. The cost of remediating the defective construction and the cost of repair the consequential damages is in excess of $140,000.00.

33. Additional costs and damages suffered or to be suffered by the Plaintiff because of the aforementioned construction defects and consequential damage, include, but are not limited to:

    a. Alternative living expenses during remediation and repair;
    b. Damage to doors and windows;

5

Case ID: 190901353

c.   Damage to interior framing and drywall;

d.   Damage to window treatments, window sills, and interior painting;

e.   Damage to landscaping, turf, driveways, sidewalks, patios and decks;

f.   Interruption of use and enjoyment of the Home;

g.   Permanent loss and diminution of value to the Home, even after successful remediation and repair, due to the existence of the kind of construction defects within the Development, decreasing the willingness of potential buyers to purchase the Home, and thus decreasing the marketability and market value of the Home; and

h.   Such other costs and damages that may be incurred during remediation and repair of construction defects and damages that cannot be fully known until the project is underway.

34.   The Builder Defendants, through their representatives, employees, and/or agents, have:

a.   Represented that goods or services have characteristics, uses, and/or benefits that they do not have;

b.   Represented that goods or services are of a particular standard, quality, or grade when they are of another;

c.   Failed to comply with the terms of a written agreement or warranty given to the Plaintiff, prior to or after a contract for the purchase of the Home; and/or

d.   Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

35.   The Builder Defendants failed to comply with the terms of written Agreement of Sale and express warranties given to the Plaintiff, prior to and/or after entering into a contract for the purchase of the Home.

Case ID: 190901353

36. Plaintiff subsequently retained counsel to seek relief against the Builder Defendants for the damage to the Home caused by the Defendants' defective, substandard, and unlawful construction of the Home.

37. Through counsel, the Plaintiff requested the Builder Defendants cure their construction defects on or about November 9, 2018. A true and correct copy of the Plaintiff's Notice to Cure is attached hereto as Exhibit "B."

38. In spite of contractual obligations, and in violation of implied warranties of workmanship and habitability, and in breach of the Builder Defendants' duty of care, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiff's Notice to Cure, offer to remediate the Home, or offer to pay the Plaintiff the cost of repairing the Home.

39. The negligence or intentional malfeasance of the Builder Defendants and/or their subcontractors, in constructing certain components or elements of the Home, has been the proximate cause of consequential damage to other parts of the Home, such as:

    a. Negligently (or intentionally/recklessly improperly) installed windows, doors, and other fenestrations have allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

    b. Negligently (or intentionally/recklessly improperly) installed window and door flashing has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home;

    c. Negligently (or intentionally/recklessly improperly) installed roofing systems, including roof flashing, has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

7

Case ID: 190901353

d.  Negligently (or intentionally/recklessly improperly) installed gutter and downspout systems that are inadequate and insufficient to contain and divert water away from the exterior walls of the Home;

e.  Negligently (or intentionally/recklessly improperly) installed weather barrier has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

f.  Negligently (or intentionally/recklessly improperly) installed lath has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

g.  Negligently (or intentionally/recklessly improperly) installed stucco has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

h.  Negligently (or intentionally/recklessly improperly) installed brick has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home; and

i.  Negligently inspected (or uninspected) workmanship of the Home, both during and after construction, has caused a defectively manufactured and leak-prone home to be delivered to the Plaintiff.

**FACTS COMMON TO CLAIMS AGAINST HARMAN**

40.  Upon information and belief, Harman was the architect/designer that designed the Selbovitz Home.

41.  Upon information and belief, Harman prepared and stamped architectural design drawings for several homes including the Selbovitz Home.

8

Case ID: 190901353

42.	Upon information and belief, the Builder Defendants entered into a written contract with Harman (the "Harman Design Contract") to serve as a design professional and/or architect for several homes including the Selbovitz Home, and to provide design documents for construction of the Home.  The Plaintiff was not in privity of contract with Harman and is not in possession of the Harman Design Contract.  Plaintiff expects to obtain true and correct copies of the Harman Design Contract during the discovery phase of this litigation.

43.	Upon information and belief, the Harman Design Contract established a professional relationship between the Builder Defendants and Harman, who designed the Selbovitz Home.

44.	Upon information and belief, in accordance with the Harman Design Contract, Harman prepared design plans to be used for obtaining the necessary permits and for constructing the Selbovitz Home.

45.	Upon information and belief, Harman knew that the design plans and specifications prepared pursuant to the Harman Design Contract were intended to be used to construct the Selbovitz Home, for the direct and intended benefit of the future occupants of the Home.

46.	Upon information and belief, Harman supplied design plans, specifications, and information necessary to construct the Selbovitz Home.

47.	The Builder Defendants promised that the Selbovitz Home was or would be designed and constructed in compliance with, and pursuant to, industry standards and applicable codes and regulations, and free from defects.

48.	Harman owed a duty to the public, and particularly, to the future purchasers and residents of the Home, to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

Case ID: 190901353

49. Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public . . . or other individual who may be affected by the professional work for which [the Architect] is responsible." *See* 49 Pa. ADC § 9.151(1)-(3).

50. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See id.*

51. By submitting the design plans and specifications to the Builder Defendants to be used in the construction of the Home, Harman represented that the information they supplied would permit the Builder Defendants to construct the Selbovitz Home in accordance with all relevant building laws and regulations.

52. Harman represented that the information they supplied pursuant to the design plans and specifications for the construction of the Selbovitz Home, if followed during the course of construction, would result in residential structures that were habitable and free from water and moisture infiltration.

53. Ultimately, the information, *vis a vis* the design plans and specifications and other information provided by Harman, was false, defective, and deficient.

54. Harman's provision of deficient and defective design plans and specifications constituted a breach of the Harman Design Contract.

55. Harman further breached the standard of care required of professional architects in the Commonwealth of Pennsylvania.

56. Harman's false, deficient, and defective design plans and specifications resulted in the construction of defective exterior envelopes and stucco systems, and caused significant water

10

Case ID: 190901353

and moisture infiltration into the Selbovitz Home, thereby causing significant and serious damage requiring remediation and repair.

## FACTS RELATING TO THE SELBOVITZ HOME

57.     In or about May 2015, Plaintiff Matthew Selbovitz entered into an Agreement of Sale with Nineteenth Street (the "Selbovitz Sales Agreement"), for the purchase of his Home located at 1369 Crease Street, Philadelphia, Pennsylvania (the "Selbovitz Home").

58.     A Certificate of Occupancy was issued on the Selbovitz Home on or about June 1, 2015 by the City of Philadelphia (the "Selbovitz CoO"). A true and correct copy of the Selbovitz Certificate of Occupancy is attached hereto as Exhibit "C."

59.     On or about June 4, 2015, Selbovitz took possession of his Home and Nineteenth Street provided Selbovitz with an executed deed to the Selbovitz Home (the "Selbovitz Deed"). A true and correct copy of the Selbovitz Deed is attached hereto as Exhibit "D."

60.     Selbovitz began his search for a new home in or about early 2014.

61.     When deciding to purchase his new Home, Selbovitz was interested in purchasing a new construction, high-end, quality home with hardwood flooring, a garage, roof deck and backyard.

62.     Selbovitz looked for homes for months in the Fishtown and Northern Liberties sections of Philadelphia, including several homes built by other developers and builders.

63.     Selbovitz chose the Home because it was new construction and because the Home appeared and was represented to be well-built.

64.     Based on the marketing materials, the existence of the Warranty, and communications with Nineteenth Street's realtor, Streamline's head contractor and other agents,

11

Case ID: 190901353

Selbovitz believed that the Builder Defendants stood behind their homes' quality and would remain available to address any concerns he may have regarding his home.

65. In reliance on the contents of the marketing materials, and the representations made by the Builder Defendants' representatives and/or agents regarding the quality, construction, warranty, and customer service, Selbovitz finalized his decision and ultimately purchased and took possession of the Home on or about June 4, 2015.

66. On or about January of 2016, Selbovitz experienced an issue with water infiltration through a window in the Home.

67. Selbovitz contacted the window manufacturer, who inspected the window and informed Selbovitz that the window was incorrectly installed.

68. Selbovitz contacted Kelly Hoy of Streamline, who informed Selbovitz that Streamline would not be repairing the window.

69. Because of issues he was experiencing within his Home, Selbovitz hired Lunny Building Diagnostics ("Lunny") to perform a Moisture Inspection of his Home on July 31, 2018 (the "Lunny Inspection Report"). A true and correct copy of the Lunny Inspection Report is attached hereto as Exhibit "E."

70. Lunny preliminarily found the following construction defects with respect to the Selbovitz Home, including, but not limited to:

  a. Missing/deficient weep screed;
  b. Improper sill flashing detail;
  c. Stucco thickness of ½", less than the required 7/8" thickness;
  d. Improper window flange configuration;
  e. Missing movement joints;
  f. Improper transition detail;
  g. Missing through-wall flashing;

12

Case ID: 190901353

       h.   Improper integration of dissimilar materials; and

       i.   Missing sealant around penetrations, windows and doors.

*See* Ex. E.

71.     Lunny found preliminary evidence of the following damage to the Selbovitz Home as a direct and proximate result of the above-referenced construction defects, which include:

       a.   Elevated moisture readings;

       b.   Interior staining and active leaking;

       c.   Bulged and cracked exterior cladding;

       d.   Staining on the stucco;

       e.   Stucco delamination; and

       f.   Mold growth.

*See id.*

72.     Lunny thus determined that "based on the number of installation deficiencies and Building Code violations full remediation of the exterior cladding system is recommended for this home at this time" *Id.* at p. 18.

73.     On July 31, 2018, Selbovitz contacted Streamline, informing them of Lunny's findings.

74.     To date, Streamline has refused to address the water infiltration concerns.

75.     Selbovitz has not performed repairs to the stucco or building envelope on his Home.

76.     Selbovitz subsequently retained counsel to seek relief against the Builder Defendants.

77.     Through counsel, Selbovitz notified the Builder Defendants of the defects and damage to his Home. *See* Ex. B.

78.     Selbovitz anticipates that to fully remediate his home, it will cost in excess of $140,000.00.

Case ID: 190901353

79. Selbovitz has satisfied all conditions precedent to filing this action.

## COUNT I
## BREACH OF CONTRACT
## PLAINTIFF
## v.
## <u>NINETEENTH STREET AND STREAMLINE</u>

80. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

81. The Plaintiff purchased the Home pursuant to an Agreement of Sale, whereby the Builder Defendants agreed to sell the Selbovitz Home that was properly constructed in a reasonably workmanlike manner, free of construction defects, and that were habitable, in compliance with industry standards and local building code requirements, and inspected by the Builder Defendants' trained personnel prior to delivery.

82. The Selbovitz Home, in fact, was not properly designed or constructed in compliance with industry standards or local building code requirements and, upon information and belief, were not properly inspected by the Builder Defendants' trained personnel prior to delivery. Nor is the Home habitable, free of construction defects, and/or built in a reasonably workmanlike manner.

83. Nineteenth Street has materially breached the Plaintiff's Agreement of Sale.

84. As a direct and proximate result of the Builder Defendants' material breach of the Agreement of Sale, the Plaintiff incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

Case ID: 190901353

85. To the extent that the Plaintiff's Agreement of Sale was entered into by and between the Plaintiff and Nineteenth Street, and not directly with Streamline, Streamline is properly named as Defendants in connection with the cause of action in Count I, and should be held jointly and severally liable with Nineteenth Street because they acted as a common business enterprises and/or single entity in all aspects of their business

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Nineteenth Street and Streamline for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

<div align="center">

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**PLAINTIFF**
**v.**
**STREAMLINE**

</div>

86. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

87. The Builder's Warranty contained an express warranty from Streamline to the Plaintiff.

88. The Plaintiff reasonably relied upon the express representations and certifications of Streamline by:

   a. Entering into Agreement of Sale to purchase the Home;
   b. Giving money to the Builder Defendants and obtaining mortgage loan(s) to purchase the Home; and
   c. Moving belongings into the Home, buying furniture and making other improvements to the Home.

Case ID: 190901353

89. The certifications and representations made by Streamline in the Builder's Warranty constituted express warranties that the Selbovitz Home had been built in compliance with the applicable building codes, and that the Home was habitable and built in a good, workmanlike manner and inspected by Streamline's trained personnel prior to delivery.

90. The Plaintiff reasonably relied upon the express warranties and representations made by Streamline in the Builder's Warranty as a material inducement for purchasing the Home.

91. Streamline materially breached the express warranty extended to the Plaintiff in the Builder's Warranties by failing to build the Home in strict compliance with the applicable building codes, failing to build the Home in a habitable, good, and workmanlike manner, and failing to have the Home inspected by Streamline's trained personnel prior to delivery.

92. The express warranty contained the following language: "Streamline Solutions pledges to the owner…that all material, workmanship, and/or building improvements provided for in the course of their building project will be free of defects, will be of specified quality, and will perform properly for a period of one year."

93. Any purported limitations in the express warranty is rendered null and void by Streamline's failure to construct the Selbovitz Home in accordance with applicable building codes.

94. As a direct and proximate result of Streamline's material breach of the express warranty, the Plaintiff has incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Streamline, for all compensatory, consequential and incidental damages, in an amount in a total amount in

16

Case ID: 190901353

excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

## COUNT III
## BREACH OF THE IMPLIED WARRANTY OF WORKMANLIKE CONSTRUCTION
## PLAINTIFF
## v.
## NINETEENTH STREET AND STREAMLINE

95.     Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

96.     The Selbovitz Home, built and sold by the Builder Defendants, contained, as a matter of law, an implied warranty that the Home, which the Builder Defendants marketed, developed, constructed, and sold, would be built in a reasonably workmanlike manner and free of construction defects.

97.     The Plaintiff reasonably and justifiably relied upon this implied warranty.

98.     The Builder Defendants knew that the Plaintiff would reasonably and justifiably rely upon this implied warranty.

99.     The Builder Defendants failed to supervise construction of the Selbovitz Home and/or failed to construct the Home in a workmanlike manner.

100.    The Home, as built and sold by the Builder Defendants, exhibits construction defects that allow water to infiltrate the Home; the exterior envelope is wet, deteriorating and rotting, and was not built to the applicable building codes, industry standards or the contemporary community standards, and does not meet the definition of reasonable workmanship under Pennsylvania law.

17

Case ID: 190901353

101. As a result, the Builder Defendants have materially breached the implied warranty of workmanlike construction.

102. The Builder Defendants are liable to the Plaintiff for breach of implied warranty of workmanlike construction, and for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

<div align="center">

**COUNT IV**
**BREACH OF THE IMPLIED WARRANTY OF HABITABILITY**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

</div>

103. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

104. The various components comprising the exterior envelopes of the Selbovitz Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, manufactured brick, wood and siding, were designed and installed by the Builder Defendants and/or its agents, with the intent that it serve as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

Case ID: 190901353

105. However, as set forth above, the various elements of the exterior envelope of the Home was defectively constructed and improperly installed.

106. The Builder Defendants impliedly warranted that the Home, which the Builder Defendants marketed, designed, constructed, supervised construction, and sold, would be constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

107. The Builder Defendants knew, or should have known, that the Plaintiff would rely upon this implied warranty.

108. The Plaintiff did, in fact, rely upon this implied warranty and such reliance was reasonable.

109. The Builder Defendants' defective construction directly and proximately caused substantial water infiltration into the Selbovitz Home, and resultant water and/or mold damage to the Home.

110. The water damage and/or mold damage to the Home, which was caused by the Builder Defendants' acts and/or omissions, render the Home uninhabitable.

111. The Builder Defendants breached the implied warranty of habitability by failing to properly construct the Selbovitz Home in a reasonable workmanlike manner and free of defects, thereby rendering the Home uninhabitable.

112. As a direct and proximate result of the Builder Defendants' breach of the implied warranty of habitability, the Plaintiff has incurred, and will continue to incur, substantial damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

19

Case ID: 190901353

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT V**
**NEGLIGENCE**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

113.    Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

114.    The various components comprising the exterior envelopes of the Selbovitz Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, and manufactured stone, were designed and/or installed by the Builder Defendants, and/or its subcontractors, with the intent that the exterior envelopes of the Home serves as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

115.    However, as set forth above, the various elements of the exterior envelope of the Selbovitz Home was negligently designed and/or negligently installed.

116.    The Builder Defendants owed a duty to the Plaintiff to construct, supervise construction, and sell homes – such as the Selbovitz Home – that were constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

117.    The Builder Defendants further owed a duty to warn the Plaintiff (and/or predecessors in interest) of any latent defects in the Home at all times, including during the design and construction of the Selbovitz Home, prior to the sale of the Home, at closing and settlement, and at all times since, including the times when the Builder Defendants discovered the defects in

Case ID: 190901353

the building envelope and stucco systems in other homes that had the same architect/designers, construction managers, site managers, subcontractors, oversight and supervision, suppliers, and manufacturers.

118.    The Builder Defendants were responsible for installing, and did install, aspects or parts of the exterior envelope of the Selbovitz Home.

119.    As a direct and proximate result of the Builder Defendants' defective, careless, and negligent performance in constructing the Selbovitz Home, the Plaintiff has experienced attendant property damage and damage to non-defectively constructed components of the Home.

120.    The damages sustained by the Plaintiff was caused by the negligent and careless acts and/or omissions of Builder Defendants in installing and performing their work in a defective manner as set forth above.

121.    The negligence and carelessness of the Builder Defendants is the legal and proximate cause of the damages sustained by the Plaintiff.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

## COUNT VI
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET. SEQ.*)
## PLAINTIFF
## v.
## NINETEENTH STREET AND STREAMLINE

122.    Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

Case ID: 190901353

123. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, codified at 73 Pa.C.S.A. **§§** 201-1 *et seq.* ("UTPCPL"), provides for a private right of action for anyone who suffers any ascertainable loss of money or property as a result of any method, act or practice deemed unlawful by the UTPCPL.

124. The UTPCPL provides that unfair methods, acts or practices include:

   a. Representing that goods or services have characteristics, uses benefits or qualities that they do not have (*see* 73 Pa.C.S.A. § 201-2(4)(v));

   b. Representing that goods or services are of a particular standard, quality or grade, if they are of another (*see* 73 Pa.C.S.A. § 201-2(4)(vii));

   c. Making repairs, improvements or replacements on real property of a nature or quality inferior to or below the standard that was agreed to in writing (*see* 73 Pa.C.S.A. § 201-2(4)(xvi)); and

   d. Engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding (*see* 73 Pa.C.S.A. § 201-2(4)(xxi)).

125. The Builder Defendants have violated the UTPCPL, in that they have:

   a. Represented that Selbovitz Home has characteristics, uses, and/or benefits that it does not have;

   b. Represented that Builder Defendants' goods or services are of a particular standard, quality or grade when they are of another; and/or

   c. Failed to comply with the terms of a written agreement or warranty given to the Plaintiff;

   d. Made repairs to the Plaintiff's real property of a nature or quality inferior to or below the standard of that agreed to in writing; and

   e. Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

126. The specific acts that constitute violations of the UTCPL by the Builder Defendants are set forth more fully above throughout this Amended Complaint.

22

Case ID: 190901353

127. As a direct and proximate result of these unlawful acts and practices, the Builder Defendants are liable to the Plaintiff for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, as well as engineering fees, consultant fees and legal fees.

128. Pursuant to the UTPCPL, the Plaintiff is entitled to actual damages not less than $140,000.00, as well as treble damages, costs of suit, and reasonable attorneys' fees and interest incurred in the prosecution of this litigation.

129. Plaintiff, through counsel, asked the Builder Defendants to remediate the Home.

130. Despite design and construction defects, and damage to the Selbovitz Home, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiff's requests, or make any effort to inspect, let alone repair, the Home.

131. These failures to act by the Builder Defendants violate the UTPCPL.

132. The unlawful acts and practices of the Builder Defendants have been so widespread, egregious, and pervasive, involving not only the Home of the Plaintiff herein, but, upon information and belief, also numerous other homes built by the Builder Defendants, that full treble damages, plus interest costs and attorney's fees, should be awarded to the Plaintiff pursuant to 73 Pa.C.S.A. § 201-9.2(a).

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in excess of $140,000.00 as well as treble damages, costs of repair which are continuing, interest, penalties, costs of litigation, attorneys' fees, and for such relief as the Court may deem proper and necessary.

## COUNT VII
## NEGLIGENT MISREPRESENTATION
## PLAINTIFF

23

Case ID: 190901353

<div align="center"><strong>v.</strong>

<strong>NINETEENTH STREET AND STREAMLINE</strong></div>

133. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

134. The Builder Defendants made material statements and misrepresentations to the Plaintiff, orally and/or in writing, about the unique and desirable features and quality of the Home, and that the Home would be constructed in compliance with the existing building code and industry standards.

135. These communications as they pertain to the latent construction defects in the Home, were misrepresentations falsely and/or negligently made.

136. The Plaintiff materially and reasonably relied upon the Builder Defendants' misrepresentations.

137. As a direct and proximate result of these material statements and misrepresentations to the Plaintiff, the Builder Defendants are liable to the Plaintiff for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, which is in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demand judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

<div align="center"><strong>COUNT VIII</strong>
<strong>BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)</strong>

<strong>PLAINTIFF</strong>
<strong>v.</strong></div>

Case ID: 190901353

**STREAMLINE**

138. The Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

139. Nineteenth Street contracted with Streamline for the construction of the Selbovitz Home.

140. Upon information and belief, Nineteenth Street entered into a written Contract with Streamline (the "Streamline Contract"), the substance of which included the promise that Nineteenth Street would pay Streamline in exchange for Streamline constructing the Selbovitz Home.

141. The Plaintiff was not in privity of contract with Streamline and is not in possession of the Streamline Contract. Plaintiff expects to obtain true and correct copies of the Contract during the discovery phase of this litigation.

142. Upon information and belief, the Selbovitz Home was constructed while the Streamline Contract was in effect.

143. Based upon information and belief of what is the likely language in the Streamline Contract, Nineteenth Street and Streamline intended Streamline would owe the same contractual duty to the Plaintiff – the owner – that Nineteenth Street did.

144. Upon information and belief, the Streamline Contract also provided additional guarantees flowing directly to the owner – the Plaintiff.

145. It was an implied condition of the Streamline Contract that the Selbovitz Home was to be built pursuant to applicable building codes and prevailing industry standards.

146. Upon information and belief of what is the likely language in the Streamline Contract, Streamline likely represented to Nineteenth Street that Streamline would properly perform its obligations under the Contract and build the Home in a workmanlike fashion, and both

25

Case ID: 190901353

Nineteenth Street and Streamline intended that the owner – the Plaintiff – benefit from the proper performance of the Contract.

147. Upon information and belief, the Streamline Contract effectuated Nineteenth Street's and Streamline's intention to construct defect-free homes for the owners – here, the Plaintiff.

148. Upon information and belief, the Streamline Contract, and the circumstances surrounding its respective performance thereof, indicates that Nineteenth Street and Streamline intended to confer the benefit of Streamline's performance upon the owner – the Plaintiff.

149. The Plaintiff, as Homeowner, is a third party beneficiary of the agreement(s) between Nineteenth Street and Streamline regarding the Home.

150. Upon information and belief, Streamline breached the Streamline Contract with Nineteenth Street by failing to properly build the Selbovitz Home; failing to properly apply, install and/or construct certain components of the Home; failing to build the Home in a workmanlike fashion; failing to perform in accordance with applicable building codes, and failing to perform in accordance with prevailing industry standards.

151. In breach of the Streamline Contract with Nineteenth Street, the Home contains material defects, as set forth above.

152. As a direct and proximate cause of the subcontractor, Streamline's breaches and failures to properly construct the Selbovitz Home, the Plaintiff has incurred, and will continue to incur, substantial damages in an amount in excess of $140,000.00, which include, but are not limited to, costs of repair and remediation and related costs and damages, diminution in market value, costs to repair and/or replace damaged interior finishes and personal property, as well as consultant fees and legal fees.

Case ID: 190901353

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Streamline, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, costs of repair which are continuing, and diminution in market value of the Home, together with interest and costs, and for such relief as the Court may deem proper and necessary.

## COUNT IX
## BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)
## PLAINTIFF
## v.
## HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and HARMAN & ASSOCIATES, LLC

153.    Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

154.    Upon information and belief, the Builder Defendants entered into the Harman Design Contract whereby Harman was to prepare and supply design plans and specifications for the Selbovitz Home.

155.    Upon information and belief, the Harman Design Contract required that Harman supply design plans and specifications for the construction of the Selbovitz Home.

156.    At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intent that the purchasers of the Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

157.    As the seller and builder of the Selbovitz Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Selbovitz Home.

158.    After all, Harman knew, or should have known, that the design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners, including the Plaintiff.

27

Case ID: 190901353

159. Harman knew, or should have known, that homeowner of the Selbovitz Home would rely upon Harman's contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

160. Thus, Harman knew, could not have been unaware of, and intended that the Plaintiff was the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

161. Harman breached the Harman Design Contract when it failed to perform all of its design work within the professional standard(s) governing the practice of architecture in the Commonwealth of Pennsylvania.

162. Harman breached the Harman Design Contract because its design plans and specifications were defective and deficient as they related to the stucco systems, flashing, and window installation work performed on the Selbovitz Home, and did not adequately or properly design the Selbovitz Home to adequately protect from water infiltration into the exterior envelopes of the Home.

163. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

164. As a result of Harman's false, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiff has been damaged in the aggregate amount in excess of $140,000.00, representing the estimated cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

Case ID: 190901353

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT X
## PROFESSIONAL NEGLIGENCE (THIRD PARTY BENEFICIARY)
## PLAINTIFF
## v.
## HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and HARMAN & ASSOCIATES, LLC

165. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

166. Upon information and belief, the Builder Defendants entered into the Harman Design Contract with Harman as the architect and/or designer, to prepare and supply design plans and specifications for the Selbovitz Home.

167. Upon information and belief, the Harman Design Contract created a professional relationship between the Builder Defendants and Harman.

168. At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intentions that the purchaser of the Selbovitz Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

169. As the seller and builder of the Selbovitz Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Selbovitz Home.

170. Similarly, Harman knew and intended that initial and subsequent purchasers of the Home benefit from the construction of the Home, which was to be built by the Builder Defendants in accordance with the design plans and specifications supplied by Harman.

Case ID: 190901353

171. After all, Harman knew, or should have known, that its design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners such as the Plaintiff.

172. Harman knew, or should have known, that homeowners of the homes being built – such as Plaintiff – would rely upon Harman's contractual obligations to the Builder Defendants to design the homes correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

173. During the construction process, the Plaintiff was generally aware that the Home had been designed by an architect and/or design professional.

174. The Plaintiff Homeowner relied upon Harman to satisfy its contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

175. Harman knew, could not have been unaware of, and intended the Plaintiff to be the third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

176. The Plaintiff is the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

177. Harman owed a duty to all purchasers of the homes – such as the Selbovitz Home – to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

178. Since Harman held itself out as an architect, Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the



Case ID: 190901353

public or other individual who may be affected by the professional work for which [the Architect] is responsible."

179. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See* 49 Pa. ADC § 9.151(1)-(3).

180. In contravention of the applicable standard of care, Harman's design plans and specifications were defective and deficient, and did not comply with applicable laws and regulations, as the design plans and specifications related to the stucco systems, flashing, and window installation work performed on the Selbovitz Home, and did not adequately design the Home to protect from water infiltration into the exterior envelope of the Selbovitz Home.

181. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

182. Thus, Harman breached the standard of care required of professional architects in Pennsylvania.

183. Further, Harman breached the required standard of care when it held itself out as an architect in Pennsylvania.

184. Plaintiff has been damaged in an amount in excess of $140,000.00, representing the cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C., a/k/a Harman Architects, PC, and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

Case ID: 190901353

<div align="center">

**COUNT XI**
**NEGLIGENT MISREPRESENTATION UNDER BILT-RITE/RESTATEMENT**
**OF TORTS (SECOND) SECTION 552**
**PLAINTIFF**
**v.**
**HARMAN & ASSOCIATES, P.C., a/k/a HARMAN ARCHITECTS, PC and**
**HARMAN & ASSOCIATES, LLC**

</div>

185. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

186. Upon information and belief, Harman was the architect, and/or held itself out as the architect and/or designer of the Selbovitz Home.

187. As defined by the Restatement (Second) of Torts, Section 522, and applied in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 480, 866 A.2d 270, 286 (Pa. 2005), Harman, as a professional architecture firm, or holding itself out as such, is in the business of supplying information for the guidance of others.

188. Harman supplied the design plans, specifications, and other information to the Builder Defendants pursuant to a transaction in which Harman had a pecuniary interest.

189. Harman had a duty to exercise due regard for the safety, life, and health of intended homeowners such as Plaintiff, and to perform its work and produce designs in compliance with all relevant laws, regulations, codes, and industry standards.

190. Under *Bilt-Rite*, in supplying design plans, specifications, and other information, Harman represented that the design plans and specifications were free from deficiencies and defects.

191. In supplying the information, Harman also represented that the design plans, specifications, and other information were sufficient to permit the Builder Defendants to construct

<div align="center">32</div>

Case ID: 190901353

the Selbovitz Home, in accordance with all relevant laws, regulations, codes, and industry standards, and would be habitable and free from water infiltration.

192. Harman made its representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, with the intent to induce others, including the Builder Defendants and purchaser of the Selbovitz Home, to act on that information in constructing and/or purchasing the Home.

193. The Plaintiff, as the purchaser and resident of the Home, justifiably relied upon Harman, and was made to believe that the Home was designed by competent architects and were safe, habitable, and free from defects.

194. Thus, the Plaintiff justifiably relied upon Harman's representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies.

195. Plaintiff was generally aware that the Home had been designed by an architect and/or design professional.

196. Harman, as the architect and/or designer of the Selbovitz Home, knew, or should have known, that the design plans, specifications, and other information it provided to the Builder Defendants were false, incomplete, deficient, and defective.

197. However, Harman failed to exercise reasonable care to determine whether its design plans, specifications, and/or other information, were accurate and in accordance with the applicable laws and regulations.

198. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

199. Thus, Harman is liable to the Plaintiff for its negligent misrepresentations with respect to the design plans and specifications being correct, complete, and free from defects or

33

Case ID: 190901353

deficiencies, pursuant to the Restatement (Second) of Torts, Section 552, and as elucidated in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*.

200.    As a result of Harman's false, incomplete, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiff has been damaged in amounts in excess $140,000.00, which includes but is not limited to, the cost to replace and repair the damaged exteriors and interiors of the Home, remedy the defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential, and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

Dated: September 10, 2019

**HORN WILLIAMSON, LLC**

BY: */s/ Jennifer M. Horn, Esquire*

Jennifer M. Horn, Esquire
2 Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
*Attorneys for Plaintiff, Matthew Selbovitz*

34

Case ID: 190901353

## VERIFICATION

I, Matthew Selbovitz, verify that the statements made in the foregoing Complaint, are true and correct to the best of my knowledge and belief; and understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

Date: 8/8/19

_____
Matthew Selbovitz

Case ID: 190901353

# EXHIBIT 5

Case ID: 190901353

**Excerpt of Trial Transcript**
**June 6, 2023**
**From Testimony of Matthew Selbovitz**


**Auger v. Streamline Solutions, LLC, et al., Docket No. 190901351**
**Butera v. Streamline Solutions, LLC, et al., Docket No. 190901268**
**Kirk v. Streamline Solutions, LLC, et al., Docket No. 190901353**
**Selbovitz v. Streamline Solutions, LLC, et al., Docket No. 190401575**


**Attached Pages:**
**Trial Transcript, June 6, 2023, pg. 129-132**
**Trial Transcript, June 6, 2023, 137-148**
**Trial Transcript, June 6, 2023, 177-180**

33125643v.1

Case ID: 190901353

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

- - -

MATTHEW SELBOVITZ         : APRIL TERM, 2019
                      :
 v.                     : NO. 01575
                      :
STREAMLINE SOLUTIONS, LLC, et al. :

- - -

DAVID BUTERA            : SEPTEMBER TERM, 2019
                      :
 v.                     : NO. 01268
                      :
STREAMLINE SOLUTIONS, LLC, et al. :

- - -

NICKOLAS AUGER          : SEPTEMBER TERM, 2019
                      :
v.                      : NO. 01351
                      :
STREAMLINE SOLUTIONS, LLC    :
and HARMAN DEUTSCH CORP.    :

- - -

DANIEL KIRK and CLARISA KIRK  : SEPTEMBER TERM, 2019
                      :
v.                      : NO. 01353
                      :
STREAMLINE SOLUTIONS, LLC    :
and NINETEENTH STREET       :
DEVELOPMENT and HARMAN      :
DEUTSCH CORP.           :

- - -

June 6, 2023

- - -

- - -

Courtroom 650 - City Hall

Philadelphia, Pennsylvania

- - -

BEFORE: THE HONORABLE MICHAEL ERDOS, J.,

and a Jury

- - -

REPORTED BY: JENNIFER VENNERI, RPR

TRANSCRIBED BY: TIFFANY MONASTRA, RPR

APPEARANCES:

HORN WILLIAMSON
    BY:  MATTHEW H. DEMPSEY, ESQUIRE
          RYAN M. LOCKMAN, ESQUIRE
          1500 JFK Boulevard, Suite 1700
          Philadelphia, PA 19102

          Counsel for Plaintiffs

BBC LAW, LLP
    BY:  CARMELO T. TORRACA, ESQUIRE
          707 White Horse Pike, Suite B8
          Absecon, NJ 08201

          Counsel for Defendants Streamline and Nineteenth

OFFIT KURMAN
    BY:  FRANKLIN C. MILLER, JR., ESQUIRE
          1801 Market Street, Suite 2300
          Philadelphia, PA 19103

          Counsel for Defendant Harman Deutsch Corp.

INDEX

- - -

PLAINTIFF'S EVIDENCE

- - -

| WITNESS: | DR | CR | RDR | RCR |
|---|---|---|---|---|
| CLARISA KIRK | | | | |
| BY MR. LOCKMAN | 11 | -- | 112 | -- |
| BY MR. TORRACA | -- | 40 | -- | -- |
| BY MR. MILLER | -- | 102 | -- | 114 |
| | | | | |
| MATTHEW SELBOVITZ | | | | |
| BY MR. LOCKMAN | 116 | -- | -- | -- |
| BY MR. TORRACA | -- | 170 | -- | -- |

- - -

EXHIBITS

- - -

| NO. | DESCRIPTION | IDENT | IN EVD |
|---|---|---|---|
| (None marked at this time.) | | | |

Case ID: 190901353

Q Okay. Let's go to P-39, page 22, which is Bates stamped Selbovitz-50.

Okay. Are these emails between you -- who is Harriet, by the way?

A To my understanding, Harriet worked for Nineteenth Street.

Q Okay. And this page has two emails between you and Harriet; correct?

A Yes.

Q Now, these aren't dated. Do you have an independent recollection of about when these emails were sent in terms of time?

A It was within a month or two after I purchased the home, so fairly soon after I purchased the home.

Q July-ish?

A July-ish, yes.

Q Got it. So the top one, you say: "Attached is a quote from the mold inspector. Also I forgot to bring up the bubbles and soft spots. I wanted to make sure this was fixed as well."

Why were you talking about a mold inspector a month into buying your home?

A At this point there were so many leaks coming from the roof and the window. And I

remembered that in my original home inspection we had seen some staining on the windowsill and didn't think much of it, but then when it started to leak like that, I realized that it must have been leaking for quite some time already and I was worried that there might be mold and that was a serious concern to me.

Q All right. And Harriet responded. Do you know how soon after she responded in the email below?

A It wasn't too much longer after. Maybe within a few days.

Q Okay. So at this point -- was this the first email? Or was this the first communication you had with Harriet after moving in about leaks?

A No, I do not believe so.

Q Okay. Had you made her aware of the leaks you were having by the time these emails come about?

A Yes.

Q Okay. To your knowledge, based on your communications with her, was she aware of the leaking issues in your home?

A Can you repeat that one more time?

Q Sure. You had made her aware of the

leaking issues with your home at the time she responds; correct?

A Yes.

Q Okay. And she says she's not going to pay for a mold inspector. Did that surprise you?

A It surprised me a little bit, yes.

Q Why?

A Because this was directly related to possible defects in the house, and I was under the impression that that would be covered under warranty.

Q Okay. She then says: "Fabio will replace and repair any" -- does that say water?

A Yeah.

Q Okay. "Fabio will replace and repair any water. Please let him know about the additional area of repair."

Who is Fabio?

A Fabio was a contractor for Streamline Solutions.

Q Okay. And so is Harriet representing Fabio's going to come out and repair any of these leaks?

A Yes.

Q Okay. Was that your understanding?

A Yes.

Q Okay. Did Fabio ever come to your house in response to this issue?

A Yes.

Q And what did he do?

A They did some water testing with a hose in many places and they found various leaks. And I do not remember if they repaired it that day, but soon after they started doing patching repair.

Q Okay. Did they tell you -- did Fabio or anyone else from Streamline tell you, okay, we fixed these problems?

A I don't believe I ever got a confirmation that the work was completed for that specific issue.

Q Okay. But you know they came out and did work?

A Yes.

Q Was it your understanding at that time when they came out and did the work that the issue was addressed?

A Yes.

Q Okay. They may not have said the words "this is done," but your impression from what they were doing and saying was that they had fixed the

Case ID: 190901353

needed to do about the window?

MR. TORRACA: Objection.

THE COURT: Overruled.

THE WITNESS: He had told me at one point that he believed that the window needed to be replaced.

BY MR. LOCKMAN:

Q He told that to you in person?

A Yes.

Q What were the circumstances of that visit?

A He was coming and measuring the squareness of the window to determine if it had been installed improperly.

Q He said that?

A Yes.

MR. TORRACA: Objection, Your Honor.

THE COURT: It can just be considered by the jury to explain the steps taken by this witness, not for the truth of what he was told.

MR. LOCKMAN: Can I have a sidebar for a moment on that?

THE COURT: We'll talk about that later. Go ahead.

MR. LOCKMAN: Okay.

BY MR. LOCKMAN:

Q Beginning in 2016, at that point you had been in the home for about six months; correct?

A Yes.

Can you say the date again, please?

Q The beginning of 2016.

A Yes.

Q You had been in the home for about six months?

A Yes.

Q You moved in. Did you move in right on June 10th or did you move in shortly thereafter?

A Very shortly after.

Q Okay. I'm going to show you page 1 of P-39. In your email up top, that's from January 30th, 2016; correct?

A Yes.

Q All right. What are the circumstances that gave rise to you sending this email to Kelly Hoy?

A At this point I had had a contractor, the technician and a window specialist, a separate window specialist come by and take a look at this window and it was unanimous --

MR. TORRACA: Objection, Your Honor. If we can approach.

THE COURT: Sorry?

MR. TORRACA: If we can approach.

THE COURT: Okay.

- - -

(Whereupon, a discussion was held at sidebar.)

- - -

BY MR. LOCKMAN:

Q Did Kelly Hoy ever identify who he worked for?

A Yes.

Q Who?

A Streamline.

Q Okay. Would he come out in response to your warranty claims?

A Yes.

Q Okay. When you met him first, how did he introduce himself?

A Just as Kelly Hoy from Streamline.

MR. LOCKMAN: Your Honor, I have this -- can we handle this now or based on the testimony?

THE COURT: I'm just going to -- I'll give the jury the same instruction for

now. And later, if it's necessary, I'll give them a different instruction.

MR. LOCKMAN: Okay. I can continue to --

THE COURT: You may.

So any of these reported statements by Kelly Hoy at this point you can consider not for the truth of anything Kelly Hoy may have said but for the impact it had on this witness.

BY MR. LOCKMAN:

Q The email that you sent January 30th, 2016, why did you send this?

A Because I wanted the window issue to be resolved.

Q And this was the same window issue that had been -- was this the same window issue that had been ongoing that you testified to earlier?

A Yes.

Q All right. And in response, a day later, Kelly Hoy -- by the way, can we zoom in on his email address? Kelly Hoy.

Kelly@streamlinephilly.com. Who gave you that email address?

A I don't recall.

Case ID: 190901353

Q    Kelly would respond using that email address; right?

A    Yes, that's Kelly's email address.

Q    Streamlinephilly.com?

A    Yes.

Q    If we look at the email below, he's responding from kelly@streamlinephilly.com; correct?

A    Yes.

Q    All right.  Can we back up a little bit?

All right.  Kelly Hoy, service manager -- let's do this whole thing.

Okay.  Kelly Hoy, service manager, 2301 Washington Avenue, Suite 111, in Philly.  This communication is the property of Streamline Solutions or its subsidiaries.

Do you see that?

A    Yes.

Q    Everything you saw, did that lead you to believe that Kelly Hoy was there on behalf of Streamline Solutions?

A    Yes.

Q    Okay.  And what did Kelly Hoy of Streamline Solutions tell you on February 1st, 2016?

A    He informed me that the window would not be replaced because it opened and closed.

Q    Okay.  Was the window opening and closing the issue that you were having?

A    No, that was never the issue.

Q    Did Kelly Hoy know that, to your knowledge?

A    Yes.

Q    How did you know what he knew?

A    Kelly and I had had extensive conversations.

MR. TORRACA:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Me and Kelly Hoy had extensive conversations about the window leak and he was well aware, very aware that the issue with the window had nothing to do with it opening and closing but had to do with it leaking.

MR. TORRACA:  Same objection, Your Honor.

THE COURT:  Overruled.

BY MR. LOCKMAN:

Q    So were you surprised when you got that email from him?

A    Very surprised.

Q    When he said the window is opening and closing so it's not going to be replaced, did you feel that he was trying to honestly fix your problem?

MR. TORRACA:  Objection, Your Honor, if we're going to the state of mind.

THE COURT:  Sustained.

MR. LOCKMAN:  I can rephrase.

BY MR. LOCKMAN:

Q    Based on what you knew Kelly knew, based on your conversations, what was your reaction when you see him saying, well, the window opens and closes, it's not going to be replaced?

A    I was very surprised and sad at the same time.  A lot of the conversations that I had with Kelly led me to believe that this issue would be resolved.  He constantly told me that this issue would be resolved, and I felt confident that it would be resolved.  And when I received this email, that's when I realized that this issue would probably never be resolved.

Q    Okay.  Ultimately going into a year from closing, did you hire another company to inspect your home?

A    For the 11-month punch list, I hired Apex to do my home inspection.

Q    All right.  Let's go to P-37.

Is this the report you received?

A    Yes.

Q    Did Apex visit your home?

A    Yes.

Q    And they gave you -- and when I said Apex, Patrick Borkowski, did he visit your home?

A    Yes.

Q    And this report was issued?

A    Yes.

Q    Did you give this report to Streamline?

A    Yes.

Q    All right.  Let's go back to P-39, page 6.

Okay.  Let's do right here to here.

Okay.  So what is this email, which is dated May 13th, 2016?

A    This is about scheduling my 11-month punch list.

Q    Okay.  The punch list was everything mentioned in the attachment from the home inspector, excluding No. 2?

A    Yes.

Case ID: 190901353

Q When you're saying "home inspector," was that the Apex report?
A Yes.
Q Okay. Kelly responds; correct?
A Yes.
Q And he sends it to Lauren Corrado?
A Yes.
Q Had you met with her before?
A No.
Q Okay. Have you ever met with her?
A Not in person.
Q Have you emailed with her?
A Yes.
Q Okay. And he says: "I've never seen an inspection report that was so short. Check his warranty date. We'll deal with this this week."
And you notice below this communication is the property of Streamline Solutions. Do you see where I'm referring to?
A Yes.
Q Was there anything at any point that led you to believe that Kelly Hoy was working for anyone other than Streamline Solutions?
A No.
Q Okay. Let's go to page 5.

And you received this email from Lauren Corrado; correct?
A Yes.
Q By the way, let's go back to that email before. I'm sorry.
"Check his warranty date."
You were within a year from closing; correct?
A Yes.
Q And you were asking Kelly Hoy and Streamline to conduct an 11-month walk-through pursuant to the warranty; correct?
A Yes.
Q We can go back, page 5. Let's go all of the way down.
All right. This is an email from Lauren to you, copying Kelly; correct?
A Yes.
Q And if you look at her email signature, Lauren Corrado, executive assistant -- let's zoom in on this a little more -- Streamline Solutions; correct?
A Yes.
Q Same address?
A Yes.
Q 2301 Washington. Same logo, Streamline

Solutions?
A Yes.
Q Let's go back to your warranty for a second, P-31.
All right. Same name; correct?
A Yes.
Q Same logo; correct?
A Yes.
Q Same address; correct?
A Yes.
Q Okay. Let's go back to P-39, page 17.
Okay. Here's an email from Lauren Corrado on June 10th, 2016; right?
A Yes.
Q Was this in response to your 11-month walk-through request where you submitted that report?
A This was after they came to my house.
Q Okay. When you submitted that Apex report, did they do any work in response?
A Yes.
Q All right. And then this email is Lauren. What was your understanding of the importance of this email?
A This is Lauren telling me that all of my

requests had been resolved.
Q Okay. Again, she's sending it on behalf of Streamline Solutions; right?
A Yes.
Q Same logo?
A Yes.
Q Same name?
A Yes.
Q All right. In 2018, you had Mr. Lunny come to your home; correct?
A Yes.
Q What precipitated that visit? Why did that visit happen?
A Because I saw more leaking coming from my large front window and I had found a lot more -- other leaks going on in my house.
Q Okay. And let's go to page 2 of P-39, up top.
What are you trying to communicate here?
A This is an email that I sent to Lauren Corrado at Streamline explaining about what Lunny had told me.
MR. TORRACA: Objection, Your Honor.
THE COURT: I think --
MR. LOCKMAN: It's not for the truth

Case ID: 190901353

representatives cleaned your deck?

A When I first had issues, Bill from Nineteenth Street was the first one to come and look at my roof.

Q Got it. So you have an understanding that there was two separate entities, Nineteenth Street and Streamline?

A Yes. I was told by Harriet that Streamline could not come out right at the beginning of my issues and that Bill would check on it until someone from Streamline was able to show up and remediate.

Q Got it. Any other maintenance that was done other than during that warranty time frame to the exterior of your building?

A Only the roof and the front window was worked on.

Q Okay. So you worked on the roof after the one-year warranty?

A I did not personally work on the roof after the one-year warranty.

Q Did anyone on your behalf work on the roof after that one-year warranty besides McDermott in 2021?

A I don't recall any work being done.

Q Okay. The same question with the window: After the one-year warranty, did you have anyone on your behalf working on the window up until 2021?

A No.

Q You mentioned every time it rained having to go back and do something to the house. I think you were working, you would come back, you were trying to stem the tide or something along those lines?

A Yes.

Q What would you do?

A I would go in with fans, set up fans to try to blow and air out the moisture coming in. I would place towels underneath on the floor and underneath the window because there was constant leaks coming in. Any time that water was appearing on my dry walls or on the ceilings in my home, I would always blow a fan at it. And I was just there keeping an eye on it, making sure that -- to minimize the damage.

Q This leak that we discussed started in -- I want to say January of 2016 or was it earlier?

A I first saw the leaks occurring within one month after purchasing my home.

Q So it would be late 2015; is that right?

A It would be beginning of summer 2015, right after I purchased the home.

Q Okay. And there have been some repairs to the window?

A There had been duct tape placed on the top of the window by Streamline, and then afterwards a weather strip was put on one side of the window by Streamline. That was all of the work that was done.

Q Okay. It continued to leak?

A Yes. After the one-year warranty was up, it continued to leak.

Q So during that time frame after they put the weather -- was it weather stripping you said?

A Yes, it was a weather strip.

Q After they put that weather stripping on up until after the one-year warranty, it didn't leak?

A I had not visually seen any leaking coming through from the weather-stripped part from the time that Kelly had applied the weather strip to the end of the warranty.

Q But there was still a concern that this window was going to leak, that's why you got that 11-month inspection?

A The 11-month inspection was not just for the window. It was for all of the other leaks occurring in the home.

Q Okay. So after the warranty is done sometime in 2016, you're saying that the leak at the window came back or persisted or what happened?

A Yes, many times the leak would return.

Q And did you ever seek a contractor before Five Star in 2019 to take a look at specifically that window?

A Yes. I had a friend of mine come through a contractor and look at my window several times.

Q And did they ever fix it?

A No.

Q Did they ever say this is something you can do or not do?

A He also agreed that the window would most likely have to be replaced to get fixed.

Q Okay. So did he try a patch or some sort of repair to stem the water from coming in at that spot?

A No, because he was not the window specialist and he recommended that I use a window specialist and/or contact MI Windows to have the window replaced.

Case ID: 190901353

# EXHIBIT 6

Case ID: 190901353

**Excerpt of Trial Exhibit, P-37**
**Apex Inspections Report May 12, 2016**

34666691v.1

Case ID: 190901353



PO Box 63827, Philadelphia, PA 19147
888-927-3944
Patrick.borkowski@apexinspections.net
5/12/2016

Matt Selbovitz

1369 Crease Street

Philadelphia, PA 19125

The following items were found to not be completed at the time of walkthrough.

1. It was reported that the 2nd floor front center casement windows have previously leaked. Repairs were reportedly performed at the window, and there are currently no signs of any active leaking. Recommend monitoring the window for any signs of leaking. If leaking occurs, repairs will be required.
2. The filter at the air handler in the basement is dirty/restrictive.
3. It was disclosed that the heating system produced a gas odor when operated, that is most significant at the front entrance and lower basement room. No concerns were observed at the time of inspection. Monitor the heater and adjacent areas. If any concerns are discovered, repairs will be required.
4. There is a covered sprinkler head in the basement utility closet, adjacent to the heating system.
5. The toilet at the 1st floor bathroom is loose to the floor.
6. The bull nose trim at the top of the short stairway from the front entrance sits above the wood flooring.
7. There is cracking and deterioration to the grout at the 1st floor bathtub surround.
8. The door to the 1st floor rear bedroom does not latch shut.
9. The underside of the roof deck railing is not sealed to the stucco.
10. The rear closet door in the 3rd floor rear bedroom rubs the frame when closed.
11. The shower head at the 3rd floor hall bathroom leaks where it meets the shower supply piping.
12. The shower door at the master bathroom shower stall is not properly aligned and it was disclosed that the door has been adjusted, however continues to shift/sag. Recommend repairs to the door to allow for proper operation.
13. The trim around the exterior of the roof deck door is not painted/sealed.
14. It was disclosed that there was previous leaking from the roof. No active leaking was observed at the time of inspection. Monitor the area and if any leaking occurs, repairs will be required.


If you have any questions or concerns, please feel free to contact me.

# Patrick Borkowski

President / Building Consultant

SELBOVITZ000210    Case ID: 190901353

# EXHIBIT 7

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H, Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com



*Filed and Attested by the*
*Office of Judicial Records*
*11 SEP 2019 01:48 pm*
*A. SILIGRINI*

*Attorneys for Plaintiff*

---

| | | |
|---|---|---|
| **DANIEL KIRK and CLARISA KIRK** | : | **COURT OF COMMON PLEAS** |
| **1371 Crease Street** | : | **PHILADELPHIA COUNTY** |
| **Philadelphia, PA 19125** | : | |
| | : | |
| **Plaintiffs** | : | **CIVIL ACTION** |
| | : | |
| | : | **SEPTEMBER 2019 TERM** |
| **v.** | : | |
| | : | **No.** |
| **STREAMLINE SOLUTIONS, LLC** | : | |
| **1241 N. Fifth Street, First Floor** | : | |
| **Philadelphia, PA 19122** | : | |
| | : | |
| **and** | : | |
| | : | |
| **NINETEENTH STREET** | : | |
| **DEVELOPMENT, LLC** | : | |
| **888 Red Wing Lane** | : | |
| **Huntingdon Valley, PA 19006** | : | |
| | : | |
| **and** | : | |
| | : | |
| **HARMAN DEUTSCH CORP.** | : | |
| **631 N. 12th Street** | : | |
| **Philadelphia, PA 19123** | : | |
| | : | |
| **Defendants** | : | |

---

### NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objection to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the

Case ID: 190901353

complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFOR TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSON AT A REDUCED FEE OR NO FEE.**

<div align="center">

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

</div>

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H, Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com                          *Attorneys for Plaintiff*

_____

| | | |
|---|---|---|
| **DANIEL KIRK and CLARISA KIRK** | : | **COURT OF COMMON PLEAS** |
| **1371 Crease Street** | : | **PHILADELPHIA COUNTY** |
| **Philadelphia, PA 19125** | : | |
| | : | |
| **Plaintiffs** | : | **CIVIL ACTION** |
| | : | |
| | : | **SEPTEMBER 2019 TERM** |
| **v.** | : | |
| | : | **No.** |
| **STREAMLINE SOLUTIONS, LLC** | : | |
| **1241 N. Fifth Street, First Floor** | : | |
| **Philadelphia, PA 19122** | : | |
| | : | |
| **and** | : | |
| | : | |
| **NINETEENTH STREET** | : | |
| **DEVELOPMENT, LLC** | : | |
| **888 Red Wing Lane** | : | |
| **Huntingdon Valley, PA 19006** | : | |
| | : | |
| **and** | : | |
| | : | |
| **HARMAN DEUTSCH CORP.** | : | |
| **631 N. 12th Street** | : | |
| **Philadelphia, PA 19123** | : | |
| | : | |
| **Defendants** | : | |

_____

Usted ha sido demandado en la corte.  Si desea defenderse de las reclamaciones establecidas en las páginas siguientes, usted debe actuar dentro de los veinte 20 días después de esta denuncia y sirve aviso, entrando en un aspecto escrito personalmente o por abogado y presentar por escrito ante el Tribunal sus defensas u objeción a las pretensiones establecidas contra usted.  Se le advertirá que si no lo hace el caso puede proceder sin usted y un juicio puede ser en su contra por el tribunal sin más notificación reclamados en la demanda de dinero o de cualquier otra reclamación o ayuda solicitados por el demandante.  Puede perder el dinero o la propiedad u otros derechos importantes a usted.  USTED DEBE

Case ID: 190901353

**TOMAR ESTE DOCUMENTO A SU ABOGADO A LA VEZ. SI NO TIENES UN ABOGADO, IR A O POR TELÉFONO AL SIGUIENTE. ESTA OFICINA PUEDE PROVEER INFORMACIÓN SOBRE LA CONTRATACIÓN DE UN ABOGADO. SI USTED NO PUEDE ELLO PARA CONTRATAR A UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN LE.**

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com          *Attorneys for Plaintiff*

| | | |
|---|---|---|
| **DANIEL AND CLARISA KIRK,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO.** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiffs, by and through their attorneys, Horn Williamson LLC, hereby file this Complaint, and aver as follows:

### Parties and Venue

1. Plaintiffs Daniel and Clarisa Kirk (the "Kirks") own and reside in a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 (the "Kirk Home" or "Home").

2. Upon information and belief, Defendant Nineteenth Street Development LLC ("Nineteenth Street") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of residential homes whose principal place of business is located at 888 Red Wing Lane, Huntingdon Valley, PA 19006.

3. Upon information and belief, Defendant Streamline Solutions, LLC ("Streamline") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of

Case ID: 190901353

residential homes, whose principal place of business is located at 1241 North 5th Street, First Floor, Philadelphia, Pennsylvania 19122.

4.     Defendants Nineteenth Street and Streamline are hereinafter collectively referred to as the "Builder Entities" or "Builder Defendants."

5.     Upon information and belief, Defendant Harman Deutsch Corp. ("Harman") is a professional corporation performing architectural and/or design services whose principal place of business was located at 631 North 12th Street, Philadelphia, Pennsylvania 19123.

## BACKGROUND FACTS

6.     Plaintiffs are the owners of one unit in a connected town home development having an address: 1371 Crease Street, Philadelphia, Pennsylvania 19125.

7.     Upon information and belief, Nineteenth Street and Streamline developed the property on which the Kirk Home is situated.

8.     Upon information and belief, Nineteenth Street and Streamline advertised, marketed, constructed, and warranted the Kirk Home.

9.     It is believed and therefore averred that Nineteenth Street sold the Kirk Home to Plaintiffs.

10.     It is believed and therefore averred that Streamline is a partner and/or subsidiary and/or affiliate of Nineteenth Street.

11.     It is believed and therefore averred, at all times relevant hereto, that with respect to the Kirk Home, Nineteenth Street and Streamline acted together for the purpose of purchasing land, obtaining zoning approvals, installing improvements and infrastructure, marketing, advertising, developing, constructing, obtaining city approval of the construction, selling, and warrantying several homes including the Kirk Home.

4

Case ID: 190901353

12. It is believed and therefore averred that, at all times relevant hereto, Harman prepared architectural plans and design drawings, and performed other design and/or supervisory functions in connection with the design and construction of homes including the Kirk Home.

13. In or about May 2015 Plaintiffs purchased the Home that was marketed, designed, built, and sold by the Builder Entities in or about 2014 to 2015 as new-construction homes.

14. Upon information and belief, the Kirk Home was built when the International Residential Building Code 2009 ("2009 IRC") or later building codes were in effect and the Builder Entities and its subcontractors were legally required to comply with the applicable 2009 IRC or later building codes when designing, constructing, developing, and furnishing the Kirk Home.

15. The 2009 IRC building code specifically mandated that homes be built with a weather resistant barrier.

16. Prior to buying the Kirk Home, Plaintiffs reviewed and relied upon marketing materials and representations about the Home's unique and desirable features and quality of construction.

17. The Builder Entities' marketing materials induced the Plaintiffs to believe the Builder Entities constructed an extremely high-quality home, constructed of the finest quality building products, and with the highest level of workmanship.

18. Believing the marketing literature and representations provided and made by the Builder Entities, and induced by and relying upon same, Plaintiffs entered into an Agreement of Sale to purchase the Kirk Home directly with Nineteenth Street to purchase the newly constructed home.

5

Case ID: 190901353

19. Streamline executed and provided the Plaintiffs, a Builder's Warranty (the "Warranty" or the "Warranty Program"). A true and correct copy of the Warranty is attached hereto as Exhibit "A."

20. The Warranty's Introduction stated that Streamline Solutions would provide a home that would "be free of defects, will be of specified quality, and will perform properly for a period of one year." *See id.*

21. The Warranty also included a five-year roof warranty. *See id.*

22. Plaintiffs reasonably relied upon this express warranty and all representations made by the Builder Entities with respect to the warranty as a material inducement for purchasing the Home.

23. Upon information and belief, at the time the Builder Entities entered into the Warranty Program and Agreement of Sale with the Plaintiffs and/or predecessors in interest, the Builder Entities knowingly, intentionally, willfully, and/or recklessly engaging in, or could not have been unaware that they were engaging in defective, substandard, and unlawful construction practices in connection with the Kirk Home.

24. The Builder Entities' actions (and willful inactions) violated applicable building codes and industry standards, such that it would be unconscionable, and contrary to the law and public policy of Pennsylvania, to enforce any waivers or limitations in the Warranty and/or Agreement of Sale which would operate in any way to prevent the Plaintiffs from obtaining a full recovery for the damages suffered as a result of Defendants' actions, and being awarded a remedy in this action.

25. After closing on and moving into the Home, Plaintiffs later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Home that led to

6

Case ID: 190901353

consequential damage to parts of the Home other than the exterior envelopes of the Home, as well as the interior contents of Home. However, Plaintiffs were unable to see or understand the cause of the deterioration.

26. The Plaintiffs hired certified building envelope inspectors to conduct stucco inspections and moisture analyses of the Home.

27. The stucco inspection and moisture analysis performed revealed that the Home experienced, and is currently experiencing, significant water intrusion issues and consequential damages caused by numerous construction deficiencies and defects.

28. The Kirk Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion and water damage, rot, and mold infestation.

29. Upon information and belief, the Builder Defendants knew, or should have known, that they were engaging in defective, substandard, and unlawful construction practices in connection with the Kirk Home.

30. The full extent of damage to the Kirk Home cannot be assessed unless more extensive destructive testing, or actual repair and remediation of the Home is performed.

31. The damage to the Home cannot be repaired without stripping the existing defective exterior envelopes and recladding all, or substantially all, portions of the Home.

32. The cost of remediating the defective construction and the cost of repair the consequential damages is in excess of $140,000.00.

33. Additional costs and damages suffered or to be suffered by the Plaintiffs because of the aforementioned construction defects and consequential damage, include, but are not limited to:

Case ID: 190901353

a.  Alternative living expenses during remediation and repair;

b.  Damage to doors and windows;

c.  Damage to interior framing and drywall;

d.  Damage to window treatments, window sills, and interior painting;

e.  Damage to landscaping, turf, driveways, sidewalks, patios and decks;

f.  Interruption of use and enjoyment of the Home;

g.  Permanent loss and diminution of value to the Home, even after successful remediation and repair, due to the existence of the kind of construction defects within the Development, decreasing the willingness of potential buyers to purchase the Home, and thus decreasing the marketability and market value of the Home; and

h.  Such other costs and damages that may be incurred during remediation and repair of construction defects and damages that cannot be fully known until the project is underway.

34.  The Builder Defendants, through their representatives, employees, and/or agents, have:

a.  Represented that goods or services have characteristics, uses, and/or benefits that they do not have;

b.  Represented that goods or services are of a particular standard, quality, or grade when they are of another;

c.  Failed to comply with the terms of a written agreement or warranty given to the Plaintiffs, prior to or after a contract for the purchase of the Home; and/or

d.  Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

35.  The Builder Defendants failed to comply with the terms of written Agreement of Sale and express warranties given to the Plaintiffs, prior to and/or after entering into a contract for the purchase of the Home.

8

Case ID: 190901353

36.     Plaintiffs subsequently retained counsel to seek relief against the Builder Defendants for the damage to the Home caused by the Defendants' defective, substandard, and unlawful construction of the Home.

37.     Through counsel, the Plaintiffs requested the Builder Defendants cure their construction defects on or about November 9, 2018.  A true and correct copy of the Plaintiffs' Notice to Cure is attached hereto as Exhibit "B."

38.     In spite of contractual obligations, and in violation of implied warranties of workmanship and habitability, and in breach of the Builder Defendants' duty of care, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiffs' Notice to Cure, offer to remediate the Home, or offer to pay the Plaintiffs the cost of repairing the Home.

39.     The negligence or intentional malfeasance of the Builder Defendants and/or their subcontractors, in constructing certain components or elements of the Home, has been the proximate cause of consequential damage to other parts of the Home, such as:

    a.  Negligently (or intentionally/recklessly improperly) installed windows, doors, and other fenestrations have allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

    b.  Negligently (or intentionally/recklessly improperly) installed window and door flashing has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home;

    c.  Negligently (or intentionally/recklessly improperly) installed roofing systems, including roof flashing, has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

Case ID: 190901353

d. Negligently (or intentionally/recklessly improperly) installed gutter and downspout systems that are inadequate and insufficient to contain and divert water away from the exterior walls of the Home;

e. Negligently (or intentionally/recklessly improperly) installed weather barrier has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

f. Negligently (or intentionally/recklessly improperly) installed lath has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

g. Negligently (or intentionally/recklessly improperly) installed stucco has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

h. Negligently (or intentionally/recklessly improperly) installed brick has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home; and

i. Negligently inspected (or uninspected) workmanship of the Home, both during and after construction, has caused a defectively manufactured and leak-prone home to be delivered to the Plaintiff.

**FACTS COMMON TO CLAIMS AGAINST HARMAN**

40. Upon information and belief, Harman was the architect/designer that designed the Kirk Home.

41. Upon information and belief, Harman prepared and stamped architectural design drawings for several homes including the Kirk Home.

Case ID: 190901353

42. Upon information and belief, the Builder Defendants entered into a written contract with Harman (the "Harman Design Contract") to serve as a design professional and/or architect for several homes including the Kirk Home, and to provide design documents for construction of the Home. The Plaintiffs were not in privity of contract with Harman and is not in possession of the Harman Design Contract. Plaintiffs expect to obtain true and correct copies of the Harman Design Contract during the discovery phase of this litigation.

43. Upon information and belief, the Harman Design Contract established a professional relationship between the Builder Defendants and Harman, who designed the Kirk Home.

44. Upon information and belief, in accordance with the Harman Design Contract, Harman prepared design plans to be used for obtaining the necessary permits and for constructing the Kirk Home.

45. Upon information and belief, Harman knew that the design plans and specifications prepared pursuant to the Harman Design Contract were intended to be used to construct the Kirk Home, for the direct and intended benefit of the future occupants of the Home.

46. Upon information and belief, Harman supplied design plans, specifications, and information necessary to construct the Kirk Home.

47. The Builder Defendants promised that the Kirk Home was or would be designed and constructed in compliance with, and pursuant to, industry standards and applicable codes and regulations, and free from defects.

48. Harman owed a duty to the public, and particularly, to the future purchasers and residents of the Home, to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

11

Case ID: 190901353

49. Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public . . . or other individual who may be affected by the professional work for which [the Architect] is responsible." *See* 49 Pa. ADC § 9.151(1)-(3).

50. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See id*.

51. By submitting the design plans and specifications to the Builder Defendants to be used in the construction of the Home, Harman represented that the information they supplied would permit the Builder Defendants to construct the Kirk Home in accordance with all relevant building laws and regulations.

52. Harman represented that the information they supplied pursuant to the design plans and specifications for the construction of the Kirk Home, if followed during the course of construction, would result in residential structures that were habitable and free from water and moisture infiltration.

53. Ultimately, the information, *vis a vis* the design plans and specifications and other information provided by Harman, was false, defective, and deficient.

54. Harman's provision of deficient and defective design plans and specifications constituted a breach of the Harman Design Contract.

55. Harman further breached the standard of care required of professional architects in the Commonwealth of Pennsylvania.

56. Harman's false, deficient, and defective design plans and specifications resulted in the construction of defective exterior envelopes and stucco systems, and caused significant water

12

Case ID: 190901353

and moisture infiltration into the Kirk Home, thereby causing significant and serious damage requiring remediation and repair.

## FACTS RELATING TO THE KIRK HOME

57. On or about April 4, 2015, Daniel and Clarisa Kirk (the "Kirks") entered into an Agreement of Sale with Nineteenth Street, whereby Nineteenth Street agreed to sell them a Home located at 1371 Crease Street, Philadelphia, Pennsylvania (the "Kirk Sales Agreement"), which was properly designed and constructed, in compliance with and pursuant to industry standards and applicable codes and regulations, and free from defects. A true and correct copy of the Kirk Sales Agreement is attached hereto as Exhibit "C."

58. A Certificate of Occupancy was issued for the Kirk Home by the City of Philadelphia on or about May 29, 2015 (the "Kirk CoO"). A true and correct copy of the Kirk Certificate of Occupancy is attached hereto as Exhibit "C."

59. At or around the time of settlement, on May 29, 2015, Nineteenth Street provided the Kirks with an executed deed to their home (the "Kirk Deed"). A true and correct copy of the Kirk Deed is attached hereto as Exhibit "E."

60. The Kirks began their search for a new home in or about early 2014.

61. When deciding to purchase their new Home, the Kirks were interested in purchasing a new construction, high-end, quality home.

62. The Kirks looked for homes for over one year, including several homes built by other developers and builders, specifically in the Fishtown section of Philadelphia due to the neighborhood's "up and coming" reputation.

63. The Kirks chose the Home due to the location, parking, and due to the Home's apparent quality.

Case ID: 190901353

64. Based on the marketing materials and Warranty, the Kirks believed that the Builder Defendants stood behind their homes' quality and would remain available to address any concerns they may have regarding their home.

65. In reliance on the contents of representations made in marketing materials and the Warranty, the Kirks finalized their decision and ultimately purchased and took possession of the Home on or about May 29, 2015.

66. On or about May 19, 2016, prior to the expiration of their One-Year Warranty, the Kirks hired Chilmark Home Inspections to perform an inspection of the Home. A true and correct copy of the May 19, 2016 Chilmark Inspection Report is attached hereto as Exhibit "F."

67. The Kirks subsequently sent the findings in the report, specifically relating to the stucco, to Streamline by way of warranty repair request, on May 23, 2016. A true and correct copy of the correspondence between the Kirks and Streamline employees Kelly Hoy and Lauren Corrado is attached hereto as Exhibit "G."

68. In response, Kelly Hoy of Streamline wrote notes on the Chilmark report, specifically indicating that "cracks in stucco are normal" on page 8 of the report. A true and correct copy of the edited Chilmark Report is attached hereto as Exhibit "H."

69. In justifiable reliance on the representations made by Streamline, the Kirks decided not to pursue the stucco concerns further, believing those representations and that no further inspection or repair was necessary.

70. Years later, because of the issues their neighbors were experiencing, the Kirks hired Lunny Building Diagnostics ("Lunny") to perform a Building Moisture Survey of their Home on September 15, 2018. A true and correct copy of the Lunny Building Moisture Survey (the "Lunny Moisture Survey") is attached hereto as Exhibit "I."

Case ID: 190901353

71. Lunny preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including but not limited to:

a. Lack of flashing on the brick veneer;
b. Missing movement joints;
c. Missing window flashing;
d. Improper flashing detail at intersection of dissimilar materials;
e. Missing drainage detail;
f. Stucco thickness of ½", less than the required 7/8" thickness;
g. Missing drip edge; and
h. Missing kickout diverters.

*See id.*

72. Lunny found preliminary evidence of the following damage to the Kirks' Home as a direct and proximate result of the above-referenced construction defects, which include, but are not limited to:

a. Elevated moisture readings around windows and doors;
b. Areas of soft, no resistance, decayed, and deteriorated sheathing;
c. Cracks in the cladding;
d. Bulges in the cladding; and
e. Efflorescence on the cladding.

*See id.*

73. Lunny thus determined that "based on the number of installation deficiencies and Building Code violations full remediation of the exterior cladding system is recommended for this home at this time" *Id*. at p. 14.

74. The Kirks have not performed repairs to the stucco or building envelope on his Home.

75. The Kirks subsequently retained counsel to seek relief against the Builder Defendants.

Case ID: 190901353

76. Through counsel, the Kirks notified the Builder Defendants of the defects and damage to their Home. *See* Ex. B.

77. The Kirks anticipate that to fully remediate their home, it will cost in excess of $140,000.00.

78. The Kirks have satisfied all conditions precedent to filing this action.

<div align="center">

**COUNT I**
**BREACH OF CONTRACT**
**PLAINTIFF**
**v.**
<u>**NINETEENTH STREET AND STREAMLINE**</u>

</div>

79. Plaintiffs hereby incorporate the preceding paragraphs as if set forth at length herein.

80. The Plaintiffs purchased the Home pursuant to an Agreement of Sale, whereby the Builder Defendants agreed to sell the Kirk Home that was properly constructed in a reasonably workmanlike manner, free of construction defects, and that were habitable, in compliance with industry standards and local building code requirements, and inspected by the Builder Defendants' trained personnel prior to delivery.

81. The Kirk Home, in fact, was not properly designed or constructed in compliance with industry standards or local building code requirements and, upon information and belief, were not properly inspected by the Builder Defendants' trained personnel prior to delivery. Nor is the Home habitable, free of construction defects, and/or built in a reasonably workmanlike manner.

82. Nineteenth Street has materially breached the Plaintiffs' Agreement of Sale.

83. As a direct and proximate result of the Builder Defendants' material breach of the Agreement of Sale, the Plaintiffs incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and

<div align="center">16</div>

Case ID: 190901353

damages in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

84.     To the extent that the Plaintiffs' Agreement of Sale was entered into by and between the Plaintiffs and Nineteenth Street, and not directly with Streamline, Streamline is properly named as Defendants in connection with the cause of action in Count I, and should be held jointly and severally liable with Nineteenth Street because they acted as a common business enterprises and/or single entity in all aspects of their business

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against Nineteenth Street and Streamline for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

<div align="center">

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**PLAINTIFF**
**v.**
**STREAMLINE**

</div>

85.     Plaintiffs hereby incorporate the preceding paragraphs as if set forth at length herein.

86.     The Builder's Warranty contained an express warranty from Streamline to the Plaintiff.

87.     The Plaintiffs reasonably relied upon the express representations and certifications of Streamline by:

    a.   Entering into Agreement of Sale to purchase the Home;

    b.   Giving money to the Builder Defendants and obtaining mortgage loan(s) to purchase the Home; and

<div align="center">17</div>

Case ID: 190901353

c. Moving belongings into the Home, buying furniture and making other improvements to the Home.

88. The certifications and representations made by Streamline in the Builder's Warranty constituted express warranties that the Kirk Home had been built in compliance with the applicable building codes, and that the Home was habitable and built in a good, workmanlike manner and inspected by Streamline's trained personnel prior to delivery.

89. The Plaintiffs reasonably relied upon the express warranties and representations made by Streamline in the Builder's Warranty as a material inducement for purchasing the Home.

90. Streamline materially breached the express warranty extended to the Plaintiffs in the Builder's Warranties by failing to build the Home in strict compliance with the applicable building codes, failing to build the Home in a habitable, good, and workmanlike manner, and failing to have the Home inspected by Streamline's trained personnel prior to delivery.

91. The express warranty contained the following language: "Streamline Solutions pledges to the owner…that all material, workmanship, and/or building improvements provided for in the course of their building project will be free of defects, will be of specified quality, and will perform properly for a period of one year."

92. Any purported limitations in the express warranty is rendered null and void by Streamline's failure to construct the Kirk Home in accordance with applicable building codes.

93. As a direct and proximate result of Streamline's material breach of the express warranty, the Plaintiffs have incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

18

Case ID: 190901353

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against Streamline, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT III**
**BREACH OF THE IMPLIED WARRANTY OF WORKMANLIKE**
**CONSTRUCTION**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

94. Plaintiffs hereby incorporate the preceding paragraphs as if set forth at length herein.

95. The Kirk Home, built and sold by the Builder Defendants, contained, as a matter of law, an implied warranty that the Home, which the Builder Defendants marketed, developed, constructed, and sold, would be built in a reasonably workmanlike manner and free of construction defects.

96. The Plaintiffs reasonably and justifiably relied upon this implied warranty.

97. The Builder Defendants knew that the Plaintiffs would reasonably and justifiably rely upon this implied warranty.

98. The Builder Defendants failed to supervise construction of the Kirk Home and/or failed to construct the Home in a workmanlike manner.

99. The Home, as built and sold by the Builder Defendants, exhibits construction defects that allow water to infiltrate the Home; the exterior envelope is wet, deteriorating and rotting, and was not built to the applicable building codes, industry standards or the contemporary

19

Case ID: 190901353

community standards, and does not meet the definition of reasonable workmanship under Pennsylvania law.

100. As a result, the Builder Defendants have materially breached the implied warranty of workmanlike construction.

101. The Builder Defendants are liable to the Plaintiffs for breach of implied warranty of workmanlike construction, and for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT IV**
**BREACH OF THE IMPLIED WARRANTY OF HABITABILITY**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

102. Plaintiffs hereby incorporate the preceding paragraphs as if set forth at length herein.

103. The various components comprising the exterior envelopes of the Kirk Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, manufactured brick, wood and siding, were designed and installed by the Builder Defendants and/or its agents, with the intent that it serve as protection to the

20

Case ID: 190901353

occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

104. However, as set forth above, the various elements of the exterior envelope of the Home was defectively constructed and improperly installed.

105. The Builder Defendants impliedly warranted that the Home, which the Builder Defendants marketed, designed, constructed, supervised construction, and sold, would be constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

106. The Builder Defendants knew, or should have known, that the Plaintiffs would rely upon this implied warranty.

107. The Plaintiffs did, in fact, rely upon this implied warranty and such reliance was reasonable.

108. The Builder Defendants' defective construction directly and proximately caused substantial water infiltration into the Kirk Home, and resultant water and/or mold damage to the Home.

109. The water damage and/or mold damage to the Home, which was caused by the Builder Defendants' acts and/or omissions, render the Home uninhabitable.

110. The Builder Defendants breached the implied warranty of habitability by failing to properly construct the Kirk Home in a reasonable workmanlike manner and free of defects, thereby rendering the Home uninhabitable.

111. As a direct and proximate result of the Builder Defendants' breach of the implied warranty of habitability, the Plaintiffs have incurred, and will continue to incur, substantial

Case ID: 190901353

damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT V**
**NEGLIGENCE**
**PLAINTIFFS**
**v.**
**NINETEENTH STREET AND STREAMLINE**

112. Plaintiffs incorporate the preceding paragraphs as if set forth at length herein.

113. The various components comprising the exterior envelopes of the Kirk Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, and manufactured stone, were designed and/or installed by the Builder Defendants, and/or its subcontractors, with the intent that the exterior envelopes of the Home serves as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

114. However, as set forth above, the various elements of the exterior envelope of the Kirk Home was negligently designed and/or negligently installed.

115. The Builder Defendants owed a duty to the Plaintiffs to construct, supervise construction, and sell homes – such as the Kirk Home – that were constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

116. The Builder Defendants further owed a duty to warn the Plaintiffs (and/or predecessors in interest) of any latent defects in the Home at all times, including during the design

22

Case ID: 190901353

and construction of the Kirk Home, prior to the sale of the Home, at closing and settlement, and at all times since, including the times when the Builder Defendants discovered the defects in the building envelope and stucco systems in other homes that had the same architect/designers, construction managers, site managers, subcontractors, oversight and supervision, suppliers, and manufacturers.

117. The Builder Defendants were responsible for installing, and did install, aspects or parts of the exterior envelope of the Kirk Home.

118. As a direct and proximate result of the Builder Defendants' defective, careless, and negligent performance in constructing the Kirk Home, the Plaintiffs have experienced attendant property damage and damage to non-defectively constructed components of the Home.

119. The damages sustained by the Plaintiffs were caused by the negligent and careless acts and/or omissions of Builder Defendants in installing and performing their work in a defective manner as set forth above.

120. The negligence and carelessness of the Builder Defendants is the legal and proximate cause of the damages sustained by the Plaintiff.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against the Builder Defendants for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

## COUNT VI
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET. SEQ.*)
### PLAINTIFFS
### v.
### NINETEENTH STREET AND STREAMLINE

23

Case ID: 190901353

121. Plaintiffs incorporate the preceding paragraphs as if set forth at length herein.

122. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, codified at 73 Pa.C.S.A. §§ 201-1 *et seq.* ("UTPCPL"), provides for a private right of action for anyone who suffers any ascertainable loss of money or property as a result of any method, act or practice deemed unlawful by the UTPCPL.

123. The UTPCPL provides that unfair methods, acts or practices include:

    a. Representing that goods or services have characteristics, uses benefits or qualities that they do not have (*see* 73 Pa.C.S.A. § 201-2(4)(v));

    b. Representing that goods or services are of a particular standard, quality or grade, if they are of another (*see* 73 Pa.C.S.A. § 201-2(4)(vii));

    c. Making repairs, improvements or replacements on real property of a nature or quality inferior to or below the standard that was agreed to in writing (*see* 73 Pa.C.S.A. § 201-2(4)(xvi)); and

    d. Engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding (*see* 73 Pa.C.S.A. § 201-2(4)(xxi)).

124. The Builder Defendants have violated the UTPCPL, in that they have:

    a. Represented that Kirk Home has characteristics, uses, and/or benefits that it does not have;

    b. Represented that Builder Defendants' goods or services are of a particular standard, quality or grade when they are of another; and/or

    c. Failed to comply with the terms of a written agreement or warranty given to the Plaintiff;

    d. Made repairs to the Plaintiffs' real property of a nature or quality inferior to or below the standard of that agreed to in writing; and

    e. Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

Case ID: 190901353

125. The specific acts that constitute violations of the UTCPL by the Builder Defendants are set forth more fully above throughout this Complaint.

126. As a direct and proximate result of these unlawful acts and practices, the Builder Defendants are liable to the Plaintiffs for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, as well as engineering fees, consultant fees and legal fees.

127. Pursuant to the UTPCPL, the Plaintiffs are entitled to actual damages not less than $140,000.00, as well as treble damages, costs of suit, and reasonable attorneys' fees and interest incurred in the prosecution of this litigation.

128. Plaintiff, through counsel, asked the Builder Defendants to remediate the Home.

129. Despite design and construction defects, and damage to the Kirk Home, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiffs' requests, or make any effort to inspect, let alone repair, the Home.

130. These failures to act by the Builder Defendants violate the UTPCPL.

131. The unlawful acts and practices of the Builder Defendants have been so widespread, egregious, and pervasive, involving not only the Home of the Plaintiffs herein, but, upon information and belief, also numerous other homes built by the Builder Defendants, that full treble damages, plus interest costs and attorney's fees, should be awarded to the Plaintiffs pursuant to 73 Pa.C.S.A. § 201-9.2(a).

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in excess of $140,000.00 as well as treble damages, costs of repair which are continuing, interest, penalties, costs of litigation, attorneys' fees, and for such relief as the Court may deem proper and necessary.

Case ID: 190901353

Case ID: 190901353

## COUNT VII
## NEGLIGENT MISREPRESENTATION
## PLAINTIFF
## v.
## NINETEENTH STREET AND STREAMLINE

132. Plaintiffs hereby incorporate the preceding paragraphs as if set forth at length herein.

133. The Builder Defendants made material statements and misrepresentations to the Plaintiff, orally and/or in writing, about the unique and desirable features and quality of the Home, and that the Home would be constructed in compliance with the existing building code and industry standards.

134. These communications as they pertain to the latent construction defects in the Home, were misrepresentations falsely and/or negligently made.

135. The Plaintiffs materially and reasonably relied upon the Builder Defendants' misrepresentations.

136. As a direct and proximate result of these material statements and misrepresentations to the Plaintiff, the Builder Defendants are liable to the Plaintiffs for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, which is in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT VIII

**BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)**

**PLAINTIFFS**
**v.**
**STREAMLINE**

137.    The Plaintiffs incorporate the preceding paragraphs as if set forth at length herein.

138.    Nineteenth Street contracted with Streamline for the construction of the Kirk Home.

139.    Upon information and belief, Nineteenth Street entered into a written Contract with Streamline (the "Streamline Contract"), the substance of which included the promise that Nineteenth Street would pay Streamline in exchange for Streamline constructing the Kirk Home.

140.    The Plaintiffs were not in privity of contract with Streamline and is not in possession of the Streamline Contract. Plaintiffs expect to obtain true and correct copies of the Contract during the discovery phase of this litigation.

141.    Upon information and belief, the Kirk Home was constructed while the Streamline Contract was in effect.

142.    Based upon information and belief of what is the likely language in the Streamline Contract, Nineteenth Street and Streamline intended Streamline would owe the same contractual duty to the Plaintiffs – the owners – that Nineteenth Street did.

143.    Upon information and belief, the Streamline Contract also provided additional guarantees flowing directly to the owner – the Plaintiff.

144.    It was an implied condition of the Streamline Contract that the Kirk Home was to be built pursuant to applicable building codes and prevailing industry standards.

145.    Upon information and belief of what is the likely language in the Streamline Contract, Streamline likely represented to Nineteenth Street that Streamline would properly perform its obligations under the Contract and build the Home in a workmanlike fashion, and both

Case ID: 190901353

Nineteenth Street and Streamline intended that the owner – the Plaintiffs – benefit from the proper performance of the Contract.

146. Upon information and belief, the Streamline Contract effectuated Nineteenth Street's and Streamline's intention to construct defect-free homes for the owners – here, the Plaintiff.

147. Upon information and belief, the Streamline Contract, and the circumstances surrounding its respective performance thereof, indicates that Nineteenth Street and Streamline intended to confer the benefit of Streamline's performance upon the owner – the Plaintiff.

148. The Plaintiff, as Homeowner, is a third party beneficiary of the agreement(s) between Nineteenth Street and Streamline regarding the Home.

149. Upon information and belief, Streamline breached the Streamline Contract with Nineteenth Street by failing to properly build the Kirk Home; failing to properly apply, install and/or construct certain components of the Home; failing to build the Home in a workmanlike fashion; failing to perform in accordance with applicable building codes, and failing to perform in accordance with prevailing industry standards.

150. In breach of the Streamline Contract with Nineteenth Street, the Home contains material defects, as set forth above.

151. As a direct and proximate cause of the subcontractor, Streamline's breaches and failures to properly construct the Kirk Home, the Plaintiffs have incurred, and will continue to incur, substantial damages in an amount in excess of $140,000.00, which include, but are not limited to, costs of repair and remediation and related costs and damages, diminution in market value, costs to repair and/or replace damaged interior finishes and personal property, as well as consultant fees and legal fees.

Case ID: 190901353

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against Defendant Streamline, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, costs of repair which are continuing, and diminution in market value of the Home, together with interest and costs, and for such relief as the Court may deem proper and necessary.

## COUNT IX
### BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)
### PLAINTIFFS
### v.
### HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and HARMAN & ASSOCIATES, LLC

152. Plaintiffs incorporate the preceding paragraphs as if set forth at length herein.

153. Upon information and belief, the Builder Defendants entered into the Harman Design Contract whereby Harman was to prepare and supply design plans and specifications for the Kirk Home.

154. Upon information and belief, the Harman Design Contract required that Harman supply design plans and specifications for the construction of the Kirk Home.

155. At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intent that the purchasers of the Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

156. As the seller and builder of the Kirk Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Kirk Home.

Case ID: 190901353

157. After all, Harman knew, or should have known, that the design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners, including the Plaintiffs.

158. Harman knew, or should have known, that homeowner of the Kirk Home would rely upon Harman's contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

159. Thus, Harman knew, could not have been unaware of, and intended that the Plaintiffs were the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

160. Harman breached the Harman Design Contract when it failed to perform all of its design work within the professional standard(s) governing the practice of architecture in the Commonwealth of Pennsylvania.

161. Harman breached the Harman Design Contract because its design plans and specifications were defective and deficient as they related to the stucco systems, flashing, and window installation work performed on the Kirk Home, and did not adequately or properly design the Kirk Home to adequately protect from water infiltration into the exterior envelopes of the Home.

162. Plaintiffs intend to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

163. As a result of Harman's false, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiffs have been damaged in the aggregate amount in excess of $140,000.00, representing the estimated

Case ID: 190901353

cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT X
## PROFESSIONAL NEGLIGENCE (THIRD PARTY BENEFICIARY)
## PLAINTIFFS
### v.
## HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and
## HARMAN & ASSOCIATES, LLC

164.    Plaintiffs incorporate the preceding paragraphs as if set forth at length herein.

165.    Upon information and belief, the Builder Defendants entered into the Harman Design Contract with Harman as the architect and/or designer, to prepare and supply design plans and specifications for the Kirk Home.

166.    Upon information and belief, the Harman Design Contract created a professional relationship between the Builder Defendants and Harman.

167.    At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intentions that the purchaser of the Kirk Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

168.    As the seller and builder of the Kirk Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Kirk Home.

31

Case ID: 190901353

169. Similarly, Harman knew and intended that initial and subsequent purchasers of the Home benefit from the construction of the Home, which was to be built by the Builder Defendants in accordance with the design plans and specifications supplied by Harman.

170. After all, Harman knew, or should have known, that its design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners such as the Plaintiff.

171. Harman knew, or should have known, that homeowners of the homes being built – such as Plaintiffs – would rely upon Harman's contractual obligations to the Builder Defendants to design the homes correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

172. During the construction process, the Plaintiffs were generally aware that the Home had been designed by an architect and/or design professional.

173. The Homeowner Plaintiffs relied upon Harman to satisfy its contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

174. Harman knew, could not have been unaware of, and intended the Plaintiffs to be third-party beneficiaries of the Harman Design Contract between the Builder Defendants and Harman.

175. The Plaintiffs are the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

176. Harman owed a duty to all purchasers of the homes – such as the Kirk Home – to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

Case ID: 190901353

177. Since Harman held itself out as an architect, Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public or other individual who may be affected by the professional work for which [the Architect] is responsible."

178. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See* 49 Pa. ADC § 9.151(1)-(3).

179. In contravention of the applicable standard of care, Harman's design plans and specifications were defective and deficient, and did not comply with applicable laws and regulations, as the design plans and specifications related to the stucco systems, flashing, and window installation work performed on the Kirk Home, and did not adequately design the Home to protect from water infiltration into the exterior envelope of the Kirk Home.

180. Plaintiffs intend to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

181. Thus, Harman breached the standard of care required of professional architects in Pennsylvania.

182. Further, Harman breached the required standard of care when it held itself out as an architect in Pennsylvania.

183. Plaintiffs have been damaged in an amount in excess of $140,000.00, representing the cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against Defendant Harman & Associates, P.C., a/k/a Harman Architects, PC, and Defendant Harman &

Case ID: 190901353

Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

**COUNT XI**
**NEGLIGENT MISREPRESENTATION UNDER BILT-RITE/RESTATEMENT**
**OF TORTS (SECOND) SECTION 552**
**PLAINTIFFS**
**v.**
**HARMAN & ASSOCIATES, P.C., a/k/a HARMAN ARCHITECTS, PC and**
**HARMAN & ASSOCIATES, LLC**

184. Plaintiffs incorporate the preceding paragraphs as if set forth at length herein.

185. Upon information and belief, Harman was the architect, and/or held itself out as the architect and/or designer of the Kirk Home.

186. As defined by the Restatement (Second) of Torts, Section 522, and applied in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 480, 866 A.2d 270, 286 (Pa. 2005), Harman, as a professional architecture firm, or holding itself out as such, is in the business of supplying information for the guidance of others.

187. Harman supplied the design plans, specifications, and other information to the Builder Defendants pursuant to a transaction in which Harman had a pecuniary interest.

188. Harman had a duty to exercise due regard for the safety, life, and health of intended homeowners such as Plaintiff, and to perform its work and produce designs in compliance with all relevant laws, regulations, codes, and industry standards.

189. Under *Bilt-Rite*, in supplying design plans, specifications, and other information, Harman represented that the design plans and specifications were free from deficiencies and defects.

34

Case ID: 190901353

190. In supplying the information, Harman also represented that the design plans, specifications, and other information were sufficient to permit the Builder Defendants to construct the Kirk Home, in accordance with all relevant laws, regulations, codes, and industry standards, and would be habitable and free from water infiltration.

191. Harman made its representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, with the intent to induce others, including the Builder Defendants and purchaser of the Kirk Home, to act on that information in constructing and/or purchasing the Home.

192. The Plaintiff, as the purchaser and resident of the Home, justifiably relied upon Harman, and was made to believe that the Home was designed by competent architects and were safe, habitable, and free from defects.

193. Thus, the Plaintiffs justifiably relied upon Harman's representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies.

194. Plaintiffs were generally aware that the Home had been designed by an architect and/or design professional.

195. Harman, as the architect and/or designer of the Kirk Home, knew, or should have known, that the design plans, specifications, and other information it provided to the Builder Defendants were false, incomplete, deficient, and defective.

196. However, Harman failed to exercise reasonable care to determine whether its design plans, specifications, and/or other information, were accurate and in accordance with the applicable laws and regulations.

197. Plaintiffs intend to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

Case ID: 190901353

198. Thus, Harman is liable to the Plaintiffs for its negligent misrepresentations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, pursuant to the Restatement (Second) of Torts, Section 552, and as elucidated in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*.

199. As a result of Harman's false, incomplete, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiffs have been damaged in amounts in excess $140,000.00, which includes but is not limited to, the cost to replace and repair the damaged exteriors and interiors of the Home, remedy the defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiffs hereby demand judgment in their favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential, and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

Dated: September 10, 2019

**HORN WILLIAMSON, LLC**

BY: */s/ Jennifer M. Horn, Esquire*

Jennifer M. Horn, Esquire
2 Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
*Attorneys for Plaintiff*

36

Case ID: 190901353

# EXHIBIT 8

Case ID: 190901353

**Excerpt of Trial Transcript**
**June 5, 2023**
**From Testimony of Clarisa Kirk**

**Auger v. Streamline Solutions, LLC, et al., Docket No. 190901351**
**Butera v. Streamline Solutions, LLC, et al., Docket No. 190901268**
**Kirk v. Streamline Solutions, LLC, et al., Docket No. 190901353**
**Selbovitz v. Streamline Solutions, LLC, et al., Docket No. 190401575**

**Attached Pages:**
**Trial Transcript, June 5, 2023, 85-96**
**Trial Transcript, June 5, 2023, 105-112**

33125643v.1

Case ID: 190901353

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

- - -

MATTHEW SELBOVITZ                    :  APRIL TERM, 2019
                                     :
 v.                                  :  NO. 01575
                                     :
STREAMLINE SOLUTIONS, LLC, et al. :
                                     :
- - -

DAVID BUTERA                         :  SEPTEMBER TERM, 2019
                                     :
 v.                                  :  NO.  01268
                                     :
STREAMLINE SOLUTIONS, LLC, et al. :
                                     :

- - -

NICKOLAS AUGER                       :  SEPTEMBER TERM, 2019
                                     :
v.                                   :  NO.  01351
                                     :
STREAMLINE SOLUTIONS, LLC            :
and HARMAN DEUTSCH CORP.             :

- - -

DANIEL KIRK and CLARISA KIRK     :  SEPTEMBER TERM, 2019
                                 :
v.                               :  NO.  01353
                                 :
STREAMLINE SOLUTIONS, LLC        :
and NINETEENTH STREET            :
DEVELOPMENT and HARMAN           :
DEUTSCH CORP.                    :

- - -

June 5, 2023

- - -

- - -

Courtroom 650 - City Hall

Philadelphia, Pennsylvania

- - -

BEFORE:  THE HONORABLE MICHAEL ERDOS, J.,

and a Jury

- - -

REPORTED BY: JENNIFER VENNERI, RPR

TRANSCRIBED BY: TIFFANY MONASTRA, RPR

APPEARANCES:

HORN WILLIAMSON
     BY:   MATTHEW H. DEMPSEY, ESQUIRE
           RYAN M. LOCKMAN, ESQUIRE
           1500 JFK Boulevard, Suite 1700
           Philadelphia, PA 19102

           Counsel for Plaintiffs


BBC LAW, LLP
     BY:   CARMELO T. TORRACA, ESQUIRE
           707 White Horse Pike, Suite B8
           Absecon, NJ 08201

           Counsel for Defendants Streamline and Nineteenth


OFFIT KURMAN
     BY:   FRANKLIN C. MILLER, JR., ESQUIRE
           1801 Market Street, Suite 2300
           Philadelphia, PA 19103

           Counsel for Defendant Harman Deutsch Corp.

INDEX

- - -

PLAINTIFF'S EVIDENCE

- - -

| WITNESS: | DR | CR | RDR | RCR |
|---|---|---|---|---|
| CLARISA KIRK | | | | |
| BY MR. LOCKMAN | 63 | -- | | |

- - -

EXHIBITS

- - -

| NO. | DESCRIPTION | IDENT | IN EVD |
|---|---|---|---|
| P-12 | Listing | | 67 |

Case ID: 190901353

Q   Okay.

A   And then the five-year warranty for the roof. I felt really protected that we had this warranty.

Q   When you say "five-year warranty for the roof," that's the --

A   Correct.

Q   -- a different font on the document?

A   Yes.

Q   Okay. Got it.

You ultimately closed on the home?

A   Correct.

Q   Okay. Do you remember receiving at any point a certificate of occupancy?

A   I do not.

Q   Okay. Let's go to P-4.

Do you recall ever receiving this document one way or another?

A   I don't.

Q   Okay. I want to go to P-6.

Can you identify this document for me?

A   Our settlement statement.

Q   The HUD-1?

A   Yes.

Q   Okay. If we can zoom in on the date

right there. Is this accurate as the date you settled?

A   May 29th.

Q   Okay. And you were sold the home by Nineteenth Street Development, LLC?

A   Yes.

Q   Okay. And that's what it indicates on your HUD-1; correct?

A   Yes.

Q   Let's go to P-5.

Is this the deed for your property?

A   Yes.

Q   Do you know why it says May 27th?

A   I do not.

Q   Do you have an independent recollection of the day that you closed on your home?

A   Yes.

Q   What was it?

A   I was thrilled. I mean, this was -- it was our first time buying a home. I was really excited. We felt really positive going into the experience. This was where -- I mean, the next day was our son's first birthday. We were thrilled. We were over the moon.

Q   What were your thoughts at the time about

the quality of the home and whether you'd have any issues with the home?

A   I felt great. Once we had finally seen the home, it was really beautiful. The finishings were top-notch. We felt like this was a really well constructed home. And as new construction, this really matched what we were looking for for, you know, this next chapter.

Q   Okay. I want to go to P-11, page 34 of the PDF. It's Bates stamped page Kirk 170.

If you look at the top, this is an email from May 27th, the day of your warranty. Richard Fravel, is he your realtor?

A   That's right.

Q   He indicates: "I've attached a copy of the warranty you and seller will sign and date at the time of settlement."

Does this refresh your recollection of exactly when you received the warranty?

A   Yes.

Q   Two days before closing?

A   Two days before closing.

Q   Before closing, you had two days. Did you thoroughly review the warranty?

A   We read through the warranty.

Q   Okay. You close, you're thrilled?

A   Yes.

Q   This was your first home?

A   Yes.

Q   How did that feel to finally own a home?

A   It felt amazing. We had saved for years for that down payment. And, you know, we both work hard. We felt like this was a really excellent home to purchase. And we felt like this was a home that we could have for years and it would be a great place to have future children to start our new life. So I was beyond thrilled.

Q   How long did you go in the home without any problems?

A   I mean, we had -- the first time we had a leak was less than two months into the home.

Q   All right.

A   In July, early July.

Q   Let's go to P-11, page 12 of the PDF. This is Bates stamped Kirk 148. Let's highlight that email.

This is an email from you?

A   Yes.

Q   To Rich. Is that your realtor?

A   Correct.

Case ID: 190901353

Q And tell me what happened right before -- what precipitated this email?

A The front left window in our living room. There was water at the top of the window, I think it's called transom. Water just started to come in, so of course, you know, that's concerning. We took a video and pictures and we knew we had the warranty. So we sent our photos and video to the realtor and said can you please pass this on so they could come and take a look.

Q You had photos?

A Yes.

Q And let's actually go through some of those photos. If we can go to the next page.

Who took these photos?

A I did.

Q Are these photos of your house?

A Yes.

Q And where in the house is this?

A In the front living room.

Q So up top, tell me what we're looking at.

A So the source of the water is starting high up. It's a very tall window. And it's just streaming down to the ledge and then it would come down the wall to the floor.

Q So this is about, what, six weeks after you move in maybe, not even?

A Right. I think it was the first or second week of July.

Q We'll get to the date in a second. And you have water pooling right here?

A Yes.

Q And go to the photo below.

Water is running down the wall?

A Yes.

Q Is this right below that window we just looked at?

A Yes.

Q All right. If we go back -- let's go to page 12 again.

So I showed you here, just because of pagination, this was the body of the email that you sent. So if we go back one page, page 11, this was an email you sent on July 9th, 2015; correct?

A Correct.

Q All right. If we can back up. Who is, to your knowledge, who is the recipient in terms of builder?

A I don't know.

Q Your realtor sent this email?

A Yes.

Q And he sent it that day; correct?

A July 9th, yes.

Q Twelve minutes later?

A Yes.

Q So if we back up, above, the next day there's an email from Har411@gmail.com to you. It's from the same email chain; correct?

A Correct.

Q Who is Harriet?

A She was an assistant that -- I don't know which company she was, whether it was Streamline or Nineteenth Street, but she was the assistant that in the future we would coordinate appointments with.

Q Okay. You know it was either Nineteenth Street or Streamline, you just don't know which one?

A We would refer to them as the builder.

Q Okay. Did you allow someone in to come and look at the window?

A Yes.

Q And to your knowledge, do you remember who came in?

A I don't remember.

Q Okay. Did Streamline come to your home on one occasion or more than one occasion in the next couple of years?

A Oh, yes. Streamline was always the one who arrived and would do any work we needed.

Q Generally speaking, maybe not in this instance, but generally speaking, who from Streamline would come out to your house?

A Mr. Kelly Hoy.

Q Kelly Hoy?

A Yes.

Q Okay. And did you have an understanding of who he worked for?

A I knew him as the contractor from Streamline who would respond to repairs we needed.

Q Okay. Let's go to page 18 of the document, Kirk 154.

Earlier that morning you also had another email to Harriet identifying some issues that needed to be addressed; correct?

A Yes.

Q What was the ceiling damage?

A The ceiling was above our steps that led up to the roof outside of our laundry room or our washer and dryer. The water -- there were water

Case ID: 190901353

stains above, like on the ceiling right in that area, the base of the stairs.

Q    Okay.  The posts, supporting gates, what was the issue there?

A    So we had glass -- you saw in the picture the glass, and we had the builder install posts before we moved in so we could attach the baby gate.  We needed something to attach the baby gate to the wall so we added posts.  The posts were loose.

Q    And then the railing for stairs that head to the bedroom, that's what we looked at before; correct?

A    That's right.

Q    So you're bringing this to their attention?

A    Correct.

Q    In early July; correct?

A    That's right.

Q    Okay.  Did they ultimately install the railings for you?

A    No.

Q    If we go to page 26 of this document, Kirk 162, there's an email that you sent on August 26th, 2015, at 10:33 a.m.  Let's blow that

up.

At this point you had been in the home for a little bit under three months; correct?

A    Yes.

Q    You had -- what's your oldest's name?  Aiden?

A    Aiden.

Q    How old was Aiden at this time?

A    He was 14 months.

Q    Was he crawling?

A    He was more than crawling.  He was definitely walking around.

Q    You got my little one beat.  Okay.  So --

A    Fifteen months.  Excuse me.  He was 15 months.

Q    So you're emailing Harriet again; correct?

A    Yes.

Q    Item number 1, you're again advising as to the railing issue; correct?

A    That's right.

Q    And lo and behold, your 15-month-old was trying to climb up the stairs through that side opening?

A    Yes.

Q    Did you think at this point that Streamline was going to help you get that installed?

A    Yes, it was promised to us.

Q    And then the window issue, what was the status there?

A    We still hadn't received any -- we hadn't made any progress.

Q    Okay.  Was that surprising?

A    I was surprised.

Q    Why?

A    Because I thought we were covered by the warranty and they would be reliable.  It seemed pretty straightforward when we were purchasing the home that if something came up, we could contact them and they would come and fulfill their promise.

Q    Let's go to page 29.  This is nearly a month later, 7:20 a.m. email.  So this is from September 26th of 2015; correct?

A    Yes.

Q    All right.  And this is from you to Harriet again?

A    Yep.

Q    Okay.  And what's the issue here?

A    We were still having water coming in.

Q    Okay.  Had Streamline been out to try and fix the water from the time between when you're first reporting it and then?

A    They would come out if we requested something.  But with each visit, I had assurances that it was addressed or repaired, but water ultimately was still coming in.

Q    So at this point -- so I want to be clear.  Do you remember one way or another whether Streamline came out and performed repairs on that window prior to this email?

A    By September, yes, Mr. Hoy or a Streamline representative had come out.

Q    Okay.  They had come out and nevertheless, you were still having leaking?

A    Yes.

Q    And you were asking them to replace your window?

A    Yes.

Q    Did they ever replace your window?

A    No.

Q    I want to move forward to six months later, page 31.  This is from March 7th, 2016.  At this point you had been in the home for eight months, nine months?

Case ID: 190901353

A   Yes.

Q   And you're emailing Harriet again?

A   Correct.

Q   And what's that first issue that you identify?

A   Now we have more leaks.

Q   More leaks.  Tell me where these new leaks were.

A   So the master bedroom.  In our -- into our bedroom and then the other one was what was our guest room.  So there was water stains surrounding the light switch that led to the outside patio. So, again, suggesting water was coming into our home.

Q   From the outside?

A   Correct.

Q   Did it look like this was, like, an interior?  I know -- you're not a plumber; right?

A   No.

Q   Is your husband a plumber?

A   No.

Q   Okay.  And did this look like this was coming from the exterior or the interior?

A   Yes.  We didn't have pools of water like you had seen, but we saw water stains on the wall.

Q   From the outside?  Like a wall that's an exterior wall?  Let me rephrase because I'm doing it poorly.

Was this a wall -- was this an interior wall?

A   It was an interior wall.

Q   Okay.  Could you tell where it was coming from?  The water?

A   I didn't know the source.  The water was surrounding a light switch.

Q   Okay.  So at this point -- now these are separate from that front window; correct?

A   That's right.

Q   All right.  Now, we have number 2, item number 2.  When you say reinstall front window, is that the same window we saw photos about earlier?

A   That's right.

Q   Okay.  At that point had Streamline come in and applied any sealant or caulk or done anything else?

A   Yes.

Q   So prior to March 7th, 2016, what had they done?

A   So there was a sealant applied.  That was the repair they made.  And then they also determined that there was a gap, our window wasn't

installed correctly.

Q   Installed correctly or incorrect?

A   It was not installed correctly.

Q   Who told you that?

A   Streamline.

MR. TORRACA:  Objection.

THE COURT:  Sustained.  The jury will disregard.

MR. LOCKMAN:  Okay.

BY MR. LOCKMAN:

Q   Why did you write the second section of this email?

A   Because the front window was still having water come in and the methods that Streamline was trying to repair it didn't feel like it had been corrected if more leaks were still coming in.

Q   More what?

A   Leaks.

Q   Okay.  And you indicate exactly that; correct?

A   Yes.  So I'm not an expert, but if the water is still coming in, it wasn't corrected.

Q   Okay.  And you had noted in this email that they had already tried to make repairs; correct?

A   Yes.

Q   It looked like those repairs weren't working?

A   Correct.

Q   The railing issue, this is at this point -- how many emails had you sent approximately about the railing?

A   Multiple.

Q   Okay.  And tell me what you're asking for here.

A   To have somebody come out to measure the railing and confirm what the design is.  During this process they had delegated to us to contact contractors or look into it.  I'm not a contractor nor do I know how to get a railing installed, so I was asking can you please schedule the appointment and get us the railing.

Q   This is March 7th.  Let's go to page 32. The next email on this chain is from Harriet to you; correct?

A   Yes.

Q   All right.  She said:  "It's been so long I thought you decided against the railing.  I would suggest you price it out and let us know.  I'll go back to the seller to see if he'll give you a

Case ID: 190901353

Did they ever give you a response in writing to that inspection report?

A Via email? No.

Q Okay. And I'm going to show you P-9.

Actually, I apologize. I want to go back to P-8 for one second. Let's go to page 5 of this document.

This is how it looked, how you gave it to Streamline; correct?

A Correct.

Q Okay. Now let's go to P-9.

So this is a marked-up copy of what I just showed you in P-8; correct?

A Yes.

Q Okay. Who wrote all of this?

A Kelly Hoy.

Q Did he hand this marked-up copy to you?

A Yes.

Q What did he tell you, if anything, when he handed it to you?

A He reviewed his notes with me, and the general takeaway was that these repairs have been addressed.

Q Have been addressed?

A Correct.

Q Okay. So you see on the left -- we don't need to zoom in -- there's a bunch that are checked off and some that are circled; correct?

A Yes.

Q To your knowledge, based on your conversation, what did the checks mean?

A Not a concern.

Q Were any of these items addressed?

MR. TORRACA: Objection.

THE WITNESS: Yes. I left my review --

THE COURT: Overruled.

I'm sorry, there was an objection and I overruled it. You can continue your answer.

THE WITNESS: Thank you.

I don't -- I left this review with Mr. Hoy. I don't have the specifics, but nothing stood out to me as there's a major concern.

BY MR. LOCKMAN:

Q I'm sorry?

A Nothing stood out to me after reviewing this with Mr. Hoy that there was a major concern, that we were okay.

Q Did he try to reassure you that about the home or about any issues with the home?

A Yeah. Some of them -- some of the notes are saying okay, this didn't need to be -- you know, this is okay, this isn't a big deal. So, you know, I felt like we were okay.

Q Okay. Did you believe what Mr. Hoy was telling you?

A Yes. I had -- he had been to our home several times that year throughout the process of the warranty so I had gotten to know Mr. Hoy and trusted him.

Q Did you have any concerns -- well, strike that.

When he handed this to you, had they -- okay, between the time that you give them the second inspection report and the time he hands this back to you, had Streamline performed any repairs on your home?

A Yeah, we had tried to address the windows leaking. We talked about a sealant on the windows. So Mr. Hoy was the primary person who would come to our home.

Q And so just in the lead-up to giving you this document, is it fair to say that Streamline

had made repairs?

A Yes.

Q What about the items that are circled? Did you have an understanding of what would occur there?

A I can't read the ones that are circled from here.

So the one that says the deck door trim is damaged, he wrote this will be corrected. So it seemed like we were, you know -- were pretty straightforward.

Q Okay. What about the one on the bottom? What was your understanding of the issue and what Kelly Hoy was saying?

A That here's how it would be repaired. Caulking is the first step.

Q Okay. And to be clear, you had a conversation with Kelly Hoy about this?

A Yes.

Q How long was your conversation?

A I don't remember the exact length.

Q If we go to page 2 of this document. Again, all of this handwriting, was that Kelly Hoy's to your knowledge?

A Yes.

Case ID: 190901353

Q    What was your understanding of what he's telling you here?

A    He was saying here was the issue we identified and here's how it was addressed, you don't need to worry about this or this is the repair I made and it should be addressed.

Q    Okay.  Next page.  Let's just zoom in on this section.

"Cracks in stucco are normal.  Anything over the thickness of a nickel would be repaired."

Is that what he verbally told you as well?

A    Yeah.

Q    And did he say -- did he discuss whether or not the stucco had to be replaced in any way?

A    No.  I took this as this was normal wear and tear.

Q    Okay.  Is that what Kelly was telling you?

A    Yeah.  I think, you know, he said anything over the thickness of a nickel.  I think it was just an illustration to help me understand because I was not familiar with stucco or cracks in stucco.

Q    And he was educating you?

A    Yeah, and I left thinking this was fine.

Q    Okay.  Let's go to page 4.

The circled item with the door, did he say they'd fix that or not?

A    I don't remember.

Q    Okay.  Page 7, do you recall what these issues were about?

A    Could you enlarge it?

Q    Sure.

A    Not the exact specifics, but this was just -- this was similar to what I mentioned where it's like caulking can address it.

Q    Okay.  Let's go back to P-11 and go to page 1.

The top email is from you to Kelly Hoy and Lauren Corrado from May 30th -- or excuse me, I'm sorry.  Let's go to the one at the bottom.

June 10th, 2016.  Was this in response to your providing Streamline with that inspection report?

A    I'm not sure.

Q    Okay.  Do you have a recollection of what this was about?

A    I'm not sure which specific request.

Q    Was it your understanding that Streamline indicated that they had made all necessary repairs in response to your home inspection report?

A    Yes.

Q    And did you trust them?

A    Yes.

Q    Why?

A    Well, one, we had over the year worked with Streamline and they were the people that we turned to that basically had built our home.  So every time we would go to them for repair, they would come and address it.  So they were the people that we were relying on and trusting to do the work.

Q    Okay.  After they performed their repairs, or say they performed the repairs, did all of your leaks stop?

A    No.

Q    What kept happening?

A    We still had water come in.

Q    Where?

A    The living room, the basement.  The guest room still had the light source area.  The master bedroom had stopped.

Q    Were those all items that you had requested to be addressed in the emails I showed you?

A    Yes, especially the living room was the

chronic problem.

Q    The living room, that front window we saw photos of?

A    Yes.

Q    And despite Streamline coming out, that was still leaking?

A    Yes.

Q    Did you ultimately -- now we're past a year from closing.  Did you ultimately reach out to Streamline again?

A    Yes.

Q    I want to show you the top of page 1 and I apologize for jumping the gun.

This is an email from you on May 30th, 2017.  So that's two years that day after closing; correct?

A    Yes.

Q    Why did you send this email?

A    Streamline was who we knew and trusted.  They had come during the warranty window so I wanted to reach out to them.  They were familiar that we had leaks, they were who we had worked with, so I wanted to see if they could still help us.

Q    Okay.  And the leaks from the basement

Case ID: 190901353

# EXHIBIT 9

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com


*Filed and Attested by the
Office of Judicial Records
10 SEP 2019 05:25 pm
M. BRYANT*

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| **DAVID BUTERA,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO.** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

### NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objection to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFOR TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSON AT A REDUCED FEE OR NO FEE.**

<div align="center">

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

</div>

1

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com                    *Attorneys for Plaintiff*

| | | |
|---|---|---|
| **DAVID BUTERA,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO.** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

### AVISO PARA DEFENDER

Usted ha sido demandado en la corte.  Si desea defenderse de las reclamaciones establecidas en las páginas siguientes, usted debe actuar dentro de los veinte 20 días después de esta denuncia y sirve aviso, entrando en un aspecto escrito personalmente o por abogado y presentar por escrito ante el Tribunal sus defensas u objeción a las pretensiones establecidas contra usted.  Se le advertirá que si no lo hace el caso puede proceder sin usted y un juicio puede ser en su contra por el tribunal sin más notificación reclamados en la demanda de dinero o de cualquier otra reclamación o ayuda solicitados por el demandante.  Puede perder el dinero o la propiedad u otros derechos importantes a usted.   USTED DEBE **TOMAR ESTE DOCUMENTO A SU ABOGADO A LA VEZ.  SI NO TIENES UN ABOGADO, IR A O POR TELÉFONO AL SIGUIENTE.  ESTA OFICINA PUEDE PROVEER INFORMACIÓN SOBRE LA CONTRATACIÓN DE UN ABOGADO.  SI USTED NO PUEDE ELLO PARA CONTRATAR A UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN LE.**

LAWYER REFERENCE SERVICE
PHILADELPHIA BAR ASSOCIATION
1101 MARKET STREET
PHILADELPHIA, PA 19107
(215) 238-6333

Case ID: 190901353

**HORN WILLIAMSON LLC**
Jennifer M. Horn, Esquire
Matthew H. Dempsey, Esquire
PA ID. No. 79721/312392
Two Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
215-987-3800
jhorn@hornwilliamson.com
mdempsey@hornwilliamson.com          *Attorneys for Plaintiff*

| | | |
|---|---|---|
| **DAVID BUTERA,** | : | **COURT OF COMMON PLEAS** |
| | : | **OF PHILADELPHIA COUNTY** |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO.** |
| **STREAMLINE SOLUTIONS, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiff, by and through attorneys, Horn Williamson LLC, hereby files this Complaint, and avers as follows:

### Parties and Venue

1.      Plaintiff David Butera ("Butera") owns and resides in a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125  (the "Butera Home" or "Home").

2.      Upon information and belief, Defendant Nineteenth Street Development LLC ("Nineteenth Street") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of residential homes whose principal place of business is located at 888 Red Wing Lane, Huntingdon Valley, PA 19006.

3.      Upon information and belief, Defendant Streamline Solutions, LLC ("Streamline") is a Pennsylvania limited liability company that operates as a developer, builder and/or seller of

3

residential homes, whose principal place of business is located at 1241 North 5th Street, First Floor, Philadelphia, Pennsylvania 19122.

4. Defendants Nineteenth Street and Streamline are hereinafter collectively referred to as the "Builder Entities" or "Builder Defendants."

5. Upon information and belief, Defendant Harman Deutsch Corp. ("Harman") is a professional corporation performing architectural and/or design services whose principal place of business was located at 631 North 12th Street, Philadelphia, Pennsylvania 19123.

## FACTUAL BACKGROUND

6. Plaintiff is the owner of one unit in a connected town home development having an address: 1373 Crease Street, Philadelphia, Pennsylvania 19125.

7. Upon information and belief, Nineteenth Street and Streamline developed the property on which the Butera Home is situated.

8. Upon information and belief, Nineteenth Street and Streamline advertised, marketed, constructed, and warranted the Butera Home.

9. It is believed and therefore averred that Nineteenth Street sold the Butera Home to Plaintiff.

10. It is believed and therefore averred that Streamline is a partner and/or subsidiary and/or affiliate of Nineteenth Street.

11. It is believed and therefore averred, at all times relevant hereto, that with respect to the Butera Home, Nineteenth Street and Streamline acted together for the purpose of purchasing land, obtaining zoning approvals, installing improvements and infrastructure, marketing, advertising, developing, constructing, obtaining city approval of the construction, selling, and warrantying homes including the Butera Home.

4

Case ID: 190901353

12. It is believed and therefore averred that, at all times relevant hereto, Harman prepared architectural plans and design drawings, and performed other design and/or supervisory functions in connection with the design and construction of homes including the Butera Home.

13. In or about July 2015 Plaintiff purchased the Home that was marketed, designed, built, and sold by the Builder Entities in or about 2014 to 2015 as new-construction homes.

14. Upon information and belief, the Butera Home was built when the International Residential Building Code 2009 ("2009 IRC") or later building codes were in effect and the Builder Entities and its subcontractors were legally required to comply with the applicable 2009 IRC or later building codes when designing, constructing, developing, and furnishing the Butera Home.

15. The 2009 IRC building code specifically mandated that homes be built with a weather resistant barrier.

16. Prior to buying the Butera Home, Plaintiff reviewed and relied upon marketing materials and representations about the Home's unique and desirable features and quality of construction.

17. The Builder Entities' marketing materials induced the Plaintiff to believe the Builder Entities constructed an extremely high-quality home, constructed of the finest quality building products, and with the highest level of workmanship.

18. Believing the marketing literature and representations provided and made by the Builder Entities, and induced by and relying upon same, Plaintiff entered into an Agreement of Sale to purchase the Butera Home directly with Nineteenth Street to purchase the newly constructed home.

5

Case ID: 190901353

19. Streamline executed and provided the Plaintiff, a Builder's Warranty (the "Warranty" or the "Warranty Program"). A true and correct copy of the Warranty is attached hereto as Exhibit "A."

20. The Warranty's Introduction stated that Streamline Solutions would provide a home that would "be free of defects, will be of specified quality, and will perform properly for a period of one year." *See id.*

21. The Warranty also included a five-year roof warranty. *See id.*

22. Plaintiff reasonably relied upon this express warranty and all representations made by the Builder Entities with respect to the warranty as a material inducement for purchasing the Home.

23. Upon information and belief, at the time the Builder Entities entered into the Warranty Program and Agreement of Sale with the Plaintiff and/or predecessors in interest, the Builder Entities knowingly, intentionally, willfully, and/or recklessly engaging in, or could not have been unaware that they were engaging in defective, substandard, and unlawful construction practices in connection with the Butera Home.

24. The Builder Entities' actions (and willful inactions) violated applicable building codes and industry standards, such that it would be unconscionable, and contrary to the law and public policy of Pennsylvania, to enforce any waivers or limitations in the Warranty and/or Agreement of Sale which would operate in any way to prevent the Plaintiff from obtaining a full recovery for the damages suffered as a result of Defendants' actions, and being awarded a remedy in this action.

25. After closing on and moving into the Home, Plaintiff later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Home that led to

Case ID: 190901353

consequential damage to parts of the Home other than the exterior envelopes of the Home, as well as the interior contents of Home. However, Plaintiff was unable to see or understand the cause of the deterioration.

26. The Plaintiff hired certified building envelope inspectors to conduct stucco inspections and moisture analyses of the Home.

27. The stucco inspection and moisture analysis performed revealed that the Home experienced, and is currently experiencing, significant water intrusion issues and consequential damages caused by numerous construction deficiencies and defects.

28. The Butera Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion and water damage, rot, and mold infestation.

29. Upon information and belief, the Builder Defendants knew, or should have known, that they were engaging in defective, substandard, and unlawful construction practices in connection with the Butera Home.

30. The full extent of damage to the Butera Home cannot be assessed unless more extensive destructive testing, or actual repair and remediation of the Home is performed.

31. The damage to the Home cannot be repaired without stripping the existing defective exterior envelopes and recladding all, or substantially all, portions of the Home.

32. The cost of remediating the defective construction and the cost of repair the consequential damages is in excess of $140,000.00.

33. Additional costs and damages suffered or to be suffered by the Plaintiff because of the aforementioned construction defects and consequential damage, include, but are not limited to:

    a. Alternative living expenses during remediation and repair;
    b. Damage to doors and windows;

7

Case ID: 190901353

c. Damage to interior framing and drywall;

d. Damage to window treatments, window sills, and interior painting;

e. Damage to landscaping, turf, driveways, sidewalks, patios and decks;

f. Interruption of use and enjoyment of the Home;

g. Permanent loss and diminution of value to the Home, even after successful remediation and repair, due to the existence of the kind of construction defects within the Development, decreasing the willingness of potential buyers to purchase the Home, and thus decreasing the marketability and market value of the Home; and

h. Such other costs and damages that may be incurred during remediation and repair of construction defects and damages that cannot be fully known until the project is underway.

34. The Builder Defendants, through their representatives, employees, and/or agents, have:

a. Represented that goods or services have characteristics, uses, and/or benefits that they do not have;

b. Represented that goods or services are of a particular standard, quality, or grade when they are of another;

c. Failed to comply with the terms of a written agreement or warranty given to the Plaintiff, prior to or after a contract for the purchase of the Home; and/or

d. Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

35. The Builder Defendants failed to comply with the terms of written Agreement of Sale and express warranties given to the Plaintiff, prior to and/or after entering into a contract for the purchase of the Home.

Case ID: 190901353

36. Plaintiff subsequently retained counsel to seek relief against the Builder Defendants for the damage to the Home caused by the Defendants' defective, substandard, and unlawful construction of the Home.

37. Through counsel, the Plaintiff requested the Builder Defendants cure their construction defects on or about November 9, 2018. A true and correct copy of the Plaintiff's Notice to Cure is attached hereto as Exhibit "B."

38. In spite of contractual obligations, and in violation of implied warranties of workmanship and habitability, and in breach of the Builder Defendants' duty of care, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiff's Notice to Cure, offer to remediate the Home, or offer to pay the Plaintiff the cost of repairing the Home.

39. The negligence or intentional malfeasance of the Builder Defendants and/or their subcontractors, in constructing certain components or elements of the Home, has been the proximate cause of consequential damage to other parts of the Home, such as:

a. Negligently (or intentionally/recklessly improperly) installed windows, doors, and other fenestrations have allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

b. Negligently (or intentionally/recklessly improperly) installed window and door flashing has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home;

c. Negligently (or intentionally/recklessly improperly) installed roofing systems, including roof flashing, has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

Case ID: 190901353

d. Negligently (or intentionally/recklessly improperly) installed gutter and downspout systems that are inadequate and insufficient to contain and divert water away from the exterior walls of the Home;

e. Negligently (or intentionally/recklessly improperly) installed weather barrier has allowed water intrusion that has caused damage to stucco and stone as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

f. Negligently (or intentionally/recklessly improperly) installed lath has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

g. Negligently (or intentionally/recklessly improperly) installed stucco has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home;

h. Negligently (or intentionally/recklessly improperly) installed brick has allowed water intrusion that has caused damage to stucco and brick as well as sheathing, framing, the weather barrier, lath, interior sheetrock, and interior finishes in the Home, as well as personal property content in the Home; and

i. Negligently inspected (or uninspected) workmanship of the Home, both during and after construction, has caused a defectively manufactured and leak-prone home to be delivered to the Plaintiff.

**FACTS COMMON TO CLAIMS AGAINST HARMAN**

40. Upon information and belief, Harman was the architect/designer that designed the Butera Home.

41. Upon information and belief, Harman prepared and stamped architectural design drawings for homes, including the Butera Home.

Case ID: 190901353

42. Upon information and belief, the Builder Defendants entered into a written contract with Harman (the "Harman Design Contract") to serve as a design professional and/or architect for several homes, including the Butera Home, and to provide design documents for construction of the homes. The Plaintiff was not in privity of contract with Harman and is not in possession of the Harman Design Contract. Plaintiff expects to obtain true and correct copies of the Harman Design Contract during the discovery phase of this litigation.

43. Upon information and belief, the Harman Design Contract established a professional relationship between the Builder Defendants and Harman, who designed the Butera Home.

44. Upon information and belief, in accordance with the Harman Design Contract, Harman prepared design plans to be used for obtaining the necessary permits and for constructing the Butera Home.

45. Upon information and belief, Harman knew that the design plans and specifications prepared pursuant to the Harman Design Contract were intended to be used to construct the Butera Home, for the direct and intended benefit of the future occupants of the Home.

46. Upon information and belief, Harman supplied design plans, specifications, and information necessary to construct the Butera Home.

47. The Builder Defendants promised that the Butera Home was or would be designed and constructed in compliance with, and pursuant to, industry standards and applicable codes and regulations, and free from defects.

48. Harman owed a duty to the public, and particularly, to the future purchasers and residents of the Home, to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

Case ID: 190901353

49. Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public . . . or other individual who may be affected by the professional work for which [the Architect] is responsible." *See* 49 Pa. ADC § 9.151(1)-(3).

50. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See id.*

51. By submitting the design plans and specifications to the Builder Defendants to be used in the construction of the Home, Harman represented that the information they supplied would permit the Builder Defendants to construct the Butera Home in accordance with all relevant building laws and regulations.

52. Harman represented that the information they supplied pursuant to the design plans and specifications for the construction of the Butera Home, if followed during the course of construction, would result in residential structures that were habitable and free from water and moisture infiltration.

53. Ultimately, the information, *vis a vis* the design plans and specifications and other information provided by Harman, was false, defective, and deficient.

54. Harman's provision of deficient and defective design plans and specifications constituted a breach of the Harman Design Contract.

55. Harman further breached the standard of care required of professional architects in the Commonwealth of Pennsylvania.

56. Harman's false, deficient, and defective design plans and specifications resulted in the construction of defective exterior envelopes and stucco systems, and caused significant water

Case ID: 190901353

and moisture infiltration into the Butera Home, thereby causing significant and serious damage requiring remediation and repair.

## FACTS RELATING TO THE BUTERA HOME

57. On or about June 12, 2015, Plaintiff Butera entered into an Agreement of Sale with Nineteenth Street (the "Butera Sales Agreement"), for the purchase of his Home located at 1373 Crease Street, Philadelphia, Pennsylvania (the "Butera Home"). A true and correct copy of the Butera Sales Agreement is attached hereto as Exhibit "C."

58. A Certificate of Occupancy was issued on the Butera Home on or about May 29, 2015 by the City of Philadelphia (the "Butera CoO"). A true and correct copy of the Butera Certificate of Occupancy is attached hereto as Exhibit "D."

59. On or about July 23, 2015, Butera took possession of his Home and Nineteenth Street provided Butera with an executed deed to the Butera Home (the "Butera Deed"). A true and correct copy of the Butera Deed is attached hereto as Exhibit "E."

60. Butera began his search for a new home in or about May 2015.

61. When deciding to purchase his new Home, Butera was interested in purchasing a new construction, high-end, quality home that would be a good investment.

62. Butera looked at several new construction homes built by other developers and builders.

63. Butera chose the Home due to its location and his belief that the Home was a great investment opportunity.

64. During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Butera to have the Builder Defendants to perform a further inspection of the windows.

13

Case ID: 190901353

65. Butera, through his realtor agent, contacted Nineteenth Street, who subsequently informed Butera's agent that the windows are fine.

66. Butera was provided with a one-year stucco warranty and five-year window warranty.

67. Based on the marketing materials and the Warranties, Butera believed that the Builder Defendants stood behind their homes' quality and would remain available to address any concerns they may have regarding their home.

68. In reliance on the contents of the marketing materials, the Warranties and the representations made by the Builder Defendants' representatives and/or agents regarding the quality, construction, warranty, and customer service, Butera finalized his decision and ultimately purchased and took possession of the Home on or about July 23, 2015.

69. Years later, because of the issues their neighbors were experiencing, Butera hired Lunny Building Diagnostics ("Lunny") to perform a Building Moisture Survey of their Home on September 15, 2018. A true and correct copy of the Lunny Building Moisture Survey (the "Lunny Moisture Survey") is attached hereto as Exhibit "F."

70. Lunny preliminarily found the following construction defects with respect to the Butera Home, including, but not limited to:

    a. Missing/deficient weep screed;
    b. Missing head flashing around windows;
    c. Stucco thickness of ½", less than the required 7/8" thickness;
    d. Missing movement joints;
    e. Improper transition detail;
    f. Missing drip edge;
    g. Missing mull cap on windows;
    h. Missing flashing on rear deck;

14

Case ID: 190901353

i. Improper integration of dissimilar materials; and

j. Kickout diverter not installed.

*See* Ex. F.

71. Lunny found preliminary evidence of the following damage to the Butera Home as a direct and proximate result of the above-referenced construction defects, which include:

a. Elevated moisture readings;

b. Interior staining;

c. Gaps at intersection of exterior cladding;

d. Staining on the stucco; and

e. Mold growth.

*See id.*

72. Lunny thus determined that "based on the number of installation deficiencies and Building Code violations full remediation of the exterior cladding system is recommended for this home at this time" *Id.* at p. 15.

73. Butera has not performed repairs to the stucco or building envelope on his Home.

74. Butera subsequently retained counsel to seek relief against the Builder Defendants.

75. Through counsel, Butera notified the Builder Defendants of the defects and damage to his Home. *See* Ex. B.

76. Butera anticipates that to fully remediate his home, it will cost in excess of $140,000.00.

77. Butera has satisfied all conditions precedent to filing this action.

**COUNT I**
**BREACH OF CONTRACT**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

Case ID: 190901353

78. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

79. The Plaintiff purchased the Home pursuant to an Agreement of Sale, whereby the Builder Defendants agreed to sell the Butera Home that was properly constructed in a reasonably workmanlike manner, free of construction defects, and that were habitable, in compliance with industry standards and local building code requirements, and inspected by the Builder Defendants' trained personnel prior to delivery.

80. The Butera Home, in fact, was not properly designed or constructed in compliance with industry standards or local building code requirements and, upon information and belief, were not properly inspected by the Builder Defendants' trained personnel prior to delivery. Nor is the Home habitable, free of construction defects, and/or built in a reasonably workmanlike manner.

81. Nineteenth Street has materially breached the Plaintiff's Agreement of Sale.

82. As a direct and proximate result of the Builder Defendants' material breach of the Agreement of Sale, the Plaintiff incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

83. To the extent that the Plaintiff's Agreement of Sale was entered into by and between the Plaintiff and Nineteenth Street, and not directly with Streamline, Streamline is properly named as Defendants in connection with the cause of action in Count I, and should be held jointly and severally liable with Nineteenth Street because they acted as a common business enterprises and/or single entity in all aspects of their business

Case ID: 190901353

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Nineteenth Street and Streamline for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

## COUNT II
## BREACH OF EXPRESS WARRANTY
## PLAINTIFF
## v.
## STREAMLINE

84. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

85. The Builder's Warranty contained an express warranty from Streamline to the Plaintiff.

86. The Plaintiff reasonably relied upon the express representations and certifications of Streamline by:

    a. Entering into Agreement of Sale to purchase the Home;

    b. Giving money to the Builder Defendants and obtaining mortgage loan(s) to purchase the Home; and

    c. Moving belongings into the Home, buying furniture and making other improvements to the Home.

87. The certifications and representations made by Streamline in the Builder's Warranty constituted express warranties that the Butera Home had been built in compliance with the applicable building codes, and that the Home was habitable and built in a good, workmanlike manner and inspected by Streamline's trained personnel prior to delivery.

Case ID: 190901353

88.     The Plaintiff reasonably relied upon the express warranties and representations made by Streamline in the Builder's Warranty as a material inducement for purchasing the Home.

89.     Streamline materially breached the express warranty extended to the Plaintiff in the Builder's Warranties by failing to build the Home in strict compliance with the applicable building codes, failing to build the Home in a habitable, good, and workmanlike manner, and failing to have the Home inspected by Streamline's trained personnel prior to delivery.

90.     The express warranty contained the following language: "Streamline Solutions pledges to the owner…that all material, workmanship, and/or building improvements provided for in the course of their building project will be free of defects, will be of specified quality, and will perform properly for a period of one year."

91.     Any purported limitations in the express warranty is rendered null and void by Streamline's failure to construct the Butera Home in accordance with applicable building codes.

92.     As a direct and proximate result of Streamline's material breach of the express warranty, the Plaintiff has incurred, and will continue to incur, substantial damages and costs, which include, but are not limited to, costs of repair and remediation and related costs and damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Streamline, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT III**
**BREACH OF THE IMPLIED WARRANTY OF WORKMANLIKE**
**CONSTRUCTION**
**PLAINTIFF**

Case ID: 190901353

93.     Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

94.     The Butera Home, built and sold by the Builder Defendants, contained, as a matter of law, an implied warranty that the Home, which the Builder Defendants marketed, developed, constructed, and sold, would be built in a reasonably workmanlike manner and free of construction defects.

95.     The Plaintiff reasonably and justifiably relied upon this implied warranty.

96.     The Builder Defendants knew that the Plaintiff would reasonably and justifiably rely upon this implied warranty.

97.     The Builder Defendants failed to supervise construction of the Butera Home and/or failed to construct the Home in a workmanlike manner.

98.     The Home, as built and sold by the Builder Defendants, exhibits construction defects that allow water to infiltrate the Home; the exterior envelope is wet, deteriorating and rotting, and was not built to the applicable building codes, industry standards or the contemporary community standards, and does not meet the definition of reasonable workmanship under Pennsylvania law.

99.     As a result, the Builder Defendants have materially breached the implied warranty of workmanlike construction.

100.    The Builder Defendants are liable to the Plaintiff for breach of implied warranty of workmanlike construction, and for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs

Case ID: 190901353

and damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT IV**
**BREACH OF THE IMPLIED WARRANTY OF HABITABILITY**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

101. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

102. The various components comprising the exterior envelopes of the Butera Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, manufactured brick, wood and siding, were designed and installed by the Builder Defendants and/or its agents, with the intent that it serve as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

103. However, as set forth above, the various elements of the exterior envelope of the Home was defectively constructed and improperly installed.

104. The Builder Defendants impliedly warranted that the Home, which the Builder Defendants marketed, designed, constructed, supervised construction, and sold, would be

20

Case ID: 190901353

constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

105. The Builder Defendants knew, or should have known, that the Plaintiff would rely upon this implied warranty.

106. The Plaintiff did, in fact, rely upon this implied warranty and such reliance was reasonable.

107. The Builder Defendants' defective construction directly and proximately caused substantial water infiltration into the Butera Home, and resultant water and/or mold damage to the Home.

108. The water damage and/or mold damage to the Home, which was caused by the Builder Defendants' acts and/or omissions, render the Home uninhabitable.

109. The Builder Defendants breached the implied warranty of habitability by failing to properly construct the Butera Home in a reasonable workmanlike manner and free of defects, thereby rendering the Home uninhabitable.

110. As a direct and proximate result of the Builder Defendants' breach of the implied warranty of habitability, the Plaintiff has incurred, and will continue to incur, substantial damages in an amount in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

**COUNT V**
**NEGLIGENCE**

21

Case ID: 190901353

111.    Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

112.    The various components comprising the exterior envelopes of the Butera Home, consisting, *inter alia*, of framing, sheathing, weather barrier, windows, doors and other fenestrations, flashing, stucco, and manufactured stone, were designed and/or installed by the Builder Defendants, and/or its subcontractors, with the intent that the exterior envelopes of the Home serves as protection to the occupants of the Home, including the Plaintiff, against the elements of weather, including heat, cold, wind, and precipitation.

113.    However, as set forth above, the various elements of the exterior envelope of the Butera Home was negligently designed and/or negligently installed.

114.    The Builder Defendants owed a duty to the Plaintiff to construct, supervise construction, and sell homes – such as the Butera Home – that were constructed in a reasonable workmanlike manner, free of construction defects and suitable for habitation.

115.    The Builder Defendants further owed a duty to warn the Plaintiff (and/or predecessors in interest) of any latent defects in the Home at all times, including during the design and construction of the Butera Home, prior to the sale of the Home, at closing and settlement, and at all times since, including the times when the Builder Defendants discovered the defects in the building envelope and stucco systems in other homes that had the same architect/designers, construction managers, site managers, subcontractors, oversight and supervision, suppliers, and manufacturers.

116.    The Builder Defendants were responsible for installing, and did install, aspects or parts of the exterior envelope of the Butera Home.

Case ID: 190901353

117. As a direct and proximate result of the Builder Defendants' defective, careless, and negligent performance in constructing the Butera Home, the Plaintiff has experienced attendant property damage and damage to non-defectively constructed components of the Home.

118. The damages sustained by the Plaintiff was caused by the negligent and careless acts and/or omissions of Builder Defendants in installing and performing their work in a defective manner as set forth above.

119. The negligence and carelessness of the Builder Defendants is the legal and proximate cause of the damages sustained by the Plaintiff.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants for all compensatory, consequential and incidental damages, in an amount in a total amount in excess of $140,000.00, diminution in market value of the Home, and for such relief as the Court may deem proper and necessary.

## COUNT VI
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET. SEQ.*)
## PLAINTIFF
## v.
## NINETEENTH STREET AND STREAMLINE

120. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

121. The Pennsylvania Unfair Trade Practices and Consumer Protection Law, codified at 73 Pa.C.S.A. §§ 201-1 *et seq.* ("UTPCPL"), provides for a private right of action for anyone who suffers any ascertainable loss of money or property as a result of any method, act or practice deemed unlawful by the UTPCPL.

122. The UTPCPL provides that unfair methods, acts or practices include:

23

Case ID: 190901353

a. Representing that goods or services have characteristics, uses benefits or qualities that they do not have (*see* 73 Pa.C.S.A. § 201-2(4)(v));

b. Representing that goods or services are of a particular standard, quality or grade, if they are of another (*see* 73 Pa.C.S.A. § 201-2(4)(vii));

c. Making repairs, improvements or replacements on real property of a nature or quality inferior to or below the standard that was agreed to in writing (*see* 73 Pa.C.S.A. § 201-2(4)(xvi)); and

d. Engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding (*see* 73 Pa.C.S.A. § 201-2(4)(xxi)).

123. The Builder Defendants have violated the UTPCPL, in that they have:

a. Represented that Butera Home has characteristics, uses, and/or benefits that it does not have;

b. Represented that Builder Defendants' goods or services are of a particular standard, quality or grade when they are of another; and/or

c. Failed to comply with the terms of a written agreement or warranty given to the Plaintiff;

d. Made repairs to the Plaintiff's real property of a nature or quality inferior to or below the standard of that agreed to in writing; and

e. Engaged in fraudulent and/or deceptive conduct creating the likelihood of confusion or misunderstanding.

124. The specific acts that constitute violations of the UTCPL by the Builder Defendants are set forth more fully above throughout this Complaint.

125. As a direct and proximate result of these unlawful acts and practices, the Builder Defendants are liable to the Plaintiff for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, as well as engineering fees, consultant fees and legal fees.

24

Case ID: 190901353

126. Pursuant to the UTPCPL, the Plaintiff is entitled to actual damages not less than $140,000.00, as well as treble damages, costs of suit, and reasonable attorneys' fees and interest incurred in the prosecution of this litigation.

127. Plaintiff, through counsel, asked the Builder Defendants to remediate the Home.

128. Despite design and construction defects, and damage to the Butera Home, the Builder Defendants have failed and/or refused to substantively respond to the Plaintiff's requests, or make any effort to inspect, let alone repair, the Home.

129. These failures to act by the Builder Defendants violate the UTPCPL.

130. The unlawful acts and practices of the Builder Defendants have been so widespread, egregious, and pervasive, involving not only the Home of the Plaintiff herein, but, upon information and belief, also numerous other homes built by the Builder Defendants, that full treble damages, plus interest costs and attorney's fees, should be awarded to the Plaintiff pursuant to 73 Pa.C.S.A. § 201-9.2(a).

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in excess of $140,000.00 as well as treble damages, costs of repair which are continuing, interest, penalties, costs of litigation, attorneys' fees, and for such relief as the Court may deem proper and necessary.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**
**PLAINTIFF**
**v.**
**NINETEENTH STREET AND STREAMLINE**

131. Plaintiff hereby incorporates the preceding paragraphs as if set forth at length herein.

Case ID: 190901353

132. The Builder Defendants made material statements and misrepresentations to the Plaintiff, orally and/or in writing, about the unique and desirable features and quality of the Home, and that the Home would be constructed in compliance with the existing building code and industry standards.

133. These communications as they pertain to the latent construction defects in the Home, were misrepresentations falsely and/or negligently made.

134. The Plaintiff materially and reasonably relied upon the Builder Defendants' misrepresentations.

135. As a direct and proximate result of these material statements and misrepresentations to the Plaintiff, the Builder Defendants are liable to the Plaintiff for substantial damages and costs incurred, and to be incurred, by the Plaintiff, which include, but are not limited to, costs of repair and remediation and related costs and damages, which is in excess of $140,000.00, diminution in value of the Home, as well as engineering fees, consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demand judgment in its favor and against the Builder Defendants, for all compensatory, consequential and incidental damages, in an amount in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT VIII
## BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)

### PLAINTIFF
### v.
### STREAMLINE

136. The Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

137. Nineteenth Street contracted with Streamline for the construction of the Butera Home.

Case ID: 190901353

138. Upon information and belief, Nineteenth Street entered into a written Contract with Streamline (the "Streamline Contract"), the substance of which included the promise that Nineteenth Street would pay Streamline in exchange for Streamline constructing the Butera Home.

139. The Plaintiff was not in privity of contract with Streamline and is not in possession of the Streamline Contract. Plaintiff expects to obtain true and correct copies of the Contract during the discovery phase of this litigation.

140. Upon information and belief, the Butera Home was constructed while the Streamline Contract was in effect.

141. Based upon information and belief of what is the likely language in the Streamline Contract, Nineteenth Street and Streamline intended Streamline would owe the same contractual duty to the Plaintiff – the owner – that Nineteenth Street did.

142. Upon information and belief, the Streamline Contract also provided additional guarantees flowing directly to the owner – the Plaintiff.

143. It was an implied condition of the Streamline Contract that the Butera Home was to be built pursuant to applicable building codes and prevailing industry standards.

144. Upon information and belief of what is the likely language in the Streamline Contract, Streamline likely represented to Nineteenth Street that Streamline would properly perform its obligations under the Contract and build the Home in a workmanlike fashion, and both Nineteenth Street and Streamline intended that the owner – the Plaintiff – benefit from the proper performance of the Contract.

145. Upon information and belief, the Streamline Contract effectuated Nineteenth Street's and Streamline's intention to construct defect-free homes for the owners – here, the Plaintiff.

Case ID: 190901353

146. Upon information and belief, the Streamline Contract, and the circumstances surrounding its respective performance thereof, indicates that Nineteenth Street and Streamline intended to confer the benefit of Streamline's performance upon the owner – the Plaintiff.

147. The Plaintiff, as Homeowner, is a third party beneficiary of the agreement(s) between Nineteenth Street and Streamline regarding the Home.

148. Upon information and belief, Streamline breached the Streamline Contract with Nineteenth Street by failing to properly build the Butera Home; failing to properly apply, install and/or construct certain components of the Home; failing to build the Home in a workmanlike fashion; failing to perform in accordance with applicable building codes, and failing to perform in accordance with prevailing industry standards.

149. In breach of the Streamline Contract with Nineteenth Street, the Home contains material defects, as set forth above.

150. As a direct and proximate cause of the subcontractor, Streamline's breaches and failures to properly construct the Butera Home, the Plaintiff has incurred, and will continue to incur, substantial damages in an amount in excess of $140,000.00, which include, but are not limited to, costs of repair and remediation and related costs and damages, diminution in market value, costs to repair and/or replace damaged interior finishes and personal property, as well as consultant fees and legal fees.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Streamline, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, costs of repair which are continuing, and diminution in market value of the Home, together with interest and costs, and for such relief as the Court may deem proper and necessary.

## COUNT IX

28

## BREACH OF CONTRACT (THIRD PARTY BENEFICIARY)
## PLAINTIFF
## v.
## HARMAN & ASSOCIATES, PC a/k/a HARMAN ARCHITECTS, PC and
## HARMAN & ASSOCIATES, LLC

151. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

152. Upon information and belief, the Builder Defendants entered into the Harman Design Contract whereby Harman was to prepare and supply design plans and specifications for the Butera Home.

153. Upon information and belief, the Harman Design Contract required that Harman supply design plans and specifications for the construction of the Butera Home.

154. At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intent that the purchasers of the Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

155. As the seller and builder of the Butera Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Butera Home.

156. After all, Harman knew, or should have known, that the design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners, including the Plaintiff.

157. Harman knew, or should have known, that homeowner of the Butera Home would rely upon Harman's contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

Case ID: 190901353

158. Thus, Harman knew, could not have been unaware of, and intended that the Plaintiff was the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

159. Harman breached the Harman Design Contract when it failed to perform all of its design work within the professional standard(s) governing the practice of architecture in the Commonwealth of Pennsylvania.

160. Harman breached the Harman Design Contract because its design plans and specifications were defective and deficient as they related to the stucco systems, flashing, and window installation work performed on the Butera Home, and did not adequately or properly design the Butera Home to adequately protect from water infiltration into the exterior envelopes of the Home.

161. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

162. As a result of Harman's false, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiff has been damaged in the aggregate amount in excess of $140,000.00, representing the estimated cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

## COUNT X

30

Case ID: 190901353

163. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

164. Upon information and belief, the Builder Defendants entered into the Harman Design Contract with Harman as the architect and/or designer, to prepare and supply design plans and specifications for the Butera Home.

165. Upon information and belief, the Harman Design Contract created a professional relationship between the Builder Defendants and Harman.

166. At the time the Harman Design Contract was entered into, it was the Builder Defendants' and Harman's intentions that the purchaser of the Butera Home benefit from the design plans and specifications supplied in accordance with the Harman Design Contract.

167. As the seller and builder of the Butera Home, the Builder Defendants knew, and intended for, the design plans and specifications supplied pursuant to the Harman Design Contract to benefit the purchaser of the Butera Home.

168. Similarly, Harman knew and intended that initial and subsequent purchasers of the Home benefit from the construction of the Home, which was to be built by the Builder Defendants in accordance with the design plans and specifications supplied by Harman.

169. After all, Harman knew, or should have known, that its design plans and specifications were being used to build numerous homes that were to be marketed, sold, and lived-in by homeowners such as the Plaintiff.

170. Harman knew, or should have known, that homeowners of the homes being built – such as Plaintiff – would rely upon Harman's contractual obligations to the Builder Defendants to

Case ID: 190901353

design the homes correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

171. During the construction process, the Plaintiff was generally aware that the Home had been designed by an architect and/or design professional.

172. The Plaintiff Homeowner relied upon Harman to satisfy its contractual obligations to the Builder Defendants to design the Home correctly and within the professional standards governing the practice of architecture in the Commonwealth of Pennsylvania.

173. Harman knew, could not have been unaware of, and intended the Plaintiff to be the third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

174. The Plaintiff is the intended third-party beneficiary of the Harman Design Contract between the Builder Defendants and Harman.

175. Harman owed a duty to all purchasers of the homes – such as the Butera Home – to adhere to the standards of professional conduct expected of architects in the Commonwealth of Pennsylvania.

176. Since Harman held itself out as an architect, Harman's duties, as set forth in 49 Pa. ADC § 9.151(1)-(3), included the duty to "exercise due regard for the safety, life and health of the public or other individual who may be affected by the professional work for which [the Architect] is responsible."

177. Harman also had the duty to "perform their work and produce designs that comply with all relevant State and municipal building laws and regulations." *See* 49 Pa. ADC § 9.151(1)-(3).

Case ID: 190901353

178. In contravention of the applicable standard of care, Harman's design plans and specifications were defective and deficient, and did not comply with applicable laws and regulations, as the design plans and specifications related to the stucco systems, flashing, and window installation work performed on the Butera Home, and did not adequately design the Home to protect from water infiltration into the exterior envelope of the Butera Home.

179. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

180. Thus, Harman breached the standard of care required of professional architects in Pennsylvania.

181. Further, Harman breached the required standard of care when it held itself out as an architect in Pennsylvania.

182. Plaintiff has been damaged in an amount in excess of $140,000.00, representing the cost to replace and repair the damaged exterior and interior of the Home, remedy defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C., a/k/a Harman Architects, PC, and Defendant Harman & Associates, LLC, for all compensatory, consequential and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

**COUNT XI**
**NEGLIGENT MISREPRESENTATION UNDER BILT-RITE/RESTATEMENT**
**OF TORTS (SECOND) SECTION 552**
**PLAINTIFF**
**v.**
**HARMAN & ASSOCIATES, P.C., a/k/a HARMAN ARCHITECTS, PC and**
**HARMAN & ASSOCIATES, LLC**

183. Plaintiff incorporates the preceding paragraphs as if set forth at length herein.

33

Case ID: 190901353

184. Upon information and belief, Harman was the architect, and/or held itself out as the architect and/or designer of the Butera Home.

185. As defined by the Restatement (Second) of Torts, Section 522, and applied in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 480, 866 A.2d 270, 286 (Pa. 2005), Harman, as a professional architecture firm, or holding itself out as such, is in the business of supplying information for the guidance of others.

186. Harman supplied the design plans, specifications, and other information to the Builder Defendants pursuant to a transaction in which Harman had a pecuniary interest.

187. Harman had a duty to exercise due regard for the safety, life, and health of intended homeowners such as Plaintiff, and to perform its work and produce designs in compliance with all relevant laws, regulations, codes, and industry standards.

188. Under *Bilt-Rite*, in supplying design plans, specifications, and other information, Harman represented that the design plans and specifications were free from deficiencies and defects.

189. In supplying the information, Harman also represented that the design plans, specifications, and other information were sufficient to permit the Builder Defendants to construct the Butera Home, in accordance with all relevant laws, regulations, codes, and industry standards, and would be habitable and free from water infiltration.

190. Harman made its representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, with the intent to induce others, including the Builder Defendants and purchaser of the Butera Home, to act on that information in constructing and/or purchasing the Home.

34

Case ID: 190901353

191. The Plaintiff, as the purchaser and resident of the Home, justifiably relied upon Harman, and was made to believe that the Home was designed by competent architects and were safe, habitable, and free from defects.

192. Thus, the Plaintiff justifiably relied upon Harman's representations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies.

193. Plaintiff was generally aware that the Home had been designed by an architect and/or design professional.

194. Harman, as the architect and/or designer of the Butera Home, knew, or should have known, that the design plans, specifications, and other information it provided to the Builder Defendants were false, incomplete, deficient, and defective.

195. However, Harman failed to exercise reasonable care to determine whether its design plans, specifications, and/or other information, were accurate and in accordance with the applicable laws and regulations.

196. Plaintiff intends to support this allegation with facts developed during the course of discovery, and expert reports to be produced during the course of the litigation.

197. Thus, Harman is liable to the Plaintiff for its negligent misrepresentations with respect to the design plans and specifications being correct, complete, and free from defects or deficiencies, pursuant to the Restatement (Second) of Torts, Section 552, and as elucidated in *Bilt-Rite Contractors, Inc. v. The Architectural Studio*.

198. As a result of Harman's false, incomplete, defective, and deficient information contained in the design plans and specifications, and Harman's failures to exercise reasonable care, the Plaintiff has been damaged in amounts in excess $140,000.00, which includes but is not limited

35

Case ID: 190901353

to, the cost to replace and repair the damaged exteriors and interiors of the Home, remedy the defective conditions, and prevent further damage and unsafe conditions.

WHEREFORE, the Plaintiff hereby demands judgment in its favor and against Defendant Harman & Associates, P.C. a/k/a Harman Architects, PC and Defendant Harman & Associates, LLC, for all compensatory, consequential, and incidental damages, in amounts in excess of $140,000.00, and for such relief as the Court may deem proper and necessary.

Dated: September 10, 2019

**HORN WILLIAMSON, LLC**

BY: */s/ Jennifer M. Horn, Esquire*

Jennifer M. Horn, Esquire
2 Penn Center
1500 JFK Blvd., Suite 1700
Philadelphia, PA 19102
*Attorneys for Plaintiff*

36

Case ID: 190901353

## VERIFICATION

I, David Butera, verify that the statements made in the foregoing Complaint, are true and correct to the best of my knowledge and belief; and understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

Date: _August 4, 2019_

_____
David Butera

Case ID: 190901353

# EXHIBIT 10

Case ID: 190901353

<p align="center">**Excerpt of Trial Transcript**
**June 8, 2023**
**From Testimony of David Butera**</p>

**Auger v. Streamline Solutions, LLC, et al., Docket No. 190901351**
**Butera v. Streamline Solutions, LLC, et al., Docket No. 190901268**
**Kirk v. Streamline Solutions, LLC, et al., Docket No. 190901353**
**Selbovitz v. Streamline Solutions, LLC, et al., Docket No. 190401575**

**Attached Pages:**
**Trial Transcript, June 8, 2023, 89-92**
**Trial Transcript, June 8, 2023, 101-112**

34666691v.1

Case ID: 190901353

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

- - -

MATTHEW SELBOVITZ                 : APRIL TERM, 2019
                                  :
 v.                               : NO. 01575
                                  :
STREAMLINE SOLUTIONS, LLC, et al. :

- - -

DAVID BUTERA                      : SEPTEMBER TERM, 2019
                                  :
 v.                               : NO.  01268
                                  :
STREAMLINE SOLUTIONS, LLC, et al. :

- - -

NICKOLAS AUGER                    : SEPTEMBER TERM, 2019
                                  :
v.                                : NO.  01351
                                  :
STREAMLINE SOLUTIONS, LLC         :
and HARMAN DEUTSCH CORP.          :

- - -

DANIEL KIRK and CLARISA KIRK      : SEPTEMBER TERM, 2019
                                  :
v.                                : NO.  01353
                                  :
STREAMLINE SOLUTIONS, LLC         :
and NINETEENTH STREET             :
DEVELOPMENT and HARMAN            :
DEUTSCH CORP.                     :

- - -

June 8, 2023

- - -

---

- - -

Courtroom 650 - City Hall

Philadelphia, Pennsylvania

- - -

BEFORE:  THE HONORABLE MICHAEL ERDOS, J.,

and a Jury

- - -

REPORTED BY: JENNIFER VENNERI, RPR

TRANSCRIBED BY: TIFFANY MONASTRA, RPR

---

APPEARANCES:

HORN WILLIAMSON
     BY:   MATTHEW H. DEMPSEY, ESQUIRE
           RYAN M. LOCKMAN, ESQUIRE
           1500 JFK Boulevard, Suite 1700
           Philadelphia, PA 19102

           Counsel for Plaintiffs


BBC LAW, LLP
     BY:   CARMELO T. TORRACA, ESQUIRE
           707 White Horse Pike, Suite B8
           Absecon, NJ 08201

           Counsel for Defendants Streamline and Nineteenth

OFFIT KURMAN
     BY:   FRANKLIN C. MILLER, JR., ESQUIRE
           1801 Market Street, Suite 2300
           Philadelphia, PA 19103

           Counsel for Defendant Harman Deutsch Corp.

---

INDEX

- - -

PLAINTIFF'S EVIDENCE

- - -

| WITNESS: | DR | CR | RDR | RCR |
|---|---|---|---|---|
| DAVID BURKHARDT (VD) | | | | |
| BY MR. DEMPSEY | 7/11 | -- | -- | -- |
| BY MR. MILLER | -- | 41 | -- | -- |
| BY MR. TORRACA | -- | 44 | -- | -- |

| WITNESS: | DR | CR | RDR | RCR |
|---|---|---|---|---|
| SEAN FRANKEL | | | | |
| (AS OF CROSS) | | | | |
| BY MR. LOCKMAN | -- | 46 | -- | 78 |
| BY MR. MILLER | -- | 59 | -- | -- |
| BY MR. TORRACA | -- | -- | 64 | -- |

| WITNESS: | DR | CR | RDR | RCR |
|---|---|---|---|---|
| DAVID BUTERA | | | | |
| BY MR. LOCKMAN | 84 | -- | -- | -- |

Case ID: 190901353

you entered the agreement of sale where you got an inspection?

A Yes.

Q Tell me about that.

A We got a home inspection, which I learned during the process is typical of homeowners to get, a general home inspection.

Q Was it visual? Were they making cuts? What were they doing during the inspection, if you recall?

A Visual, and I remember he had a little tool to check the outlets if they were working.

Q So other than checking the outlets, everything was visual?

A Yes.

Q Let's show you P-48.

Was this a building inspection report that you received after the inspection?

A Yes.

Q Okay. And were there any issues that were raised during this inspection?

A Yes.

Q Let's go to page 3. Let's blow up this part.

Now, Dave, do you have any construction

experience?

A I do not.

Q Okay. What do you do for work?

A I work in the scientific field, so drug discovery, drug development.

Q Okay. Anything related to construction, architecture, engineering, anything like that?

A No.

Q Okay. So there's a major concern. That's what's indicated here. "Localized damage of the stucco exterior wall should be repaired." Do you see what I'm referring to?

A Yes.

Q Do you remember seeing this?

A Yes.

Q What did you do in response?

A I got another -- scheduled another inspection.

Q And who was that by?

A It was with Anthony Spadaccini, I want to say, for a visual stucco inspection.

Q All right. Now, at this point were you concerned?

A Not too much, no, because I wanted to wait and see what another inspector would say.

Q Okay. Did you have prior experience with stucco?

A No.

Q So you got another inspector. Let's go to P-52, page 44.

All right. This is from Michael Spadaccini. Is that how you pronounce it?

A I believe so, yes.

Q Okay. That's how you pronounce it?

A That's how I pronounce it, yes.

Q Got it. And it says David, we provided a walk and talk, in parentheses, a noninvasive visual exterior observation of the general stucco conditions at the above premises today, June 14th, 2015.

Did I read that correctly?

A Yes.

Q Does that comport with your memory of when this occurred and what happened?

A Yes.

Q Okay. So everything was -- even the stucco inspection, that was visual?

A Yes.

Q Okay. And it says buyer, buyer's agent, and Fabio, building site supervisor, were present.

Who is Fabio, to your knowledge?

A Fabio was the site supervisor, my understanding, at the build site, I guess, when the property was being built.

Q Did he tell you who he worked for or did you have an understanding of who he worked for?

A Yes.

Q Who?

A I believe Streamline, was my impression of it, yeah.

Q And why did you have that impression?

A Just because I -- actually, I'm not sure who he was at the actual company, but I knew he was -- or he told me he was the site supervisor for the construction company. I don't recall the actual name.

Q He told you he was the site supervisor for the construction company. Is that what you said?

A Yes.

Q Okay. Did you ever come to have a better understanding of who he worked for?

A Not directly from him, no.

Q But in any sense?

A Yes.

Case ID: 190901353

A No.

Q Did you at any point thereafter?

A Yes.

Q Tell me what happened.

A Immediately after that, strangely, we had our first leak.

Q Immediately. Are you saying a minute? An hour? a day? a week? a month?

A From my recollection, it was days or weeks.

Q Okay. So we're still early-ish 2018 when you have your first leak, early mid?

A Yes.

Q Okay. At that point what do you do?

A At that point I reach out to Nineteenth Street and Streamline to have it -- I'm sorry, I had to get an inspection.

Q Okay. You get an inspection by whom?

A Lunny.

Q And then you get the inspection report. What do you do next?

A We get the inspection report and then reach out to Nineteenth Street and Streamline to have the problem fixed.

Q Okay. When you -- mid-2018, mid- or late

2018 -- well, strike that. Give me a moment. I just want to show the first page of P-49.

MR. TORRACA: Objection, Your Honor.

MR. LOCKMAN: I'm having him identify the document.

THE COURT: I'm sorry?

MR. LOCKMAN: I'm having him identify the document. That's it.

THE COURT: That's fine.

BY MR. LOCKMAN:

Q Is this the report you received?

A Yes.

Q Okay. Do you remember when you received this?

A Yes, in 2018.

Q Do you remember the month?

A Not specifically, no.

MR. LOCKMAN: I'm going to just refresh the witness's recollection. I'm going to show him the exhibit.

BY MR. LOCKMAN:

Q We're not putting it up on the screen, but we're showing you the report itself. Do you remember when you received this?

A Yes.

Q Okay. When did you receive the report?

A September of 2018.

Q Okay. Prior to that point, had you had any inkling that you had -- your home wasn't built to code?

MR. TORRACA: Objection, Your Honor.

MR. LOCKMAN: I can rephrase if that's going to resolve the issue.

THE COURT: Yeah. Sustained.

BY MR. LOCKMAN:

Q What did you do at that point after getting that report?

A I tried to figure out what to do. I contacted my attorneys.

Q Okay. I don't want to hear about anything you talked about with your attorneys. I'm going to show you P-58, the one we've been using.

Did you review this letter before it was sent?

A Yes.

Q Okay. What was the purpose to you of sending this letter?

A To get the problem fixed.

Q Okay. And you sent it to both the builder and the seller; correct?

A Correct.

Q Were you asking one of them or both of them to fix the house?

A Either or.

Q Okay. Did you care one way or another?

A No.

Q Did they ever respond with a scope of work showing you, look, we're going to get this fixed?

A No.

Q After that point did the problems in your house start to get worse?

A Yes.

Q So when you first noticed the leak, where was it?

A It was right at the pilot house, which is the stairwell that goes up to the roof deck.

Q Okay. And what was the problem?

A There was water staining and at that point dripping as well.

Q Okay. And the problems started to get worse?

A They did.

Q Tell me about it.

A So there was additional water stains in other places of the house.

Case ID: 190901353

Q   Where?

A   In the kitchen, the windows, at the back of the house.  There was staining on just the whole outside of -- the inside of the house but surrounding the window frames.  There was additional leaking from the pilot house that would come and go with rain and just kind of unpredictably.  There was staining and water dripping from the pilot house.  I believe the front window also had some dripping on the sill.  But it was mainly those three places, I believe.

Q   What did you do next?

A   Next I just kept trying to figure out if we could get them to get someone to come and fix the property.

Q   Okay.  Did you ultimately become concerned about -- well, strike that.

Did you hire -- strike that.

Who is Friel?  Friel Plastering and Stucco?

A   Friel is someone that came into the picture a little bit later on after we had -- we were no longer living at the property.

Q   All right.  So let's talk about that.  At what point did you -- at what point did you start thinking about finding another home?

A   Strangely, probably at the end of 2017, before -- right around or before we had our first child.

Q   So this is --

A   Not strangely, but --

Q   You wanting to move, did that have anything -- strike that.

When you started to say all right, let's buy another house, had you had any water issues with this home?

A   No.

Q   Okay.  Why did you want to leave the house?

A   Because we wanted more space.  And I say strangely because it was so soon after having our purchase of this home.  Some more space, starting to build a family.  And I actually worked in Wilmington, so the commute from Philadelphia was quite difficult on 95.  So I wanted somewhere that would be closer to my work.

Q   Okay.

A   And with more space.

Q   So you're not claiming you had any water issues was the thing forcing you to move out of your house; correct?

A   That is correct.

Q   Ultimately, when the -- where did you buy another home?

A   We bought another home in West Chester, Pennsylvania.

Q   PA?

A   Correct.

Q   Not New York?

A   No.

Q   And when did you move there?  Not when you sold this property, but when did you move to West Chester?

A   So that was October of 2019.

Q   October of 2019?

A   Correct.

Q   You still at that point owned your Crease Street home; correct?

A   Correct.

Q   All right.  What did you do at this point with your Crease Street home?

A   So we rented it out ultimately, and we found tenants to move in.

Q   Did you disclose to your tenants issues that had existed in the home?

A   Yes.

Q   What did you do to make sure that they were aware of these issues?

A   So we were up front during the whole process when we met with all potential tenants.  We showed them where the issues were.  We told them that we had an inspection report.  And we even put in our lease with them very specific kind of legal language that said we had the inspection, we had water intrusion issues, and that we may have to get the home fixed or remediated.  And if that was the case, we would allow them to relocate, we would pay for that.  We would let them break the lease, all these other things to make sure that we fully told them and made them aware of what was going on and the inspections that we had and give them the opportunity to leave if the place was ultimately remediated.

Q   Did your issues remain just water or did it get worse?

A   It got a lot worse.

Q   Tell me about it.

A   So there were more water issues and more leaking by the pilot house.  And then there was also ultimately leaking by the front master bedroom window, so the front of the house.  And then we got

Case ID: 190901353

the call that there was stuff growing on the ceiling on the third floor.

Q   A call from your tenant?

A   Yes.

Q   Okay.  Did you take photos of your house with mold?

A   I did.

Q   Let's go to P-53.

There are 22 pages in this file.  These are photos that you took?

A   Yes.

Q   Approximately when?

A   That was after 2018.

Q   Okay.  Do you know 2019, '20, '21?  Do you have a recollection?

A   That was probably around 2019.

Q   Okay.  Is this the pilot house?

A   That is correct.

Q   Okay.  I know you're not a mold expert or anything like that, but did you have an understanding of what that was, that black stuff?

A   Not specifically at that part, but there are other pictures where I could identify.

Q   Okay.  If you need to see it closer, you can either come closer if the Court will allow or

we have binders.

A   I can see.  It's okay.

Q   Let's go to the next photo.

What are we looking at here?  Is this still right below the pilot house or right at the pilot house?

A   That's right, yes.

Q   Right above this, is that the roof?

A   Yes.

Q   Again, these are all photos that you took?

A   Correct.

Q   Next page.  This is more of the same area?

A   Yes.

Q   All right.  Next page.  More of the same?

A   Correct.

Q   Let's back up a little bit.

This part, this splitting of the drywall, do you know when that started approximately?

A   Not specifically, no.

Q   Okay.  That's perfectly okay.

Next page.  That's the railing going up the stairs; correct?

A   Yes.

Q   To the roof deck?

A   Correct.

Q   Next one.  All right.  Butera 30, this is a different area of the home; correct?

A   Yes.

Q   What are we looking at here?  Where in the home are we looking?

A   This is the kitchen window.

Q   Kitchen window.  Can we just zoom in on the bad part?

All right.  When did you start noticing stuff like this?

A   Probably around 2018, I believe.

Q   Next photo.  Where are we looking at here?  Is this the same window or a different one?

A   That's a different window.

Q   Where?

A   I believe that's the front of the living room.

Q   Okay.  Next one.

A   Actually, now that I see that other picture, that looks like the kitchen window.

Q   Kitchen?

A   Yeah.

Q   Okay.  That next one, is that the kitchen

window?

A   Yes, it looks like the kitchen window.

Q   Next one.  What are we looking at there?

A   That's under the windowsill of the kitchen window.

Q   The same window in the kitchen or a different one?

A   I think it was the same window below the right back window in the kitchen.

Q   Okay.  Next photo.  Are we back to where we were before?

A   I believe that looks like the kitchen window to me, yeah.

Q   Okay.  All right.  Is that photo upside down?

A   I can't tell from here.

Q   Okay.

A   It's tough because the lines come from the bottom and the top.

Q   Okay.  Same area where we saw before?

A   Yes.

Q   Next photo.  What are we looking at here?

A   That's the front -- no, that's the back kitchen window.

Q   Back kitchen.  Water coming in?

Case ID: 190901353

# EXHIBIT 11

Case ID: 190901353

**Excerpt of Trial Exhibit, P-48**
**Building Inspection Report June 19, 2015**

Case ID: 190901353

# Building Inspection Report

1373 Crease Street

**Inspection Date:**
6/19/2015

**Prepared For:**
David Butera

**Prepared By:**
**HOMECHECK, INC.**
**2115 Dunhill Drive**
**Wilmington, DE 19810**

**800-410-7443**
**888-565-5357** Fax
**homecheck3@gmail.com**

**Report Number:**
15-0619-02

**Inspector:**
Christopher S. Hunt

© 2015 **HOMECHECK, INC.**

**BUTERA000346** Case ID: 190901353

## IMPROVEMENT RECOMMENDATION HIGHLIGHTS / SUMMARY

The following is a synopsis of the potentially significant improvements that should be budgeted for over the short term. Other significant improvements, outside the scope of this inspection, may also be necessary. Please refer to the body of this report for further details on these and other recommendations.

### MAJOR CONCERNS

- **Major Concern:** Localized damage of the stucco exterior walls should be repaired. There is extra risk of hidden damage in such areas caused by previous or present leaks that should be sealed. The installation of the stucco may be improper in locations and should be further investigated by a qualified, licensed stucco inspector/contractor prior to the end of the inspection contingency period.
- **Major Concern:** The temperature drop measured across the evaporator coil of the air conditioning system is lower than typical. Repairs are needed. A qualified heating and cooling technician should be consulted to further evaluate this condition and the remedies available prior to the end of the inspection contingency period.

### SAFETY ISSUES

- **Safety Issue:** The electric eye sensors at the garage door opener should be lowered to within 6 inches of the garage floor to assure safe operation.
- **Safety Issue:** Proper fire separation between the garage and house proper is recommended. The HVAC vent at the garage ceiling should be properly sealed.
- **Safety Issue:** The installation of operating CO detectors on all levels and in the bedrooms is recommended.
- **Safety Issue:** A return air vent is situated close to the furnace. *This arrangement is a safety concern, as it could in some conditions send furnace exhaust in the living area, causing a carbon monoxide hazard.* It should be properly sealed.
- **Safety Issue:** It is suspected that there is an insufficient supply of combustion air for the water heater. *Improvement is usually straightforward, and should be a high priority for safety reasons.* The installation of additional grilles at the door or walls is recommended.
- **Safety Issue:** For improved safety, it is recommended that proper hand rails be provided for the stairways. Additionally, the sharp corners at the glass panels should be rounded for added safety.

### REPAIR ITEMS

- **Repair:** Circuits within the auxiliary panel that are doubled up (referred to as "double taps") should be separated. Each circuit should be served by a separate breaker.
- **Repair:** A receptacle in the garage is inoperative. This outlet and circuit should be investigated.
- **Repair:** The open neutral receptacle in the dining room should be repaired to assure safe operation.
- **Repair:** Lights in the living room and rooftop deck are inoperative. If the bulbs are not blown, the circuits should be repaired.
- **Repair:** The basin trap in the master bathroom is leaking. Repairs are recommended.
- **Repair:** Cracked, deteriorated and/or missing bathtub and shower enclosure grout and caulk should be replaced.
- **Repair:** The damaged screen at a window in the master bedroom should be repaired.
- **Repair:** Water staining was observed at a window sill in the master bedroom. This should be further investigated and improved as needed prior to closing.
- **Repair:** Missing casement window cranks should be replaced.
- **Repair:** The cracked mirror at the master bathroom should be replaced.

### ITEMS TO MONITOR

- **Monitor:** This home is in an area known for wood destroying organism activity. Wood destroying organisms can do a substantial amount of damage to the wood structural components of a home. Any form of wood/soil contact should be avoided. Controlling dampness in the soil around the perimeter of a home, including below porches and in crawl spaces, is recommended. Preventative chemical treatment, performed by a licensed pest control specialist, is also advisable.
- **Monitor:** The downspouts that discharge below grade level should be monitored. If they are ever suspected to be clogged or disconnected below grade, they should be redirected to discharge at least five (5) feet from the building. Foundation leakage adjacent to a downspout is an indication of a problem below grade.
- **Monitor:** Proper performance of the sump pump may be critical to preventing basement leakage. Sump pumps usually serve to discharge storm water from the perimeter foundation drainage tiles. If the sump pump becomes inoperative, or if the discharge line is broken, damaged or improperly sloped, basement leakage can result. The operation of the sump

# EXHIBIT 12

Case ID: 190901353

**Excerpt of Trial Exhibit, P-52**
**Email Excerpts**

34666691v.1

Case ID: 190901353

\>

\> *Like Us on Facebook! <http://www.facebook.com/McCannTeam>*

\>

\> *Click here to view Mike McCann "The Real Estate Man" and the 5 Star Team

\>

\> <https://www.youtube.com/watch?v=NSBUY8TVFF4>*

\>

\>

\> Sent from my iPhone

\>

\>

\> On Jun 22, 2015, at 7:03 AM, "dbutera@gmail.com" <dbutera@gmail.com>

\>

\> wrote:

\>

\>

\> I don't want to accept the property until it has been properly inspected

\>

\>

\> Sent from my iPhone

\>

\>

\> On Jun 21, 2015, at 23:12, Liz Pierce <lizpierce615@gmail.com> wrote:

\>

\>

\>

\>

\>

\> Sent from my iPhone

\>

\>

\>

\> On Jun 21, 2015, at 11:07 PM, Liz Pierce <lizpierce615@gmail.com> wrote:

\>

\>

\>

\> Hi Ame,

\>

\>

\>

\> Sorry for the late response but we wanted to make sure we were making

\>

\>

\> the right decision.  We definitely like 1373 Crease and need to have

\>

\>

\> the following items addressed in order to move forward/to compensate

\>

\>

\> for the misrepresentation of square footage. Can you please add this

\>

\>

\> to your list and send to the seller?

\>

\>

\>

\> First and foremost is an extension of the inspection contingency

\>

\>

\> period to allow for a stucco inspection and further a/c inspection as

\>

\>

\> described in the inspection report. The buyers reserve the right to

\>

\>

\> walk away in the event of an inconclusive or negative report from the

\>

BUTERA000305

Case ID: 190901353

>
> inspectors.
>
>
>
> Additionally:
>
>
>
> ♣   High quality Washer/Dryer
>
>
> ♣   Upgraded pedestal sink that matches décor of bathroom on 1st floor
>
>
> ♣   Stainless Steel Dishwasher as advertised
>
>
> ♣   Move doorbell somewhere not in the center of the living room
>
>
> wall/somewhere less obtrusive
>
>
>
> The following fixes from the inspection report:
>
>
> •   Localized damage of the stucco exterior walls should be repaired.
>
>
> There is extra risk of hidden damage in such areas caused by previous
>
>
> or present leaks that should be sealed. The installation of the stucco
>
>
> may be improper in locations and should be further investigated by a
>
>
> qualified, licensed stucco inspector/contractor prior to the end of
>
>
> the inspection contingency period.
>
>
> •   The temperature drop measured across the evaporator coil of the air
>
>
> conditioning system is lower than typical. Repairs are needed. A
>
>
> qualified heating and cooling technician should be consulted to
>
>
> further evaluate this condition and the remedies available prior to
>
>
> the end of the inspection contingency period.
>
>
> •   The electric eye sensors at the garage door opener should be lowered
>
>
> to within 6 inches of the garage floor to assure safe operation.
>
>

Case ID: 190901353
BUTERA000306

> • Installation of operating CO detectors on all levels and in the
>
> bedrooms
>
>
> • A return air vent is situated close to the furnace. This arrangement
>
>
> is a safety concern, as it could in some conditions send furnace
>
>
> exhaust in the living area, causing a carbon monoxide hazard. It
>
>
> should be properly sealed.
>
>
> • It is suspected that there is an insufficient supply of combustion
>
>
> air for the water heater. Improvement is usually straightforward, and
>
>
> should be a high priority for safety reasons. Installation of
>
>
> additional grilles at the door or walls is requested.
>
>
> • The sharp corners at the glass panels should be rounded for added
>
> safety.
>
>
> • Circuits within the auxiliary panel that are doubled up (referred to
>
>
> as "double taps") should be separated. Each circuit should be served
>
>
> by a separate breaker.
>
>
> • A receptacle in the garage is inoperative. This outlet and circuit
>
>
> should be investigated and fixed.
>
>
> • The open neutral receptacle in the dining room should be repaired to
>
>
> assure safe operation.
>
>
> • Lights in the living room and rooftop deck are inoperative. If the
>
>
> bulbs are not blown, the circuits should be repaired.
>
>
> • Repair the basin trap in the master bathroom.
>
>
> • Cracked, deteriorated and/or missing bathtub and shower enclosure
>
>

BUTERA000307

Case ID: 190901353

> grout and caulk should be replaced.
>
>
> • The damaged screen at a window in the master bedroom should be
>
> repaired.
>
>
> • Water staining was observed at a window sill in the master bedroom.
>
>
> This should be further investigated and improved as needed prior to
>
>
> closing.
>
>
> • Missing casement window cranks should be replaced.
>
>
> • The cracked mirror at the master bathroom should be replaced.
>
>
> • Proper hand rails should be provided for the stairways.
>
>
>
> Let me know if you have any questions.
>
>
>
> Dave
>
>
>
> <Butera Contingency Extension 1373 Crease 22June2015.pdf>
>

BUTERA000308    Case ID: 190901353

---------- Forwarded message ---------
From: **David Butera** <dbutera@gmail.com>
Date: Wed, Jun 24, 2015 at 9:27 PM
Subject: 1373 Crease St. Contract Update
To: Ame Goldman <amegold@mccannteam.com>
Cc: David Butera <dbutera@gmail.com>, Liz Pierce <lizpierce615@gmail.com>

Ame,

Based on the stucco inspection, I have included a list of repair items
that the inspector recommended. They are the following;

?X Front elevation has a combination of brick and siding at the "box
bay" window. Some brick to stucco transitions have a few sections of
missing, continuous mortar. Apply sealant to prevent moisture
intrusion at these areas.

?X Windows in rear reflected sealant application BELOW the window sills
at all 2nd floor locations, but was not evident or remaining window.
Builder to consult with window manufacturer/Installer to determine if
this method is a requirement or was this an error in applying the
sealant at that location. If it was an error, the seller should fix.
If this was a requirement, please provide notice in writing.

?X Several windows noted some missing mortar at seams. Maintain/fix
with matching stucco product and/or sealant.

?X Cracks were noted near the roof on the front of the building where
1373 joins the mortar of 1375. Seal/repair these cracks

?X Cracks were noted on the pilot house between the stucco and door
frame. Seal/repair these cracks

Based on the findings of the inspections, we request that the above
repair items, as well as the previously submitted list of repair items
and requests be addressed.

As mentioned previously, we uncovered some inconsistencies between
what was marketed and what was uncovered during due-diligence. In
order to rectify the significant difference in square footage and
layout width compared to other units in the development, we are
requesting a $7,000 price concession. This would bring us to a
purchase price of $513,000 ($520,000 with the $7,000 seller assist).

We look forward to calling this our new home, and I hope we can work
everything out to make the closing as seamless as possible.

Best,

Dave

BUTERA000416    Case ID: 190901353



From: **Liz Pierce** <lizpierce615@gmail.com>
Date: Tue, Jun 22, 2021 at 4:24 PM
Subject: Fwd: Revisions
To: David Butera <dbutera@gmail.com>

On Thu, Jul 2, 2015 at 2:39 PM, Ame Goldman <ame.goldman@foxroach.com> wrote:

He received and presented. Asked if Seller could fix leak. I explained our concerns on that, he is waiting for a response from Seller. He does not believe any of the other points will be an issue.

Ame

Ame Goldman
Berkshire Hathaway Home Services, Fox & Roach Realtors
The McCann Team
215-627-6005 o | 215-440-8348 d | 215-868-3532 c
www.mccannteam.com

**Like Us on Facebook!**
**Click here to view Mike McCann "The Real Estate Man" and the 5 Star Team**

Sent from my iPhone

On Jul 2, 2015, at 1:56 PM, "dbutera@gmail.com" <dbutera@gmail.com> wrote:

> Hi Ame,
>
> Anything from Jim?
>
> Dave
>
> Sent from my iPhone
>
> On Jul 1, 2015, at 22:45, Ame Goldman <ame.goldman@foxroach.com> wrote:
>
>> Submitted with the request that once In agreement, you can send in contractor to fix basement window ASAP.

Case ID: 190901353
BUTERA000309

Ame

Ame Goldman
Berkshire Hathaway Home Services, Fox & Roach Realtors
The McCann Team
215-627-6005 o | 215-440-8348 d | 215-868-3532 c
www.mccannteam.com

**Like Us on Facebook!**
**Click here to view Mike McCann "The Real Estate Man" and the 5 Star Team**

Sent from my iPhone

On Jul 1, 2015, at 10:40 PM, "dbutera@gmail.com" <dbutera@gmail.com> wrote:

> Just signed it.  As far as the window repair, we want to get moving on that as soon as we can to prevent further damage.  Please relay this to Jim so we can make arrangements ASAP.
>
> Thanks
>
> Dave
>
> Sent from my iPhone
>
> On Jul 1, 2015, at 22:34, Ame Goldman <ame.goldman@foxroach.com> wrote:
>
> > Just sent revisions.  Once we are all in agreement, I will be forwarding page 2 of the agreement with the price change, which changes the amount of the mortgage.
> >
> > Lenders do NOT want to see addendums that pertain to inspections.  They want just the agreement of sale.
> >
> > Ame
> >
> > Ame Goldman
> > Berkshire Hathaway Home Services, Fox & Roach Realtors
> > The McCann Team
> > 215-627-6005 o | 215-440-8348 d | 215-868-3532 c
> > www.mccannteam.com
> >
> > **Like Us on Facebook!**
> > **Click here to view Mike McCann "The Real Estate Man" and the 5 Star Team**
> >
> > Sent from my iPhone

BUTERA000310

# EXHIBIT 13

Case ID: 190901353

**Excerpt of Trial Exhibit, P-70**
**Email Excerpt**

34666691v.1

Thank you,
*Harriet*

P: 215.550.3847
F: 888.554.1145

Harr411@gmail.com

**From:** Jim Onesti [mailto:jonesti@mccannteam.com]
**Sent:** Thursday, July 2, 2015 9:12 AM
**To:** sean; Sean Frankle. Builder!
**Subject:** Fwd: 1373 Crease reply to inspection.pdf

sean/harr,

see attached addendum for 1373 crease.

in summarry:

12k reduction
NO BUILDER WARRANTY
2 year HSA warranty
a few minor repairs that sean agreed to

ROOF CERT Realtors will be providing
Stucco one year warranty Seller will provide from stucco contractor

**** seller to credit buyer for window leak/repair... buyer is assuming you are not fixing but i believe you are fixing it or may have already fixed it. Please advise.

Thanks for all of your patience through this...

Jim


--
**Jim Onesti**
Berkshire Hathaway HomeServices I Fox & Roach Realtors I The McCann Team
530 Walnut Street I Suite 260 I Philadelphia PA 19106 I 215.627.8106 Office Fax
215.440.2052 D I 215.627.6005 M I jonesti@mccannteam.com I @RealtorPhilly
PackerParkLiving.com I NorthernLibertiesLife.com I PhillyRealEstateInvestorDEALS.com

**Check Out Our Video!**
**Meet Mike McCann & The Team!**

Case ID: 190901353

CONFIDENTIAL

# EXHIBIT 14

Case ID: 190901353

| Judge's Name: | Judge's I.D.: | Signature: |
|---|---|---|
| **MICHAEL ERDOS** | J487 | *Michael E Erdos* |

Report Generated 16-JUN-23 Job #71346

| Caption: | Case Type: | Program: |
|---|---|---|
| **BUTERA VS STREAMLINE SOLUTIONS, LLC ETAL** | CONSTRUCTION CONTRACT | MAJOR JURY-COMPLEX |

| Court Term and Number: | If Consolidated, Court Term and Number: |
|---|---|
| **#1909-01268** | #1904-01575    #1909-01351    #1909-01353 |

| Trial Date: | | Total Amount: | Number of Days: | Disposition Date: | Date Sheet Prepared: |
|---|---|---|---|---|---|
| 05-JUN-2023 | [X] Jury<br>[ ] Non-Jury | $741,857.00 | 10 | 16-JUN-2023 | 16-JUN-2023 |

Full Description of Disposition (to be entered Verbatim on the Docket)

Jury verdict in favor of Plaintiff and against Defendants Nineteenth Street Development and Streamline Solutions, LLC in the amount of $741,857.

| | | |
|---|---|---|
| [ ] Default Judgment/Court Ordered | [X] Jury Verdict for Plaintiff | [ ] Other (explain) |
| [ ] Directed Verdict | [ ] Jury Verdict for Defendant | |
| [ ] Discontinuance Ordered | [ ] Mistrial | |
| [ ] Transferred to binding arbitration | [ ] Hung Jury | |
| [ ] Finding for Defendant (Non-Jury) | [ ] Non-Pros entered | |
| [ ] Finding for Plaintiff (Non-Jury) | [ ] Non-Suit entered | |
| [ ] Damages Assessed | [ ] Settled prior to assignment for trial (Team Leaders, only) | |
| [ ] Judgment entered by agreement | [ ] Settled after assignment for trial | |
| [ ] Judgment entered | [ ] prior to jury selection | |
| [ ] Judgment satisfied | [ ] after jury sworn | |

WSJVP-Butera Vs Streamline Solutions, Llc Etal



19090126800117

<span style="color:red">Case ID: 190901353</span>

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  N. ERICKSON  06/16/2023

| | |
|---|---|
| MATTHEW SELBOVITZ,<br>　　　　　Plaintiff | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: APRIL TERM, 2019<br>: NO.: 1575 |
| VS. | |
| STREAMLINE SOLUTIONS, et al.,<br>　　　　　Defendants | :<br>: |

| | |
|---|---|
| DAVID BUTERA,<br>　　　　　Plaintiff | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: SEPTEMBER TERM, 2019<br>: NO.: 1268 |
| VS. | |
| STREAMLINE SOLUTIONS, et al.,<br>　　　　　Defendants | :<br>: |

| | |
|---|---|
| NICKOLAS AUGER,<br>　　　　　Plaintiff | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: SEPTEMBER TERM, 2019<br>: NO.: 1351 |
| VS. | |
| STREAMLINE SOLUTIONS, et al.,<br>　　　　　Defendants | :<br>: |

| | |
|---|---|
| DANIEL KIRK and CLARISA KIRK,<br>　　　　　Plaintiffs | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: SEPTEMBER TERM, 2019<br>: NO.: 1353 |
| VS. | |
| STREAMLINE SOLUTIONS, et al.,<br>　　　　　Defendants | :<br>: |

## <u>VERDICT SHEET</u>

**QUESTION 1:**

Were the Defendants negligent in the performance of their duties and/or responsibilities?

Nineteenth Street Development　　　　　Yes __✓__　　No_____

Streamline Solutions, LLC　　　　　Yes __✓__　　No_____

1

Case ID: 190901353

*If you answered "Yes" as to any Defendant in Question 1, proceed to Question 2.*

*If you answered "No" as to all Defendants to Question 1, proceed to Question 3.*

## QUESTION 2:

For each Defendant listed in Question 1 that you have found to be negligent, was that negligence a factual cause of any harm to the Plaintiffs?

Nickolas Auger at 1367 Crease Street:

Nineteenth Street Development         Yes_____     No__✓__

Streamline Solutions, LLC         Yes__✓__     No_____

Matthew Selbovitz at 1369 Crease Street:

Nineteenth Street Development         Yes__✓__     No_____

Streamline Solutions, LLC         Yes__✓__     No_____

Daniel and Clarisa Kirk at 1371 Crease Street:

Nineteenth Street Development         Yes__✓__     No_____

Streamline Solutions, LLC         Yes__✓__     No_____

David Butera at 1373 Crease Street:

Nineteenth Street Development         Yes__✓__     No_____

Streamline Solutions, LLC         Yes__✓__     No_____

*Proceed to Question 3.*

## QUESTION 3:

(A) Plaintiff Nickolas Auger entered into a contract with Nineteenth Street Development – the Agreement of Sale. Plaintiff Nickolas Auger did not enter into a contract with either Streamline Solutions or Harman Deutsch. Do you find that Plaintiff Nickolas Auger was an intended

Case ID: 190901353

beneficiary of either Nineteenth Street Development's construction contract with Streamline Solutions and/or Nineteenth Street Development's design contract with Harman Deutsch?

Streamline Solutions, LLC          Yes __✓__     No _____

Harman Deutsch Corp.               Yes __✓__     No _____

(B) Plaintiff Matthew Selbovitz entered into a contract with Nineteenth Street Development – the Agreement of Sale. Plaintiff Matthew Selbovitz did not enter into a contract with either Streamline Solutions or Harman Deutsch. Do you find that Plaintiff Mathew Selbovitz was an intended beneficiary of either Nineteenth Street Development's construction contract with Streamline Solutions and/or Nineteenth Street Development's design contract with Harman Deutsch?

Streamline Solutions, LLC          Yes __✓__     No _____

Harman Deutsch Corp.               Yes __✓__     No _____

(C) Plaintiffs Daniel and Clarisa Kirk entered into a contract with Nineteenth Street Development – the Agreement of Sale. Plaintiffs Daniel and Clarisa Kirk did not enter into a contract with either Streamline Solutions or Harman Deutsch. Do you find that Plaintiffs Daniel and Clarisa Kirk were intended beneficiaries of either Nineteenth Street Development's construction contract with Streamline Solutions and/or Nineteenth Street Development's design contract with Harman Deutsch?

Streamline Solutions, LLC          Yes __✓__     No _____

Harman Deutsch Corp.               Yes __✓__     No _____

(D) Plaintiff David Butera entered into a contract with Nineteenth Street Development – the Agreement of Sale. Plaintiff David Butera did not enter into a contract with either Streamline Solutions or Harman Deutsch. Do you find that Plaintiff David Butera was an intended beneficiary of either Nineteenth Street Development's construction contract with Streamline Solutions and/or Nineteenth Street Development's design contract with Harman Deutsch?

Streamline Solutions, LLC          Yes __✓__     No _____

Harman Deutsch Corp.               Yes __✓__     No _____

*Proceed to Question 4.*

**QUESTION 4:**

(A) With regard to Plaintiff Nickolas Auger:

3

Case ID: 190901353

(i) Did Nineteenth Street Development breach its Agreement of Sale contract with Nickolas Auger?

Yes_____ No__✓__

(ii) If you found that Nickolas Auger was an intended beneficiary of Nineteenth Street Development's construction contract with Streamline Solutions, did Streamline Solutions breach that contract?

Yes__✓__ No_____

(iii) If you found that Nickolas Auger was an intended beneficiary of Nineteenth Street Development's design contract with Harman Deutsch, did Harman Deutsch breach that contract?

Yes_____ No__✓__

(B) With regard to Plaintiff Matthew Selbovitz:

(i) Did Nineteenth Street Development breach its Agreement of Sale contract with Matthew Selbovitz?

Yes__✓__ No_____

(ii) If you found that Matthew Selbovitz was an intended beneficiary of Nineteenth Street Development's construction contract with Streamline Solutions, did Streamline Solutions breach that contract?

Yes__✓__ No_____

(iii) If you found that Matthew Selbovitz was an intended beneficiary of Nineteenth Street Development's design contract with Harman Deutsch, did Harman Deutsch breach that contract?

Yes_____ No__✓__

(C) With regard to Plaintiffs Daniel and Clarisa Kirk:

(i) Did Nineteenth Street Development breach its Agreement of Sale contract with Daniel and Clarisa Kirk?

Yes__✓__ No_____

(ii) If you found that Daniel and Clarisa Kirk werre intended beneficiaries of Nineteenth Street Development's construction contract with Streamline Solutions, did Streamline Solutions breach that contract?

Yes__✓__ No_____

(iii) If you found that Daniel and Clarisa Kirk were intended beneficiaries of Nineteenth Street Development's design contract with Harman Deutsch, did Harman Deutsch breach that contract?

Yes_____ No__✓__

4

Case ID: 190901353

(D) With regard to Plaintiff David Butera:

(i) Did Nineteenth Street Development breach its Agreement of Sale contract with David Butera?

Yes ✓   No_____

(ii) If you found that David Butera was an intended beneficiary of Nineteenth Street Development's construction contract with Streamline Solutions, did Streamline Solutions breach that contract?

Yes ✓   No_____

(iii) If you found that David Butera was an intended beneficiary of Nineteenth Street Development's design contract with Harman Deutsch, did Harman Deutsch breach that contract?

Yes_____   No ✓

*If you answered "Yes" as to any Defendant in Questions 4 (A), (B), (C), or (D), proceed to Question 5.*

*If you answered "No" as to all Defendants in Questions 4 (A), (B), (C), and (D), proceed to Question 6.*

**QUESTION 5:**

(A) With regard to Plaintiff Nickolas Auger, and as to each Defendant for whom you answered "Yes" in Question 4(A):

(i) Was Nineteenth Street Development's breach of its contract with Nickolas Auger a factual cause of harm to Nickolas Auger?

Yes_____   No_____   N|A

(ii) Was Streamline Solutions's breach of its construction contract a factual cause of harm to Nickolas Auger?

Yes ✓   No_____

(iii) Was Harman Deutsch's breach of its design contract a factual cause of harm to Nickolas Auger?

Yes_____   No_____   N|A

(B) With regard to Plaintiff Matthew Selbovitz, and as to each Defendant for whom you answered "Yes" in Question 4(B):

(i) Was Nineteenth Street Development's breach of its contract with Matthew Selbovitz a factual cause of harm to Matthew Selbovitz?

5

Case ID: 190901353

Yes ✓ No_____

(ii) Was Streamline Solutions's breach of its construction contract a factual cause of harm to Matthew Selbovitz?

Yes ✓ No_____

(iii) Was Harman Deutsch's breach of its design contract a factual cause of harm to Matthew Selbovitz?

Yes____ No_____ N|A

(C) With regard to Plaintiffs Daniel and Clarisa Kirk, and as to each Defendant for whom you answered "Yes" in Question 4(C):

(i) Was Nineteenth Street Development's breach of its contract with Daniel and Clarisa Kirk a factual cause of harm to Daniel and Clarisa Kirk?

Yes ✓ No_____

(ii) Was Streamline Solutions's breach of its construction contract a factual cause of harm to Daniel and Clarisa Kirk?

Yes ✓ No_____

(iii) Was Harman Deutsch's breach of its design contract a factual cause of harm to Daniel and Clarisa Kirk?

Yes____ No_____ N|A

(D) With regard to Plaintiff David Butera, and as to each Defendant for whom you answered "Yes" in Question 4(D):

(i) Was Nineteenth Street Development's breach of its contract with David Butera a factual cause of harm to David Butera?

Yes ✓ No_____

(ii) Was Streamline Solutions's breach of its construction contract a factual cause of harm to David Butera?

Yes ✓ No_____

(iii) Was Harman Deutsch's breach of its design contract a factual cause of harm to David Butera?

Yes____ No_____ N|A

*Proceed to Question 6.*
**QUESTION 6:**

Did the Defendants breach the implied warranty of workmanlike construction?

Nickolas Auger at 1367 Crease Street:

6

Case ID: 190901353

Nineteenth Street Development      Yes_____    No__✓__

Streamline Solutions, LLC      Yes_✓__    No_____

Matthew Selbovitz at 1369 Crease Street:

     Nineteenth Street Development      Yes_✓__    No_____

     Streamline Solutions, LLC      Yes_✓__    No_____

Daniel and Clarisa Kirk at 1371 Crease Street:

     Nineteenth Street Development      Yes_✓__    No_____

     Streamline Solutions, LLC      Yes_✓__    No_____

David Butera at 1373 Crease Street:

     Nineteenth Street Development      Yes_✓__    No_____

     Streamline Solutions, LLC      Yes_✓__    No_____

*If you answered "Yes" as to any Defendant in Question 6, proceed to Question 7 and answer as to that Defendant.*

*If you answered "No" as to all Defendants in Questions 6, proceed to Question 8.*

## QUESTION 7:

As to each Defendant in Question 6 for which you answered "Yes," was that breach of implied warranty of workmanlike construction a factual cause of harm to the Plaintiff?

Nickolas Auger at 1367 Crease Street:

     Nineteenth Street Development      Yes_____    No_____   N/A

     Streamline Solutions, LLC      Yes_✓__    No_____

Matthew Selbovitz at 1369 Crease Street:

     Nineteenth Street Development      Yes_✓__    No_____

7

Case ID: 190901353

Streamline Solutions, LLC     Yes ✓     No_____

Daniel and Clarisa Kirk at 1371 Crease Street:

Nineteenth Street Development     Yes ✓     No_____

Streamline Solutions, LLC     Yes ✓     No_____

David Butera at 1373 Crease Street:

Nineteenth Street Development     Yes ✓     No_____

Streamline Solutions, LLC     Yes ✓     No_____

*Proceed to Question 8.*

## QUESTION 8:

Did the Defendants breach the implied warranty of habitability?

Nickolas Auger at 1367 Crease Street:

Nineteenth Street Development     Yes ✓     No_____

Streamline Solutions, LLC     Yes ✓     No_____

Matthew Selbovitz at 1369 Crease Street:

Nineteenth Street Development     Yes ✓     No_____

Streamline Solutions, LLC     Yes ✓     No_____

Daniel and Clarisa Kirk at 1371 Crease Street:

Nineteenth Street Development     Yes ✓     No_____

Streamline Solutions, LLC     Yes ✓     No_____

Case ID: 190901353

David Butera at 1373 Crease Street:

Nineteenth Street Development      Yes ✓    No _____

Streamline Solutions, LLC      Yes ✓    No _____

*If you answered "Yes" as to any Defendants in Question 8, proceed to Question 9 and answer as to that Defendant.*

*If you answered "No" as to all Defendants in Questions 8, proceed to Question 10.*

## QUESTION 9:

As to each Defendant in Question 8 for which you answered "Yes," was that breach of implied warranty of habitability a factual cause of harm to the Plaintiffs?

Nickolas Auger at 1367 Crease Street:

Nineteenth Street Development      Yes ✓    No _____

Streamline Solutions, LLC      Yes ✓    No _____

Matthew Selbovitz at 1369 Crease Street:

Nineteenth Street Development      Yes ✓    No _____

Streamline Solutions, LLC      Yes ✓    No _____

Daniel and Clarisa Kirk at 1371 Crease Street:

Nineteenth Street Development      Yes ✓    No _____

Streamline Solutions, LLC      Yes ✓    No _____

David Butera at 1373 Crease Street:

Nineteenth Street Development      Yes ✓    No _____

Streamline Solutions, LLC      Yes ✓    No _____

*Proceed to Question 10.*

Case ID: 190901353

**QUESTION 10:**

Did Streamline Solutions breach one or more express warranties to Plaintiffs?

| | | |
|---|---|---|
| 1367 Crease Street (Nickolas Auger) | Yes ✓ | No _____ |
| 1369 Crease Street (Matthew Selbovitz) | Yes ✓ | No _____ |
| 1371 Crease Street (Daniel and Clarisa Kirk) | Yes ✓ | No _____ |
| 1373 Crease Street (David Butera) | Yes ✓ | No _____ |

*If you answered "Yes" as to any Plaintiffs in Question 10, proceed to Question 11 and answer only as to those Plaintiffs.*

*If you answered "No" as to all Plaintiffs in Questions 10, proceed to Question 12.*

**QUESTION 11:**

As to each Plaintiff in Question 10 for which you answered "Yes," was Streamline's breach of the express warranty a factual cause of harm to the Plaintiffs?

| | | |
|---|---|---|
| 1367 Crease Street (Nickolas Auger) | Yes ✓ | No _____ |
| 1369 Crease Street (Matthew Selbovitz) | Yes ✓ | No _____ |
| 1371 Crease Street (Daniel and Clarisa Kirk) | Yes ✓ | No _____ |
| 1373 Crease Street (David Butera) | Yes ✓ | No _____ |

*Proceed to Question 12.*

**QUESTION 12:**

(A) Did the Defendants make one or more negligent misrepresentations to Plaintiff Nickolas Auger regarding 1367 Crease Street?

| | | |
|---|---|---|
| Nineteenth Street Development | Yes _____ | No ✓ |
| Streamline Solutions, LLC | Yes ✓ | No _____ |

(B) Did the Defendants make one or more negligent misrepresentations to Plaintiff Matthew Selbovitz regarding 1369 Crease Street?

10

Case ID: 190901353

Nineteenth Street Development          Yes ✓          No_____

Streamline Solutions, LLC             Yes ✓          No_____

(C) Did the Defendants make one or more negligent misrepresentations to Plaintiffs Daniel and Clarisa Kirk regarding 1371 Crease Street?

Nineteenth Street Development          Yes ✓          No_____

Streamline Solutions, LLC             Yes ✓          No_____

(D) Did the Defendants make one or more negligent misrepresentations to Plaintiff David Butera regarding 1373 Crease Street?

Nineteenth Street Development          Yes ✓          No_____

Streamline Solutions, LLC             Yes ✓          No_____

*If you answered "Yes" as to any Defendant in Question 12, proceed to Question 13 and answer as to that Defendant.*

*If you answered "No" as to all Defendants in Questions 12, proceed to Question 14.*

## QUESTION 13:

(A) As to each Defendant for whom you have answered "Yes" to Question 12(A), was the negligent misrepresentation a factual cause of harm to Nickolas Auger?

Nineteenth Street Development          Yes_____          No_____   N\A

Streamline Solutions, LLC             Yes ✓          No_____

(B) As to each Defendant for whom you have answered "Yes" to Question 12(B), was the negligent misrepresentation a factual cause of harm to Matthew Selbovitz?

Nineteenth Street Development          Yes ✓          No_____

Streamline Solutions, LLC             Yes ✓          No_____

(C) As to each Defendant for whom you have answered "Yes" to Question 12(C), was the negligent misrepresentation a factual cause of harm to Daniel and Clarisa Kirk?

Nineteenth Street Development          Yes ✓          No_____

Streamline Solutions, LLC             Yes ✓          No_____

11

Case ID: 190901353

(D) As to each Defendant for whom you have answered "Yes" to Question 12(D), was the negligent misrepresentation a factual cause of harm to David Butera?

Nineteenth Street Development        Yes ✓        No_____

Streamline Solutions, LLC        Yes ✓        No_____


*Proceed to Question 14.*

**QUESTION 14:**

Was Defendant Harman Deutsch professionally negligent in the performance of its architectural responsibilities with regards to the units?

1367 Crease Street (Nickolas Auger)        Yes_____        No ✓

1369 Crease Street (Matthew Selbovitz)        Yes_____        No ✓

1371 Crease Street (Daniel and Clarisa Kirk)        Yes_____        No ✓

1373 Crease Street (David Butera)        Yes_____        No ✓


*If you answered "Yes" as to any unit in Question 14, proceed to Question 15.*
*If you answered "No" as to all units in Questions 14, proceed to Question 16.*


**QUESTION 15:**

Was the professional negligence of Harman Deutsch a factual cause of harm to the Plaintiffs?        N|A

1367 Crease Street (Nickolas Auger)        Yes_____        No_____

1369 Crease Street (Matthew Selbovitz)        Yes_____        No_____

1371 Crease Street (Daniel and Clarisa Kirk)        Yes_____        No_____

1373 Crease Street (David Butera)        Yes_____        No_____


*Proceed to Question 16.*


**QUESTION 16:**

Case ID: 190901353

(A) State the amount of compensatory damages you award to Nickolas Auger.

$ _240,557_

*If you answered "Yes" to Questions 2, 5(A), 7, 9, 11, 13(A), and/or 15 for two or more of the Defendants above, proceed to 16(B), and only answer with regard to those Defendants.*

*If not, proceed to Question 17.*

(B) Apportion the amount you believe each party bears with regard to the monetary damages sustained by Nickolas Auger. The total must equal the amount in part A.:

Nineteenth Street Development: $ _24,055.70_

Streamline Solutions, LLC: $ _216,501.30_

Harman Deutsch, Corp.: $ _0_

Total: $ _240,557_

*Proceed to Question 17.*

**QUESTION 17:**

(A) State the amount of compensatory damages you award to Matthew Selbovitz.

$ _234,109_

*If you answered "Yes" to Questions 2, 5(B), 7, 9, 11, 13(B), and/or 15 for two or more Defendants above, proceed to 17(B), and only answer with regard to those Defendants.*

*If not, proceed to Question 18.*

(B) Apportion the amount you believe each party bears with regard to the monetary damages sustained by Matthew Selbovitz. The total must equal the amount in part A.:

Nineteenth Street Development: $ _105,349.05_

Streamline Solutions, LLC: $ _128,759.95_

Harman Deutsch, Corp.: $ _0_

Total: $ _234,109_

*Proceed to Question 18.*

13

Case ID: 190901353

**QUESTION 18:**

(A) State the amount of compensatory damages you award to Daniel and Clarisa Kirk.

$ 305,029

*If you answered "Yes" to Questions 2, 5(C), 7, 9, 11, 13(C), and/or 15 for two or more Defendants above, proceed to 18(C), and only answer with regard to those Defendants.*

*If not, proceed to Question 19.*

(B) Apportion the amount you believe each party bears with regard to the monetary damages sustained by Daniel and Clarisa Kirk. The total must equal the amount in part A.:

Nineteenth Street Development: $ 137,263.05

Streamline Solutions, LLC: $ 167,765.95

Harman Deutsch, Corp.: $ 0

Total: $ 305,029

*Proceed to Question 19.*

**QUESTION 19:**

(A) State the amount of compensatory damages you award to David Butera.

$ 226,857

*If you answered "Yes" to Questions 2, 5(D), 7, 9, 11, 13(D), and/or 15 for two or more Defendants above, proceed to 19(D), and only answer with regard to those Defendants.*

*If not, proceed to Question 20.*

(B) Apportion the amount you believe each party bears with regard to the monetary damages sustained by David Butera. The total must equal the amount in part A.:

Nineteenth Street Development: $ 102,055.65

Streamline Solutions, LLC: $ 124,771.35

Harman Deutsch, Corp.: $ 0

14

Case ID: 190901353

Total: $ 226,857

*Proceed to Question 20.*

**QUESTION 20:**

Did the Defendants act recklessly, intentionally, fraudulently, or outrageously?

Nineteenth Street Development      Yes ✓      No_____

Streamline Solutions, LLC      Yes ✓      No_____

*If you answered "Yes" as to any part of Question 20, proceed to Question 21.*

*If you answered "No" as to all parts of Questions 20, you should not answer any further questions. Please sign and date the Verdict Sheet and notify Court staff that you have reached a verdict.*

**QUESTION 21:**

State the amount of punitive damages you award to Nickolas Auger.

$ 590,000 _____

*Proceed to Question 22.*

**QUESTION 22:**

If you answered "Yes" as to both Defendants in Question 20, state the percentage of those punitive damages you attribute to each Defendant.

Nineteenth Street Development:      ___0___ %

Streamline Solutions, LLC:      _100_ %

Total: ___100%

*Proceed to Question 23.*

**QUESTION 23:**

State the amount of punitive damages you award to Matthew Selbovitz.

$ 550,000 _____

*Proceed to Question 24.*

15

Case ID: 190901353

**QUESTION 24:**

If you answered "Yes" as to both Defendants in Question 20, state the percentage of those punitive damages you attribute to each Defendant.

Nineteenth Street Development:       0 %

Streamline Solutions, LLC:       100 %

Total:   100%

*Proceed to Question 25.*

**QUESTION 25:**

State the amount of punitive damages you award to Daniel and Clarisa Kirk.

$ 525,000

*Proceed to Question 26.*

**QUESTION 26:**

If you answered "Yes" as to both Defendants in Question 20, state the percentage of those punitive damages you attribute to each Defendant.

Nineteenth Street Development:       0 %

Streamline Solutions, LLC:       100 %

Total:   100%

*Proceed to Question 27.*

**QUESTION 27:**

State the amount of punitive damages you award to David Butera.

$ 515,000

*Proceed to Question 28.*

**QUESTION 28:**

If you answered "Yes" as to both Defendants in Question 20, state the percentage of those punitive damages you attribute to each Defendant.

16

Case ID: 190901353

Nineteenth Street Development: _3_ %

Streamline Solutions, LLC: _97_ %

Total: _100%_

*Please sign and date the Verdict Sheet and notify Court staff.*

DATED: June 16th 2023

Jury Foreperson

Case ID: 190901353

# EXHIBIT 15

Case ID: 190901353

| | |
|---|---|
| NICKOLAS AUGER,<br><br>    Plaintiff<br><br>vs.<br><br>STREAMLINE SOLUTIONS, et al.,<br><br>    Defendants | COURT OF COMMON PLEAS<br><br>PHILADELPHIA COUNTY<br><br>September Term, 2019<br><br>No. 1351 |

## ORDER

AND NOW, this 31st day of October, 2024, the Court finds in favor of Plaintiff Auger and against Defendants 19th Street Development, LLC and Streamline Solutions, LLC on the UTPCPL claim, and awards damages as follows:

Compensatory Damages:

    19th Street: $24,055.70

    Streamline: $216,501.30

    Because these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here.

Fees and Costs:

    19th Street: $53,637.63

    Streamline: $53,637.63

ORDER-Auger Vs Nineteenth Street Development Llc Etal [CMF]

19090135100211

BY THE COURT:

*Michael E. Erdos*

**Honorable Michael E. Erdos**

| | |
|---|---|
| DAVID BUTERA,<br><br>    Plaintiff<br><br>vs.<br><br>STREAMLINE SOLUTIONS, et al.,<br><br>    Defendants | COURT OF COMMON PLEAS<br><br>PHILADELPHIA COUNTY<br><br>September Term, 2019<br><br>No. 1268 |

## ORDER

AND NOW, this 31st day of October, 2024, the Court finds in favor of Plaintiff Butera and against Defendants 19th Street Development, LLC and Streamline Solutions, LLC on the UTPCPL claim, and awards damages as follows:

Compensatory Damages:

    19th Street: $102,085.65

    Streamline: $124,771.35

    Because these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here.

Fees and Costs:

    19th Street: $55,176.02

    Streamline: $55,176.01

ORDER-Butera Vs Streamline Solutions, Llc Etal [CMF]

19090126800152

BY THE COURT:

_Michael E. Erdos_

**Honorable Michael E. Erdos**

Case ID: 190901268

<span style="color:red">Case ID: 190901353</span>

| | |
|---|---|
| DANIEL KIRK and CLARISA KIRK,<br><br>    Plaintiffs<br><br>vs.<br><br>STREAMLINE SOLUTIONS, et al.,<br><br>    Defendants | COURT OF COMMON PLEAS<br><br>PHILADELPHIA COUNTY<br><br>September Term, 2019<br><br>No. 1353 |

## ORDER

AND NOW, this 31st day of October, 2024, the Court finds in favor of Plaintiffs Daniel and Clarisa Kirk and against Defendants 19th Street Development, LLC and Streamline Solutions, LLC on the UTPCPL claim, and awards damages as follows:

Compensatory Damages:

    19th Street: $137,263.05

    Streamline: $167,765.95

    Because these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here.

Fees and Costs:

    19th Street: $52,850.97

    Streamline: $52,850.98

ORDER-Kirk Etal Vs Nineteenth Street Development Llc Eta [CMF]

19090135300166

BY THE COURT:

*Michael E. Erdos*

_____

**Honorable Michael E. Erdos**

Case ID: 190901353

Case ID: 190901353

| MATTHEW SELBOVITZ | COURT OF COMMON PLEAS |
| Plaintiff | PHILADELPHIA COUNTY |
| vs. | April Term, 2019 |
| STREAMLINE SOLUTIONS, et al., | No. 1575 |
| Defendants | |

## **ORDER**

AND NOW, this 31st day of October, 2024, the Court finds in favor of Plaintiff Selbovitz and against Defendants 19th Street Development, LLC and Streamline Solutions, LLC on the UTPCPL claim, and awards damages as follows:

Compensatory Damages:

19th Street: $105,349.05

Streamline: $128,759.95

Because these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here.

Fees and Costs:

19th Street: $53,592.55

Streamline: $53,592.54

**BY THE COURT:**

ORDER-Auger Etal Vs Streamline Solutions, Llc Etal [CMF]

19040157500188

*[signature]*

**Honorable Michael E. Erdos**

# EXHIBIT 16

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

Ten Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                    **President**

Case ID: 190901353

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;

2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

Case ID: 190901353



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others; and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Case ID: 190901353

# EVANSTON INSURANCE COMPANY

## COMMON POLICY DECLARATIONS

**POLICY NUMBER:** 3C42330          **RENEWAL OF POLICY:** New

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

LION CONSTRUCTION, LLC DBA: STREAMLINE SOLUTIONS, LLC; 1508-22 MASCHER ST LLC

2301 WASHINGTON AVE STE 111

PHILADELPHIA, PA 19146

Policy Period: From 11/01/2017 to 11/01/2018 at 12:01 A.M. Standard Time at your mailing address shown above.

BUSINESS DESCRIPTION:  Contractors--Executive Supervisors or Executive Superintendents

| FORM OF BUSINESS | | | | |
|---|---|---|---|---|
| ☐ Individual | ☐ Partnership | ☐ Joint Venture | ☐ Trust | ☐ Corporation |
| ☒ Limited Liability Company | | ☐ Other Organization**:** | | |
| Audit Period: Annual unless otherwise stated: | | | FTZ Code:  Not Applicable | |

## IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S), BUT ONLY FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
|---|---|
| Commercial Property Coverage Part | $ ▮▮▮ |
| Commercial General Liability Coverage Part | $ ▮▮▮ |
| Commercial Inland Marine Coverage Part | $ ▮▮▮ |
| Commercial Ocean Marine Coverage Part | $ ▮▮▮ |
| Commercial Professional Liability Coverage Part | $ ▮▮▮ |
| Commercial Automobile Liability Coverage Part | $ ▮▮▮ |
| Liquor Liability Coverage Part | $ ▮▮▮ |
| Crime Coverage Part | $ ▮▮▮ |
| Other Coverages: | $ |
| | $ |
| **Premium Total** | $ ▮▮▮ |
| Other Charges:    Policy Fee | $ ▮▮ |
| | $ |
| | $ |
| **GRAND TOTAL** | $ ▮▮▮ |

| Producer Number, Name and Mailing Address | |
|---|---|
| 01750 | |
| Hull & Company, LLC (Horsham) Formerly DVUA - Horsham | |
| 220 Gibraltar Rd. Ste. 100 | Inspection Ordered: Yes ☐ No ☐ |
| Horsham, PA 19044 | Program Code: |

Case ID: 190901353

| Endorsements |
|---|
| Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:<br><br><div align="center">SEE FORMS SCHEDULE - MDIL 1001</div> |

| **These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.** |
|---|

AUTHORIZED REPRESENTATIVE

**Countersigned:** 11/09/2017                    BY:
                    **Date**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 08 10 | Policy Jacket |
| IL 09 10 12 03 | Pennsylvania Notice |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1083 04 15 | US Treasury Dept Office Of Foreign Assets Control |
| MDIL 1000 08 11 | Common Policy Declaration |
| MDIL 1001 08 11 | Forms Schedule |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion |
| IL 02 46 09 07 | Pennsylvania Changes - Cancellation and Nonrenewal |
| IL 12 01 11 85 | Policy Changes |
| MEIL 1200 10 16 | Service of Suit |
| MEIL 1225 10 11 | Changes - Civil Union |
| MEIL 1231 10 13 | Minimum Earned Premium & Minimum Retained Premium |
| CG 21 73 01 15 | Exclusion of Certified Acts of Terrorism |
| MDGL 1008 08 11 | CGL Coverage Part Declarations |
| CG 00 01 04 13 | Commercial General Liability Coverage Form |
| CG 20 10 04 13 | Additional Insured - Person Or Organization |
| CG 20 18 04 13 | Additional Insured - Mortgagee, Assignee or Receiv |
| CG 20 33 04 13 | Addl Insured-Owners, Lessees, Or Contractual Auto |
| CG 20 37 04 13 | Addl Insured-Owners, Lessees/Contractors Compl Ops |
| CG 21 09 06 15 | Exclusion - Unmanned Aircraft |
| CG 21 36 03 05 | Exclusion - New Entities |
| CG 21 47 12 07 | Employment Related Practices Exclusion |
| CG 21 65 12 04 | Total Pollution Excl w/ Bldg Heating Cooling Excpt |
| CG 21 86 12 04 | Exclusion - Exterior Insulation and Finish Systems |
| CG 21 96 03 05 | Silica Or Silica-Related Dust Exclusion |
| CG 22 79 04 13 | Exclusion - Contractors - Professional Liability |
| ME 037 04 99 | Composite Rate Endorsement |
| MEGL 0008 01 16 | Excl - Continuous or Progressive Injury or Damage |
| MEGL 0048 03 13 | Deductible Endorsement |
| MEGL 0170 05 16 | Premium Basis |
| MEGL 0241-01 05 16 | Blanket Waiver of Transfer of Rights Against Other |
| MEGL 0313 02 17 | Construction Project(s) Gen Aggregate Limit |
| MEGL 1331 11 15 | Exclusion-Opns Covered By A Consolidated Ins Progr |
| MEGL 1361 05 16 | Exclusion - Tainted Drywall/Gypsum Containing Bld |
| MEGL 1623 05 16 | Exclusion - Named Insured Versus Name Insured |
| MEGL 1625 11 13 | Exclusion - Specified States |
| MEGL 1671 05 16 | Exclusion - Punitive Or Exemplary Damages |
| MEGL 1847 12 15 | Changes - Occurrence Redefined |
| MEGL 1849 08 14 | Contractual Risk Deductible Liability Insurance |
| MEGL 1884 10 15 | Amended Limits of Insurance |
| MEGL 5300 05 16 | Exclusion-Organic Pathogen And Legionellae |
| MEGL 5302 05 16 | Exclusion - Asbestos |
| MEGL 5303 05 16 | Exclusion - Lead |

Case ID: 190901353

Case ID: 190901353

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property threat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

  © ISO Properties, Inc., 2007

Case ID: 190901353

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007  ☐

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**2. Cancellation Of Policies In Effect For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**3. Cancellation Of Policies In Effect For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**b.** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**c.** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**d.** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

IL 02 46 09 07 © ISO Properties, Inc., 2006 Page 1 of 2 ☐

Case ID: 190901353

**e.** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**f.** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

**4.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**5.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**6.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**7.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

**B.** The following are added and supersede any provisions to the contrary:

**1. Nonrenewal**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**2. Increase Of Premium**

If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2006 **IL 02 46 09 07** ☐

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number  A

| POLICY NUMBER<br><br>3C42330 | POLICY CHANGES EFFECTIVE<br>11/01/2017 | COMPANY<br><br>EVANSTON INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br>LION CONSTRUCTION, LLC; STREAMLINE SOLUTIONS, LLC;<br>1508-22 MASCHER ST LLC | | AUTHORIZED REPRESENTATIVE<br>Hull & Company, LLC (Horsham)<br>220 Gibraltar Rd. Ste. 100<br>Horsham, PA  19044 |
| COVERAGE PARTS AFFECTED<br>COMMERCIAL GENERAL LIABILITY | | |

CHANGES

Named Insured Schedule:

Lion Construction, Inc. DBA: Streamline Solutions, LLC

1508-22 Mascher St, LLC

2 Comma, LLC

2239 North 12th Street, LLC

2438-48 Federal St, LLC

732 Properties, LLC

821 N. 20th Street, LLC

BuildingUp, LLC

CI Holdings I, LLC

DDF Developments I, LLC

Donni & Donni Developments, LLC

DSE Holdings I, LLC

FoundationUp, LLC

KI Partners I, LP

Mabel US, LLC

Mabel ESP, LLC

MSA1RE Developments, LLC

Case ID: 190901353

Parc Partners One, LLC

Phillip Street Properties, LLC

Q3 Acquisitions, LLC

Q4 Real Estate, LLC

Q5 Real Estate, LLC

Q6 Real Estate, LLC

SK Five Developments, LLC

SK Four Developments, LLC

SK One Developments, LLC

SK Seven Developments, LLC

SK Six Developments, LLC

SK Three Developments, LLC

SK Two Developments, LLC

SP Holdings I, LLC

SSA Acquisitions, LLC

STL Holdings I, LLC

Techadelphia, LLC

To The Sky, LLC

TR1 Holdings, LLC

Page 53 of 65

TR2 Holdings, LLC

Trinity Real Estate, LLC

US Capital Investment Management, LLC

US Capital Investments 1, LLC

US Capital Investments 2, LLC

US Capital Investments 3, LLC

US Capital Investments 4, LLC

US Capital Investments 5, LLC

US Capital Investments 6, LLC

106 -112 Jefferson Street Condominimum Association

158 W Thompson Condominimum Association

233 Poplar Street Condominimum Association

Case ID: 190901353

316 Richmond Street Condominimum Association

547 N 12th Street Condominimum Association

631 W Oxford Street Condominimum Association

823 N Uber Street Condominimum Association

828 N 19th Street Condominimum Association

832 N 19th Street Condominimum Association
834 N 19th Street Condominimum Association
970 N Marshall Street Condominimum Association
972 N Marshall Street Condominimum Association
974 N Marshall Street Condominimum Association
976 N Marshall Street Condominimum Association
979 N Marshall Street Condominimum Association
1012-1014 S Randolph Street Condominimum Association
1138 Mount Vernon Street Condominimum Association
1419 N 7th Street Condominimum Association
1431-33 N 5th Street Condominimum Association
1506 N 7th Street Condominimum Association
1527 N 7th Street Condominimum Association
1532 N 7th Street Condominimum Association
1903-1915 E Hagert Street Condominimum Association
2311 Ellsworth Condominimum Association
2352 Federal Street Condominimum Association
2438-48 Federal Street Condominimum Association
2536 W Girard Avenue Condominimum Association
2403-2425 Manton Street Homeowner's Association
Lion Construction, LLC
Lion Construction Management, LLC
Helping Hands Philidelphia
Streamline Acquisitions, LLC
Streamline Solutions, LLC
Streamline Home Management, LLC
Streamline Partners, LLC

All other terms and conditions remain unchanged.

_____
AUTHORIZED REPRESENTATIVE

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.

**MEIL 1225 10 11**                                                                                       **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM AND MINIMUM RETAINED PREMIUM

This endorsement modifies all coverage forms and coverage parts attached to this policy.

**SCHEDULE**

| | |
|---|---|
| Minimum Earned Premium Percentage: | 25 % |
| Minimum Retained Premium Percentage: | 95 % |

The following is added to Conditions:

**A. Minimum Earned Premium**

If this policy is cancelled either at your request or due to non-payment of premium, we will retain a minimum earned premium or the short rate earned premium, whichever is greater. The minimum earned premium will be calculated by multiplying the policy premium shown in the Declarations by the Minimum Earned Premium Percentage shown in the Schedule above.

**B. Minimum Retained Premium**

If this policy was issued on an adjustable basis, the policy also has a minimum amount of premium that applies to the policy period. The minimum retained premium will be calculated by multiplying the policy premium shown in the Declarations by the Minimum Retained Premium Percentage shown in the Schedule above.

At the completion of the audit, if the audit premium is:

**1.** Greater than the premium shown in the Declarations, the additional premium is due and payable upon notice to you.

**2.** Less than the premium shown in the Declarations, we shall retain the minimum retained premium or the audit premium, whichever is greater.

**C.** The Minimum Earned Premium and Minimum Retained Premium provisions in this endorsement replace any other similar provisions included within the policy.

All other terms and conditions remain unchanged.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**MARKEL**®

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

POLICY NUMBER: 3C42330      ☐ "X" If Supplemental Declarations Is Attached

| RETROACTIVE DATE | |
|---|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. | |
| RETROACTIVE DATE: | None |
| | (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| LIMITS OF INSURANCE | | |
|---|---|---|
| General Aggregate Limit (other than Products/Completed Operations) | $ 2,000,000 | |
| Products/Completed Operations Aggregate Limit | $ 2,000,000 | |
| Personal and Advertising Injury Limit | $ 1,000,000 | Any One Person or Organization |
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You Limit | $ 100,000 | Any One Premises |
| Medical Expense Limit | $ 5,000 | Any One Person |

### ALL PREMISES YOU OWN, RENT OR OCCUPY

| Loc. No. | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
|---|---|
| | 2301 Washington Ave., Suite 111, Philadelphia, PA 19146 |
| | |
| | |
| | |
| | |

### CLASSIFICATION AND PREMIUM

| Loc. No. | Code No. Classification | Rating Basis | Premium Basis | Other Basis | Rate Pr/Co | Rate All Other | Advance Premium Pr/Co | Advance Premium All Other |
|---|---|---|---|---|---|---|---|---|
| | 91580 - Contractors-Executive Supervisors | Total Cost | ■ | | $ | ■ | $ | ■ |
| | 91340 - Carpentry-Construction of Residential | Payroll | ■ | | $ | ■ | $ | ■ |
| | 49451 - Vacant Land-For Profit | Acres | ▪ | | $ | ■ | $ | ■ |
| | | | | | $ | $ | $ | $ |
| | | | | | $ | $ | $ | $ |
| | | | | | $ | $ | $ | $ |

**MDGL 1008 08 11**      **Page 1 of 2**

Case ID: 190901353

| | | | | | $ | | $ | | $ | | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|

*(a) Area  *(c) Total Cost  *(m) Admissions  *(p) Payroll  *(s) Gross Sales  (u) Units *(r) Gross Receipts  (e) Each  (o) Other:

Premium Basis identified with a "**\***" is per 1000 of selected basis.

| | **Total Advance Premium** | $ | |
|---|---|---|---|

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

| **FORMS AND ENDORSEMENTS** |
|---|
| SEE FORMS SCHEDULE - MDIL 1001 |

Case ID: 190901353

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

Case ID: 190901353

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

**CG 00 01 04 13**

Case ID: 190901353

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

Case ID: 190901353

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

© Insurance Services Office, Inc., 2012

**CG 00 01 04 13**

Case ID: 190901353

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III –** Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

Case ID: 190901353

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

Case ID: 190901353

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Case ID: 190901353

## COVERAGE C – MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

   (1) On premises you own or rent;

   (2) On ways next to premises you own or rent; or

   (3) Because of your operations;

   provided that:

   (a) The accident takes place in the "coverage territory" and during the policy period;

   (b) The expenses are incurred and reported to us within one year of the date of the accident; and

   (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

   (1) First aid administered at the time of an accident;

   (2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

   (3) Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

a. **Any Insured**

   To any insured, except "volunteer workers".

b. **Hired Person**

   To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

   To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers' Compensation And Similar Laws**

   To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

   To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

   Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

   Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012 **CG 00 01 04 13**

Case ID: 190901353

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

Case ID: 190901353

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

© Insurance Services Office, Inc., 2012 CG 00 01 04 13

Case ID: 190901353

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

  **a.** Damages under Coverage **A;** and

  **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

  **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.** If a claim is made or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

  **c.** You and any other involved insured must:

    **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    **(2)** Authorize us to obtain records and other information;

    **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

  **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

  **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

  **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Case ID: 190901353

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I –** Coverage **A –** Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

Case ID: 190901353

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Case ID: 190901353

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012 CG 00 01 04 13

Case ID: 190901353

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

Case ID: 190901353

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

 © Insurance Services Office, Inc., 2012 **CG 00 01 04 13**

Case ID: 190901353

POLICY NUMBER: 3C42330

**COMMERCIAL GENERAL LIABILITY
CG 20 10 04 13**

.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| **As required by written contract executed by both parties prior to loss** | **All Locations** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

**1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

Case ID: 190901353

**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
|---|---|
| As required by written contract executed by both parties prior to loss | All Locations |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A. Section II – Who Is An Insured** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

However, the insurance afforded to such additional insured:

**1.** Only applies to the extent permitted by law; and

**2.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

   **a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

   **b.** Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or the failure to render any professional architectural, engineering or surveying services.

Case ID: 190901353

**2.** "Bodily injury" or "property damage" occurring after:

   **a.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

   **b.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

   **1.** Required by the contract or agreement you have entered into with the additional insured; or

   **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012 **CG 20 33 04 13**

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| **As required by written contract executed by both parties prior to loss** | **All Locations** |
| | |
| | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.g. Aircraft, Auto Or Watercraft** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**g. Aircraft, Auto Or Watercraft**

**(1) Unmanned Aircraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This Paragraph **g.(1)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

**(2) Aircraft (Other Than Unmanned Aircraft), Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This Paragraph **g.(2)** applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft (other than "unmanned aircraft"), "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This Paragraph **g.(2)** does not apply to:

**(a)** A watercraft while ashore on premises you own or rent;

**(b)** A watercraft you do not own that is:

**(i)** Less than 26 feet long; and

**(ii)** Not being used to carry persons or property for a charge;

**(c)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(d)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

Case ID: 190901353

**(e)** "Bodily injury" or "property damage" arising out of:

**(i)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(ii)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Unmanned Aircraft**

"Personal and advertising injury" arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any aircraft that is an "unmanned aircraft".

This exclusion does not apply to:

**a.** The use of another's advertising idea in your "advertisement"; or

**b.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**C.** The following definition is added to the **Definitions** section:

"Unmanned aircraft" means an aircraft that is not:

**1.** Designed;

**2.** Manufactured; or

**3.** Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

 © Insurance Services Office, Inc., 2014 **CG 21 09 06 15**

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

Paragraph **3.** of **Section II – Who Is An Insured** does not apply.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

  **(a)** Refusal to employ that person;

  **(b)** Termination of that person's employment; or

  **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

1. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   **a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

   **b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

2. Subject to Paragraph **3.** below, professional services include:

   **a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   **b.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMPOSITE RATE ENDORSEMENT

The premium stated in our Policy is an estimated premium only.  Upon expiration of the policy, the earned premium shall be computed by applying a rate of:

$
$

If the earned premium thus computed exceeds the estimated premium paid, you shall pay the excess to us.

It is understood that a complete re-survey of the exposures and revision of rate may be made at any time at our request to reflect the effect of marked exposure changes which would not otherwise be fully reflected by the rating basis in effect. You agree to notify us at any time exposures change or your operation changes.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTINUOUS OR PROGRESSIVE INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to Paragraph **2.** Exclusions under Section **I –** Coverages, Coverage **A –** Bodily Injury And Property Damage Liability and Coverage **B –** Personal And Advertising Injury Liability:

This insurance does not apply to:

**Continuous Or Progressive Injury Or Damage**

"Bodily injury", "property damage" or "personal and advertising injury" which:

**(1)** First occurred, first began to occur, or is alleged to have first occurred;

**(2)** Is alleged to be in the process of occurring to any degree; or

**(3)** Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred,

prior to the effective date of this policy.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS COVERAGE FORM
PROFESSIONAL LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
OTHER COVERAGE FORM (SPECIFY): _____

Please refer to each coverage form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all coverage forms.

### SCHEDULE

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| | PER CLAIM or | PER OCCURRENCE |
| **1.** Bodily Injury Liability | $ | $ |
| **2.** Property Damage Liability | $ | $ |
| **3.** Bodily Injury Liability and/or Property Damage Liability Combined | $ | $ 5,000 |
| **4.** Personal and Advertising Injury Liability | $ | $ 5,000 |
| **5.** Professional Liability | $ | $ |
| **6.** Other (describe): _____ | $ | $ |

### EACH COMMON CAUSE

| | | |
|---|---|---|
| **7.** Liquor Liability | $ | N/A |

☐ If this box is marked, the deductible for "property damage" is amended to apply on a Per Item, Per Claim basis.

**A.** Our obligation to pay damages on your behalf under Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability, Professional Liability, or Liquor Liability, or any other coverage under this policy referenced above, applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above.

**B.** For coverages other than Liquor Liability, the deductible amount will be on either a per "claim" or a per "occurrence" basis. For Liquor Liability, the deductible applies on an Each Common Cause basis. Your deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above and will include loss payments, adjustment, investigative and legal fees and costs, whether or not loss payment is involved.

Case ID: 190901353

The deductible amount stated in the Schedule above applies as follows:

1. **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per "claim" basis, that deductible applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

      **(1)** "Bodily injury";

      **(2)** "Property damage"; or

      **(3)** "Bodily injury" and "property damage" combined.

   d. Under Personal and Advertising Injury Liability, to all damages sustained by any one person because of "personal and advertising injury"; or

   e. Under Professional Liability, to all damages sustained by any one person because of an injury, offense, wrongful act, or any other covered cause of loss as stated in the coverage form; as the result of any one "occurrence." If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a "claim" for such damages. With respect to "property damage", person includes an organization.

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages because of "property damage"; or

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

      **(1)** "Bodily injury";

      **(2)** "Property damage"; or

      **(3)** "Bodily injury" and "property damage" combined

   d. Under Personal and Advertising Injury Liability, to all damages because of "personal and advertising injury"; or

   e. Under Professional Liability, to all damages because of an injury, offense, wrongful act, or any other covered cause of loss as stated in the Professional Liability coverage form attached to this policy as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

3. **EACH COMMON CAUSE BASIS**. If the deductible amount indicated in the Schedule above is on an Each Common Cause basis, that deductible amount applies to all damages because of an "injury" as the result of the selling, serving, or furnishing alcoholic beverages.

4. **ANY OTHER BASIS.** If the deductible amount indicated in the Schedule above applies to another coverage described in the Schedule above which is on any other basis, that deductible amount applies to all damages because of a covered loss on the same basis as the coverage described in the Schedule above.

**C.** The terms of this insurance, including those with respect to:

   1. Our right and duty to defend the insured against any "suits" seeking those damages; and

   2. Your duties in the event of an "occurrence," "claim", or "suit"

Case ID: 190901353

apply irrespective of the application of the deductible amount.

**D.** We may pay any part of or the entire deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**E.** In the event that you do not promptly reimburse us for the deductible amount demanded, then any cost we incur in collection of the deductible amount shall be added to and applied in addition to the applicable deductible amount without limitation to such costs. These costs shall include, but not be limited to, collection agency fees, attorneys' fees, and interest.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PREMIUM BASIS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

One or more of the following symbols may be entered under the Premium Basis column of the Declarations. These symbols designate the basis used for determining your premium. The following is a definition of the symbols when used as a premium basis.

**Symbol Definitions**

a    "Area" means:

The total number of square feet of floor space at the insured premises, computed as follows:

1.  For entire buildings, multiply the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:

    a.  Courts and mezzanine types of floor openings; or

    b.  Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance "employees", heating units, power plants or air-conditioning equipment.

2.  For tenants, determine the area they occupy in the same manner as for entire buildings.

The rates apply per 1,000 square feet of area.

c    "Total Cost" means:

The total cost of all work let or sublet in connection with each specific project including:

1.  The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; and

2.  All fees, bonuses or commissions made, paid or due.

The rates apply per $1,000 of total cost.

e    "Each" – See description of "t" below.

m    "Admissions" means:

The total number of persons, other than "employees" of the Named Insured, admitted to the event insured or to events conducted on the premises, whether on paid admissions, tickets, complimentary tickets or passes.

The rates apply per 1,000 admissions.

o    "Other" means:

Any premium basis not otherwise shown.

p    "Payroll" means:

1.  Remuneration which includes money or substitutes for money.

2.  Payroll includes:

Case ID: 190901353

a. Commissions, bonuses, pay for holidays, vacations or periods of illness;

b. Extra pay for overtime;

c. Payments by an employer or amounts otherwise required by law to be paid by "employees" to statutory insurance or pension plans, such as Social Security Act;

d. Payment to "employees" on any basis other than time worked, such as piece work, profit sharing or incentive plans;

e. Payment or allowance for hand tools or power tools used by hand, provided by "employees" and used in their work or operations for the insured;

f. The rental value of an apartment or a house provided for an "employee" based on comparable accommodations;

g. Value of meals and lodging other than an apartment or house received by "employees" as part of their pay;

h. The value of store certificates, merchandise, credits or any other substitute for money received by "employees" as part of their pay;

i. The payroll of all drivers, "mobile equipment" operators and their helpers, whether or not the operators are designated or licensed to operate "autos". If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

j. The payroll of "executive officers", individual insureds and co-partners; and

k. Fees paid to employment agencies for temporary personnel provided to the insured.

3. Payroll does not include:

a. Tips and other gratuities received by "employees";

b. Payments by an employer to group insurance or group pension plans for "employees" in accordance with the manuals in use by us;

c. The value of special rewards for individual invention or discovery; or

d. Dismissal or severance payments except for time worked or accrued vacation.

The rates apply per $1,000 of payroll.

r    "Receipts" – See description of "s" below.

s    "Gross Sales" or "Receipts" means:

1. The gross amount charged by the Named Insured, concessionaires of the Named Insured or by others trading under the insured's name for:

a. All goods or products, sold or distributed;

b. Operations performed during the policy period;

c. Rentals; and

d. Dues or fees.

2. Inclusions

The following items shall not be deducted from gross sales:

a. Foreign exchange discounts;

b. Freight allowance to customers;

c. Total sales of consigned goods and warehouse receipts;

d. Trade or cash discounts;

e. Bad debts; and

f. Repossession of items sold on installments (amount actually collected).

Case ID: 190901353

**3.** Exclusions

The following items shall be deducted from gross sales:

**a.** Sales or excise taxes which are collected and submitted to a governmental division;

**b.** Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;

**c.** Finance charges for items sold on installments;

**d.** Freight charges on sales if freight is charged as a separate item on the customer's invoice; and

**e.** Royalty income from patent rights or copyrights which are not product sales.

The rates apply per $1,000 of gross sales.

t    "Each" means:

Units of exposure. The quantity comprising each unit of exposure is indicated in the Declarations, such as per person.

The rates apply per unit of exposure.

u    "Unit" means:

A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

The rates apply per each unit.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## BLANKET WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### SCHEDULE

| |
|---|
| **Name Of Person Or Organization:** |
| Any person(s) or organization(s) with whom the Named Insured agrees, in a written contract executed prior to the "occurrence", to waive rights of recovery |
| **Additional Premium:**   $ ▮▮▮▮▮ |

The following is added to Condition **8.** Transfer Of Rights Of Recovery Against Others To Us under Section **IV –** Commercial General Liability Conditions:

We waive any right of recovery we may have against any person or organization shown in the Schedule of this endorsement. This waiver applies only to the person or organization shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE**

| | |
|---|---|
| Maximum Annual Limit Of Insurance: | $5,000,000 |

The following changes are subject to the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement. In no event will we be liable for damages in excess of the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement.

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I – Coverage A**, and for all medical expenses caused by accidents under Section **I – Coverage C**, which can be attributed only to ongoing operations at a single designated construction project:

    **1.** A separate Construction Project General Aggregate Limit applies to each construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

    **2.** The Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage **C** regardless of the number of:

        **a.** Insureds;

        **b.** Claims made or "suits" brought; or

        **c.** Persons or organizations making claims or bringing "suits".

    **3.** Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses will reduce the Construction Project General Aggregate Limit for that construction project and the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement. Such payments will not reduce the General Aggregate Limit shown in the Declarations nor will they reduce any other Construction Project General Aggregate Limit for any other construction project.

    **4.** The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Construction Project General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I – Coverage A**, and for all medical expenses caused by accidents under Section **I – Coverage C**, which cannot be attributed only to ongoing operations at a single construction project:

    **1.** Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses will reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable, and the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement; and

    **2.** Such payments will not reduce any Construction Project General Aggregate Limit.

Case ID: 190901353

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit and Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement, but not reduce the General Aggregate Limit nor the Construction Project General Aggregate Limit.

**D.** If the applicable construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

**E.** The provisions of Section **III** – Limits Of Insurance not otherwise modified by this endorsement will continue to apply as stipulated.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to Paragraph **2.** Exclusions under Bodily Injury And Property Damage Liability coverage:

This insurance does not apply to:

**Wrap-up Operations**

"Bodily injury" or "property damage" arising out of your ongoing operations or your operations included within the "products-completed operations hazard" at any location where a consolidated (wrap-up) insurance program has been provided by the prime contractor, project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Form;

**(2)** Has limits adequate to cover all claims or "suits"; or

**(3)** Remains in effect.

For the purposes of this endorsement, consolidated (wrap-up) insurance program includes an owner-controlled insurance program and any other job or project specific insurance program.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – TAINTED DRYWALL/GYPSUM CONTAINING BUILDING MATERIALS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following Exclusion is added:

This insurance does not apply to:

**Tainted Drywall/Gypsum Containing Building Materials**

"Bodily injury", "property damage" or "personal and advertising injury" actually or allegedly arising out of or in any way involving a claim, "suit", administrative action or proceeding, regulatory or statutory remediation, or liability legislation of any governmental entity, seeking remediation, damages or equitable relief for, "tainted drywall/gypsum containing building materials".

**B.** The following Definition is added:

"Tainted drywall/gypsum containing building materials" means any drywall, plasterboard, sheetrock, wall board, green board, blue board, gypsum board or any gypsum containing building materials which:

**a.** Emits, or has the potential to emit, sulfuric odors, sulfur-containing gas or sulfuric-containing acids;

**b.** Causes or contributes to corrosion or oxidation of any matter;

**c.** Contains arsenic, strontium, or any radioactive compounds;

**d.** Contains fly ash or any other material derived from coal-fired power plants;

**e.** Contains gypsum that is less than 70.0 percent weight percent $CaSO_4 \cdot 2H_2O$; or

**f.** Contains manufacturing by-products, waste, or asbestos.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – NAMED INSURED VERSUS NAMED INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to Paragraph **2.** Exclusions under Section **I –** Coverages, Coverage **A –** Bodily Injury And Property Damage Liability and Coverage **B –** Personal And Advertising Injury Liability:

This insurance does not apply to:

**Named Insured Versus Named Insured**

Any claim or "suit" alleging "bodily injury", "property damage" or "personal and advertising injury" made by any Named Insured covered by this policy against any other Named Insured covered by this policy.

All other terms and conditions remain unchanged.

| MEGL 1623 05 16 | Includes copyrighted material of Insurance Services Office, Inc., with its permission. | Page 1 of 1 |
|---|---|---|

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SPECIFIED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE**

| |
|---|
| **Specified States: Colorado and New York** |

The following is added to Paragraph **2.** Exclusions under Section **I –** Coverages, Coverage **A –** Bodily Injury And Property Damage Liability and Coverage **B –** Personal And Advertising Injury Liability:

This insurance does not apply to:

**Specified States**

"Bodily injury", "property damage", "personal and advertising injury", or any loss, cost or expense arising out of any work or operations, including losses within the "products-completed operations hazard", performed by you or on your behalf in any state shown in the Schedule above.

We have no duty to defend any claims or "suits" caused by or arising out of such work or operations.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

The following exclusion is added:

This insurance does not apply to:

**Punitive Damages**

**(1)** Punitive, exemplary, multiplied or other non-compensatory damages;

**(2)** Fines, penalties or sanctions imposed by law; or

**(3)** Defense costs related to any of the above.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – OCCURRENCE REDEFINED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

The Definition of "occurrence" in the Definitions section is replaced by the following:

"Occurrence" means:

**a.** An accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

**b.** "Bodily injury" or "property damage" resulting from faulty workmanship, exclusive of the faulty workmanship itself.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTUAL RISK DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

**SCHEDULE**

| Coverage | AMOUNT AND BASIS OF DEDUCTIBLE | |
|---|---|---|
| | EACH OCCURRENCE | EACH CLAIMANT |
| Contractual Risk Deductible: | | |
|     With Contractual Risk Transfer: | $ 5,000 | $ |
|     Without Contractual Risk Transfer: | $ 50,000 | $ |
| | | |
| All Other Deductible: | $ 5,000 | $ |

**A.** The following is added to **Conditions**:

Prior to the commencement of work for you or on your behalf by any contractor or subcontractor, you must require, secure and maintain each of the following:

**1.** A Certificate of Insurance for such contractor or subcontractor evidencing:

    **a.** Commercial General Liability Coverage on an occurrence basis with a carrier which has a financial strength rating of A- (Excellent) or better; and

    **b.** Limits equal to or greater than $1,000,000 for the Each Occurrence Limit, $1,000,000 for the General Aggregate Limit and $1,000,000 for the Products/Completed Operations Aggregate Limit;

**2.** Evidence that you have been named as an additional insured for ongoing operations and "products-completed operations hazard" on a primary and non-contributory basis on the Commercial General Liability policy of such contractor or subcontractor; and

**3.** A contract or agreement where such contractor or subcontractor has agreed in writing to defend, indemnify and hold harmless the insured.

You must be able to provide proof of compliance with all of the above conditions at the time of any "occurrence", claim or "suit" involving such contractor or subcontractor.

**B.** the following is added to **Limits Of Insurance**:

Our obligation to pay damages on your behalf applies only to the amount of damages in excess of the deductible amount stated in the Schedule of this endorsement and as described below:

Case ID: 190901353

1. **Contractual Risk Deductible**

   The Contractual Risk Deductible amount applies to your operations in which a contractor or subcontractor is performing any work for you or on your behalf. In the event that you have:

   a. With Contractual Risk Transfer

   Complied with all of the conditions in Paragraph **A.** of this endorsement, then the With Contractual Risk Transfer Deductible will be applicable to the "occurrence, claim or "suit"; or

   b. Without Contractual Risk Transfer

   Not complied with one or more of the conditions in Paragraph **A.** of this endorsement, then the Without Contractual Risk Transfer Deductible will be applicable to the "occurrence", claim or "suit".

2. **All Other Deductible**

   The All Other Deductible amount applies to your operations in which a contractor or subcontractor is not performing work for you or on your behalf. The All Other Deductible will be applicable to the "occurrence", claim or "suit".

   In the event that more than one deductible is applicable to the same "occurrence", claim or "suit", the largest applicable deductible will apply.

3. You may select a deductible amount on either an each "occurrence" or an each claimant basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

   a. **Each Occurrence Basis**

   If the deductible amount indicated in the Schedule above is on an each "occurrence" basis, that deductible amount applies to all damages because of "bodily injury", "property damage" and "personal and advertising injury" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

   b. **Each Claimant Basis**

   If the deductible amount indicated in the Schedule above is on an each claimant basis, that deductible amount applies to all damages sustained separately by each and every person or entity, regardless of the number of claims which may be joined in to any one "suit" or claim, because of "bodily injury", "property damage" and "personal and advertising injury" as the result of any one "occurrence", claim or "suit". The Deductible Amount applies separately regardless of whether:

   (1) A claim is made, or a "suit" is filed, jointly or individually; and

   (2) The claim or "suit" arises out of one, or more than one, "occurrence".

4. The terms of this insurance, including those with respect to:

   a. Our right and duty to defend the insured against any "suits" seeking those damages; and

   b. Your duties in the event of an "occurrence", claim, or "suit"

   apply irrespective of the application of the deductible amount.

5. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED LIMITS OF INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Section **III –** Limits Of Insurance is replaced by the following:

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   **a.** Medical expenses under Coverage **C**;

   **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   **c.** Damages under Coverage **B**;

   incurred within the policy period as stated in the Declarations.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to your or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ORGANIC PATHOGENS AND LEGIONELLAE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following are added to the Exclusions section:

This insurance does not apply to:

**Organic Pathogens**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury", including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth including, but not limited to:

**(a)** Actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from "fungi", bacteria, organic pathogens or bio-organic growth;

**(b)** Systemic chemical poisoning from "fungi", bacteria, organic pathogens or bio-organic growth; and

**(c)** Warnings, instructions, recommendations or advice given, or which should have been given, regarding "fungi", bacteria, organic pathogens or bio-organic growth.

Paragraph **(a)** above applies regardless of the source or location of the "fungi", bacteria, organic pathogens or bio-organic growth.

**(2)** Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi", bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.

As used in this endorsement, "fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.

**Legionellae**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" in any way involving the actual, alleged or threatened inhalation or aspiration of, ingestion of, contact with, exposure to, existence of, or presence of any legionellae, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage; and

**(2)** Any loss, cost or expense arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, legionellae by any insured or by any other person or entity.

The exclusions added by this endorsement apply even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following  is added to the Exclusions section:

This insurance does not apply to:

**Asbestos**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury", including consequential injury, loss or damage, in any way involving asbestos or asbestos-containing products, including, but not limited to any:

   **(a)** Actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of any toxic substances from asbestos or asbestos-containing products;

   **(b)** Systemic chemical poisoning from asbestos or asbestos-containing products; or

   **(c)** Warnings, instructions, recommendations or advice given or which should have been given regarding asbestos or asbestos-containing products.

   Paragraph **(a)** above applies regardless of the source or location of the asbestos or asbestos-containing products.

**(2)** Any loss, cost or expense arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, asbestos by any insured or by any other person or entity.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM


Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This insurance does not apply to:

**Lead**

"Bodily injury", "property damage", or "personal and advertising injury" in any way involving any lead:

**(1)** Whether involving actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from lead and/or systemic chemical poisoning. This applies regardless of source, including but not limited to, from any goods, products or structures containing same, existence of same in any form, in occupancy or construction, manufacture, sale, transportation, handling, storage, disposal or removal of lead; and

**(2)** Regardless of supervision, instructions, recommendations, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same, or in any way respond to assess the effects of lead.

Coverage does not apply to any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of lead by any insured or by any other person or entity.


All other terms and conditions remain unchanged.

Case ID: 190901353

# EXHIBIT 17

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

Ten Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                              **President**

Case ID: 190901353

# PENNSYLVANIA NOTICE

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;
2. Consultation or advice; or
3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, is not liable for damages from injury, death or loss occurring as a result of any act or omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors;
2. To consultation services required to be performed under a written service contract not related to a policy of insurance; or
3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

---

**Instruction to Policy Writers**

Attach the Pennsylvania Notice to all new and renewal certificates insuring risks located in Pennsylvania.

---

 © ISO Properties, Inc., 2001

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS

## LARGE COMMERCIAL RISK POLICY

This policy meets the requirements of a "large commercial risk", as defined by the State of Pennsylvania, and contains forms and/or rates that are exempt from filing requirements.

Case ID: 190901353



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

Case ID: 190901353



# HOW TO REPORT A CLAIM

**How to report a new claim:**

- ➢ **Email:** newclaims@markelcorp.com
- ➢ **FAX:** (855) 662-7535
- ➢ ***Phone:** (800) 362-7535
- ➢ **Mail:** P.O. Box 2009, Glen Allen, VA 23058-2009

Please complete the appropriate ACORD form in detail and include the name and phone number of the contact person at the location of the reported incident. If possible, please attach a copy of the facility incident report. When reporting an auto claim, please identify the unit # on the schedule along with the VIN#. If the loss/claim involves a building or damage to property, please provide the physical address of the property.

***Please refer to your specific policy language for new claim reporting requirements. Some policies require you to report all claims in writing only.**

**How to send Supplemental Information / Questions on an existing claim:**

- ➢ **Email:** markelclaims@markelcorp.com
- ➢ **FAX:** (855) 662-7535
- ➢ **Phone:** (800) 362-7535
- ➢ **Mail:** P.O. Box 2009, Glen Allen, VA 23058-2009

**If you have questions about a claim, please call 1-800-362-7535.**

**Inquiries may also be faxed to 1-855-662-7535.**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMON POLICY DECLARATIONS

**POLICY NUMBER:** MKLV7PBC000002        **RENEWAL OF POLICY:** 3C42330

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

LION CONSTRUCTION MANAGEMENT, LLC

2301 WASHINGTON AVE STE 111

PHILADELPHIA, PA 19146

Policy Period: From 11/01/2018 to 11/01/2019 at 12:01 A.M. Standard Time at your mailing address shown above.

BUSINESS DESCRIPTION:  Vacant Land (For-Profit)

| FORM OF BUSINESS | | | | |
|---|---|---|---|---|
| ☐ Individual | ☐ Partnership | ☐ Joint Venture | ☐ Trust | ☐ Corporation |
| ☒ Limited Liability Company | ☐ Other Organization: | | | |
| Audit Period: Annual unless otherwise stated: | | FTZ Code: Not Applicable | | |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S), BUT ONLY FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
|---|---|
| Commercial Property Coverage Part | $ ███████ |
| Commercial General Liability Coverage Part | $ █████ |
| Commercial Inland Marine Coverage Part | $ ███████ |
| Commercial Ocean Marine Coverage Part | $ ███████ |
| Commercial Professional Liability Coverage Part | $ ███████ |
| Commercial Automobile Liability Coverage Part | $ ███████ |
| Liquor Liability Coverage Part | $ ███████ |
| Crime Coverage Part | $ ██████ |
| Other Coverages: | $ |
| | $ |
| **Premium Total** | $ █████ |
| Other Charges:    Policy Fee | $ ██ |
| | $ |
| | $ |
| **GRAND TOTAL** | $ █████ |

| Producer Number, Name and Mailing Address | |
|---|---|
| 01750 | |
| Hull & Company, LLC (Horsham) Formerly DVUA - Horsham | |
| 220 Gibraltar Rd. Ste. 100 | Inspection Ordered: Yes ☐ No ☐ |
| Horsham, PA 19044 | Program Code: |

<span style="color:red">Case ID: 190901353</span>

| **Endorsements** |
|---|
| Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue: |
| SEE FORMS SCHEDULE - MDIL 1001 |

| **These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.** |
|---|

AUTHORIZED REPRESENTATIVE

**Countersigned:** <u>11/08/2018</u>              BY:
                          **Date**

Case ID: 190901353





# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 08 10 | Policy Jacket |
| IL 09 10 07 02 | Pennsylvania Notice |
| MIL PN-PA 02 99 | Notice To Policyholders - Large Commercial Risk Policy |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1041 02 12 | How To Report A Claim |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Notice |
| MDIL 1000 08 11 | Common Policy Declaration |
| MDIL 1001 08 11 | Forms Schedule |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 00 21 09 08 | Nuclear Energy Liability Exclusion Endorsement |
| IL 02 46 09 07 | Pennsylvania Changes - Cancellation and Nonrenewal |
| MEIL 1200 10 16 | Service of Suit |
| MEIL 1225 10 11 | Changes - Civil Union |
| MEIL 1231 10 13 | Minimum Earned Premium And Minimum Retained Premium |
| MIL 1214 09 17 | Trade Or Economic Sanctions |
| MDGL 1008 08 11 | Commercial General Liability Coverage Part Declarations |
| CG 00 01 04 13 | Commercial General Liability Coverage Form |
| CG 20 10 04 13 | Additional Insured - Owneres, Lessees or Contractors |
| CG 20 18 04 13 | Additional Insured - Mortgagee, Assignee or Receiv |
| CG 20 33 04 13 | Addl Insured-Owners, Lessees, Or Contractual Auto |
| CG 20 37 04 13 | Addl Insured-Owners, Lessees/Contractors Compl Ops |
| CG 21 34 01 87 | Exclusion Design Work |
| CG 21 36 03 05 | Exclusion - New Entities |
| CG 21 47 12 07 | Employment Related Practices Exclusion |
| CG 21 65 12 04 | Total Pollution Excl w/ Bldg Heating Cooling Excpt |
| CG 21 73 01 15 | Exclusion of Certified Acts of Terrorism |
| CG 21 86 12 04 | Exclusion - Exterior Insulation and Finish Systems |
| CG 21 96 03 05 | Silica Or Silica-Related Dust Exclusion |
| CG 22 79 04 13 | Exclusion - Contractors - Professional Liability |
| ME 037 04 99 | Composite Rate Endorsement |
| MEGL 0008 01 16 | Exclusion - Continuous or Progressive Injury or Damage |
| MEGL 0048 03 13 | Deductible Endorsement |
| MEGL 0170 05 16 | Premium Basis |
| MEGL 0241-01 05 16 | Blanket Waiver of Transfer of Rights Against Other |
| MEGL 0313 02 17 | Construction Project(s) Gen Aggregate Limit |
| MEGL 1331 11 15 | Exclusion-Opns Covered By A Consolidated Ins Progr |
| MEGL 1361 05 16 | Exclusion - Tainted Drywall/Gypsum Containing Bld |
| MEGL 1623 08 17 | Exclusion - Named Insured Versus Named Insured |
| MEGL 1625 11 13 | Exclusion - Specified States |
| MEGL 1671 05 16 | Exclusion - Punitive Or Exemplary Damages |
| MEGL 1847 12 15 | Changes - Occurrence Redefined |
| MEGL 1849 08 14 | Contractual Risk Deductible Liability Insurance |
| MEGL 1884 10 15 | Amended Limits of Insurance |
| MEGL 5300 05 16 | Exclusion-Organic Pathogen And Legionellae |
| MEGL 5302 05 16 | Exclusion - Asbestos |

**MDIL 1001 08 11**

Case ID: 190901353

| MEGL 5303 05 16 | Exclusion - Lead |
| MGL 1319 01 16 | Exclusion - Unmanned Aircraft |
| MDIL 1005 08 14 | Schedule Of Named Insureds |

Case ID: 190901353

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Case ID: 190901353


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property threat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

 Case ID: 190901353

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007 **IL 00 21 09 08**

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The **Cancellation** Common Policy Condition is replaced by the following:

**CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**2. Cancellation Of Policies In Effect For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**3. Cancellation Of Policies In Effect For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**a.** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**b.** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**c.** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**d.** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

Case ID: 190901353

e.  Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

f.  Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

4.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

5.  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6.  If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

7.  If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

B.  The following are added and supersede any provisions to the contrary:

1.  **Nonrenewal**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

2.  **Increase Of Premium**

If we increase your renewal premium, we will mail or deliver to the first Named Insured written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.

**MEIL 1225 10 11**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM AND MINIMUM RETAINED PREMIUM

This endorsement modifies all coverage forms and coverage parts attached to this policy.

**SCHEDULE**

| | |
|---|---|
| Minimum Earned Premium Percentage: | 25 % |
| Minimum Retained Premium Percentage: | 95 % |

The following is added to Conditions:

**A. Minimum Earned Premium**

If this policy is cancelled either at your request or due to non-payment of premium, we will retain a minimum earned premium or the short rate earned premium, whichever is greater. The minimum earned premium will be calculated by multiplying the policy premium shown in the Declarations by the Minimum Earned Premium Percentage shown in the Schedule above.

**B. Minimum Retained Premium**

If this policy was issued on an adjustable basis, the policy also has a minimum amount of premium that applies to the policy period. The minimum retained premium will be calculated by multiplying the policy premium shown in the Declarations by the Minimum Retained Premium Percentage shown in the Schedule above.

At the completion of the audit, if the audit premium is:

1. Greater than the premium shown in the Declarations, the additional premium is due and payable upon notice to you.

2. Less than the premium shown in the Declarations, we shall retain the minimum retained premium or the audit premium, whichever is greater.

**C.** The Minimum Earned Premium and Minimum Retained Premium provisions in this endorsement replace any other similar provisions included within the policy.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

MIL 1214 09 17

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

POLICY NUMBER: MKLV7PBC000002      ☐ "X" If Supplemental Declarations Is Attached

| RETROACTIVE DATE | |
|---|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. | |
| RETROACTIVE DATE: | NONE |
| | (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| LIMITS OF INSURANCE | | |
|---|---|---|
| General Aggregate Limit (other than Products/Completed Operations) | $ 2,000,000 | |
| Products/Completed Operations Aggregate Limit | $ 2,000,000 | |
| Personal and Advertising Injury Limit | $ 1,000,000 | Any One Person or Organization |
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You Limit | $ 100,000 | Any One Premises |
| Medical Expense Limit | $ 5,000 | Any One Person |

### ALL PREMISES YOU OWN, RENT OR OCCUPY

| Loc. No. | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
|---|---|
| | 2301 WASHINGTON AVE STE 111, PHILADELPHIA, PA 19146 |
| | |
| | |
| | |
| | |

### CLASSIFICATION AND PREMIUM

| Loc. No. | Code No. Classification | Rating Basis | Premium Basis | Other Basis | Rate Pr/Co | Rate All Other | Advance Premium Pr/Co | Advance Premium All Other |
|---|---|---|---|---|---|---|---|---|
| | 49451 – Vacant Land (For-Profit) | Units | ▮ | | $ | $▮ | $ | ▮ |
| | 91340 – Carpentry - construction of residential property not exceeding three stories in height | Payroll | ▮ | | $ | $▮ | $ | $▮ |
| | 91580 – Contractors - executive supervisors or executive superintendents | Total Cost | ▮ | | $ | $▮ | $ | ▮ |
| | | | | | $ | $ | $ | $ |
| | | | | | $ | $ | $ | $ |
| | | | | | $ | $ | $ | $ |

MDGL 1008 08 11       **Page 1 of 2**

Case ID: 190901353

| | | | | | $ | $ | $ | $ |
|---|---|---|---|---|---|---|---|---|

*(a) Area  *(c) Total Cost  *(m) Admissions  *(p) Payroll  *(s) Gross Sales  (u) Units *(r) Gross Receipts  (e) Each  (o) Other:

Premium Basis identified with a "*" is per 1000 of selected basis.

| **Total Advance Premium** | $ | |
|---|---|---|

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

| **FORMS AND ENDORSEMENTS** |
|---|
| SEE FORMS SCHEDULE - MDIL 1001 |

Case ID: 190901353

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   **b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   **e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

© Insurance Services Office, Inc., 2012

Case ID: 190901353

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1), (2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Case ID: 190901353

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

Case ID: 190901353

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Case ID: 190901353

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III –** Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3), (4), (5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

Case ID: 190901353

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III – Limits Of Insurance.**

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III – Limits Of Insurance;** and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

Case ID: 190901353

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Case ID: 190901353

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

  **a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

    **(1)** On premises you own or rent;

    **(2)** On ways next to premises you own or rent; or

    **(3)** Because of your operations;

    provided that:

      **(a)** The accident takes place in the "coverage territory" and during the policy period;

      **(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

      **(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

  **b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

    **(1)** First aid administered at the time of an accident;

    **(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

    **(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

  **a. Any Insured**

    To any insured, except "volunteer workers".

  **b. Hired Person**

    To a person hired to do work for or on behalf of any insured or a tenant of any insured.

  **c. Injury On Normally Occupied Premises**

    To a person injured on that part of premises you own or rent that the person normally occupies.

  **d. Workers' Compensation And Similar Laws**

    To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

  **e. Athletics Activities**

    To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

  **f. Products-Completed Operations Hazard**

    Included within the "products-completed operations hazard".

  **g. Coverage A Exclusions**

    Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

  **a.** All expenses we incur.

  **b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

  **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

  **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

  **e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

  **f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Case ID: 190901353

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

Case ID: 190901353

**2.** Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    **(1)** "Bodily injury" or "personal and advertising injury":

      **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

      **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

      **(d)** Arising out of his or her providing or failing to provide professional health care services.

    **(2)** "Property damage" to property:

      **(a)** Owned, occupied or used by;

      **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   **b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   **c.** Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

   **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   **c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

   **a.** Medical expenses under Coverage **C**;

   **b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   **c.** Damages under Coverage **B**.

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

Case ID: 190901353

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Case ID: 190901353

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Case ID: 190901353

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

Case ID: 190901353

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph **f.** does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

© Insurance Services Office, Inc., 2012

CG 00 01 04 13

Case ID: 190901353

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

  **(a)** Snow removal;

  **(b)** Road maintenance, but not construction or resurfacing; or

  **(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  **a.** False arrest, detention or imprisonment;

  **b.** Malicious prosecution;

  **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

  **f.** The use of another's advertising idea in your "advertisement"; or

  **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

  **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

  **(1)** Products that are still in your physical possession; or

  **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    **(a)** When all of the work called for in your contract has been completed.

    **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

  Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **b.** Does not include "bodily injury" or "property damage" arising out of:

  **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

  **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

  **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

  **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

Case ID: 190901353

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

© Insurance Services Office, Inc., 2012 CG 00 01 04 13

Case ID: 190901353

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY
# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
| --- | --- |
| **As required by written contract executed by both parties prior to loss** | **All locations** |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

Case ID: 190901353

**2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

© Insurance Services Office, Inc., 2012 CG 20 10 04 13

Case ID: 190901353

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED –
# MORTGAGEE, ASSIGNEE OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person(s) Or Organization(s) | Designation Of Premises |
| --- | --- |
| **As required by written contract executed by both parties prior to loss** | **All Premises** |

| |
| --- |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.


Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** **Section II – Who Is An Insured** is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

**1.** Your acts or omissions; or

**2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

However, the insurance afforded to such additional insured:

**1.** Only applies to the extent permitted by law; and

**2.** Will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or the failure to render any professional architectural, engineering or surveying services.

Case ID: 190901353


**2.** "Bodily injury" or "property damage" occurring after:

  **a.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

  **b.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

  **1.** Required by the contract or agreement you have entered into with the additional insured; or

  **2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

 © Insurance Services Office, Inc., 2012 CG 20 33 04 13

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) | Location And Description Of Completed Operations |
|---|---|
| As required by written contract executed by both parties prior to loss | All locations |
|  |  |
|  |  |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and

2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Case ID: 190901353


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED WORK

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

**Description of your work:**  Sales of real estate, homes, condominiums, townhomes, apartments, commercial property, vacant land in which there was no construction performed by the Named Insured and which has GL coverage elsewhere.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of "your work" shown in the Schedule.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II – Who Is An Insured** does
not apply.

Case ID: 190901353


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Case ID: 190901353


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

Case ID: 190901353


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.


Case ID: 190901353

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

1. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

   b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

2. Subject to Paragraph **3.** below, professional services include:

   a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.


Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## COMPOSITE RATE ENDORSEMENT

The premium stated in our Policy is an estimated premium only.  Upon expiration of the policy, the earned premium shall be computed by applying a rate of:

| | | |
|---|---|---|
| $ ▮ | Per $ ▮ | Of Total Cost for code 91580 |
| $ ▮ | Per $ ▮ | Of Payroll for code 91340 |
| $ ▮ | Per ▮ | Of Acres for code 49451 |

If the earned premium thus computed exceeds the estimated premium paid, you shall pay the excess to us.

It is understood that a complete re-survey of the exposures and revision of rate may be made at any time at our request to reflect the effect of marked exposure changes which would not otherwise be fully reflected by the rating basis in effect. You agree to notify us at any time exposures change or your operation changes.

All other terms and conditions remain unchanged.

ME 037 04 99

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CONTINUOUS OR PROGRESSIVE INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following is added to Paragraph **2.** Exclusions under Section **I –** Coverages, Coverage **A –** Bodily Injury And Property Damage Liability and Coverage **B –** Personal And Advertising Injury Liability:

This insurance does not apply to:

**Continuous Or Progressive Injury Or Damage**

"Bodily injury", "property damage" or "personal and advertising injury" which:

**(1)** First occurred, first began to occur, or is alleged to have first occurred;

**(2)** Is alleged to be in the process of occurring to any degree; or

**(3)** Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred,

prior to the effective date of this policy.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS COVERAGE FORM
PROFESSIONAL LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
OTHER COVERAGE FORM (SPECIFY): _____

Please refer to each coverage form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all coverage forms.

**SCHEDULE**

| Coverage | Amount and Basis of Deductible | | |
|---|---|---|---|
| | PER CLAIM | or | PER OCCURRENCE |
| **1.** Bodily Injury Liability | $ | | $ |
| **2.** Property Damage Liability | $ | | $ |
| **3.** Bodily Injury Liability and/or Property Damage Liability Combined | $ | | $ 5,000 |
| **4.** Personal and Advertising Injury Liability | $ | | $ 5,000 |
| **5.** Professional Liability | $ | | $ |
| **6.** Other (describe): _____ | $ | | $ |

**EACH COMMON CAUSE**

| | | |
|---|---|---|
| **7.** Liquor Liability | $ | N/A |

☐ If this box is marked, the deductible for "property damage" is amended to apply on a Per Item, Per Claim basis.

**A.** Our obligation to pay damages on your behalf under Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability, Professional Liability, or Liquor Liability, or any other coverage under this policy referenced above, applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above.

**B.** For coverages other than Liquor Liability, the deductible amount will be on either a per "claim" or a per "occurrence" basis. For Liquor Liability, the deductible applies on an Each Common Cause basis. Your deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above and will include loss payments, adjustment, investigative and legal fees and costs, whether or not loss payment is involved.

Case ID: 190901353

The deductible amount stated in the Schedule above applies as follows:

1. **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per "claim" basis, that deductible applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

      **(1)** "Bodily injury";

      **(2)** "Property damage"; or

      **(3)** "Bodily injury" and "property damage" combined.

   d. Under Personal and Advertising Injury Liability, to all damages sustained by any one person because of "personal and advertising injury"; or

   e. Under Professional Liability, to all damages sustained by any one person because of an injury, offense, wrongful act, or any other covered cause of loss as stated in the coverage form; as the result of any one "occurrence." If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a "claim" for such damages. With respect to "property damage", person includes an organization.

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages because of "property damage"; or

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

      **(1)** "Bodily injury";

      **(2)** "Property damage"; or

      **(3)** "Bodily injury" and "property damage" combined

   d. Under Personal and Advertising Injury Liability, to all damages because of "personal and advertising injury"; or

   e. Under Professional Liability, to all damages because of an injury, offense, wrongful act, or any other covered cause of loss as stated in the Professional Liability coverage form attached to this policy as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

3. **EACH COMMON CAUSE BASIS**. If the deductible amount indicated in the Schedule above is on an Each Common Cause basis, that deductible amount applies to all damages because of an "injury" as the result of the selling, serving, or furnishing alcoholic beverages.

4. **ANY OTHER BASIS.** If the deductible amount indicated in the Schedule above applies to another coverage described in the Schedule above which is on any other basis, that deductible amount applies to all damages because of a covered loss on the same basis as the coverage described in the Schedule above.

**C.** The terms of this insurance, including those with respect to:

   1. Our right and duty to defend the insured against any "suits" seeking those damages; and

   2. Your duties in the event of an "occurrence," "claim", or "suit"

Case ID: 190901353

apply irrespective of the application of the deductible amount.

**D.** We may pay any part of or the entire deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**E.** In the event that you do not promptly reimburse us for the deductible amount demanded, then any cost we incur in collection of the deductible amount shall be added to and applied in addition to the applicable deductible amount without limitation to such costs. These costs shall include, but not be limited to, collection agency fees, attorneys' fees, and interest.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PREMIUM BASIS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

One or more of the following symbols may be entered under the Premium Basis column of the Declarations. These symbols designate the basis used for determining your premium. The following is a definition of the symbols when used as a premium basis.

**Symbol Definitions**

a   "Area" means:

The total number of square feet of floor space at the insured premises, computed as follows:

1.  For entire buildings, multiply the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:

    a.  Courts and mezzanine types of floor openings; or

    b.  Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance "employees", heating units, power plants or air-conditioning equipment.

2.  For tenants, determine the area they occupy in the same manner as for entire buildings.

The rates apply per 1,000 square feet of area.

c   "Total Cost" means:

The total cost of all work let or sublet in connection with each specific project including:

1.  The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; and

2.  All fees, bonuses or commissions made, paid or due.

The rates apply per $1,000 of total cost.

e   "Each" – See description of "t" below.

m   "Admissions" means:

The total number of persons, other than "employees" of the Named Insured, admitted to the event insured or to events conducted on the premises, whether on paid admissions, tickets, complimentary tickets or passes.

The rates apply per 1,000 admissions.

o   "Other" means:

Any premium basis not otherwise shown.

p   "Payroll" means:

1.  Remuneration which includes money or substitutes for money.

2.  Payroll includes:

Case ID: 190901353

**a.** Commissions, bonuses, pay for holidays, vacations or periods of illness;

**b.** Extra pay for overtime;

**c.** Payments by an employer or amounts otherwise required by law to be paid by "employees" to statutory insurance or pension plans, such as Social Security Act;

**d.** Payment to "employees" on any basis other than time worked, such as piece work, profit sharing or incentive plans;

**e.** Payment or allowance for hand tools or power tools used by hand, provided by "employees" and used in their work or operations for the insured;

**f.** The rental value of an apartment or a house provided for an "employee" based on comparable accommodations;

**g.** Value of meals and lodging other than an apartment or house received by "employees" as part of their pay;

**h.** The value of store certificates, merchandise, credits or any other substitute for money received by "employees" as part of their pay;

**i.** The payroll of all drivers, "mobile equipment" operators and their helpers, whether or not the operators are designated or licensed to operate "autos". If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

**j.** The payroll of "executive officers", individual insureds and co-partners; and

**k.** Fees paid to employment agencies for temporary personnel provided to the insured.

**3.** Payroll does not include:

**a.** Tips and other gratuities received by "employees";

**b.** Payments by an employer to group insurance or group pension plans for "employees" in accordance with the manuals in use by us;

**c.** The value of special rewards for individual invention or discovery; or

**d.** Dismissal or severance payments except for time worked or accrued vacation.

The rates apply per $1,000 of payroll.

r    "Receipts" – See description of "s" below.

s    "Gross Sales" or "Receipts" means:

**1.** The gross amount charged by the Named Insured, concessionaires of the Named Insured or by others trading under the insured's name for:

**a.** All goods or products, sold or distributed;

**b.** Operations performed during the policy period;

**c.** Rentals; and

**d.** Dues or fees.

**2.** Inclusions

The following items shall not be deducted from gross sales:

**a.** Foreign exchange discounts;

**b.** Freight allowance to customers;

**c.** Total sales of consigned goods and warehouse receipts;

**d.** Trade or cash discounts;

**e.** Bad debts; and

**f.** Repossession of items sold on installments (amount actually collected).

Case ID: 190901353

3. Exclusions

The following items shall be deducted from gross sales:

   **a.** Sales or excise taxes which are collected and submitted to a governmental division;

   **b.** Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;

   **c.** Finance charges for items sold on installments;

   **d.** Freight charges on sales if freight is charged as a separate item on the customer's invoice; and

   **e.** Royalty income from patent rights or copyrights which are not product sales.

The rates apply per $1,000 of gross sales.

t   "Each" means:

Units of exposure. The quantity comprising each unit of exposure is indicated in the Declarations, such as per person.

The rates apply per unit of exposure.

u   "Unit" means:

A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

The rates apply per each unit.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BLANKET WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE**

| **Name Of Person Or Organization:** |
| --- |
| Any person(s) or organization(s) with whom the Named Insured agrees, in a written contract executed prior to the "occurrence", to waive rights of recovery |
| **Additional Premium:**　　$▮▮▮▮▮▮▮▮ |

The following is added to Condition **8.** Transfer Of Rights Of Recovery Against Others To Us under Section **IV –** Commercial General Liability Conditions:

We waive any right of recovery we may have against any person or organization shown in the Schedule of this endorsement. This waiver applies only to the person or organization shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

## SCHEDULE

| Maximum Annual Limit Of Insurance: | $5,000,000 |
|---|---|

The following changes are subject to the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement. In no event will we be liable for damages in excess of the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement.

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I – Coverage A**, and for all medical expenses caused by accidents under Section **I – Coverage C**, which can be attributed only to ongoing operations at a single designated construction project:

   **1.** A separate Construction Project General Aggregate Limit applies to each construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

   **2.** The Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under Coverage **C** regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

   **3.** Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses will reduce the Construction Project General Aggregate Limit for that construction project and the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement. Such payments will not reduce the General Aggregate Limit shown in the Declarations nor will they reduce any other Construction Project General Aggregate Limit for any other construction project.

   **4.** The limits shown in the Declarations for Each Occurrence, Damage To Premises Rented To You and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Construction Project General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section **I – Coverage A**, and for all medical expenses caused by accidents under Section **I – Coverage C**, which cannot be attributed only to ongoing operations at a single construction project:

   **1.** Any payments made under Coverage **A** for damages or under Coverage **C** for medical expenses will reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable, and the Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement; and

   **2.** Such payments will not reduce any Construction Project General Aggregate Limit.

Case ID: 190901353

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit and Maximum Annual Limit Of Insurance shown in the Schedule of this endorsement, but not reduce the General Aggregate Limit nor the Construction Project General Aggregate Limit.

**D.** If the applicable construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

**E.** The provisions of Section **III – Limits Of Insurance** not otherwise modified by this endorsement will continue to apply as stipulated.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to Paragraph **2.** Exclusions under Bodily Injury And Property Damage Liability coverage:

This insurance does not apply to:

**Wrap-up Operations**

"Bodily injury" or "property damage" arising out of your ongoing operations or your operations included within the "products-completed operations hazard" at any location where a consolidated (wrap-up) insurance program has been provided by the prime contractor, project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Form;

**(2)** Has limits adequate to cover all claims or "suits"; or

**(3)** Remains in effect.

For the purposes of this endorsement, consolidated (wrap-up) insurance program includes an owner-controlled insurance program and any other job or project specific insurance program.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – TAINTED DRYWALL/GYPSUM CONTAINING BUILDING MATERIALS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following Exclusion is added:

This insurance does not apply to:

**Tainted Drywall/Gypsum Containing Building Materials**

"Bodily injury", "property damage" or "personal and advertising injury" actually or allegedly arising out of or in any way involving a claim, "suit", administrative action or proceeding, regulatory or statutory remediation, or liability legislation of any governmental entity, seeking remediation, damages or equitable relief for, "tainted drywall/gypsum containing building materials".

**B.** The following Definition is added:

"Tainted drywall/gypsum containing building materials" means any drywall, plasterboard, sheetrock, wall board, green board, blue board, gypsum board or any gypsum containing building materials which:

**a.** Emits, or has the potential to emit, sulfuric odors, sulfur-containing gas or sulfuric-containing acids;

**b.** Causes or contributes to corrosion or oxidation of any matter;

**c.** Contains arsenic, strontium, or any radioactive compounds;

**d.** Contains fly ash or any other material derived from coal-fired power plants;

**e.** Contains gypsum that is less than 70.0 percent weight percent $CaSO_4 \cdot 2H_2O$; or

**f.** Contains manufacturing by-products, waste, or asbestos.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – NAMED INSURED VERSUS NAMED INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

The following is added to the Exclusions section:

This insurance does not apply to:

**Named Insured Versus Named Insured**

Any claim made or "suit" brought by any Named Insured covered by this policy against any other Named Insured covered by this policy.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SPECIFIED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

### SCHEDULE

**Specified States: Colorado, New York**

The following is added to Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability and Coverage **B** – Personal And Advertising Injury Liability:

This insurance does not apply to:

**Specified States**

"Bodily injury", "property damage", "personal and advertising injury", or any loss, cost or expense arising out of any work or operations, including losses within the "products-completed operations hazard", performed by you or on your behalf in any state shown in the Schedule above.

We have no duty to defend any claims or "suits" caused by or arising out of such work or operations.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

The following exclusion is added:

This insurance does not apply to:

**Punitive Damages**

**(1)** Punitive, exemplary, multiplied or other non-compensatory damages;

**(2)** Fines, penalties or sanctions imposed by law; or

**(3)** Defense costs related to any of the above.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – OCCURRENCE REDEFINED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

The Definition of "occurrence" in the Definitions section is replaced by the following:

"Occurrence" means:

**a.** An accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

**b.** "Bodily injury" or "property damage" resulting from faulty workmanship, exclusive of the faulty workmanship itself.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTUAL RISK DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

### SCHEDULE

| Coverage | AMOUNT AND BASIS OF DEDUCTIBLE | |
| --- | --- | --- |
| | EACH OCCURRENCE | EACH CLAIMANT |
| Contractual Risk Deductible: | | |
|     With Contractual Risk Transfer: | $ 5,000 | $ |
|     Without Contractual Risk Transfer: | $ 50,000 | $ |
| All Other Deductible: | $ 5,000 | $ |

**A.** The following is added to **Conditions**:

Prior to the commencement of work for you or on your behalf by any contractor or subcontractor, you must require, secure and maintain each of the following:

**1.** A Certificate of Insurance for such contractor or subcontractor evidencing:

**a.** Commercial General Liability Coverage on an occurrence basis with a carrier which has a financial strength rating of A- (Excellent) or better; and

**b.** Limits equal to or greater than $1,000,000 for the Each Occurrence Limit, $1,000,000 for the General Aggregate Limit and $1,000,000 for the Products/Completed Operations Aggregate Limit;

**2.** Evidence that you have been named as an additional insured for ongoing operations and "products-completed operations hazard" on a primary and non-contributory basis on the Commercial General Liability policy of such contractor or subcontractor; and

**3.** A contract or agreement where such contractor or subcontractor has agreed in writing to defend, indemnify and hold harmless the insured.

You must be able to provide proof of compliance with all of the above conditions at the time of any "occurrence", claim or "suit" involving such contractor or subcontractor.

**B.** the following is added to **Limits Of Insurance**:

Our obligation to pay damages on your behalf applies only to the amount of damages in excess of the deductible amount stated in the Schedule of this endorsement and as described below:

Case ID: 190901353

1. **Contractual Risk Deductible**

   The Contractual Risk Deductible amount applies to your operations in which a contractor or subcontractor is performing any work for you or on your behalf. In the event that you have:

   a. With Contractual Risk Transfer

   Complied with all of the conditions in Paragraph **A.** of this endorsement, then the With Contractual Risk Transfer Deductible will be applicable to the "occurrence, claim or "suit"; or

   b. Without Contractual Risk Transfer

   Not complied with one or more of the conditions in Paragraph **A.** of this endorsement, then the Without Contractual Risk Transfer Deductible will be applicable to the "occurrence", claim or "suit".

2. **All Other Deductible**

   The All Other Deductible amount applies to your operations in which a contractor or subcontractor is not performing work for you or on your behalf. The All Other Deductible will be applicable to the "occurrence", claim or "suit".

   In the event that more than one deductible is applicable to the same "occurrence", claim or "suit", the largest applicable deductible will apply.

3. You may select a deductible amount on either an each "occurrence" or an each claimant basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

   a. **Each Occurrence Basis**

   If the deductible amount indicated in the Schedule above is on an each "occurrence" basis, that deductible amount applies to all damages because of "bodily injury", "property damage" and "personal and advertising injury" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

   b. **Each Claimant Basis**

   If the deductible amount indicated in the Schedule above is on an each claimant basis, that deductible amount applies to all damages sustained separately by each and every person or entity, regardless of the number of claims which may be joined in to any one "suit" or claim, because of "bodily injury", "property damage" and "personal and advertising injury" as the result of any one "occurrence", claim or "suit". The Deductible Amount applies separately regardless of whether:

   (1) A claim is made, or a "suit" is filed, jointly or individually; and

   (2) The claim or "suit" arises out of one, or more than one, "occurrence".

4. The terms of this insurance, including those with respect to:

   a. Our right and duty to defend the insured against any "suits" seeking those damages; and

   b. Your duties in the event of an "occurrence", claim, or "suit"

   apply irrespective of the application of the deductible amount.

5. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED LIMITS OF INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Section **III –** Limits Of Insurance is replaced by the following:

**SECTION III – LIMITS OF INSURANCE**

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits".

2.  The General Aggregate Limit is the most we will pay for the sum of:

    **a.** Medical expenses under Coverage **C**;

    **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    **c.** Damages under Coverage **B**;

    incurred within the policy period as stated in the Declarations.

3.  The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4.  Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5.  Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    **a.** Damages under Coverage **A**; and

    **b.** Medical expenses under Coverage **C**

    because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6.  Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to your or temporarily occupied by you with permission of the owner.

7.  Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ORGANIC PATHOGENS AND LEGIONELLAE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following are added to the Exclusions section:

This insurance does not apply to:

**Organic Pathogens**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury", including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth including, but not limited to:

   **(a)** Actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from "fungi", bacteria, organic pathogens or bio-organic growth;

   **(b)** Systemic chemical poisoning from "fungi", bacteria, organic pathogens or bio-organic growth; and

   **(c)** Warnings, instructions, recommendations or advice given, or which should have been given, regarding "fungi", bacteria, organic pathogens or bio-organic growth.

   Paragraph **(a)** above applies regardless of the source or location of the "fungi", bacteria, organic pathogens or bio-organic growth.

**(2)** Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi", bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.

As used in this endorsement, "fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.

**Legionellae**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" in any way involving the actual, alleged or threatened inhalation or aspiration of, ingestion of, contact with, exposure to, existence of, or presence of any legionellae, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage; and

**(2)** Any loss, cost or expense arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, legionellae by any insured or by any other person or entity.

The exclusions added by this endorsement apply even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This insurance does not apply to:

**Asbestos**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury", including consequential injury, loss or damage, in any way involving asbestos or asbestos-containing products, including, but not limited to any:

    **(a)** Actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of any toxic substances from asbestos or asbestos-containing products;

    **(b)** Systemic chemical poisoning from asbestos or asbestos-containing products; or

    **(c)** Warnings, instructions, recommendations or advice given or which should have been given regarding asbestos or asbestos-containing products.

    Paragraph **(a)** above applies regardless of the source or location of the asbestos or asbestos-containing products.

**(2)** Any loss, cost or expense arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, asbestos by any insured or by any other person or entity.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This insurance does not apply to:

**Lead**

"Bodily injury", "property damage", or "personal and advertising injury" in any way involving any lead:

**(1)** Whether involving actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from lead and/or systemic chemical poisoning. This applies regardless of source, including but not limited to, from any goods, products or structures containing same, existence of same in any form, in occupancy or construction, manufacture, sale, transportation, handling, storage, disposal or removal of lead; and

**(2)** Regardless of supervision, instructions, recommendations, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same, or in any way respond to assess the effects of lead.

Coverage does not apply to any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of lead by any insured or by any other person or entity.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** The following is added to Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **A** – Bodily Injury And Property Damage Liability:

This insurance does not apply to:

**Unmanned Aircraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any "unmanned aircraft". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any "unmanned aircraft".

This exclusion does not serve to create coverage for "bodily injury" or "property damage" that is otherwise excluded under this Coverage Form.

**B.** The following is added to Paragraph **2.** Exclusions under Section **I** – Coverages, Coverage **B** – Personal And Advertising Injury Liability:

This insurance does not apply to:

**Unmanned Aircraft**

"Personal and advertising injury" arising out of the ownership, maintenance, use or entrustment to others of any "unmanned aircraft". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the offense which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any "unmanned aircraft".

This exclusion does not apply to:

**(1)** The use of another's advertising idea in your "advertisement"; or

**(2)** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**C.** The following is added to the **Definitions** section:

"Unmanned aircraft" means an aircraft that is not:

**a.** Designed;

**b.** Manufactured; or

**c.** Modified after manufacture;

to be controlled directly by a person from within or on the aircraft.

All other terms and conditions remain unchanged.

MGL 1319 01 16      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      Page 1 of 1

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## SCHEDULE OF NAMED INSUREDS

| SCHEDULE |
|---|
| Lion Construction Management, LLC |
| 2239 North 12th Street, LLC |
| 2437-48 Federal St, LLC |
| 732 Properties, LLC |
| 821 N. 20th Street, LLC |
| BuildingUp, LLC |
| CI Holdings, I, LLC |
| DDF Developments I, LLC |
| Donni & Donni Developments, LLC |
| DSE Holdings I, LLC |
| FounationUp, LLC |
| Helping Hands Philadelphia |
| KI Partners I, LLC |
| Lion Construction, LLC |
| Mabel ESP, LLC |
| Mabel US, LLC |
| MSAIRE Developments, LLC |
| Parc Partners One, LLC |
| Phillip Street Properties, LLC |
| Q3 Acquisitions, LLC |
| Q4 Real Estate, LLC |
| Q5 Real Estate, LLC |
| Q6 Real Estate, LLC |
| SK 7 Developments, LLC |
| SK Five Developments, LLC |
| SK Four Developments, LLC |
| SK One Developments, LLC |
| SK Seven Developments, LLC |
| SK Six Developments, LLC |
| SK Three Developments, LLC |
| SK Two Developments, LLC |
| SP Holdings I, LLC |
| Spanish Capital 2, LLC |
| Spanish Capital Investments 1, LLC |
| Spanish Capital Investments 3, LLC |

Case ID: 190901353

Spanish Capital Investments 5, LLC
Spanish Capital Investments 8, LLC
SSA Acquisitions, LLC
STL Holdings I, LLC
Streamline Acquisitions, LLC
Streamline Commercial Development, LLC
Streamline Home Management, LLC
Streamline Partners, LLC
Streamline Solutions, LLC
Techadelphia, LLC
To The Sky, LLC
TR1 Holdings, LLC
TR2 Holdings, LLC
Trinity Real Estate, LLC
US Capital 1, LLC
US Capital 16, LLC
US Capital Investment Management, LLC
US Capital Investments 1, LLC
US Capital Investments 10, LLC
US Capital Investments 11, LLC
US Capital Investments 12, LLC
US Capital Investments 16, LLC
US Capital Investments 2, LLC
US Capital Investments 3, LLC
US Capital Investments 4, LLC
US Capital Investments 5, LLC
US Capital Investments 6, LLC
US Capital Investments 8, LLC
US Capital Investments 9, LLC
US Capital Investments 13, LLC

Case ID: 190901353

# EXHIBIT 18

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

10 Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                     **President**

Case ID: 190901353



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described.  We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others; and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law.  We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files.  A more detailed description of your rights and practices regarding such information is available upon request.  Please contact your agent/broker for instructions on how to submit a request to us.

Case ID: 190901353

# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS

POLICY NUMBER: MKLV1EUL100396          RENEWAL POLICY NUMBER: MKLV10LE104646-

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

LION CONSTRUCTION LLC/ STREAMLINE SOLUTIONS LLC
2301 WASHINGTON AVE
PHILADELPHIA          PA     19146-2534

Policy Period: From: <u>November 1, 2016</u> to <u>November 1, 2017</u> at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

### Limits of Insurance

| | |
|---|---|
| Each Occurrence Limit: | $ 1,000,000 |
| Aggregate Limit: | $ 1,000,000 |

### Premium

| | |
|---|---|
| Policy Premium: | $ ████ |
| Terrorism Premium: | $ ██████ |
| Fees (Where Applicable) | $ ██████ |
| Total Premium: | $ ████ |

Audit Period:     ☒ Not Applicable     ☐ Annual     ☐ Semi-Annual     ☐ Quarterly     ☐ Monthly

Rating Basis (If Subject to Audit)     Premium Basis: _____     Rate: _____

### Producer Number, Name and Mailing Address

Partners Specialty Group, LLC
100 Tournament Drive Suite 214
Horsham          PA   19044

### Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
Per Forms Schedule

### Schedule of Underlying Insurance

Per Schedule Of Underlying Insurance

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____ 11/16/2016 _____     By: _____
                          **DATE**                                        **AUTHORIZED REPRESENTATIVE**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| **Form Number** | **Form Name** |
|---|---|
| MJIL 1000 08 10 | POLICY JACKET |
| MPIL 1007 03 14 | PRIVACY NOTICE |
| MADUB 1000 01 15 | COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS |
| MDIL 1001 08 11 | FORMS SCHEDULE |
| MEIL 1200 01 10 | SERVICE OF SUIT |
| MEIL 1225 10 11 | CHANGES - CIVIL UNION |
| MADUB 1003 01 15 | SCHEDULE OF UNDERLYING INSURANCE |
| MAUB 0001 01 15 | COMMERCIAL EXCESS LIABILITY POLICY |
| MAUB 1243 01 15 | UNIMPAIRED AGGREGATE LIMIT |
| MAUB 1264 01 15 | 25% MINIMUM EARNED PREMIUM |
| MAUB 1274 01 15 | KNOWN INJURY OR DAMAGE LIMITATION |
| MAUB 1305 01 15 | EXCL - POLL - HOSTILE FIRE COLL/UPSET AND PCO FOLLOWING FORM EXCEP |
| MAUB 1355 01 15 | EXCLUSION - NUCLEAR ENERGY LIABILITY |
| MAUB 1363 01 15 | EXCLUSION - CONTRACTOR'S SERVICES |
| MAUB 1384 01 15 | EXCLUSION - EMPLOYMENT-RELATED PRACTICES |
| MAUB 1386 01 15 | EXCLUSION - ERISA |
| MAUB 1391 01 15 | EXCLUSION - COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS |
| MAUB 1402-PA 01 15 | PENNSYLVANIA AMENDATORY |
| MAUB 1604 01 15 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEM |
| MAUB 1615 01 15 | EXCLUSION - DAMAGE TO PROPERTY |
| MAUB 1621 01 15 | EXCLUSION - RECORDING AND DISTRIBUTION OF MATERIAL INFO IN VIOLATION OF LAW |
| MAUB 1638 01 15 | EXCLUSION - FUNGI OR BACTERIA |
| MAUB 1642 01 15 | EXCLUSION - LEAD |
| MAUB 1663 01 15 | EXCLUSION - PROFESSIONAL SERVICES |
| MAUB 1666 01 15 | EXCLUSION - WAR LIABILITY |
| MAUB 1692 01 15 | EXCLUSION - PUNITIVE DAMAGES |
| MAUB 1693 01 15 | EXCLUSION - RADIOACTIVE MATTER |
| MAUB 1696 01 15 | EXCLUSION - CERTIFIED ACTS OF TERRORISM |
| MAUB 1804 01 15 | EXCLUSION - SILICA OR MIXED DUST |
| MAUB 1813 01 15 | EXCLUSION - ASBESTOS |
| MUB TERR-2 01 15 | CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE |

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Midwest, Ten Parkway North, Deerfield, Illinois 60015 and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| General Liability<br>Carrier: United Specialty<br>Effective Date:  11/01/2016<br>Expiration Date: 11/01/2017 | Occurrence | $1,000,000 |
| | General Aggregate | $2,000,000 |
| | Products and Completed Operations Aggregate | $2,000,000 |
| | Personal and Advertising Injury | $1,000,000 |
| Automobile Liability<br>Carrier: Selective<br>Effective Date:  11/01/2016<br>Expiration Date: 11/01/2017 | Combined Single Limit | $1,000,000 |
| Employers Liability<br>Carrier: Erie<br>Effective Date:  11/01/2016<br>Expiration Date: 11/01/2017 | Bodily Injury by Accident – each accident | $1,000,000 |
| | Bodily Injury by Disease – policy limit | $1,000,000 |
| | Bodily Injury by Disease – each employee | $1,000,000 |
| Employee Benefits Liability<br>Carrier: United Specialty<br>Effective Date:  11/01/2016<br>Expiration Date: 11/01/2017 | Each Employee | $1,000,000 |
| | Aggregate | $1,000,000 |
| General Liability<br>Carrier: James River<br>Effective Date:  11/01/2016<br>Expiration Date: 11/01/2017 | Occurrence | $1,000,000 |
| | General Aggregate | $2,000,000 |
| | Products and Completed Operations Aggregate | $2,000,000 |
| | Personal and Advertising Injury | $1,000,000 |

All Limits Of Insurance are Each Occurrence and Aggregate, if applicable.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy and any "underlying insurance" carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an Insured under the "underlying insurance". The words "we" and "us" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to Section **V.** Definitions.

### SECTION I. INSURING AGREEMENT

**1.** We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

**2.** This policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except:

    **a.** We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and

    **b.** With respect to any provisions to the contrary contained in this policy.

**3.** The amount we will pay for damages shall not exceed the Limits Of Insurance shown in the Declarations.

**4.** We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend ends when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

### SECTION II. EXCLUSIONS

The exclusions applicable to the "underlying insurance" also apply to this policy.

### SECTION III. LIMITS OF INSURANCE

**1.** The Limit Of Insurance shown in the Declarations as the Each Occurrence Limit is the most we will pay for damages arising out of any one occurrence or offense.

**2.** If a Limit Of Insurance is shown in the Declarations as the Aggregate Limit, that amount will apply in the same manner as the aggregate limits shown in the Schedule Of Underlying Insurance.

### SECTION IV. CONDITIONS

If any of the following conditions are contrary to conditions contained in the "underlying insurance" the provisions contained in this policy apply.

**1. Appeals**

In the event the underlying insurer(s) elects not to appeal a judgment in excess of the limits of the "underlying insurance", we may elect to make such an appeal. If we so elect, we shall be liable, in addition to the applicable Limits Of Insurance, for all defense expenses we incur.

Case ID: 190901353

## 2. Maintenance Of Underlying Insurance

**a.** You agree to maintain the "underlying insurance" in full force and effect during the term of this policy, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. Failure to maintain the "underlying insurance" in full force and effect or to meet all conditions and warranties of such "underlying insurance" will not invalidate insurance provided under this policy, but insurance provided under this policy shall apply as if the "underlying insurance" were available and collectible.

**b.** Reduction or exhaustion of the aggregate limit of any "underlying insurance" by payments for judgments, settlements or any costs or expenses subject to that limit, will not be a failure to maintain "underlying insurance" in full force and effect.

**c.** No statement contained in this condition limits our right to cancel or not renew this policy.

For purposes of this policy, if any "underlying insurance" is not available or collectible because of:

**a.** The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

**b.** The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy;

then this policy shall apply and amounts payable hereunder shall be determined as if such "underlying insurance" were available and collectible.

## 3. Other Insurance

This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

## 4. Cancellation

**a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering advance written notice of cancellation to us.

**b.** We may cancel this policy by mailing or delivering written notice of cancellation to the first Named Insured at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 60 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the Named Insured's last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

## 5. Policy Period

This insurance will respond to injury or damage that occurs, or arises from an offense committed, during the Policy Period shown in the Declarations.

## SECTION V. DEFINITIONS

"Underlying insurance" means the policies or self-insurance shown in the Schedule Of Underlying Insurance, any replacements thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued replacements of policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## UNIMPAIRED AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Limits Of Insurance section:

The aggregate limits on "underlying insurance" shall be unimpaired as of the inception date of this policy. Only "occurrences" that take place during the policy period of this policy shall be considered in determining the extent of any exhaustion of the aggregate limits on "underlying insurance".

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## 25% MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraph **e.** of condition **4.** Cancellation under Section **IV.** Conditions is replaced by the following:

    **e.** If this policy is cancelled by:

        **(1)** The first Named Insured and the policy is not subject to audit, we will retain no less than 25% of the Total Premium shown in the Declarations.

        **(2)** The first Named Insured and the policy is subject to audit, the earned premium will be determined by the final audit. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

        **(3)** Us for any reason other than for nonpayment of premium, the refund will be pro-rata. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

        The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to Section **IV.** Conditions:

**Minimum Earned Premium**

    **a.** The minimum earned premium for the policy period is 25% of the Total Premium, shown on the Declarations, plus any premium adjustment for endorsements and any additional premium developed by audit.

    **b.** Audits that indicate a return premium will not reduce the minimum earned premium as stated in Paragraph **a.** above.

**Premium Audit**

    **a.** We will compute all premiums for this policy in accordance with our rules and rates.

    **b.** If this policy is subject to audit, the Total Premium shown on the Declarations is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the deposit and audit premiums paid for the policy period is greater than the earned premium, we will return the excess, subject to the minimum earned premium, to the first Named Insured.

    **c.** The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## KNOWN INJURY OR DAMAGE LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **I.** Insuring Agreement

This insurance applies to bodily injury and property damage only if, prior to the policy period, no insured and no employee authorized by you to give or receive notice of an occurrence or claim knew that the bodily injury or property damage had occurred, in whole or in part.

If such a listed insured or authorized employee knew, prior to the policy, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

Bodily injury or property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured or any employee authorized by you to give or receive notice of an occurrence or claim includes any continuation, change or resumption of that bodily injury or property damage after the end of the policy period.

Bodily injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured or any employee authorized by you to give or receive notice of an occurrence or claim:

**a.** Reports all, or any part, of the bodily injury or property damage to us or any other insurer;

**b.** Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or

**c.** Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.

Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – POLLUTION – HOSTILE FIRE, COLLISION/UPSET AND PRODUCTS-COMPLETED OPERATIONS FOLLOWING FORM EXCEPTIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Pollution**

**a.** Any liability which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

However, insofar as coverage is afforded by the policies shown in the Schedule Of Underlying Insurance, for the full limits shown therein, Paragraph **a.** above does not apply to any liability arising out of:

**(1)** The collision or upset of a motor vehicle;

**(2)** Any heat, smoke or fumes from a "hostile fire"; or

**(3)** The products-completed operations hazard, provided that:

**(a)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" originates away from the premises owned or occupied by, or rented or loaned to a Named Insured;

**(b)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not consist of or arise from waste or materials that were at any time transported, stored, treated, disposed of, processed or handled as waste; and

**(c)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not occur at any premises, facility, site or location which is or was at any time used by or for any insured or others for the treatment, storage, disposal, processing or handling of waste.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(2)** Claim or suit, by or on behalf of a governmental authority, for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

**B.** The following are added to Section **V.** Definitions as respects this exclusion:

"Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – NUCLEAR ENERGY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Nuclear Energy Liability**

Any liability resulting from the "hazardous properties" of "nuclear material".

**B.** As used in this exclusion:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "by-product material"; and

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION - CONTRACTOR'S SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following are added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Any property or equipment rented, leased or loaned to any insured;

**b.** Property being installed or erected by or for any insured; or

**c.** That particular part of real property on which work is being performed by or for any insured.

**Wrap-up**

Bodily injury or property damage arising out of either your ongoing operations or operations included within the products-completed operations hazard at any joint venture or any project for which you are, or ever were, included as an insured under any owner-controlled, consolidated (wrap-up) insurance program.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**a.** Provides coverage identical to that provided by this policy;

**b.** Has limits adequate to cover all claims; or

**c.** Remains in effect;

**Joint Venture Or Partnership**

Bodily injury or property damage arising out of any joint venture or partnership of which any insured is a member and which is not designated in this policy as a Named Insured.

**Architectural, Engineering Or Land Surveying Professional Services**

Bodily injury, property damage or personal and advertising injury arising out of the rendering of or failure to render any architectural, engineering or land surveying professional services performed by or for you, including:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawing and specifications; and

**b.** Supervisory, inspection, architectural or engineering services.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage, or the offense which caused the personal and advertising injury, involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – EMPLOYMENT-RELATED PRACTICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Employment-Related Practices**

Bodily injury or personal and advertising injury to a person arising out of any:

**a.** Refusal to employ;

**b.** Termination of employment;

**c.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**d.** Consequential bodily injury as a result of the employment-related practices described in Paragraphs **a.** through **c.** above.

This exclusion applies whether the injury-causing event described in Paragraphs **a.** through **c.** above occurs before employment, during employment or after employment.

This exclusion applies whether the insured maybe held liable as an employer or in any other capacity, and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ERISA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**ERISA**

Any obligations incurred or imposed upon an insured (or which are imputed to any insured) under the Employee Retirement Income Security Act of 1974 (ERISA), Public Law 93-406, any law amendatory thereof and any similar state or local laws.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Computer-Related And Other Electronic Problems**

Any "bodily injury", "property damage", "personal and advertising injury" or damages arising out of a pecuniary, financial or other economic loss resulting from the failure of any electronic data processing equipment, microprocessor, computer program, software, media, or data to correctly recognize, interpret, differentiate or process any date.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraphs **a., b., c., d.,** and **f.** of the **Cancellation** Condition are replaced by the following:

**Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**b. Cancellation Of Policies In Effect**

**(1) For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**(2) For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(a)** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**(b)** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**(c)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(d)** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(e)** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(f)** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

MAUB 1402-PA 01 15          Includes copyrighted material of Insurance Services Offices, Inc          **Page 1 of 2**
With its permission.

Case ID: 190901353

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

The following is added to the **Cancellation** Condition:

If we cancel, any premium refund due will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, any premium refund due will be returned within 30 days after the effective date of cancellation.

**B.** The following is added to **SECTION IV. CONDITIONS:**

**a. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**b. Increase of Premium**

If we increase your renewal premium, we will mail or deliver to you written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to you at the mailing addresses last known to us. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Exterior Insulation And Finish System**

Any liability included in the "products-completed operations hazard" and arising out of:

**a.** The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:

**(1)** An "exterior insulation and finish system" or any part thereof; or

**(2)** Any substantially similar system or any part thereof,

including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system.

**b.** Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.

**B.** The following is added to the Definitions section:

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

**a.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**b.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**c.** A reinforced base coat;

**d.** A finish coat providing surface texture and color; or

**e**. Any flashing, caulking or sealant used with the system for any purpose.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – DAMAGE TO PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Property you use, own, rent or occupy, including any costs or expenses incurred by you or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.** Property loaned to you;

**c.** Real or personal property in the care, custody or control of any insured (as respects real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, only excluding property damage to that particular part of real property on which operations are being performed, if the property damage arises out of those operations);

**d.** Property transported by the insured; or

**e.** Premises you sell, give away or abandon, if the property damage arises out of any part of those premises, and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

All other terms and conditions remain unchanged.

**MAUB 1615 01 15**                                                      **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**c.** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**d.** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions,, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the Exclusions Section:

This policy does not apply to:

**Fungi Or Bacteria**

**a.** Any liability arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following is added to the Definitions section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Lead**

Any loss, claim or expense caused by, resulting from or arising out of lead, paint containing lead, or any other material or substance containing lead.

We have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or "suit" excluded herein.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render professional services or advice by an insured or by any person for whose acts or omissions the insured is legally responsible, whether or not that service or advice is ordinary in your profession and regardless of whether a claim or "suit" is brought by a client or any other person or organization.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

All other terms and conditions remain unchanged.

**MAUB 1663 01 15**     Includes copyrighted material of Insurance Services Office, Inc.     **Page 1 of 1**
with its permission.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – WAR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**War Liability**

Any liability, however caused, arising directly or indirectly out of:

**a.** War, including undeclared or civil war; or

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Punitive Or Exemplary Damages**

Punitive or exemplary damages. This exclusion applies regardless of any other provision of this policy.

If a "suit" is brought, against any insured, seeking both compensatory damages and punitive or exemplary damages, no coverage will be provided by this policy for any costs, including defense costs, interest, fines or penalties attributable to punitive or exemplary damages.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – RADIOACTIVE MATTER

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy does not apply to:

**Radioactive Matter**

Any liability arising out of the actual, alleged or threatened exposure of any person or property to any radioactive matter or any form of radiation.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** For the purposes of this endorsement, the following are added to the Definitions section:

"Any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions remain unchanged.

**MAUB 1696 01 15**     Includes copyrighted material of Insurance Services Office, Inc.,     **Page 1 of 1**
with its permission.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA OR MIXED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Silica Or Mixed Dust**

**a.** Liability caused by, resulting from, or arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation, ingestion or respiration of "mixed dust", silica, silica-related dust or products or substances containing silica. This includes, but is not limited to any:

**(1)** Supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

**(2)** Obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "mixed dust", silica, silica-related dust or products or substances containing silica, by any insured or by any other person or entity.

**B.** As respects this exclusion, the following is added to Section **V.** Definitions:

"Mixed dust" means inorganic or organic dusts that have harmful effects on human beings.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Asbestos**

**a.** The actual, alleged or threatened:

**(1)** Inhalation of, ingestion of, or prolonged physical exposure to asbestos or products or work containing asbestos;

**(2)** Use of asbestos in your work or your product or the work or product of any person or organization for whom you may be legally responsible; or

**(3)** Exposure to asbestos or products containing asbestos which are at any time removed from a building or a structure, transported, handled, stored, treated, disposed of, processed or manufactured by you or any person or any organization for whom you may be legally responsible.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove or contain, or in any way respond to or assess the effects of asbestos; or

**(2)** Claim or suit by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up or removing, containing or in any way responding to, or assessing the effects of asbestos.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE – TERRORISM RISK INSURANCE ACT

### SCHEDULE

| | |
|---|---|
| Terrorism Premium: | ■■■■ |
| Federal Share Of Terrorism Losses: | 85% In 2015 |
| | 84% In 2016 |
| | 83% In 2017 |
| | 82% In 2018 |
| | 81% In 2019 |
| | 80% In 2020 |

**Disclosure Of Premium**

We have notified you that under the Terrorism Risk Insurance Act we must make certified acts of terrorism coverage available in the policies we offer. At that time we advised you that the premium for such terrorism coverage would be the amount shown in the Schedule of this notice.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in the Schedule of this notice) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If you have not indicated to us or your agent that certified acts of terrorism coverage is desired, a certified act of terrorism exclusion will be attached to your policy and we will not charge your policy for terrorism coverage.

If you desire to purchase terrorism coverage, please contact us or your agent.

Case ID: 190901353

# EXHIBIT 19

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

10 Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                    **President**

Case ID: 190901353



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others; and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS

POLICY NUMBER: MKLV1EUL101129          RENEWAL POLICY NUMBER:

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

LION CONSTRUCTION, LLC
2301 WASHINGTON AVE STE 111
PHILADELPHIA                    PA     19146-2534

Policy Period: From: <u>November 1, 2017</u> to <u>November 1, 2018</u> at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Limits of Insurance | |
|---|---|
| Each Occurrence Limit: | $ 2,000,000 |
| Aggregate Limit: | $ 2,000,000 |

| Premium | |
|---|---|
| Policy Premium: | $ ▉▉▉ |
| Terrorism Premium: | $ ▉▉▉ |
| Fees (Where Applicable) | $ ▉▉▉ |
| Total Premium: | $ ▉▉▉ |

Audit Period:      ☒ Not Applicable    ☐ Annual    ☐ Semi-Annual    ☐ Quarterly    ☐ Monthly

Rating Basis (If Subject to Audit)      Premium Basis: _____      Rate: _____

## Producer Number, Name and Mailing Address

Hull & Company, LLC
220 Gibraltar Road, Suite 100
Horsham                    PA     19044

## Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
Per Forms Schedule

## Schedule of Underlying Insurance

Per Schedule Of Underlying Insurance

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____11/30/2017_____      By: _____
                    **DATE**                                    **AUTHORIZED REPRESENTATIVE**

<span style="color:red">Case ID: 190901353</span>



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| MJIL 1000 08 10 | POLICY JACKET |
| MPIL 1007 03 14 | PRIVACY NOTICE |
| MPIL 1083 04 15 | U.S. TREASURY DEPT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| MADUB 1000 01 15 | COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS |
| MDIL 1001 08 11 | FORMS SCHEDULE |
| MEIL 1200 10 16 | SERVICE OF SUIT |
| MEIL 1225 10 11 | CHANGES - CIVIL UNION |
| MADUB 1003 01 15 | SCHEDULE OF UNDERLYING INSURANCE |
| MAUB 0001 01 15 | COMMERCIAL EXCESS LIABILITY POLICY |
| MAUB 1243 11 16 | UNIMPAIRED AGGREGATE LIMIT |
| MAUB 1264 01 15 | 25% MINIMUM EARNED PREMIUM |
| MAUB 1274 01 15 | KNOWN INJURY OR DAMAGE LIMITATION |
| MAUB 1305 01 15 | EXCL - POLL - HOSTILE FIRE COLL/UPSET AND PCO FOLLOWING FORM EXCEP |
| MAUB 1355 01 15 | EXCLUSION - NUCLEAR ENERGY LIABILITY |
| MAUB 1363 01 15 | EXCLUSION - CONTRACTOR'S SERVICES |
| MAUB 1384 01 15 | EXCLUSION - EMPLOYMENT-RELATED PRACTICES |
| MAUB 1386 01 15 | EXCLUSION - ERISA |
| MAUB 1391 01 15 | EXCLUSION - COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS |
| MAUB 1402-PA 01 15 | PENNSYLVANIA AMENDATORY |
| MAUB 1604 01 15 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEM |
| MAUB 1615 01 15 | EXCLUSION - DAMAGE TO PROPERTY |
| MAUB 1621 01 15 | EXCLUSION - RECORDING AND DISTRIBUTION OF MATERIAL INFO IN VIOLATION OF LAW |
| MAUB 1638 01 15 | EXCLUSION - FUNGI OR BACTERIA |
| MAUB 1642 01 15 | EXCLUSION - LEAD |
| MAUB 1663 01 15 | EXCLUSION - PROFESSIONAL SERVICES |
| MAUB 1666 01 15 | EXCLUSION - WAR LIABILITY |
| MAUB 1692 01 15 | EXCLUSION - PUNITIVE DAMAGES |
| MAUB 1693 01 15 | EXCLUSION - RADIOACTIVE MATTER |
| MAUB 1696 01 15 | EXCLUSION - CERTIFIED ACTS OF TERRORISM |
| MAUB 1804 01 15 | EXCLUSION - SILICA OR MIXED DUST |
| MAUB 1813 01 15 | EXCLUSION - ASBESTOS |
| MAUB 1815 01 15 | EXCLUSION - NEW YORK OPERATIONS |
| MUB TERR-2 01 15 | CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE |

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| General Liability<br>Carrier: Evanston Insurance Company<br>Effective Date: 11/01/2017<br>Expiration Date: 11/01/2018 | Occurrence | $1,000,000 |
| | General Aggregate | $2,000,000 |
| | Products and Completed Operations Aggregate | $2,000,000 |
| | Personal and Advertising Injury | $1,000,000 |
| Employee Benefits Liability<br>Carrier: United Specialty<br>Effective Date: 11/01/2017<br>Expiration Date: 11/01/2018 | Each Employee | $1,000,000 |
| | Aggregate | $1,000,000 |
| Employers Liability<br>Carrier: Erie<br>Effective Date: 11/01/2017<br>Expiration Date: 11/01/2018 | Bodily Injury by Accident - each accident | $1,000,000 |
| | Bodily Injury by Disease - policy limit | $1,000,000 |
| | Bodily Injury by Disease - each employee | $1,000,000 |

All Limits Of Insurance are Each Occurrence and Aggregate, if applicable.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy and any "underlying insurance" carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an Insured under the "underlying insurance". The words "we" and "us" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to Section **V.** Definitions.

### SECTION I. INSURING AGREEMENT

**1.** We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

**2.** This policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except:

**a.** We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and

**b.** With respect to any provisions to the contrary contained in this policy.

**3.** The amount we will pay for damages shall not exceed the Limits Of Insurance shown in the Declarations.

**4.** We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend ends when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

### SECTION II. EXCLUSIONS

The exclusions applicable to the "underlying insurance" also apply to this policy.

### SECTION III. LIMITS OF INSURANCE

**1.** The Limit Of Insurance shown in the Declarations as the Each Occurrence Limit is the most we will pay for damages arising out of any one occurrence or offense.

**2.** If a Limit Of Insurance is shown in the Declarations as the Aggregate Limit, that amount will apply in the same manner as the aggregate limits shown in the Schedule Of Underlying Insurance.

### SECTION IV. CONDITIONS

If any of the following conditions are contrary to conditions contained in the "underlying insurance" the provisions contained in this policy apply.

**1. Appeals**

In the event the underlying insurer(s) elects not to appeal a judgment in excess of the limits of the "underlying insurance", we may elect to make such an appeal. If we so elect, we shall be liable, in addition to the applicable Limits Of Insurance, for all defense expenses we incur.

Case ID: 190901353

2. **Maintenance Of Underlying Insurance**

   **a.** You agree to maintain the "underlying insurance" in full force and effect during the term of this policy, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. Failure to maintain the "underlying insurance" in full force and effect or to meet all conditions and warranties of such "underlying insurance" will not invalidate insurance provided under this policy, but insurance provided under this policy shall apply as if the "underlying insurance" were available and collectible.

   **b.** Reduction or exhaustion of the aggregate limit of any "underlying insurance" by payments for judgments, settlements or any costs or expenses subject to that limit, will not be a failure to maintain "underlying insurance" in full force and effect.

   **c.** No statement contained in this condition limits our right to cancel or not renew this policy.

   For purposes of this policy, if any "underlying insurance" is not available or collectible because of:

   **a.** The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

   **b.** The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy;

   then this policy shall apply and amounts payable hereunder shall be determined as if such "underlying insurance" were available and collectible.

3. **Other Insurance**

   This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

4. **Cancellation**

   **a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering advance written notice of cancellation to us.

   **b.** We may cancel this policy by mailing or delivering written notice of cancellation to the first Named Insured at least:

   **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **(2)** 60 days before the effective date of cancellation if we cancel for any other reason.

   **c.** We will mail or deliver our notice to the Named Insured's last mailing address known to us.

   **d.** Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

   **e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   **f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

5. **Policy Period**

   This insurance will respond to injury or damage that occurs, or arises from an offense committed, during the Policy Period shown in the Declarations.

## SECTION V. DEFINITIONS

"Underlying insurance" means the policies or self-insurance shown in the Schedule Of Underlying Insurance, any replacements thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued replacements of policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## UNIMPAIRED AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Limits Of Insurance section:

The aggregate limits on "underlying insurance" shall be unimpaired as of the inception date of this policy.

Only "occurrences" that take place during the policy period of this policy shall be considered in determining the extent of any exhaustion of the aggregate limits on "underlying insurance".

If any "underlying insurance" is written on a claims made basis, the aggregate limits on "underlying insurance" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this policy.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## 25% MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraph **e.** of condition **4.** Cancellation under Section **IV.** Conditions is replaced by the following:

**e.** If this policy is cancelled by:

**(1)** The first Named Insured and the policy is not subject to audit, we will retain no less than 25% of the Total Premium shown in the Declarations.

**(2)** The first Named Insured and the policy is subject to audit, the earned premium will be determined by the final audit. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

**(3)** Us for any reason other than for nonpayment of premium, the refund will be pro-rata. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to Section **IV.** Conditions:

**Minimum Earned Premium**

**a.** The minimum earned premium for the policy period is 25% of the Total Premium, shown on the Declarations, plus any premium adjustment for endorsements and any additional premium developed by audit.

**b.** Audits that indicate a return premium will not reduce the minimum earned premium as stated in Paragraph **a.** above.

**Premium Audit**

**a.** We will compute all premiums for this policy in accordance with our rules and rates.

**b.** If this policy is subject to audit, the Total Premium shown on the Declarations is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the deposit and audit premiums paid for the policy period is greater than the earned premium, we will return the excess, subject to the minimum earned premium, to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## KNOWN INJURY OR DAMAGE LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **I.** Insuring Agreement

This insurance applies to bodily injury and property damage only if, prior to the policy period, no insured and no employee authorized by you to give or receive notice of an occurrence or claim knew that the bodily injury or property damage had occurred, in whole or in part.

If such a listed insured or authorized employee knew, prior to the policy, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

Bodily injury or property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured or any employee authorized by you to give or receive notice of an occurrence or claim includes any continuation, change or resumption of that bodily injury or property damage after the end of the policy period.

Bodily injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured or any employee authorized by you to give or receive notice of an occurrence or claim:

**a.** Reports all, or any part, of the bodily injury or property damage to us or any other insurer;

**b.** Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or

**c.** Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.

Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – POLLUTION – HOSTILE FIRE, COLLISION/UPSET AND PRODUCTS-COMPLETED OPERATIONS FOLLOWING FORM EXCEPTIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Pollution**

**a.** Any liability which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

However, insofar as coverage is afforded by the policies shown in the Schedule Of Underlying Insurance, for the full limits shown therein, Paragraph **a.** above does not apply to any liability arising out of:

**(1)** The collision or upset of a motor vehicle;

**(2)** Any heat, smoke or fumes from a "hostile fire"; or

**(3)** The products-completed operations hazard, provided that:

    **(a)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" originates away from the premises owned or occupied by, or rented or loaned to a Named Insured;

    **(b)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not consist of or arise from waste or materials that were at any time transported, stored, treated, disposed of, processed or handled as waste; and

    **(c)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not occur at any premises, facility, site or location which is or was at any time used by or for any insured or others for the treatment, storage, disposal, processing or handling of waste.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(2)** Claim or suit, by or on behalf of a governmental authority, for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

**B.** The following are added to Section **V.** Definitions as respects this exclusion:

"Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – NUCLEAR ENERGY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Nuclear Energy Liability**

Any liability resulting from the "hazardous properties" of "nuclear material".

**B.** As used in this exclusion:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "by-product material"; and

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION - CONTRACTOR'S SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following are added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Any property or equipment rented, leased or loaned to any insured;

**b.** Property being installed or erected by or for any insured; or

**c.** That particular part of real property on which work is being performed by or for any insured.

**Wrap-up**

Bodily injury or property damage arising out of either your ongoing operations or operations included within the products-completed operations hazard at any joint venture or any project for which you are, or ever were, included as an insured under any owner-controlled, consolidated (wrap-up) insurance program.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**a.** Provides coverage identical to that provided by this policy;

**b.** Has limits adequate to cover all claims; or

**c.** Remains in effect;

**Joint Venture Or Partnership**

Bodily injury or property damage arising out of any joint venture or partnership of which any insured is a member and which is not designated in this policy as a Named Insured.

**Architectural, Engineering Or Land Surveying Professional Services**

Bodily injury, property damage or personal and advertising injury arising out of the rendering of or failure to render any architectural, engineering or land surveying professional services performed by or for you, including:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawing and specifications; and

**b.** Supervisory, inspection, architectural or engineering services.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage, or the offense which caused the personal and advertising injury, involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – EMPLOYMENT-RELATED PRACTICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Employment-Related Practices**

Bodily injury or personal and advertising injury to a person arising out of any:

**a.** Refusal to employ;

**b.** Termination of employment;

**c.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**d.** Consequential bodily injury as a result of the employment-related practices described in Paragraphs **a.** through **c.** above.

This exclusion applies whether the injury-causing event described in Paragraphs **a.** through **c.** above occurs before employment, during employment or after employment.

This exclusion applies whether the insured maybe held liable as an employer or in any other capacity, and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ERISA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**ERISA**

Any obligations incurred or imposed upon an insured (or which are imputed to any insured) under the Employee Retirement Income Security Act of 1974 (ERISA), Public Law 93-406, any law amendatory thereof and any similar state or local laws.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Computer-Related And Other Electronic Problems**

Any "bodily injury", "property damage", "personal and advertising injury" or damages arising out of a pecuniary, financial or other economic loss resulting from the failure of any electronic data processing equipment, microprocessor, computer program, software, media, or data to correctly recognize, interpret, differentiate or process any date.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraphs **a., b., c., d.,** and **f.** of the **Cancellation** Condition are replaced by the following:

**Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**b. Cancellation Of Policies In Effect**

**(1) For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**(2) For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(a)** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**(b)** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**(c)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(d)** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(e)** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(f)** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

Case ID: 190901353

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

The following is added to the **Cancellation** Condition:

If we cancel, any premium refund due will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, any premium refund due will be returned within 30 days after the effective date of cancellation.

**B.** The following is added to **SECTION IV. CONDITIONS:**

**a. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**b. Increase of Premium**

If we increase your renewal premium, we will mail or deliver to you written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to you at the mailing addresses last known to us. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Exterior Insulation And Finish System**

Any liability included in the "products-completed operations hazard" and arising out of:

**a.** The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:

**(1)** An "exterior insulation and finish system" or any part thereof; or

**(2)** Any substantially similar system or any part thereof,

including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system.

**b.** Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.

**B.** The following is added to the Definitions section:

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

**a.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**b.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**c.** A reinforced base coat;

**d.** A finish coat providing surface texture and color; or

**e**. Any flashing, caulking or sealant used with the system for any purpose.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – DAMAGE TO PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Property you use, own, rent or occupy, including any costs or expenses incurred by you or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.** Property loaned to you;

**c.** Real or personal property in the care, custody or control of any insured (as respects real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, only excluding property damage to that particular part of real property on which operations are being performed, if the property damage arises out of those operations);

**d.** Property transported by the insured; or

**e.** Premises you sell, give away or abandon, if the property damage arises out of any part of those premises, and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

All other terms and conditions remain unchanged.

**MAUB 1615 01 15**                                                          **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**c.** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**d.** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions,, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the Exclusions Section:

This policy does not apply to:

**Fungi Or Bacteria**

**a.** Any liability arising out of the actual, alleged or threatened  inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following is added to the Definitions section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Lead**

Any loss, claim or expense caused by, resulting from or arising out of lead, paint containing lead, or any other material or substance containing lead.

We have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or "suit" excluded herein.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render professional services or advice by an insured or by any person for whose acts or omissions the insured is legally responsible, whether or not that service or advice is ordinary in your profession and regardless of whether a claim or "suit" is brought by a client or any other person or organization.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – WAR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**War Liability**

Any liability, however caused, arising directly or indirectly out of:

**a.** War, including undeclared or civil war; or

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Punitive Or Exemplary Damages**

Punitive or exemplary damages. This exclusion applies regardless of any other provision of this policy.

If a "suit" is brought, against any insured, seeking both compensatory damages and punitive or exemplary damages, no coverage will be provided by this policy for any costs, including defense costs, interest, fines or penalties attributable to punitive or exemplary damages.

All other terms and conditions remain unchanged.

**MAUB 1692 01 15**

**Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – RADIOACTIVE MATTER

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy does not apply to:

**Radioactive Matter**

Any liability arising out of the actual, alleged or threatened exposure of any person or property to any radioactive matter or any form of radiation.

All other terms and conditions remain unchanged.

**MAUB 1693 01 15**                                                                                     **Page 1  of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** For the purposes of this endorsement, the following are added to the Definitions section:

"Any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA OR MIXED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Silica Or Mixed Dust**

**a.** Liability caused by, resulting from, or arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation, ingestion or respiration of "mixed dust", silica, silica-related dust or products or substances containing silica. This includes, but is not limited to any:

**(1)** Supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

**(2)** Obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "mixed dust", silica, silica-related dust or products or substances containing silica, by any insured or by any other person or entity.

**B.** As respects this exclusion, the following is added to Section **V.** Definitions:

"Mixed dust" means inorganic or organic dusts that have harmful effects on human beings.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Asbestos**

**a.** The actual, alleged or threatened:

**(1)** Inhalation of, ingestion of, or prolonged physical exposure to asbestos or products or work containing asbestos;

**(2)** Use of asbestos in your work or your product or the work or product of any person or organization for whom you may be legally responsible; or

**(3)** Exposure to asbestos or products containing asbestos which are at any time removed from a building or a structure, transported, handled, stored, treated, disposed of, processed or manufactured by you or any person or any organization for whom you may be legally responsible.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove or contain, or in any way respond to or assess the effects of asbestos; or

**(2)** Claim or suit by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up or removing, containing or in any way responding to, or assessing the effects of asbestos.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – NEW YORK OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy shall not apply to:

**New York Operations**

Liability arising out of operations conducted in the State of New York, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for you or for others.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE – TERRORISM RISK INSURANCE ACT

### SCHEDULE

| | |
|---|---|
| Terrorism Premium: | ███████ |
| Federal Share Of Terrorism Losses: | 85% In 2015 |
| | 84% In 2016 |
| | 83% In 2017 |
| | 82% In 2018 |
| | 81% In 2019 |
| | 80% In 2020 |

**Disclosure Of Premium**

We have notified you that under the Terrorism Risk Insurance Act we must make certified acts of terrorism coverage available in the policies we offer. At that time we advised you that the premium for such terrorism coverage would be the amount shown in the Schedule of this notice.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in the Schedule of this notice) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If you have not indicated to us or your agent that certified acts of terrorism coverage is desired, a certified act of terrorism exclusion will be attached to your policy and we will not charge your policy for terrorism coverage.

If you desire to purchase terrorism coverage, please contact us or your agent.

Case ID: 190901353

# EXHIBIT 20

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

10 Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**

**President**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY
## ADVISORY NOTICE TO POLICYHOLDERS

This is a summary of the major changes in your policy. No coverage is provided by this summary nor can it be construed to replace any provision of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, **THE PROVISIONS OF THE POLICY SHALL PREVAIL.**

The major areas within the policy that broaden or reduce coverage, and other changes, are highlighted below. This notice does not reference every editorial change made in your policy.

**Not all forms addressed in this notice are included in a particular policy.**

## MULTISTATE ENDORSEMENTS

### A. BROADENING OF COVERAGE

**MAUB 1648** Exclusion – Municipality was revised to remove the exclusion for public officials' activities and volunteer firefighters' or police officers' activities.

### B. REDUCTION OF COVERAGE

**MAUB 1258** Limitation Of Coverage To Designated Premises Or Project was revised by adding new Paragraphs 5. and 6. to the Insuring Agreement. These paragraphs separately address bodily injury and property damage versus personal and advertising injury as follows:

- For bodily injury and property damage, the occurrence must happen during the policy period, and the injury or damage must occur on the premises scheduled, or the grounds or structures appurtenant to those premises, or arise out of the project scheduled. "Ownership, maintenance or use" language and "and operations necessary or incidental to those premises" was removed from this insurance agreement to further clarify that the injury or damage must happen on the premises.
- For personal and advertising injury, the offense must be committed during the policy period, and the offense must arise out of business performed on the premise scheduled or in connection with the project scheduled. It further states that if personal and advertising injury is caused by false arrest, detention or imprisonment, or the wrongful eviction from, entry into or invasion of the right of private occupancy, then such offense must occur on the premises scheduled or on the grounds or structures appurtenant to those premises.

### C. OTHER CHANGES

1. **MAUB 1222** Adjustable Rate And Minimum Retained Premium was revised as follows:

   - The title of the form was revised from Changes To Conditions – Adjustable Rate;
   - The Schedule was revised to show a minimum retained premium percentage and earned premium computations;
   - The Adjustable Rate condition was replaced by a new Minimum Retained Premium condition which describes how the minimum retained premium and earned premium will be calculated; and
   - A provision regarding the amount of premium retained in the event of cancellation was added.

2. **MAUB 1264** 25% Minimum Earned Premium was revised as follows:

   - In Paragraph A., a statement was added that we will send the first Named Insured any premium refund;
   - In Paragraph B., the Premium Audit provision was removed as it is not applicable.

3. **MAUB 1310** Exclusion – Prior Incidents And Prior Construction Defects was revised to add the following statement: "When coverage does not apply for the Named Insured, no coverage or defense will be afforded to any additional insured under this policy."

Case ID: 190901353

4. **MAUB 1513** Contractors And Subcontractors - Indemnification And Insurance Conditions was revised as follows:

- Removed the Aggregate limits in the Schedule;
- Removed the defined term lead-in;
- Removed the insured warranty language;
- Removed paragraphs a.(2)-(4) regarding insurance requirements.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

Case ID: 190901353



# HOW TO REPORT A CLAIM

**How to report a new claim:**

- **Email:  newclaims@markelcorp.com**
- **FAX:    (855) 662-7535**
- ***Phone:  (800) 362-7535**
- **Mail:    P.O. Box 2009, Glen Allen, VA 23058-2009**

Please complete the appropriate ACORD form in detail and include the name and phone number of the contact person at the location of the reported incident. If possible, please attach a copy of the facility incident report. When reporting an auto claim, please identify the unit # on the schedule along with the VIN#. If the loss/claim involves a building or damage to property, please provide the physical address of the property.

**\*Please refer to your specific policy language for new claim reporting requirements. Some policies require you to report all claims in writing only.**

**How to send Supplemental Information / Questions on an existing claim:**

- **Email:  markelclaims@markelcorp.com**
- **FAX:    (855) 662-7535**
- **Phone: (800) 362-7535**
- **Mail:    P.O. Box 2009, Glen Allen, VA 23058-2009**

**If you have questions about a claim, please call 1-800-362-7535.**

**Inquiries may also be faxed to 1-855-662-7535.**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS

POLICY NUMBER: MKLV7EUL100475     RENEWAL POLICY NUMBER: MKLV1EUL101129

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

Lion Construction, LLC
2301 WASHINGTON AVE STE 111
PHILADELPHIA          PA     19146-2534

Policy Period: From: <u>November 1, 2018</u> to <u>November 1, 2019</u> at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

### Limits of Insurance

| | |
|---|---|
| Each Occurrence Limit: | $ 2,000,000 |
| Aggregate Limit: | $ 2,000,000 |

### Premium

| | |
|---|---|
| Policy Premium: | $ ▉ |
| Terrorism Premium: | $ ▉ |
| Fees (Where Applicable): | $ ▉ |
| Total Premium: | $ ▉ Payable At Inception |

Audit Period:  ☒ Not Applicable  ☐ Annual  ☐ Semi-Annual  ☐ Quarterly  ☐ Monthly

Rating Basis (If Subject to Audit)     Premium Basis: _____   Rate: _____

### Producer Number, Name and Mailing Address

Hull & Company, LLC
220 Gibraltar Road, Suite 100
Horsham          PA     19044

### Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
Per Forms Schedule

### Schedule of Underlying Insurance

Per Schedule Of Underlying Insurance

**These declarations, together with the Coverage Form and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____<u>01/02/2019</u>_____     By: _____
                        **DATE**                                          **AUTHORIZED REPRESENTATIVE**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| Form Number | Form Name |
| --- | --- |
| MJIL 1000 08 10 | POLICY JACKET |
| MAPUB 1013 04 17 | COMMERCIAL EXCESS LIABILITY POLICY ADVISORY NOTICE TO POLICYHOLDERS |
| MPIL 1007 03 14 | PRIVACY NOTICE |
| MPIL 1041 02 12 | HOW TO REPORT A CLAIM |
| MPIL 1083 04 15 | U.S. TREASURY DEPT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| MADUB 1000 04 17 | COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS |
| MDIL 1001 08 11 | FORMS SCHEDULE |
| MEIL 1200 10 16 | SERVICE OF SUIT |
| MEIL 1225 10 11 | CHANGES - CIVIL UNION |
| MIL 1214 09 17 | TRADE OR ECONOMIC SANCTIONS |
| MADUB 1003 04 17 | SCHEDULE OF UNDERLYING INSURANCE |
| MAUB 0001 01 15 | COMMERCIAL EXCESS LIABILITY POLICY |
| MAUB 1243 04 17 | UNIMPAIRED AGGREGATE LIMIT |
| MAUB 1264 04 17 | 25% MINIMUM EARNED PREMIUM |
| MAUB 1274 01 15 | KNOWN INJURY OR DAMAGE LIMITATION |
| MAUB 1305 01 15 | EXCL - POLL - HOSTILE FIRE COLL/UPSET AND PCO FOLLOWING FORM EXCEP |
| MAUB 1355 01 15 | EXCLUSION - NUCLEAR ENERGY LIABILITY |
| MAUB 1363 04 17 | LIMITATION - CONTRACTOR'S SERVICES |
| MAUB 1384 01 15 | EXCLUSION - EMPLOYMENT-RELATED PRACTICES |
| MAUB 1386 01 15 | EXCLUSION - ERISA |
| MAUB 1391 01 15 | EXCLUSION - COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS |
| MAUB 1402-PA 01 15 | PENNSYLVANIA AMENDATORY |
| MAUB 1604 01 15 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEM |
| MAUB 1615 01 15 | EXCLUSION - DAMAGE TO PROPERTY |
| MAUB 1621 01 15 | EXCLUSION - RECORDING AND DISTRIBUTION OF MATERIAL INFO IN VIOLATION OF LAW |
| MAUB 1638 01 15 | EXCLUSION - FUNGI OR BACTERIA |
| MAUB 1642 01 15 | EXCLUSION - LEAD |
| MAUB 1663 01 15 | EXCLUSION - PROFESSIONAL SERVICES |
| MAUB 1666 01 15 | EXCLUSION - WAR LIABILITY |
| MAUB 1692 01 15 | EXCLUSION - PUNITIVE DAMAGES |
| MAUB 1693 01 15 | EXCLUSION - RADIOACTIVE MATTER |
| MAUB 1696 01 15 | EXCLUSION - CERTIFIED ACTS OF TERRORISM |
| MAUB 1804 01 15 | EXCLUSION - SILICA OR MIXED DUST |
| MAUB 1813 01 15 | EXCLUSION - ASBESTOS |
| MAUB 1815 01 15 | EXCLUSION - NEW YORK OPERATIONS |
| MUB TERR-2 01 15 | CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE |

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.

**MEIL 1225 10 11**                                                                                 **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

**MIL 1214 09 17**                                                                                           **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
| --- | --- | --- |
| General Liability<br>Carrier: Evanston Insurance Company<br>Effective Date: 11/01/2018<br>Expiration Date: 11/01/2019 | Occurrence | $1,000,000 |
| | General Aggregate | $2,000,000 |
| | Products and Completed Operations Aggregate | $2,000,000 |
| | Personal and Advertising Injury | $1,000,000 |
| Employers Liability<br>Carrier: New Hampshire Ins Co<br>Effective Date: 07/01/2018<br>Expiration Date: 07/01/2019 | Bodily Injury by Accident - each accident | $2,000,000 |
| | Bodily Injury by Disease - policy limit | $2,000,000 |
| | Bodily Injury by Disease - each employee | $2,000,000 |

All Limits Of Insurance are Each Occurrence and Aggregate, if applicable.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy and any "underlying insurance" carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an Insured under the "underlying insurance". The words "we" and "us" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to Section **V.** Definitions.

### SECTION I. INSURING AGREEMENT

**1.** We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

**2.** This policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except:

    **a.** We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and

    **b.** With respect to any provisions to the contrary contained in this policy.

**3.** The amount we will pay for damages shall not exceed the Limits Of Insurance shown in the Declarations.

**4.** We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend ends when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

### SECTION II. EXCLUSIONS

The exclusions applicable to the "underlying insurance" also apply to this policy.

### SECTION III. LIMITS OF INSURANCE

**1.** The Limit Of Insurance shown in the Declarations as the Each Occurrence Limit is the most we will pay for damages arising out of any one occurrence or offense.

**2.** If a Limit Of Insurance is shown in the Declarations as the Aggregate Limit, that amount will apply in the same manner as the aggregate limits shown in the Schedule Of Underlying Insurance.

### SECTION IV. CONDITIONS

If any of the following conditions are contrary to conditions contained in the "underlying insurance" the provisions contained in this policy apply.

**1. Appeals**

In the event the underlying insurer(s) elects not to appeal a judgment in excess of the limits of the "underlying insurance", we may elect to make such an appeal. If we so elect, we shall be liable, in addition to the applicable Limits Of Insurance, for all defense expenses we incur.

Case ID: 190901353

## 2. Maintenance Of Underlying Insurance

**a.** You agree to maintain the "underlying insurance" in full force and effect during the term of this policy, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. Failure to maintain the "underlying insurance" in full force and effect or to meet all conditions and warranties of such "underlying insurance" will not invalidate insurance provided under this policy, but insurance provided under this policy shall apply as if the "underlying insurance" were available and collectible.

**b.** Reduction or exhaustion of the aggregate limit of any "underlying insurance" by payments for judgments, settlements or any costs or expenses subject to that limit, will not be a failure to maintain "underlying insurance" in full force and effect.

**c.** No statement contained in this condition limits our right to cancel or not renew this policy.

For purposes of this policy, if any "underlying insurance" is not available or collectible because of:

**a.** The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

**b.** The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy;

then this policy shall apply and amounts payable hereunder shall be determined as if such "underlying insurance" were available and collectible.

## 3. Other Insurance

This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

## 4. Cancellation

**a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering advance written notice of cancellation to us.

**b.** We may cancel this policy by mailing or delivering written notice of cancellation to the first Named Insured at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 60 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the Named Insured's last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

## 5. Policy Period

This insurance will respond to injury or damage that occurs, or arises from an offense committed, during the Policy Period shown in the Declarations.

## SECTION V. DEFINITIONS

"Underlying insurance" means the policies or self-insurance shown in the Schedule Of Underlying Insurance, any replacements thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued replacements of policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## UNIMPAIRED AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Limits Of Insurance section:

The aggregate limits on "underlying insurance" shall be unimpaired as of the inception date of this policy.

Only "occurrences" that take place during the policy period of this policy shall be considered in determining the extent of any exhaustion of the aggregate limits on "underlying insurance".

If any "underlying insurance" is written on a claims made basis, the aggregate limits on "underlying insurance" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this policy.

All other terms and conditions remain unchanged.

MAUB 1243 4 17                                                                                                  **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## 25% MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraph **e.** of Condition **4.** Cancellation under Section **IV.** Conditions is replaced by the following:

   **e.** If this policy is cancelled by:

      **(1)** The first Named Insured and the policy is not subject to audit, we will retain no less than 25% of the Total Premium shown in the Declarations.

      **(2)** The first Named Insured and the policy is subject to audit, the earned premium will be determined by the final audit. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

      **(3)** Us for any reason other than for nonpayment of premium, the refund will be pro-rata. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

      We will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to Section **IV.** Conditions:

   **Minimum Earned Premium**

   **a.** The minimum earned premium for the policy period is 25% of the Total Premium, shown on the Declarations, plus any premium adjustment for endorsements and any additional premium developed by audit.

   **b.** Audits that indicate a return premium will not reduce the minimum earned premium as stated in Paragraph **a.** above.

All other terms and conditions remain unchanged.

Case ID: 190901353


**MARKEL**®

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## KNOWN INJURY OR DAMAGE LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **I.** Insuring Agreement

This insurance applies to bodily injury and property damage only if, prior to the policy period, no insured and no employee authorized by you to give or receive notice of an occurrence or claim knew that the bodily injury or property damage had occurred, in whole or in part.

If such a listed insured or authorized employee knew, prior to the policy, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

Bodily injury or property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured or any employee authorized by you to give or receive notice of an occurrence or claim includes any continuation, change or resumption of that bodily injury or property damage after the end of the policy period.

Bodily injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured or any employee authorized by you to give or receive notice of an occurrence or claim:

**a.** Reports all, or any part, of the bodily injury or property damage to us or any other insurer;

**b.** Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or

**c.** Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.

Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – POLLUTION – HOSTILE FIRE, COLLISION/UPSET AND PRODUCTS-COMPLETED OPERATIONS FOLLOWING FORM EXCEPTIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Pollution**

**a.** Any liability which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

However, insofar as coverage is afforded by the policies shown in the Schedule Of Underlying Insurance, for the full limits shown therein, Paragraph **a.** above does not apply to any liability arising out of:

**(1)** The collision or upset of a motor vehicle;

**(2)** Any heat, smoke or fumes from a "hostile fire"; or

**(3)** The products-completed operations hazard, provided that:

   **(a)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" originates away from the premises owned or occupied by, or rented or loaned to a Named Insured;

   **(b)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not consist of or arise from waste or materials that were at any time transported, stored, treated, disposed of, processed or handled as waste; and

   **(c)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not occur at any premises, facility, site or location which is or was at any time used by or for any insured or others for the treatment, storage, disposal, processing or handling of waste.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(2)** Claim or suit, by or on behalf of a governmental authority, for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

**B.** The following are added to Section **V.** Definitions as respects this exclusion:

"Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

MAUB 1305 01 15      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – NUCLEAR ENERGY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Nuclear Energy Liability**

Any liability resulting from the "hazardous properties" of "nuclear material".

**B.** As used in this exclusion:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "by-product material"; and

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LIMITATION – CONTRACTOR'S SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following are added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Any property or equipment rented, leased or loaned to any insured;

**b.** Property being installed or erected by or for any insured; or

**c.** That particular part of real property on which work is being performed by or for any insured.

**Wrap-up**

Bodily injury or property damage arising out of either your ongoing operations or operations included within the products-completed operations hazard at any joint venture or any project for which you are, or ever were, included as an insured under any owner-controlled, consolidated (wrap-up) insurance program.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**a.** Provides coverage identical to that provided by this policy;

**b.** Has limits adequate to cover all claims; or

**c.** Remains in effect;

**Joint Venture Or Partnership**

Bodily injury or property damage arising out of any joint venture or partnership of which any insured is a member and which is not designated in this policy as a Named Insured.

**Architectural, Engineering Or Land Surveying Professional Services**

Bodily injury, property damage or personal and advertising injury arising out of the rendering of or failure to render any architectural, engineering or land surveying professional services performed by or for you, including:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawing and specifications; and

**b.** Supervisory, inspection, architectural or engineering services.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage, or the offense which caused the personal and advertising injury, involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

All other terms and conditions remain unchanged.

**MAUB 1363 04 17**                                                                 **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – EMPLOYMENT-RELATED PRACTICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Employment-Related Practices**

Bodily injury or personal and advertising injury to a person arising out of any:

**a.** Refusal to employ;

**b.** Termination of employment;

**c.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**d.** Consequential bodily injury as a result of the employment-related practices described in Paragraphs **a.** through **c.** above.

This exclusion applies whether the injury-causing event described in Paragraphs **a.** through **c.** above occurs before employment, during employment or after employment.

This exclusion applies whether the insured maybe held liable as an employer or in any other capacity, and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ERISA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**ERISA**

Any obligations incurred or imposed upon an insured (or which are imputed to any insured) under the Employee Retirement Income Security Act of 1974 (ERISA), Public Law 93-406, any law amendatory thereof and any similar state or local laws.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Computer-Related And Other Electronic Problems**

Any "bodily injury", "property damage", "personal and advertising injury" or damages arising out of a pecuniary, financial or other economic loss resulting from the failure of any electronic data processing equipment, microprocessor, computer program, software, media, or data to correctly recognize, interpret, differentiate or process any date.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraphs **a., b., c., d.,** and **f.** of the **Cancellation** Condition are replaced by the following:

**Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**b. Cancellation Of Policies In Effect**

**(1) For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**(2) For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(a)** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**(b)** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**(c)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(d)** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(e)** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(f)** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

Case ID: 190901353

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

The following is added to the **Cancellation** Condition:

If we cancel, any premium refund due will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, any premium refund due will be returned within 30 days after the effective date of cancellation.

**B.** The following is added to **SECTION IV. CONDITIONS:**

**a. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**b. Increase of Premium**

If we increase your renewal premium, we will mail or deliver to you written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to you at the mailing addresses last known to us.  If notice is mailed, it will be by registered or first class mail.  Proof of mailing will be sufficient proof of notice.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Exterior Insulation And Finish System**

Any liability included in the "products-completed operations hazard" and arising out of:

**a.** The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:

**(1)** An "exterior insulation and finish system" or any part thereof; or

**(2)** Any substantially similar system or any part thereof,

including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system.

**b.** Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.

**B.** The following is added to the Definitions section:

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

**a.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**b.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**c.** A reinforced base coat;

**d.** A finish coat providing surface texture and color; or

**e**. Any flashing, caulking or sealant used with the system for any purpose.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – DAMAGE TO PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Property you use, own, rent or occupy, including any costs or expenses incurred by you or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.** Property loaned to you;

**c.** Real or personal property in the care, custody or control of any insured (as respects real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, only excluding property damage to that particular part of real property on which operations are being performed, if the property damage arises out of those operations);

**d.** Property transported by the insured; or

**e.** Premises you sell, give away or abandon, if the property damage arises out of any part of those premises, and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c. The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

d. Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions,, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the Exclusions Section:

This policy does not apply to:

**Fungi Or Bacteria**

**a.** Any liability arising out of the actual, alleged or threatened  inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following is added to the Definitions section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Lead**

Any loss, claim or expense caused by, resulting from or arising out of lead, paint containing lead, or any other material or substance containing lead.

We have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or "suit" excluded herein.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render professional services or advice by an insured or by any person for whose acts or omissions the insured is legally responsible, whether or not that service or advice is ordinary in your profession and regardless of whether a claim or "suit" is brought by a client or any other person or organization.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – WAR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**War Liability**

Any liability, however caused, arising directly or indirectly out of:

**a.**  War, including undeclared or civil war; or

**b.**  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.**  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Punitive Or Exemplary Damages**

Punitive or exemplary damages. This exclusion applies regardless of any other provision of this policy.

If a "suit" is brought, against any insured, seeking both compensatory damages and punitive or exemplary damages, no coverage will be provided by this policy for any costs, including defense costs, interest, fines or penalties attributable to punitive or exemplary damages.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – RADIOACTIVE MATTER

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy does not apply to:

**Radioactive Matter**

Any liability arising out of the actual, alleged or threatened exposure of any person or property to any radioactive matter or any form of radiation.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** For the purposes of this endorsement, the following are added to the Definitions section:

"Any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA OR MIXED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Silica Or Mixed Dust**

**a.** Liability caused by, resulting from, or arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation, ingestion or respiration of "mixed dust", silica, silica-related dust or products or substances containing silica. This includes, but is not limited to any:

**(1)** Supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

**(2)** Obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "mixed dust", silica, silica-related dust or products or substances containing silica, by any insured or by any other person or entity.

**B.** As respects this exclusion, the following is added to Section **V.** Definitions:

"Mixed dust" means inorganic or organic dusts that have harmful effects on human beings.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Asbestos**

**a.** The actual, alleged or threatened:

**(1)** Inhalation of, ingestion of, or prolonged physical exposure to asbestos or products or work containing asbestos;

**(2)** Use of asbestos in your work or your product or the work or product of any person or organization for whom you may be legally responsible; or

**(3)** Exposure to asbestos or products containing asbestos which are at any time removed from a building or a structure, transported, handled, stored, treated, disposed of, processed or manufactured by you or any person or any organization for whom you may be legally responsible.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove or contain, or in any way respond to or assess the effects of asbestos; or

**(2)** Claim or suit by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up or removing, containing or in any way responding to, or assessing the effects of asbestos.

All other terms and conditions remain unchanged.

MAUB 1813 01 15 **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW YORK OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy shall not apply to:

**New York Operations**

Liability arising out of operations conducted in the State of New York, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for you or for others.

All other terms and conditions remain unchanged.

**MAUB 1815 01 15**                                                                                   **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE – TERRORISM RISK INSURANCE ACT

### SCHEDULE

| | |
|---|---|
| Terrorism Premium: | ███████ |
| Federal Share Of Terrorism Losses: | 85% In 2015 |
| | 84% In 2016 |
| | 83% In 2017 |
| | 82% In 2018 |
| | 81% In 2019 |
| | 80% In 2020 |

**Disclosure Of Premium**

We have notified you that under the Terrorism Risk Insurance Act we must make certified acts of terrorism coverage available in the policies we offer. At that time we advised you that the premium for such terrorism coverage would be the amount shown in the Schedule of this notice.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in the Schedule of this notice) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If you have not indicated to us or your agent that certified acts of terrorism coverage is desired, a certified act of terrorism exclusion will be attached to your policy and we will not charge your policy for terrorism coverage.

If you desire to purchase terrorism coverage, please contact us or your agent.

Case ID: 190901353

# EXHIBIT 21

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

10 Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                         **President**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.

Case ID: 190901353



# HOW TO REPORT A CLAIM

**How to report a new claim:**

- **Email: newclaims@markelcorp.com**
- **FAX: (855) 662-7535**
- **\*Phone: (800) 362-7535**
- **Mail: P.O. Box 2009, Glen Allen, VA 23058-2009**

Please complete the appropriate ACORD form in detail and include the name and phone number of the contact person at the location of the reported incident. If possible, please attach a copy of the facility incident report. When reporting an auto claim, please identify the unit # on the schedule along with the VIN#. If the loss/claim involves a building or damage to property, please provide the physical address of the property.

**\*Please refer to your specific policy language for new claim reporting requirements. Some policies require you to report all claims in writing only.**

**How to send Supplemental Information / Questions on an existing claim:**

- **Email: markelclaims@markelcorp.com**
- **FAX: (855) 662-7535**
- **Phone: (800) 362-7535**
- **Mail: P.O. Box 2009, Glen Allen, VA 23058-2009**

**If you have questions about a claim, please call 1-800-362-7535.**

**Inquiries may also be faxed to 1-855-662-7535.**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS

POLICY NUMBER: MKLV7EUL101098        RENEWAL POLICY NUMBER: MKLV7EUL100475

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)

Lion Construction Management, LLC
2301 Washington Ave Ste 111
Philadelphia            PA      19146-2534

Policy Period: From: <u>November 1, 2019</u> to <u>November 1, 2020</u> at 12:01 A.M. Standard Time at your mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

### Limits of Insurance

| | | |
|---|---|---|
| Each Occurrence Limit: | $ | 2,000,000 |
| Aggregate Limit: | $ | 2,000,000 |

### Premium

| | | |
|---|---|---|
| Policy Premium: | $ | ▮▮▮▮▮ |
| Terrorism Premium: | $ | ▮▮▮▮▮ |
| Fees (Where Applicable) | $ | ▮▮▮▮▮ |
| Total Premium: | $ | ▮▮▮▮▮  Payable At Inception |

Audit Period:    ☒ Not Applicable    ☐ Annual    ☐ Semi-Annual    ☐ Quarterly    ☐ Monthly

Rating Basis (If Subject to Audit)    Premium Basis: _____    Rate: _____

### Producer Number, Name and Mailing Address

Hull & Company, LLC
220 Gibraltar Road, Suite 100
Horsham            PA    19044

### Endorsements

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
Per Forms Schedule

### Schedule of Underlying Insurance

Per Schedule Of Underlying Insurance

**These declarations, together with the Coverage Form and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____12/24/2019_____    By: _____
                          **DATE**                          **AUTHORIZED REPRESENTATIVE**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| MJIL 1000 08 10 | POLICY JACKET |
| MPIL 1007 03 14 | PRIVACY NOTICE |
| MPIL 1041 02 12 | HOW TO REPORT A CLAIM |
| MPIL 1083 04 15 | U.S. TREASURY DEPT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| MADUB 1000 04 17 | COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS |
| MDIL 1001 08 11 | FORMS SCHEDULE |
| MEIL 1200 10 16 | SERVICE OF SUIT |
| MEIL 1225 10 11 | CHANGES - CIVIL UNION |
| MIL 1214 09 17 | TRADE OR ECONOMIC SANCTIONS |
| MADUB 1003 04 17 | SCHEDULE OF UNDERLYING INSURANCE |
| MAUB 0001 01 15 | COMMERCIAL EXCESS LIABILITY POLICY |
| MAUB 1243 04 17 | UNIMPAIRED AGGREGATE LIMIT |
| MAUB 1264 04 17 | 25% MINIMUM EARNED PREMIUM |
| MAUB 1274 01 15 | KNOWN INJURY OR DAMAGE LIMITATION |
| MAUB 1305 01 15 | EXCL - POLL - HOSTILE FIRE COLL/UPSET AND PCO FOLLOWING FORM EXCEP |
| MAUB 1355 01 15 | EXCLUSION - NUCLEAR ENERGY LIABILITY |
| MAUB 1363 04 17 | LIMITATION - CONTRACTOR'S SERVICES |
| MAUB 1384 01 15 | EXCLUSION - EMPLOYMENT-RELATED PRACTICES |
| MAUB 1386 01 15 | EXCLUSION - ERISA |
| MAUB 1391 01 15 | EXCLUSION - COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS |
| MAUB 1402-PA 01 15 | PENNSYLVANIA AMENDATORY |
| MAUB 1604 01 15 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEM |
| MAUB 1615 01 15 | EXCLUSION - DAMAGE TO PROPERTY |
| MAUB 1621 01 15 | EXCLUSION - RECORDING AND DISTRIBUTION OF MATERIAL INFO IN VIOLATION OF LAW |
| MAUB 1638 01 15 | EXCLUSION - FUNGI OR BACTERIA |
| MAUB 1642 01 15 | EXCLUSION - LEAD |
| MAUB 1663 01 15 | EXCLUSION - PROFESSIONAL SERVICES |
| MAUB 1666 01 15 | EXCLUSION - WAR LIABILITY |
| MAUB 1692 01 15 | EXCLUSION - PUNITIVE DAMAGES |
| MAUB 1693 01 15 | EXCLUSION - RADIOACTIVE MATTER |
| MAUB 1696 01 15 | EXCLUSION - CERTIFIED ACTS OF TERRORISM |
| MAUB 1804 01 15 | EXCLUSION - SILICA OR MIXED DUST |
| MAUB 1813 01 15 | EXCLUSION - ASBESTOS |
| MAUB 1815 01 15 | EXCLUSION - NEW YORK OPERATIONS |
| MUB TERR-2 01 15 | CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE |

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CHANGES – CIVIL UNION

All references to "spouse" or "family member" in any Coverage Part or policy form made part of this insurance shall include a party to a civil union or domestic partnership law recognized under any applicable statute.

All other terms and conditions remain unchanged.

**MEIL 1225 10 11**                                                            **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

**MIL 1214 09 17**                                                                                         **Page 1 of 1**

<span style="color:red">Case ID: 190901353</span>



# EVANSTON INSURANCE COMPANY

## SCHEDULE OF UNDERLYING INSURANCE

| Type of Policy/Carrier | Limits Of Liability | |
|---|---|---|
| General Liability<br>Carrier: United Specialty<br>Effective Date:  11/01/2019<br>Expiration Date: 11/01/2020 | Occurrence | $1,000,000 |
| | Personal and Advertising Injury | $1,000,000 |
| | Products and Completed Operations Aggregate | $2,000,000 |
| | General Aggregate | $2,000,000 |
| Employers Liability<br>Carrier: New Hampshire Insurance Co.<br>Effective Date:  07/01/2019<br>Expiration Date: 07/01/2020 | Bodily Injury by Disease - each employee | $2,000,000 |
| | Bodily Injury by Disease - policy limit | $2,000,000 |
| | Bodily Injury by Accident - each accident | $2,000,000 |

All Limits Of Insurance are Each Occurrence and Aggregate, if applicable.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

## COMMERCIAL EXCESS LIABILITY POLICY

Various provisions in this policy restrict coverage. Read the entire policy and any "underlying insurance" carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an Insured under the "underlying insurance". The words "we" and "us" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meanings. Refer to Section **V.** Definitions.

### SECTION I. INSURING AGREEMENT

**1.** We will pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance.

**2.** This policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except:

  **a.** We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and

  **b.** With respect to any provisions to the contrary contained in this policy.

**3.** The amount we will pay for damages shall not exceed the Limits Of Insurance shown in the Declarations.

**4.** We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend ends when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

### SECTION II. EXCLUSIONS

The exclusions applicable to the "underlying insurance" also apply to this policy.

### SECTION III. LIMITS OF INSURANCE

**1.** The Limit Of Insurance shown in the Declarations as the Each Occurrence Limit is the most we will pay for damages arising out of any one occurrence or offense.

**2.** If a Limit Of Insurance is shown in the Declarations as the Aggregate Limit, that amount will apply in the same manner as the aggregate limits shown in the Schedule Of Underlying Insurance.

### SECTION IV. CONDITIONS

If any of the following conditions are contrary to conditions contained in the "underlying insurance" the provisions contained in this policy apply.

**1. Appeals**

In the event the underlying insurer(s) elects not to appeal a judgment in excess of the limits of the "underlying insurance", we may elect to make such an appeal. If we so elect, we shall be liable, in addition to the applicable Limits Of Insurance, for all defense expenses we incur.

Case ID: 190901353

2. **Maintenance Of Underlying Insurance**

   **a.** You agree to maintain the "underlying insurance" in full force and effect during the term of this policy, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. Failure to maintain the "underlying insurance" in full force and effect or to meet all conditions and warranties of such "underlying insurance" will not invalidate insurance provided under this policy, but insurance provided under this policy shall apply as if the "underlying insurance" were available and collectible.

   **b.** Reduction or exhaustion of the aggregate limit of any "underlying insurance" by payments for judgments, settlements or any costs or expenses subject to that limit, will not be a failure to maintain "underlying insurance" in full force and effect.

   **c.** No statement contained in this condition limits our right to cancel or not renew this policy.

   For purposes of this policy, if any "underlying insurance" is not available or collectible because of:

   **a.** The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

   **b.** The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of its policy;

   then this policy shall apply and amounts payable hereunder shall be determined as if such "underlying insurance" were available and collectible.

3. **Other Insurance**

   This insurance is excess over any other valid and collectible insurance whether primary, excess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

4. **Cancellation**

   **a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering advance written notice of cancellation to us.

   **b.** We may cancel this policy by mailing or delivering written notice of cancellation to the first Named Insured at least:

   **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **(2)** 60 days before the effective date of cancellation if we cancel for any other reason.

   **c.** We will mail or deliver our notice to the Named Insured's last mailing address known to us.

   **d.** Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

   **e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   **f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

5. **Policy Period**

   This insurance will respond to injury or damage that occurs, or arises from an offense committed, during the Policy Period shown in the Declarations.

## SECTION V. DEFINITIONS

"Underlying insurance" means the policies or self-insurance shown in the Schedule Of Underlying Insurance, any replacements thereof and other policies purchased or issued for newly acquired or formed organizations. Policies purchased or issued replacements of policies or self-insurance listed in the Schedule Of Underlying Insurance or for newly acquired or formed organizations shall not be more restrictive than those listed in the Schedule Of Underlying Insurance. All "underlying insurance" shall be maintained by you in accordance with the Maintenance Of Underlying Insurance condition of this policy.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## UNIMPAIRED AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Limits Of Insurance section:

The aggregate limits on "underlying insurance" shall be unimpaired as of the inception date of this policy.

Only "occurrences" that take place during the policy period of this policy shall be considered in determining the extent of any exhaustion of the aggregate limits on "underlying insurance".

If any "underlying insurance" is written on a claims made basis, the aggregate limits on "underlying insurance" will only be reduced or exhausted by claims for that insurance that are made during the policy period, or any Extended Reporting Period, of this policy.

All other terms and conditions remain unchanged.

MAUB 1243 4 17                                                                                                    **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## 25% MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraph **e.** of Condition **4.** Cancellation under Section **IV.** Conditions is replaced by the following:

   **e.** If this policy is cancelled by:

      **(1)** The first Named Insured and the policy is not subject to audit, we will retain no less than 25% of the Total Premium shown in the Declarations.

      **(2)** The first Named Insured and the policy is subject to audit, the earned premium will be determined by the final audit. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

      **(3)** Us for any reason other than for nonpayment of premium, the refund will be pro-rata. However, in no event will we retain less than 25% of the Total Premium as described in the Minimum Earned Premium condition.

      We will send the first Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to Section **IV.** Conditions:

   **Minimum Earned Premium**

   **a.** The minimum earned premium for the policy period is 25% of the Total Premium, shown on the Declarations, plus any premium adjustment for endorsements and any additional premium developed by audit.

   **b.** Audits that indicate a return premium will not reduce the minimum earned premium as stated in Paragraph **a.** above.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## KNOWN INJURY OR DAMAGE LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **I.** Insuring Agreement

This insurance applies to bodily injury and property damage only if, prior to the policy period, no insured and no employee authorized by you to give or receive notice of an occurrence or claim knew that the bodily injury or property damage had occurred, in whole or in part.

If such a listed insured or authorized employee knew, prior to the policy, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

Bodily injury or property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured or any employee authorized by you to give or receive notice of an occurrence or claim includes any continuation, change or resumption of that bodily injury or property damage after the end of the policy period.

Bodily injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured or any employee authorized by you to give or receive notice of an occurrence or claim:

**a.** Reports all, or any part, of the bodily injury or property damage to us or any other insurer;

**b.** Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or

**c.** Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.

Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – POLLUTION – HOSTILE FIRE, COLLISION/UPSET AND PRODUCTS-COMPLETED OPERATIONS FOLLOWING FORM EXCEPTIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Pollution**

**a.** Any liability which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

However, insofar as coverage is afforded by the policies shown in the Schedule Of Underlying Insurance, for the full limits shown therein, Paragraph **a.** above does not apply to any liability arising out of:

**(1)** The collision or upset of a motor vehicle;

**(2)** Any heat, smoke or fumes from a "hostile fire"; or

**(3)** The products-completed operations hazard, provided that:

**(a)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" originates away from the premises owned or occupied by, or rented or loaned to a Named Insured;

**(b)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not consist of or arise from waste or materials that were at any time transported, stored, treated, disposed of, processed or handled as waste; and

**(c)** The discharge, dispersal, seepage, migration, release or escape of "pollutants" does not occur at any premises, facility, site or location which is or was at any time used by or for any insured or others for the treatment, storage, disposal, processing or handling of waste.

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(2)** Claim or suit, by or on behalf of a governmental authority, for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

**B.** The following are added to Section **V.** Definitions as respects this exclusion:

"Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

"Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – NUCLEAR ENERGY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Nuclear Energy Liability**

Any liability resulting from the "hazardous properties" of "nuclear material".

**B.** As used in this exclusion:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "by-product material"; and

"Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LIMITATION – CONTRACTOR'S SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following are added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Any property or equipment rented, leased or loaned to any insured;

**b.** Property being installed or erected by or for any insured; or

**c.** That particular part of real property on which work is being performed by or for any insured.

**Wrap-up**

Bodily injury or property damage arising out of either your ongoing operations or operations included within the products-completed operations hazard at any joint venture or any project for which you are, or ever were, included as an insured under any owner-controlled, consolidated (wrap-up) insurance program.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**a.** Provides coverage identical to that provided by this policy;

**b.** Has limits adequate to cover all claims; or

**c.** Remains in effect;

**Joint Venture Or Partnership**

Bodily injury or property damage arising out of any joint venture or partnership of which any insured is a member and which is not designated in this policy as a Named Insured.

**Architectural, Engineering Or Land Surveying Professional Services**

Bodily injury, property damage or personal and advertising injury arising out of the rendering of or failure to render any architectural, engineering or land surveying professional services performed by or for you, including:

**a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawing and specifications; and

**b.** Supervisory, inspection, architectural or engineering services.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage, or the offense which caused the personal and advertising injury, involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

All other terms and conditions remain unchanged.

**MAUB 1363 04 17**                                                    **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – EMPLOYMENT-RELATED PRACTICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Employment-Related Practices**

Bodily injury or personal and advertising injury to a person arising out of any:

**a.** Refusal to employ;

**b.** Termination of employment;

**c.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**d.** Consequential bodily injury as a result of the employment-related practices described in Paragraphs **a.** through **c.** above.

This exclusion applies whether the injury-causing event described in Paragraphs **a.** through **c.** above occurs before employment, during employment or after employment.

This exclusion applies whether the insured maybe held liable as an employer or in any other capacity, and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ERISA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**ERISA**

Any obligations incurred or imposed upon an insured (or which are imputed to any insured) under the Employee Retirement Income Security Act of 1974 (ERISA), Public Law 93-406, any law amendatory thereof and any similar state or local laws.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Computer-Related And Other Electronic Problems**

Any "bodily injury", "property damage", "personal and advertising injury" or damages arising out of a pecuniary, financial or other economic loss resulting from the failure of any electronic data processing equipment, microprocessor, computer program, software, media, or data to correctly recognize, interpret, differentiate or process any date.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA AMENDATORY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** Paragraphs **a., b., c., d.,** and **f.** of the **Cancellation** Condition are replaced by the following:

**Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

**b. Cancellation Of Policies In Effect**

**(1) For Less Than 60 Days**

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

**(2) For 60 Days Or More**

If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(a)** You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

**(b)** You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

**(c)** A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(d)** Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time of cancellation, shall be certified to the Insurance Commissioner as directly affecting in-force policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(e)** Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

**(f)** Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

Case ID: 190901353

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

The following is added to the **Cancellation** Condition:

If we cancel, any premium refund due will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, any premium refund due will be returned within 30 days after the effective date of cancellation.

**B.** The following is added to **SECTION IV. CONDITIONS:**

**a. When We Do Not Renew**

If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal, stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

**b. Increase of Premium**

If we increase your renewal premium, we will mail or deliver to you written notice of our intent to increase the premium at least 30 days before the effective date of the premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to you at the mailing addresses last known to us.  If notice is mailed, it will be by registered or first class mail.  Proof of mailing will be sufficient proof of notice.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Exterior Insulation And Finish System**

Any liability included in the "products-completed operations hazard" and arising out of:

**a.** The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:

**(1)** An "exterior insulation and finish system" or any part thereof; or

**(2)** Any substantially similar system or any part thereof,

including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system.

**b.** Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.

**B.** The following is added to the Definitions section:

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

**a.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**b.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**c.** A reinforced base coat;

**d.** A finish coat providing surface texture and color; or

**e**. Any flashing, caulking or sealant used with the system for any purpose.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – DAMAGE TO PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Damage To Property**

Property damage to:

**a.** Property you use, own, rent or occupy, including any costs or expenses incurred by you or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**b.** Property loaned to you;

**c.** Real or personal property in the care, custody or control of any insured (as respects real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, only excluding property damage to that particular part of real property on which operations are being performed, if the property damage arises out of those operations);

**d.** Property transported by the insured; or

**e.** Premises you sell, give away or abandon, if the property damage arises out of any part of those premises, and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.

All other terms and conditions remain unchanged.

**MAUB 1615 01 15**                                                                 **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**c.** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**d.** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions,, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

All other terms and conditions remain unchanged.

**MAUB 1621 01 15**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

**A.** The following is added to the Exclusions Section:

This policy does not apply to:

**Fungi Or Bacteria**

**a.** Any liability arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following is added to the Definitions section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Lead**

Any loss, claim or expense caused by, resulting from or arising out of lead, paint containing lead, or any other material or substance containing lead.

We have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or "suit" excluded herein.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render professional services or advice by an insured or by any person for whose acts or omissions the insured is legally responsible, whether or not that service or advice is ordinary in your profession and regardless of whether a claim or "suit" is brought by a client or any other person or organization.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – WAR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**War Liability**

Any liability, however caused, arising directly or indirectly out of:

**a.** War, including undeclared or civil war; or

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

The following is added to the Exclusions section:

This policy does not apply to:

**Punitive Or Exemplary Damages**

Punitive or exemplary damages. This exclusion applies regardless of any other provision of this policy.

If a "suit" is brought, against any insured, seeking both compensatory damages and punitive or exemplary damages, no coverage will be provided by this policy for any costs, including defense costs, interest, fines or penalties attributable to punitive or exemplary damages.

All other terms and conditions remain unchanged.

**MAUB 1692 01 15**                                                                                          **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – RADIOACTIVE MATTER

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy does not apply to:

**Radioactive Matter**

Any liability arising out of the actual, alleged or threatened exposure of any person or property to any radioactive matter or any form of radiation.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.

**A.** The following is added to the Exclusions section:

This policy does not apply to:

**Terrorism**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** For the purposes of this endorsement, the following are added to the Definitions section:

"Any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SILICA OR MIXED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

**A.** The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Silica Or Mixed Dust**

**a.** Liability caused by, resulting from, or arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation, ingestion or respiration of "mixed dust", silica, silica-related dust or products or substances containing silica. This includes, but is not limited to any:

**(1)** Supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

**(2)** Obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "mixed dust", silica, silica-related dust or products or substances containing silica, by any insured or by any other person or entity.

**B.** As respects this exclusion, the following is added to Section **V.** Definitions:

"Mixed dust" means inorganic or organic dusts that have harmful effects on human beings.

All other terms and conditions remain unchanged.

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY

The following is added to Section **II.** Exclusions:

This policy does not apply to:

**Asbestos**

**a.** The actual, alleged or threatened:

   **(1)** Inhalation of, ingestion of, or prolonged physical exposure to asbestos or products or work containing asbestos;

   **(2)** Use of asbestos in your work or your product or the work or product of any person or organization for whom you may be legally responsible; or

   **(3)** Exposure to asbestos or products containing asbestos which are at any time removed from a building or a structure, transported, handled, stored, treated, disposed of, processed or manufactured by you or any person or any organization for whom you may be legally responsible.

**b.** Any loss, cost or expense arising out of any:

   **(1)** Request, demand or order that any insured or others test for, monitor, clean up, remove or contain, or in any way respond to or assess the effects of asbestos; or

   **(2)** Claim or suit by or on behalf of any person, organization or governmental authority for damages because of testing for, monitoring, cleaning up or removing, containing or in any way responding to, or assessing the effects of asbestos.

All other terms and conditions remain unchanged.

MAUB 1813 01 15 **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – NEW YORK OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY

The following is added to the Exclusions section:

This policy shall not apply to:

**New York Operations**

Liability arising out of operations conducted in the State of New York, regardless of whether such operations are conducted by you or on your behalf or whether the operations are conducted for you or for others.

All other terms and conditions remain unchanged.

**MAUB 1815 01 15** **Page 1 of 1**

Case ID: 190901353



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# CONFIRMATION OF EXCLUSION OF CERTIFIED ACTS OF TERRORISM COVERAGE – TERRORISM RISK INSURANCE ACT

### SCHEDULE

| | |
|---|---|
| Terrorism Premium: | ████████ |
| Federal Share Of Terrorism Losses: | 85% In 2015 |
| | 84% In 2016 |
| | 83% In 2017 |
| | 82% In 2018 |
| | 81% In 2019 |
| | 80% In 2020 |

**Disclosure Of Premium**

We have notified you that under the Terrorism Risk Insurance Act we must make certified acts of terrorism coverage available in the policies we offer. At that time we advised you that the premium for such terrorism coverage would be the amount shown in the Schedule of this notice.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in the Schedule of this notice) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If you have not indicated to us or your agent that certified acts of terrorism coverage is desired, a certified act of terrorism exclusion will be attached to your policy and we will not charge your policy for terrorism coverage.

If you desire to purchase terrorism coverage, please contact us or your agent.

Case ID: 190901353

# EXHIBIT 22

Case ID: 190901353



July 14, 2020

**VIA FIRST CLASS & CERTIFIED MAIL    RETURN RECEIPT REQUESTED**

**DUE TO COMPLIANCE WITH SHELTER IN PLACE ORDERS IMPACTING OUR CLAIMS OPERATIONS, THE CERTIFIED MAILING OF THIS LETTER MAY BE DELAYED**

Streamline Solutions LLC
2301 Washington Avenue
Suite 111
Philadelphia, PA 19146

Attention: Dave Larkin, VP, General Counsel

**PARTIAL DISCLAIMER/RESERVATION OF RIGHTS**

| | | |
|---|---|---|
| RE: | Our Insured: | Streamline Solutions LLC |
| | Issuing Company: | Evanston Insurance Company |
| | Plaintiff: | David Butera, et al |
| | Our File Number: | C065245 |
| | Policy Number: | 3C42330 |
| | Policy Period: | 12/13/17 to 11/01/18 |

Dear Mr. Larkin,

Markel Service Incorporated as the claim service manager for Evanston Insurance Company (also referred to as  Evanston ) previously acknowledged receipt of  the lawsuits filed in the Court of Common Pleas of Philadelphia County, E filings 01575, 01353, 011351, 01268. The suits are for property damage to housing units owned by Matthew Selbovitz, David Butera, Daniel Kirk and Nickolas Auger.

Based upon a review of the lawsuits, the policy, and the investigation to date, Evanston agrees to participate in your defense, subject to a complete and full Reservation of Rights, which is specifically set forth below. By handling this matter under a Reservation of Rights, Evanston reserves the right to investigate this matter and disclaim coverage for any damages that are not covered under the policy referenced above. Evanston Insurance Company is not agreeing to indemnify your company for any allegations and damages not covered under the Evanston policy, as set forth more fully below.

As you know, we have retained Bryan P. Werley Esq. of Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, PC to defend Streamline Solutions LLC ( Streamline ) with regard to these lawsuits. Please provide Mr. Werley with your full cooperation. All questions concerning the defense or representation of Streamline should be directed to the above referenced attorney handling this matter, who can be reached at (610) 417- 3534.

**SUMMARY OF FACTUAL BACKGROUND**

According to the information provided to us, these four cases, Butera, Selbovitz, Auger and Kirk arise from the development and construction of four townhomes on Crease Street in Philadelphia, Pennsylvania.  At the time, Streamline was acting as the general contractor.  The developer/owner is Nineteenth Street Development, the architect was Harm Deutsch and Streamline hired several subcontractors, including

**Markel - Claims**
**Arizona  California  Illinois  Nebraska  New Jersey  New York  Texas  Virginia  Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

Modern Home Insulation, Fresh Air Services, Expo Construction and Tyrone Masonry. Tender letters have been sent to all of these subcontractors. The alleged defects have caused water infiltration. The properties include:

> 1373 Crease Street, Philadelphia, PA 19125
> 1369 Crease Street, Philadelphia, PA 19125
> 1367 Crease Street, Philadelphia, PA 19125
> 1371 Crease Street, Philadelphia, PA 19125

Plaintiffs set forth the following causes of action in the complaints: Breach of Contract, Breach of Express Warranty, Breach of The Implied Warranty of Workmanlike Construction, Breach of The Implied Warranty of Habitability, Negligence, Violation of The Pennsylvania Unfair Trade Practices and Consumer Protection Law, Negligent Misrepresentation and Breach of Contract (Third Part Beneficiary). Plaintiffs seek judgement for all compensatory, consequential and incidental damages.

## EVANSTON INSURANCE COMPANY S POLICY INFORMATION

Evanston Insurance Company insures Streamline under a Commercial General Liability Insurance Policy, designated as policy number 3C42330 This policy provides coverage for the period of 12/13/17 to 11/11/18 The policy is subject to a $5,000 Deductible, as well as the following Limits of Liability:

| | | |
|---|---|---|
| (i) | $2,000,000 | General Aggregate Limit (Other than Products/Completed Operations); |
| (ii) | $2,000,000 | Products/Completed Operations Aggregate Limit; |
| (iii) | $1,000,000 | Personal and Advertising Injury Limit; |
| (iv) | $1,000,000 | Each Occurrence Limit; |
| (v) | $100,000 | Damage to Rented Premises (Each Occurrence); |
| (vi) | $5,000 | Medical Expense (Any One Person). |

## AN EXPLANATION OF EVANSTON S PARTIAL DISCLAIMER/RESERVATION OF RIGHTS

Based upon a review of the information provided, the policy and the investigation to date, Evanston concludes that it has no obligation to indemnify Streamline for certain causes of action. Although Evanston is relying upon its policy in their entirety in informing of you of this lack of coverage, Evanston refers you to the following specific policy provisions.

Your policy includes multiple Insuring Agreements. For the purpose of this claim, we refer you to the Coverage A. Insuring Agreement (form CG 0001 04 13) which provides in pertinent part:

*COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY*
*1. Insuring Agreement*
*a. We will pay those sums that the insured be-comes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:*
*(1) The amount we will pay for damages is limited as described in Section III Limits Of Insurance; and*
*(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.*
*No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments Coverages A and B.*

Bodily injury is defined in the policy as follows:

Case ID: 190901353

3. Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

Occurrence is defined in the policy as follows:

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

The Evanston policy contains the following exclusion, which may preclude coverage in this matter:

## 2. Exclusions

This insurance does not apply to:

\*\*\*

## j. Damage to property

Property damage to:

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the property damage arises out of those operations;

Evanston reserves the right to disclaim coverage for damages if it is determined that the work performed by you or any contractor or subcontractor arose out of their operations.

Your policy also includes the following Endorsement CHANGES OCCURRENCE REDEFINED MEGL 1847 12 15 which may preclude coverage in this matter:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The definition of occurrence in the Definition section is replaced by the following:

Occurrence means:

a. An accident including continuous or repeated exposure to substantially the same general harmful conditions; or
b. Bodily injury or property damage resulting from faulty workmanship, exclusive of the faulty workmanship itself.

All other terms and conditions remain unchanged.

The following causes of action are asserted in the complaints: Breach of Contract, Breach of Express Warranty, Breach of The Implied Warranty of Workmanlike Construction, Breach of The Implied Warranty of Habitability, Violation of The Pennsylvania Unfair Trade Practices and Consumer Protection Law, Negligent Misrepresentation and Breach of Contract (Third Party Beneficiary). Plaintiffs seek judgement for all compensatory, consequential and incidental damages.

Case ID: 190901353

The above causes of action do not meet the redefined definition of an OCCURRENCE in the MEGL1847 12 15 Endorsement. Therefore there is no coverage afforded Streamline for these causes of action. The above endorsement also excludes coverage for the faulty workmanship itself. Therefore Streamline has coverage only for damages resulting from the alleged faulty workmanship.

Your policy also includes the following endorsement MEGL 0008 01 16, which may preclude coverage in this matter:

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

*EXCLUSION    CONTINUOUS OR PROGRESSIVE INJURY OR DAMAGE*

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM*

*The following is added to Paragraph 2. Exclusions under Section I    Coverages, Coverage A Bodily Injury And Property Damage Liability and Coverage B    Personal And Advertising Injury Liability:*

*This insurance does not apply to:*
*Continuous Or Progressive Injury Or Damage*
  *Bodily injury  ,   property damage   or   personal and advertising injury   which:*
*(1)      First occurred, first began to occur, or is alleged to have first occurred;*
*(2)      Is alleged to be in the process of occurring to any degree; or*
*(3)      Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred,*
*prior to the effective date of this policy.*

*All other terms and conditions remain unchanged.*

Evanston further reserves its right to disclaim coverage for any  continuous or progressive injury or damage.

Your policy also includes the following endorsement: MEGL 5300 05 16, which may preclude coverage in this matter:

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

*EXCLUSION    ORGANIC PATHOGENS AND LEGIONELLAE*

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM*
*PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM*

*Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may not be defined in all Coverage Forms.*

Case ID: 190901353

*The following are added to the Exclusions section:*
*This insurance does not apply to:*
*Organic Pathogens*
*(1)      Bodily injury , property damage  or  personal and advertising injury , including consequential injury, loss or damage, in any way involving  fungi , bacteria, organic pathogens or bio-organic growth including, but not limited to:*
*(a)      Actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from  fungi , bacteria, organic pathogens or bio-organic growth;*
*(b)      Systemic chemical poisoning from  fungi , bacteria, organic pathogens or bio-organic growth; and*
*(c)      Warnings, instructions, recommendations or advice given, or which should have been given, regarding  fungi , bacteria, organic pathogens or bio-organic growth.*
*Paragraph (a) above applies regardless of the source or location of the  fungi , bacteria, organic pathogens or bio-organic growth.*
*(2)      Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of  fungi , bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.*
*As used in this endorsement,  fungi  means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by  fungi . However, this exclusion does not apply to any  fungi  or bacteria that are on, or are contained in, a good or product intended for bodily consumption.*
*Legionellae*
*(1)      "Bodily injury", "property damage" or "personal and advertising injury" in any way involving the actual, alleged or threatened inhalation or aspiration of, ingestion of, contact with, exposure to, existence of, or presence of any legionellae, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage; and*
*(2)      Any loss, cost or expense arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, legionellae by any insured or by any other person or entity.*
*The exclusions added by this endorsement apply even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured.*

*All other terms and conditions remain unchanged.*

To the extent any claim is made for Bodily Injury or Property Damage caused by mold, there is no coverage afforded Streamline in accordance with the above endorsement.

## CONCLUSION

As discussed above, Evanston agrees to participate in your defense of this lawsuit, subject to a complete and full reservation of rights.  As discussed in detail above, the policy will not provide coverage for certain alleged damages, including damages that do not constitute  property damage  caused by an  occurrence or damage to  your work  as those terms are defined in the policy. Evanston reserves its rights to withdraw from the defense in the event there are no covered allegations, and Evanston reserves the right to limit or deny any duty to indemnify.

Case ID: 190901353

The foregoing discussion of grounds for Evanston s Reservation of Rights is not intended to be necessarily exhaustive or complete. Our investigation is ongoing and this letter is based on presently available information. Evanston reserves the right to supplement this coverage position and assert additional grounds for disclaimer of coverage if new or additional information becomes available.

This letter quotes the policy in part. However, please refer back to the policy itself for the complete and precise language of the policy. The language cited herein is not meant to change, supplement, add or subtract from the policy terms. The language in the policy itself is controlling.

If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at (800) 243-6869 ext. 28701.

In the event that you receive an amended pleading, please forward that information to our attention so that we can evaluate the amended allegations under the policy.

Please reference our File Number C065245 on all future correspondence.

Very truly yours,

MARKEL SERVICE, INCORPORATED

John Kuc

John Kuc, CPCU, CLCS
Sr. Claims Examiner

Markel Claims Service Center
310 Highway 35 South
Red Bank, NJ 07701


cc:

Bryan P. Werley Esq.
Zarwin, Baum, DeVito,
Kaplan, Schaer & Toddy, PC
2005 Market Street
One Commerce Square, 16th Floor
Philadelphia, PA 119103-7042


Alanna Coyle
The Gilchrist Ins Group
8 East 2nd Street, 1st Floor
Media, PA 19063

Christopher Givligiani
Hull & Company
220 Gibraltar Road, Suite 100
Horsham, PA 19044

Case ID: 190901353

# EXHIBIT 23

Case ID: 190901353



December 14, 2022

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND VIA EMAIL**

Streamline Solutions, LLC
Attn: Pamela Schatz
      Michael Stillwell
1100 N. Delaware Ave. REAR
Philadelphia, PA 19125
Pamela.Schatz@streamlinephilly.com
Mike@streamlinephilly.com

<u>**RESERVATION OF RIGHTS**</u>

| | | |
|---|---|---|
| RE: | Our Insured: | Streamline Solutions, LLC |
| | Issuing Company: | Evanston Insurance Company |
| | Plaintiff(s): | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz |
| | Our File Number: | C065245 |
| | Policy Number(s): | MKLVIEUL100396 (11/1/16-11/1/17) Excess; |
| | | 3C42330 (11/1/17-11/1/18) General Liability; |
| | | MKLV1EU101129 (11/1/17-11/1/18) Excess; |
| | | MKLV7PBC0002 (11/1/18-11/1/19) General Liability; |
| | | MKLV7EUL100475 (11/1/18-11/1/19) Excess; |
| | | MKLV7EUL101098 (11/1/19-11/1/20) Excess. |

Ms. Schatz and Mr. Stillwell:

Markel Service, Incorporated is a claims service manager for Evanston Insurance Company ("Evanston"). We write to provide a review of coverage available to you under the above-mentioned policies ("Evanston Policies"), specifically in connection with the action captioned:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Augur Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

pending before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Crease Street Lawsuits"[1]). We understand that Streamline Solutions, LLC ("Streamline") is named as a defendant in the Lawsuits. We also understand that the above claims relate to the following properties:

- Augur– 1367 Crease Street, Philadelphia, PA
- Selbovitz– 1369 Crease Street, Philadelphia, PA

---

[1] The Crease Street Lawsuits were consolidated under case ID 190901353 (Kirk Lawsuit).

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

- Kirk – 1371 Crease Street, Philadelphia, PA
- Butera -1373 Crease Street, Philadelphia, PA

Please note that this letter incorporates by reference any prior communications and correspondence from Evanston in connection with the Crease Street Lawsuits, including Evanston's correspondence from July 14, 2020.

This letter is being directed to your attention as the individual authorized to address insurance-related coverage communications on behalf of Streamline. **If you are not so authorized to address insurance related communications, please let me know immediately and provide me with the name and contact information of the appropriate individual to whom this and other communications should be directed.**

Based on the documents we have received to date, Evanston has determined that the Crease Street Lawsuits do not appear to allege damages covered by the Evanston Policies.

After reviewing the above and additional documents we have received in connection with the Underlying Actions, **Evanston has determined that this claim does not appear to allege damages covered by the Evanston Policies. Among other things, the Policies contain an exclusion barring coverage for any damages for "bodily injury", "property damage" [], including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth and related remediation costs.**

**Additionally, the damages at issue appear to have first manifested before the inception of the Evanston CGL Policies and, to the extent any damage occurred during the 2016-2017 Excess Policy, there is no indication that the underlying insurance to that Policy has been exhausted. As such, while Evanston will continue to provide a defense to Streamline, Evanston reserves the right to deny coverage for any damages that are not covered by the Evanston Policies as well as reserves all rights to seek reimbursement/contribution from your previous CGL carrier. If you have not already done so, please provide notice of this matter and tender your defense to your other CGL carriers for years prior to 2017 and any other insurer providing coverage for that time period.**

**As such, while Evanston will continue to provide a defense to Streamline in the Crease Street Lawsuit, Evanston reserves the right to deny coverage for any damages that are not covered by the Evanston Policies.**

### FACTUAL BACKGROUND

Based on the allegations in the Crease Street Lawsuits and other information provided to us, we understand the following. If you believe any of this summary is incomplete or inaccurate, please let us know and provide any additional information or documentation. Below we analyze each complaint filed in connection with the Crease Street Lawsuits.

### Kirk Complaint

Plaintiffs Daniel and Clarisa Kirk own a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 ("Kirk Home"). Compl. ¶1. Plaintiffs filed a complaint against Streamline on September 11, 2019. Per the allegations in the complaint, Plaintiffs purchased the Kirk Home in May 2015 and took possession on May 29, 2015. Id. ¶13; 59. "After closing on and moving into the [Kirk] Home, Plaintiffs later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the [Kirk] Home that led to consequential damage to parts of the [Kirk] Home other than the exterior envelopes of the [Kirk] Home, as well as the interior contents of the [Kirk] Home." Id. ¶25. The complaint alleges that "[o]n or about May 19, 2016, prior to the expiration of their One-Year Warranty, the Kirks hired Chilmark Home Inspections to perform an inspection of the Home. Id. ¶66. The Kirks subsequently sent the findings in the report, specifically relating to stucco and requested repairs. In turn, Streamline wrote notes on the report indicating that "cracks in stucco are normal." Id. ¶66-67. Because of the issues that their neighbors were experiencing Kirks hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger

Home on September 15, 2018 because similarly situated neighbors were experiencing similar issues as those he was experiencing.  Id. ¶70.

The diagnostics preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including:

    a.   Lack of flashing on the brick veneer
    b.   Missing movement joints
    c.   Missing window flashing
    d.   Improper flashing detail at intersection of dissimilar material
    e.   Missing drainage detail
    f.   Stucco thickness of 1/2", less than the required 7/8" thickness;
    g.   Missing drip edge; and
    h.   Missing kickout diverters.

Id. ¶71.  The diagnostics found preliminary evidence of damages to the Kirks Home including:

    a.   Elevated moisture readings around windows and doors
    b.   Areas of soft, no resistance, decayed, and deteriorated sheathing
    c.   Cracks in the cladding
    d.   Bulges in the cladding
    e.   Efflorescence on the cladding

Id. ¶72.

Plaintiff alleges the following claims against Streamline: (1) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of Implied Warranty of Workmanlike Construction; (IV) Breach of the Implied Warranty of Habitability; (V) Negligence; (VI) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VII) Negligent Misrepresentation; (VIII) Breach of Contract.

**Auger Lawsuit**

Plaintiff Nickolas Auger owns a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 ("Auger Home"). Compl. ¶1.  Auger filed a complaint against Streamline on September 10, 2019.  Per the allegations in the complaint, Plaintiff purchased the Auger Home in May 2015 and took possession on May 29, 2015. Id. ¶13; 59.  "After closing on and moving into the [Auger] Home, Plaintiff later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the [Auger] Home that led to consequential damage to parts of the [Auger] Home other than the exterior envelopes of the [Auger] Home, as well as the interior contents of the [Auger] Home." Id. ¶25.  Auger hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018 because similarly situated neighbors were experiencing similar issues as those he was experiencing.  Id. ¶68.  The Diagnostics found the following construction defects with respect to the Auger Home, including but not limited to:

    a.   Poor detail/flashing between stucco and brick
    b.   Stucco thickness of ½", less than the required 7/8" thickness
    c.   Incorrect window flange configuration on all windows
    d.   No visible through-wall flashing in brick
    e.   Vents not flashed or sealed
    f.   Missing kickout diverter on the roof
    g.   Improper flashing at intersection of stucco and rooftop deck
    h.   Backer rod and sealant missing around doors
    i.   Improperly flashed light fixtures
    j.   Lack of movement joints
    k.   Missing weep screed
    l.   Missing flashing at dissimilar materials
    m.  Missing flashing around windows.

Compl. ¶69.  The Diagnostics found evidence of the following damage in the Auger Home:

a. Elevated moisture readings
b. Interior moisture penetration/staining
c. Bulging of exterior cladding
d. Cracks in the cladding
e. Surface staining
f. Potential Mold growth

Compl. ¶ 70. Stucco inspection and moisture analysis performed at the Auger Home, revealed that there was significant water intrusion issues. Id. ¶27. Auger alleges that the "Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion, water damage, rot, and mold infestation." Id. ¶28.

Plaintiff alleges the following claims against Streamline: (1) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of Implied Warranty of Workmanlike Construction; (IV) Breach of the Implied Warranty of Habitability; (V) Negligence; (VI) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VII) Negligent Misrepresentation; (VIII) Breach of Contract.

**Butera Complaint**

Plaintiff David Butera owns a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125 ("Butera Home"). Compl. ¶1. Butera filed a complaint against Streamline on September 10, 2019. Per the allegations in the complaint, Plaintiff purchased the Butera Home on June 12, 2015 and took possession on July 23, 2015. Id. ¶57;59. During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Butera to have defendants, including Streamline perform further inspection of the windows. Id. ¶64. He was subsequently assured by Defendants that the windows were fine. Id. ¶65. Butera hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Butera Home on September 15, 2018 because his neighbors were experiencing some issues. Id. ¶69. The report found the following construction defects:

a. Missing/deficient weep screed;
b. Missing head flashing around windows;
c. Stucco thickness of 1/2", less than required 7/8' thickness;
d. Missing movement joints;
e. Improper transition detail;
f. Missing drip edge;
g. Missing mull cap on windows;
h. Missing flashing on rear deck;
i. Improper integration of dissimilar materials; and
j. Kickout diverter not installed.

*See* Compl. ¶70. The report also found preliminary evidence of damage as direct and proximate result of the construction defects including: (a) Elevated moisture readings; (b) Interior staining; (c) gaps at intersection of exterior cladding; (d) Staining on the stucco; and (e) Mold growth. Id. ¶71.

Plaintiff alleges the following claims against Streamline: (1) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of Implied Warranty of Workmanlike Construction; (IV) Breach of the Implied Warranty of Habitability; (V) Negligence; (VI) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VII) Negligent Misrepresentation; (VIII) Breach of Contract.

**Selbovitz Complaint**

Plaintiff Matthew Selbovitz owns a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 ("Selbovitz Home"). Compl. ¶1. Plaintiff filed a complaint against Streamline on September 11, 2019. Per the allegations in the complaint, Plaintiff purchased the Home in May 2015 and took possession on June 4, 2015. Id. ¶13; 59. "On or about January of 2016, Selbovitz experienced an issue with water infiltration through a window of the Home." Id. ¶66. Selbovitz contacted with window manufacturer "who inspected the window and informed Selbovitz that the window was incorrectly installed." Id. ¶67. Because of issues

he was experiencing, Selbovitz hired Lunny Building diagnostics to perform a Moisture Inspection of his home on July 31, 2018.

The diagnostics preliminarily found the following construction defects and damage to property with respect to the Selbovitz Home, including:

    a. Missing/deficient weep screed
    b. Improper sill flashing detail
    c. Stucco thickness of ½" less than the required 7/8" thickness
    d. Improper window flange configuration
    e. Missing movement joints
    f. Improper transition detail
    g. Missing through-wall flashing
    h. Improper integration of dissimilar materials
    i. Missing sealant around penetrations, windows and doors

Compl. ¶70.  The diagnostics found preliminary evidence of damages to the Selbovitz Home including:

    a. Elevated moisture readings
    b. Interior staining and active leaking
    c. Bulged and cracked exterior cladding
    d. Staining on the stucco
    e. Stucco delamination
    f. Mold growth

Id. ¶71.

Plaintiff alleges the following claims against Streamline: (1) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of Implied Warranty of Workmanlike Construction; (IV) Breach of the Implied Warranty of Habitability; (V) Negligence; (VI) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VII) Negligent Misrepresentation; (VIII) Breach of Contract.

### EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

While this letter quotes selected terms and definitions, you should review all terms and definitions in the Policies.

Evanston issued two Commercial General Liability ("CGL") Insurance Policies, designated as policy numbers 3C42330, providing coverage for the policy period November 1, 2017 to November 1, 2018, and MKLV7PBC0002, providing coverage for the policy period November 1, 2018 to November 1, 2019.  The first CGL Policy was issued to first named insured Lion Construction LLC dba Streamline Solutions, LLC. The second CGL Policy was issued to first named insured Lion Construction LLC.  Both of these Policies contain an endorsement listing Streamline as a named insured.

Evanston issued an Excess policy to Lion Construction LLC and Streamline Solutions, LLC, policy number MKLVIEULI00396 for the policy period of November 1, 2016 to November 1, 2017.  Evanston also issued the following Excess policies to Lion Construction, LLC: [2] MKLV1EU101129 for the policy period November 1, 2017 to November 1, 2018; MKLV7EUL100475 for the policy period November 1, 2018 to November 1, 2019; and MKLV7EUL101098 for the policy period November 1, 2019 to November 1, 2020, each providing certain coverage in excess of the underlying policy, on condition that the underlying policy also applies (collectively "Excess Policies").

---

[2] As noted above, we have not received information indicating that Streamline is a named insured under those three Excess Policies.  Those Policies were issued to Lion Construction.  Evanston reserves the right to deny coverage to extent Streamline is not insured under the three Excess Policies issued to Lion Construction.

Case ID: 190901353

Page 6

The two CGL Policies and four Excess Policies are collectively referred to herein as the "Evanston Policies".

The quoted policy language in this letter is from the 2017- 2018 Commercial General Liability Policy ("the 2017-18 CGL Policy). However, please note that the corresponding language of the 2018 to 2019 policy is identical, unless otherwise stated.

The CGL Policies are subject to the following applicable Limits of Liability:

(i)  $2,000,000   General Aggregate Limit (Other than Products/Completed Operations);
(ii) $1,000,000   Each Occurrence Limit;

**RESERVATION OF RIGHTS**

Please note that certain terms, conditions, and exclusions in the Evanston Policies and/or underlying policies to which the Evanston Policies follow form may limit or preclude coverage for the noticed and potential claims, and Evanston reserves all of its rights and defenses under the Policies and available at law and in equity. Evanston incorporates by reference any previous communications related to coverage, as if fully set forth herein.

**I.   THE PROPERTY DAMAGE ALLEGED IN THE COMPLAINT OCCURRED/MANIFESTED AFTER THE CGL POLICIES EXPIRED**

The Commercial General Liability Coverage Form of the CGL Policies contains the following Insuring Agreement:

*SECTION I – COVERAGES*

*COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY*

*1.   Insuring Agreement*

*a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.*

\*\*\*

*b.   This insurance applies to "bodily injury" and "property damage" only if:*
\*\*\*
*(2)   The "bodily injury" or "property damage" occurs during the policy period;…*

The policy defines "Property Damage" as:

*a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or*

Case ID: 190901353

> b. *Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.*

The Policies also define "Your work" as:

> a. *Means:*
>
> > (1) *Work or operations performed by you or on your behalf; and*
> >
> > (2) *Materials, parts or equipment furnished in connection with such work or operations.*
>
> b. *Includes:*
>
> > (1) *Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and*
> >
> > (2) *The providing of or failure to provide warnings or instructions.*

The Policy includes an endorsement titled: Changes-Occurrence Redefined, which defines occurrence as:

> *"Occurrence" means:*
>
> a. *An accident, including continuous or repeated exposure to substantially the same general harmful conditions; or*
>
> b. *"Bodily injury" or "property damage" resulting from faulty workmanship, exclusive of the faulty workmanship itself.*

Among other things, in order for there to be coverage under the CGL Policies, any "property damage" must have occurred during the policy period of one of the Policies.

Pennsylvania law employs a first manifestation trigger for determining whether property damage caused by faulty work occurs during the policy period. Under the first manifestation theory, coverage is triggered when property damage is first reasonably ascertainable. Pursuant to that theory, only the policy in effect when the property damage first manifests may be answerable for the ensuing bodily injury or property damage.

Here, in at least some of the Crease Street Lawsuits the manifestation dates alleged in the complaints appear to predate the Evanston's Policies. Plaintiff Selbovitz first became aware of water infiltration in his Home in **January 2016**. Plaintiff Butera first became aware of stucco related issues with his home as a result of an inspection during the contingency period, while in the process of purchasing the home some time between **June and July 2015**. The Kirks Plaintiffs became aware of stucco related issues with their home in **May 2016** when they hired a company to perform an inspection. Plaintiff Auger became aware of damages in the home after closing on the home and moving in. Auger purchased the home in May 2015 and took possession on **May 29, 2015.**

In a recent Settlement Conference Memorandum submitted by Plaintiffs' attorney, counsel reiterated that the damages for which Plaintiffs seek redress first manifested between 2015-2016. Counsel states, "[s]hortly after moving into their homes, these homeowners experienced water infiltration at the windows and other areas of their respective homes, as well as defective components and systems." The memorandum goes on to state that "[d]uring the one-year warranty period, the homeowners raised these issues to Streamline – the warranty holder."

Accordingly, Evanston reserves all rights to deny indemnity for this matter to the extent the damages at issue manifested after the Evanston's CGL Policies had expired.

The Lawsuits also does not seek damages covered by the Excess Policies. To the extent any damage occurred and manifested during the 2016-2017 Excess Policy period, the Policy was issued to Lion Construction, subject to the terms and condition of the underlying insurance. To date, Evanston has not been provided with any information showing that Streamline would qualify as insureds under the Policy. Moreover, Evanston has not been provided with any information showing that the applicable limits of the underlying insurance to the 2016-2017 Excess Policy have been exhausted. Evanston thus reserves all rights to deny coverage under that Policy to the extent that Streamline is not an insured and/or to the extent that the underlying limits have not been exhausted.

Moreover, the Crease Street Lawsuits allege damages based on alleged construction defects which caused extensive observable damage to the home. Such faulty workmanship itself is not an occurrence. Additionally, the claims for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the Pa. UTPCPL, generally do not seek damages because of an "occurrence." Please refer to the language of the insuring agreement cited above and full copies of the policies for a detailed explanation of these terms. Evanston reserves the right to deny coverage to the extent that claims against Streamline involve property damage that was not caused by an "occurrence" as defined in the Policies and applicable law.

## II.    COVERAGE MAY ALSO BE BARRED AND/OR LIMITED BY OTHER TERMS OF THE POLICIES

Evanston reserves the right to further deny or limit coverage to the extent precluded or limited by any policy provision, definition, exclusion, limitation or condition.

### a.  Contractual Liability Exclusion

The CGL Policies contain the following exclusion:

> *2.    Exclusions*
>
> *This insurance does not apply to:*
>
> <div align="center">* * *</div>
>
> *"Bodily injury" and "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damage*

The Crease Street Lawsuits allege damages for breach of contract and breach of implied and express warranties, specifically pointing to the Agreement of Sale (the "Agreement").

Moreover, the Lawsuits reflect that Plaintiffs entered into an express warranty with Streamline. Plaintiffs allege that they reasonably relied upon the express representations and certifications of Streamline as a material inducement for purchasing the Home. Plaintiffs allege that Streamline breached the express warranties extended to Plaintiffs by failing to build the Homes in compliance with the applicable building codes and in a good and workmanlike manner.

Accordingly, Evanston reserves the right to limit or deny coverage for any damages that Streamline may be obligated to pay by reason of the Agreement, to the extent those damages are excluded from coverage by the above-mentioned exclusion.

### b.  Damage to Property Exclusion

The CGL Policies contain the following exclusion:

> **2.    Exclusions**
>
> *This insurance does not apply to:*
>
> <p align="center">* * *</p>
>
> *j.    Damage to Property*
>
> > *"Property Damage" to:*
> >
> > <p align="center">* * *</p>
> >
> > *(6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.*
> >
> > <p align="center">* * *</p>
> >
> > *Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".*

The Lawsuits seek damages for faulty construction and construction defects. For example, Plaintiffs allege that Streamline's "defective construction directly and proximately caused substantial water infiltration into the Plaintiffs' Property, and resultant water and/or mold damage to the Plaintiffs' Home." *See e.g.* Butera Compl. ¶107; Kirk Compl. ¶108. Evanston reserves the right to limit or deny coverage for any damages precluded by this exclusion.

### c.    Damage to Product Exclusion

The CGL Policies contain the following exclusion:

> **2.    Exclusions:**
>
> <p align="center">* * *</p>
>
> *k.    Damage to Your Product:*
>
> > *"Property damage" to "your product" arising out of it or any part of it.*

The Crease Street Lawsuits seeks damages for faulty construction and construction defects which allegedly derived from Streamline's construction of the Homes.

Evanston reserves the right to limit or deny coverage for damages that Streamline may be obligated to pay for property damage to your product arising out of it or any part of it.

### d.    Damage to Your Work

The CGL Policies contain the following exclusion:

> **2.    Exclusion:**
>
> <p align="center">* * *</p>
>
> *l.    Damage to Your Work*
>
> > *"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"*

Case ID: 190901353

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

The Crease Street Lawsuits seek damages for faulty construction and construction defects arising from Streamline's work at the Home. Among other things, the Lawsuits allege that elements of the constructions were negligently installed or constructed allowing for water intrusion that caused damage.

Evanston reserves the right to limit or deny coverage for damages that Streamline may be obligated to pay for property damage to your work arising out of it or any part of it and otherwise precluded by this exclusion.

### e. Damage to Impaired Property Or Property Not Physically Injured

The CGL Policies contain the following exclusion:

> *2.       Exclusions:*
>
> <div align="center">* * *</div>
>
> *m.       Damage to Impaired Property or Property Not Physically Injured*
>
> *"Property damage" to "impaired property" or property that has not been physically injured arising out of:*
>
> *(1)       A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or*
>
> *(2)       A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms*
>
> *This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.*

The Policies defined "impaired property" as follows:

> *8.       "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:*
>
> *a.       It incorporates "your product" or "your work" that is known or thought to be defective deficient, inadequate or dangerous; or*
>
> *b.       You have failed to fulfill the terms of a contract or agreement;*
>
> *If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.*

The Crease Street Lawsuits seek damages for faulty construction and construction defects which allegedly derived from Streamline's construction of the property. The Lawsuits also allege that Streamline failed to fulfill the terms of the Agreement of Sale. Moreover, the Crease Street Lawsuits allege that "the full extent of damage to the [Homes] cannot be assessed unless more extensive destructive testing, or actual repair and remediation of the Home is performed."

Evanston reserves the right to limit or deny coverage for damages to the extent recovery is barred by the terms of the above exclusion.

**f.  Operations Covered by a Consolidated (Wrap-Up) Insurance Program**

The CGL Policies contain the following endorsement titled Exclusion—operations covered by a consolidated (wrap-up) insurance program stating:

*This insurance does not apply to:*

*Wrap-up Operations*

*"Bodily injury" or "property damage" arising out of your ongoing operations or your operations included within the "products-completed operations hazard" at any location where a consolidated (wrap-up) insurance program had been provided by the prime contractor, project manager or owner of the construction project in which you are involved.*

*This exclusion applies whether or not the consolidated (wrap-up) insurance program:*

*(1)     Provides coverage identical to that provided by the Coverage Form;*

*(2)     Has limits adequate to cover all claims or "suits"; or*

*(3)     Remains in effect.*

*For the purposes of this endorsement, consolidated (wrap-up) insurance program includes an owner- controlled insurance program and any other job or project specific insurance program and any other job or project specific insurance program.*

Evanston reserves the right to limit or deny coverage for damages to the extent recovery is barred by the terms of the above exclusion.

**g.  Organic Pathogens and Legionellae**

The 2017-18 Policy[3] contains the following endorsement titled – Exclusion- Organic Pathogens and Legionellae:

*The following are added to the Exclusions section:*

*This insurance does not apply to:*

*Organic Pathogens*

*(1)     "Bodily injury", "property damage" [], including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth including, but not limited to:*

*(a)     Actual, alleged or threatened inhalation of, ingestion of, contact with exposure to, existence of, presence of,*

---

[3] The 2018-19 CGL Policy includes a comparable exclusion titled: Fungi or Bacteria.

Case ID: 190901353

> *discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from "fungi", bacteria, organic pathogens or bio-organic growth;*
>
> (b) *Systemic chemical poisoning from "fungi", bacteria, organic pathogens or bio-organic growth; and*
>
> (c) *Warnings, instructions, recommendations or advice given, or which should have been given, regarding "fungi", bacteria, organic pathogens or bio-organic growth.*
>
> *Paragraph (a) applies regardless of the source or location of the "fungi" bacteria, organic pathogens or bio-organic growth.*
>
> (2) *Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi", bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.*
>
> *As used in this endorsement, "fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.*

To the extent the Crease Street Lawsuits allege that diagnostics inspections revealed evidence of mold growth, Evanston reserves the right to limit or deny coverage for damages to the extent recovery is barred by the terms of the above exclusion.

## III.   THE POLICIES DO NOT PROVIDE COVERAGE FOR PUNITIVE DAMAGES

The Policies include an Endorsement titled: Exclusion—Punitive or Exemplary Damages[4] stating as follows:

> *This insurance does not apply to:*
> (1) *Punitive, exemplary, multiplied or other non-compensatory damages;*
> (2) *Fines, penalties or sanctions imposed by law; or*
> (3) *Defense costs related to any of the above.*

Evanston reserves its right to deny coverage for punitive, exemplary, multiplied or other non-compensatory damages should they be awarded to Plaintiffs or made part of any settlement.

### GENERAL RESERVATION

For the reasons stated above, Evanston is continuing to investigate and defend this claim subject to a full reservation of rights. At this time, we have not received any information indicating that the manifestation of any damages occurred during any of the CGL Policies' policy periods. In fact, based on the information

---

[4]  The Excess Policies issued by Evanston also include an endorsement titled "Exclusion – Punitive Damages" excluding coverage of punitive damages.

Case ID: 190901353

that we currently have, the damage for which the Crease Street Lawsuits seeks redress appears to have first manifested outside of (*i.e.*, after) each of the Evanston CGL Policies' policy periods. If you disagree, please provide us with any additional relevant documents that you may have to assist our continued investigation of this matter.

Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or estoppel. This letter does not constitute a waiver of any policy provisions or defenses available to Evanston. All rights are expressly reserved. Evanston reserves the right to file a declaratory judgment action to determine the parties' rights and obligations under the Policies with respect to the Crease Street Lawsuits.

Please be advised that our position is based upon the facts and information available to us at this time and is subject to the availability and review of additional information. If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at (800) 243-6869, ext. 128870.

Please note that this letter quotes the Evanston Policies and underlying policies in part. Please refer back to the policies for the complete and precise language of the policies. The language cited herein is not meant to change, supplement, add, or subtract from the policy terms. The language in the policies is controlling.

In the event that you receive an amended pleading, please forward that information to our attention so that we can evaluate the amended allegations under the Policies.

Please reference our File Number C065245 on all future correspondence.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*
Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

cc:

Gilchrist Insurance Group
8 E. 2nd Street
Media, PA 19063

# EXHIBIT 24

Case ID: 190901353



December 14, 2022

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND VIA EMAIL**

Nineteenth Street Development, LLC
Attn: Sean Frankel
209 Leedom Street
2nd Fl
Jenkintown, PA 19046
seanfrankel@comcast.net

## RESERVATION OF RIGHTS

| RE: | Our Insured: | Streamline Solutions, LLC |
|---|---|---|
| | Issuing Company: | Evanston Insurance Company |
| | Plaintiff: | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz |
| | Our File Number: | C065245 |
| | Policy Number(s): | MKLVIEUL100396 (11/1/16-11/1/17) Excess; 3C42330 (11/1/17-11/1/18) General Liability; MKLV7PBC0002 (11/1/18-11/1/19) General Liability; MKLV1EU101129 (11/1/17-11/1/18) Excess; MKLV7EUL100475 (11/1/18-11/1/19) Excess; MKLV7EUL101098 (11/1/19-11/1/20) Excess. |

Ms. Frankel:

Markel Service, Incorporated is a claims service manager for Evanston Insurance Company ("Evanston"). We write to provide a review of coverage available to you under the above-mentioned policies ("Evanston Policies"), specifically in connection with the action captioned:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Augur Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

pending before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Crease Street Lawsuits"[1]). We understand that Nineteenth Street Development, LLC ("Nineteenth Street") is named as a defendant in the Lawsuits. We also understand that the above claims relate to the following properties:

---

[1] The Crease Street Lawsuits were consolidated under case ID 190901353 (Kirk Lawsuit).

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

Page 2

- Augur– 1367 Crease Street, Philadelphia, PA
- Selbovitz– 1369 Crease Street, Philadelphia, PA
- Kirk – 1371 Crease Street, Philadelphia, PA
- Butera -1373 Crease Street, Philadelphia, PA

Please note that this letter incorporates by reference any prior communications and correspondence from Evanston in connection with the Crease Street Lawsuits.

Evanston is currently providing a defense and has assigned counsel to represent Nineteenth Street in connection with the above referenced actions.

This letter is being directed to your attention as the individual authorized to address insurance-related coverage communications on behalf of on Nineteenth Street's behalf. **If you are not so authorized, please immediately provide me with the name and contact information of the appropriate person to whom this and other communications should be directed.**

Based on the documents we have received to date, Evanston has determined that Crease Street Lawsuits do not appear to allege damages covered by the Evanston Policies.

After reviewing the above and additional documents we have received in connection with the Underlying Actions, **Evanston has determined that this claim does not appear to allege damages covered by the Evanston Policies. Among other things, the Policies contain an exclusion barring coverage for any damages for "bodily injury", "property damage" [], including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth and related remediation costs.**

**Additionally, the damages at issue appear to have first manifested before the inception of the Evanston CGL Policies and, to the extent any damage occurred during the 2016-2017 Excess Policy, there is no indication that the underlying insurance to that Policy has been exhausted. As such, while Evanston will continue to provide a defense to Streamline, Evanston reserves the right to deny coverage for any damages that are not covered by the Evanston Policies as well as reserves all rights to seek reimbursement/contribution from your previous CGL carrier. If you have not already done so, please provide notice of this matter and tender your defense to your other CGL carriers for years prior to 2017 and any other insurer providing coverage for that time period.**

**As such, while Evanston will continue to provide a defense to Nineteenth Street in the Crease Street Lawsuits, Evanston reserves the right to deny coverage for any damages that are not covered by the Evanston Policies.**

<u>**FACTUAL BACKGROUND**</u>

Based on the allegations in the Crease Street Lawsuits and other information provided to us, we understand the following. If you believe any of this summary is incomplete or inaccurate, please let us know and provide any additional information or documentation. Below we analyze each complaint filed in connection with the Crease Street Lawsuits.

<u>**Kirk Complaint**</u>

Plaintiffs Daniel and Clarisa Kirk own a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 ("Kirk Home"). Compl. ¶1. Plaintiffs filed a complaint against Nineteenth Street on September 11, 2019. Per the allegations in the complaint, Plaintiffs purchased the Kirk Home in May 2015 from Nineteenth Street and took possession on May 29, 2015. Id. ¶¶9, 13; 59. The complaint alleges that Nineteenth Street and Streamline acted together in purchasing the land, constructing, marketing and selling the Home. Id. ¶11. "After closing on and moving into the [Kirk] Home, Plaintiffs later discovered

<span style="color:red">Case ID: 190901353</span>

leaks and/or evidence of consequential water damage to the exterior envelope of the [Kirk] Home that led to consequential damage to parts of the [Kirk] Home other than the exterior envelopes of the [Kirk] Home, as well as the interior contents of the [Kirk] Home." Id. ¶25. The complaint alleges that "[o]n or about May 19, 2016, prior to the expiration of their One-Year Warranty, the Kirks hired Chilmark Home Inspections to perform an inspection of the Home. Id. ¶66. The Kirks subsequently sent the findings in the report, specifically relating to stucco and requested repairs. In turn, Streamline wrote notes on the report indicating that "cracks in stucco are normal." Id. ¶66-67. Because of the issues that their neighbors were experiencing Kirks hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018 because similarly situated neighbors were experiencing similar issues as those he was experiencing. Id. ¶70.

The diagnostics preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including:

a. Lack of flashing on the brick veneer
b. Missing movement joints
c. Missing window flashing
d. Improper flashing detail at intersection of dissimilar material
e. Missing drainage detail
f. Stucco thickness of 1/2", less than the required 7/8" thickness;
g. Missing drip edge; and
h. Missing kickout diverters.

Compl. ¶71. The diagnostics found preliminary evidence of damages to the Kirks Home including:

a. Elevated moisture readings around windows and doors
b. Areas of soft, no resistance, decayed, and deteriorated sheathing
c. Cracks in the cladding
d. Bulges in the cladding
e. Efflorescence on the cladding

Id. ¶72.

Plaintiffs allege the following claims against Nineteenth Street: (I) Breach of Contract; (II) Breach of Implied Warranty of Workmanlike Construction; (III) Breach of the Implied Warranty of Habitability; (IV) Negligence; (V) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VI) Negligent Misrepresentation.

**Auger Lawsuit**

Plaintiff Nickolas Auger owns a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 ("Auger Home"). Compl. ¶1. Auger filed a complaint against Streamline on September 10, 2019. Per the allegations in the complaint, Plaintiffs purchased the Kirk Home in May 2015 from Nineteenth Street and took possession on May 29, 2015. Id. ¶¶9, 13; 59. The complaint alleges that Nineteenth Street and Streamline acted together in purchasing the land, constructing, marketing and selling the Home. Id. ¶11. "After closing on and moving into the [Auger] Home, Plaintiff later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the [Auger] Home that led to consequential damage to parts of the [Auger] Home other than the exterior envelopes of the [Auger] Home, as well as the interior contents of the [Auger] Home." Id. ¶25. Auger hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018 because similarly situated neighbors were experiencing similar issues as those he was experiencing. Id. ¶68. The Diagnostics found the following construction defects with respect to the Auger Home, including but not limited to:

a. Poor detail/flashing between stucco and brick
b. Stucco thickness of ½", less than the required 7/8" thickness

Page 4

    c.  Incorrect window flange configuration on all windows
    d.  No visible through-wall flashing in brick
    e.  Vents not flashed or sealed
    f.  Missing kickout diverter on the roof
    g.  Improper flashing at intersection of stucco and rooftop deck
    h.  Backer rod and sealant missing around doors
    i.  Improperly flashed light fixtures
    j.  Lack of movement joints
    k.  Missing weep screed
    l.  Missing flashing at dissimilar materials
    m.  Missing flashing around windows.

Compl. ¶69. The Diagnostics found evidence of the following damage in the Auger Home:

    a.  Elevated moisture readings
    b.  Interior moisture penetration/staining
    c.  Bulging of exterior cladding
    d.  Cracks in the cladding
    e.  Surface staining
    f.  Potential Mold growth

Compl. ¶ 70. Stucco inspection and moisture analysis performed at the Auger Home, revealed that there was significant water intrusion issues. Id. ¶27. Auger alleges that the "Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion, water damage, rot, and mold infestation." Id. ¶28.

Plaintiff alleges the following claims against Nineteenth Street: (I) Breach of Contract; (II) Breach of Implied Warranty of Workmanlike Construction; (III) Breach of the Implied Warranty of Habitability; (IV) Negligence; (V) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VI) Negligent Misrepresentation.

**<u>Butera Complaint</u>**

Plaintiff David Butera owns a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125 ("Butera Home"). Compl. ¶1. Butera filed a complaint against Streamline on September 10, 2019. Per the allegations in the complaint, Plaintiff purchased the Butera Home on June 12, 2015 from Nineteenth Street and took possession on July 23, 2015. Id. ¶¶9; 57;59. The complaint alleges that Nineteenth Street and Streamline acted together in purchasing the land, constructing, marketing and selling the Home. Id. ¶11. During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Butera to have defendants, including Streamline perform further inspection of the windows. Id. ¶64. He was subsequently assured by Defendants that the windows were fine. Id. ¶65. Butera hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Butera Home on September 15, 2018 because his neighbors were experiencing some issues. Id. ¶69. The report found the following construction defects:

    a.  Missing/deficient weep screed;
    b.  Missing head flashing around windows;
    c.  Stucco thickness of 1/2", less than required 7/8' thickness;
    d.  Missing movement joints;
    e.  Improper transition detail;
    f.  Missing drip edge;
    g.  Missing mull cap on windows;
    h.  Missing flashing on rear deck;
    i.  Improper integration of dissimilar materials; and

Case ID: 190901353

  j. Kickout diverter not installed.

*See* Compl. ¶70.  The report also found preliminary evidence of damage as direct and proximate result of the construction defects including: (a) Elevated moisture readings; (b) Interior staining; (c) gaps at intersection of exterior cladding; (d) Staining on the stucco; and (e) Mold growth. Id. ¶71.

Plaintiffs allege the following claims against Nineteenth Street: (I) Breach of Contract; (II) Breach of Implied Warranty of Workmanlike Construction; (III) Breach of the Implied Warranty of Habitability; (IV) Negligence; (V) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VI) Negligent Misrepresentation.

## Selbovitz Complaint

Plaintiff Matthew Selbovitz owns a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 ("Selbovitz Home"). Compl. ¶1.  Plaintiff filed a complaint against Streamline on September 11, 2019. Per the allegations in the complaint, Plaintiff purchased the Kirk Home in May 2015 from Nineteenth Street and took possession on June 4, 2015. Id. ¶13; 59. The complaint alleges that Nineteenth Street and Streamline acted together in purchasing the land, constructing, marketing and selling the Home. Id. ¶11.  "On or about January of 2016, Selbovitz experienced an issue with water infiltration through a window of the Home." Id. ¶66.  Selbovitz contacted with window manufacturer "who inspected the window and informed Selbovitz that the window was incorrectly installed." Id. ¶67.  Because of issues he was experiencing, Selbovitz hired Lunny Building diagnostics to perform a Moisture Inspection of his home on July 31, 2018.

The diagnostics preliminarily found the following construction defects and damage to property with respect to the Selbovitz Home, including:

  a. Missing/deficient weep screed
  b. Improper sill flashing detail
  c. Stucco thickness of ½" less than the required 7/8" thickness
  d. Improper window flange configuration
  e. Missing movement joints
  f. Improper transition detail
  g. Missing through-wall flashing
  h. Improper integration of dissimilar materials
  i. Missing sealant around penetrations, windows and doors

Compl. ¶70.  The diagnostics found preliminary evidence of damages to the Selbovitz Home including:

  a. Elevated moisture readings
  b. Interior staining and active leaking
  c. Bulged and cracked exterior cladding
  d. Staining on the stucco
  e. Stucco delamination
  f. Mold growth

Id. ¶71.

Plaintiffs allege the following claims against Nineteenth Street: (I) Breach of Contract; (II) Breach of Implied Warranty of Workmanlike Construction; (III) Breach of the Implied Warranty of Habitability; (IV) Negligence; (V) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (VI) Negligent Misrepresentation.

### EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

While this letter quotes selected terms and definitions, you should review all terms and definitions in the Policies.

Evanston issued two Commercial General Liability ("CGL") Insurance Policies, designated as policy numbers 3C42330, providing coverage for the policy period November 1, 2017 to November 1, 2018, and MKLV7PBC0002, providing coverage for the policy period November 1, 2018 to November 1, 2019. The first CGL Policy was issued to first named insured Lion Construction LLC dba Streamline Solutions, LLC. The second CGL Policy was issued to first named insured Lion Construction LLC. Both of these Policies contain an endorsement listing Streamline as a named insured.

Evanston issued an Excess policy to Lion Construction LLC and Streamline Solutions, LLC, policy number MKLVIEULI00396 for the policy period of November 1, 2016 to November 1, 2017. Evanston also issued the following Excess policies to Lion Construction, LLC: [2] MKLV1EU101129 for the policy period November 1, 2017 to November 1, 2018; MKLV7EUL100475 for the policy period November 1, 2018 to November 1, 2019; and MKLV7EUL101098 for the policy period November 1, 2019 to November 1, 2020, each providing certain coverage in excess of the underlying policy, on condition that the underlying policy also applies (collectively "Excess Policies").

The two CGL Policies and four Excess Policies are collectively referred to herein as the "Evanston Policies".

The quoted policy language in this letter is from the 2017- 2018 Commercial General Liability Policy ("the 2017-18 CGL Policy). However, please note that the corresponding language of the 2018 to 2019 policy is identical, unless otherwise stated.

The CGL Policies are subject to the following applicable Limits of Liability:

    (i)   $2,000,000    General Aggregate Limit (Other than Products/Completed Operations);

    (ii)   $1,000,000    Each Occurrence Limit;

### RESERVATION OF RIGHTS

Please note that certain terms, conditions, and exclusions in the Evanston Policies and/or underlying policies to which the Evanston Policies follow form may limit or preclude coverage for the noticed and potential claims, and Evanston reserves all of its rights and defenses under the Policies and available at law and in equity. Evanston incorporates by reference any previous communications related to coverage, as if fully set forth herein.

## I.    THE PROPERTY DAMAGE ALLEGED IN THE COMPLAINT OCCURRED/MANIFESTED AFTER THE CGL POLICIES EXPIRED

The Commercial General Liability Coverage Form of the CGL Policies contains the following Insuring Agreement:

---

[2] As noted above, we have not received information indicating that Streamline is a named insured under those three Excess Policies. Those Policies were issued to Lion Construction. Evanston reserves the right to deny coverage to extent Streamline is not insured under the three Excess Policies issued to Lion Construction.

*SECTION I – COVERAGES*

*COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY*

1. **Insuring Agreement**

   a. *We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.*

   \*\*\*

   b. *This insurance applies to "bodily injury" and "property damage" only if:*
   \*\*\*
   (2) *The "bodily injury" or "property damage" occurs during the policy period;…*

The policy defines "Property Damage" as:

   a. *Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or*

   b. *Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.*

The Policies also define "Your work" as:

   a. *Means:*

   (1) *Work or operations performed by you or on your behalf; and*

   (2) *Materials, parts or equipment furnished in connection with such work or operations.*

   b. *Includes:*

   (1) *Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and*

   (2) *The providing of or failure to provide warnings or instructions.*

Case ID: 190901353

The Policy includes an endorsement titled: Changes-Occurrence Redefined, which defines occurrence as:

> *"Occurrence" means:*
>
> a.   *An accident, including continuous or repeated exposure to substantially the same general harmful conditions; or*
>
> b.   *"Bodily injury" or "property damage" resulting from faulty workmanship, exclusive of the faulty workmanship itself.*

Among other things, in order for there to be coverage under the CGL Policies, any "property damage" must have occurred during the policy period of one of the Policies.

Pennsylvania law employs a first manifestation trigger for determining whether property damage caused by faulty work occurs during the policy period.  Under the first manifestation theory, coverage is triggered when property damage is first reasonably ascertainable.  Pursuant to that theory, only the policy in effect when the property damage first manifests may be answerable for the ensuing bodily injury or property damage.

Here, in at least some of the Crease Street Lawsuits the manifestation dates alleged in the complaints appear to predate the Evanston's Policies.  Plaintiff Selbovitz first became aware of water infiltration in his Home in **January 2016**.  Plaintiff Butera first became aware of stucco related issues with his home as a result of an inspection during the contingency period, while in the process of purchasing the home some time between **June and July 2015**.  The Kirks Plaintiffs became aware of stucco related issues with their home in **May 2016** when they hired a company to perform an inspection.  Plaintiff Auger became aware of damages in the home after closing on the home and moving in.  Auger purchased the home in May 2015 and took possession on **May 29, 2015.**

In a recent Settlement Conference Memorandum submitted by Plaintiffs' attorney, counsel reiterated that the damages for which Plaintiffs seek redress first manifested between 2015-2016.  Counsel states, "[s]hortly after moving into their homes, these homeowners experienced water infiltration at the windows and other areas of their respective homes, as well as defective components and systems."  The memorandum goes on to state that "[d]uring the one year warranty period, the homeowners raised these issues to Streamline – the warranty holder."

Accordingly, Evanston reserves all rights to deny indemnity for this matter to the extent the damages at issue manifested after the Evanston's CGL Policies had expired.

The Lawsuits also do not seek damages covered by the Excess Policies.  To the extent any damage occurred and manifested during the 2016-2017 Excess Policy period, the Policy was issued to Lion Construction, subject to the terms and condition of the underlying insurance.  To date, Evanston has not been provided with any information showing that Streamline would qualify as insureds under the Policy.  Moreover, Evanston has not been provided with any information showing that the applicable limits of the underlying insurance to the 2016-2017 Excess Policy have been exhausted.

Moreover, the Lawsuit alleges damages based on alleged construction defects which caused extensive observable damage to the home.  Such faulty workmanship itself is not an occurrence.  Additionally, the claims for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the Pa. UTPCPL, generally do not seek damages because of an "occurrence."  Please refer to the language of the insuring agreement cited above and full copies of the policies for a detailed explanation of these terms.  Evanston reserves the right to deny coverage to the extent that claims against Streamline involve property damage that was not caused by an "occurrence" as defined in the Policies and applicable law.

**II.    COVERAGE MAY ALSO BE BARRED AND/OR LIMITED BY OTHER TERMS OF THE POLICIES**

Evanston reserves the right to further deny or limit coverage to the extent precluded or limited by any policy provision, definition, exclusion, limitation or condition.

### a.  Contractual Liability Exclusion

The CGL Policies contain the following exclusion:

> *2.       Exclusions*
>
> *This insurance does not apply to:*
>
> <p style="text-align:center">* * *</p>
>
> *"Bodily injury" and "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damage*

The Crease Street Lawsuits allege damages for breach of contract and breach of implied and express warranties, specifically pointing to Agreement of Sale (the "Agreement") they entered into with Nineteenth Street.

Accordingly, Evanston reserves the right to limit or deny coverage for any damages that Nineteenth Street may be obligated to pay by reason of the Agreement, to the extent those damages are excluded from coverage by the above-mentioned exclusion.

### b.  Damage to Property Exclusion

The CGL Policies contain the following exclusion:

> *2.       Exclusions*
>
> *This insurance does not apply to:*
>
> <p style="text-align:center">* * *</p>
>
> *j.        Damage to Property*
>
> *"Property Damage" to:*
>
> <p style="text-align:center">* * *</p>
>
> *(6)       That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.*
>
> <p style="text-align:center">* * *</p>
>
> *Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".*

Case ID: 190901353

The Lawsuits seek damages for faulty construction and construction defects. For example, Plaintiffs allege that Streamline's "defective construction directly and proximately caused substantial water infiltration into the Plaintiffs' Property, and resultant water and/or mold damage to the Plaintiffs' Home." *See e.g.* Butera Compl. ¶107. The complaints alleges that Nineteenth Street and Streamline acted together for the purpose of purchasing land, developing, and constructing the Homes. Evanston reserves the right to limit or deny coverage for any damages precluded by this exclusion.

### c. Damage to Product Exclusion

The CGL Policies contain the following exclusion:

> *2.      Exclusions:*
>
> <div align="center">* * *</div>
>
> *k.      Damage to Your Product:*
>
> *"Property damage" to "your product" arising out of it or any part of it.*

The Crease Street Lawsuits seeks damages for faulty construction and construction defects which allegedly derived from Streamline and Nineteenth Street construction of the Homes.

Evanston reserves the right to limit or deny coverage for damages that Streamline may be obligated to pay for property damage to your product arising out of it or any part of it.

### d. Damage to Your Work

The CGL Policies contain the following exclusion:

> *2.      Exclusion:*
>
> <div align="center">* * *</div>
>
> *l.      Damage to Your Work*
>
> *"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"*
>
> *This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

The Crease Street Lawsuits seek damages for faulty construction and construction defects arising from Streamline's work at the Home. Among other things, the Lawsuits allege that elements of the constructions were negligently installed or constructed allowing for water intrusion that caused damage.

Evanston reserves the right to limit or deny coverage for damages that Streamline may be obligated to pay for property damage to your work arising out of it or any part of it and otherwise precluded by this exclusion.

### e. Damage to Impaired Property Or Property Not Physically Injured

The CGL Policies contain the following exclusion:

*2.      Exclusions:*

* * *

*m.      Damage to Impaired Property or Property Not Physically Injured*

*"Property damage" to "impaired property" or property that has not been physically injured arising out of:*

*(1)     A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or*

*(2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms*

*This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.*

The Policies defined "impaired property" as follows:

*8.      "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:*

*a.      It incorporates "your product" or "your work" that is known or thought to be defective deficient, inadequate or dangerous; or*

*b.      You have failed to fulfill the terms of a contract or agreement;*

*If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.*

The Crease Street Lawsuits seek damages for faulty construction and construction defects which allegedly derived from Streamline and Nineteenth Street's construction of the property. The Lawsuits also allege that these Defendants failed to fulfill the terms of the Agreement of Sale. Moreover, the Lawsuit alleges that "the full extent of damage to the [Homes] cannot be assessed unless more extensive destructive testing, or actual repair and remediation of the Home is performed."

Evanston reserves the right to limit or deny coverage for damages to the extent recovery is barred by the terms of the above exclusion.

### f.   Operations Covered by a Consolidated (Wrap-Up) Insurance Program

The CGL Policies contain the following endorsement titled Exclusion—operations covered by a consolidated (wrap-up) insurance program stating:

*This insurance does not apply to:*

*Wrap-up Operations*

*"Bodily injury" or "property damage" arising out of your ongoing operations or your operations included within the "products-completed operations hazard" at any location where a consolidated (wrap-up) insurance program had been provided by the prime contractor, project manager or owner of the construction project in which you are involved.*

*This exclusion applies whether or not the consolidated (wrap-up) insurance program:*

*(1)     Provides coverage identical to that provided by the Coverage Form;*

*(2)     Has limits adequate to cover all claims or "suits"; or*

*(3)     Remains in effect.*

*For the purposes of this endorsement, consolidated (wrap-up) insurance program includes an owner- controlled insurance program and any other job or project specific insurance program and any other job or project specific insurance program.*

Evanston reserves the right to limit or deny coverage for damages to the extent recovery is barred by the terms of the above exclusion.

### g.  Organic Pathogens and Legionellae

The 2017-18 Policy[3] contains the following endorsement titled – Exclusion- Organic Pathogens and Legionellae:

*The following are added to the Exclusions section:*

*This insurance does not apply to:*

*Organic Pathogens*

*(1)     "Bodily injury", "property damage" [], including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth including, but not limited to:*

*(a)     Actual, alleged or threatened inhalation of, ingestion of, contact with exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from "fungi", bacteria, organic pathogens or bio-organic growth;*

*(b)     Systemic chemical poisoning from "fungi", bacteria, organic pathogens or bio-organic growth; and*

---

[3] The 2018-19 CGL Policy includes a comparable exclusion titled: Fungi or Bacteria.

Case ID: 190901353

> > (c)   Warnings, instructions, recommendations or advice given, or which should have been given, regarding "fungi", bacteria, organic pathogens or bio-organic growth.
>
> > Paragraph (a) applies regardless of the source or location of the "fungi" bacteria, organic pathogens or bio-organic growth.
>
> (2)   Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi", bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.
>
> > As used in this endorsement, "fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.

To the extent the Crease Street Lawsuits allege that diagnostics inspections revealed evidence of mold growth, Evanston reserves the right to limit or deny coverage for damages to the extent recovery is barred by the terms of the above exclusion.

## III.   THE POLICIES DO NOT PROVIDE COVERAGE FOR PUNITIVE DAMAGES

The Policies include an Endorsement titled: Exclusion—Punitive or Exemplary Damages[4] stating as follows:

> > This insurance does not apply to:
> > (1)   Punitive, exemplary, multiplied or other non-compensatory damages;
> > (2)   Fines, penalties or sanctions imposed by law; or
> > (3)   Defense costs related to any of the above.

Evanston reserves its right to deny coverage for punitive, exemplary, multiplied or other non-compensatory damages should they be awarded to Plaintiffs or made part of any settlement.

### GENERAL RESERVATION

For the reasons stated above, Evanston is continuing to investigate and defend this claim subject to a full reservation of rights. At this time, we have not received any information indicating that the manifestation of any damages occurred during any of the CGL Policies' policy periods. In fact, based on the information that we currently have, the damage for which the Crease Street Lawsuits seeks redress appears to have first manifested outside of (*i.e.*, after) each of the Evanston CGL Policies' policy periods. If you disagree, please provide us with any additional relevant documents that you may have to assist our continued investigation of this matter.

Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or estoppel. This letter does not constitute a waiver of any policy provisions or defenses available to Evanston. All

---

[4]  The Excess Policies issued by Evanston also include an endorsement titled "Exclusion – Punitive Damages" excluding coverage of punitive damages.

rights are expressly reserved. Evanston reserves the right to file a declaratory judgment action to determine the parties' rights and obligations under the Policies with respect to the Crease Street Lawsuits.

Please be advised that our position is based upon the facts and information available to us at this time and is subject to the availability and review of additional information. If any of the factual information relied upon by us in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at (800) 243-6869, ext. 128870.

Please note that this letter quotes the Evanston Policies and underlying policies in part. Please refer back to the policies for the complete and precise language of the policies. The language cited herein is not meant to change, supplement, add, or subtract from the policy terms. The language in the policies is controlling.

In the event that you receive an amended pleading, please forward that information to our attention so that we can evaluate the amended allegations under the Policies.

Please reference our File Number C065245 on all future correspondence.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*
Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

cc:

Gilchrist Insurance Group
8 E. 2nd Street
Media, PA 19063

Case ID: 190901353

# EXHIBIT 25

Case ID: 190901353



August 10, 2023

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND VIA EMAIL**

Streamline Solutions, LLC
Attn: Pamela Schatz
     Michael Stillwell
1100 N. Delaware Ave. REAR
Philadelphia, PA 19125
Pamela.Schatz@streamlinephilly.com
Mike@streamlinephilly.com

<div align="center">

**PARTIAL DENIAL OF COVERAGE AND
<u>SUPPLEMENTAL RESERVATION OF RIGHTS</u>**

</div>

| | | |
|---|---|---|
| RE: | Our Named Insured: | Streamline Solutions, LLC |
| | Issuing Company: | Evanston Insurance Company |
| | Plaintiff(s): | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz |
| | Our File Number: | C065245D1 |
| | Policy Number(s): | MKLVIEUL100396 (11/1/16-11/1/17) Excess; 3C42330 (11/1/17-11/1/18) General Liability; MKLV1EU101129 (11/1/17-11/1/18) Excess; MKLV7PBC0002 (11/1/18-11/1/19) General Liability; MKLV7EUL100475 (11/1/18-11/1/19) Excess; MKLV7EUL101098 (11/1/19-11/1/20) Excess. |

Ms. Schatz and Mr. Stillwell:

As you know, Markel Service, Incorporated is a claim service manager for Evanston Insurance Company ("Evanston"). We write to supplement our prior letters to you of July 14, 2020, and December 14, 2022, regarding coverage under the above-mentioned policies ("Evanston Policies"), in light of the jury's verdict in the actions captioned:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

pending before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Crease Street Lawsuits"[1]). We understand that a jury verdict has been issued against Streamline

---

[1] Consolidated for purposes of trial under the Kirk Lawsuit, but which proceeded in practice under the Auger Docket number.

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

Solutions, LLC ("Streamline") and against Nineteenth Street Development LLC ("Nineteenth Street"), both named as Defendants in the Crease Street Lawsuits (the "Verdict").[2] We also understand that the above lawsuits relate to the following properties:

- Auger– 1367 Crease Street, Philadelphia, PA
- Selbovitz– 1369 Crease Street, Philadelphia, PA
- Kirk – 1371 Crease Street, Philadelphia, PA
- Butera -1373 Crease Street, Philadelphia, PA

Please note that this letter incorporates by reference any prior communications and correspondence from Evanston in connection with the Crease Street Lawsuits, including Evanston's correspondence dated July 14, 2020, and December 14, 2022.  As we previously advised, the Crease Street Lawsuits and subsequently issued verdict, do not appear to allege and award damages covered by the Evanston Policies.  Also as previously addressed, the damages awarded may further be barred from coverage based on language and exclusions in the Evanston Policies.

This letter is being directed to your attention as the individuals authorized to address insurance-related coverage communications on behalf of Streamline.  **If you are not so authorized to address insurance related communications, please let me know immediately and provide me with the name and contact information of the appropriate individual to whom this and other communications should be directed in future.**

Evanston understands that on June 16, 2023, the jury returned the Verdict against Defendants Streamline and Nineteenth Street finding them jointly liable to each underlying Plaintiff and awarding punitive damages for each Plaintiff.[3]  Evanston also understands that the jury found Defendants liable to each Plaintiff for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, negligent misrepresentation, and for punitive damages.  Evanston further understands that the claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") is to be decided by the Judge at a later date after a further hearing.

For the reasons explained below, Evanston denies coverage and indemnity for any damages and costs awarded for repairs of faulty work performed by Streamline as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies.  Likewise, Evanston denies coverage and indemnity for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the UTPCPL.  All of these claims also do not present "property damage" caused by an "occurrence."  Additionally, Plaintiffs were awarded punitive damages in the Verdict and seek multiplied and other non-compensatory damages in the UTPCPL claim.  Evanston denies coverage and indemnity for any and all punitive, exemplary, multiplied, or other non-compensatory damages awarded (or that may be awarded) against Streamline as such damages are not covered under the law and each policy contains a punitive damages exclusion.  There are also various other policy provisions, discussed below, that operate to exclude coverage and indemnity for some or all of the damages awarded in the Verdict.

Moreover, the first manifestation date of the damages for which the Verdict was issued appears to pre-date the Policy Period of the first Evanston Policy – an excess policy in effect from November

---

[2] We also understand that the jury found another Defendant, Harman Deutsch Corp. (alleged to be a design professional) not liable.

[3] The Verdict also awarded punitive damages against Nineteenth Street specifically as to the Butera Action.

Case ID: 190901353

1, 2016 to November 1, 2017.  Evanston has requested a copy of the trial transcripts to assess the evidence presented at trial and confirm when the damages first manifested.

In addition, Evanston reserves the right to further deny or limit indemnity, for the Verdict under each of its policies for the reasons discussed below.

## FACTUAL BACKGROUND

Based on the information provided to us, and as developed though the litigation process, we understand the following.  If you believe any of this summary is incomplete or inaccurate, please let us know and provide any additional information or documentation.

### Auger Lawsuit

Plaintiff Nickolas Auger owns a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 ("Auger Home").  According to the Complaint, Auger purchased the Auger Home in May 2015 and took possession on May 29, 2015.  After closing on and moving into the Auger Home, Auger discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Auger Home.  Auger hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018, because similarly situated neighbors were experiencing similar issues as those he was experiencing.  The Diagnostics found the following construction defects with respect to the Auger Home, including but not limited to:

a.   Poor detail/flashing between stucco and brick
b.   Stucco thickness of ½", less than the required 7/8" thickness
c.   Incorrect window flange configuration on all windows
d.   No visible through-wall flashing in brick
e.   Vents not flashed or sealed
f.   Missing kickout diverter on the roof
g.   Improper flashing at intersection of stucco and rooftop deck
h.   Backer rod and sealant missing around doors
i.   Improperly flashed light fixtures
j.   Lack of movement joints
k.   Missing weep screed
l.   Missing flashing at dissimilar materials
m.  Missing flashing around windows.

The Diagnostics found evidence of the following damage in the Auger Home:

a.   Elevated moisture readings
b.   Interior moisture penetration/staining
c.   Bulging of exterior cladding
d.   Cracks in the cladding
e.   Surface staining
f.   Potential Mold growth

Stucco inspection and moisture analysis performed at the Auger Home, revealed that there was significant water intrusion issues. Auger alleges that the "Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion, water damage, rot, and mold infestation."

After trial, on June 16, 2023, the jury awarded Auger $240,557.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation of which $215,356.69 was awarded as compensable costs.  Of the award, Streamline was held responsible

for $216,501.30.  In addition, punitive damages in the amount of $590,000.00 were awarded against Streamline in favor of Auger.  The UTPCPL claim remains to be determined by the Court at a later date.

## Selbovitz Lawsuit

Plaintiff Matthew Selbovitz owns a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 ("Selbovitz Home").  According to the Complaint, Plaintiff purchased the Home in May 2015 and took possession on June 4, 2015. On or about January of 2016, Selbovitz experienced an issue with water infiltration through a window of the Home.   Selbovitz contacted with window manufacturer who inspected the window and informed Selbovitz that the window was incorrectly installed.  Because of issues he was experiencing, Selbovitz hired Lunny Building diagnostics to perform a Moisture Inspection of his home on July 31, 2018.

The diagnostics preliminarily found the following construction defects and damage to property with respect to the Selbovitz Home, including:

a.  Missing/deficient weep screed
b.  Improper sill flashing detail
c.  Stucco thickness of ½" less than the required 7/8" thickness
d.  Improper window flange configuration
e.  Missing movement joints
f.  Improper transition detail
g.  Missing through-wall flashing
h.  Improper integration of dissimilar materials
i.  Missing sealant around penetrations, windows and doors

The diagnostics found preliminary evidence of damages to the Selbovitz Home including:

a.  Elevated moisture readings
b.  Interior staining and active leaking
c.  Bulged and cracked exterior cladding
d.  Staining on the stucco
e.  Stucco delamination
f.  Mold growth

After trial, on June 16, 2023, the jury awarded Selbovitz $234,109.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation of which $183,708.97 was awarded as compensable costs.  Of the award, Streamline was held responsible for $128,759.95.   In addition, punitive damages in the amount of $550,000.00 were awarded against Streamline in favor of Selbovitz.  The UTPCPL claim remains to be determined by the Court at a later date.

## Kirk Lawsuit

Plaintiffs Daniel and Clarisa Kirk own a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 ("Kirk Home"). According to the Complaint, Plaintiffs purchased the Kirk Home in May 2015 and took possession on May 29, 2015.  After closing on and moving into the Kirk Home, Plaintiffs later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the Kirk Home.  On or about May 19, 2016, prior to the expiration of their One-Year Warranty, the Kirks hired Chilmark Home Inspections to perform an inspection of the Home. The Kirks subsequently sent the findings in the report, specifically relating to stucco and requested repairs. In turn, Streamline wrote notes on the report indicating that "cracks in stucco are normal."   Because of the issues that their neighbors were experiencing Kirks hired Lunny

Page 5

Building Diagnostics to perform a Building Moisture Survey of the Kirk Home on September 15, 2018.

The diagnostics preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including:

   a.  Lack of flashing on the brick veneer
   b.  Missing movement joints
   c.  Missing window flashing
   d.  Improper flashing detail at intersection of dissimilar material
   e.  Missing drainage detail
   f.  Stucco thickness of 1/2", less than the required 7/8" thickness;
   g.  Missing drip edge; and
   h.  Missing kickout diverters.

The diagnostics found preliminary evidence of damages to the Kirks Home including:

   a.  Elevated moisture readings around windows and doors
   b.  Areas of soft, no resistance, decayed, and deteriorated sheathing
   c.  Cracks in the cladding
   d.  Bulges in the cladding
   e.  Efflorescence on the cladding

After trial, on June 16, 2023, the jury awarded the Kirks $305,029.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation of which was awarded as $203,428.69 compensable costs.  Of the award, Streamline was held responsible for $167,765.95.  In addition, punitive damages in the amount of $525,000.00 were awarded against Streamline in favor of the Kirks.  The UTPCPL claim remains to be determined by the Court at a later date.

**<u>Butera Lawsuit</u>**

Plaintiff David Butera owns a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125 ("Butera Home").  According to the Complaint, Butera purchased the Butera Home on June 12, 2015 and took possession on July 23, 2015.  During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Butera to have defendants, including Streamline perform further inspection of the windows.   Butera was subsequently assured by Defendants that the windows were fine. Butera hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Butera Home on September 15, 2018, because his neighbors were experiencing some issues.  The report found the following construction defects:

   a.  Missing/deficient weep screed;
   b.  Missing head flashing around windows;
   c.  Stucco thickness of 1/2", less than required 7/8' thickness;
   d.  Missing movement joints;
   e.  Improper transition detail;
   f.  Missing drip edge;
   g.  Missing mull cap on windows;
   h.  Missing flashing on rear deck;
   i.  Improper integration of dissimilar materials; and
   j.  Kickout diverter not installed.

Case ID: 190901353

The report also found preliminary evidence of damage as direct and proximate result of the construction defects including: (a) Elevated moisture readings; (b) Interior staining; (c) gaps at intersection of exterior cladding; (d) Staining on the stucco; and (e) Mold growth.

After trial, on June 16, 2023, the jury awarded Butera $226,857.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation of which $190,856.69 was awarded as compensable costs. Of the award, Streamline was held responsible for $124,771.35. In addition, punitive damages in the amount of $515,000.00 were awarded in favor of Butera of which $499,550.00 were awarded against Streamline. The UTPCPL claim remains to be determined by the Court at a later date.

## THE VERDICT

In summary, Evanston understands that the jury awarded compensatory damages as follows:

| PLAINTIFF | TOTAL COMPENSATORY DAMAGES | NINETEENTH STREET | STREAMLINE |
|---|---|---|---|
| Auger | $240,557.00 | $24,055.70 | $216,501.30 |
| Selbovitz | $234,109.00 | $105,349.05 | $128,759.95 |
| Kirk | $305,029.00 | $137,263.05 | $167,765.95 |
| Butera | $226,857.00 | $102, 085.65 | $124,771.35 |
| **TOTAL** | **$1,006,552.00** | **$368,753.45** | **$637,798.55** |

Evanston further understands that of the damages awarded to Plaintiffs the following amounts were for compensable costs:

Auger:          $215,356.69
Selbovitz       $183,708.97
Kirk            $203,428.69
Butera          $190,856.69

We further understand that punitive damages were awarded to Plaintiffs as follows:

Auger:          $590,000.00 (all against Streamline)
Selbovitz:      $550,000.00 (all against Streamline)
Kirk:           $525,000.00 (all against Streamline)
Butera          $515,000.00 (all but $15,450.00 against Streamline [$499,550.00]).

Although the jury returned the Verdict, we understand that the Court has yet to enter judgment against Streamline or Nineteenth Street. We further understand that judgment will be entered only upon the disposition of all claims (including the pending UTPCPL claim) and any post-trial motions.

## EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

Please refer to Evanston's letters of July 14, 2020, and December 14, 2022 for a discussion of the Evanston Policies. Please note that certain terms, conditions, and exclusions in the Evanston Policies and/or underlying policies to which the Evanston Excess Policies follow form may limit or preclude coverage for the noticed and potential claims, and Evanston reserves all of its rights and defenses under the Policies and available at law and in equity. Evanston incorporates by reference any previous communications related to coverage, as if fully set forth herein.

Case ID: 190901353

## PARTIAL DENIAL OF COVERAGE AND
## SUPPLEMENTAL RESERVATION OF RIGHTS

As explained in the earlier letters to you, the Evanston Policies each contain an insuring agreement that limits coverage to "property damage" that is caused by an "occurrence" that takes place during the policy period. Evanston reserves the right to deny coverage and indemnity for any damages and costs awarded for repairs of faulty work performed by or on behalf of Streamline as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies. The Evanston Policies provide coverage for damage to property beyond the scope of the insured's work. Evanston continues to reserve its rights to deny coverage to the extent that no plaintiff alleges any "property damage" caused by an "occurrence" during the policy period.

Further, Evanston continues to reserve the right to deny coverage obligations, including indemnity, for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and any amount awarded for violation of the. UTPCPL as such claims also do not seek damages for a covered loss, i.e., "property damage" caused by an "occurrence" as required by the Evanston Policies. For the reasons discussed at length in Evanston's prior letters, all of these claims do not present "property damage" caused by an "occurrence."

Evanston denies coverage and indemnity for all punitive and exemplary damages awarded in the Verdict as such damages are not covered as a matter of law and expressly excluded under each of the Evanston Policies.

The Evanston Policies' insuring agreement also require that the "property damage" take place during the policy period. Thus, even if there was damage to property other than the insured's work, there is only coverage for property damage that takes place during the policy period. Under applicable Pennsylvania law, only the policy in effect when the property damage first manifests may be potentially answerable for any ensuing bodily injury or property damage. It appears from the documents and materials provided to date, that leaks at the Project first manifested prior to the earliest Evanston primary policy effective November 1, 2017 and/or the first Evanston excess policy effective November 1, 2016. As noted above, Evanston requested a copy of the trial transcript in order to confirm the evidence presented at trial and testimony as to the date that any damage first manifested Should this evidence confirm that the Plaintiffs' damages first manifested before Evanston's policy periods, then Evanston would not owe any coverage for the damages assessed in the Verdict.

Even if there is any obligation to indemnify under the Evanston CGL policies, which is not apparent at this time for the reasons stated above, the Evanston Excess Policies are only potentially triggered if the underlying policy below it is fully and properly exhausted by payment of covered damages. None of the underlying primary policies have been exhausted. As such, Evanston continues to have no present obligation to defend or indemnify Streamline under the Evanston excess policies.

As discussed more fully in Evanston's prior letters, Evanston has and continues to reserve the right to further deny or limit indemnity for the Verdict to the extent coverage is further precluded or limited by any of the Evanston Policies' provision, definition, exclusion, limitation or condition,

including any such policy provision, definition, exclusion, limitation or condition cited in Evanston's previous letters and including, but not limited to, those cited below.

Evanston is currently providing a defense under the 2017-2018 CGL Policy. Among other things, the Evanston 2017-2018 CGL Policy[4] contains endorsement number MGL 0008 01 16 titled "Exclusion-Continuous or Progressive Injury or Damage" which states in relevant part:

> *This insurance does not apply to:*
>
> *Continuous Or Progressive Injury Or Damage*
>
> *"Bodily injury", "property damage" or "personal and advertising injury" which:*
>
> *(1)    First occurred, first began to occur, or is alleged to have first occurred;*
>
> *(2)    Is alleges to be in the process of occurring to any degree; or*
>
> *(3)    Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred, prior to the effective date of this policy.*

Pursuant to information available, the damages for which the Verdict was issued first began before November 1, 2017 — the effective date of the first primary CGL policy issued by Evanston to Streamline. Based on the above exclusion, there is no coverage for damages awarded for "property damage" that "first occurred" or "began" prior to the effective date of the Evanston 2017-2018 CGL Policy. As noted above, Evanston reserves the right to deny coverage the extent that it is determined that any damage first occurred prior to the effective date of any Evanston policy.

The Evanston 2017-2018 CGL Policy also contains a Contractual Liability Exclusion stating:

> *b.    Contractual Liability*
>
> *"Bodily injury" and "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. . .*

Streamline was found to have breached its construction contract with each Plaintiff. Streamline was also found to have breached express warranties to each Plaintiff. Streamline was also found to have breached its implied warranty of workmanlike construction to each Plaintiff. Streamline also was found to have breached its implied warranty of habitability to each Plaintiff. Evanston reserves the right to deny coverage of damages awarded for damages that Streamline is obligated to pay by reason of assumption of liability in a contract or agreement, to the extent coverage for those damages are barred by the above-mentioned exclusion.

---

[4] While the analysis herein points to the terms of the 2017-2018 Evanston CGL Policy as Evanston is currently providing a defense under this Policy, please note that the terms of the 2018-2019 Evanston CGL Policy are identical unless otherwise noted. As such our coverage position and related reservation of rights applies to the 2018-2019 as well unless otherwise stated.

The Evanston 2017-2018 CGL Policy also includes a Damage to Property Exclusion, which provides that this insurance does not apply to:

> *j.        Damage to Property*
>
> *"Property Damage" to:*
>
> * * *
>
> *(6)        That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.*
>
> * * *
>
> *Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".*

Plaintiffs were awarded damages for "compensable costs" for the defects in their homes.  Evanston reserves the right to deny coverage of damages to the extent damages were awarded to restore, repair, or replace any part of the properties due to Streamline's incorrectly performed work to the extent coverage for those damages is barred by the above-mentioned exclusion.

The Evanston 2017-2018 CGL Policy also includes a Damage to Product exclusion which provides that this insurance does not apply to:

> *k.        Damage to Your Product:*
>
> *"Property damage" to "your product" arising out of it or any part of it.*

Plaintiffs were awarded damages for "compensable costs" for the defects in their homes.  Evanston reserves the right to deny coverage of damages awarded that are not covered pursuant to the above-mentioned exclusion.

The Evanston 2017-2018 CGL Policy also includes a Damage to Your Work exclusion which provides that this insurance does not apply to:

> *l.        Damage to Your Work*
>
> *"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"*
>
> *This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

Plaintiffs were awarded "compensable costs" for faulty construction and construction defects arising from Streamline's work at the Home.  Evanston reserves the right to deny coverage to the extent the damages awarded are not covered pursuant to the terms of the above-mentioned exclusion.

The Evanston 2017-2018 CGL Policy also includes a Damage to Impaired Property Or Property Not Physically Injured exclusion which provides that this insurance does not apply to:

> *m.* *Damage to Impaired Property or Property Not Physically Injured*
>
> *"Property damage" to "impaired property" or property that has not been physically injured arising out of:*
>
> *(1) A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or*
>
> *(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms*
>
> *This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.*

The Evanston 2017-2018 CGL Policy define "impaired property" to mean:

> *8.* *"Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:*
>
> *a.* *It incorporates "your product" or "your work" that is known or thought to be defective deficient, inadequate or dangerous; or*
>
> *b. You have failed to fulfill the terms of a contract or agreement;*
>
> *If such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.*

Plaintiffs were awarded damages for the defects in their homes as well as loss of enjoyment of their respective homes because of the defects in the work and Streamline's product, including for Streamline's failure to perform its contractual obligations. Evanston reserves the right to deny coverage of amounts awarded to restore, repair, or replace any part of the properties because Streamline's work was incorrectly performed, to the extent those damages are not covered pursuant to the above-mentioned exclusion.

The Evanston 2017-2018 CGL Policy also contains an Endorsement adding an exclusion for Organic Pathogens and Legionellae[5] which provides that this insurance does not apply to:

> *Organic Pathogens*
>
> *(1)* *"Bodily injury", "property damage" [], including consequential injury, loss or damage, in any way involving "fungi", bacteria, organic pathogens or bio-organic growth including, but not limited to:*

---

[5] The 2018-19 CGL Policy includes a comparable exclusion titled: Fungi or Bacteria.

*(a)     Actual, alleged or threatened inhalation of, ingestion of, contact with exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from "fungi", bacteria, organic pathogens or bio-organic growth;*

*(b)     Systemic chemical poisoning from "fungi", bacteria, organic pathogens or bio-organic growth; and*

*(c)     Warnings, instructions, recommendations or advice given, or which should have been given, regarding "fungi", bacteria, organic pathogens or bio-organic growth.*

*Paragraph (a) applies regardless of the source or location of the "fungi" bacteria, organic pathogens or bio-organic growth.*

*(2)     Any loss, cost or expenses arising out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, disinfecting, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi", bacteria, organic pathogens or bio-organic growth by any insured or by any other person or entity.*

*As used in this endorsement, "fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.*

Auger, Selbovitz, the Kirks, and Butera each sought damages that faulty construction led to water infiltration into their homes, including mold growth. Evanston has no obligation to indemnify Streamline for any damages awarded to monitor, abate, clean up, test, remediate, treat or in any way respond to the effects of "fungi", bacteria, organic pathogens or bio-organic growth.

Further, the Verdict specifically makes an award of Punitive Damages against Streamline. The Evanston 2017-2018 CGL Policy (as well as all Evanston Policies) includes provisions excluding punitive damages from coverage. The 2017-2018 CGL Policy includes an Endorsement titled: Exclusion—Punitive or Exemplary Damages[6] stating as follows:

*This insurance does not apply to:*

*(1) Punitive, exemplary, multiplied or other non-compensatory damages;*

*(2) Fines, penalties or sanctions imposed by law; or*

*(3) Defense costs related to any of the above.*

---

[6]  The Excess Policies issued by Evanston also include an endorsement titled "Exclusion – Punitive Damages" excluding coverage of punitive damages.

There is no coverage for the punitive damages awarded against Streamline.

Additionally, Plaintiffs seek in the UTPCPL claim multiplied and other non-compensatory damages. Evanston denies coverage for any and all punitive, exemplary, multiplied, or other non-compensatory damages awarded against Streamline.

As noted above, Evanston reserves the right to deny coverage of damages if damages first manifested outside of the Evanston Policy periods.

Moreover, to the extent any damage occurred and manifested during the 2016-2017 Excess Policy Period, to date, Evanston has not been provided with any information showing that the applicable limits of the Underlying Insurance to the Evanston 2016-2017 Excess Policy have been exhausted. Evanston thus reserves all rights to deny coverage under that Policy to the extent that the underlying limits have not been exhausted. Moreover, the 2016-2017 Excess Policy provides coverage subject "to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance'"– the Underlying Policy. Accordingly, Evanston further reserves the right to deny coverage under the 2016-2017 Policy to the extent coverage is not available to Streamline under the terms of the 2016-2016 Underlying Policy, and/or any other additional endorsements, policy language and provisions included in the Evanston 2016-2017 Excess Policy.

Moreover, to the extent Streamline seeks damages under the Evanston 2017-2018 Excess Policy issued to Lion Construction, LLC, this Policy provides coverage subject "to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance'"– the Evanston CGL Policies. As such, Evanston denies coverage for the reasons stated above.

Additionally, Evanston has and continues to reserve the right to further deny or limit indemnity for the Verdict under the Evanston 2017-2018 Excess Policy to the extent coverage is further precluded or limited by any policy provision, definition, exclusion, limitation or condition, including any such policy provision, definition, exclusion, limitation or condition including, but not limited to, those cited below.

Among other things, the Evanston 2017-2018 Excess Policy contains an endorsement titled "Known Injury or Damage Limitation" stating:

> *This insurance applies to bodily injury and property damage only if, prior to the policy period, no insured and no employee authorized by you to give or receive notice of an occurrence or claim knew that the bodily injury or property damage had occurred, in whole or in part.*
>
> *If such a listed insured or authorized employee knew, prior to the policy, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.*
>
> *\*\*\**
>
> *Bodily injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured or any employee authorized by you to give or receive notice of an occurrence or claim:*
>
> *a.      Reports all, or any part, of the bodily injury or property damage to us or any other insurer;*

Case ID: 190901353

*b.      Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or*

*c.      Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.*

*Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury. . .*

Pursuant to the information available, the damage to the Plaintiffs' homes predates the effective date of the 2017-2018 Excess policy issued by Evanston.  Based on the above exclusion, there is no coverage for damages awarded for "property damage" that "first occurred" or "began" prior to the effective date of the Evanston 2017-2018 CGL Policy.

The Evanston 2017-2018 Excess Policy also contains endorsement titled "Exterior Insulation and Finish System" stating:

*This policy does not apply to:*

*Exterior Insulation And Finish System*

*Any liability included in the "products-completed operations hazard" and arising out of:*

*a.      The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of:*

*(1)      An "exterior insulation and finish system" or any part thereof; or*

*(2)      Any substantially similar system or any part thereof,*

*Including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system.*

*b.      Any work or operations with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system" is used on any part of that structure.*

*B.      The following is added to the Definition section:*

*"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:*

*a.      A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;*

Case ID: 190901353

*b.     The adhesive and or mechanical fasteners used to attach the insulation board to the substrate;*

*c.     A reinforced base coat;*

*d.     A finish coat providing surface texture and color; or*

*e.     Any flashing, caulking or sealant used with the system for any purpose.*

Damages awarded in the Verdict concern faulty construction of the exterior envelope of the homes at issue in the Crease Street Lawsuit which led to water infiltration and moisture. Based on the above exclusion, there is no coverage for those damages.

The Evanston 2017-2018 Excess Policy also contains endorsement titled "Exclusion – Fungi or Bacteria" stating:

*This policy does not apply to:*

*Fungi or Bacteria*

*a. Any liability arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.*

*b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria.*

*\* \* \**

*B. The following is added to the Definitions section:*

*"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.*

As stated above, Auger, Selbovitz, the Kirks, and Butera each sought damages for faulty construction that led to water infiltration into their homes, including mold growth. Evanston has no obligation to indemnify Streamline for any damages awarded to monitor, abate, clean up, test, remediate, treat or in any way respond to the effects of "fungi," bacteria, organic pathogens or bio-organic growth.

The Evanston 2017-2018 Excess Policy also contains endorsement titled "Exclusion- Damage to Property" stating:

*This policy does not apply to:*

*Damage to Property*

*Property damage to:*

*\* \* \**

*e. Premises you sell, give away or abandon, if the property damage arises out of any part of those premises and occurred from hazards that were known by you, or should have reasonably been known by you, at the time the property was transferred or abandoned.*

Evanston denies coverage for damages awarded in the Verdict to the extent Streamline knew or should have reasonably known of hazards that led to the property damages to the homes at issue in the Crease Street Lawsuits.

The Evanston 2017-2018 Excess Policy also contains endorsement titled "Contractor's Services" stating:

*This policy does not apply to:*

*Damage to Property*

*Property damage to:*

*\* \* \**

*b. Property being installed or erected by or for any insured; or*

*c. That particular part of real property on which work is being performed by or for any insured.*

Evanston denies coverage to the extent the above exclusion applies to the damages awarded in the Verdict.

The Evanston 2017-2018 Excess Policy also contains endorsement titled "Exclusion – Punitive Damages" stating:

*This policy does not apply to:*

*Punitive or Exemplary Damages*

*Punitive or exemplary damages. This exclusion applies regardless of any other provision of this policy.*

*If a "suit" is brought, against any insured, seeking both compensatory damages and punitive or exemplary damages, no*

> *coverage will be provided by this policy for any costs, including defense costs, interest, fines or penalties attributable to punitive or exemplary damages.*

Based on the above, Evanston denies any coverage of punitive or exemplary damages awarded by the jury in the Verdict issued in the Crease Street Lawsuits under the Evanston 2017-2018 Excess Policy.

Moreover, to the extent Streamline seeks damages under the Evanston 2018-2019 Excess Policy issued to Lion Construction, LLC, this Policy provides coverage subject "to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance'"– the Evanston CGL Policies. As such, Evanston denies coverage for the same reasons stated above.

Evanston has received no indication or information that the 2019-2020 Excess Policy issued to Lion Construction Management, LLC, has been triggered or provides coverage to Streamline. To the extent Streamline seeks damages under the Evanston 2019-2020 Excess Policy, Evanston reserves all rights to deny coverage under that Policy.

## CONCLUSION

In conclusion, Evanston continues to reserve the right to deny coverage and indemnity for any damages and costs awarded for repairs of faulty work performed by or on behalf of Streamline. Further, Evanston reserves the right to deny coverage and indemnity for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the Pa. UTPCPL. All of these claims do not present "property damage" caused by an "occurrence." Evanston denies coverage and indemnity for all punitive damages awarded in the Verdict. There are also various other policy provisions discussed above which operate to exclude coverage and indemnity for some or all of the damages awarded in the Verdict.

Moreover, the first manifestation date of the damages for which the Verdict was issued appears to pre-date the Policy Period of the first Evanston CGL Policy. Evanston intends to review the trial transcripts to assess the evidence presented at trial as to when the damages first manifested. Should this evidence confirm that damages first manifested before Evanston's policy periods, then Evanston would not owe any coverage for the damages assessed in the Verdict.

Evanston understands that the Court has yet to adjudicate the claim concerning alleged violations of the UTPCPL in the Crease Street Lawsuits. Please be advised that, should damages be awarded for violations of the UTPCPL, damages for violations of the UTPCPL are also not damages for "property damage" caused by an "occurrence." Additionally, Plaintiffs seek in the UTPCPL claim multiplied and other non-compensatory damages. Evanston denies coverage for any and all punitive, exemplary, multiplied, or other non-compensatory damages awarded against Streamline.

In addition, Evanston denies, or reserves the right to further deny or limit indemnity, for the Verdict under each of its excess policies for the reasons discussed above.

As you know, Evanston attempted to intervene in the Crease Street Lawsuits to propound special interrogatories to allow the jury to further segregate uncovered from potentially covered damages. Although that petition was denied, Evanston has appealed that ruling. Further, Evanston reserves the right to file a declaratory judgment action to seek a declaration as to its rights, duties, and obligations under the Evanston Policies and to determine which, if any, part of the judgment ultimately entered by the Court against Streamline is covered under any of the Evanston Policies.

In the meantime, Evanston will continue to provide a defense for Streamline and pursue post-trial relief, if deemed appropriate by defense counsel, of any adverse judgment entered against Streamline in the Crease Street Lawsuits.

Finally, Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or estoppel. This letter does not constitute a waiver of any policy provisions or defenses available to Evanston. All rights are expressly reserved.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*
Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

cc:

Gilchrist Insurance Group
8 E. 2nd Street
Media, PA 19063

30942250v.1

# EXHIBIT 26

Case ID: 190901353



February 15, 2024

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND VIA EMAIL**

Streamline Solutions, LLC
Attn: Michael Stillwell
1100 N. Delaware Ave. REAR
Philadelphia, PA 19125
Mike@streamlinephilly.com

## <u>DENIAL OF COVERAGE WITH CONTINUING DEFENSE AND RESERVATION OF RIGHTS<br>PENDING FINAL VERDICT</u>

| | | |
|---|---|---|
| RE: | Our Named Insured: | Streamline Solutions, LLC |
| | Issuing Company: | Evanston Insurance Company |
| | Plaintiff(s): | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz |
| | Our File Number: | C065245 |
| | Policy Number(s): | MKLVIEUL100396 (11/1/16-11/1/17) Excess; 3C42330 (11/1/17-11/1/18) General Liability; MKLV1EU101129 (11/1/17-11/1/18) Excess; MKLV7PBC0002 (11/1/18-11/1/19) General Liability; MKLV7EUL100475 (11/1/18-11/1/19) Excess; MKLV7EUL101098 (11/1/19-11/1/20) Excess. |

Mr. Stillwell:

As you know, Markel Service, Incorporated is a claim service manager for Evanston Insurance Company ("Evanston"). We write to supplement our prior letters to Streamline Solutions, LLC ("Streamline") of July 14, 2020, December 14, 2022, and August 10, 2023, in connection with the damages and related verdict issued in the following matters:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Crease Street Lawsuits"[1]). We write in light of new information that has come to our attention which affects coverage available to you under above-mentioned policies ("Evanston Policies"). We understand that a jury verdict has been issued against Streamline and against Nineteenth Street

---

[1] Consolidated for purposes of trial under the Kirk Lawsuit, but which proceeded in practice under the Auger Docket number.

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

Page 2

Development LLC ("Nineteenth Street"), both named as Defendants in the Crease Street Lawsuits.[2] We also understand that the above lawsuits relate to the following properties:

- Auger– 1367 Crease Street, Philadelphia, PA
- Selbovitz– 1369 Crease Street, Philadelphia, PA
- Kirk – 1371 Crease Street, Philadelphia, PA
- Butera -1373 Crease Street, Philadelphia, PA

This letter is being directed to your attention as the individuals authorized to address insurance-related coverage communications on behalf of Streamline. **If you are not so authorized to address insurance related communications, please let me know immediately and provide me with the name and contact information of the appropriate individual to whom this and other communications should be directed in future.**

Evanston understands that on June 16, 2023, the jury returned the Verdict against Defendants Streamline and Nineteenth Street finding them jointly liable to each underlying Plaintiff and awarding punitive damages for each Plaintiff.[3] Evanston also understands that the jury found Defendants liable to each Plaintiff for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, negligent misrepresentation, and for punitive damages. Evanston further understands that the claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") has yet to be decided by the Judge and will be determined through a separate hearing.

Further, we understand that an appeal is currently pending before the Superior Court of Pennsylvania in connection with the Lawsuits' trial. Please note that this letter incorporates by reference any prior communications and correspondence from Evanston in connection with the Crease Street Lawsuits.

Evanston is in receipt of the transcript of the trial which took place in connection with the Lawsuits from June 5, 2023 to June 16, 2023.[4] **Upon review of the trial transcript and specifically testimony provided by each of the Plaintiffs in the Lawsuits, Evanston has now confirmed that the first manifestation date for damages sought by Plaintiffs predates Evanston's Policies.** Specifically, damages alleged by the Kirk Plaintiffs first manifested shortly after they moved in the home, on or about July 9, 2015. Damages sought by Plaintiff Selbovitz also manifested shortly after he moved in the home, on or around July 15, 2015. Plaintiff Butera testified that he was made aware of certain defects in the construction of the home prior to closing on the property as a result of an initial inspection – he closed on the property in June 2015. Lastly, Plaintiff Auger testified that he was informed of certain deficiencies in the construction of his home prior to closing. Mr. Auger closed on the home in May 2015.

**Please be advised that based on the new information received, we have determined that no coverage is available, and thus, Evanston has no obligation to indemnify**

---

[2] We also understand that the jury found another Defendant, Harman Deutsch Corp. (alleged to be a design professional) not liable.

[3] The Verdict also awarded punitive damages against Nineteenth Street specifically as to the Butera Action.

[4] Evanston requested copies of the transcripts immediately after the trial concluded, however, due to a delay outside of its control, the transcript was only delivered in full by the court as of December 17, 2023.

**Streamline, for the above-mentioned claims and related damages awarded to date. We recognize, however, that the UTPCPL claims in the Kirk, Auger, Butera, and Selbovitz Lawsuits remain outstanding. Although Evanston believes that any award on those claims will not be covered because, among other reasons, the first manifestation date for damages sought by Plaintiffs predates the Evanston Policies and because such claims do not present "property damage" caused by an "occurrence," Evanston will provide its final coverage position upon receipt of the ruling and any award(s) on those claims. In the interim, Evanston will continue its defense of Streamline in the Crease Street Lawsuits.**

In addition to the above, Evanston continues to deny coverage and indemnity for any damages and costs awarded to each of the Plaintiffs for repairs of faulty work performed by Streamline as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies. Likewise, Evanston denies coverage and indemnity for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the UTPCPL. All of these claims also do not present "property damage" caused by an "occurrence." Additionally, Plaintiffs were awarded punitive damages in the Verdict and seek multiplied and other non-compensatory damages in the UTPCPL claim. Evanston denies coverage and indemnity for any and all punitive, exemplary, multiplied, or other non-compensatory damages awarded (or that may be awarded) against Streamline as such damages are not covered under the law and each policy contains a punitive damages exclusion. There are also various other policy provisions which we discussed in our previous correspondence that operate to exclude coverage and indemnity for some or all of the damages awarded in the Verdict.

## FACTUAL BACKGROUND

In the interest of brevity, the below narration focuses on new evidence and facts most recently received by Evanston through its review of the trial transcripts. The below is not meant to be a full summary of the facts, nor inclusive of all facts evaluated to reach this determination. Please refer to full copies of the documents mentioned as well as to our previous correspondence for additional facts relevant for purposes of our evaluation. If you believe any of the below summary is inaccurate, please let us know and provide any additional information or documentation.

Based on the information provided to us, and as developed through the litigation process, we understand the following:

### Auger Lawsuit

Per the Complaint, Plaintiff Nickolas Auger owns a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 ("Auger Home"). According to the Complaint, Auger purchased the Auger Home in May 2015 and took possession on May 29, 2015. At the initial inspection, on May 11, 2015, certain items were noted as needing to be fixed and were added to a punch list prior to closing. According to Mr. Auger's testimony at trial, on June 13, 2023, these items included: "properly caulk and seal the windows and doors throughout to assure watertight condition" and "seal the opening in the siding materials in the stucco and the walls around the roof deck." *See Trial Transcript*, June 13, 2023, 16:4-16.

The report noted:

> There is staining and evidence of leaking around the rear basement window, at the right side of the basement ceiling and at the 2nd floor front living room windows. Pin pointing the source of leaking can be difficult and typically requires

several repairs prior to eliminating the concerns. Determine the source and make any needed repairs. Once the leaking is determined to be inactive, repairs can be made to the finished materials

Trial Exhibit P-22, Apex Report, pg. 9. The report further states that "several of the windows and doors are not adequately sealed throughout the exterior." *Id.*, Pg. 17.

Mr. Auger understood that these items would be fixed prior to closing. *See Trial Transcript*, June 13, 2023, 16-17. However, Mr. Auger testified that he does not recall anyone from Streamline specifically going to fix any of the items pointed out in the initial inspection report and the punch list. *Id.* 17:1-10.

In 2018, Mr. Selbovitz informed Mr. Auger of issues he was experiencing at his home. This surprised Mr. Auger because he "hadn't experienced any of the same troubles." *Id.* 23:11-24. Mr. Auger obtained an exterior cladding inspection in September 2018 "to make sure that the property that [he] was living in was safe." *Id.* 24:5-23. The report, which was attached as an exhibit to the complaint, found "elevated moisture readings" throughout the house. Lunny Report, pg. 17. It also noted [m]ultiple installation deficiencies exist with the stucco system, windows, door & system penetrations."

Per the Complaint, the report found the following construction defects with respect to the Auger Home, including but not limited to:

a. Poor detail/flashing between stucco and brick
b. Stucco thickness of ½", less than the required 7/8" thickness
c. Incorrect window flange configuration on all windows
d. No visible through-wall flashing in brick
e. Vents not flashed or sealed
f. Missing kickout diverter on the roof
g. Improper flashing at intersection of stucco and rooftop deck
h. Backer rod and sealant missing around doors
i. Improperly flashed light fixtures
j. Lack of movement joints
k. Missing weep screed
l. Missing flashing at dissimilar materials
m. Missing flashing around windows.

And further, the following damage was reported to the Auger Home:

a. Elevated moisture readings
b. Interior moisture penetration/staining
c. Bulging of exterior cladding
d. Cracks in the cladding
e. Surface staining
f. Potential Mold growth

Stucco inspection and moisture analysis performed at the Auger Home, revealed that there were significant water intrusion issues. As stated in the Auger Complaint, the "Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion, water damage, rot, and mold infestation."

After trial, on June 16, 2023, the jury awarded Auger $240,557.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation. Of the award, Streamline was held responsible for $216,501.30. In addition, punitive damages in the amount of $590,000.00 were awarded against Streamline in favor of Auger. The UTPCPL claim remains to be determined by the Court at a later date.

**Selbovitz Lawsuit**

Per the Complaint, Plaintiff Matthew Selbovitz owns a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 ("Selbovitz Home"). According to the Complaint, Plaintiff purchased the Home in May 2015 and took possession on June 4, 2015.

According to the testimony provided by Matthew Selbovitz at trial on June 6, 2023, damages to the Selbovitz Home first manifested in late June 2015. Mr. Selbovitz specifically testified:

> Q.      All right.  How soon after moving in did you start having problems?
> A.      Within around two weeks, three weeks.
> Q.      What happened?
> A.      I started to see leaks forming.  I cannot recall if it was from the roof or the large window in the front living room, but it started in one of those two places.
> Q.      Okay.  Did you end up having leaks in both places?
> A.      Yes.

*See Trial Transcript*, June 6, 2023, pg. 129:12-15. After first noticing a leak, Mr. Selbovitz attested that he communicated with "Harriet" -- who he understood to work for Nineteenth Street -- multiple times, including in July 2015, to make her award of the problem. *Id*. at 129-132. Mr. Selbovitz further testified that at the time he communicated with her, "there were so many leaks coming from the roof and the window. And [he] remembered that in [his] original home inspection we had seen some staining on the windowsill and didn't think much of it, but then when it started to leak like that, [he] realized that it must have been leaking for quite some time already." *Id*. 129:24-130:6. According to Mr. Selbovitz, some repairs were performed, but in early 2016, issues with the windows presented again. *Id*. 140-141. In 2016, Mr. Selbovitz once again hired a home inspector and shared the resulting report and punch list with Streamline. *Id*. at 143:23-144-25. This inspection, as testified by Mr. Selbovitz "was not just for the window. It was for all of the other leaks occurring in the home." *Id*. at 180:1-3.

The inspection report, dated May 12, 2016, found among other things:

> It was reported that the 2nd floor front and center casement windows have previously leaked.  Repairs were reportedly performed at the window, and there are currently no signs of any active leaking.

Trial Exhibit, P-37, pg. 1.

Because of issues he was experiencing, Mr. Selbovitz hired Lunny Building diagnostics to perform a Moisture Inspection of his home on July 31, 2018. *Id*. at 148.

The report found the following construction defects and damage to property with respect to the Selbovitz Home, including:

a. Missing/deficient weep screed
b. Improper sill flashing detail
c. Stucco thickness of ½" less than the required 7/8" thickness
d. Improper window flange configuration
e. Missing movement joints
f. Improper transition detail
g. Missing through-wall flashing
h. Improper integration of dissimilar materials
i. Missing sealant around penetrations, windows and doors

The report found preliminary evidence of damages to the Selbovitz Home including:

a. Elevated moisture readings
b. Interior staining and active leaking
c. Bulged and cracked exterior cladding
d. Staining on the stucco
e. Stucco delamination
f. Mold growth

After trial, on June 16, 2023, the jury awarded Selbovitz $234,109.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation. Of the award, Streamline was held responsible for $128,759.95. In addition, punitive damages in the amount of $550,000.00 were awarded against Streamline in favor of Selbovitz. The UTPCPL claim remains to be determined by the Court at a later date.

**Kirk Lawsuit**

Per the Complaint, Plaintiffs Daniel and Clarisa Kirk own a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 ("Kirk Home"). According to the Complaint, Plaintiffs purchased the Kirk Home in May 2015 and took possession on May 29, 2015. As initially alleged, "[a]fter closing on and moving into the [Kirk] Home, Plaintiffs later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the [Kirk] Home that led to consequential damage to parts of the [Kirk] Home other than the exterior envelope… as well as the interior contents of the [] Home."

According to testimony provided by Clarissa Kirk at trial on June 5, 2023, damages for which Plaintiffs seek redress first manifested in July 2015. Mrs. Kirk stated:

> Q.      How long did you go in the home without any problems?
> A.      I mean, we had – the first time we had a leak was less than two months into the home.
> Q.      All right.
> A.      In July, early July.

*See* Trial Transcript, June 5, 2023, 88:13-18. Per the testimony provided, upon first noticing water intrusion, the Kirks contacted their realtor via email, on July 9, 2015. *See id.*, 91:1-4.

In her testimony Mrs. Kirk described the damages that they first noticed:

> Q.     And tell me what happened right before – what precipitated this email?
> A.     The front left window in out living room.  There was water at the top of the window, I think it's called transom.  Water just started to come in, so of course, you know, that's concerning.   We took a video and pictures and we knew we had warranty. So we sent our photos and video to the realtor and said can you please pass this on so they could come and take a look.

*See Id.,* 89:1-10.

Mrs. Kirk further testified that Streamline went to the Home a number of times to attempt to resolve the issue, but "the water ultimately was still coming in." *Id.* 96:4-7.  She noted some of the work done by Streamline:

> A.     So there was a sealant applied.  That was the repair they made.  And then they also determined that there was a gap, our window wasn't installed correctly.

*Id.* 98:23-99:1.  As also alleged in the Complaint, in 2016, the Kirks had the Home inspected again. *Id*. 103-104.  The Kirks subsequently sent the findings in the report, specifically relating to stucco and requested repairs. *Id.* 104-110.  However, the leaks did not stop after Streamline performed repairs. *Id.* 111:12-21.

Because of the issues that their neighbors were experiencing the Kirks hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018.  As alleged in the Complaint, the diagnostics preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including:

a.  Lack of flashing on the brick veneer
b.  Missing movement joints
c.  Missing window flashing
d.  Improper flashing detail at intersection of dissimilar material
e.  Missing drainage detail
f.  Stucco thickness of 1/2", less than the required 7/8" thickness;
g.  Missing drip edge; and
h.  Missing kickout diverters.

The diagnostics found preliminary evidence of damages to the Kirks Home including:

a.  Elevated moisture readings around windows and doors
b.  Areas of soft, no resistance, decayed, and deteriorated sheathing
c.  Cracks in the cladding
d.  Bulges in the cladding
e.  Efflorescence on the cladding

After trial, on June 16, 2023, the jury awarded the Kirks $305,029.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation.  Of the award, Streamline was held responsible for $167,765.95.  In addition, punitive damages in the amount of $525,000.00 were awarded against Streamline in favor of the Kirks.  The UTPCPL claim remains to be determined by the Court at a later date.

**Butera Lawsuit**

As alleged in the Complaint, Plaintiff David Butera owns a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125 ("Butera Home"). According to the Complaint, Butera purchased the Butera Home on June 12, 2015 and took possession on July 23, 2015. During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Mr. Butera to have defendants, including Streamline perform further inspection of the windows. Mr. Butera was subsequently assured by Defendants that the windows were fine.

In his testimony at trial, Mr. Butera confirmed that issues were raised during the initial inspection of the home which produced a report dated June 19th, 2015, prior to closing. Specifically, the report noted that "[l]ocalized damage of the stucco exterior wall should be repaired." *See* Trial Transcript, June 8, 2023, 90:9-12. The Inspection report, dated June 19, 2015 found leaks in the basement and "water staining" at the window sill in the master bedroom. Trial Exhibit P-48, pg. 3.

On June 21, 2015, Liz Pierce, Butera's wife wrote to their realtor outlining items that would need to be repaired and addressed in order for them to move forward with purchasing the property. This email listed – almost verbatim- the concerns outlined in the first home report:

> Hi Ame,
>
> Sorry for the late response but we wanted to make sure we were making the right decision. We definitely like 1373 Crease and need to have the following items addressed in order to move forward/to compensate for misrepresentation of square footage. Can you please add this to your list and send to the seller?
>
> First and foremost is an extension of the inspection contingency period to allow for stucco inspection and further a/c inspection as described in the inspection report. The buyers reserve the right to walk away in the event of an inconclusive or negative report from the inspectors.
>
> Additionally:
>
> High quality Washer/Dryer
>
> Upgraded pedestal sink that matches décor of bathroom on 1st floor
>
> Stainless Steel Dishwasher as advertised
>
> Move doorbell somewhere not in the center of the living room wall/somewhere less obtrusive
>
> The following fixes from the inspection report:
>
> Localized damage of the stucco exterior walls should be repaired. There is extra risk of hidden damage in such areas caused by previous or present leaks that should be sealed. The installation of the stucco may be improper in locations and should be further investigated by a qualified, licensed stucco inspector/ contractor prior to the end of the inspection contingency period.

The temperature drop measured across the evaporator coil of the air conditioning system is lower than typical. Repairs are needed. A qualified heating and cooling technician should be consulted to further evaluate this condition and the remedies available prior to the end of the inspection contingency period.

The electric eye sensor at the garage door opener should be lowered to within 6 inches of the garage floor to assure safe operation.

Installation of operating CO detectors on all levels and in the bedrooms

A return air vent is situated close to the furnace. This arrangement is a safety concern, as it could in some conditions send furnace exhaust in the living area, causing a carbon monoxide hazard. It should be properly sealed.

It is suspected that there is an insufficient supply of combustion air for the water heater. Improvement is usually straightforward and should be high priority for safety reasons. Installation of additional grilles at the door or wall is requested.

...

Repair the basin trap in the master bathroom

...

Water staining was observed at the window sill in the master bedroom. This should be further investigated and improved as needed prior to closing.

*See* Trial Exhibit, P-52. The email was signed by David Butera.

On June 28, David Butera emailed a list of items to be repaired to his realtor. This list resulted from the stucco inspection/were items that the inspector recommended.

"?X Front elevation has a combination o brick and siding at the "box bay" window. Some brick to stucco transitions have few sections of missing, continuous mortar. Apply sealant to prevent moisture intrusion at these areas.

?X Windows in rear reflected sealant application BELOW the window sills at all 2nd floor locations, but was not evident or remaining window. Builder to consult with window manufacturer/Installer to determine if this method is a requirement or was this an error in applying the sealant at the location. IF it was an error, the seller should fix. If this was a requirement, please provide notice in writing.

?X Several windows noted some missing mortar at seams. Maintain/fix with matching stucco product and/or sealant.

?X Cracks were noted near the roof on the front of the building where 1373 joins the mortar of 1375. Seal/repair these cracks.

?X Cracks were noted on the pilot house between the stucco and door frame. Seal/repair these cracks.

….

*See Id*. In an email from David Butera on July 1, 2015 to Ame Goldman:

"Just signed it. As far as the window repair, we want to get moving on that as soon as we can to prevent further damage. Please relay this to Jim so we can make arrangements ASAP."

*Id*. In an email from the Butera's realtor Ame Goldman, on July 2, 2015 she stated:

He received and presented. Asked if Seller could fix leak. I explained our concerns on that, he is waiting for a response from Seller. He does not believe any of other points will be an issue…

In an email from July 2, 2015, Jim Onesti, Mr. Butera's realtor from Berkshire Hathaway emailed Harriet and Sean Frankel of Nineteenth Street, requesting the "seller to credit buyer for window leak/repair… buyer is assuming you are not fixing but I believe you are fixing it or may have already fixed it." *See* Trial Exhibit, P-70.

In 2018, Mr. Butera noticed leaks in his Home. *Id*. at 101:5-6. In his trial testimony, he described the leaks as follows:

Q.      So when you first noticed the leak, where was it?

A.      It was right at the pilot house, which is the stairwell that goes up to the roof deck.

Q.      Okay. And what was the problem?

A.      There was water staining and at that point dripping as well.

Q.      Okay. And the problems stated to get worse?

A.      They did.

Q.      Tell me about it.

A.      So there was additional water stains in other places of the house.

Q.      Where?

A.      In the kitchen, the windows, at the back of the house. There was staining on just the whole outside of – the inside of the house but surrounding the window frames. There was additional leaking from the pilot house that would come and go with rain

and just kind of unpredictably. There was staining and water dripping from the pilot house. I believe the front window also had some dripping on the sill. But it was mainly those three place I believe.

*See* Trial Transcript, June 8, 2023, 104:13-105:1-15. As testified, issues at the Butera Home worsened with time and leaks appeared in the same locations first noticed in 2015:

> Q. Did your issues remain just water or did it get worse.
> A. It got a lot worse
> Q. Tell me about it.
> A. So there were more water issues and more leaking in the pilot house. And then there was also ultimately leaking by the front master bedroom window, so the front of the house. And then we got the call that there was stuff growing on the ceiling on the third floor.
> Q. A call from your tenant?
> A. Yes.

*Id.* at 108:18-109:6.

Per the Complaint, Butera hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Butera Home on September 15, 2018, because his neighbors were experiencing some issues. The report found the following construction defects:

a. Missing/deficient weep screed;
b. Missing head flashing around windows;
c. Stucco thickness of 1/2", less than required 7/8' thickness;
d. Missing movement joints;
e. Improper transition detail;
f. Missing drip edge;
g. Missing mull cap on windows;
h. Missing flashing on rear deck;
i. Improper integration of dissimilar materials; and
j. Kickout diverter not installed.

The report also found preliminary evidence of damage as direct and proximate result of the construction defects including: (a) Elevated moisture readings; (b) Interior staining; (c) gaps at intersection of exterior cladding; (d) Staining on the stucco; and (e) Mold growth.

After trial, on June 16, 2023, the jury awarded Butera $226,857.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation. Of the award, Streamline was held responsible for $124,771.35. In addition, punitive damages in the amount of $515,000.00 were awarded in favor of Butera of which $499,550.00 were awarded against Streamline. The UTPCPL claim remains to be determined by the Court at a later date.

**EVANSTON INSURANCE COMPANY'S POLICY INFORMATION**

Please refer to Evanston's letters of July 14, 2020, December 14, 2022, August 10, 2023, for a discussion of the Evanston Policies and to copies of the policies for a full copy of the language referred to below. Please note that certain terms, conditions, and exclusions in the Evanston Policies and/or underlying policies to which the Evanston Excess Policies follow form may limit or preclude coverage for the noticed and potential claims, and Evanston reserves all of its rights and

defenses under the Policies and available at law and in equity. Evanston incorporates by reference any previous communications related to coverage, as if fully set forth herein.

## <u>DENIAL OF COVERAGE WITH CONTINUING DEFENSE AND RESERVATION OF RIGHTS PENDING FINAL VERDICT</u>

### I. EVANSTON HAS NO COVERAGE OBLIGATIONS FOR DAMAGES THAT FIRST MANIFESTED BEFORE THE EVANSTON POLICY PERIODS

As explained in our previous correspondence, the Evanston Policies each contain an insuring agreement that limits coverage to "property damage" that is caused by an "occurrence" that takes place during the policy period. Evanston previously reserved the right to deny coverage and indemnity for any damages and costs awarded for damages that took place outside of the applicable policy period.

Among other things, in order for there to be coverage under the CGL Policies, any "property damage" alleged must have occurred during the policy period of one of the Policies. Here, information available reflects that the damages at issue first manifested outside of both CGL Policy periods. Specifically, testimony provided at trial by Plaintiffs indicates that each Plaintiffs first became aware of deficiencies in the construction of the homes and related damages in 2015.

Pennsylvania law employs a first manifestation trigger for determining whether property damage caused by faulty work occurs during the policy period. Under the first manifestation theory, coverage is triggered when property damage is first reasonably ascertainable. Pursuant to that theory, only the policy in effect when damage first occurs is answerable for the ensuing bodily injury or property damage.

Here, Evanston issued CGL Policies for the periods of November 1, 2017-November 1, 2018 and November 1, 2018-November 1, 2019. Evanston issued Excess Policies to certain Streamline entities for the policy period of November 1, 2016 to November 1, 2017, November 1, 2017 to November 1, 2018, November 1, 2018 to November 1, 2019, and November 1, 2019 to November 1, 2020.

According to the trial testimony provided by each of the Plaintiffs in the Lawsuits, damages first manifested in or before July 2015:

- Kirk – on or before July, 2015
- Selbovitz – on or before July, 2015
- Auger – on or before May 2015
- Butera – on or before June 2015

As such, no coverage is available under any of the Evanston Policies for the damages awarded to date. Please review the documents cited herein. **If you disagree with our determination or you have information that contradict this evaluation, please provide us with a copy of the documents as soon as possible so that we may re-evaluate our determination if applicable.**

### II. COVERAGE FOR THE CLAIMS IS FURTHER BARRED IN WHOLE, OR AT LEAST IN PART BASED ON THE LANGUAGE OF THE EVANSTON POLICIES

Page 13

Evanston is currently providing a defense under the 2017-2018 CGL Policy. Among other things, the Evanston 2017-2018 CGL Policy[5] contains endorsement number MGL 0008 01 16 titled "Exclusion-Continuous or Progressive Injury or Damage" which states in relevant part:

> *This insurance does not apply to:*
>
> *Continuous Or Progressive Injury Or Damage*
>
> *"Bodily injury", "property damage" or "personal and advertising injury" which:*
>
> *(1)     First occurred, first began to occur, or is alleged to have first occurred;*
>
> *(2)     Is alleges to be in the process of occurring to any degree; or*
>
> *(3)     Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred, prior to the effective date of this policy.*

Pursuant to information available, the damages for which the Verdict was issued first began before November 1, 2017 — the effective date of the first primary CGL policy issued by Evanston to Streamline. Based on the above exclusion, there is no coverage for damages awarded for "property damage" that "first occurred" or "began" prior to the effective date of the Evanston 2017-2018 CGL Policy. As such, Evanston denies coverage for damages to the extent excluded by the above cited language.

Evanston also denies coverage for damages for repairs of faulty work performed by or on behalf of Streamline as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies. The Evanston Policies provide coverage for damage to property beyond the scope of the insured's work.

Further, Evanston denies coverage for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation. Evanston further reserves the right to deny coverage for any amount awarded for violation of the UTPCPL, which we understand have yet to be determined by the Court. Claims for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation and violation of the UTPCPL do not seek damages for a covered loss, i.e., "property damage" caused by an "occurrence" as required by the Evanston Policies. For the reasons discussed at length in Evanston's prior letters, all of these claims, as alleged in the Lawsuits, do not present "property damage" caused by an "occurrence."

Evanston denies coverage and indemnity for all punitive and exemplary damages awarded in the Verdict as such damages are not covered as a matter of law and expressly excluded under each of the Evanston Policies.

---

[5] While the analysis herein points to the terms of the 2017-2018 Evanston CGL Policy as Evanston is currently providing a defense under this Policy, please note that the terms of the 2018-2019 Evanston CGL Policy are identical unless otherwise noted. As such our coverage position and related reservation of rights applies to the 2018-2019 as well unless otherwise stated.

In addition to denying coverage under the Excess Policies because the damages appear to have been manifested prior to any of the applicable policy periods, Evanston also reserves the right to deny coverage under these policies because to date it has received no indication that the policies have been triggered.

As discussed more fully in Evanston's prior letters, Evanston has and continues to reserve the right to further deny or limit indemnity for the Verdict to the extent coverage is further precluded or limited by any of the Evanston Policies' provision, definition, exclusion, limitation or condition, including any such policy provision, definition, exclusion, limitation or condition cited in Evanston's previous letters.

## CONCLUSION

**In conclusion, based on the new information received, we have determined that no coverage is available, and thus, Evanston has no obligation to indemnify Streamline, for the above-mentioned claims and related damages awarded to date. We recognize, however, that the UTPCPL claims in the Kirk, Auger, Butera, and Selbovitz Lawsuits remain outstanding. Although Evanston believes that any award on those claims will not be covered because, among other reasons, the first manifestation date for damages sought by Plaintiffs predates the Evanston Policies and because such claims do not present "property damage" caused by an "occurrence," Evanston will provide its final coverage position upon receipt of the ruling and any award(s) on those claims. In the interim, Evanston will continue its defense of Streamline in the Crease Street Lawsuits.**

Our position is based on documents currently available to us. We hope that you understand and agree with our coverage determination. **If you do not, please let us know the basis for your disagreement and provide us with any additional information which you believe impacts the coverage position taken herein.**

Evanston also reserves the right to file a declaratory judgment action to determine the rights, duties, and obligations of the parties, including whether Evanston may withdraw from the defense of Streamline in the Lawsuits.

Moreover, if Streamline has not done so yet, it should tender the Lawsuits to its insurer(s) who may have insured Streamline before the above referenced Evanston Policies.

Finally, Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or estoppel. This letter does not constitute a waiver of any policy provisions or defenses available to Evanston. All rights are expressly reserved.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*

Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

cc:     Gilchrist Insurance Group
        8 E. 2nd Street
        Media, PA 19063

Case ID: 190901353

# EXHIBIT 27

Case ID: 190901353



**Edward M. Koch**
1650 Market Street | One Liberty Place, Suite 1800 | Philadelphia, PA 19103-7395
Direct 215.864.6319 | Fax 215.789.7613
koche@whiteandwilliams.com | whiteandwilliams.com

**Laura Rossi**
1650 Market Street | One Liberty Place, Suite 1800 | Philadelphia, PA 19103-7395
Direct 215.864.6366 | Fax 215.789.7588
rossil@whiteandwilliams.com | whiteandwilliams.com

September  21, 2023

**<u>VIA EMAIL ONLY</u>**
Evan A. Blaker, Esquire
COHEN SEGLIAS, PALLAS
GREENHALL & FURMAN, PC
1600 Market Street
32nd Floor
Philadelphia, PA 19103
eblaker@cohenseglias.com

|      |                          |                                                                       |
|------|--------------------------|-----------------------------------------------------------------------|
| RE:  | Issuing Company:         | Evanston Insurance Company                                            |
|      | Plaintiffs:              | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz |
|      | Evanston's File Number:  | C065245                                                               |
|      | Policy Numbers:          | MKLVIEUL100396 (11/1/16-11/1/17) Excess; 3C42330 (11/1/17-11/1/18) General Liability; MKLV1EU101129 (11/1/17-11/1/18) Excess; MKLV7PBC0002 (11/1/18-11/1/19) General Liability; MKLV7EUL100475 (11/1/18-11/1/19) Excess; MKLV7EUL101098 (11/1/19-11/1/20) Excess. |

Dear Mr. Blaker:

This letter serves as a response to your July 5, 2023 correspondence demanding that Evanston Insurance Company ("Evanston") indemnify Nineteenth Street Development, LLC ("Nineteenth Street") in connection with "general compensatory damages and vicarious punitive damages" found by the jury in the verdict issued in connection with four lawsuits:

<span style="color:red">Case ID: 190901353</span>

- *Nicholas Auger v. Nineteenth Street Development, LLC, et al.*
- *Daniel Kirk and Clarisa Kirk v. Nineteenth Street Development, LLC, et al*
- *Matthew Selbovitz v. Streamline Solutions, LLC et al.*
- *David Butera v. Nineteenth Street Development, LLC et al.*

(collectively the "Lawsuits"). As you noted in your correspondence, our firm represents Evanston as coverage counsel in relation to the Lawsuits. Please note that this letter incorporates by reference all of Evanston's prior communications related to this claim and the Lawsuits.

We understand that you have served as coverage counsel for Nineteenth Street since the inception of this matter. We also understand that you tendered the claim to Evanston on behalf of your client in 2020. Subsequent to your initial tender, Evanston immediately appointed counsel to represent Nineteenth Street in the Lawsuits and reimbursed Nineteenth Street for applicable fees incurred prior to its involvement. In appointing counsel, Evanston clarified that, given the faulty construction nature of the claim, only consequential damages resulting from the Lawsuits may be covered by the terms of the policy under which a defense was bring provided. Evanston offered to defend Nineteenth Street under the terms of the 2017-2018 Commercial General Liability Policy issued to Lion Construction, LLC. On December 14, 2022, shortly after a settlement conference was held, Evanston issued a reservation of rights letter to Nineteenth Street in light of new facts and information received in connection with the ongoing proceedings. Notwithstanding that, Evanston continued to provide a defense to Nineteenth Street through the trial proceedings.

As you further know, Evanston attempted to intervene in the Lawsuits to propound special interrogatories to allow the jury to further segregate uncovered from potentially covered damages. Although that petition was denied, Evanston has appealed the ruling.

For the reasons explained below and in prior communications, Evanston is properly relying on its coverage defenses and is not estopped from doing so. Most, if not all, of the damages fall outside of the insuring agreement and/or are subject to an exclusion. In brief summary, Evanston continues to deny coverage and indemnity for any damages and costs awarded for repairs of faulty work as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies. Likewise, Evanston denies coverage and indemnity for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the UTPCPL. All of these claims also do not present "property damage" caused by an "occurrence." Additionally, Plaintiffs were awarded punitive damages in the jury's verdict and seek multiplied and other non-compensatory damages in the UTPCPL claim. Evanston denies coverage and indemnity for any and all punitive, exemplary, multiplied, or other non-compensatory damages awarded (or that may be awarded) against Nineteenth Street as such damages are not covered under the law as well as the terms of the Evanston Policies.

Moreover, the first manifestation date of the damages for which the jury's verdict was issued remains in question. Please be advised that Evanston is awaiting receipt of transcripts from the trial proceedings to further evaluate whether the damages for which Nineteenth Street seeks redress first manifested within any of the Evanston Policy periods, and reserves the right to further deny coverage if the damages did not first manifest within any of Evanston's Policy periods.

In addition, Evanston reserves the right to further deny or limit indemnity for the Verdict under each of its Policies for the reasons discussed previously and below.

## THE VERDICT

We understand that on June 16, 2023, a jury issued a verdict against Nineteenth Street and Streamline Solutions, LLC both named as Defendants in the Lawsuits (the "Verdict"). We also understand that the above lawsuits relate to the following properties:

- Auger– 1367 Crease Street, Philadelphia, PA
- Selbovitz– 1369 Crease Street, Philadelphia, PA
- Kirk – 1371 Crease Street, Philadelphia, PA
- Butera -1373 Crease Street, Philadelphia, PA

The jury returned the Verdict against Nineteenth Street (and Streamline) finding Nineteenth Street liable to each underlying Plaintiff and awarding at least some punitive damages against Nineteenth Street. The jury also found Nineteenth Street liable to the Kirk, Selbowitz, and Butera Plaintiffs for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, negligent misrepresentation. The jury found Nineteenth Street liable to Plaintiff Auger for Negligence. Moreover, the jury assessed punitive damages against Nineteenth Street for Plaintiff Butera. There is currently one pending claim against Defendants for Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") which is in the process of being decided by the Judge at a later date after a further hearing.

Evanston understands that the jury awarded compensatory damages as follows:

| PLAINTIFF | TOTAL COMPENSATORY DAMAGES | NINETEENTH STREET | STREAMLINE |
|---|---|---|---|
| Auger | $240,557.00 | $24,055.70 | $216,501.30 |
| Selbovitz | $234,109.00 | $105,349.05 | $128,759.95 |
| Kirk | $305,029.00 | $137,263.05 | $167,765.95 |
| Butera | $226,857.00 | $102, 085.65 | $124,771.35 |
| TOTAL | $1,006,552.00 | $368,753.45 | $637,798.55 |

Evan A. Blaker, Esquire
September 21, 2023
Page 4

We further understand that punitive damages were awarded for each Plaintiff as follows:

Auger:          $590,000.00 (all against Streamline)
Selbovitz:      $550,000.00 (all against Streamline)
Kirk:           $525,000.00 (all against Streamline)
Butera          $515,000.00 (**3% against Nineteenth Street** , 97% against
                Streamline)

Punitive damages were awarded based on the jury response to Question No. 20:

Although the jury returned the Verdict, judgment has not yet been entered against Streamline or Nineteenth Street. Judgment will be entered only upon the disposition of all claims (including the pending UTPCPL claim) and any post-trial motions.

### EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

Please refer to Evanston's letter dated December 14, 2022 for a more detailed discussion of the Evanston Policies, as well as to copies of the Policies for applicable terms. Please note that certain terms, conditions, and exclusions in the Evanston Policies, and/or underlying policies to which the Evanston Policies follow form, may limit or preclude coverage for the noticed and potential claims, and Evanston reserves all of its rights and defenses under the Policies and available at law and in equity. Evanston incorporates by reference any previous communications related to coverage, as if fully set forth herein.

Evanston continues to deny coverage and indemnity for any damages and costs awarded for repairs of faulty work performed by Nineteenth Street. Further, Evanston continues to deny coverage and indemnity for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and damages that may be awarded for violations of the Pa. UTPCPL. For the reasons discussed at length in Evanston's prior letter and communications, all of these claims do not present

<span style="color:red">Case ID: 190901353</span>

"property damage" caused by an "occurrence." Evanston also continues to deny coverage and indemnity for all punitive and exemplary damages awarded in the Verdict as they are not recoverable pursuant to Pennsylvania law and per the terms of the Evanston Policies. We understand that you believe punitive damages awarded against Nineteenth Street to be vicarious. However, we do not see any indications in support of this conclusion in the Verdict. If, upon review of the Verdict, you find our conclusion to be incorrect, kindly provide us with documents and information in support of your determination at your earliest convenience.

Further, Pennsylvania law employs a first manifestation trigger for determining whether property damage caused by faulty work occurs during the policy period. Under the first manifestation theory, coverage is triggered when property damage is first reasonably ascertainable. Pursuant to that theory, only the policy in effect when the property damage first manifests may be answerable for the ensuing bodily injury or property damage. In the Lawsuits, at least some of the manifestation dates alleged predate the Evanston's Policies: Selbovitz first became aware of water in his home in January 2016. Plaintiff Butera first became aware of stucco related issues with his home as a result of an inspection during the contingency period, while in the process of purchasing the home - between June and July 2015. The Kirks Plaintiffs became aware of stucco related issues with their home in May 2016 when they hired a company to perform an inspection. Plaintiff Auger became aware of damages in the home after purchasing it –in May 2015. Thus, damages for which the jury awarded the Verdict may have manifested outside of the Evanston Policy periods. Evanston intends to review the trial transcripts to assess the evidence presented at trial as to when the damages first manifested for each Plaintiff. Should this evidence confirm that a Plaintiff's damages first manifested before Evanston's policy periods, then Evanston would not owe any coverage for the damages assessed in the Verdict for such Plaintiff.

Moreover, the Evanston 2017-2018 CGL Policy contains endorsement number MGL 0008 01 16 titled "Exclusion-Continuous or Progressive Injury or Damage" which states in relevant part:

> *This insurance does not apply to:*
>
> *Continuous Or Progressive Injury Or Damage*
>
> *"Bodily injury", "property damage" or "personal and advertising injury" which:*
>
> *(1) First occurred, first began to occur, or is alleged to have first occurred;*
>
> *(2) Is alleges to be in the process of occurring to any degree; or*

> *(3)     Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred, prior to the effective date of this policy.*

Pursuant to information available, the damages for which the Verdict was issued first began before the effective date of the first CGL policy issued by Evanston – in 2017-2018.  Based on the above exclusion, there is no coverage for damages awarded for "property damage" that "first occurred" or "began" prior to the effective date of the Evanston 2017-2018 CGL Policy.

As discussed more fully in Evanston's prior letters, Evanston has and continues to reserve the right to further deny or limit indemnity for the Verdict to the extent coverage is further precluded or limited by any of its Policies' provisions, definitions, exclusions, limitations or conditions.

The above discusses the terms of the 2017-2018 CGL Policy because Evanston has provided a defense to Nineteenth Street in connection with the Lawsuit under that Policy specifically.  To date, Evanston has not received any information regarding exhaustion of any primary layer potentially triggering any of the Evanston Excess policies.  Nevertheless, we briefly address each of those policies individually below.  Please refer to copies of the policies for a full statement of applicable language.  Evanston reserves all rights to further deny or limit coverage beyond the basis briefly stated herein for each of its policies.

To the extent any damage occurred and manifested during the 2016-2017 Excess Policy Period, to date, Evanston has not been provided with any information showing that the applicable limits of the Underlying Insurance to the Evanston 2016-2017 Excess Policy have been exhausted. Evanston thus reserves all rights to deny coverage under that Policy to the extent that the underlying limits have not been exhausted. Moreover, the 2016-2017 Excess Policy provides coverage subject "to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance'"– the Underlying Policy. Accordingly, Evanston further reserves the right to deny coverage under the 2016-2017 Policy to the extent coverage is not available under the terms of the 2016-2016 Underlying Policy, and/or any other additional endorsements, policy language and provisions included in the Evanston 2016-2017 Excess Policy.

Moreover, to the extent Streamline seeks damages under the Evanston 2017-2018 Excess Policy issued to Lion Construction, LLC, this Policy provides coverage subject "to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance'"– the Evanston CGL Policies.  As such, Evanston denies coverage for the reasons stated above.

While the analysis herein refers to the terms of the 2017-2018 Evanston CGL Policy, please note that the terms of the 2018-2019 Evanston CGL Policy are identical for purposes of this letter and the above-mentioned continued reservation. As such our coverage position and related reservation of rights applies to the 2018-2019 CGL Policy as well unless otherwise stated.

Further, to the extent Nineteenth Street seeks damages under the Evanston 2018-2019 Excess Policy issued to Lion Construction, LLC, we have received no indication that this Policy provides coverage to your client. Additionally, this Policy also provides coverage subject "to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance"- the Evanston CGL Policies. As such Evanston, reserves the right to further deny coverage for the reasons stated above and in Evanston's prior coverage determination letters.

Evanston has also received no indication or information that the 2019-2020 Excess Policy issued to Lion Construction Management, LLC has been triggered or that it provides any coverages to Nineteenth Street. To the extent Nineteenth Street seeks damages under this Policy, Evanston reserves all rights to deny coverage under the Policy.

## CONCLUSION

Based on the above, Evanston continues to maintain that some or all damages awarded against Nineteenth Street in the Verdict may not be covered by the terms of its Policies. As such, Evanston is unable to grant to your request to indemnify Nineteenth Street at this time, as no indemnity may be owed.

Further, Evanston reserves the right to file a declaratory judgment action to seek a declaration as to its rights, duties, and obligations under the Evanston Policies and to determine which, if any, part of the judgment ultimately entered by the Court against Nineteenth Street is covered under any of the Evanston Policies. Evanston also intends to continue to pursue the appeal of the denial of its Petition to Intervene.

In the meantime, Evanston will continue to provide a defense for Nineteenth Street and, if deemed appropriate by defense counsel, continue to pursue post-trial relief and an appeal of any adverse judgment entered against Nineteenth Street in the Lawsuits. As to your request that Evanston post an appeal bond, please be advised that Evanston will not post an appeal bond to guarantee payment for damages that are not covered under the Evanston Policies. Finally, Evanston remains willing to participate in any settlement discussions or mediation.

Please feel free to reach out to us if you have any additional questions or if you would like to discuss this matter.

Case ID: 190901353

Evan A. Blaker, Esquire
September 21, 2023
Page 8

Sincerely,

**WHITE AND WILLIAMS LLP**

*Edward M. Koch*

Edward Koch
Laura Rossi

Case ID: 190901353

# EXHIBIT 28

Case ID: 190901353



February 15, 2024

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND VIA EMAIL**

Nineteenth Street Development, LLC
Attn: Sean Frankel
888 Redwing Lane
Huntington Valley, PA 19006
seanfrankel@comcast.net

## DENIAL OF COVERAGE WITH CONTINUING DEFENSE AND RESERVATION OF RIGHTS PENDING FINAL VERDICT

|     |     |     |
| --- | --- | --- |
| RE: | Our Named Insured: | Streamline Solutions, LLC |
|     | Issuing Company: | Evanston Insurance Company |
|     | Plaintiff(s): | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz |
|     | Our File Number: | C065245 |
|     | Policy Number(s): | MKLVIEUL100396 (11/1/16-11/1/17) Excess; 3C42330 (11/1/17-11/1/18) General Liability; MKLV1EU101129 (11/1/17-11/1/18) Excess; MKLV7PBC0002 (11/1/18-11/1/19) General Liability; MKLV7EUL100475 (11/1/18-11/1/19) Excess; MKLV7EUL101098 (11/1/19-11/1/20) Excess. |

Mr. Frankel:

As you know, Markel Service, Incorporated is a claim service manager for Evanston Insurance Company ("Evanston").  We write to supplement our prior letters directed to Nineteenth Street Development, LLC ("Nineteenth Street") of December 14, 2022, and September 21, 2023, in connection with the damages and related verdict issued in the following matters:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Crease Street Lawsuits"[1]).  We write in light of new information that has come to our attention which affects coverage available to you under above-mentioned policies ("Evanston Policies").  We understand that a jury verdict has been issued against Streamline Solutions, LLC ("Streamline")

---

[1] Consolidated for purposes of trial under the Kirk Lawsuit, but which proceeded in practice under the Auger Docket number.

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #OD95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

and against Nineteenth Street, both named as Defendants in the Crease Street Lawsuits.[2] We also understand that the above lawsuits relate to the following properties:

- Auger– 1367 Crease Street, Philadelphia, PA
- Selbovitz– 1369 Crease Street, Philadelphia, PA
- Kirk – 1371 Crease Street, Philadelphia, PA
- Butera -1373 Crease Street, Philadelphia, PA

This letter is being directed to your attention as the individuals authorized to address insurance-related coverage communications on behalf of Nineteenth Street. **If you are not so authorized to address insurance related communications, please let me know immediately and provide me with the name and contact information of the appropriate individual to whom this and other communications should be directed in future.**

Evanston understands that on June 16, 2023, the jury returned the Verdict against Defendants Streamline and Nineteenth Street finding them jointly liable to each underlying Plaintiff and awarding punitive damages for each Plaintiff.[3] Evanston also understands that the jury found Defendants liable to each Plaintiff for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, negligent misrepresentation, and for punitive damages. Evanston further understands that the claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") has yet to be decided by the Judge and will be determined through a separate hearing.

Further, we understand that an appeal is currently pending before the Superior Court of Pennsylvania in connection with the Lawsuits' trial. Please note that this letter incorporates by reference any prior communications and correspondence from Evanston in connection with the Crease Street Lawsuits.

Evanston is in receipt of the transcript of the trial which took place in connection with the Lawsuits from June 5, 2023 to June 16, 2023.[4] **Upon review of the trial transcript and specifically testimony provided by each of the Plaintiffs in the Lawsuits, Evanston has now confirmed that the first manifestation date for damages sought by Plaintiffs predates Evanston's Policies.** Specifically, damages alleged by the Kirk Plaintiffs first manifested shortly after they moved in the home, on or about July 9, 2015. Damages sought by Plaintiff Selbovitz also manifested shortly after he moved in the home, on or around July 15, 2015. Plaintiff Butera testified that he was made aware of certain defects in the construction of the home prior to closing on the property as a result of an initial inspection – he closed on the property in June 2015. Lastly, Plaintiff Auger testified that he was informed of certain deficiencies in the construction of his home prior to closing. Mr. Auger closed on the home in May 2015.

**Please be advised that based on the new information received, we have determined that no coverage is available, and thus, Evanston has no obligation to indemnify**

---

[2] We also understand that the jury found another Defendant, Harman Deutsch Corp. (alleged to be a design professional) not liable.

[3] The Verdict awarded punitive damages against Nineteenth Street specifically as to the Butera Action.

[4] Evanston requested copies of the transcripts immediately after the trial concluded, however, due to a delay outside of its control, the transcript was only delivered in full by the court as of December 17, 2023.

**Nineteenth Street, for the above-mentioned claims and related damages awarded to date. We recognize, however, that the UTPCPL claims in the Kirk, Auger, Butera, and Selbovitz Lawsuits remain outstanding. Although Evanston believes that any award on those claims will not be covered because, among other reasons, the first manifestation date for damages sought by Plaintiffs predates the Evanston Policies and because such claims do not present "property damage" caused by an "occurrence," Evanston will provide its final coverage position upon receipt of the ruling and any award(s) on those claims. In the interim, Evanston will continue its defense of Nineteenth Street in the Crease Street Lawsuits.**

In addition to the above, Evanston continues to deny coverage and indemnity for any damages and costs awarded to each of the Plaintiffs for repairs of faulty construction by Nineteenth Street as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies. Likewise, Evanston denies coverage and indemnity for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation, and violation of the UTPCPL. All of these claims also do not present "property damage" caused by an "occurrence." Additionally, Plaintiffs were awarded punitive damages in the Verdict and seek multiplied and other non-compensatory damages in the UTPCPL claim. Evanston denies coverage and indemnity for any and all punitive, exemplary, multiplied, or other non-compensatory damages awarded (or that may be awarded) against Nineteenth Street as such damages are not covered under the law and each policy contains a punitive damages exclusion. There are also various other policy provisions which we discussed in our previous correspondence that operate to exclude coverage and indemnity for some or all of the damages awarded in the Verdict.

## FACTUAL BACKGROUND

In the interest of brevity, the below narration focuses on new evidence and facts most recently received by Evanston through its review of the trial transcripts. The below is not meant to be a full summary of the facts, nor inclusive of all facts evaluated to reach this determination. Please refer to full copies of the documents mentioned as well as to our previous correspondence for additional facts relevant for purposes of our evaluation. If you believe any of the below summary is inaccurate, please let us know and provide any additional information or documentation.

Based on the information provided to us, and as developed through the litigation process, we understand the following:

**Auger Lawsuit**

Per the Complaint, Plaintiff Nickolas Auger owns a home located at 1367 Crease Street, Philadelphia, Pennsylvania 19125 ("Auger Home"). According to the Complaint, Auger purchased the Auger Home in May 2015 and took possession on May 29, 2015. At the initial inspection, on May 11, 2015, certain items were noted as needing to be fixed and were added to a punch list prior to closing. According to Mr. Auger's testimony at trial, on June 13, 2023, these items included: "properly caulk and seal the windows and doors throughout to assure watertight condition" and "seal the opening in the siding materials in the stucco and the walls around the roof deck." *See Trial Transcript*, June 13, 2023, 16:4-16.

The report noted:

> There is staining and evidence of leaking around the rear basement window, at the right side of the basement ceiling and at the 2nd floor front living room windows. Pin pointing the source of leaking can be difficult and typically requires

several repairs prior to eliminating the concerns.  Determine the source and make any needed repairs.  Once the leaking is determined to be inactive, repairs can be made to the finished materials

Trial Exhibit P-22, Apex Report, pg. 9.  The report further states that "several of the windows and doors are not adequately sealed throughout the exterior." *Id.*, Pg. 17.

Mr. Auger understood that these items would be fixed prior to closing. *See Trial Transcript*, June 13, 2023, 16-17. However, Mr. Auger testified that he does not recall anyone from Streamline specifically going to fix any of the items pointed out in the initial inspection report and the punch list. *Id.* 17:1-10.

In 2018, Mr. Selbovitz informed Mr. Auger of issues he was experiencing at his home.  This surprised Mr. Auger because he "hadn't experienced any of the same troubles." *Id.* 23:11-24.  Mr. Auger obtained an exterior cladding inspection in September 2018 "to make sure that the property that [he] was living in was safe." *Id.* 24:5-23. The report, which was attached as an exhibit to the complaint, found "elevated moisture readings" throughout the house.  Lunny Report, pg. 17.  It also noted [m]ultiple installation deficiencies exist with the stucco system, windows, door & system penetrations."

Per the Complaint, the report found the following construction defects with respect to the Auger Home, including but not limited to:

a. Poor detail/flashing between stucco and brick
b. Stucco thickness of ½", less than the required 7/8" thickness
c. Incorrect window flange configuration on all windows
d. No visible through-wall flashing in brick
e. Vents not flashed or sealed
f. Missing kickout diverter on the roof
g. Improper flashing at intersection of stucco and rooftop deck
h. Backer rod and sealant missing around doors
i. Improperly flashed light fixtures
j. Lack of movement joints
k. Missing weep screed
l. Missing flashing at dissimilar materials
m. Missing flashing around windows.

And further, the following damage was reported to the Auger Home:

a. Elevated moisture readings
b. Interior moisture penetration/staining
c. Bulging of exterior cladding
d. Cracks in the cladding
e. Surface staining
f. Potential Mold growth

Stucco inspection and moisture analysis performed at the Auger Home, revealed that there were significant water intrusion issues.  As stated in the Auger Complaint, the "Auger Home lacks certain construction details necessary and required according to industry standards and/or applicable building codes and regulations, thereby causing water intrusion, water damage, rot, and mold infestation."

After trial, on June 16, 2023, the jury awarded Auger $240,557.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation. Of the award, Nineteenth Street was held responsible for $24,055.70. In addition, punitive damages in the amount of $590,000.00 were awarded against Streamline only in favor of Auger. The UTPCPL claim remains to be determined by the Court at a later date.

**Selbovitz Lawsuit**

Per the Complaint, Plaintiff Matthew Selbovitz owns a home located at 1369 Crease Street, Philadelphia, Pennsylvania 19125 ("Selbovitz Home"). According to the Complaint, Plaintiff purchased the Home in May 2015 and took possession on June 4, 2015.

According to the testimony provided by Matthew Selbovitz at trial on June 6, 2023, damages to the Selbovitz Home first manifested in late June 2015. Mr. Selbovitz specifically testified:

> Q. *All right. How soon after moving in did you start having problems?*
> A. *Within around two weeks, three weeks.*
> Q. *What happened?*
> A. *I started to see leaks forming. I cannot recall if it was from the roof or the large window in the front living room, but it started in one of those two places.*
> Q. *Okay. Did you end up having leaks in both places?*
> A. *Yes.*

*See Trial Transcript*, June 6, 2023, pg. 129:12-15. After first noticing a leak, Mr. Selbovitz attested that he communicated with "Harriet" -- who he understood to work for Nineteenth Street -- multiple times, including in July 2015, to make her award of the problem. *Id*. at 129-132. Mr. Selbovitz further testified that at the time he communicated with her, "there were so many leaks coming from the roof and the window. And [he] remembered that in [his] original home inspection we had seen some staining on the windowsill and didn't think much of it, but then when it started to leak like that, [he] realized that it must have been leaking for quite some time already." *Id*. 129:24-130:6. According to Mr. Selbovitz, some repairs were performed, but in early 2016, issues with the windows presented again. *Id*. 140-141. In 2016, Mr. Selbovitz once again hired a home inspector and shared the resulting report and punch list with Streamline. *Id*. at 143:23-144-25. This inspection, as testified by Mr. Selbovitz "was not just for the window. It was for all of the other leaks occurring in the home." *Id*. at 180:1-3.

The inspection report, dated May 12, 2016, found among other things:

> It was reported that the 2nd floor front and center casement windows have previously leaked. Repairs were reportedly performed at the window, and there are currently no signs of any active leaking.

Trial Exhibit, P-37, pg. 1.

Because of issues he was experiencing, Mr. Selbovitz hired Lunny Building diagnostics to perform a Moisture Inspection of his home on July 31, 2018. *Id*. at 148.

The report found the following construction defects and damage to property with respect to the Selbovitz Home, including:

a. Missing/deficient weep screed
b. Improper sill flashing detail
c. Stucco thickness of ½" less than the required 7/8" thickness
d. Improper window flange configuration
e. Missing movement joints
f. Improper transition detail
g. Missing through-wall flashing
h. Improper integration of dissimilar materials
i. Missing sealant around penetrations, windows and doors

The report found preliminary evidence of damages to the Selbovitz Home including:

a. Elevated moisture readings
b. Interior staining and active leaking
c. Bulged and cracked exterior cladding
d. Staining on the stucco
e. Stucco delamination
f. Mold growth

After trial, on June 16, 2023, the jury awarded Selbovitz $234,109.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation. Of the award, Nineteenth Street was held responsible for $105,349.05. In addition, punitive damages in the amount of $550,000.00 were awarded against Streamline only in favor of Selbovitz. The UTPCPL claim remains to be determined by the Court at a later date.

## Kirk Lawsuit

Per the Complaint, Plaintiffs Daniel and Clarisa Kirk own a home located at 1371 Crease Street, Philadelphia, Pennsylvania 19125 ("Kirk Home"). According to the Complaint, Plaintiffs purchased the Kirk Home in May 2015 and took possession on May 29, 2015. As initially alleged, "[a]fter closing on and moving into the [Kirk] Home, Plaintiffs later discovered leaks and/or evidence of consequential water damage to the exterior envelope of the [Kirk] Home that led to consequential damage to parts of the [Kirk] Home other than the exterior envelope… as well as the interior contents of the [] Home."

According to testimony provided by Clarissa Kirk at trial on June 5, 2023, damages for which Plaintiffs seek redress first manifested in July 2015. Mrs. Kirk stated:

> Q. How long did you go in the home without any problems?
> A. I mean, we had – the first time we had a leak was less than two months into the home.
> Q. All right.
> A. In July, early July.

See Trial Transcript, June 5, 2023, 88:13-18. Per the testimony provided, upon first noticing water intrusion, the Kirks contacted their realtor via email, on July 9, 2015. See id., 91:1-4.

In her testimony Mrs. Kirk described the damages that they first noticed:

Page 7

> Q.    And tell me what happened right before – what precipitated this email?
>
> A.    The front left window in out living room.  There was water at the top of the window, I think it's called transom.  Water just started to come in, so of course, you know, that's concerning.  We took a video and pictures and we knew we had warranty. So we sent our photos and video to the realtor and said can you please pass this on so they could come and take a look.

*See Id.,* 89:1-10.

Mrs. Kirk further testified that Streamline went to the Home a number of times to attempt to resolve the issue, but "the water ultimately was still coming in." *Id.* 96:4-7.  She noted some of the work done by Streamline:

> A.    So there was a sealant applied.  That was the repair they made.  And then they also determined that there was a gap, our window wasn't installed correctly.

*Id.* 98:23-99:1.  As also alleged in the Complaint, in 2016, the Kirks had the Home inspected again. *Id.* 103-104.  The Kirks subsequently sent the findings in the report, specifically relating to stucco and requested repairs. *Id.* 104-110.  However, the leaks did not stop after Streamline performed repairs. *Id.* 111:12-21.

Because of the issues that their neighbors were experiencing the Kirks hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Auger Home on September 15, 2018.  As alleged in the Complaint, the diagnostics preliminarily found the following construction defects and damage to property with respect to the Kirks' Home, including:

a.  Lack of flashing on the brick veneer
b.  Missing movement joints
c.  Missing window flashing
d.  Improper flashing detail at intersection of dissimilar material
e.  Missing drainage detail
f.  Stucco thickness of 1/2", less than the required 7/8" thickness;
g.  Missing drip edge; and
h.  Missing kickout diverters.

The diagnostics found preliminary evidence of damages to the Kirks Home including:

a.  Elevated moisture readings around windows and doors
b.  Areas of soft, no resistance, decayed, and deteriorated sheathing
c.  Cracks in the cladding
d.  Bulges in the cladding
e.  Efflorescence on the cladding

After trial, on June 16, 2023, the jury awarded the Kirks $305,029.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation.  Of the award, Nineteenth Street was held responsible for $137,263.05.  In addition, punitive damages in the amount of $525,000.00 were awarded against Streamline only in favor of the Kirks.  The UTPCPL claim remains to be determined by the Court at a later date.

**Butera Lawsuit**

As alleged in the Complaint, Plaintiff David Butera owns a home located at 1373 Crease Street, Philadelphia, Pennsylvania 19125 ("Butera Home"). According to the Complaint, Butera purchased the Butera Home on June 12, 2015 and took possession on July 23, 2015. During the inspection contingency period, Butera performed a non-invasive stucco inspection, at which time the inspector directed Mr. Butera to have defendants, including Streamline perform further inspection of the windows. Mr. Butera was subsequently assured by Defendants that the windows were fine.

In his testimony at trial, Mr. Butera confirmed that issues were raised during the initial inspection of the home which produced a report dated June 19th, 2015, prior to closing. Specifically, the report noted that "[l]ocalized damage of the stucco exterior wall should be repaired." *See* Trial Transcript, June 8, 2023, 90:9-12. The Inspection report, dated June 19, 2015 found leaks in the basement and "water staining" at the window sill in the master bedroom. Trial Exhibit P-48, pg. 3.

On June 21, 2015, Liz Pierce, Butera's wife wrote to their realtor outlining items that would need to be repaired and addressed in order for them to move forward with purchasing the property. This email listed – almost verbatim- the concerns outlined in the first home report:

> Hi Ame,
>
> Sorry for the late response but we wanted to make sure we were making the right decision. We definitely like 1373 Crease and need to have the following items addressed in order to move forward/to compensate for misrepresentation of square footage. Can you please add this to your list and send to the seller?
>
> First and foremost is an extension of the inspection contingency period to allow for stucco inspection and further a/c inspection as described in the inspection report. The buyers reserve the right to walk away in the event of an inconclusive or negative report from the inspectors.
>
> Additionally:
>
> High quality Washer/Dryer
>
> Upgraded pedestal sink that matches décor of bathroom on 1st floor
>
> Stainless Steel Dishwasher as advertised
>
> Move doorbell somewhere not in the center of the living room wall/somewhere less obtrusive
>
> The following fixes from the inspection report:
>
> Localized damage of the stucco exterior walls should be repaired. There is extra risk of hidden damage in such areas caused by previous or present leaks that should be sealed. The installation of the stucco may be improper in locations and should be further investigated by a qualified, licensed stucco inspector/ contractor prior to the end of the inspection contingency period.

The temperature drop measured across the evaporator coil of the air conditioning system is lower than typical. Repairs are needed. A qualified heating and cooling technician should be consulted to further evaluate this condition and the remedies available prior to the end of the inspection contingency period.

The electric eye sensor at the garage door opener should be lowered to within 6 inches of the garage floor to assure safe operation.

Installation of operating CO detectors on all levels and in the bedrooms

A return air vent is situated close to the furnace. This arrangement is a safety concern, as it could in some conditions send furnace exhaust in the living area, causing a carbon monoxide hazard. It should be properly sealed.

It is suspected that there is an insufficient supply of combustion air for the water heater. Improvement is usually straightforward and should be high priority for safety reasons. Installation of additional grilles at the door or wall is requested.

...

Repair the basin trap in the master bathroom

...

Water staining was observed at the window sill in the master bedroom. This should be further investigated and improved as needed prior to closing.

*See* Trial Exhibit, P-52. The email was signed by David Butera.

On June 28, David Butera emailed a list of items to be repaired to his realtor. This list resulted from the stucco inspection/were items that the inspector recommended.

"?X Front elevation has a combination o brick and siding at the "box bay" window. Some brick to stucco transitions have few sections of missing, continuous mortar. Apply sealant to prevent moisture intrusion at these areas.

?X Windows in rear reflected sealant application BELOW the window sills at all 2nd floor locations, but was not evident or remaining window. Builder to consult with window manufacturer/Installer to determine if this method is a requirement or was this an error in applying the sealant at the location. IF it was an error, the seller should fix. If this was a requirement, please provide notice in writing.

?X Several windows noted some missing mortar at seams. Maintain/fix with matching stucco product and/or sealant.

Case ID: 190901353

?X Cracks were noted near the roof on the front of the building where 1373 joins the mortar of 1375. Seal/repair these cracks.

?X Cracks were noted on the pilot house between the stucco and door frame. Seal/repair these cracks.

….

*See Id.* In an email from David Butera on July 1, 2015 to Ame Goldman:

"Just signed it. As far as the window repair, we want to get moving on that as soon as we can to prevent further damage. Please relay this to Jim so we can make arrangements ASAP."

*Id.* In an email from the Butera's realtor Ame Goldman, on July 2, 2015 she stated:

He received and presented. Asked if Seller could fix leak. I explained our concerns on that, he is waiting for a response from Seller. He does not believe any of other points will be an issue…

In an email from July 2, 2015, Jim Onesti, Mr. Butera's realtor from Berkshire Hathaway emailed Harriet and Sean Frankel of Nineteenth Street, requesting the "seller to credit buyer for window leak/repair… buyer is assuming you are not fixing but I believe you are fixing it or may have already fixed it." *See* Trial Exhibit, P-70.

In 2018, Mr. Butera noticed leaks in his Home. *Id.* at 101:5-6. In his trial testimony, he described the leaks as follows:

Q. So when you first noticed the leak, where was it?

A. It was right at the pilot house, which is the stairwell that goes up to the roof deck.

Q. Okay. And what was the problem?

A. There was water staining and at that point dripping as well.

Q. Okay. And the problems stated to get worse?

A. They did.

Q. Tell me about it.

A. So there was additional water stains in other places of the house.

Q. Where?

A. In the kitchen, the windows, at the back of the house. There was staining on just the whole outside of – the inside of the house but surrounding the window frames. There was additional leaking from the pilot house that would come and go with rain

> and just kind of unpredictably. There was staining and water dripping from the pilot house. I believe the front window also had some dripping on the sill. But it was mainly those three place I believe.

*See* Trial Transcript, June 8, 2023, 104:13-105:1-15. As testified, issues at the Butera Home worsened with time and leaks appeared in the same locations first noticed in 2015:

> Q.  Did your issues remain just water or did it get worse.
> A.  It got a lot worse
> Q.  Tell me about it.
> A.  So there were more water issues and more leaking in the pilot house. And then there was also ultimately leaking by the front master bedroom window, so the front of the house. And then we got the call that there was stuff growing on the ceiling on the third floor.
> Q.  A call from your tenant?
> A.  Yes.

*Id.* at 108:18-109:6.

Per the Complaint, Butera hired Lunny Building Diagnostics to perform a Building Moisture Survey of the Butera Home on September 15, 2018, because his neighbors were experiencing some issues. The report found the following construction defects:

a.  Missing/deficient weep screed;
b.  Missing head flashing around windows;
c.  Stucco thickness of 1/2", less than required 7/8' thickness;
d.  Missing movement joints;
e.  Improper transition detail;
f.  Missing drip edge;
g.  Missing mull cap on windows;
h.  Missing flashing on rear deck;
i.  Improper integration of dissimilar materials; and
j.  Kickout diverter not installed.

The report also found preliminary evidence of damage as direct and proximate result of the construction defects including: (a) Elevated moisture readings; (b) Interior staining; (c) gaps at intersection of exterior cladding; (d) Staining on the stucco; and (e) Mold growth.

After trial, on June 16, 2023, the jury awarded Butera $226,857.00 in damages for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, and negligent misrepresentation. Of the award, Nineteenth Street was held responsible for $102,085.65. In addition, punitive damages in the amount of $515,000.00 were awarded in favor of Butera of which $499,550.00 were awarded against Streamline and $15,450 against Nineteenth Street. The UTPCPL claim remains to be determined by the Court at a later date.

## EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

Please refer to Evanston's letters of December 14, 2022, September 21, 2023, for a discussion of the Evanston Policies and to copies of the policies for a full copy of the language referred to below. Please note that certain terms, conditions, and exclusions in the Evanston Policies and/or underlying policies to which the Evanston Excess Policies follow form may limit or preclude coverage for the noticed and potential claims, and Evanston reserves all of its rights and defenses under the

Policies and available at law and in equity. Evanston incorporates by reference any previous communications related to coverage, as if fully set forth herein.

## DENIAL OF COVERAGE WITH CONTINUING DEFENSE AND RESERVATION OF RIGHTS PENDING FINAL VERDICT

### I. EVANSTON HAS NO COVERAGE OBLIGATIONS FOR DAMAGES THAT FIRST MANIFESTED BEFORE THE EVANSTON POLICY PERIODS

As explained in our previous correspondence, the Evanston Policies each contain an insuring agreement that limits coverage to "property damage" that is caused by an "occurrence" that takes place during the policy period. Evanston previously reserved the right to deny coverage and indemnity for any damages and costs awarded for damages that took place outside of the applicable policy period.

Among other things, in order for there to be coverage under the CGL Policies, any "property damage" alleged must have occurred during the policy period of one of the Policies. Here, information available reflects that the damages at issue first manifested outside of both CGL Policy periods. Specifically, testimony provided at trial by Plaintiffs indicates that each Plaintiffs first became aware of deficiencies in the construction of the homes and related damages in 2015.

Pennsylvania law employs a first manifestation trigger for determining whether property damage caused by faulty work occurs during the policy period. Under the first manifestation theory, coverage is triggered when property damage is first reasonably ascertainable. Pursuant to that theory, only the policy in effect when damage first occurs is answerable for the ensuing bodily injury or property damage.

Here, Evanston issued CGL Policies for the periods of November 1, 2017-November 1, 2018 and November 1, 2018-November 1, 2019. Evanston issued Excess Policies to certain Streamline entities for the policy period of November 1, 2016 to November 1, 2017, November 1, 2017 to November 1, 2018, November 1, 2018 to November 1, 2019, and November 1, 2019 to November 1, 2020.

According to the trial testimony provided by each of the Plaintiffs in the Lawsuits, damages first manifested in or before July 2015:

- Kirk – on or before July, 2015
- Selbovitz – on or before July, 2015
- Auger – on or before May 2015
- Butera – on or before June 2015

As such, no coverage is available under any of the Evanston Policies for the damages awarded to date. Please review the documents cited herein. **If you disagree with our determination or you have information that contradict this evaluation, please provide us with a copy of the documents as soon as possible so that we may re-evaluate our determination if applicable.**

### II. COVERAGE FOR THE CLAIMS IS FURTHER BARRED IN WHOLE, OR AT LEAST IN PART BASED ON THE LANGUAGE OF THE EVANSTON POLICIES

Page 13

Evanston is currently providing a defense under the 2017-2018 CGL Policy. Among other things, the Evanston 2017-2018 CGL Policy[5] contains endorsement number MGL 0008 01 16 titled "Exclusion-Continuous or Progressive Injury or Damage" which states in relevant part:

> *This insurance does not apply to:*
>
> *Continuous Or Progressive Injury Or Damage*
>
> *"Bodily injury", "property damage" or "personal and advertising injury" which:*
>
> *(1)     First occurred, first began to occur, or is alleged to have first occurred;*
>
> *(2)     Is alleges to be in the process of occurring to any degree; or*
>
> *(3)     Is caused by or alleged to have been caused by incremental, continuous or progressive injury or damage arising from an "occurrence" or offense which first occurred, began to occur, or is alleged to have first occurred, prior to the effective date of this policy.*

Pursuant to information available, the damages for which the Verdict was issued first began before November 1, 2017 — the effective date of the first primary CGL policy issued by Evanston to Streamline (policies under which Nineteenth Street is seeking coverage). Based on the above exclusion, there is no coverage for damages awarded for "property damage" that "first occurred" or "began" prior to the effective date of the Evanston 2017-2018 CGL Policy. As such, Evanston denies coverage for damages to the extent excluded by the above cited language.

Evanston also denies coverage for damages for repairs of faulty work performed by or on behalf of Nineteenth Street as such claims do not constitute "property damage" caused by an "occurrence" as required by the Evanston Policies. The Evanston Policies provide coverage for damage to property beyond the scope of the insured's work.

Further, Evanston denies coverage for amounts awarded for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation. Evanston further reserves the right to deny coverage for any amount awarded for violation of the UTPCPL, which we understand have yet to be determined by the Court. Claims for breach of contract, breach of implied warranty of workmanship, warranty, fraud, negligent misrepresentation and violation of the UTPCPL do not seek damages for a covered loss, i.e., "property damage" caused by an "occurrence" as required by the Evanston Policies. For the reasons discussed at length in Evanston's prior letters, all of these claims, as alleged in the Lawsuits, do not present "property damage" caused by an "occurrence."

Evanston denies coverage and indemnity for all punitive and exemplary damages awarded in the Verdict as such damages are not covered as a matter of law and expressly excluded under each of the Evanston Policies.

---

[5] While the analysis herein points to the terms of the 2017-2018 Evanston CGL Policy as Evanston is currently providing a defense under this Policy, please note that the terms of the 2018-2019 Evanston CGL Policy are identical unless otherwise noted. As such our coverage position and related reservation of rights applies to the 2018-2019 as well unless otherwise stated.

In addition to denying coverage under the Excess Policies because the damages appear to have been manifested prior to any of the applicable policy periods, Evanston also reserves the right to deny coverage under these policies because to date it has received no indication that the policies have been triggered.

As discussed more fully in Evanston's prior letters, Evanston has and continues to reserve the right to further deny or limit indemnity for the Verdict to the extent coverage is further precluded or limited by any of the Evanston Policies' provision, definition, exclusion, limitation or condition, including any such policy provision, definition, exclusion, limitation or condition cited in Evanston's previous letters.

## CONCLUSION

**In conclusion, based on the new information received, we have determined that no coverage is available, and thus, Evanston has no obligation to indemnify Nineteenth Street for the above-mentioned claims and related damages awarded to date. We recognize, however, that the UTPCPL claims in the Kirk, Auger, Butera, and Selbovitz Lawsuits remain outstanding. Although Evanston believes that any award on those claims will not be covered because, among other reasons, the first manifestation date for damages sought by Plaintiffs predates the Evanston Policies and because such claims do not present "property damage" caused by an "occurrence," Evanston will provide its final coverage position upon receipt of the ruling and any award(s) on those claims. In the interim, Evanston will continue its defense of Nineteenth Street in the Crease Street Lawsuits.**

Our position is based on documents currently available to us. We hope that you understand and agree with our coverage determination. **If you do not, please let us know the basis for your disagreement and provide us with any additional information which you believe impacts the coverage position taken herein.**

Evanston also reserves the right to file a declaratory judgment action to determine the rights, duties, and obligations of the parties, including whether Evanston may withdraw from the defense of Nineteenth Street in the Lawsuits.

Moreover, if Nineteenth Street has not done so yet, it should tender the Lawsuits to its insurer(s) who may have insured Nineteenth Street before the above referenced Evanston Policies.

Finally, Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or estoppel. This letter does not constitute a waiver of any policy provisions or defenses available to Evanston. All rights are expressly reserved.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*
Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

cc:    Gilchrist Insurance Group
        8 E. 2nd Street
        Media, PA 19063

# EXHIBIT 29

Case ID: 190901353



February 24, 2025

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND VIA EMAIL**

Streamline Solutions, LLC
Attn: Michael Stillwell
1100 N. Delaware Ave. REAR
Philadelphia, PA 19125
Mike@streamlinephilly.com

### DENIAL OF COVERAGE

RE:     Our Named Insured:     Streamline Solutions, LLC
       Issuing Company:     Evanston Insurance Company
       Plaintiff(s):     Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz
       Our File Number:     C065245
       Policy Number(s):     MKLVIEUL100396 (11/1/16-11/1/17) Excess;
                               3C42330 (11/1/17-11/1/18) General Liability;
                               MKLV1EU101129 (11/1/17-11/1/18) Excess;
                               MKLV7PBC0002 (11/1/18-11/1/19) General Liability; MKLV7EUL100475
                               (11/1/18-11/1/19) Excess;
                               MKLV7EUL101098 (11/1/19-11/1/20) Excess.

Mr. Stillwell:

As you know, Markel Service, Incorporated is a claim service manager for Evanston Insurance Company ("Evanston"). In light of the orders issued by the Court on October 31, 2024 related to the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL") claims, and judgments entered via praecipe on November 22, against Defendants Streamline Solutions, LLC ("Streamline") and Nineteenth Street Development, LLC ("Nineteenth Street), we write to supplement our prior letters to Streamline of July 14, 2020, December 14, 2022, August 10, 2023, and February 15, 2024, in connection with coverage for the amounts awarded and related verdicts issued in the following matters:

- *Kirk v. Streamline Solutions, LLC,* case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC,* case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Lawsuits"[1]). Please note that this letter incorporates by reference all previously issued coverage determination letters and correspondence by or on behalf of Evanston in connection with the Lawsuits.

Evanston understands that the claims brought in connection with the UTPCPL have been decided by the Judge on October 31 after the parties' submission of respective bench memorandums thus providing a ruling on all claims in the Lawsuits that remained outstanding. Judgments were entered via praecipes on November 22. These Judgments follow the previous June 16, 2023, jury verdict against Defendants Streamline and Nineteenth Street finding them jointly liable to each underlying Plaintiff and awarding

---

[1] Consolidated for purposes of trial under the Kirk Lawsuit, but which proceeded in practice under the Auger Docket number.

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #0D95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

punitive damages for each Plaintiff.[2]  The jury found Defendants liable to each Plaintiff for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, negligent misrepresentation, and for punitive damages.

**Please be advised that, Evanston has reviewed the orders issued by the court on October 31 and the judgments entered on November 22, along with the previously issued jury verdict and documents received, and determined that none of the amounts awarded in the Lawsuits are covered by the Evanston Policies because, among other reasons, the first manifestation date for the amounts awarded to Plaintiffs predates the Evanston Policies and because damages for UTPCPL violations and related fees do not present "property damage" caused by an "occurrence."**

As we noted in our February 15, 2024 correspondence, according to trial testimony provided by each of the Plaintiffs in the Lawsuits during trial, damages first manifested on or before July 2015:

- Kirk – on or before July 2015
- Selbovitz – on or before July 2015
- Auger – on or before May 2015
- Butera – on or before June 2015.

In that letter, Evanston advised that since the manifestation date for damages awarded by the Jury in the Lawsuits predated the Policies, no coverage is available to Streamline for the June 16, 2023 verdict against Defendants, and thus, Evanston had no obligation to indemnify Streamline.

However, Evanston continued to provide a defense to Streamline in light of the UTPCPL claims in the Kirk, Auger, Butera, and Selbovitz Lawsuits that remained outstanding after the jury verdict.  On October 31, 2024 the Judge awarded the following amounts in connection with the UTPCPL claims in each of the Lawsuits:

*Butera*

Compensatory damages:
- 19th Street: $102,085.65
- Streamline: $124,771.35

Fees and Costs:
- 19th Street: $55,176.02
- Streamline: $55,176.01

*Kirk*

Compensatory damages:
- 19th Street: $137,263.05
- Streamline: $167,765.95

Fees and Costs:
- 19th Street: $52,850.97
- Streamline: $52,850.98

*Auger*

Compensatory damages:
- 19th Street: $24,055.70
- Streamline: $216,501.30

---

[2] The Verdict also awarded punitive damages against Nineteenth Street specifically as to the Butera Action.

Fees and Costs:
- 19th Street: $53,637.63
- Streamline: $53,637.63

*Selbovitz*

Compensatory damages:
- 19th Street: $105,349.05
- Streamline:$128,759.95

Fees and Costs
- 19th Street:$53,592.55
- Streamline: $53,592.54

As related to the compensatory damages awarded for UTPCPL violations, the court specified that "[b]ecause these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here for each of the four Plaintiffs." Amounts awarded for UTPCPL violations, including related fees and costs, do not meet the threshold requirements for coverage mandated by the Policies' insuring agreements which limit coverage to "property damage" caused by an "occurrence" during the "policy period." Thus, in addition to being excluded from coverage because they first manifested outside of the Evanston Policy periods, compensatory damages awarded in the Lawsuits are also excluded from coverage because they do not present "property damage" caused by an "occurrence."

Since none of the amounts awarded in the Lawsuits are covered by the Policies, Evanston denies indemnity for all amounts awarded in the Lawsuits.

## CONCLUSION

In conclusion, based on the information received to date, Evanston has determined that no coverage is available, and thus, Evanston has no obligation to indemnify Streamline for the above-mentioned claims and damages awarded in connection with the Lawsuits. Please note that since none of the amounts awarded are covered by the Policies, Evanston will not post an appeal bond to guarantee payment for any amounts awarded in the Lawsuits.

Our position is based on documents currently available to us. We hope that you understand and agree with our coverage determination. If you do not, please let us know the basis for your disagreement and provide us with any additional information which you believe impacts the coverage position taken herein.

Evanston also reserves the right to file a declaratory judgment action to determine the rights, duties, and obligations of the parties. Moreover, if Streamline has not done so yet, it should tender the Lawsuits to its insurer(s) who may have insured Streamline before the above-referenced Evanston Policies.

Finally, Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or estoppel. This letter does not constitute a waiver of any policy provisions or defenses available to Evanston. All rights are expressly reserved.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*

Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

Case ID: 190901353

cc:

Gilchrist Insurance Group
8 E. 2nd Street
Media, PA 19063

Case ID: 190901353

# EXHIBIT 30

Case ID: 190901353



March 10, 2025

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED AND VIA EMAIL**

**Receipt No.**
Nineteenth Street Development, LLC
Attn: Sean Frankel
888 Redwing Lane
Huntington Valley, PA 19006
seanfrankel@comcast.net

<u>**DENIAL OF COVERAGE**</u>

|       |                       |                                                                                      |
|-------|-----------------------|--------------------------------------------------------------------------------------|
| RE:   | Our Named Insured:    | Streamline Solutions, LLC                                                            |
|       | Issuing Company:      | Evanston Insurance Company                                                           |
|       | Plaintiff(s):         | Nickolas Auger, David Butera, Daniel and Clarisa Kirk, Matthew Selbovitz            |
|       | Our File Number:      | C065245                                                                              |
|       | Policy Number(s):     | MKLVIEUL100396 (11/1/16-11/1/17) Excess;                                            |
|       |                       | 3C42330 (11/1/17-11/1/18) General Liability;                                        |
|       |                       | MKLV1EU101129 (11/1/17-11/1/18) Excess;                                             |
|       |                       | MKLV7PBC0002 (11/1/18-11/1/19) General Liability;                                   |
|       |                       | MKLV7EUL100475 (11/1/18-11/1/19) Excess;                                            |
|       |                       | MKLV7EUL101098 (11/1/19-11/1/20) Excess.                                            |

Mr. Frankel:

As you know, Markel Service, Incorporated is a claim service manager for Evanston Insurance Company ("Evanston").  In light of the orders issued by the Court on October 31, 2024 related to the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL") claims, and judgments entered via praecipe on November 22, against Defendants Streamline Solutions, LLC ("Streamline") and Nineteenth Street Development, LLC ("Nineteenth Street"), we write to supplement our prior letters to Nineteenth Street of December 14, 2022, September 21, 2023, and February 15, 2024, in connection with the damages and related verdict issued in the following matters:

- *Kirk v. Streamline Solutions, LLC*, case ID 190901353 (the "Kirk Lawsuit")
- *Auger v. Streamline Solutions, LLC,* case ID 190901351 (the "Auger Lawsuit")
- *Butera v. Streamline Solutions, LLC*, case ID 190901268 (the "Butera Lawsuit")
- *Selbovitz v. Streamline Solutions, LLC,* case ID 190401575 (the "Selbovitz Lawsuit")

before the Pennsylvania Court of Common Pleas, Philadelphia County (collectively the "Lawsuits"[1]).  Please note that this letter incorporates by reference all previously issued coverage determination letters and correspondence from Evanston in connection with the Lawsuits.

---

[1] Consolidated for purposes of trial under the Kirk Lawsuit, but which proceeded in practice under the Auger Docket number.

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #0D95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

Case ID: 190901353

Evanston understands that the claims brought in connection with the UTPCPL have been decided by the Judge on October 31 after the parties' submission of respective bench memorandums thus providing a ruling on all claims in the Lawsuits that remained outstanding. Judgments were entered via praecipes on November 22. These Judgments follow the previous June 16, 2023, jury verdict against Defendants Streamline and Nineteenth Street finding them jointly liable to each underlying Plaintiff and awarding punitive damages for each Plaintiff.[2] The jury found Defendants liable to each Plaintiff for negligence, breach of contract, breach of implied warranty of workmanlike construction, breach of implied warranty of habitability, breach of expressed warranty, negligent misrepresentation, and for punitive damages.

**Please be advised that, Evanston has reviewed the orders issued by the court on October 31 and the judgments entered on November 22, along with the previously issued jury verdict and documents received, and determined that none of the amounts awarded in the Lawsuits are covered by the Evanston Policies because, among other reasons, the first manifestation date for the amounts awarded to Plaintiffs predates the Evanston Policies and because damages for UTPCPL violations and related fees do not present "property damage" caused by an "occurrence."**

As we noted in our February 15, 2024 correspondence, according to trial testimony provided by each of the Plaintiffs in the Lawsuits during trial, damages first manifested on or before July 2015:

- Kirk – on or before July 2015
- Selbovitz – on or before July 2015
- Auger – on or before May 2015
- Butera – on or before June 2015

In that letter, Evanston advised that since the manifestation date for damages awarded by the Jury in the Lawsuits predated the Policies, no coverage is available for the June 16, 2023 verdict against Defendants, and thus, Evanston had no obligation to indemnify Nineteenth Street.

However, Evanston continued to provide a defense to Nineteenth Street in light of the UTPCPL claims in the Kirk, Auger, Butera, and Selbovitz Lawsuits that remained outstanding after the jury verdict. On October 31, 2024 the Judge awarded the following amounts in connection with the UTPCPL claims in each of the Lawsuits:

*Butera*

Compensatory damages:
- 19th Street: $102,085.65
- Streamline: $124,771.35

Fees and Costs:
- 19th Street: $55,176.02
- Streamline: $55,176.01

*Kirk*

Compensatory damages:
- 19th Street: $137,263.05
- Streamline: $167,765.95

---

[2] The Verdict also awarded punitive damages against Nineteenth Street specifically as to the Butera Action.

Fees and Costs:
- 19th Street: $52,850.97
- Streamline: $52,850.98

*Auger*

Compensatory damages:
- 19th Street: $24,055.70
- Streamline: $216,501.30

Fees and Costs:
- 19th Street: $53,637.63
- Streamline: $53,637.63

*Selbovitz*

Compensatory damages:
- 19th Street: $105,349.05
- Streamline:$128,759.95

Fees and Costs
- 19th Street:$53,592.55
- Streamline: $53,592.54

As related to the compensatory damages awarded for UTPCPL violations, the court specified that "[b]ecause these compensatory damages are duplicative of those awarded in the companion jury trial, they are not owed by Defendants here for each of the four Plaintiffs." Amounts awarded for UTPCPL violations, including related fees and costs, do not meet the threshold requirements for coverage mandated by the Policies' insuring agreements which limit coverage to "property damage" caused by an "occurrence" during the "policy period." Thus, in addition to being excluded from coverage because they first manifested outside of the Evanston Policy periods, compensatory damages awarded in the Lawsuits are also excluded from coverage because they do not present "property damage" caused by an "occurrence."

Since none of the amounts awarded in the Lawsuits are covered by the Policies, Evanston denies indemnity for all amounts awarded in the Lawsuits.

**CONCLUSION**

In conclusion, based on the information received to date, Evanston has determined that no coverage is available, and thus, Evanston has no obligation to indemnify Nineteenth Street for the above-mentioned claims and damages awarded in connection with the Lawsuits. Please note that since none of the amounts awarded are covered by the Policies, Evanston will not post an appeal bond to guarantee payment for any amounts awarded in the Lawsuits.

Our position is based on documents currently available to us. We hope that you understand and agree with our coverage determination. If you do not, please let us know the basis for your disagreement and provide us with any additional information which you believe impacts the coverage position taken herein.

Evanston also reserves the right to file a declaratory judgment action to determine the rights, duties, and obligations of the parties. Moreover, if Nineteenth Street has not done so yet, it should tender the Lawsuits to its insurer(s) who may have insured Nineteenth Street before the above-referenced Evanston Policies.

Finally, Evanston reserves all of its rights under the Evanston Policies, at equity and at law. We may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver, or

Page 4

estoppel.  This letter does not constitute a waiver of any policy provisions or defenses available to Evanston.
All rights are expressly reserved.

Sincerely,

**MARKEL SERVICE, INCORPORATED**

*Belinda V. Skeen*
Belinda V. Skeen
Manager
Casualty Claims
(800) 243-6869, ext. 128870

cc:

Gilchrist Insurance Group
8 E. 2nd Street
Media, PA 19063