# CLOSING CHECKLIST

*Updated as of December 11, 2020*

**LENDER:**

HUNTINGDON VALLEY BANK
Attention: Hugh Connelly, CFA CTP
Executive Vice President
Chief Lending Officer
Business Banking Division
990 Spring Garden Street, Suite 702
Philadelphia, PA 19123
Telephone: cell: 609-668-5679
Email: hconnelly@myhvb.com

**BORROWERS:**

COULBEE, LLC., a Pennsylvania limited liability company ("Coulbee"), LION CONSTRUCTION, LLC, a Pennsylvania limited liability company ("Lion"), LION CONSTRUCTION MANAGEMENT, LLC, a Pennsylvania limited liability company ("Lion Management"), STREAMLINE GROUP, LLC, a Pennsylvania limited liability company ("Streamline"), STREAMLINE SOLUTIONS ACQUISITIONS, LLC, a Pennsylvania limited liability company ("Streamline Solutions"), STREAMLINE REALTY, LLC, a Pennsylvania limited liability company ("Streamline Realty"), STREAMLINE PARTNERS, LLC, a Pennsylvania limited liability company ("Streamline Partners"), STREAMLINE HOME MANAGEMENT, LLC, a Pennsylvania limited liability company ("Streamline Home")and STREAMLINE COMMERCIAL DEVELOPMENT, LLC, a Pennsylvania limited liability company ("Streamline Commercial")
2301 Washington Avenue, Suite 111
Philadelphia, PA 19146

**GUARANTOR:**

MICHAEL STILLWELL, an adult individual, STREAMLINE RESIDENTIAL CONSTRUCTION, LLC, a Pennsylvania limited liability company, SL RENTALS, LLC, a Pennsylvania limited liability company, STREAMLINE CONSTRUCTION MANAGEMENT, LLC, a Pennsylvania limited liability company, SL CONSULTING, LLC, a Pennsylvania limited liability

company, STREAMLINE QOZB MANAGER, LLC, a Pennsylvania limited liability company, STREAMLINE QOZB INVESTOR, LLC, a Pennsylvania limited liability company, STREAMLINE TECHNOLOGIES, LLC, a Pennsylvania limited liability company, STREAMLINE SALES AND MARKETING, LLC, a Pennsylvania limited liability company, STREAMLINE COMMERCIAL CONSTRUCTION, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 1, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 2, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 3, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 4, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 5, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 6, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 7, LLC, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 8, LLC, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 1, LLC, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 2, LLC, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 3, LLC, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 4, LLC, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 5, LLC, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 6, LLC, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 9, LLC, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 10, LLC, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 11, LLC, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 14, LLC, a Pennsylvania limited liability company, PRS 1, LLC, a Pennsylvania limited liability company, PRS 2, LLC, a Pennsylvania limited liability company, PRS 3, LLC, a Pennsylvania limited liability company, PRS 4, LLC, a Pennsylvania limited liability company, PRS 5, LLC, a Pennsylvania limited

| | |
|---|---|
| | liability company and SL RIDGE, LLC, a Pennsylvania limited liability company (collectively, "Guarantor") |
| **LOAN:** | Up to $14,800,000 Main Street Priority Lending Program Loan |
| **PURPOSE:** | Proceeds of the Loan shall be used solely to pay off existing indebtedness, invest in real estate projects, buy-out investors in various projects, pay off SBA -EIDL loan, for working capital and other purposes as permitted by the Main Street Priority Loan Facility ("MSPLF") and to pay related closing costs |
| **LENDER'S COUNSEL:** | Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, P.C.<br>2005 Market Street, 16th Floor<br>Philadelphia, PA 19103<br><br>Kenneth J. Fleisher, Esq.<br>Telephone: 267-765-9610<br>Fax: 267-765-9650<br>Email: kjfleisher@zarwin.com<br><br>Scott E. Goldstein, Esq.<br>Telephone: 267-990-4595<br>Fax: 267-765-9637<br>Email: segoldstein@zarwin.com |
| **BORROWERS' COUNSEL:** | James I. Kennedy, Esq.<br>Kennedy Kelly LLP<br>1 West Third Street, Suite 213<br>Media, Pennsylvania 19063<br>T: 610.888.6984<br>E: jkennedy@kennedykelly.com |
| **CLOSING DATE:** | December 11, 2020 |

| NO. | DOCUMENT | RESPONSIBILITY | STATUS |
|---|---|---|---|
| 1 | Loan Agreement with Priority Loan Facility Certifications and Covenants | LC | *Draft* |
| 2 | Promissory Note ($14,800,000) from Borrowers | LC | *Draft* |
| 3 | Guaranty Agreement from Guarantor | LC | *Draft* |
| 4 | Affidavit for Purpose of Closing Loan | LC | *Draft* |
| 5 | Disclosure for Confession of Judgment<br>(a) Borrowers<br>(b) Guarantor | LC | *Draft*<br>(a)<br>(b) |
| 6 | Errors & Omissions Compliance Agreement<br>(a) Borrowers<br>(b) Guarantor | LC | *Draft*<br>(a)<br>(b) |
| 7 | Opinion of Counsel | LC as to form; BC as to execution | *Form approved* |
| 8 | Co-Lender Agreement | LC | *Draft* |
| 9 | (a) Assignment in Blank<br>(b) PPP Forgiveness Form | LC | (a) *Draft*<br>(b)*Draft* |
| | **ENTITY DOCUMENTS** | **RESPONSIBILITY** | **STATUS** |
| 10 | As to all Borrowers and Entity Guarantors:<br>(i) Certificate of Organization (filed)<br>(ii) Operating Agreement<br>(iii) Subsistence Certificate - PA | B | *On file with Bank*<br>*Streamline Group documents missiing<br>(i)<br>(ii) |

| NO. | DOCUMENT | RESPONSIBILITY | STATUS |
|---|---|---|---|
| | (iv) Resolution | | (iii)<br><br>(iv) |
| | **DUE DILIGENCE** | **RESPONSIBILITY** | **STATUS** |
| 11 | Policies and Certificates of Insurance<br><br>(a) Property (ACORD 28) - Broad form Policy (special causes of loss); replacement cost endorsement;<br><br>(b) Commercial General Liability (ACORD 25-S) - Lender named additional insured<br><br>(c) Rent Loss/Business Interruption (12 months)<br><br>(d) Worker's Compensation (if applicable)<br><br>(e) Auto Liability (if applicable)<br><br>(f) Flood Insurance (if applicable)<br><br>(g) Environmental Insurance (if applicable) | B | *Sent to Bank*<br><br>(a)<br><br>(b)<br><br>(c)<br><br>(d)<br><br>(e)<br><br>(f)<br><br>(g) |
| 12 | UCC/Lien Search/Bankruptcy Search/ Patriot Act/Litigation & Judgment Searches<br><br>(a) Borrowers<br><br>(b) Guarantors | B | (a)<br><br>(b) *UCC Search Waived by Lender* |

| NO. | DOCUMENT | RESPONSIBILITY | STATUS |
|---|---|---|---|
| | | | |
| 13 | Financial Statements/Tax Returns<br><br>(a) Borrowers<br><br>(b) Guarantor | B | <br><br>(a)<br><br>(b) |
| 14 | Payoff Letters/UCC-3 Termination Statements from existing lenders | B | *If necessary* |
| 15 | *Reserved* | | |
| 16 | *Reserved* | | |
| | **CLOSING ITEMS** | **RESPONSIBILITY** | **STATUS** |
| 17 | Settlement Statement | TC | |
| 18 | Wire Instructions and Wire Confirmation Form | L | |
| 19 | Lender's Counsel Invoice | LC | |
| 20 | Payment of "Points" and Lender Costs | B | |
| 21 | Establishment of Deposit Accounts | B | |
| 22 | W-9s (if needed)<br><br>(a) Borrowers<br><br>(b) Guarantor | L | <br><br>(a)<br><br>(b) |
| 23 | Closing Instructions/Escrow Instructions Letter | LC (*if needed*) | |
| 24 | *Reserved* | | |

| NO. | DOCUMENT | RESPONSIBILITY | STATUS |
|---|---|---|---|
| 25 | *Reserved* | | |

INDEX:

B: Borrowers/Guarantor
L: Lender
BC: Borrowers' and Guarantor's Counsel
LC: Lender's Counsel

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is made this 11th day of December, 2020 and effective the 11th day of December, 2020 (the "Effective Date"), by and among **COULBEE LIMITED LIABILITY COMPANY**, a Pennsylvania limited liability company ("Coulbee"), **LION CONSTRUCTION, LLC**, a Pennsylvania limited liability company ("Lion"), **LION CONSTRUCTION MANAGEMENT, LLC**, a Pennsylvania limited liability company ("Lion Management"), **STREAMLINE GROUP, LLC**, a Delaware limited liability company ("Streamline"), **STREAMLINE SOLUTIONS ACQUISITIONS, LLC**, a Pennsylvania limited liability company ("Streamline Solutions"), **STREAMLINE REALTY, LLC**, a Pennsylvania limited liability company ("Streamline Realty"), **STREAMLINE PARTNERS, LLC**, a Pennsylvania limited liability company ("Streamline Partners"), **STREAMLINE HOME MANAGEMENT, LLC**, a Pennsylvania limited liability company ("Streamline Home")and **STREAMLINE COMMERCIAL DEVELOPMENT, LLC**, a Pennsylvania limited liability company ("Streamline Commercial"), each with a mailing address at 2301 Washington Avenue, Suite 111, Philadelphia, PA 19146 (collectively, Coulbee, Lion, Lion Management, Streamline, Streamline Solutions, Streamline Realty, Streamline Partners, Streamline Home and Streamline Commercial, the "Borrower") and **HUNTINGDON VALLEY BANK**, with a banking office at 2005 S. Easton Road, Suite 304, Doylestown, PA 18901 (together with its successors and assigns, "Lender").

In consideration of the premises and of the mutual covenants contained in this Agreement and intending to be legally bound, the parties agree as follows:

## ARTICLE I. Definitions

**1.1 Definitions.** As used in this Agreement, unless otherwise specified, the following terms shall have the following respective meanings:

**"Actual Knowledge"** - means the actual knowledge of any Guarantor or any member, manager, officer or director of Borrower.

**"Affiliate"** - means any Person who now or hereafter has Control of, or is now or hereafter under common Control with, Borrower or over whom or over which Borrower now or hereafter has Control.

**"Agreement"** - means this Loan Agreement, including any schedule or exhibit hereto, as it may be Modified from time to time.

**"Anti-Terrorism Laws"** - means any laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224, the USA Patriot Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the forgoing laws may from time to time be amended, renewed, extended or replaced).

**"Applicable Method of Accounting"** - means GAAP, the federal income tax method of accounting, special purpose accounting or such other method of accounting as is regularly and properly used by any Obligor in the preparation of tax returns and financial statements.

**"Approvals"** - *Intentionally omitted.*

**"Assignment of Rents"** - *Intentionally omitted.*

**"Benefit Plan Investor"** - means any of the following: (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans; (ii) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended; or (iii) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or other plan in such Person.

**"Board"** - is defined in Section 9.19(a).

**"Borrower Certifications and Covenants Addendum"** - is defined in Section 2.5(b).

**"Broker"** - is defined in Section 3.16.

**"Business Day"** - means a day of the year which is neither a Saturday nor Sunday nor a legal holiday on which banks are required or authorized by law to close in the Commonwealth of Pennsylvania.

**"Closing"** or **"Closing Date"** - means the closing of the transactions provided for in this Agreement, or such other date upon which the parties may agree.

**"Code"** - means the Uniform Commercial Code in effect in the Commonwealth of Pennsylvania or any other applicable jurisdiction as of the Effective Date.

**"Collateral"** - *Intentionally omitted.*

**"Collateral Documents"** - *Intentionally omitted.*

**"Constituent Documents"** - the applicable articles of incorporation and bylaws of each Borrower and each Entity Guarantor.

**"Contracts"** - means all contracts, instruments, undertakings, documents or other agreements in or under which Borrower now has or hereafter may have any right, title or interest (to the extent same can be freely assigned).

**"Control"** - means (i) the power to vote at least fifty percent (50%) of the outstanding shares of any class of stock of a corporation or equity, membership or ownership interest in any partnership, limited partnership, limited liability company or other business entity or (ii) the beneficial ownership of at least fifty percent (50%) of (a) the outstanding shares of any class of stock of a corporation or (b) of any outstanding equity, membership or ownership interest in any other Person.

**"Controlled Group"** - means Borrower and each Person required to be aggregated with Borrower under Internal Revenue Code Sections 414(b), (c), (m) or (o).

**"Debt"** - is defined in Section 7.1(v).

**"Debt Service Coverage Ratio"** - *Intentionally omitted.*

**"Depository Account(s)"** - is defined in Section 4.10. Any Depository Account may also be a Direct Debit Account.

**"Direct Debit Account"** - means the commercial deposit account in the name of Borrower and maintained at Lender into which Lender may deposit Loan funds and from which Lender may automatically debit sums required to repay the Obligations with such minimum balance as Lender may require not to exceed 15% of the outstanding principal amount of the Loan.

**"Directors and Officers"** - means the directors and officers, if any, of Borrower or General Partner.

**"Entity Guarantor"** - means collectively, each of Streamline Residential Construction Limited Liability Company, a Pennsylvania limited liability company, SL Rentals Limited Liability Company, a Pennsylvania limited liability company, Streamline Construction Management Limited Liability Company, a Pennsylvania limited liability company, SL Consulting Limited Liability Company, a Pennsylvania limited liability company, Streamline QOZB Manager Limited Liability Company, a Pennsylvania limited liability company, Streamline QOZB Investor Limited Liability Company, a Pennsylvania limited liability company, Streamline Technologies Limited Liability Company, a Pennsylvania limited liability company, Streamline Sales and Marketing Limited Liability Company, a Pennsylvania limited liability company, Streamline Commercial Construction Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 1 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 2 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 3 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 4 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 5 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 6 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 7 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 8 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 1 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 2 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 3 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 4 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 5 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 6 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 9 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 10 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 11 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 14 Limited Liability Company, a Pennsylvania limited liability company, PRS 1 Limited Liability Company, a Pennsylvania limited liability company, PRS 2 Limited Liability Company, a Pennsylvania limited liability company, PRS 3 Limited Liability Company, a Pennsylvania limited liability company, PRS 4 Limited Liability Company, a Pennsylvania limited liability company, PRS 5 Limited Liability Company, a Pennsylvania limited liability company and SL Ridge Limited Liability Company, a Pennsylvania limited liability company.

**"Environment"** - means any water including, but not limited to, surface water and ground water or water vapor; any land including land surface or subsurface; stream sediments; air; fish; wildlife; plants; and all other natural resources or environmental media.

**"Environmental Laws"** - means any statute, law, order, regulation, code, rule, writ, decree, treaty or order of court, whether now existing or subsequently enacted or amended, relating to (a) pollution or protection of the Environment, (b) exposure of Persons to Hazardous Substances, and protection of the public health or welfare from the effects of products, by-products, wastes, emissions, discharges, or releases of Hazardous Substances, or (c) regulation of the manufacture, generation, use or introduction into commerce of Hazardous Substances. "Environmental Laws" shall include (i) any environmental approval issued with respect to the Mortgaged Premises by any applicable Governmental Authority and the terms and conditions thereof, (ii) the following statutes: the Clean Air Act (42 U.S.C. 7401 et seq.); the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.); the Hazardous Material Transportation Act (49 U.S.C. §1801 et seq.); the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136 et seq.); the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.) (including the Hazardous and Solid Waste Amendments of 1984), the Toxic Substance Control Act (15 U.S.C. §2601 et seq.); the Federal Occupational Safety & Health Act of 1970 (29 U.S.C. §651 et seq.) (including §3101 of the Omnibus Reconciliation Act of 1990), and the regulations promulgated thereunder and all as amended from time to time, and (iii) any common law doctrine (including, without limitation, injunctive relief and tort, such as negligence, nuisance, trespass and strict liability) that may impose obligations or liabilities for personal injury or property damage due to, or threatened as a result of, the presence of or exposure to Hazardous Substances.

**"Environmental Permits"** - means all licenses, permits, approvals, authorizations, consents or registrations required by any applicable Environmental Laws and all applicable judicial and administrative orders in connection with ownership, lease, purchase, transfer, closure, use and/or operation of Borrower's property, including, without limitation, as may be required for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances.

**"Environmental Reports"** - is defined in Section 3.12.

**"ERISA"** - means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated pursuant thereto.

**"ERISA Affiliate"** - means any Person who is under common control with Borrower within the meaning of Section 414(b) of the Internal Revenue Code, including, but not limited to, a Subsidiary of Borrower, or any trade or business (whether or not incorporated) or any Person, which together with Borrower would be treated as or deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA.

**"ERISA Event"** - means (i) (a) any "reportable event," as defined in Section 4043 of ERISA with respect to a Pension Plan (other than an event for which the thirty (30) day notice period is waived) or (b) the existence of a condition or event with respect to a Pension Plan that presents a risk of the imposition of an excise tax or any other liability on Borrower or of the imposition of a Lien on the assets of Borrower; (ii) the engagement by a Controlled Group member in a non-exempt "prohibited transaction" (as defined under ERISA Section 406 or Internal Revenue Code Section 4975) or a breach

of a fiduciary duty under ERISA that could result in liability to Borrower; (iii) a failure to satisfy the minimum funding standards of Internal Revenue Code Section 412 or Section 302 of ERISA, whether or not waived, or the application by a Controlled Group member for a waiver from the minimum funding requirements of Internal Revenue Code Section 412 or ERISA Section 302 or a Controlled Group member is required to provide security under Internal Revenue Code Section 401(a)(29) or ERISA Section 307; (iv) the occurrence of a Reportable Event with respect to any Pension Plan as to which notice is required to be provided to the PBGC; (v) the withdrawal by a Controlled Group member from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" (as such terms are defined in ERISA Sections 4203 and 4205, respectively) or the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of withdrawal liability in connection therewith; (vi) the involvement of, or occurrence or existence of any event or condition that makes likely the involvement of, a Multiemployer Plan in any reorganization under ERISA Section 4241 or a failure to make any required contribution to a Multiemployer Plan when due; (vii) the failure of a Pension Plan (and any related trust) that is intended to be qualified under Internal Revenue Code Sections 401 and 501 to be so qualified or any "cash or deferred arrangement" under any such Pension Plan to meet the requirements of Internal Revenue Code Section 401(k); (viii) the taking by the PBGC of any steps to terminate a Pension Plan or appoint a trustee to administer a Pension Plan, the receipt by Borrower or any ERISA Affiliate of any notice from the PBGC or a plan administrator relating to an intention to terminate any Pension Plan or the taking by a Controlled Group member of any steps to terminate a Pension Plan or appoint a receiver or trustee to administer a Pension Plan; (ix) the failure by a Controlled Group member or a Pension Plan to satisfy any requirements of law applicable to a Pension Plan; (x) the commencement, existence or threatening of the incurrence by a Controlled Group member of a claim, action, suit, audit or investigation with respect to a Pension Plan, other than a routine claim for benefits; (xi) a failure to make any required installment under Internal Revenue Code Section 430(j) with respect to any Pension Plan or a determination that any Pension Plan is in "at risk" status (as defined in Internal Revenue Code Section 430 or Section 303 of ERISA; or (xii) any occurrence by or any expectation of the incurrence by a Controlled Group member of any liability for post-retirement benefits under any Welfare Plan, other than as required by ERISA Section 601, et. seq. or Internal Revenue Code Section 4980B.

**"Excluded Swap Indebtedness of Borrower"** *Intentionally omitted.*

**"Executive Order No. 13224"** - means Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, Modified, amended, renewed, extended or replaced.

**"Federal Reserve"** - is defined in Section 9.19(a).

**"Financial Contract(s)"** - *Intentionally omitted.*

**"Financing Statements"** - means any UCC-1 financing statements evidencing a security interest in any property owned by Borrower or otherwise providing notice to any third party of prohibitions contained in the Loan Documents against Borrower incurring any other Debt.

**"GAAP"** - means generally accepted accounting principles in the United States of America in effect from time to time and consistently applied from period to period.

**"General Partner"** – *Intentionally omitted.*

**"Governmental Authority"** - means any federal, state, local or foreign government and any agency, commission, or other entity thereof with jurisdiction over Borrower.

**"Guarantor"** or **"Guarantors"** - means individually or collectively, each Individual Guarantor, each Entity Guarantor and any other Person who guarantees payment of any Loan governed by this Agreement.

**"Guaranty"** or **"Guaranties"** - means any guaranty agreement given by Guarantor(s) to Lender, as may be Modified from time to time.

**"Hazardous Substances"** - means (a) Any flammable substance, explosive, radioactive material, hazardous material, hazardous waste, toxic substance, solid waste, pollution, contaminate, or any related material, raw material, substance, product, or by product of any substance specified in or regulated or otherwise affected by any Environmental Law, (b) any toxic chemical or other substance from or related to industrial, commercial, or institutional activities, (c) asbestos, gasoline, diesel fuel, motor oil, waste and used oil, heating oil, and other petroleum products or compounds, polychlorinated biphenyls, radon gas, and urea formaldehyde, and (d) all other substances or waste of any nature regulated pursuant to any Environmental Law. *Intentionally omitted.*

**"Hazardous Substances Agreement"** - *Intentionally omitted.*

**"Historical Financial Statements"** - is defined in Section 3.7.

**"Indebtedness"** - means indebtedness evidenced by the Note and any of the other Loan Documents including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under the Note or under any of the other Loan Documents. Indebtedness also includes all (i) indebtedness or liability for borrowed money or for the deferred purchase price of property or services (including trade obligations); (ii) current liabilities in respect of unfunded vested benefits under any pension plan; (iii) obligations under letters of credit issued for the account of any Person; (iv) obligations arising under acceptance facilities; (v) guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss; and (vi) obligations secured by any Lien on property owned by any Person, whether or not the obligations have been assumed.

**"Individual Guarantor"** – means Michael Stillwell, an adult individual.

**"Insurance Policies"** - means the policies of insurance actually carried by or required in the Loan Documents to be carried by Borrower or any other Person.

**"Internal Revenue Code"** - means the Internal Revenue Code of 1986, as amended from time to time.

**"ISDA"** - *Intentionally omitted.*

**"Land"** - *Intentionally omitted.*

"**Lease**" - means any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of any real property, and every renewal or Modification thereof, every option therefor, and all related agreements, as well as any sublease or other agreement entered into in connection with such lease, sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, including cash or other security deposits.

"**Legal Requirements**" - means all applicable statutes, laws, rules, orders, regulations, codes, ordinances, judgments, decrees and injunctions of any court or Governmental Authorities affecting Borrower, whether now or hereafter enacted and in force, including the Americans with Disabilities Act of 1990, and all permits, approvals, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any agreements, easements, contracts or other instruments, either of record or known to Borrower, at any time in force and affecting Borrower or any of its real or personal property, including any which may (i) require repairs, modifications or alterations or (ii) in any way limit the use and enjoyment thereof.

"**Lender Affiliate**" - means any bank or non-bank subsidiary (other than Lender) of Lender.

"**Lender Certifications and Covenants**" - *Intentionally omitted.*

"**Lender Costs**" - means all taxes and reasonable insurance premiums of every kind and nature of Borrower paid by Lender pursuant to and/or in connection with this Agreement or any of the other Loan Documents; all filing, recording, publication, and search fees incurred in connection with and relating to any Obligor paid by Lender pursuant to and/or in connection with this Agreement or any of the other Loan Documents; all reasonable out-of-pocket costs (including reasonable attorneys' fees) incurred and sums expended by Lender (i) in connection with preparation of the Loan Documents or, with or without suit, to correct any Event of Default, (ii) to make advances of principal and interest or payments to prior secured parties, (iii) to enforce any right or remedy of Lender with respect to any other lender relative to the Loan, (iv) reasonable actual out-of-pocket costs following the occurrence of an Event of Default, including appraisal, accounting, consulting and attorneys' fees and expenses incurred by Lender in preparing, reviewing, enforcing, amending, modifying, administering, defending or otherwise concerning this Agreement or any other Loan Document or any portion hereof or thereof; and, whether or not suit is brought, all reasonable out-of-pocket costs (including reasonable attorneys' fees) of arbitration, bankruptcy and insolvency proceedings.

"**Lien**" - means (i) any lien, judicial lien (including, without limitation, any judgment by any court, arbitrator or governmental authority), assignment, charge, conditional sale or other title retention agreement, lease constituting a capital lease, hypothecation, mortgage, pledge or other security interest, encumbrance or title retention agreement of any kind, whether legal or equitable, in respect of any property of a Person, or upon the income, rents or profits therefrom; (ii) any arrangement, express or implied, under which any property of a Person is transferred, sequestered or otherwise identified for the purpose of subjecting the same to the payment of indebtedness or performance of any other obligation in priority to the payment of the general unsecured creditors of such Person; (iii) any indebtedness for wages or indebtedness arising for any other reason which is unpaid more than thirty (30) days after the same shall have become due and payable and which, if unpaid, might, by Section 507 of the Bankruptcy Code or any other law (whether or not the events or conditions (other than the existence of such

indebtedness or the initiation of legal proceedings available generally to unsecured creditors) set forth in such law have occurred or been satisfied), be given any priority whatsoever over general unsecured creditors of such Person; and (iv) the filing of, or any agreement to give, any financing statement under the Code or its equivalent of any jurisdiction to evidence any of the foregoing.

**"Limited Partner"** or **"Limited Partners"** – *Intentionally omitted.*

**"Loan"** - is defined in Section 2.1.

**"Loan Documents"** - means, collectively, the Note, the Guaranty and any other document, instrument or agreements executed by any Obligor in connection with the Loan, as each may be Modified from time to time, each of which may be referred to herein individually as a "Loan Document."

**"Loan Fee"** - means the sum of Two Hundred Ninety-Six Thousand Dollars ($296,000), being two percent (2%) of the principal sum of the Loan, due and payable upon execution of this Agreement, of which one percent (1%) shall be paid directly to the Federal Reserve Bank of Boston.

**"Loan Maturity Date"** - means the date set forth in the Note issued pursuant to this Agreement on which a Loan is scheduled to be paid in full, unless such date is otherwise accelerated in accordance with the terms of this Agreement or any other Loan Document.

**"Loans or Debt Instruments"** - means debt for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments and all guarantees of the foregoing.

**"MSPLF"** - is defined in Section 2.4.

**"Manager"** – means any manager or managing member of any Borrower or any Entity Guarantor.

**"Margin Stock"** - as defined under Regulation U of the Board of Governors of the Federal Reserve System, as amended from time to time.

**"Material Adverse Effect"** - means a material adverse effect on: (i) the property, assets, financial condition, business or operations of and Obligor; (ii) the ability of Borrower to perform any payment or other obligations under this Agreement, the Note, or any other Loan Document to which Borrower is a party; (iii) the legality, validity or enforceability of the obligations of Borrower or Guarantor under this Agreement, the Note, or any other Loan Document to which Borrower or Guarantor is a party; or (d) the ability of Lender to exercise its rights and remedies with respect to, or otherwise realize upon, any property of Borrower.

**"Member"** or **"Members"** – means, individually, each Person who is a member of or owns a membership interest in any Borrower or any Entity Guarantor, and collectively, all such Persons.

**"Modification"** - means any extension, renewal, substitution, replacement, supplement, amendment or modification of any agreement, certificate, document, instrument or other

writing, at any time and from time to time. "Modified" or "Modify" refers to the status of or the act of making any such agreement, etc., after the occurrence of any of the foregoing.

**"Mortgage Debt"** - means (i) Debt secured only by real property at the time of origination of the Loan and (ii) limited recourse equipment financings (including equipment capital or finance leasing and purchase money equipment loans) secured only by the acquired equipment.

**"Mortgaged Property"** - *Intentionally omitted.*

**"MSLP Agent"** - is defined in Section 6.2.

**"Multiemployer Plan"** - has the meaning ascribed to such term in Section 4001(a)(3) of ERISA.

**"Net Operating Income"** - is defined in Section 4.2(b)(ii).

**"Note"** - is defined in Section 2.2.

**"Obligations"** - means (i) any and all Indebtedness, obligations, letters of credit, liabilities, duties and agreements of every kind and nature (a) of any Obligor to or with Lender and (b) related to the Loan or arising out of any Loan Document, whether direct or indirect, secured or unsecured, arising by operation of law or otherwise and however acquired, including, without limitation, by assignment, (ii) all obligations of any Obligor for any future advances made by Lender to any Obligor pursuant to the Loan Documents whether or not evidenced by a promissory note and all obligations under any renewals, extensions or changes in form of, or substitutions for, any of said Indebtedness, obligations or liabilities; (iii) all sums and charges to be paid to Lender pursuant to the Loan Documents including, but not limited to Lender Costs; and (iv) all interest and late changes on any of the foregoing.

**"Obligor"** - Borrower and Guarantors.

**"OFAC"** - is defined in Section 3.13.

**"Other Charges"** - *Intentionally omitted.*

**"PBGC"** - means the Pension Benefit Guaranty Corporation.

**"Pension Plan"** - means an "employee benefit plan" (within the meaning of ERISA Section 3(3)) that a Controlled Group member at any time sponsors, maintains, contributes to, has liability with respect to or has an obligation to contribute to such plan or any other pension plan as defined in Section 3(2) of ERISA with respect to which Borrower or any Subsidiary has incurred or may incur liability, including contingent liability, under Title IV of ERISA, to such plan or to the PBGC including, without limitation, any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any Subsidiary of Borrower or ERISA Affiliate (or by any Person that was an ERISA Affiliate within the last six (6) years), or with respect to which Borrower or Subsidiary of Borrower or ERISA Affiliate has any liability, whether actual or contingent.

**"Permitted Distribution"** - means any distributions to Borrower's members or partners so long as no Event of Default has occurred and is continuing, such distributions do not violate any provisions of the Main Street Loan Program and Borrower is in full compliance with all covenants in this Agreement.

**"Permitted Indebtedness"** - means: (i) Indebtedness owing by Borrower to Lender and outstanding indebtedness shown on current financial statements of Borrower as previously provided to and approved by Lender; (ii) Indebtedness incurred by Borrower in favor of trade creditors in the ordinary course of business, including, without limitation, for the purchase of supplies, insurance and services; (iii) Indebtedness of Borrower in respect of taxes, assessments, governmental charges, workers' compensation, levies and claims for labor, materials, supplies and rentals to the extent otherwise permitted under this Agreement to remain unpaid and undischarged; (iv) Mortgage Debt; or (v) Indebtedness of Borrower incurred with respect to the purchase or lease of machinery or equipment (including capitalized lease obligations associated with the acquisition of any such assets); provided if the total lease or debt payments exceed Fifty Thousand Dollars ($50,000), Borrower shall first obtain Lender's consent to enter into any such lease or purchase financing, which consent shall not be unreasonably withheld or delayed. In any case, no Permitted Indebtedness shall at any time be of senior priority to the Loan or Loan Documents.

**"Permitted Liens"** - means: (i) *intentionally omitted*; (ii) Liens for taxes, assessments or governmental charges or levies not yet due or which are delinquent and which are being contested in good faith and by appropriate proceedings, promptly initiated and diligently conducted, for which reserves satisfactory to Lender have been established in accordance with Borrower's Applicable Method of Accounting with respect thereto and as to which foreclosure, distraint, sale or other similar proceedings shall not have been commenced; (iii) *intentionally omitted*; (iv) *intentionally omitted.*

**"Permitted Transfer"** - means any transfer of a membership interest in any Borrower or any Entity Guarantor by a Member, as the case may be, to (i) heirs, legatees, executors, administrators or personal representatives of such Member upon the death, bankruptcy, adjudication or incompetency of such member or partner, or by operation of law; (ii) the trustee or trustees of an irrevocable trust whose primary beneficiaries is a member or partner and/or the spouse, ancestors or linear descendants of such member or partner, or a trust revocable solely by such member or partner; (iii) to the beneficiary or beneficiaries of any trust which is a member or partner; and (iv) with respect to any member or partner which is a Pension Plan, to a successor trustee, or to effect a merger, consolidation, or transfer of assets and liabilities of one or more plans funded by such member or partner in compliance with Internal Revenue Code Section 414(l).

**"Person"** - means any individual, corporation, limited liability company, partnership, joint venture, trust, unincorporated association, government or political subdivision or other entity, body, organization or group.

**"Prohibited Person"** - is defined in <u>Section 3.13</u>.

**"Purpose"** - is defined in <u>Section 2.4</u>.

**"Rent Roll"** - *Intentionally omitted.*

**"Reportable Event"** - means any event with regard to a Pension Plan described in Section 4043(b) of ERISA, or in Regulations issued thereunder.

**"Security Agreement"** - *Intentionally omitted.*

**"Shareholder"** or **"Shareholders"** - *Intentionally omitted.*

**"Special Purpose Entity"** - *Intentionally omitted.*

**"SPV"** - is defined in Section 9.19(a).

**"Subsidiary"** - means any corporation of which at least twenty-five percent (25%) of the voting stock or equity interests are owned by Borrower directly, or indirectly through one or more Subsidiaries.

**"Swap"** and/or **"Swap Transaction"** - *Intentionally omitted.*

**"Swap Indebtedness"** - *Intentionally omitted.*

**"Swap Transaction Documents"** - *Intentionally omitted.*

**"Taxes"** - *Intentionally omitted.*

**"Tenant"** - *Intentionally omitted.*

**"Title Insurer"** - *Intentionally omitted.*

**"Title Policy"** - *Intentionally omitted.*

**"Trigger Date"** - is defined in Section 7.4.

**"USA Patriot Act"** - means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

**1.2 Accounting Terms.** All accounting terms not otherwise defined herein shall have the meaning assigned to them in accordance with the Applicable Method of Accounting.

**1.3 UCC Definitions.** Unless otherwise defined in this Agreement, capitalized words shall have the meanings set forth in the Code as in effect in the Commonwealth of Pennsylvania on the Effective Date.

**1.4 Construction of Terms.** Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, the singular the plural and the part the whole and "or" has the inclusive meaning represented by the phrase "and/or." The term "Borrower" shall refer jointly and severally to each of Coulbee, Lion, Lion Management, Streamline, Streamline Solutions, Streamline Realty, Streamline Partners, Streamline Home and Streamline Commercial unless the context clearly requires otherwise. The neuter shall be deemed to include the masculine and the feminine, as the context may require. References in this Agreement to "determination" by Lender include good faith estimates by Lender (in the case of quantitative determinations) and good faith beliefs by Lender (in the case of qualitative determinations). The words "hereof," "herein,"

"hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The section and other headings contained in this Agreement preceding this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect. Section, subsection, schedule and exhibit references are to this Agreement, unless otherwise specified.

## ARTICLE II. The Financing

**2.1 Loan.** Lender agrees, based on the terms and conditions and relying upon the representations and warranties set forth in this Agreement, to lend to Borrower, and Borrower agrees to borrow from Lender, a loan in the amount of Fourteen Million Eight Hundred Thousand Dollars ($1) (the "Loan").

**2.2 The Note.** The Loan subject to this Agreement shall be evidenced in part by, and payable as provided in, a note executed by Borrower in favor of Lender of even date with this Agreement in the principal sum of the Loan (as it may be Modified from time to time, the "Note").

**2.3 Interest and Late Charges.**

(a) **Interest and Late Charges on the Loan.** The Loan shall bear interest from the Effective Date until the Loan Maturity Date (whether by acceleration or otherwise) and thereafter until paid in full on the unpaid principal amount thereof at a per annum rate equal to the interest rate set forth in the Note. If any payment of principal of or interest on the Note is not paid within ten (10) days of the date when due, Borrower shall pay to Lender any late charge set forth in the Note. The Note shall continue to accrue interest, including interest at the Default Rate if applicable, both before and after judgment has been rendered on the Note.

(b) **Computation of Interest and Payment.** Accrued interest on the Note shall be paid on the dates set forth in the Note, and on the date the Note is paid in full. Interest on the Note shall be calculated on the basis set forth in the Note. Principal payments shall be made as set forth in the Note.

(c) **Prepayment.** Borrower may prepay principal and interest under the Note in accordance with the terms thereof.

**2.4 Use of Proceeds.** Proceeds of the Loan shall be used solely to pay off existing indebtedness, invest in real estate projects, buy-out investors in various projects, pay off SBA -EIDL loan, for working capital and other purposes as permitted by the Main Street Priority Loan Facility ("MSPLF") and to pay related closing costs (the "Purpose"). At Closing, and provided all conditions precedent described in this Agreement and any other Loan Document have been satisfied in full, Lender shall make the proceeds of the Loan available to Borrower solely for the Purpose.

**2.5 Conditions Precedent.**

(a) **In General.** Lender shall not be obligated to fund the Loan if (a) any Event of Default shall occur or be continuing or (b) Borrower fails to meet any other conditions set forth in the Loan Documents or any condition precedent is not otherwise satisfied or waived by Lender in writing.

Borrower shall deliver, or cause to be delivered, to Lender at or before Closing, the duly executed Loan Documents and such other documents, agreements, assignments, disclosures, indemnities and other agreements as Lender may reasonably require and Lender shall also receive evidence of all insurance required by the Loan Documents.

(b) **Main Street Loan Program.** Notwithstanding anything to the contrary in Section 2.5(a), above, Lender shall not be obligated to fund the Loan unless and until (i) Lender receives a commitment letter from the Main Street Special Purpose Vehicle, (ii) Borrower has executed the "Borrower Certifications and Covenants" appended to this Agreement (the "Borrower Certifications and Covenants Addendum"), which certifications and covenants are incorporated by reference and restated as if more fully set forth at length herein, and (iii) Borrower has executed any other agreements, certifications, affidavits or other documents as may be required in connection with the Main Street Loan Program.

**2.6 Charge to Account.** On the date that any principal of, or interest on, the Loan, or of any fees, expenses or charges payable are due, Borrower authorizes Lender to debit the Direct Debit Account maintained with Lender on such due date in an amount equal to such unpaid principal, interest, fee, expense or charge, as applicable; provided that Lender shall be under no obligation to so debit any such Direct Debit Account.

**2.7 Loan Fee.** At the Closing and as a condition precedent to Lender funding the Loan, Borrower shall pay the Loan Fee to Lender. The Loan Fee has been fully earned by Lender as of the Effective Date hereof and is nonrefundable irrespective of the total amount of the Loan actually advanced.

**2.8 Fees.** Borrower agrees to pay to Lender or as directed by Lender any and all reasonable fees and actual out-of-pocket costs incurred by Lender in connection with the making of the Loan, including Lender's reasonable third party attorneys' fees and costs, appraisal fees, environmental or other inspection fees, recording costs, survey costs, inspection fees, title insurance fees and flood insurance premiums (if applicable) and other Lender Costs.

**2.9 Business Day.** Whenever any payment hereunder or under the Note is due on any day other than a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day and all interest and other fees shall accrue during such extension;

**2.10 No Setoff.** All amounts due pursuant to this Agreement and the other Loan Documents, principal, interest or otherwise, shall be payable and paid without setoff, counterclaim, defense or any other deduction whatsoever.

## ARTICLE III. Representations and Warranties

Borrower makes the following representations and warranties, which shall be deemed to be continuing representations and warranties so long as any Indebtedness of Borrower to Lender or any Lender Affiliate, including Indebtedness for fees and expenses, remains unpaid:

**3.1 Good Standing and Authority.** Each Borrower and each Entity Guarantor is a limited liability company, each of which is duly organized and validly subsisting under the laws of the Commonwealth of Pennsylvania and registered to do business a foreign entity and validly subsisting or in good standing in all jurisdictions in which the conduct of its business requires it to be so registered; each has all necessary power and authority to transact the business in which it is

engaged; each is duly licensed or qualified and in good standing in each other jurisdiction in which the conduct of such business requires such licensing or such qualification, except where the failure to be so licensed or qualified would not have a Material Adverse Effect. Each of Borrower and each Entity Guarantor has all necessary power and authority to enter this Agreement and to execute, deliver and perform this Agreement, the Note, the other Loan Documents and any other document executed by Borrower or Entity Guarantors in connection with this Agreement, all of which have been duly authorized by all proper and necessary action by the respective Borrower or Entity Guarantor. The individual executing the Loan Documents on behalf of each Borrower and each Entity Guarantor has full power and authority to bind such Borrower and such Entity Guarantor, respectively, to their terms by his or her signature;

3.2 **Valid and Binding Obligation**. This Agreement, the Note and any other Loan Document executed by Obligors in connection herewith constitute the legal, valid and binding obligations of the respective Obligor, enforceable in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy and insolvency laws and laws affecting creditor's rights generally;

3.3 **Good Title**. Borrower has sole good and marketable title to its real property and good and valid title to all of its personal tangible and intangible property, none of which is subject to any third party rights or claims nor any mortgage, indenture, pledge, Lien, conditional sale contract, security interest, encumbrance, claim, assignment, trust or charge except for Permitted Liens or as referred to in the financial statements described herein or except as otherwise permitted herein;

3.4 **No Pending Litigation**. There are no actions any actions, suits, proceedings (whether or not on behalf of Borrower) or investigations pending or, to the best of Borrower's knowledge, threatened in writing against Borrower which, if adversely determined, would, in any case or in the aggregate, have a Material Adverse Effect, or which question the validity of this Agreement, the Note or other Loan Documents required by this Agreement, or any action taken or to be taken pursuant to any of the foregoing;

3.5 **No Consent or Filing**. No consent, license, approval, order or authorization of, or registration, declaration or filing with, any court, Governmental Authority or other Person, which has not been obtained or made, is required in connection with Borrower's or Guarantor's valid execution, delivery or performance of this Agreement, the Note or other Loan Documents required by this Agreement or in connection with any of the transactions contemplated thereby;

3.6 **No Violations**. Neither Borrower nor any Entity Guarantor is in violation of any term of its Constituent Documents, nor is any Obligor in violation in any material respect of any mortgage, borrowing agreement or other instrument or agreement pertaining to Indebtedness for borrowed money. Borrower is not in violation of any term of any other indenture, instrument or agreement to which it is a party or by which it may be bound, resulting, or which might reasonably be expected to result, in a Material Adverse Effect. Obligors are not in violation of any order, writ, judgment, injunction or decree of any court or other tribunal of competent jurisdiction. To Borrower's best knowledge, Borrower is not in violation of any statute, rule or regulation of any Governmental Authority, the violation of which could have a Material Adverse Effect. The execution and delivery of this Agreement, the Note and other Loan Documents required by this Agreement and the performance of all of the same is and will be in compliance with the foregoing and will not result in any violation or result in the creation of any mortgage, Lien, security interest, charge or encumbrance upon any properties or assets of Borrower except in favor of Lender. There exists no fact or

circumstance not disclosed in this Agreement or in the documents furnished in connection herewith (other than general economic conditions) which does, or in the future could, have a Material Adverse Effect;

3.7 **Financial Statements.** Obligors have furnished to Lender financial statements showing Borrower's and Guarantor's financial condition as of the end of Borrower's and Guarantor's respective most recently completed fiscal year, with any updates, which statements represent fairly the results of its operations and transactions as of the dates and for the period referred to and have been prepared in accordance with the Applicable Method of Accounting (the "Historical Financial Statements"). From the date of such Historical Financial Statements to the Effective Date of this Agreement, there has not been any Material Adverse Effect or any fire, explosion, accident, flood, drought, storm, earthquake, condemnation, statutory or regulatory change, act of God, or act of public enemy or other casualty, whether or not insured, which would cause a Material Adverse Effect. To Borrower's knowledge, subject to any limitations stated therein or in connection therewith, all information furnished or to be furnished by Borrower pursuant to the terms hereof is, or will be at the time the same is furnished, accurate and complete in all material respects necessary in order to make the information furnished, in the light of the circumstances under which such information is furnished, not misleading. No fact or circumstance exists which would make any information delivered by Borrower to Lender inaccurate, incomplete or misleading in any material respect when taken as a whole;

3.8 **Tax Returns.** Borrower each Entity Guarantor has duly and timely filed all federal, state and municipal income and other tax returns required to be filed and has paid all taxes required by such returns through the last period which such taxes were due. Neither Borrower nor any Entity Guarantor has received any assessments by the Internal Revenue Service or other taxing authority for additional unpaid taxes;

3.9 **ERISA Matters.**

(a) **ERISA Compliance.**

(i) Borrower is not and will not be a Benefit Plan Investor;

(ii) Neither Borrower nor any Subsidiary of Borrower or ERISA Affiliate maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under a plan subject to Section 302 or Title IV of ERISA or Internal Revenue Code Section 412;

(iii) Neither Borrower nor any Subsidiary of Borrower or ERISA Affiliate has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Pension Plans is part of, or has at any time been part of, a multiple employer welfare arrangement, as defined in Section 3(40) of ERISA. No Pension Plan is or has at any time been a multiple employer plan, as described in Internal Revenue Code Section 413(c) or Sections 4063 or 4064 of ERISA, and neither Borrower nor any Subsidiary of Borrower or ERISA Affiliate has ever contributed to or had an obligation to contribute to any such plan;

(iv) No ERISA Event has occurred or is reasonably expected to occur;

(v) No employee welfare benefit plan within the meaning of Section 3(I) or 3(2)(B) of ERISA of Borrower or any Subsidiary of Borrower provides benefit coverage

subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws;

(vi) Each Pension Plan is in material compliance with all applicable provisions of ERISA, the Internal Revenue Code and any other applicable law. Each Pension Plan that is intended to qualify under Internal Revenue Code Section 401(a) has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 200744, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification;

(vii) No Prohibited Transactions has occurred with respect to any such Pension Plan;

(b) **Termination or Withdrawal.** Except in compliance with all applicable laws and regulations, no Pension Plan has been terminated or partially terminated or is insolvent or in reorganization, nor have any proceedings been instituted or any other steps taken to terminate or reorganize any Pension Plan; neither Borrower nor any Subsidiary or ERISA Affiliate has withdrawn from any Pension Plan, nor has a condition occurred which if continued would result in a complete or partial withdrawal; neither Borrower or any Subsidiary or ERISA Affiliate has incurred any liability to the PBGC other than for required insurance premiums which have been paid when due; and no Pension Plan or other "employee pension benefit plan" has an "accumulated funding deficiency," as such term is used in Section 3 of ERISA;

(c) **Minimum Funding Standards.** All Pension Plans meet the minimum funding standards of Section 302 of ERISA; and

(d) **Liability.** Borrower has no existing liability to the PBGC;

**3.10 Solvency.** Borrower is not insolvent as defined in any applicable state or federal statute, nor will either Borrower be rendered insolvent by the execution and delivery of this Agreement, the Note or any of the other Loan Documents. After the making of the Loan, Borrower reasonably expects to (a) be able to pay its debts as they become due, (b) have funds and capital sufficient to carry on its business and all businesses in which it is about to engage, and (c) own property having a value at both fair valuation and at fair salable value in the ordinary course of Borrower's business greater than the amount required to pay its debts as they become due;

**3.11 Federal Reserve Regulations.** Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loan will be used, directly or indirectly, for a purpose which violates any law, rule or regulation of any governmental body, including without limitation the provisions of Regulations U or X of the Board of Governors of the Federal Reserve System, as amended. No part of the proceeds of the Loan will be used, directly or indirectly, to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock;

**3.12 Environmental Matters.** Except as provided in those certain environmental summaries and reports previously received by Lender for any real property owned by Borrower (the "Environmental Reports") or as otherwise disclosed to Lender in writing, it being understood that

Borrower has not undertaken any independent investigation as to the matters described below: (a) to Borrower's Actual Knowledge, no above ground or underground storage tanks containing any Hazardous Substances are or have been located on any property owned, leased or operated by Borrower; (b) to Borrower's Actual Knowledge, no property owned, leased or operated by Borrower or any Subsidiary is used for the unpermitted or unauthorized treatment, storage or disposal of Hazardous Substances; (c) to Borrower's Actual Knowledge, no Release of a Hazardous Substance has occurred or is threatened on, at, or from any property owned, leased or operated by Borrower or any Subsidiary that will now or in the future (based on Environmental Laws currently in effect) require (i) remedial or corrective action, removal, monitoring or closure pursuant to any Environmental Laws currently in effect or (ii) Borrower or any Subsidiary to incur costs pursuant to the terms or conditions of any lease; (d) Neither Borrower nor its real property is subject to any existing, pending or, to Borrower's Actual Knowledge, threatened suit, claim, notice of violation or request for information under any material Environmental Law; and (e) to Borrower's Actual Knowledge, Borrower and any Subsidiary of Borrower are in compliance in all material respects with, and have obtained all Environmental Permits required by all Environmental Laws;

**3.13 Prohibited Person Compliance.** Neither Borrower nor Guarantor nor any of their respective Affiliates is or will be a Person (a) that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 issued on September 24, 2001; (b) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons;" (c) who commits, threatens to commit or supports "terrorism," as defined in Executive Order No. 13224; or (d) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in subparts (a) - (d) above are herein referred to as a "Prohibited Person"). Borrower covenants and agrees that neither Borrower nor Guarantor nor any of their respective Affiliates will knowingly (i) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services to or for the benefit of a Prohibited Person, or (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224. Borrower further covenants and agrees to deliver (from time to time) to Lender any such certification or other evidence as may be requested by Lender in its sole and absolute discretion, confirming each such representation;

**3.14 Regarding the Mortgaged Property.** *Intentionally Omitted.*

**3.15 Surveys.** *Intentionally Omitted.*

**3.16 No Broker.** Borrower has not dealt with any Person who is or may be entitled to any brokerage commission, finder's fee, loan commission or other sum in connection with the execution of this Agreement, the consummation of the transactions contemplated hereby or the making of the Loan. Borrower shall indemnify, defend and hold Lender harmless from and against any and all losses, costs, liabilities and expenses, including reasonable attorneys' fees, that Lender may suffer or sustain should the representation and warranty set forth in this paragraph prove to be inaccurate or not performed in whole or in part;

**3.17 Accuracy.** To Obligors' knowledge, all reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or required by this Agreement or any of the other Loan Documents, including, without limitation, the Borrower Certifications and Covenants Addendum attached hereto, are accurate, correct and sufficiently complete in all material

respects to give Lender true and accurate knowledge of their subject matter, and do not contain any untrue statement of a material fact or omit any material fact necessary to make the same not misleading. There is no fact known to Obligors which may result in a Material Adverse Effect on the business, assets, operations, financial condition or results of operation of Borrower and which has not otherwise been fully set forth in this Agreement or in the Loan Documents, other than general economic and market conditions;

3.18 **Flood**. *Intentionally Omitted*;

3.19 **Taxes; Fees**. *Intentionally Omitted.*

3.20 **Leases; Rent Roll**. *Intentionally Omitted.*

3.21 **Taxes Pertaining to the Mortgaged Property**. *Intentionally Omitted*;

3.22 **Bank Holding Company**. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System;

3.23 **No Casualty**. *Intentionally omitted*;

3.24 **Purchase Options**. *Intentionally omitted*;

3.25 **FIRPTA**. Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Internal Revenue Code;

3.26 **PUHCA**. Borrower is not a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company," all as defined in the Public Utility Holding Company Act of 1935, as amended;

3.27 **Insurance**. Borrower has obtained and has delivered to Lender original or certified copies of all Insurance Policies required in connection with the Loan, with all premium installments having been timely paid to date, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any of the Insurance Policies for which coverage has been disclaimed, denied, limited or provided under a reservation of rights, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Insurance Policies;

3.28 **Physical Condition**. *Intentionally Omitted*;

3.29 **Use of Proceeds of Loan; Federal Reserve Regulations**. Borrower has not engaged principally, or as one of their important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System). Notwithstanding any other provision in this Agreement to the contrary, Borrower will not, directly or indirectly, use any part of such proceeds for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock, or for any purpose which violates, or is inconsistent with, Regulation X of the Board of Governors of the Federal Reserve System;

3.30 **Eligible Contract Participant Status**. *Intentionally Omitted*;

3.31 **Labor**. As of the Effective Date of this Agreement, Borrower is not involved in any strike, lock-out, boycott or any other labor dispute, similar or dissimilar, nor is it involved in labor negotiations;

3.32 **Group Health Plans**. If and to the extent Borrower is or at any time becomes subject to Internal Revenue Code Section 4980B(f) and/or Section 1862(b)(1) of the Social Security Act, Borrower represents and warrants or shall be deemed to represent and warrant, as appropriate, that Borrower (a) provides or will provide COBRA Continuation Coverage under group health plans for separating employees in accordance with the provisions of Internal Revenue Code Section 4980B(f); and (b) is or will be in compliance with the provisions of Section 1862(b)(1) of the Social Security Act;

3.33 **Financial; Main Street Priority Lending**. Borrower has no other secured Loans or Debt Instruments, other than Mortgage Debt. Borrower has a reasonable basis to believe that, as of the date of this Agreement and giving effect to the Loan, Borrower has the ability to meet its financial obligations for at least a period of ninety (90) days following closing of the Loan and Borrower does not expect to file for bankruptcy during such time period. Borrower is eligible to participate in the Main Street Priority Lending Program and, further in that regard, without limitation, Borrower certifies it is not in violation of any conflict of interest prohibitions described in Section 4019(b) of the CARES Act.

3.34 **Nature of Representations and Warranties**. All representations and warranties made in this Agreement and all other Loan Documents are true and correct in all material respects and do not contain any untrue statement of a material fact or omit any material fact necessary to make such representations and warranties not misleading. Any such representations and warranties shall remain true and correct in all material respects and shall survive so long as any Obligations have not been satisfied or the Loan or any part thereof remains outstanding except as expressly provided in the Loan Documents. Each representation and warranty made in this Agreement, in any other Loan Document and in any other document delivered to Lender by Borrower shall be deemed to have been relied upon by or on behalf of Lender, or any disbursement made by Lender related thereto.

## ARTICLE IV. Affirmative Covenants

Borrower covenants and agrees to do the following from the date of Closing of the Loan until satisfaction in full of the obligations under the Loan Documents:

4.1 **Use of Proceeds**. Use the proceeds of the Loan solely as set forth in Section 2.4;

4.2 **Financial Documents**.

(a) **Requirements**. Furnish to Lender or cause to be furnished to Lender the following financial information, tax returns and such additional information, reports or statements as Lender may from time to time reasonably request regarding the financial and business affairs of Borrower:

(i) **Annual Financials**. As soon as available, but in any event within sixty (60) days after the end of Borrower's fiscal year, Borrower shall deliver to Lender financial reporting in a form and substance reasonably acceptable to Lender setting for the financial information, and

where applicable, reasonably detailed calculations of the required data, set forth on Exhibit 4.2(a)(i) attached hereto as at the end of such fiscal year of Borrower, which financial reporting and calculations, in each case, shall be true and accurate in all material respects and, where applicable, present fairly in all material respects the financial condition of Borrower for the period covered thereby in accordance with Borrower's Applicable Method of Accounting, consistently applied

(ii) **Quarterly Financials.** As soon as available, but in any event within sixty (60) days after the end of each fiscal quarter of Borrower, Borrower shall deliver to Lender financial reporting in a form and substance reasonably acceptable to Lender setting for the financial information, and where applicable, reasonably detailed calculations of the required data, set forth on Exhibit 4.2(a)(ii) attached hereto as at the end of such fiscal quarter of Borrower, which financial reporting and calculations, in each case, shall be true and accurate in all material respects and, where applicable, present fairly in all material respects the financial condition of Borrower for the period covered thereby in accordance with Borrower's Applicable Method of Accounting, consistently applied;

(iii) **Tax Returns.** As soon as available, and in any event within the earlier to occur of one hundred twenty (120) days of year-end or within thirty (30) days of the date of actual filing, but in no event later than October 31 of each year, signed copies of all federal and state tax returns of Borrower, including all related schedules and forms, for the respective fiscal year(s), all in reasonable detail and scope and certified to Lender's satisfaction. If any extension to file said tax returns is filed with the Internal Revenue Service, Borrower shall, within fifteen (15) days of filing such an extension, deliver to Lender a copy of such filed extension (including all attachments thereto);

(iv) **Guarantor's Tax Returns and Financial Statements.** Borrower shall cause Guarantors to furnish such tax returns, financial statements and other financial statements in accordance with the requirements of the Guaranty;

(v) **Rent Roll.** Intentionally Omitted.

(vi) **Other.** Such other financial documentation or statements as Lender reasonably requests from time to time.

(vii) **Compliance Certificate.** Concurrently with each delivery of financial statements described above in this Section 4.2, a compliance certificate signed by each Borrower's chief financial officer (or other officer acceptable to Lender) and otherwise in form and substance satisfactory to Lender (i) certifying that to the best of that officer's knowledge and belief, (A) those financial statements have been prepared in accordance with Borrower's Applicable Method of Accounting and fairly present in all material respects Borrower's financial condition and results of operations, if any, in accordance with Borrower's Applicable Method of Accounting subject, in the case of interim financial statements, to routine year-end adjustments and (B) no Event of Default then exists or if any does, a brief description of the Event of Default and Borrowers intentions in respect thereof and (ii) setting forth calculations with respect to Section 4.2(b), below;

(viii) **Main Street Loan Program.** Comply with all requirements of the Main Street Loan Program including, without limitation, making commercially reasonable efforts to retain employees during the term of the Loan. Specifically, among other things: (A) Borrower shall undertake good-faith efforts to maintain payroll and retain employees, in light of its capacities, the economic environment, its available resources, and the business need for labor; (B) Borrower will

follow compensation, stock repurchase and capital distribution restrictions as they apply to direct loan programs under Section 4003(c)(3)(A)(ii) of the CARES Act; provided, if Borrower is an "S" corporation, Borrower may make distributions to its members or partners, as the case may be, to the extent reasonably required to cover their tax obligations in respect of Borrower's earnings; (C) Borrower will not seek to cancel or reduce any of Borrower's committed lines of credit, if any, with Lender or any other lender; (D) Borrower shall not repay the principal balance of, or pay interest on, any other Debt until the Loan is repaid in full unless such payment is mandatory and due.

**4.3 Taxes.**

(a) **Payment.** Promptly pay and discharge all of its taxes, assessments and other governmental charges prior to the date on which penalties are attached thereto, establish adequate reserves for the payment of taxes and assessments and make all required withholding and other tax deposits. Nothing herein shall be interpreted to require the payment of any tax, assessment or charge so long as its validity is being contested in good faith and by appropriate proceedings diligently conducted, and Borrower has established an adequate reserve for any such expense;

(b) **Tax and Insurance Escrow.** *Intentionally Omitted.*

**4.4 Insurance.** Maintain all Insurance Policies as reasonably required by Lender in accordance with and as further described on Exhibit 4.4 attached hereto and (a) keep all of Borrower's property so insurable insured at all times with responsible insurance carriers against fire, theft, flood (if applicable) and other risks in coverage, form and amount reasonably satisfactory to Lender and as is customary in the case of other Persons engaged in the same or similar business or having similar properties similarly situated; (b) keep adequately insured at all times in reasonable amounts with responsible insurance carriers against liability on account of damage to persons or property and under all applicable worker's compensation laws; (c) promptly deliver to Lender certificates of insurance in form and content acceptable to Lender for any of those Insurance Policies required to be carried by Borrower pursuant hereto which shall be in the name of Lender and Lender's successors and/or assigns, with appropriate endorsements designating Lender as additional insured and mortgagee or lender loss payee, or both, as requested by Lender and written confirmation of renewal of each such policy at least fifteen (15) days in advance of the applicable expiration date; and (d) cause each such Insurance Policy to require the insurer to provide Lender with prompt written notice of cancellation. If Borrower fails to comply with this Section 4.4 within five (5) days' written notice from Lender, Lender is authorized to obtain such Insurance Policies in the name of Borrower or Lender at the expense of Borrower;

**4.5 Litigation.** Promptly notify Lender in writing as soon as Borrower has knowledge thereof, and furnish or cause to be furnished to Lender such information regarding the same as Lender may request of (a) the institution or filing of any litigation, action, suit, claim or counterclaim to which Borrower is a party, or (b) any administrative proceeding against, or investigation of Borrower by or before any regulatory body or governmental agency, where (i) the outcome of such litigation, action, suit, claim, counterclaim, administrative proceeding or investigation may have a Material Adverse Effect, or (ii) such litigation, action, suit, claim, counterclaim, administrative proceeding or investigation questions the validity of this Agreement, the Note, or any other Loan Documents, or any action taken or to be taken pursuant to the foregoing; and furnish or cause to be furnished to Lender such information regarding the same as Lender may request;

4.6 **Entity Standing**. Maintain Borrower's existing entity status in good standing in its jurisdiction of formation and remain or become duly licensed or qualified and in good standing in each jurisdiction in which the conduct of its business requires such qualification or licensing, except where the failure to be so licensed or qualified would not have a Material Adverse Effect;

4.7 **Books and Records**. Maintain proper books and records in accordance with Borrower's Applicable Method of Accounting, consistently applied, and notify Lender promptly in writing of any proposed change in the location at which such books and records are maintained;

4.8 **Single Purpose Entity**. *Intentionally omitted.*

4.9 **Notices**. Notify Lender in writing of the occurrence of any:

(a) Event of Default or any act or condition, which, with the giving of notice or the passage of time might become an Event of Default;

(b) Intentionally Omitted;

(c) material dispute that may arise between Borrower and any Governmental Authority or law enforcement;

(d) *Intentionally Omitted*; and

(e) change in its place of business from its present place of business and/or locations.

4.10 **Environmental Compliance.**

(a) **Compliance**. *Intentionally Omitted.*

(b) **Notice of Release**. Immediately notify Lender (and any other Person whom Borrower is required to notify pursuant to any applicable Environmental Laws) once it is aware of a release or threatened release of Hazardous Substances or any violation of any Environmental Law on, from or near any real estate owned, used or leased by Borrower, which might require any remedial action or reporting to any Governmental Authority;

(c) **Clean-Up**. Immediately notify Lender once an environmental investigation or clean-up proceeding is instituted by any Person in connection with such real estate;

(d) **Investigation**. Fully comply with and assist any such environmental investigation and clean-up proceeding;

(e) **Remedial Action**. Promptly execute and complete any remedial actions necessary to ensure that such real estate is in compliance with all applicable Environmental Laws and free from contamination, and to ensure that no environmental Liens are levied against or exist with respect to such real estate;

(f) **Citation**. Immediately notify Lender of any material citation, notification, complaint, or violation received from any Person which relates to or pertains to the making, storing, handling, treating, disposing, generating, transporting or release of any Hazardous Substances;

**4.11** **Maintain Operating Accounts; Direct Debit.** Borrower agrees to maintain with Lender Borrower's Direct Debit Account and operating accounts (collectively, "Depository Accounts"); provided the minimum account balance required by Lender cannot at any time exceed 15% of the outstanding principal amount of the Loan. At the option of Lender, all interest payments, principal payments and fees will automatically be deducted from Borrower's primary Direct Debit Account or other Depository Account;

**4.12** **Estoppel Certificates and Subordination, Non-Disturbance and Attornment Agreements.** *Intentionally Omitted*;

**4.13** **Reimbursement.** Reimburse (with interest at the highest rate in the Note) Lender promptly for all reasonable Lender Costs, including the cost of title insurance premiums, charges and update fees, fees and expenses of Lender's attorneys, legal documentation costs, survey costs, appraisal costs, lending fees, environmental inspection fees, recording fees and taxes and all other expenses paid in connection with the preparation, closing, Modification, enforcement and administration of the Loan and the Loan Documents, all of which, to the extent incurred before Closing, Lender is authorized to advance from the Loan or deduct from the proceeds of any disbursement of all or any portion of the Loan;

**4.14** **Compliance with Covenants, Agreements and Laws**. Comply with all material obligations under all Contracts and Leases;

**4.15** **Liens.** Promptly discharge or bond over any Lien or charge against any property other than Permitted Encumbrances;

**4.16** **Leases.** *Intentionally omitted*;

**4.17** **ERISA.** Promptly, and in any event within ten (10) days after the occurrence of a Reportable Event with respect to a Pension Plan, furnish to Lender a copy of any materials required to be filed with the PBGC with respect to such Reportable Event or those that would have been required to be filed if the thirty (30) day notice requirement to PBGC were not waived. In addition, promptly upon receipt, and in no event more than two (2) Business Days after receipt, of a notice by Borrower or any ERISA Affiliate or any administrator of any Plan or Multiemployer Plan that the PBGC has instituted proceedings to terminate such Plan or to appoint a trustee to administer such Plan, furnish to Lender a copy of such notice; and

**4.18** **Other Acts.** Execute and deliver, or cause to be executed and delivered, to Lender all further documents and perform all other acts and things which Lender deems necessary or appropriate to comply with all covenants and agreements and perform all other acts as may be required by the terms of the Borrower Certifications and Covenants Addendum or otherwise in connection with the Main Street Loan Program.

## ARTICLE V. Negative Covenants

Borrower, without the prior written consent of Lender, which Lender may withhold for any reason, covenants and agrees that Borrower will not do any of the following:

**5.1** **Borrowed Money.** Except for the Loan, the Permitted Indebtedness and as may be listed on a schedule attached hereto, if any, create, incur, assume or suffer to exist any Indebtedness or liability for borrowed money except to Lender. For the avoidance of doubt, Borrower may not and

shall not enter into any contract which would cause the Loan or any Loan Document to be subordinated in terms of priority to Borrower's other unsecured Loans or Debt Instruments or contractual obligations;

**5.2 Encumbrances, Negative Pledge and Debt.**

(a) Borrower will not, nor will it permit any Subsidiary to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, securing any debt for borrowed money or any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, or any guarantee of the foregoing. Further, Borrower shall not enter into any agreement with any Person, other than in connection with this Agreement, which creates or causes Borrower to incur, assume or suffer to exist any Lien upon or with respect to any real or personal property of Borrower or which prohibits or limits the ability of Borrower to create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien or other encumbrance upon any of its property. For the avoidance of doubt, Borrower is permitted to incur additional Debt or guarantee additional Debt, provided such obligations are not secured by Borrower's real or personal property, none of such additional Debt is senior in priority to the Loan or Loan Documents, the use of funds complies with all requirements of the Main Street Loan Program and, further provided Borrower notifies Lender in writing at least thirty (30) days before incurring or guaranteeing additional Debt and furnishes Lender all information regarding same as Lender may reasonably request;

(b) Become a guarantor, surety or otherwise liable for the Indebtedness or other obligations of any other Person, whether by agreement to purchase the Indebtedness of any other Person, or agreement for the furnishing of funds to any other Person through the purchase of goods, supplies or services (or by way of stock purchase, capital contribution, advance or loan) for the purpose of paying or discharging the Indebtedness of any other Person, or otherwise, except as an endorser of instruments for the payment of money deposited to Borrower's bank account for collection in the ordinary course of business;

**5.3 Sale of Assets or Merger.** Convey, sell, transfer, lease, or sell and lease back, all or any substantial portion of its property, assets or business to any other Person, or merge or consolidate with or into any other Person or into any joint venture or partnership with any other Person;

**5.4 Ownership Interests.**

(a) Purchase, redeem, acquire or retire any of Borrower's ownership interests whether such interests are in the form of stock, partnership or limited partnership interests, limited liability company units or other ownership interests;

(b) Permit any change in the management or ownership of the equity of Borrower as such entity is currently constituted;

(c) Permit any Modification or termination of any of Borrower's Constituent Documents;

**5.5 Investments and Loans.** Make or suffer to exist any investments in, or loans or advances to, any other Person except (a) advance payments or deposits against purchases made in the ordinary course of Borrower's regular business; (b) direct obligations to the United States of America;

(c) any existing investments in, or existing advances to, any Affiliate; or (d) temporary advances to employees to cover expenses incurred in the ordinary course of Borrower's business;

**5.6 Dividends or Distributions.** Pay or declare any cash dividends or distributions, except for Permitted Distributions;

**5.7 Assign.** Assign, pledge or encumber this Agreement, the other Loan Documents or the Loan. No such assignment, pledge or encumbrance shall be effective without Lender's prior written consent;

**5.8 Lease.** *Intentionally omitted*;

**5.9 Zoning.** *Intentionally omitted*;

**5.10 Other Assets.** *Intentionally omitted;*

**5.11 Name.** Change its name or its principal place of business from that set forth above, without notifying Lender thereof prior thereto;

**5.12 Accounting.** Make or consent to a change in its Applicable Method of Accounting (including, without limitation, the basis of application of GAAP) or in its tax elections under the Internal Revenue Code, as applicable;

**5.13 Single Purpose Entity.** *Intentionally omitted;*

**5.14 Miscellaneous Covenants.**

(a) **Contract.** Become or be a party to any Contract which at the time of becoming a party to such Contract materially impairs Borrower's ability to perform under this Agreement, or under any other instrument, agreement or document to which such Borrower is a party or by which it is or may be bound;

(b) **Margin Stock.** Carry or purchase any "margin stock" within the meaning of Regulations U, T or X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II.

## ARTICLE VI. Conditions Precedent

**6.1 Conditions Precedent.** As conditions precedent to Lender making distribution of the proceeds of the Loan, prior to or on the date of Closing, Borrower shall have furnished, or shall have caused to be furnished to Lender, at Borrower's own cost and expense, each of the following; all of which shall be acceptable to Lender and Lender's counsel in terms, form and substance;

(a) **Loan Documents.** The Loan Documents, fully executed and delivered to Lender, all of which shall be in full force and effect, enforceable against Borrower. All public filings contemplated thereby shall have been made and copies thereof furnished to Lender;

(b) **Borrower's Documents.** Such Constituent Documents, good standing or subsistence certificates, resolutions, incumbency and any other documents, instruments or certificates as may be and all legal matters incident to the Loan and Loan Documents shall be reasonably satisfactory to Lender's counsel;

(c) **Title Insurance**. *Intentionally omitted*;

(d) **Surveys**. *Intentionally omitted*;

(e) **Appraisal**. *Intentionally omitted;*

(f) **Deeds**. *Intentionally omitted*;

(g) **Zoning and Code**. *Intentionally omitted*;

(h) **Environmental Reports**. *Intentionally omitted;*

(i) **Termination Statements; Release Statements and Satisfaction Pieces**. Evidence satisfactory to Lender that all necessary termination statements, releases and mortgage satisfaction pieces in connection with any and all Liens with respect to Borrower or any real or personal property of Borrower that are not Permitted Liens have been filed or satisfactory arrangements have been made for such filing (including payoff letters, if applicable, in form and substance satisfactory to Lender);

(j) **Insurance Policies**. Evidence, in form and substance reasonably satisfactory to Lender, that the business and all assets of Borrower are adequately insured and that Lender has been named as additional insured and lender's loss payee, as its interests may appear, as applicable, entitled to prompt written notice of cancellation or modification, on all such Insurance Policies;

(k) **No Material Adverse Change; Representations and Warranties**. Evidence that all representations and warranties of Borrower are true, correct and complete in all material respects and that no event that would have a Material Adverse Effect shall have occurred since the date of the Historical Financial Statements delivered to Lender;

(l) **Financing Statements; Notices of Security Interest**. *Intentionally omitted*;

(m) **Good Standing and Tax Lien Certificates**. A subsistence certificate for Borrower from the Secretary of State of the Commonwealth of Pennsylvania;

(n) **Leases; Rent Roll; Estoppel Certificates and Subordination Non-Disturbance and Attornment Agreements**. *Intentionally omitted;*

(o) **Contracts**. *Intentionally omitted*;

(p) **Historical Financial Statements**. Historical Financial Statements of Borrower and Guarantor as described in Section 3.7 of this Agreement, in form and substance satisfactory to Lender;

(q) **Opinion of Counsel**. An opinion of counsel for Borrower and Guarantor, in form and substance satisfactory to Lender;

(r) **Other Documents and Conditions**. Such other documents and conditions as may be required to be submitted to Lender by the terms of this Agreement or of any Loan Document, all of which, including those referred to above in this Article VI shall be satisfactory in form, content and substance to Lender;

(s) **Loan Fee; Lender's Costs**. Borrower shall pay the Loan Fee and all Lender Costs, Lender's reasonable attorneys' fees incurred in connection with the making and Closing of the Loan, and all reimbursable out-of-pocket costs and actual out-of-pocket expenses pursuant to the Loan Documents;

(t) **Accounts**. Borrower shall have established the Direct Debit Account and such other Depository Accounts as Lender may require;

(u) **Searches**. Lender shall have received and approved such Lien, secured transaction, bankruptcy, litigation, judgment, docket and Patriot Act searches as Lender deems appropriate;

(v) **Compliance**. Borrower and Guarantor shall have complied with all of their Obligations and covenants contained in the Loan Documents and no Event of Default shall have occurred nor shall any event have occurred which after expiration of time or giving of notice, would constitute and Event of Default;

**6.2** **Approval**. Further notwithstanding anything to the contrary in this Agreement, Lender's duties and obligations under this Agreement are specifically conditioned upon approval by the Federal Reserve Bank of Boston or its nominee ("MSLP Agent") including, without limitation, the purchase of up to ninety-five percent (95%) of the Loan by the MSLP Agent. Lender and MSLP Agent shall be considered pari passu with respect to all conditions and risks of the Loan. Lender agrees to retain its portion of the Loan until the earlier of its maturity or the date when the MSLP Agent sells all of its participation.

## ARTICLE VII. Default

**7.1** **Events of Default**. The occurrence of any one or more of the following events shall constitute an event of default (each, individually, an "Event of Default," and collectively, "Events of Default"):

(a) **Nonpayment**. Nonpayment within ten (10) days of when due (pursuant to the terms of the Note or this Agreement) whether by acceleration or otherwise of principal of, interest on, or any fee or premium provided for hereunder or in the Note;

(b) **Negative Covenants**. Default in the observance of any of the covenants or agreements of Borrower contained in Article V of this Agreement;

(c) **Other Covenants**. Default in the observance of any of the covenants or agreements of Borrower contained in this Agreement, other than in Article V, or in any other agreement with Lender or any Affiliate of Lender, which is not remedied within thirty (30) days following written notice thereof or such longer period as shall be reasonably necessary in the exercise of due diligence so long as Borrower commences the cure within the aforementioned thirty (30) day period and thereafter diligently pursue such remedy and notifies Lender of such progress;

(d) **Voluntary Insolvency Proceedings**. If Borrower or any Guarantor shall (i) file a petition or request for liquidation, reorganization, arrangement, adjudication as a bankrupt, or other similar relief under the bankruptcy, insolvency or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction, now or hereafter in effect; (ii) consent to the filing of a petition in any bankruptcy, liquidation, reorganization or insolvency

proceeding; (iii) make a general assignment for the benefit of creditors; (iv) consent to the appointment of a receiver or trustee for Borrower or any Guarantor or any of Borrower's or any Guarantor's assets, including, without limitation, the appointment of or taking possession by a "custodian" as defined in the federal Bankruptcy Code; (v) make any, or send notice of any intended, bulk sale; or (vi) execute a consent to any other type of insolvency proceeding (under the federal Bankruptcy Code or otherwise) or any formal or informal proceeding for the dissolution or liquidation of, or settlement of claims against or winding up of affairs of, Borrower;

(e) **Involuntary Insolvency Proceedings.** The appointment of a receiver, trustee, custodian or officer performing similar functions for Borrower, Guarantors or any of Borrower's or any Guarantor's assets, including, without limitation, the appointment of or taking possession by a "custodian" as defined in the federal Bankruptcy Code; or the filing against Borrower or Guarantors of a request or petition for liquidation, reorganization, arrangement, adjudication as a bankrupt or other relief under the bankruptcy, insolvency or similar laws of the United States of America or any state or territory thereof or any foreign jurisdiction, now or hereafter in effect; or the institution against Borrower or Guarantors of any other type of insolvency proceeding (under the federal Bankruptcy Code or otherwise) or of any formal or informal proceeding for the dissolution or liquidation of, settlement of claims against or winding up of affairs of Borrower, and the failure to have such appointment vacated or such petition or proceeding dismissed within sixty (60) days after such appointment, filing or institution;

(f) **Representations.** If any certificate, statement, representation, warranty or financial statement furnished by or on behalf of Borrower pursuant to or in connection with this Agreement or the Note (including, without limitation, representations and warranties contained herein) or as an inducement to Lender or any Lender Affiliate to enter into this Agreement or the Note or any other lending agreement with Borrower shall prove to have been false in any material respect at the time as of which the facts therein set forth were certified, or to have omitted any material contingent or unliquidated liability or claim against Borrower or Guarantors or if on the date of the execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed by any such statement or certificate, which change shall not have been disclosed by Borrower to Lender at or prior to the time of such execution;

(g) **Other Indebtedness and Agreements.** Nonpayment by Borrower of any Indebtedness owing by Borrower when due (or, if permitted by the terms of the applicable document, within any applicable grace period), whether such Indebtedness shall become due by scheduled maturity, by required prepayment, by acceleration, by demand or otherwise, or failure to perform any material term, covenant or agreement on its part to be performed under any agreement or instrument (other than this Agreement) evidencing or securing or relating to any Indebtedness owing by Borrower when required to be performed if the effect of such failure is to permit the holder to accelerate the maturity of such Indebtedness;

(h) **Judgments.** If any judgment or judgments in excess of $250,000 in the aggregate other than any judgment for which it is fully insured against Borrower remains unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days;

(i) **Pension Default.** A Reportable Event which Lender or any Lender Affiliate determines constitutes grounds for the termination of any Pension Plan by the PBGC or for the appointment by an appropriate United States district court of a trustee to administer any Pension Plan shall have occurred and continued thirty (30) days after written notice thereof to either Borrower by

Lender or any Lender Affiliate; or the PBGC shall have instituted proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; or a trustee shall be appointed by an appropriate United States district court to administer any Pension Plan; or any Pension Plan shall be terminated; or either Borrower withdraws from a Pension Plan in a complete withdrawal or a partial withdrawal; or either Borrower shall fail to pay to any Pension Plan any contribution which it is obligated to pay under the terms of such plan or any agreement, or which is required to meet statutory minimum funding standards of Section 412 of the Internal Revenue Code or Section 303 of ERISA;

(j) **Guarantor Default.** If any Guaranty shall cease, for any reason, to be in effect without the prior consent of Lender, or any Guarantor or Borrower shall so assert in writing; or any Guarantor shall fail to perform or observe any covenant contained in the Guaranty to which such Guarantor is a party; or any representation, warranty or financial statement made or furnished by Guarantors in connection with this Agreement or the Guaranty shall prove to have been false in any material respect, or to have omitted any material contingent or unliquidated liability; or there shall occur with respect to Guarantor any event described in Section 7.1(d) or (e) hereof;

(k) **Challenge to Loan Documents; Priority.** If Borrower, directly or indirectly, shall challenge, or indicate Borrower's intention to challenge, the validity and binding effect of any provision of the Note or the other Loan Documents or the Note or any other Loan Documents shall for any reason (except to the extent permitted by their express terms) cease to be effective or if any other Debt at any time is senior in priority to the Loan, for any reason;

(l) **Change of Control.** If there is a change of Control of Borrower;

(m) **Termination of Business; Death.**

(i) If Borrower takes or suffers any action to dissolve, merge or liquidate or otherwise terminates its business or ceases to operate as a going concern; or

(ii) Upon the death, incapacity or incarceration of Individual Guarantor; provided death shall not be an Event of Default if, (A) promptly after the Individual Guarantor's death, the decedent's estate executes all documents Lender reasonably requires to confirm it will continue as a substitute Guarantor of the Loan to the same extent as the decedent ("Replacement Documents"); (B) no other Event of Default exists; (C) other than for payment of estate expenses, the decedent's estate does not disburse any of the assets of Individual Guarantor's estate without Lender's written consent; and (D) within ninety (90) days after Individual Guarantor's death, the decedent's estate and Lender agree on a replacement Guarantor of equal or greater net worth, with comparable business experience and otherwise who is reasonably acceptable to Lender and who shall likewise execute Replacement Documents as Lender may require, or additional cash collateral or other arrangement reasonably satisfactory to Lender as an adequate substitution for Individual Guarantor. Failure to provide an acceptable substitute Guarantor, cash collateral or other arrangement in a timely manner shall be an Event of Default;

(n) **Material Adverse Change.**

(i) If Borrower fails to meet the financial covenants required by Section 4.2(i) hereof; or

(ii) There shall occur any event or condition in Borrower's business, operations or financial condition that has, or in Lender's reasonable judgment, is likely to have, a Material Adverse Effect.

(o) **Legal Requirements.** If Borrower fails to comply with any Legal Requirements within sixty (60) days after notice of such Legal Requirement has been given to Borrower unless a shorter period of time is required by such notice, subject to Borrower's right to contest such Legal Requirement by appropriate proceedings, diligently prosecuted;

(p) **Execution.** *Intentionally omitted;*

(q) **Failure of Lien.** *Intentionally omitted*;

(r) **Taxes.** Failure of Borrower to timely pay any tax, assessment or any other governmental imposition or levy prior to the date upon which any fine, penalty, interest or cost may be asses thereto or imposed by law for non-payment thereof; provided, the foregoing shall not be an Event of Default to the extent Borrower has deposited the required sums into escrow with Lender;

(s) **Uninsured Loss.** *Intentionally omitted*;

(t) **Other Loan Documents; Swap Transaction Documents.** If an Event of Default occurs under the terms of any other Loan Document or any Swap Transaction Document, subject to applicable notice and cure periods;

(u) **Cross Default.** *Intentionally omitted*;

(v) **Cross Acceleration.** If Borrower or any Subsidiary shall fail to (i) make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Debt (as defined herein) (other than Indebtedness under the Loan Documents) owing to Lender or any commonly controlled Affiliate of Lender, in each case beyond the applicable grace period with respect thereto, if any, or (ii) observe or perform any other agreement or condition relating to any such Debt or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure to make a payment, default or other event described in clause (i) or (ii) is to cause such Debt to become due or be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or any offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity; provided that clause (ii) shall not apply to secured Debt that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Debt, if such sale or transfer is permitted hereunder and under the documents providing for such Debt and such Debt is repaid when required under the documents providing for such Debt; provided that, as used in this Section 7.1(v), the term "Debt" shall mean all debt for borrowed money and any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, and any guarantee of any of the foregoing;

**7.2 Effects of an Event of Default.**

(a) **Acceleration.** Upon the occurrence of one or more Events of Default (except a default under either Section 7.1(d) or 7.1(e) hereof), Lender may declare any obligations it or any Lender Affiliate may have hereunder to be canceled and the principal of the Loan then outstanding to be immediately due and payable, together with all interest thereon and fees and expenses accruing

under this Agreement without presentation, demand or further notice of any kind to Borrower and, if applicable, Borrower shall no longer be permitted to obtain advances of the Loan.

(b) **Effect on Lender**. Upon the occurrence of one or more Events of Default under Section 7.1(d) or 7.1(e) hereof, Lender's and Lender Affiliates' obligations hereunder shall be cancelled immediately, automatically and without notice, and Loan then outstanding shall become immediately due and payable without presentation, demand or notice of any kind to Borrower.

(c) **Certain Waivers.** Borrower hereby waives as a defense to the nonperformance of any Obligations under the Loan Documents, the occurrence of unforeseen market conditions such as the disfunctionality or seizure of the credit markets.

7.3 **Remedies.** Upon the occurrence and during the continuance of any Event of Default or upon any termination of this Agreement as a result of an Event of Default, then Lender and each Lender Affiliate shall have all of its rights under this Agreement or any other Loan Document or otherwise under law or equity. In addition to, and without limitation of, any rights of Lender and each Lender Affiliate under applicable law, if any Event of Default occurs, any and all deposits (including all account balances, whether provisional or final and whether or not collected or available) and any other Indebtedness at any time held or owing by Lender and each Lender Affiliate to or for the credit or account of Borrower may be offset and applied toward the payment of the Indebtedness of Borrower to Lender and each Lender Affiliate. Lender may, in its sole discretion, exercise alternately or cumulatively any of the remedies available hereunder or under any other document securing the indebtedness, or at law or equity. The failure to exercise one or more of such remedies upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same at any subsequent time in respect of the same Event of Default or any other Event of Default. Neither the acceptance by Lender of any payment hereunder which is less than payment in full of all amounts due and payable at the time of such payment, or any negotiation or discussion with Borrower, shall constitute a waiver of the right to exercise one or more of such remedies at that time or at any subsequent time or nullify any prior exercise of any remedy, except as and to the extent otherwise provided by law.

7.4 **Mandatory Prepayment**. Notwithstanding anything to the contrary in this Article VII, if, on any date (such date, a "Trigger Date"), the Board of Governors of the Federal Reserve System or a designee thereof has, after consultation with Lender, notified Lender in writing that Borrower has materially breached, made a material misrepresentation with respect to or otherwise failed to comply with certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certification) of the Borrower Certifications and Covenants Addendum appended to this Agreement in any material respect or that any such certification has failed to be true and correct in any material respect, upon such notice to Lender, Lender shall promptly so notify Borrower and Borrower shall, no later than two (2) Business Days after such Trigger Date, prepay the Loan in full, along with any accrued and unpaid interest thereon, and Lender shall be permitted to take any and all other actions and remedies permitted hereunder following the occurrence of an Event of Default.

7.5 **Set-Off.** Upon the occurrence of any Event of Default, Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other Loan Document, all rights and remedies of a secured party under the Code, to the fullest extent permitted by law. Without limiting the generality of the foregoing, Lender may, to the fullest extent permitted by law, without any requirement of notice, setoff any and all amounts owing by Borrower to it against

any Depository Account maintained at Lender (or any Lender Affiliate) by Borrower or any other property of Borrower which may now or hereafter be in Lender's (or any Lender Affiliate's) possession or control, and such right of setoff shall be deemed to have been exercised immediately upon such stated or accelerated maturity as aforesaid even though such setoff is not noted on Lender's records until a later time.

7.6 **Waivers.**

(a) **Presentment.** Borrower hereby waives: (i) presentment, demand, protest or any notice of any kind in connection with this Agreement or any Collateral, except as otherwise provided herein; (ii) all rights to seek from any court any bond or security prior to the exercise by Lender of any remedy described herein or in any other Loan Document; and (iii) *Intentionally omitted.*

(b) **Damages.** Neither Borrower nor any other Person shall have any right to rely on any procedures required by Lender, such procedures being solely for the protection of Lender, as lender. Lender shall not be responsible or liable for any damages, consequential or otherwise, that may be incurred or alleged by Borrower or by any other Person, including Borrower, as a result of any of the Loan Documents or the exercise by Lender of its rights under the Loan Documents or the collection by or on behalf of Lender of sums due thereunder, except to the extent such damages are incurred solely as a result of the gross negligence or willful misconduct of Lender.

7.7 **Nature of Remedies.** The recovery of any judgment by Lender and/or the levy of execution under any judgment shall not affect in any manner or to any extent, any rights, remedies or powers of Lender under any of the Loan Documents or with respect to any Guaranty, but such rights, remedies and powers of Lender shall continue unimpaired as before. Further, the entry of any judgment by Lender shall not affect in any way the interest rate payable under any of the Loan Documents on any amounts due to Lender, but interest shall continue to accrue on such amounts at the rate specified in such Loan Document.

7.8 **Regarding Lender's Waivers.** If Lender shall release, compromise, forbear with respect to, waive, suspend, extend, renew, amend, supplement or modify any of the terms of the Loan Documents, including any Guaranty, such action taken by Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of Lender, or of any Event of Default, or of any liability or obligation of Obligors under any of the Loan Documents.

7.9 **Costs and Expenses; Attorneys' Fees.** Following the occurrence of any Event of Default, Borrower and Guarantor (but only to the extent required in the Loan Documents) shall pay upon demand all commercially reasonable Lender Costs actually incurred by Lender in the exercise of any of its rights, remedies or powers under any of the Loan Documents or with respect to any Guaranty or any Collateral with respect to such Event of Default, and any amount thereof not paid promptly following demand shall accrue interest at the highest Default Rate specified in the Note.

## ARTICLE VIII. Expenses and Indemnification

8.1 **Reimbursement.** Borrower shall reimburse Lender promptly upon request by Lender for all of its and each Lender Affiliate's reasonable expenses including, without limitation, reasonable counsel fees and expenses (whether outside or internal), filing fees and recording fees incurred in connection with this Agreement and with any indebtedness subject hereto, for any taxes which Lender or any Lender Affiliate may be required to pay in connection with the execution and delivery of this Agreement, the Note or any Guaranty, for the preparation of any modifications, amendments or

renewals of the Loan Documents, and for any expenses, including counsel fees and expenses (whether outside or internal) incident to the enforcement of any provision of this Agreement, the Note or any Guaranty or other Loan Documents.

8.2 **Indemnity.** Borrower agrees to indemnify Lender and hereby holds Lender harmless against all claims, actions, suits, proceedings, costs, expenses, brokerage or other fees, losses, damages and liabilities of any kind including in tort, penalties and interest, which Lender may incur in any manner other than Lender's own active gross negligence or willful misconduct, by reason of any matter relating, directly or indirectly, to the Loan and the Loan Documents.

8.3 **ERISA Indemnification.** Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and any Lender Affiliate from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses, judgments, expenses, attorneys' fees or liabilities or other Lender Costs incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole and absolute discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 3.9 hereof.

## ARTICLE IX. Miscellaneous

9.1 **Amendments and Waivers.** No modification, rescission, waiver, release or amendment of any provision of this Agreement shall be made except by another written agreement subscribed by duly authorized officers of Borrower and Lender.

9.2 **Delays and Omissions.** No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Lender may remedy any default by Borrower hereunder or with respect to any other Person in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for its expenses in so remedying such default. All rights and remedies of Lender hereunder are cumulative.

9.3 **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of Lender, Borrower and their respective heirs, executors, successors and assigns, except that Borrower may not assign or transfer any of Borrower's rights hereunder without the prior written consent of Lender.

9.4 **Notices.** All notices and other communications under this Agreement shall be in writing and shall be sent to the party to receive such notice at its address set forth in the opening paragraph of this Agreement or to such other address as either party may designate from time to time by notice to the other in the manner set forth herein. Notice shall, for all purposes, be deemed given and received: (a) if hand delivered to a party, when the notice is received; (b) if given by reputable, nationally recognized overnight delivery service, the day on which the notice is delivered by such delivery service to such party; or (c) if given by registered and certified mail (return receipt requested), two (2) Business Days after such notice is posted with the United States Postal Service.

9.5 **Entire Understanding.** This Agreement and any other Loan Documents represent the entire understanding and agreement between the parties hereto with respect to the subject matter

hereof and supersede all prior negotiations and writings between the parties, including specifically, but without limitation, the application for the Loan, any commitment letter and correspondence related thereto.

9.6 **Force Majeure**. Borrower agrees that Lender shall not be liable and Borrower will indemnify and hold Lender harmless from and against any error, failure or delay in the performance of any of Lender's obligations under this Agreement which cause is beyond the control of Lender, including, without limitation, any natural disaster, fire, flood, storm, war, strike, civil unrest, terrorism, error in inoperability of communication equipment or links or power supply, compliance with law or governmental order, direction of a jurisdiction or any other circumstances beyond the control of Lender or actions taken by Lender which were reasonably believed by Lender to be taken pursuant to this Agreement.

9.7 **Authorization to Obtain Credit Reports**. By signing below, any Borrower who is an individual provides written authorization to Lender or its designee (and any Lender hereof) to obtain such Borrower's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Agreement and subsequently for the purpose of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

9.8 **Governing Law**. This Agreement, the transaction described herein and the obligations of Lender and Borrower shall be construed under, and governed by, the internal laws of the Commonwealth of Pennsylvania without regard to principles of conflict of laws.

9.9 **Inconsistent Provisions**. The terms of this Agreement and any related agreements, instruments or other documents, including, without limitation, the Note, shall be cumulative except to the extent that they are specifically inconsistent with each other, in which case the terms of this Agreement shall prevail.

9.10 **USA Patriot Act**. Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56), Lender is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the USA Patriot Act.

9.11 **Limitation of Liability**. To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waive any claim against Lender, on any theory of liability, for special, indirect, consequential or punitive damages (but excluding direct or actual damages) arising out of, in connection with or as a result of, this Agreement, any related Loan Documents, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds.

9.12 **Counterparts**. This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same agreement. Borrower agrees that in any legal proceeding, a copy of this Agreement kept in Lender's course of business may be admitted into evidence as an original.

**9.13 JURISDICTION AND VENUE. BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY (a) CONSENTS IN EACH ACTION AND OTHER LEGAL PROCEEDING COMMENCED BY LENDER OR ANY**

**LENDER AFFILIATE AND ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, THE LOAN, THE NOTE OR OTHER LOAN DOCUMENTS TO THE JURISDICTION OF ANY COURT THAT IS EITHER A COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA OR A COURT OF THE UNITED STATES LOCATED IN THE COMMONWEALTH OF PENNSYLVANIA AND (b) WAIVES EACH OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION OR OTHER LEGAL PROCEEDING.**

**9.14 <u>WAIVER OF JURY TRIAL</u>. BORROWER (a) KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO, AND IN, ANY ACTION OR OTHER LEGAL PROCEEDING OF ANY NATURE, RELATING TO (i) THIS AGREEMENT, THE LOAN, THE NOTE OR OTHER LOAN DOCUMENTS, (ii) ANY TRANSACTION CONTEMPLATED IN ANY SUCH LOAN DOCUMENTS OR (iii) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT, ANY OF THE OBLIGATIONS, THE NOTE OR ANY OTHER LOAN DOCUMENT AND (b) CERTIFIES THAT (i) NEITHER LENDER, ANY LENDER AFFILIATE NOR ANY REPRESENTATIVE OF LENDER OR ANY LENDER AFFILIATE HAS REPRESENTED TO BORROWER THAT LENDER OR ANY LENDER AFFILIATE WILL NOT SEEK TO ENFORCE THE WAIVER MADE BY BORROWER IN THIS <u>SECTION 9.14</u>, AND (ii) BORROWER HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AS NECESSARY AND APPROPRIATE BY INDEPENDENT LEGAL COUNSEL.**

**9.15 <u>Headings</u>.** The headings preceding the text of the sections and subsections of this Agreement are used solely for convenience of reference and shall not affect the meaning, construction of effect of this Agreement.

**9.16 <u>No Partnership</u>.** Nothing contained in this Agreement shall be construed in any manner to create any relationship between Borrower and Lender other than the relationship of borrower and lender. Borrower and Lender shall not be considered partners or co-venturers for any purpose on account of this Agreement. Lender shall not be in any way liable or responsible for the payment of any claims arising out of or in connection with the acts of Borrower in connection herewith by reason of the provisions hereof or otherwise.

**9.17 <u>Post Closing Compliance</u>.** Borrower agrees to execute, re-execute and deliver to Lender or its legal counsel, as may be deemed appropriate, any document or instrument executed in connection with the Loan which was incorrectly drafted and/or executed, as well as any document or instrument which should have been executed at or prior to the Closing of the Loan, but which was not so executed and delivered. Borrower agrees to comply with any such written request by Lender within ten (10) days after receipt by Borrower of such request. Failure by Borrower to so comply shall, at the option of Lender, constitute an Event of Default hereunder.

**9.18 <u>Regarding Lender Waivers</u>.** Borrower agrees that Lender may release, compromise, forbear with respect to, waive, suspend, extend, renew, amend, supplement or Modify any of the terms of the Loan Documents. Any action taken by Lender pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of Lender, or of any Event of Default, or of any liability or Obligation of Borrower, under any of the Loan Documents.

**9.19 Main Street Priority Loan Facility; Participation.**

(a) The Loan described in this Agreement is a "Main Street Priority Loan Facility," which has been authorized under Section 13(3) of the Federal Reserve Act. The Federal Reserve Bank of Boston, acting under the direction of the Board of Governors of the Federal Reserve System (the "Board" and, together with the twelve Federal Reserve Banks, the "Federal Reserve"), has committed to lend to a special purpose vehicle, MS Facilities LLC, a Delaware limited liability company (the "SPV"), on a recourse basis. Lender shall have the unrestricted right to at any time or from time to time to grant a participation interest in ninety-five percent (95%) its rights and obligations hereunder to the SPV; provided Lender will retain five percent (5%) of its rights and obligations hereunder. Borrower shall execute, or cause to be executed, such documents, including without limitation, the Borrower Certifications and Covenants Addendum and any amendments to this Agreement and to any other documents, instruments and agreements executed in connection herewith as Lender shall deem reasonably necessary to effect the foregoing.

(b) Upon the execution and delivery of appropriate documentation in connection with the participation and the payment by the Federal Reserve and/or the SPV of the participating amount agreed to by Lender and the Federal Reserve and/or the SPV, the SPV may be deemed a party to this Agreement and shall have all of the rights and obligations of Lender hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by Lender pursuant to the participation documentation between Lender and the Federal Reserve and/or the SPV. Notwithstanding the foregoing, Lender shall remain responsible for the performance of its obligations hereunder and Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations hereunder.

(c) Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the Loan shall be subject to all terms and conditions of the MSPLF including, without limitation, all changes, modifications, amendments, rules, regulations and requirements thereof as determined from time to time by the Federal Reserve Bank of Boston or its authorized agent. In the event of any conflict between the foregoing and the terms of this Agreement or any other Loan Document, the MSPLF shall control.

*signatures on next page*

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be signed by their duly authorized officers as of the date first written above.

**LENDER:**

HUNTINGDON VALLEY BANK

By: ____________________________ (SEAL)
Name: Hugh Connelly
Title: EVP

**BORROWER**:

COULBEE LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION MANAGEMENT, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE SOLUTIONS
ACQUISITIONS, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE REALTY, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE PARTNERS, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE HOME MANAGEMENT,
LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL
DEVELOPMENT, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

# EXHIBITS, SCHEDULES AND ADDENDA

| | TITLE | SECTION REFERENCE |
|---|---|---|
| Exhibit 4.2(a)(i) | Annual Financial Reporting Requirements | 4.2(a)(i) |
| Exhibit 4.2(a)(ii) | Quarterly Financial Reporting Requirements | 4.2(a)(ii) |
| Exhibit 4.4 | Insurance Requirements | 4.4 |
| Schedule 3.14(d)(iv) | *Intentionally Omitted* | |
| Addendum I | Borrower Certifications and Covenants | 2.5(b) |
| Addendum II | *Intentionally Omitted* | |

**Exhibit 4.2(a)(i)**
**Annual Financial Reporting Requirements**

The items listed in the table below must be provided by Borrower to Lender annually, in form and substance reasonably acceptable to Lender, in accordance with Section 4.2(a)(i).

| Required Data | Definition |
|---|---|
| Total Assets | The sum of current assets, fixed assets, and other non-current assets (including, but not limited to, intangible assets, deferred items, investments, and advances). |
| Current Assets | Cash, accounts receivable, inventory, and other short-term assets that are likely to be converted into cash, used, sold, exchanged, or otherwise expensed in the normal course of business within one year. |
| Cash & Marketable Securities | Cash, depository accounts, and marketable securities that can be easily sold and readily converted into cash. |
| Tangible Assets | Assets having a physical existence, measured as total assets less intangible assets. Tangible assets are distinguished from intangible assets, such as trademarks, copyrights, and goodwill. |
| Total Liabilities | The total amount of all outstanding obligations, both current and noncurrent. |
| Current Liabilities | Short term debt, accounts payable, and other current liabilities that are due within one year. |
| Total Debt (Including Undrawn Available Lines Of Credit) | Existing outstanding and committed debt (including any undrawn available amounts). |
| Total Equity | Measured as total assets minus total liabilities. |
| Total Revenue | Total income generated by the sale of goods or services from ongoing operations. Total Revenue excludes any non-recurring sales or gains. |
| Net Income | The income (or loss) after expenses and losses have been subtracted from all revenues and gains for the fiscal period, including discontinued operations. |
| Unadjusted EBITDA | Earnings before interest expense, income tax expense, depreciation expense, and amortization expense. The starting point is net income. |
| Adjusted EBITDA | Unadjusted EBITDA adjusted for any non-recurring, one-time, or irregular items. The Adjusted EBITDA measurement should align with the relevant facility's term sheet. |
| Depreciation Expense | Non-cash expense measured based on the use of fixed assets, recognized over the useful life of the fixed assets. |
| Amortization Expense | Non-cash expense measured based on the use of intangible assets, recognized over the life of the intangible asset. |
| Interest Expense | The periodic finance expense of short term and long term debt. |
| Tax Expense | Federal, state and local income tax expenses. |
| Rent Expense | The contractual costs of occupying leased real estate. |
| Dividends/Equity Distributions | Distributions to equity owners. |
| Accounts Receivable (net of allowances) | Amounts owed to Borrower resulting from providing goods and/or services. Accounts receivable will be net of any allowances for uncollectible amounts. |
| Inventory (net of reserves) | Value of the raw materials, work in process, supplies used in operations, finished goods, and merchandise bought which are intended to be sold in the ordinary course of business. Inventory should be net of reserves. |

| | |
|---|---|
| Fixed Assets, Gross | Tangible property used in the business and not for resale, including buildings, furniture, fixtures, equipment, and land. Report fixed assets gross of depreciation. |
| Accumulated Depreciation | Cumulative depreciation of all fixed assets up to the Date of Financial Information. |
| Accounts Payable | The obligations owed to Borrower's creditors arising from the entity's ongoing operations, including the purchase of goods, materials, supplies, and services. Accounts payable excludes short term and long term debt. |
| Short Term Debt | Debt obligations of Borrower due with a term of less than one year, including the current portion of any Long Term Debt. |
| Long Term Debt | Debt obligations of Borrower that are due in one year or more, excluding the current portion that is otherwise captured in Short Term Debt. |
| Description of EBITDA Adjustments | Description of items that are added to Unadjusted EBITDA to determine Adjusted EBITDA. |
| Total Expenses | All money spent and costs incurred, both recurring and non-recurring, to generate revenue. Expenses exclude items capital in nature (i.e., expenses that are allowed to be capitalized and included in the cost basis of a fixed asset). |
| Operating Expenses | Money spent and costs incurred related to normal business operations including selling, general & administrative expenses, depreciation, and amortization (i.e., total expenses less non-recurring expenses). Exclude capital expenditures. |
| Operating Income | Profit (or loss) realized from continuing operations (i.e., revenue less operating expenses). |
| Fixed Charges | Expenses that recur on a regular basis, regardless of the volume of business (i.e., lease payments, rental payments, loan interest payments, or insurance payments). |
| Capitalized Expenditures | Non-operating expenditures capitalized to fixed assets. |
| Guarantor Net Assets | Total assets less total liabilities of Guarantor (also referred to as net worth). |
| Senior Debt Balance | *Intentionally omitted.* |
| Additional Pari Passu Debt Balance | Debt amount ranking pari passu to the Main Street loan. |
| Collateral Type (Non-Real Estate) | *Intentionally omitted.* |
| Collateral Type (Real Estate) | *Intentionally omitted.* |
| Collateral Value Reporting | *Intentionally omitted.* |
| Collateral Value Date | *Intentionally omitted.* |
| Covenant Status (Pass/ Fail) | Yes/no, indicating if the facility has satisfied covenant tests. |
| Date of Covenant Default | If applicable, report the date when Borrower defaulted under any covenants. |
| Nature of Covenant Default | If applicable, describe the covenant default (i.e., missing financial statements, ratio trigger). |
| Date of Covenant Cure | If applicable, report the date when Borrower cured previous defaults. |

**Exhibit 4.2(a)(ii)**
**Quarterly Financial Reporting Requirements**

The items listed in the table below must be provided by Borrower to Lender quarterly, in form and substance reasonably acceptable to Lender, in accordance with Section 4.2(a)(ii).

| **Required Data** | **Definition** |
|---|---|
| Total Assets | The sum of current assets, fixed assets, and other non-current assets (including, but not limited to, intangible assets, deferred items, investments, and advances). |
| Current Assets | Cash, accounts receivable, inventory, and other short-term assets that are likely to be converted into cash, used, sold, exchanged, or otherwise expensed in the normal course of business within one year. |
| Cash & Marketable Securities | Cash, depository accounts, and marketable securities that can be easily sold and readily converted into cash. |
| Total Liabilities | The total amount of all outstanding obligations, both current and noncurrent. |
| Current Liabilities | Short term debt, accounts payable, and other current liabilities that are due within one year. |
| Total Debt (Including Undrawn Available Lines Of Credit) | Existing outstanding and committed debt (including any undrawn available amounts). |
| Total Equity | Measured as total assets minus total liabilities. |
| Total Revenue | Total income generated by the sale of goods or services from ongoing operations. Total Revenue excludes any non-recurring sales or gains. |
| Net Income | The income (or loss) after expenses and losses have been subtracted from all revenues and gains for the fiscal period, including discontinued operations. |
| Unadjusted EBITDA | Earnings before interest expense, income tax expense, depreciation expense, and amortization expense. The starting point is net income. |
| Adjusted EBITDA | Unadjusted EBITDA adjusted for any non-recurring, one-time, or irregular items. The Adjusted EBITDA measurement should align with the relevant facility's term sheet. |
| Interest Expense | The periodic finance expense of short term and long term debt. |
| Dividends/Equity Distributions | Distributions to equity owners. |
| Operating Expenses | Money spent and costs incurred related to normal business operations including selling, general & administrative expenses, depreciation, and amortization (i.e., total expenses less non-recurring expenses). Exclude capital expenditures. |
| Operating Income | Profit (or loss) realized from continuing operations (i.e., revenue less operating expenses). |
| Capitalized Expenditures | Non-operating expenditures capitalized to fixed assets. |
| Senior Debt Balance | *Intentionally omitted.* |
| Additional Pari Passu Debt Balance | Debt amount ranking pari passu to the Main Street loan. |
| Covenant Status (Pass/ Fail) | Yes/no, indicating if the facility has satisfied covenant tests. |

| | |
|---|---|
| Date of Covenant Default | If applicable, report the date when Borrower defaulted under any covenants. |
| Nature of Covenant Default | If applicable, describe the covenant default (i.e., missing financial statements, ratio trigger). |
| Date of Covenant Cure | If applicable, report the date when Borrower cured previous defaults. |

**Exhibit 4.4**
**Insurance Requirements**

Lender's address for new, renewal and replacement insurance certificates:

Huntingdon Valley Bank
Attn: ________________
______________________
______________________

## LIABILITY INSURANCE

- Liability Insurance Coverage is evidenced on an ACORD 25 certificate.
- Borrower is listed as the first named insured.
- Certificate must obligate the insurance carrier to provide Lender thirty (30) days' notice of cancellation or material change. Cancellation provision should not contain "endeavor to notify" language.
- Location and Improvements must be described correctly.
- Evidence of general liability coverage showing a minimum per occurrence limit of not less than $1,000,000, and $2,000,000 in the annual aggregate (per location), and any other additional insurance as required by Lender.
- Lender named as Additional Insured on Borrower's policy.
- If applicable, evidence of automobile liability coverage should be illustrated in the certificate.
- If applicable, evidence of Worker's Compensation coverage (in accordance with state statutory requirements), and Employer's Liability coverage should be illustrated in the certificate.
- All policy numbers must be clearly identified.
- All endorsements clearly stated on the ACORD 25 certificate.
- Insurance Carrier to have a Best's Key Rating of at least "A-."
- Insurance Carrier to have a Best's Key Rating Class of at least "IX" (nine).
- Insurance Carrier to be approved to do business in the state where Borrower is located.

## COMMERCIAL PROPERTY INSURANCE

- Property Insurance Coverage is evidenced on an ACORD 28.
- Borrower named as Insured.
- Lender named as additional insured as its interests may appear.
- Certificate must obligate the insurance carrier to provide Lender thirty (30) days' notice of cancellation or material change. Cancellation provision should not contain "endeavor to notify" language.
- Location and Improvements must be described correctly.
- *Intentionally omitted.*
- *Intentionally omitted.*
- Business Interruption Insurance coverage in the amount of twelve (12) months of actual gross revenue/net profit. In addition, coverage shall be endorsed to include an extended period of indemnity of at least 180 days. Policy should include Policy number clearly identified.
- Insurance Carrier to have a Best's Key Rating of at least "A-."
- Insurance Carrier to have a Best's Key Rating Class of at least "IX" (nine).

- Insurance Carrier to be approved to do business in the state where Borrower is located.

**FLOOD INSURANCE (IF REQUIRED BY LENDER)**

- Flood Coverage is evidenced on an ACORD 29.
- Borrower named as Insured.
- Lender named as Loss Payee.
- Flood Risk Zone must be present on the Declaration Page of the policy and on the Certificate and must match the flood risk zone set forth on the Flood Determination.
- Certificate must obligate the insurance carrier to provide Lender thirty (30) days' notice of cancellation or material change. Cancellation provision should not contain "endeavor to notify" language.
- Location and Improvements must be described correctly.
- Policy should provide insurance coverage in an amount equal to the lesser of the full replacement cost value of the subject property or the maximum limit of coverage available for the subject property under the Flood Insurance Acts (or such higher amount as Lender may require in its sole discretion).
- Insurance Carrier to have a Best's Key Rating of at least "A-."
- Insurance Carrier to have a Best's Key Rating Class of at least "IX" (nine).
- Insurance Carrier to be approved to do business in the state where Borrower is located.

**ENVIRONMENTAL INSURANCE (IF REQUIRED BY LENDER)**

- Environmental Coverage is evidenced on an ACORD 25.
- Borrower is listed as the first named insured.
- Lender named as Additional Insured on Borrower's policy.
- Certificate must obligate the insurance carrier to provide Lender thirty (30) days' notice of cancellation or material change. Cancellation provision should not contain "endeavor to notify" language.
- Location and Improvements must be described correctly.
- Policy should provide insurance showing a minimum per occurrence limit of not less than $2,000,000 (or such higher amount as Lender may require in its sole discretion).
- Insurance Carrier to have a Best's Key Rating of at least "A-."
- Insurance Carrier to have a Best's Key Rating Class of at least "IX" (nine).
- Insurance Carrier to be approved to do business in the state where Borrower is located.

**<u>Addendum I</u>**
**Borrower Certifications and Covenants**

*See attached.*

# CERTIFICATE OF BORROWERS AND GUARANTORS

I, Michael Stillwell, on behalf of the Borrowers and the Guarantors, in order to enable the law firm of Kennedy Kelly LLP ("Kennedy Kelly") to render certain legal opinions to Huntingdon Valley Bank (the "Lender") in connection with a $14,800,000.00 loan (the "Loan") made by the Lender to the Borrowers hereby certify to Kennedy Kelly, that to the best of my knowledge, information and belief:

1. For the purposes of this Certificate the following instruments, all of even date hereof unless otherwise noted, are hereinafter collectively referred to as the "Loan Documents":

X a. The Loan Agreement;
X b. ONLY 1 SIGNED The Term Note in the original principal amount of $14,800,000.00 executed by the Borrowers in favor of the Lender (the "Note");
X c. The Guaranty and Suretyship Agreement executed by the Guarantors in favor of the Lender (collectively, the "Guaranty");
X d. Assignment and Assumption for the Main Street Lending Program;
X e. Co-Lender Agreement Under the Main Street Lending Program;
X f. Affidavit for Purpose of Closing Loan;
X g. Errors and Omissions Compliance Agreement – Guarantors;
X h. Errors and Omissions Compliance Agreement – Borrowers;
X i. Main Street Priority Loan Facility Borrower Certifications and Covenants;
X j. Confession of Judgment Explanation and Disclosure of Rights/Waivers.
X k) BORROWER'S RESOLUTION - (k) APP.

2. I have made due inquiry of all persons deemed necessary or appropriate to verify or confirm the statements contained herein.

3. The execution and delivery by the Borrowers of the Loan Documents to which each Borrower is a party and the performance of the obligations of the Borrowers thereunder do not (i) result in a breach of or constitute a default or ground for acceleration of the maturity under any agreement or instrument to which each Borrower is a party or by which any of its respective properties is bound or affected; (ii) result in, or require, the creation or imposition of any lien, other than any permitted under the Loan Documents to which each Borrower is a party, upon or with respect to any of the properties now owned by each Borrower other than the lien of the Lender under the Loan Documents; or (iii) violate any judgment, order, writ, injunction or decree binding on each Borrower.

4. The execution and delivery by the Guarantors of the Guaranty and the performance of the obligations of the Guarantors thereunder does not (i) result in a breach of or constitute a default or ground for acceleration of the maturity under any agreement or instrument to which each Guarantor is a party or by which any of the Guarantors' properties are bound or affected; or (ii) result in, or require, the creation or imposition of any lien, other than any permitted under the Loan Documents to which any Guarantor is a party, upon or with respect to any of the properties now owned by any Guarantor other than the lien of the Lender under the

Loan Documents; or (iii) violate any judgment, order, writ, injunction or decree binding on each Guarantor.

5. There is no pending action or proceeding before any federal or state court in which any Borrower or Guarantor is a named defendant that challenges the validity or enforceability of, or seeks to enjoin the performance of, the Loan Documents.

6. A true and correct copy of the Certificate of Organization of each Borrower and each Entity Guarantor, as amended to date, a true and correct copy of the Operating Agreement of each Borrower and each Entity Guarantor, as amended to date, and a true and correct copy of the Consent of the Sole Member of each Borrower and each Entity Guarantor dated December 11, 2020 (the "Consent") have been provided to Kennedy Kelly. The Consent has not been amended or modified and remains in full force and effect.

7. The representations and warranties made by the Borrowers and the Guarantors in the Loan Documents are accurate and complete and Kennedy Kelly may rely upon such representations and warranties.

IN WITNESS WHEREOF, the undersigned has executed this certificate on December 11, 2020.

____________________________
Michael Stillwell

*Issued on June 11, 2020*

**MAIN STREET PRIORITY LOAN FACILITY
BORROWER CERTIFICATIONS AND COVENANTS
INSTRUCTIONS AND GUIDANCE**

Reference is made to the Main Street Priority Loan Facility (the "Facility"), which has been authorized under section 13(3) of the Federal Reserve Act (the "FRA"). Under the Facility, the Federal Reserve Bank of Boston (the "Reserve Bank"), acting under the direction of the Board of Governors of the Federal Reserve System (the "Board" and, together with the twelve Federal Reserve Banks, the "Federal Reserve"), has committed to lend to a special purpose vehicle, MS Facilities LLC, a Delaware limited liability company (the "SPV"), on a recourse basis. The SPV will purchase 95 percent participations in certain eligible loans made by eligible lenders to eligible borrowers. Eligible lenders will retain 5 percent of each such eligible loan. The Secretary of the Treasury ("Secretary") has committed funds appropriated to the Exchange Stabilization Fund under section 4027 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to the SPV in connection with the Facility, the Main Street New Loan Facility, and the Main Street Expanded Loan Facility (each, a "Main Street Facility").

**INSTRUCTIONS**: To participate in the Main Street Priority Loan Facility, the borrower (the "Borrower") must provide the following certifications and covenants (the "Borrower Certifications and Covenants") in a writing executed, on behalf of the Borrower, by its principal executive officer *and* principal financial officer (or individuals performing similar functions)[1] in connection with the loan (the "Eligible Loan") to be made by the eligible lender (the "Eligible Lender") to the Borrower under the Facility. For purposes of these certifications and covenants, the Federal Reserve's current Frequently Asked Questions ("FAQs") on the Main Street Facilities, as posted on the website of the Board or the Reserve Bank as of the date hereof, are incorporated by reference. The Borrower may rely on the clarifications and interpretations provided in the FAQs, to the extent applicable.

1. **Facility Borrower Eligibility Certifications and Covenants.**

**1.A.** ***Borrower Is a Business.*** The Borrower must certify that it is a Business. For purposes of the Borrower Certifications and Covenants, "Business" means an entity that is organized for profit as a partnership; a limited liability company; a corporation; an association; a trust; a cooperative; a joint venture with no more than 49 percent participation by foreign business entities; a tribal business concern that is (i) wholly owned by one or more Indian tribal governments, or by a corporation that is wholly owned by one or more Indian tribal governments, or (ii) owned in part by one or more Indian tribal governments, or by a corporation that is wholly owned by one or more Indian tribal governments, if all other owners are either U.S. citizens or Businesses; or any other form of organization that has been publicly designated by the Federal Reserve as a "Business."[2]

**1.B.** ***Date of Establishment.*** The Borrower must certify that it was established prior to March 13, 2020. For purposes of this certification, "established" means the date of formation, incorporation, or organization for any registered entity under the laws of the United States, one of the several states of the United States, the District of Columbia, any of the territories and possessions of the United States, or an Indian tribal government.

**1.C.** ***Not an Ineligible Business.*** The Borrower must certify that, after reasonable, good faith diligence, it has no reason to believe it is an Ineligible Business.

[1] If the principal executive officer and principal financial officer of a Borrower are the same individual, the second signatory should be the next-in-line officer or employee of the Borrower that works in a financial or accounting capacity.
[2] Any such designations will be published in FAQs posted to the website of the Board or the Reserve Bank.

- For purposes of the Borrower Certifications and Covenants, an "Ineligible Business" means a business of any of the types listed in 13 CFR 120.110(b)-(j), (m)-(s), as modified and clarified by Small Business Administration ("SBA") regulations for purposes of the Paycheck Protection Program ("PPP") on or before April 24, 2020. Such modifications and clarifications include the SBA's recent interim final rules available at 85 Fed. Reg. 20811, 85 Fed. Reg. 21747, and 85 Fed. Reg. 23450. The Federal Reserve may further modify the application of these restrictions to Main Street.[3]

- *Reasonable, Good Faith Diligence*. For purposes of this certification, Eligible Borrowers are expected to review the list of Ineligible Businesses in 13 CFR 120.110(b)-(j), (m)-(s), and make a reasonable, good faith effort to determine if the Borrower's activities or ownership would cause it to be classified within one of the listed ineligible categories. If representatives of the Borrower have reason to believe that the Borrower may be an Ineligible Business under the categories listed in that regulation, Borrowers are expected to conduct further inquiry into the SBA's interpretations of such categories, including in the interim final rules, and to reference the FAQs.

**1.D.** ***Maximum Size***. The Borrower must certify that it meets at least one of the following two conditions: (i) the Borrower has 15,000 employees or fewer, or (ii) the Borrower had 2019 annual revenues of $5 billion or less. The Borrower must meet at least one of these conditions, but is not required to meet both.

- *Number of Employees*. To determine the number of its employees, the Borrower should follow the framework set out in the Small Business Administration's regulation at 13 CFR 121.106. As set out in that regulation, the Borrower should count as employees all full-time, part-time, seasonal, or otherwise employed persons, excluding volunteers and independent contractors. The Borrower should count its own employees and those employed by its affiliates. In order to determine the applicable number of employees, the Borrower should use the average of the total number of persons employed by the Borrower and its affiliates for each pay period over the 12 months prior to the origination of the Eligible Loan.

- *Amount of Revenues*. To determine its 2019 annual revenues, the Borrower must aggregate its revenues with those of its affiliates. The Borrower may use either of the following methods to calculate 2019 annual revenues for purposes of determining eligibility: (1) the Borrower may use its (and its affiliates') annual "revenue" as reflected on its fiscal year 2019 audited financial statements prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"); or (2) the Borrower may use its (and its affiliates') annual receipts for the fiscal year 2019, as reported to the Internal Revenue Service. For purposes of the Facility, the term "receipts" has the same meaning used by the Small Business Administration in 13 CFR 121.104(a). If the Borrower (or its affiliate) does not yet have 2019 audited financial statements prepared in accordance with U.S. GAAP or annual receipts for 2019, the Borrower (or its affiliate) should use its most recent audited financial statements or annual receipts.

- *Identifying Affiliates*. For purposes of the Borrower Certifications and Covenants, the Borrower should identify its affiliates in accordance with the affiliation principles set forth in 13 CFR 121.301(f) (1/1/2019 ed.).

---

[3] Any such modifications will be published in the FAQs posted to the website of the Board or the Reserve Bank.

**1.E.** ***Other Similar Credit Programs***. The Borrower must certify that it has not also participated in, and commit that it will not seek to participate simultaneously in, the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility (a facility established by the Federal Reserve under section 13(3) of the FRA, using equity committed by the Secretary, to support bond and loan issuances). For the avoidance of doubt, a Borrower that has received a PPP loan is permitted to borrow under the Facility, provided that it meets the other Facility eligibility criteria.

**2. CARES Act Borrower Eligibility Certifications and Covenants.**

**2.A.** ***Specific Support under CARES Act***. Consistent with the definition of an "eligible business" under section 4002(4) of the CARES Act, the Borrower must certify that it has not received specific support pursuant to the Coronavirus Economic Stabilization Act of 2020 (Subtitle A of Title IV of the CARES Act). For purposes of this certification, a Borrower is ineligible only if it has received support pursuant to section 4003(b)(1)-(3) of the CARES Act.

**2.B.** ***U.S. Business Requirement***. The Borrower must certify that it is a business that is created or organized in the United States or under the laws of the United States and that has significant operations in and a majority of its employees based in the United States, consistent with section 4003(c)(3)(C) of the CARES Act.

- *Created or Organized*. A business is created or organized in the United States if it is created or organized under the laws of the United States, one of the several states of the United States, the District of Columbia, any of the territories and possessions of the United States, or an Indian tribal government.
- *Significant Operations*. To determine if it has "significant operations" in the United States, the Borrower's operations should be evaluated on a consolidated basis together with its subsidiaries, but not its parent companies or sister affiliates. For example, the Borrower has significant operations in the United States if, when consolidated with its subsidiaries, greater than 50 percent of the Borrower's (i) assets are located in the United States; (ii) annual net income is generated in the United States; (iii) annual net operating revenues are generated in the United States; or (iv) annual consolidated operating expenses (excluding interest expense and any other expenses associated with debt service) are generated in the United States. This is a non-exhaustive list of examples that reflects the principles that should be applied by the Borrower when evaluating its eligibility under this criterion.
- *Majority of Employees*. To determine if it has "a majority of its employees" in the United States, the Borrower's operations should be evaluated on a consolidated basis together with its subsidiaries, but not its parent companies or sister affiliates. As set out in 13 CFR 121.106, the Borrower should count as employees all full-time, part-time, seasonal, or otherwise employed persons, excluding volunteers and independent contractors. In order to determine the applicable number of employees, the Borrower should use the average of the total number of persons employed by the Borrower and its subsidiaries for each pay period over the 12 months prior to the origination of the Eligible Loan under the Facility.

**2.C.** ***Eligible under Conflicts of Interest Prohibition***. Section 4019(c) of the CARES Act requires the principal executive officer and principal financial officer (or individuals performing similar functions) of a Borrower to certify to the Secretary and the Board that the Borrower is not a Covered Entity.

- For purposes of the Borrower Certifications and Covenants, "Covered Entity" means an entity in which a Covered Individual directly or indirectly holds a Controlling Interest.

- For purposes of the Borrower Certifications and Covenants, "Covered Individual" means the President, the Vice President, the head of an Executive department as defined in 5 U.S.C. § 101, or a member of Congress (each a "Government Official" and collectively "Government Officials"), and the spouse, child, son-in-law, or daughter-in-law, as determined under applicable common law, of the Government Official (each a "Family Member" and any group of which are "Family Members"). The term "child" includes a step-child, but the term "spouse" does not include an ex-spouse. To determine a Covered Individual's equity interest in an entity, the Government Official's and Family Members' equity interests shall be aggregated.

- For purposes of the Borrower Certifications and Covenants, a "Controlling Interest" means owning, controlling, or holding not less than 20 percent, by vote or value, of the outstanding amount of any class of equity interest in an entity. An "equity interest" means (a) shares, (b) capital or profit interest in a limited liability company or partnership, or (c) a warrant or right (other than a right to convert) to purchase, sell, or subscribe to any such equity interest. The determination of whether a Covered Individual directly or indirectly holds a Controlling Interest in an entity must take into account a Covered Individual's direct interest in the entity as well as a Covered Individual's interest in any entity that directly or indirectly has an interest in such entity (*e.g.*, the entity's parent companies).

    - *Direct Interests*. If a Covered Individual directly owns, controls, or holds 20 percent or more, by vote or value, of the outstanding amount of any class of equity interest in an entity that is seeking to enter into a transaction with the Facility, that entity is a Covered Entity.

    - *Indirect Interests*. For the purpose of determining the amount of an equity interest indirectly owned or held by a Covered Individual in an entity:

        - A Covered Individual's indirect equity interest by value (*i.e.*, economic interest that may or may not include voting rights) shall be calculated on a proportional basis, taking into account any partial ownership of the relevant entity's parents.

            - For example, if a Government Official owns 25 percent of the economic interest in Company A, and Company A owns 40 percent of the outstanding amount of a class of voting securities of Company B, the Government Official is deemed to own 10 percent of the class of voting securities of Company B.

        - For the purpose of determining the amount of an equity interest indirectly controlled by a Covered Individual in an entity:

            - A Covered Individual shall be deemed to indirectly control an equity interest in an entity if he or she controls, directly or indirectly, the entity that owns or holds the equity interest.

            - An individual or entity shall be deemed to control another entity only when the individual or entity owns or holds a majority of the voting interest in such entity, or is, or holds a majority of the voting interest in, the general partner of such entity.

*Issued on June 11, 2020*

- For example, if a Government Official owns a 51 percent voting interest in Company A, which owns a 51 percent voting interest in Company B, which owns 20 percent of the equity interests of Company C, the Government Official shall be deemed to control 20 percent of the equity interests of Company C.

  - *Shares*. A share is considered an ownership interest without regard to whether the share is transferrable or classified as stock or anything similar and without regard to whether the share is a voting security. For example, a nonvoting preferred share would be considered a share.

  - *Warrants or Rights*. If the Covered Individual has warrants or other rights (other than a right to convert), calculate the Covered Individual's interest in the underlying equity interest on a fully diluted basis assuming that both the individual and other holders of such warrants or rights have exercised such interests. Warrants, options, and similar rights must be counted even if they are unexercised or "out of the money." For example, when calculating an individual's percentage in an equity interest, use the following formula:

$$\frac{\text{(Individual's shares in a class) + (Individual's options and warrants in that class)}}{\text{(Total outstanding shares in that class, assuming all warrants or rights are exercised)}}$$

- *Basis for Certification: Reasonable Diligence*. In light of limited public information on ownership interests of Government Officials, and that the identities of Government Officials' Family Members are not disclosed or reported in any routine or comprehensive manner, it is necessary to prescribe the level of diligence required to make a conflict of interest certification in good faith. To determine whether any Covered Individual holds a Controlling Interest in an entity, it is necessary and sufficient for the entity to undertake the following reasonable diligence:

  - Entities must take into account the ownership, control, and holding of any equity interest of any size if the entity has actual knowledge that a Covered Individual, directly or indirectly, owns, controls, or holds the interest.

  - Entities must determine the beneficial owner of any 5 percent or greater equity interest of the entity and determine whether such beneficial owner is a Covered Individual (i) by checking the name of each such beneficial owner against a list of all Government Officials (link here) and (ii) if the entity has not otherwise been able to confirm whether such beneficial owner is a Family Member, by asking each such beneficial owner whether the owner is a Family Member. If the aggregate amount of equity interests owned by the identified beneficial owners, together with the aggregate percentage ownership determined from actual knowledge in (i) above, is less than 20 percent, an entity need not determine if the identified beneficial owners are Family Members.

  - To determine the identity of beneficial owners of publicly traded securities, Borrowers may rely on information disclosed by such persons in reporting under sections 13(d) and 13(g) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78m(d), 78m(g)).

**2.D.** ***Direct Loan Restrictions***. The Borrower must commit to comply with the compensation, stock repurchase, and capital distribution restrictions that apply to direct loan programs under section 4003(c)(3)(A)(ii) of the CARES Act, except that an S corporation or other tax pass-through entity that is

a Borrower may make distributions to the extent reasonably required to cover its owners' tax obligations in respect of the Borrower's earnings.

- *Limits on Compensation*. The following restrictions apply to compensation of officers and employees of Borrowers that exceeds $425,000 and, where applicable, $3,000,000, in calendar year 2019 or the Subsequent Reference Period (as defined below).
  - *Officer or employee:* "Officer or employee" means an individual who performs compensated services for the Borrower and either:
    - (i) for whom, in connection with those services, the Borrower would be responsible for reporting the compensation on Form W-2 and withholding federal income taxes under IRS rules applicable to U.S. citizen employees in a state or the District of Columbia (regardless of whether the compensation paid to the individual is actually subject to federal income tax withholding, and whether or not tax is withheld); or
    - (ii) is a partner in a partnership, a member of a limited liability company, or other similar structure. Officer or employee does not include an independent director or an independent contractor.
    - *Total Compensation:* "Total Compensation" includes salary, bonuses, awards of stock, and other financial benefits provided by the Borrower and its affiliates to an officer or employee of the Borrower.[4]
  - *Restrictions on compensation for employees or officers with total compensation of between $425,000 and $3,000,000*. No employee or officer whose total compensation exceeded $425,000, but was less than or equal to $3,000,000, in calendar year 2019 or the Subsequent Reference Period will, until 12 months after the date on which the Eligible Loan is no longer outstanding:
    - receive from the Borrower total compensation which exceeds, during any 12 consecutive month period, the total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period; or
    - receive from the Borrower severance pay or other benefits upon termination of employment with the Borrower, which exceeds twice the maximum total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period.
    - Exception. These restrictions do not apply to an employee whose compensation is determined through an existing collective bargaining agreement entered into prior to March 1, 2020. For purposes of this exception, the term "employee" has the same meaning given the term in section 2 of the National Labor Relations Act (29 U.S.C. § 152); and includes any individual employed by an employer subject to the Railway Labor Act (45 U.S.C. § 151 *et seq.*).

[4] Borrowers should consult the FAQs for additional guidance on "Total Compensation" before signing the Borrower Certifications and Covenants.

- *Restrictions on compensation for employees or officers with total compensation exceeding $3,000,000*. No employee or officer whose total compensation exceeded $3,000,000 in calendar year 2019 or the Subsequent Reference Period will, until 12 months after the date on which the Eligible Loan is no longer outstanding:
  - receive, during any 12 consecutive month period, total compensation in excess of the sum of (1) $3,000,000; and (2) 50 percent of the excess over $3,000,000 of the total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period; and
  - except for an employee whose compensation is determined through an existing collective bargaining agreement entered into prior to March 1, 2020, receive from the Borrower severance pay or other benefits upon termination of employment with the Borrower, which exceeds twice the maximum total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period. For purposes of this exception, the term "employee" has the same meaning given the term in section 2 of the National Labor Relations Act (29 U.S.C. § 152); and includes any individual employed by an employer subject to the Railway Labor Act (45 U.S.C. § 151 *et seq.*).
- *Restrictions applicable to new hires and existing officers or employees who become highly compensated*. For an officer or employee whose employment with a Borrower started during 2019 or later, the "Subsequent Reference Period" is the 12-month period starting from the end of the month in which the officer or employee commenced employment, if such officer's or employee's total compensation exceeds $425,000 (or $3,000,000) during such period. For an officer or employee whose total compensation first exceeds $425,000 during a 12-month period ending after 2019, the "Subsequent Reference Period" is the 12-month period starting from the end of the month in which the officer or employee's total compensation first exceeded $425,000 (or $3,000,000).

- *Limits on repurchases of equity securities*. The following restrictions on repurchases apply to Borrowers that have, or have a parent company that has, equity securities that are listed on a national securities exchange. The term equity security has the same meaning as in section 3(a) of the Securities Exchange Act of 1934. The term national securities exchange means an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934. For purposes of these restrictions, the term repurchase includes a redemption of an equity security.
  - Restrictions applicable to the Borrower's repurchases of its own shares. Until 12 months after the date on which the Eligible Loan is no longer outstanding, a Borrower must commit not to repurchase an equity security that is issued by the Borrower and listed on a national securities exchange.
  - Restrictions applicable to the Borrower's repurchases of shares of its parent company. While the Eligible Loan is outstanding, the Borrower also must commit to not repurchase an equity security issued by any of its parent companies that is listed on a national securities exchange. A parent company means any company that consolidates the Borrower for purposes of financial reporting, such as under rules of consolidation established by the Securities Exchange Commission or U.S. GAAP.

- Exception. Restrictions on repurchases of equity securities by the Borrower or a parent company do not apply to any repurchases required under a contractual obligation that was in effect as of March 27, 2020.

- *Limits on distributions*. Until 12 months after the date on which the Eligible Loan is no longer outstanding, the Borrower must agree not to pay dividends or make other capital distributions with respect to the common stock equivalents of the Borrower, except as provided below. For purposes of these restrictions, the term "common stock equivalents" includes common stock in a corporation and equivalent interests in a partnership, limited liability company, a business organized as a trust or other legal entity. Dividends and other capital distributions means any payment made with respect to the Borrower's common stock equivalents, including a discretionary dividend payment. In addition, preferred stock or any other equity interest in a Borrower that provides for mandatory or preferential payment of dividends or other distributions shall be subject to these restrictions unless both the equity interest and the obligation to pay dividends or distributions existed as of March 27, 2020. Dividends and other capital distributions do not include repurchases or redemptions.

  - *S Corporations and other tax pass-through entities*. A Borrower that is an S corporation or other tax pass-through entity may make distributions in respect of its common stock equivalents to the extent reasonably required to cover its owners' tax obligations in respect of the entity's earnings. Such distributions shall be subject to an annual reconciliation, with any surplus or deficiency to be deducted from or added to distributions, as applicable, in the following year.

**3. FRA and Regulation A Borrower Eligibility Certifications.**

**3.A.** ***Unavailability of Credit*.** Consistent with 12 CFR 201.4(d)(8), the Borrower must certify that it is unable to secure adequate credit accommodations from other banking institutions. This does not necessarily mean that no other credit is available for the Borrower's purposes. Rather, the Borrower can certify that it is unable to secure "adequate credit accommodations" because the amount, price, or terms of credit available from other sources are inadequate for the Borrower's needs during the current unusual and exigent circumstances.

**3.B.** ***Solvency*.** Under section 13(3) of the FRA, the Borrower must certify that it is not Insolvent as that term is used in 12 CFR 201.4(d)(5)(iii). For purposes of this certification, a Borrower is "Insolvent" if it is in bankruptcy, resolution under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any other Federal or State insolvency proceeding (as defined in paragraph B(ii) of section 13(3) of the Federal Reserve Act), or if it was "generally failing to pay undisputed debts as they become due" during the 90 days preceding the date of borrowing. For purposes of this certification, a Borrower has been "generally failing to pay undisputed debts as they become due" during the 90 days preceding the date hereof to the extent it is behind on its debts for reasons other than disruptions to its business resulting from the Coronavirus Disease 2019 ("COVID-19") pandemic. For the avoidance of doubt, a person or entity would not be Insolvent or "generally failing to pay its undisputed debts as they become due" if it is behind on its debts because of reduced business activity resulting from stay-at-home, shelter-in-place, social distancing, or other similar orders or recommendations by federal, state, or local government authorities related to the COVID-19 pandemic. Additionally, a person or entity would not be Insolvent if expected and routine sources of funding were unexpectedly unavailable due to market conditions resulting from the COVID-19 pandemic. If, however, a person or entity is failing to pay its undisputed debts as they become due for reasons unrelated to the COVID-19 pandemic, then it is Insolvent. For

example, a person or entity is Insolvent if it was generally failing to pay its undisputed debts in the 90 days preceding the later of March 1, 2020, or the date on which changes in its business activity related to the COVID-19 pandemic commenced.

**4. Eligible Loan Certifications.**

**4.A.** ***Financial Records***. The Borrower must certify that (i) it has provided financial records to the Eligible Lender and a calculation of the Borrower's (and, if relevant, the Borrower's affiliates' and/or Selected Subsidiaries') adjusted 2019 earnings before interest, taxes, depreciation, and amortization ("EBITDA"), reflecting only those adjustments permitted pursuant to the methodology that the Borrower agreed upon with the Eligible Lender, and (ii) such financial records fairly present, in all material respects, the financial condition of such entities for the period covered thereby in accordance with U.S. GAAP (if applicable), consistently applied, and that such adjusted EBITDA calculations are true and correct in all material respects.

- Borrowers are expected to submit statements to the Lender as follows:[5]
  - ***U.S. GAAP Compliance:*** Borrowers that are subject to U.S. GAAP reporting requirements or that already prepare their financials in accordance with U.S. GAAP must submit U.S. GAAP-compliant financial records in connection with this certification. Borrowers that do not have to comply with U.S. GAAP and that do not typically prepare their financials in accordance with U.S. GAAP are not required to submit U.S. GAAP compliant financials.
  - ***Financial Statements:*** Borrowers that typically prepare audited financial statements must submit audited financial statements. Otherwise Borrowers should submit reviewed financial statements or financial statements prepared for the purpose of filing taxes. If a Borrower does not yet have audited or reviewed financial statements for 2019, the Borrower should use its most recent audited or reviewed financial statements.
  - ***Consolidation:*** Borrowers that typically prepare financial statements that consolidate the Borrower with its subsidiaries (but not its parent companies or sister affiliates) must submit such consolidated financial statements. If a Borrower does not typically prepare consolidated financial statements, it is not required to do so, unless so required by the Lender.
- For purposes of the Borrower Certifications and Covenants, "Selected Subsidiaries" means one or more operating subsidiaries selected by the Borrower to provide a guarantee for the Eligible Loan on a joint and several basis, provided that (i) a Borrower is only required to designate Selected Subsidiaries if it is a holding company, all or substantially all of the assets of which comprise equity interests in other entities; (ii) each Selected Subsidiary must itself be eligible to borrow under the Facility's eligibility criteria; (iii) the aggregate adjusted 2019 EBITDA of the Selected Subsidiaries must be used to calculate the Borrower's maximum loan size under the Facility (in addition to the other tests, as applicable); and (iv) if the Eligible Loan is secured, then the Selected Subsidiaries' guarantees are also secured.

**4.B.** ***Unsecured Eligible Loans – Pari Passu***. The Borrower must certify that, if the Eligible Loan is unsecured, then the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) are

[5] The same framework should be applied to the Borrower's affiliates or Selected Subsidiaries, where applicable.

unsecured at the time of origination of the Eligible Loan, as well. For purposes of this certification, the "Borrower's other Loans or Debt Instruments" shall be read to include the Loans or Debt Instruments of the Selected Subsidiaries, if any, on an aggregate basis.

- For purposes of the Borrower Certifications and Covenants:
    - "Loans or Debt Instruments" means debt for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments, and all guarantees of the foregoing.
    - "Mortgage Debt" means (i) debt secured by real property at the time of the Eligible Loan's origination; and (ii) limited recourse equipment financings (including equipment capital or finance leasing and purchase money equipment loans) secured only by the acquired equipment.

**4.C.** ***Secured Eligible Loans – Valuations and Calculations***. The Borrower must certify that, if the Eligible Loan is secured, then the Borrower has provided the Eligible Lender with (i) good faith valuations of any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) at the time of origination of the Eligible Loan, (ii) good faith valuations of any collateral security for each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan, (iii) good faith calculation of the outstanding aggregate principal amount of each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan, and (iv) confirmation as to whether any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) is Shared Collateral (all of the foregoing, "Lien and Collateral Valuation Reporting"). For purposes of this certification, the "Borrower's other Loans or Debt Instruments" shall be read to include the Loans or Debt Instruments of the Selected Subsidiaries, if any, on an aggregate basis.

- For purposes of the Borrower Certifications and Covenants, "Shared Collateral" means any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) that is also collateral security for any of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt).

**4.D.** ***Secured Eligible Loans – Shared Collateral***. The Borrower must certify that, if the Eligible Loan is secured, then the Borrower has no knowledge or reason to believe that the lien of the Eligible Lender in any Shared Collateral is not senior to or *pari passu* with the lien on such Shared Collateral that secures any of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt). For purposes of this certification, the "Borrower's other Loans or Debt Instruments" shall be read to include the Loans or Debt Instruments of the Selected Subsidiaries, if any, on an aggregate basis.

**5. Additional Borrower Certifications and Covenants.**

**5.A.** ***Prohibition on Early Repayment of Other Debt***. The Borrower must commit that it will not repay the principal balance of, or pay any interest on, any debt, unless the principal or interest payment is mandatory and due, until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee holds an interest in the Eligible Loan in any capacity. This restriction shall apply only to other debt for borrowed money of the Borrower. The Borrower may, however, at the time of origination of the Eligible Loan, use the proceeds of the Eligible Loan to refinance existing debt owed by the Borrower to a lender that is not the Eligible Lender or an affiliate of the Eligible Lender.

- For purposes of the Borrower Certifications and Covenants, "Governmental Assignee" means any of the following entities, if the SPV's interest in the Eligible Loan is transferred or assigned

to such entity: any Federal Reserve Bank, any vehicle authorized to be established by the Board or any Federal Reserve Bank, any entity created by an act of the United States Congress, or any vehicle established or acquired by the Department of the Treasury or any other department or agency of the Federal government of the United States.

- *Mandatory and Due*. With respect to debt that predates the Eligible Loan, principal and interest payments are "mandatory and due" on the future date upon which they were scheduled to be paid as of the date of origination of the Eligible Loan, or upon the occurrence of an event that automatically triggers mandatory prepayments under a contract for indebtedness that the Borrower executed prior to the date of origination of the Eligible Loan, except that any such prepayments triggered by the incurrence of new debt can only be paid at the time of origination or if such prepayments are *de minimis*. For the avoidance of doubt, the Borrower may continue to pay, and the Lender may request that the Borrower pay, interest or principal payments on outstanding debt on (or after) the payment due date, provided that the payment due date was scheduled prior to the date of origination of the Eligible Loan. The Borrower may not pay, and the Lender may not request that the Borrower pay, interest or principal payments on such debt ahead of schedule during the life of the Eligible Loan, unless required by a mandatory prepayment clause as specifically permitted above. For future debt incurred by the Borrower in compliance with the terms and conditions of the Eligible Loan, principal and interest payments are "mandatory and due" on their scheduled dates or upon the occurrence of an event that automatically triggers mandatory prepayments.

- *Safe Harbor*. The foregoing Prohibition on Early Repayment of Other Debt would not prohibit the Borrower from undertaking any of the following actions during the term of the Eligible Loan:

    - repaying a line of credit (including a credit card) in accordance with the Borrower's normal course of business usage for such line of credit;

    - taking on and paying additional debt obligations required in the normal course of business and on standard terms, including inventory and equipment financing, provided that such debt is secured only by the newly acquired property (*e.g.*, inventory or equipment), and, apart from such security, is of equal or lower priority than the Eligible Loan; or

    - refinancing debt that is maturing no later than 90 days from the date of such refinancing.

**5.B.** ***Prohibition on Early Cancellation or Reduction of Other Existing Credit Lines***. The Borrower must commit that it will not seek to cancel or reduce any of its committed lines of credit with the Eligible Lender or any other lender until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee holds an interest in the Eligible Loan in any capacity.

- *Safe Harbor*. The safe harbor to the Prohibition on Early Repayment of Other Debt is also a safe harbor to the Prohibition on Early Cancellation or Reduction of Other Existing Credit Lines.

**5.C.** ***Ability to Meet Financial Obligations for 90 Days***. The Borrower must certify that it has a reasonable basis to believe that, as of the date of origination of the Eligible Loan and after giving effect to the Eligible Loan, the Borrower has the ability to meet its financial obligations for at least the next 90 days and does not expect to file for bankruptcy during that time period. In order to make this certification,

the Borrower must determine that, in addition to the foregoing, after receiving the Eligible Loan, it expects to be able to pay its undisputed debts that (i) are due as of the date hereof and (ii) become due during the 90 days following the date hereof.

**5.D.** ***Use of Proceeds***. If the Borrower is a subsidiary of a foreign company, the Borrower must commit that it will use the proceeds of the Eligible Loan only for the benefit of the Borrower, its consolidated U.S. subsidiaries, and other affiliates of the Borrower that are U.S. businesses. The proceeds of the Eligible Loan may not be used for the benefit of the Borrower's foreign parents, affiliates, or subsidiaries.

**5.E.** ***Previous Use of the Facility by the Borrower***. The Borrower must certify that it has informed the Eligible Lender if it has previously received, or has a pending application to receive, funds in connection with any Main Street Facility, as well as the value of such funding. The Borrower is subject to the maximum loan size limitations of the Facility on an entity-basis, rather than on a loan basis. That is, if the Borrower receives more than one loan under the Facility, the sum of those loans cannot exceed the permissible maximum loan size of the Facility.

**5.F.** ***Previous Use of Other Credit Programs by Affiliates***. The Borrower must certify that, to its knowledge after reasonable diligence, none of its affiliates has accessed the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility. It must also certify that it has informed the Eligible Lender if, after reasonable diligence, it has determined that any of its affiliates has previously received, or has a pending application to receive, funds in connection with any Main Street Facility, as well as the value of such funding. An affiliated group of companies can participate in only one Main Street Facility and may not participate in both a Main Street Facility and the Primary Market Corporate Credit Facility. In no case can an affiliated group's total participation in the Facility exceed the maximum loan size that the affiliated group is eligible to receive on a consolidated basis. As result, the Borrower's maximum loan size is limited by its own leverage level, the leverage level of the affiliated group on a consolidated basis, and the size of any loan extended to other affiliates in the group.

**5.G.** ***Use of the Facility by Borrower That Is a Holding Company***. If (and only if) the Borrower is a company, all or substantially all of the assets of which comprise equity interests in other entities, then the Borrower must certify that (i) the Eligible Loan is fully guaranteed on a joint and several basis by its Selected Subsidiaries and (ii) if the Eligible Loan is secured, then the Selected Subsidiaries' guarantees are also secured.

**6.** **Indemnity**. The certifications and covenants shall also include an indemnification by the Borrower of the beneficiaries of such certifications and covenants for any liability, claim, cost, loss, judgment, damage or expense that a beneficiary incurs or suffers as a result of or arising out of a material breach of any of the Borrower's certifications or covenants contained in such document.

**FORM CERTIFICATIONS AND COVENANTS:** The form certifications and covenants are provided on the next page.

*Issued on June 11, 2020*

**MAIN STREET PRIORITY LOAN FACILITY**
**FORM OF BORROWER CERTIFICATIONS AND COVENANTS**

Reference is made to the Main Street Priority Loan Facility (the "Facility"), which has been authorized under section 13(3) of the Federal Reserve Act (the "FRA"). Under the Facility, the Federal Reserve Bank of Boston (the "Reserve Bank"), acting under the direction of the Board of Governors of the Federal Reserve System (the "Board" and, together with the twelve Federal Reserve Banks, the "Federal Reserve"), has committed to lend to a special purpose vehicle, MS Facilities LLC, a Delaware limited liability company (the "SPV"), on a recourse basis. The SPV will purchase 95 percent participations in certain eligible loans made by eligible lenders to eligible borrowers. Eligible lenders will retain 5 percent of each such eligible loan. The Secretary of the Treasury ("Secretary") has committed funds appropriated to the Exchange Stabilization Fund under section 4027 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to the SPV in connection with the Facility, the Main Street New Loan Facility, and the Main Street Expanded Loan Facility (each, a "Main Street Facility").

Reference is further made to the Main Street Priority Loan Facility Borrower Certifications and Covenants Instructions and Guidance (the "Instructions") immediately preceding these Main Street Priority Loan Facility Borrower Certifications and Covenants.

I, the undersigned principal executive officer or principal financial officer, or other authorized officer performing similar functions of the borrower named below (the "Borrower"), in such capacity, make these certifications and covenants (these "Borrower Certifications and Covenants") to the SPV, the lender named below as the eligible lender (the "Eligible Lender") with respect to the eligible loan to be made to the Borrower under the Facility (the "Eligible Loan"), the Reserve Bank, the Board, and the Secretary (each, a "Beneficiary" and, collectively, the "Beneficiaries") in connection with Borrower's participation in the Facility.

I hereby confirm that I have the full power and authority to make the following certifications and covenants on behalf of the Borrower and that the Borrower has the full power and authority to enter into, deliver, and perform the following covenants, agreements, and undertakings, and that such covenants, agreements, and undertakings (i) have been duly and validly authorized, executed, and delivered by the Borrower and (ii) are the legal, valid, and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, except that such enforceability against the Borrower may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies. I also hereby confirm that I have consulted with such other officers, employees, and advisors of the Borrower as I have deemed appropriate, and made such other investigations and inquiries as I have deemed appropriate, in order to make the following certifications, covenants, and agreements.

**1. Facility Borrower Eligibility Certifications and Covenants.** In connection with Borrower's proposed participation in the Facility, I hereby:

**1.A.** certify that, as of the date hereof, the Borrower is a Business (as defined in the Instructions);

**1.B.** certify that the Borrower was established (as defined in the Instructions) prior to March 13, 2020;

**1.C.** certify that, as of the date hereof, after reasonable, good faith diligence (as explained in the Instructions), the Borrower has no reason to believe that it is an Ineligible Business (as defined in the Instructions);

**1.D.** certify that, as of the date hereof, the Borrower (when aggregated with its affiliates in accordance with the Instructions) meets at least one of the following two conditions: (i) has 15,000 employees or fewer, or (ii) had 2019 annual revenues of $5 billion or less; and

**1.E.** certify that, as of the date hereof, the Borrower has not also participated in, and covenant and agree that the Borrower will not seek to participate simultaneously in, the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility.

**2. CARES Act Borrower Eligibility Certifications and Covenants**. In connection with Borrower's proposed participation in the Facility, I hereby:

**2.A.** certify that, as of the date hereof, the Borrower has not received specific support pursuant to the Coronavirus Economic Stabilization Act of 2020 (Subtitle A of Title IV of the CARES Act);

**2.B.** certify that, as of the date hereof, the Borrower is created or organized in the United States or under the laws of the United States with significant operations in and a majority of its employees based in the United States, consistent with section 4003(c)(3)(C) of the CARES Act;

**2.C.** certify that, as of the date hereof, to the best of my knowledge and based on reasonable diligence (as explained in the Instructions), the Borrower is not a Covered Entity (as defined in the Instructions); and

**2.D.** covenant and agree that the Borrower will comply with the compensation, stock repurchase, and capital distribution restrictions that apply to direct loan programs under section 4003(c)(3)(A)(ii) of the CARES Act, except that an S corporation or other tax pass-through entity that is a Borrower may make distributions to the extent reasonably required to cover its owners' tax obligations in respect of the Borrower's earnings.

**3. FRA and Regulation A Borrower Eligibility Certifications**. In connection with Borrower's proposed participation in the Facility, I hereby certify, as of the date hereof, that the Borrower:

**3.A.** is unable to secure adequate credit accommodations from other banking institutions, consistent with 12 CFR 201.4(d)(8); and

**3.B.** is not Insolvent (as defined in the Instructions), consistent with 12 CFR 201.4(d)(5).

**4. Eligible Loan Certifications**. In connection with the Borrower's proposed participation in the Facility, I hereby certify that:

**4.A.** (i) the Borrower has provided financial records to the Eligible Lender and a calculation of the Borrower's (and, if relevant, the Borrower's affiliates' and Selected Subsidiaries' (as defined in the Instructions)) adjusted 2019 earnings before interest, taxes, depreciation, and amortization ("EBITDA"), reflecting only those adjustments permitted pursuant to the methodology agreed upon with the Eligible Lender, and (ii) such financial records fairly present, in all material respects, the financial condition of such entities for the period covered thereby in accordance with U.S. Generally Accepted Accounting Principles (if applicable), consistently applied, and that such adjusted EBITDA calculations are true and correct in all material respects;

**4.B.** if the Eligible Loan is unsecured, the Borrower's other Loans or Debt Instruments (as defined in the Instructions), other than Mortgage Debt (as defined in the Instructions), are unsecured at the time of origination of the Eligible Loan;

**4.C.** if the Eligible Loan is secured, the Borrower has provided the Eligible Lender with (i) good faith valuations of any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) at the time of origination of the Eligible Loan, (ii) good faith valuations of any collateral security for each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan, (iii) good faith calculation of the outstanding aggregate principal amount of each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan and (iv) confirmation as to whether

any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) is Shared Collateral (as defined in the Instructions); and

**4.D.** if the Eligible Loan is secured, I have no knowledge or reason to believe that the lien of the Eligible Lender in any Shared Collateral is not senior to or *pari passu* with the lien on such Shared Collateral securing any of the Borrower's other Loans or Debt Instruments, other than Mortgage Debt.

**5. Additional Borrower Certifications and Covenants**. In connection with the Borrower's proposed participation in the Facility, I hereby:

**5.A.** covenant and agree that the Borrower will not repay the principal balance of, or pay any interest on, any debt unless the principal or interest payment is mandatory and due, until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee (as defined in the Instructions) holds an interest in the Eligible Loan in any capacity, provided that the Borrower may, at the time of origination of the Eligible Loan, refinance existing debt owed by the Borrower to a lender that is not the Eligible Lender;

**5.B.** covenant and agree that the Borrower will not seek to cancel or reduce any of its committed lines of credit with the Eligible Lender or any other lender until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee holds an interest in the Eligible Loan in any capacity;

**5.C.** certify that, as of the date hereof, I have a reasonable basis to believe that, after giving effect to the Eligible Loan, the Borrower has the ability to meet its financial obligations for at least the next 90 days and does not expect to file for bankruptcy during that time period;

**5.D.** covenant and agree that, if the Borrower is a subsidiary of a foreign company, the Borrower will use the proceeds of the Eligible Loan only for the benefit of the Borrower, its consolidated U.S. subsidiaries, and other affiliates of the Borrower that are U.S. businesses, and not for the benefit of the Borrower's foreign parents, affiliates, or subsidiaries;

**5.E.** certify that I have informed the Eligible Lender if, as of the date hereof, the Borrower has previously received, or has a pending application to receive, funds in connection with any Main Street Facility, as well as the value of such funding;

**5.F.** certify that, to my knowledge after reasonable diligence, none of the Borrower's affiliates has accessed the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility as of the date hereof, and the Borrower has informed the Eligible Lender if, after reasonable diligence, it has determined that any of its affiliates has previously received, or has a pending application to receive, funds in connection with the Facility, as well as the value of such funding; and

**5.G.** certify that, if (and only if) the Borrower is, as of the date hereof, a company, all or substantially all of the assets of which comprise equity interests in other entities, then (i) the Eligible Loan is fully guaranteed on a joint and several basis by its Selected Subsidiaries and (ii) if the Eligible Loan is secured, then the Selected Subsidiaries' guarantees are also secured.

**6. Indemnification**. The Borrower shall indemnify, defend, and hold each Beneficiary and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, or expense (including reasonable attorneys' fees and expenses) that any Indemnitee incurs or suffers as a result of or arising out of a material

breach of any of Borrower's representations, warranties, covenants, or agreements in these Borrower Certifications and Covenants.

7. **Miscellaneous.**

**7.A.** I further covenant and agree that the Borrower will promptly notify the Eligible Lender of any material misrepresentation with respect to any certification hereunder and any material breach of any covenant made hereunder during the time in which the Eligible Loan is outstanding and the SPV, or any Governmental Assignee, holds an interest in the Eligible Loan, and for one year after the Eligible Loan is no longer owned in any capacity by the SPV or any other Governmental Assignee.

**7.B.** I acknowledge that, if this certification includes a knowing material misrepresentation, in addition to all remedies available at law, in equity or otherwise, the SPV, the Reserve Bank, the Board, or the Secretary may refer the matter to the relevant law enforcement authorities for investigation and possible action in accordance with applicable criminal and civil law. *See, e.g.*, 18 U.S.C. § 1001; 31 U.S.C. § 3729.

**7.C.** I further acknowledge that, the Eligible Loan and any other financial assistance provided to the Borrower through the Facility would promptly become due and payable upon discovery of a material misrepresentation or material breach of covenant related to Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certifications) of these Borrower Certifications and Covenants.

**7.D.** I further acknowledge that the Reserve Bank, the Board, the Department of the Treasury, and any Governmental Assignee or agency of the Federal government associated with such Governmental Assignee may make public and nonpublic disclosures with respect to the Facility including, without limitation, those required under applicable law. These disclosures may include the identity of the Borrower; the date and amount of the loan provided to the Borrower through the Main Street Facilities; the form in which the loan was provided to the Borrower; material terms of such loan; and other information. In addition, the SPV or the managing member of the SPV may make disclosures of information that it receives from and about the Borrower in connection with the Facility to the Reserve Bank, the Board, the Department of the Treasury, and any Governmental Assignee or agency of the Federal government associated with such Governmental Assignee. On behalf of the Borrower, I consent to such disclosures.

**7.E.** I covenant and agree that the Borrower will retain records (the "File") containing the basis for the certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) and compliance with the covenant therein, and will make such information available to the Reserve Bank as promptly as practicable upon request of the Reserve Bank, either as (i) a copy of the File for the Reserve Bank's own inspection or review or (ii) an attestation by an external auditor that the auditor has examined the File and has found it sufficient to support the certification and compliance with the related covenant. If the Borrower submits an attestation by an external auditor, the Reserve Bank reserves the right to request a copy of the File for its own inspection or review. The Borrower will retain the File for a period of 10 years following the termination of all of the Main Street Facilities, or for the period of time required by the Borrower's document retention policies, whichever is longer.

The illegality, invalidity or unenforceability of any provision of these Borrower Certifications and Covenants under the law of any jurisdiction shall not affect its legality, validity, or enforceability under the law of any other jurisdiction or the legality, validity, or enforceability of any other provision.

THESE BORROWER CERTIFICATIONS AND COVENANTS, THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND BENEFICIARIES UNDER THESE BORROWER CERTIFICATIONS AND COVENANTS

*Issued on June 11, 2020*

AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THESE BORROWER CERTIFICATIONS AND COVENANTS OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

The Borrower irrevocably and unconditionally submits to and accepts the non-exclusive jurisdiction of the United States District Court for the District of Massachusetts located in the City of Boston or the courts of the Commonwealth of Massachusetts located in the County of Suffolk for any action, suit, or proceeding arising out of or based upon these Borrower Certifications and Covenants or any matter relating to them and waives any objection that it may have to the laying of venue in any such court or that any such court is an inconvenient forum or does not have personal jurisdiction over it.

These Borrower Certifications and Covenants may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. These Borrower Certifications and Covenants shall become effective when it shall have been duly executed and delivered by the undersigned officers of the Borrower. The words "executed," signed," "signature," and words of like import as used above and elsewhere in these Borrower Certifications and Covenants may include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Name of the Borrower: COULBEE LIMITED LIABILITY COMPANY, LION CONSTRUCTION, LLC, LION CONSTRUCTION MANAGEMENT, LLC, STREAMLINE GROUP, LLC, STREAMLINE SOLUTIONS ACQUISITIONS, LLC, STREAMLINE REALTY, LLC, STREAMLINE PARTNERS, LLC, STREAMLINE HOME MANAGEMENT, LLC, and STREAMLINE COMMERCIAL DEVELOPMENT, LLC,

Name of the Lender: Huntingdon Valley Bank

*On behalf of Coulbee Limited Liability Company,*

By:____________________ By:____________________

Name: Michael Stillwell Name: Steve Koslaski

Title: President Title: Chief Financial Officer

Date: December 11, 2020 Date: December 11, 2020



D001150

*Issued on June 11, 2020*

*On behalf of Lion Construction, LLC:*

| | |
|---|---|
| By:_______________ | By:_______________ |
| Name: Michael Stillwell | Name: Steve Koslosk |
| Title: President | Title: Chief Financial Officer |
| Date: December 11, 2020 | Date: December 11, 2020 |

*On behalf of Lion Construction Management, LLC:*

| | |
|---|---|
| By:_______________ | By:_______________ |
| Name: Michael Stillwell | Name: Steve Koslosk |
| Title: President | Title: Chief Financial Officer |
| Date: December 11, 2020 | Date: December 11, 2020 |

*On behalf of Streamline Group, LLC:*

| | |
|---|---|
| By:_______________ | By:_______________ |
| Name: Michael Stillwell | Name: Steve Koslosk |
| Title: President | Title: Chief Financial Officer |
| Date: December 11, 2020 | Date: December 11, 2020 |

*On behalf of Streamline Solutions Acquisitions, LLC:*

| | |
|---|---|
| By:_______________ | By:_______________ |
| Name: Michael Stillwell | Name: Steve Koslosk |
| Title: President | Title: Chief Financial Officer |
| Date: December 11, 2020 | Date: December 11, 2020 |

*On behalf of Streamline Realty, LLC:*

| | |
|---|---|
| By:_______________ | By:_______________ |
| Name: Michael Stillwell | Name: Steve Koslosk |
| Title: President | Title: Chief Financial Officer |
| Date: December 11, 2020 | Date: December 11, 2020 |

*On behalf of Streamline Partners, LLC:*

By:______________________________

Name: Michael Stillwell

Title: President

Date: December 11, 2020

By:______________________________

Name: Steve Koslaski

Title: Chief Financial Officer

Date: December 11, 2020

*On behalf of Streamline Home Management, LLC:*

By:______________________________

Name: Michael Stillwell

Title: President

Date: December 11, 2020

By:______________________________

Name: Steve Koslaski

Title: Chief Financial Officer

Date: December 11, 2020

*On behalf of Streamline Commercial Development, LLC:*

By:______________________________

Name: Michael Stillwell

Title: President

Date: December 11, 2020

By:______________________________

Name: Steve Koslaski

Title: Chief Financial Officer

Date: December 11, 2020

**GUARANTY AND SURETYSHIP AGREEMENT**
**(INDIVIDUAL GUARANTOR)**

THIS GUARANTY AND SURETYSHIP AGREEMENT (as amended, supplemented, replaced or otherwise modified, this "Guaranty") is given by MICHAEL STILLWELL, an individual ("Stillwell"), Streamline Residential Construction Limited Liability Company, a Pennsylvania limited liability company, SL Rentals Limited Liability Company, a Pennsylvania limited liability company, Streamline Construction Management Limited Liability Company, a Pennsylvania limited liability company, SL Consulting Limited Liability Company, a Pennsylvania limited liability company, Streamline QOZB Manager Limited Liability Company, a Pennsylvania limited liability company, Streamline QOZB Investor Limited Liability Company, a Pennsylvania limited liability company, Streamline Technologies Limited Liability Company, a Pennsylvania limited liability company, Streamline Sales and Marketing Limited Liability Company, a Pennsylvania limited liability company, Streamline Commercial Construction Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 1 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 2 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 3 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 4 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 5 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 6 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 7 Limited Liability Company, a Pennsylvania limited liability company, Iron Capital Investments 8 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 1 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 2 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 3 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 4 Limited Liability Company, a Pennsylvania limited liability company, Putter Capital Investments 5 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 6 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 9 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 10 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 11 Limited Liability Company, a Pennsylvania limited liability company, Wood Capital Investments 14 Limited Liability Company, a Pennsylvania limited liability company, PRS 1 Limited Liability Company, a Pennsylvania limited liability company, PRS 2 Limited Liability Company, a Pennsylvania limited liability company, PRS 3 Limited Liability Company, a Pennsylvania limited liability company, PRS 4 Limited Liability Company, a Pennsylvania limited liability company, PRS 5 Limited Liability Company, a Pennsylvania limited liability company and SL Ridge Limited Liability Company, a Pennsylvania limited liability company, each with an address at 2301 Washington Avenue, Suite 111, Philadelphia, PA 19146 (collectively and jointly and severally, "Guarantor") to HUNTINGDON VALLEY BANK, with a banking office at 2005 S. Easton Road, Suite 304, Doylestown, PA 18901 (together with its successors and assigns, "Lender") in consideration of Lender now or hereafter (a) extending or agreeing to extend a commercial loan in the principal sum of Fourteen Million Eight Hundred Thousand Dollars ($14,800,000) (the "Loan") to Coulbee Limited Liability Company., a Pennsylvania limited liability company ("Coulbee"), Lion Construction, LLC, a Pennsylvania limited liability company ("Lion"), Lion Construction Management, LLC, a Pennsylvania limited liability company ("Lion Management"), Streamline Group, LLC, a Delaware limited liability company ("Streamline"), Streamline Solutions Acquisitions, LLC, a Pennsylvania limited liability company ("Streamline Solutions"), Streamline Realty, LLC, a Pennsylvania limited liability company ("Streamline Realty"), Streamline Partners, LLC, a Pennsylvania limited liability company ("Streamline Partners"),

Streamline Home Management, LLC, a Pennsylvania limited liability company ("Streamline Home")and Streamline Commercial Development, LLC, a Pennsylvania limited liability company (jointly and severally, "Borrower") or (b) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation, and for other valuable consideration, the receipt of which is acknowledged. All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the loan agreement by and among Borrower and Lender of even date herewith (the "Loan Agreement").

Intending to be legally bound, Guarantor agrees as follows:

1. **GUARANTY.** Guarantor, jointly and severally, unconditionally guarantees and acts as surety for, as primary obligor, without any setoff or other deduction, the payment or performance when due, whether by acceleration or lapse of time or otherwise, all of the Obligations, as defined below, without any limitation as to amount. This Guaranty is a continuing, absolute, irrevocable and unconditional guaranty and suretyship of payment and not collection. "Obligations" means, collectively, (A) all obligations of Borrower to Lender in any capacity for the payment of any money, however evidenced, regardless of kind, class or form, whether for the payment when due, by acceleration, at maturity or otherwise, of any principal, interest, fee, charge, cost or expense or otherwise (including, without limitation, to the extent permitted by law, reasonable attorneys' fees and legal expenses), now existing or hereafter arising or accruing, created directly or by any assignment or other transfer, direct or indirect, absolute or contingent, whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise, whether related to foreign exchange obligations, treasury management services or indebtedness, liabilities, fees, costs, assessments, whether similar or dissimilar or related or unrelated and whether or not arising or accrued subsequent to any commencement of or made, proved, voted or allowed as a claim in any case or other proceeding pursuant to any bankruptcy, insolvency or similar statute, that have been heretofore or are hereafter incurred by, in any capacity and whether alone or otherwise, Borrower or, if Borrower is not an individual, any direct or indirect successor of such Borrower or any direct or indirect transferee of all or substantially all of the assets of such Borrower, together with all amendments, extensions, renewals or increases thereof, and (B) all of Borrower's other duties, debts, indemnities, obligations and liabilities under the Loan Agreement and any Loan Documents, as such term is defined in the Loan Agreement. Each portion of the Obligations now or hereafter (x) paid or satisfied or (y) received, applied or retained by Lender and later recovered from Lender as a result of any claim (including, without limitation, any claim involving any allegation that any money constituted trust funds or that the receipt, application or retention of any payments or the grant, creation or perfection of any security interest or lien on any collateral constituted a preference or a fraudulent conveyance or transfer), shall be reinstated as part of the Obligations for purposes of this Guaranty as of the date it originally arose or accrued and shall survive the termination of the Guaranty.

2. **INDEMNIFICATION.** Guarantor shall, jointly and severally, indemnify Lender on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if Lender retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against Lender as a result of any claim arising out of this Guaranty.

3. **EXPENSES.** Guarantor shall pay to Lender on demand each cost and expense (including, but not limited to, if Lender retains counsel for advice, litigation or any other purpose, reasonable

attorneys' fees and disbursements) hereafter incurred by Lender in endeavoring to enforce any obligation of Guarantor pursuant to this Guaranty or preserve or exercise any right or remedy of Lender pursuant to this Guaranty.

4. **FURNISHING OF INFORMATION.** At any time and from time to time, promptly upon the request of Lender, Guarantor shall furnish to Lender all information requested by Lender and relating to Guarantor or the business, operations, assets, affairs or condition of Guarantor including, without limitation, verification of liquidity on an ongoing basis. Notwithstanding the foregoing, Guarantor will provide to Lender:

(a) **Tax Returns.** As soon as available, and in any event within thirty (30) days of the date of actual filing and no later than October 31 of each year, signed copies all federal and state annual tax returns of Guarantor, including all related schedules and forms, for the previous calendar years, all in reasonable detail and scope and certified to Lender's satisfaction and, if any extension to file said tax returns is filed with the Internal Revenue Service, Guarantor shall, within fifteen (15) days of filing such an extension, deliver to Lender a copy of such filed extension (including all attachments thereto); and.

(b) **Personal Financial Statements.** As soon as available, and in any event no later than one hundred twenty (120) days after each calendar year end, Stillwell's signed personal financial statements for each calendar year on or attached to Lender's required form, signed and certified by Stillwell as being true and correct and in reasonable detail satisfactory to Lender.

(c) **Other.** Such other financial information as Lender may reasonably request from time to time.

5. **POSTPONEMENT OF SUBROGATION.** Until (a) the final and indefeasible payment in full and performance of (i) the Obligations, and (ii) each liability, cost and expense that Guarantor are obligated to pay or perform pursuant to this Guaranty and (b) the expiration or other termination of each commitment and other agreement of Lender to extend any credit or other financial accommodation to Borrower, Guarantor shall not assert any claim against Borrower or any other guarantor or commence or prosecute any action or other legal proceeding relating to or otherwise enforce any right of subrogation, indemnification, reimbursement or contribution, or any similar right, against Borrower or any other guarantor in connection with this Guaranty or any of the Obligations.

6. **TERMINATION.** This Guaranty shall remain in full force and effect until the earlier of: (i) such time as the Obligations have been indefeasibly paid in full and shall terminate as to Guarantor only upon the final and indefeasible payment in full and performance of the Obligations. This Guaranty is an agreement of suretyship as well as a guaranty and is enforceable regardless of the genuineness, regularity, validity or enforceability of the Obligations, without the necessity of any suit or other proceeding of any nature against Borrower.

7. **REPRESENTATIONS AND WARRANTIES; COVENANTS.** Guarantor represents and warrants to Lender that (a) the execution, delivery to Lender and performance of this Guaranty by Guarantor (i) does not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which Guarantor is bound, (ii) does not and will not violate or constitute any default under any agreement, instrument or other document by which Guarantor is bound, and (iii) does not and will not require any authorization of, notice to or other act by or relating to any Person that has not been duly obtained, given or done and is not in full force and effect and (b)

this Guaranty is enforceable in accordance with its terms against Guarantor, (c) there is no action, suit or proceeding pending or, to the knowledge of Guarantor, threatened against or affecting Guarantor or Borrower before or by any court, administrative agency or other governmental authority, or which brings into question of the validity of the transactions contemplated hereby, (d) Guarantor has not applied for nor consented to the appointment of a receiver, trustee or liquidator of Guarantor or any of Guarantor's property, has not admitted in writing Guarantor's inability to pay Guarantor's debts as they mature, has not made a general assignment for the benefit of creditors, been adjudicated a bankrupt or insolvent or filed a voluntary petition in bankruptcy, nor has a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against Guarantor in any proceeding under any such law, and no action has been taken by Guarantor for the purpose of effecting any of the foregoing and (e) Guarantor has received, read and reviewed with an independent attorney (or waived their right to read and review with an independent attorney) all of the Loan Documents and the Loan is and will be of direct interest, benefit and advantage to Guarantor. Guarantor further represents and warrants that Guarantor's financial statements ("Financial Statements") heretofore delivered to Lender are true and correct in all material respects and fairly represent Guarantor's respective financial condition as of the date thereof and for the periods shown therein; that no material change has thereafter occurred in the financial conditions reflected therein; and that the assets shown on the Financial Statements are wholly owned by Guarantor and are not jointly owned with any other Person except as otherwise stated in the Financial Statements. Guarantor covenants and agrees (a) that Guarantor shall notify Lender promptly of any material adverse change in their financial condition as shown on the Financial Statements and (b) Guarantor shall maintain complete and accurate books and records and make them available for inspection by Lender upon advance notice as Lender may reasonably request. No order, judgment or decree has been entered by any court of competent jurisdiction approving a petition seeking reorganization of the respective Guarantor, as applicable, or all or a substantial part of the assets of Guarantor, or appointing a receiver, sequestrator, trustee or liquidator of them or any of their property. Guarantor covenants and agrees that Guarantor has not and will not, without prior written consent of Lender, sell, lease, assign, gift, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets or any interest therein. Guarantor assumes the responsibility to keep informed of Borrower's financial condition and of all circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of risks Guarantor assumes hereunder.

## 8. CERTAIN CONSENTS AND WAIVERS.

(a) **Consents.** Any act, omission or other thing, whether now in existence or hereafter occurring shall not cause (i) this Guaranty to be modified or terminated as to Guarantor, (ii) any obligation of Guarantor pursuant to this Guaranty and no right or remedy of Lender pursuant to this Guaranty or arising or accruing as a result of this Guaranty to be impaired or otherwise adversely affected, and (iii) any right or remedy to be waived, by any act, omission or other thing, whether now in existence or hereafter occurring. Guarantor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, and agrees that this Guaranty shall not be terminated as to Guarantor by, or no right or remedy shall be waived by, whether now in existence or hereafter occurring, (A) any direct or indirect extension, renewal, refinancing or other modification or replacement of, or any assignment or other transfer, compromise, cancellation, discharge, invalidity, impairment, unenforceability or change in any term or condition of, defense with respect to or grant of any participation in, any of the Obligations, any increase or alteration to the risk associated with the Obligations, or any other obligation of Borrower or Guarantor, or any other Person, (B) any

acceptance of any Person or Governmental Authority or other entity who or that is now or hereafter liable, whether directly or indirectly, for payment or performance of any Obligations (each, an "Other Obligor"), (C) *intentionally omitted*, (D) *intentionally omitted*, (E) any exercise or waiver of, failure or delaying to exercise, forbearance from exercising, or failure to give any notice prior to exercising, any right or remedy of Lender or any other Person relating to any of the Obligations or against Borrower, Guarantor, any Other Obligor or any other Person, (F) any case or other proceeding pursuant to any bankruptcy, insolvency or similar statute with respect to Borrower or Guarantor, Other Obligor or other Person, (G) any failure of Lender or any other Person to make, prove or vote any claim relating to any of the Obligations or any failure of any such claim to be allowed, in any case or other proceeding pursuant to any bankruptcy, insolvency or similar statute, (H) the Obligations being at any time or from time to time paid in full or reduced and then increased or exceeding any limitation as to amount set forth in Section 1 of this Guaranty, (I) any refusal or other failure of Lender or any other Person to grant any or any additional credit or other financial accommodation to Borrower or Guarantor, Other Obligor or other Person or to provide to Guarantor any or complete and accurate information relating to Borrower, any other Guarantor, Other Obligor or other Person, (J) any notice to Lender or any other Person from Guarantor, Other Obligor or other Person not to grant any or any additional credit or other financial accommodation to Borrower or to take or not to take any other action, (K) the acceptance by Lender or any other Person of any writing intended by Borrower or Guarantor, Other Obligor or other Person, but not by Lender, to create an accord and satisfaction with respect to any of the Obligations, (L) *intentionally omitted*, (M) the manner or order of application of any money applied in payment of any of the Obligations, (N) any change in the ownership, membership, location, business, name, identity or structure of Borrower or any Other Obligor or other Person, (O) *intentionally omitted* (P) the surrender, exchange, termination, compromise or release of this Guaranty, whether by agreement or operation of law or otherwise or (Q) the surrender, exchange, acceptance or compromise or release by Lender of any other party, guarantor or guaranty.

(b) **Waivers.** Guarantor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, (i) the acceptance of this Guaranty by Lender, (ii) any demand upon or presentment or protest to Borrower or Guarantor, Other Obligor or other Person, (iii) any exercise of any right or remedy of Lender or any other Person relating to any of the Obligations or against Borrower or Guarantor, Other Obligor or other Person, (iv) the impairment of suretyship defenses (v) any defense based upon election of remedies, (vi) the incapacity, lack of authority, death or disability of, or revocation hereof or any other guaranty, suretyship, indemnity, or other Loan Document by any Person, (vii) Lender's failure to enforce any claim against the estate (private, bankruptcy or any other proceeding) of any Person, (viii) marshalling of assets or any right to cause Lender to proceed against any security for the Obligations against Guarantor, or (ix) any notice to Borrower or Guarantor, Other Obligor or other Person of protest for nonpayment, any incurring or nonpayment of any of the Obligations, any occurrence or existence of any event or condition of default relating to any of the Obligations, any exercise of any right or remedy of Lender or any other Person relating to any of the Obligations or against Borrower or Guarantor, Other Obligor or other Person, any action taken or not taken by Lender or any other Person or any other matter.

**9. NOTICES AND OTHER COMMUNICATIONS.** Each notice and other communication relating to this Guaranty shall be in writing, sent by mail or overnight courier service to at the address set forth in the opening paragraph of this Guaranty, and shall be deemed to have been given when deposited in the mail, first-class or certified postage prepaid, or accepted by any post office or overnight courier service for delivery and to have been received upon the earlier of (a) the actual receipt thereof or (b) three (3) days after being so deposited or accepted.

**10. MISCELLANEOUS.**

(a) **Joint and Several Liability.** If there is more than one Guarantor, (i) each of them shall be jointly and severally liable pursuant to this Guaranty, and (ii) this Guaranty shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to Lender a separate agreement identical to this Guaranty.

(b) **Right of Setoff.** Upon and at any time and from time to time after any default in the payment when due, whether by acceleration or lapse of time or otherwise, of any of the Obligations or any occurrence or existence of any other event or condition of default relating to any of the Obligations, Lender shall have the right to place an administrative hold on, and set off against each obligation of Guarantor pursuant to this Guaranty, any obligation of Lender or any other direct or indirect subsidiary of Lender (in any capacity) owing to Guarantor, whether now existing or hereafter arising or accruing, whether or not then due and whether pursuant to any deposit account or certificate of deposit or in any other manner. Such setoff shall become effective at the time Lender opts therefor even though evidence thereof is not entered in the records of Lender until later.

(c) **Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by Lender, Lender shall have the right to assign or otherwise transfer or grant any participation in this Guaranty, any obligation of Guarantor pursuant to this Guaranty or any right or remedy of Lender pursuant to this Guaranty or arising or accruing as a result of this Guaranty.

(d) **Binding Effect.** This Guaranty shall be binding upon Guarantor and each direct or indirect legal representative, successor, heir and assignee of Guarantor and shall inure to the benefit of and be enforceable by Lender and each direct or indirect successor and assignee of Lender.

(e) **Entire Agreement, Modifications and Waivers.** This Guaranty contains the entire agreement between Lender and Guarantor with respect to the subject matter of this Guaranty and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Lender with respect thereto. Notwithstanding the foregoing, this Guaranty does not supersede or replace any other guaranty or security granted to Lender by Guarantor or others. No action now or hereafter taken or not taken, no course of conduct now or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation made, and no agreement or representation hereafter made other than in writing, by or on behalf of Lender shall modify or terminate this Guaranty, impair or otherwise adversely affect any obligation of Guarantor pursuant to this Guaranty or any right or remedy of Lender pursuant to this Guaranty or arising or accruing as a result of this Guaranty or operate as a waiver of any such right or remedy. No modification of this Guaranty or waiver of any such right or remedy shall be effective unless made in a writing duly executed by Lender and specifically referring to such modification or waiver.

(f) **Rights and Remedies Cumulative.** All rights and remedies of Lender pursuant to this Guaranty or arising or accruing as a result of this Guaranty shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy. Anything herein or in any other loan documents notwithstanding, the maximum liability of Guarantor hereunder shall in no event exceed the amount which can be guaranteed by Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution).

(g) **Exercise of Rights; Requests.** Except as expressly provided in this Guaranty, each right and remedy of Lender pursuant to this Guaranty may be exercised (i) at any time and from time to time, (ii) in the sole discretion of Lender, (iii) without any notice or demand of any kind and (iv) whether or not any event or condition of default relating to any of the Obligations has occurred or existed, but Lender shall not be obligated to exercise any such right or remedy. Each request by Lender pursuant to this Guaranty may be made (A) at any time and from time to time, (B) in the sole discretion of Lender and (C) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations has occurred or existed.

(h) **Severability.** Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

(i) **Governing Law.** This Guaranty shall be governed by the internal law of the Commonwealth of Pennsylvania without regard to the law of any other jurisdiction.

(j) **Headings; Copies or Reproductions.** In this Guaranty, headings of sections are for convenience of reference only and have no substantive effect. Guarantor agrees that a copy or other reproduction of this Guaranty which is kept in Lender's normal course of business may be admitted as an original in any legal proceeding, whether or not the original is in existence.

(k) **Authorization to Obtain Credit Reports.** By signing below, Guarantor provides written authorization to Lender or its designee (and any Lender hereof) to obtain Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Guaranty and subsequently for the purpose of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

(l) **Limitation of Liability.** To the fullest extent permitted by applicable law, Guarantor shall not assert, and hereby waives any claim against Lender, on any theory of liability, for special, indirect, consequential or punitive damages (but excluding direct or actual damages) arising out of, in connection with or as a result of, this Guaranty, any related loan documents, the transactions contemplated hereby or thereby or any loan or the use of the proceeds.

**11. LEGAL PROCEEDINGS.**

**(a) JURISDICTION AND VENUE. GUARANTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY (i) CONSENTS IN EACH ACTION AND OTHER LEGAL PROCEEDING COMMENCED BY LENDER AND ARISING OUT OF OR OTHERWISE RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS TO THE JURISDICTION OF ANY COURT THAT IS EITHER A COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA OR A COURT OF THE UNITED STATES LOCATED IN THE COMMONWEALTH OF PENNSYLVANIA AND (ii) WAIVES EACH OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION OR OTHER LEGAL PROCEEDING.**

**(b) WAIVER OF JURY TRIAL. GUARANTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT GUARANTOR MAY**

**HAVE TO A TRIAL BY JURY WITH RESPECT TO, AND IN, ANY ACTION OR OTHER LEGAL PROCEEDING OF ANY NATURE, RELATING TO (i) THIS GUARANTY OR ANY RELATED LOAN DOCUMENT, (ii) ANY TRANSACTION CONTEMPLATED BY ANY SUCH DOCUMENT OR (iii) ANY NEGOTIATION, PERFORMANCE OR ENFORCEMENT OF THIS GUARANTY. GUARANTOR ACKNOWLEDGES THAT GUARANTOR HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL AS NECESSARY AND APPROPRIATE.**

(c) **POWER TO CONFESS JUDGMENT. UPON THE FAILURE OF GUARANTOR TO PERFORM ITS OBLIGATIONS HEREUNDER AND THE CONTINUANCE OF SUCH FAILURE FOR FIVE (5) DAYS AFTER NOTICE FROM LENDER, GUARANTOR HEREBY IRREVOCABLY EMPOWERS THE PROTHONOTARY, ANY ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA, TO APPEAR FOR AND, WITH OR WITHOUT COMPLAINT FILED, CONFESS JUDGMENT AGAINST GUARANTOR FOR SUCH SUMS AS ARE DUE AND/OR MAY BECOME DUE HEREUNDER, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION AND WITH AN AMOUNT EQUAL TO FIVE PERCENT (5%) OF THE AMOUNT OF SUCH JUDGMENT, BUT NOT LESS THAN $1,000.00, ADDED FOR ATTORNEYS' COLLECTION FEES. NOTWITHSTANDING THE ATTORNEY'S COMMISSION PROVIDED FOR IN THE PRECEDING SENTENCE (WHICH IS INCLUDED IN THE WARRANT FOR PURPOSES OF ESTABLISHING A SUM CERTAIN), THE AMOUNT OF ATTORNEYS' FEES THAT LENDER MAY RECOVER FROM GUARANTOR AND RETAIN SHALL NOT EXCEED THE ACTUAL REASONABLE ATTORNEYS' FEES INCURRED BY LENDER. THIS GUARANTY OR A COPY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. GUARANTOR FOREVER WAIVES AND RELEASES ALL PROCEDURAL ERRORS IN SUCH PROCEEDINGS. NO SINGLE EXERCISE OF THE FOREGOING POWER SHALL EXHAUST THE POWER, AND MAY BE EXERCISED AS OFTEN AS THE HOLDER SHALL FIND IT NECESSARY AND DESIRABLE. THE HOLDER HEREOF MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER. IF ANY JUDGMENT CONFESSED HEREUNDER IS STRICKEN OR OPENED FOR ANY REASON, THE HOLDER OF THIS GUARANTY IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST GUARANTOR FOR ANY PART OR ALL OF THE AMOUNTS OWING HEREUNDER, IF DOING SO WILL CURE ANY ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS. IT IS UNDERSTOOD AND AGREED THAT ANY EXERCISE OF THIS AUTHORIZATION BY THE HOLDER HEREOF SHALL BE ON BEHALF OF THE HOLDER HEREOF AND NOT ON BEHALF OF GUARANTOR.**

[***Signatures on Following Page.***]

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty Agreement on the date set forth below and made it effective as of December 11, 2020.

Guarantor:

______________________________ (SEAL)
MICHAEL STILLWELL

STREAMLINE RESIDENTIAL CONSTRUCTION LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RENTALS LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE CONSTRUCTION MANAGEMENT LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

SL CONSULTING LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE QOZB MANAGER LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE QOZB INVESTOR LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE TECHNOLOGIES LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SALES AND MARKETING LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL CONSTRUCTION LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

IRON CAPITAL INVESTMENTS 1
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 2
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 3
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 4
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 5
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

IRON CAPITAL INVESTMENTS 6
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 7
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 8
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 1
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 2
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PUTTER CAPITAL INVESTMENTS 3
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 4
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 5
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 6
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 9
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

WOOD CAPITAL INVESTMENTS 10
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 11
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 14
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 1 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 2 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PRS 3 LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 4 LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 5 LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RIDGE LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

# TERM NOTE

$14,800,000 Effective: December 11, 2020

**FOR VALUE RECEIVED,** and intending to be legally bound, **COULBEE LIMITED LIABILITY COMPANY.**, a Pennsylvania limited liability company, **LION CONSTRUCTION, LLC,** a Pennsylvania limited liability company, **LION CONSTRUCTION MANAGEMENT, LLC,** a Pennsylvania limited liability company, **STREAMLINE GROUP, LLC,** a Delaware limited liability company, **STREAMLINE SOLUTIONS ACQUISITIONS, LLC,** a Pennsylvania limited liability company, **STREAMLINE REALTY, LLC,** a Pennsylvania limited liability company, **STREAMLINE PARTNERS, LLC,** a Pennsylvania limited liability company, **STREAMLINE HOME MANAGEMENT, LLC,** a Pennsylvania limited liability company and **STREAMLINE COMMERCIAL DEVELOPMENT, LLC,** a Pennsylvania limited liability company, each with a mailing address at 2301 Washington Avenue, Suite 111, Philadelphia, PA 19146 (jointly and severally, "Borrower") hereby promises to pay to **HUNTINGDON VALLEY BANK**, with a banking office at 2005 S. Easton Road, Suite 304, Doylestown, PA 18901 ("Lender") or order, on or before the Maturity Date, in immediately available funds, the principal sum of Fourteen Million Eight Hundred Thousand Dollars ($14,800,000) (the "Loan") together with interest thereon until paid in full.

**1. DEFINITIONS.** As used in this Note, unless otherwise specified, the following terms shall have the following respective meanings:

"Anti-Terrorism Laws" is defined in Section 16(n)(ii).

"Business Day" means a day of the year which is neither a Saturday nor Sunday nor a legal holiday on which banks are required or authorized by law to close in the State of New York.

"Collateral" *Intentionally omitted.*

"Commodity Exchange Act" means the statute codified at 7 U.S.C. § 1 et seq., as amended from time to time, and any successor statute or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"Compliance Authority" is defined in Section 16(n)(ii).

"Covered Entity" is defined in Section 16(n)(ii).

"Debt" is defined in Section 10(j).

"Default Rate" is defined in Section 2(c).

"Depository Accounts" is defined in Section 4(d).

"Financial Contract(s)" *Intentionally omitted.*

"Floor Rate" *Intentionally omitted.*

"Governmental Rule" is defined in Section 13.

"Indebtedness" means the indebtedness evidenced by this Note and any of the other Loan Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Note, or under any of the other Loan Documents.

"ISDA" *Intentionally omitted.*

"Lender's Subsidiary" is defined in Section 12.

"LIBOR" (i.e. the London Interbank Offered Rate) means, as applicable to any LIBOR Interest Period, the three (3) month LIBOR rate as reported on Reuters Screen LIBOR1 Page as of 11:00 am, London Time, on the LIBOR Reset Date; provided, however, if the rate described above does not appear on Reuters Screen LIBOR1 Page on any such applicable LIBOR Reset Date, then the LIBOR rate shall be the rate as determined by Lender from another recognized source for the quotation of the London Interbank Offered Rate or any successor rate utilized by Lender generally for LIBOR-based loans as determined by Lender in its sole discretion, as exercised in good faith.

Notwithstanding any other provision of this Note or any other Loan Document, if Lender shall reasonably determine (which determination shall be conclusive and binding absent manifest error) that, (a) by reason of circumstances affecting the relevant market, reasonable and adequate means do not exist for ascertaining LIBOR, or (b) LIBOR does not adequately and fairly reflect the cost to Lender of funding of any loan evidenced hereby, or (c) a Regulatory Change (defined below) shall, in the reasonable determination of Lender, make it unlawful or commercially unreasonable for Lender to use LIBOR as the index for purposes of determining the LIBOR Based Rate, then (i) LIBOR shall be replaced with an alternative or successor rate or index chosen by Lender in its reasonable discretion, exercising good faith; and (ii) the Margin (defined below) may also be adjusted by Lender in its reasonable discretion, exercising good faith, giving due consideration to market convention for determining rates of interest on comparable loans.

"LIBOR Based Rate" means an interest rate equal to the LIBOR rate plus the Margin.

"LIBOR Interest Period" means each ninety (90) day period beginning on the Start Date. Each LIBOR Interest Period shall commence on the LIBOR Reset Date immediately following the previous LIBOR Interest Period.

"LIBOR Reset Date" means the first day after the end of each LIBOR Interest Period. The Interest Rate is subject to adjustment from time to time based on changes in LIBOR. Such adjustments shall be determined and become effective on the LIBOR Reset Date.

"Loan Agreement" means the Loan Agreement of even date by and between Borrower and Lender pursuant to the terms of which Lender has extended the loan to Borrower.

"Loan Documents" means the Loan Agreement, this Note, absolute or collateral assignments, indemnities, guaranty or suretyship agreements or other loan document executed by Borrower or any guarantor of this Note.

"Loan Year" means each twelve (12) month period beginning on the Start Date and ending at 11:59 p.m. on the previous day of the same month in the next calendar year, with the last Loan Year ending on the Maturity Date.

"Margin" means three hundred (300) basis points.

"Maturity Date" means the fifth (5th) anniversary of the effective date of this Note.

"Modification" means any extension, increase, renewal, substitution, replacement, supplement, amendment or modification of any agreement, certificate, document, instrument or other writing.

"Modified" or "Modify" refers to the status of or the act of making any such agreement, etc., after the occurrence of any of the foregoing.

"Mortgaged Property" *Intentionally omitted.*

"Note" shall mean this Term Note.

"Regulation D" is defined above under the definition of LIBOR.

"Regulatory Change" means, after the Start Date of this Note, any change in any applicable law, treaty, rule, regulation or guideline or the interpretation or administration thereof, by the administrator of the relevant benchmark or its regulatory supervisor, any Governmental Authority, central bank or other fiscal, monetary or other authority having jurisdiction over Lender or its lending office.

"Reportable Compliance Event" is defined in Section 16(k)(ii).

"Sanctioned Country" is defined in Section 16(k)(ii).

"Sanctioned Person" is defined in Section 16(k)(ii).

"Start Date" means the date of this Note.

"Swap" and/or "Swap Transaction" *Intentionally omitted.*

"Swap Indebtedness" *Intentionally omitted.*

"Swap Transaction Documents" *Intentionally omitted.*

"Taxes" is defined in Section 4(c)(i).

"Trigger Date" is defined in Section 7(b).

"Updated Principal Amount" is defined in Section 2(a).

All capitalized terms used in this Note but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

**2. INTEREST RATE.**

(a) Interest Rate; Capitalization of Interest. From the Start Date of this Note through and including the last day of the Loan Year 1, interest shall accrue on the outstanding principal balance hereunder based on the LIBOR Based Rate. On the first anniversary of the effective date of this Note, all accrued and outstanding interest shall be added to the principal amount of the Loan (thereafter the "Updated Principal Amount"). Thereafter, through and including the Maturity Date, interest shall accrue on the Updated Principal Amount based on the LIBOR Based Rate.

(b) Maximum Rate. If pursuant to the terms of this Note, Borrower is at any time obligated to pay interest on the principal balance of this Note at a rate in excess of the maximum interest rate permitted by applicable law, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal (without being subject to any applicable prepayment fee) and not on account of the interest due hereunder.

(c) Default Rate. After the occurrence of an Event of Default, at Lender's option, interest shall accrue at a floating rate equal to the aggregate of six percent (6.00%) plus the LIBOR Based Rate (the "Default Rate"). The Default Rate shall continue to apply whether or not judgment is entered on this Note.

**3. ADDITIONAL INTEREST PROVISIONS.** Interest shall accrue on the outstanding principal balance, calculated on the basis of a 360-day year for the actual number of days of each year (365 or 366, as applicable), on the outstanding Updated Principal Amount from and including the Start Date of this Note to, but not including, the date all outstanding principal is paid in full. Upon request, Lender shall give prompt notice to Borrower of the LIBOR Based Rate as determined and adjusted herein, which determination shall be conclusive absent manifest error.

**4. REPAYMENT.**

(a) Payment Schedule.

(i) Interest Payments.

(A) Commencing on the Start Date and through the end of Loan Year 1, interest on the Loan shall accrue based on the LIBOR Based Rate, but payment on all such interest shall be deferred and capitalized at the end of Loan Year 1, to be included in the Updated Principal Amount as set forth in Section 2(a), above.

(B) Commencing on January 11, 2022 [the first payment date in Loan Year 2] and on the eleventh (11th) day of each month thereafter until the Maturity Date, Borrower shall pay to Lender monthly payments of interest, only, on the outstanding principal balance of the Loan, calculated at the LIBOR Based Rate.

(ii) Principal Payments. In addition to the interest payments described above, on each of December 11, 2023 and December 11, 2024, Borrower shall pay Lender an amount equal to fifteen percent (15%) of the principal balance of the Loan..

(b) Maturity Date. On the Maturity Date or upon the earlier acceleration or termination of this Note, Borrower shall pay the entire principal balance, plus all accrued and unpaid interest and fees, without demand, notice or offset.

(c) Taxes.

(i) All payments by Borrower of principal of, and interest on, the Loan and all other amounts payable hereunder shall be made free and clear of and without setoff or deduction of any kind, including, without limitation, for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority; provided, that Borrower shall have no obligation to reimburse Lender for, or otherwise pay, any ordinary income tax payable by Lender under applicable federal, state or local laws. Borrower shall pay the cost of any revenue, tax or other stamps (other than those relating to income) now or hereafter required by the laws of the Commonwealth of Pennsylvania or the United States to be affixed to this Note. Borrower shall pay directly or reimburse Lender upon demand the amount of such taxes without credit against any indebtedness represented by this Note (all of the foregoing are collectively known as "Taxes").

(ii) In the event any withholding or deduction from any payment to be made by Borrower under this Note is required in respect of any Taxes pursuant to any applicable law, rule or regulations, then Borrower will:

(A) pay directly to the relevant authority the full amount required to be so withheld or deducted without any credit to any sums due under this Note;

(B) promptly forward to Lender an official receipt or other documentation satisfactory to Lender evidencing such payment to such authority; and

(C) pay to Lender such additional amount or amounts as is necessary to ensure that the net amount actually received by Lender will equal the full amount Lender would have received had no such withholding or deduction been required.

(iii) Moreover, if any Taxes are directly asserted against Lender with respect to any payment received by Lender hereunder, Lender may pay such Taxes and Borrower will promptly pay such additional amount (including any penalties, interest or expenses) as is necessary in order that the net amount received by Lender after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount Lender would have received had not such Taxes been imposed.

(iv) If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence or to reimburse Lender for Taxes paid by Lender, Borrower (i) shall indemnify Lender for any incremental Taxes, interest or penalties that may become payable by Lender as a result of any such

failure and (ii) Lender may at its option, declare an Event of Default and accelerate the indebtedness evidenced by this Note to maturity.

(d) Depository Accounts. As a condition of making the Loan, Borrower will maintain with Lender throughout the term of the Loan all of Borrower's depository, property operating and escrow accounts ("Depository Accounts") and shall maintain Lender as its sole depository. Borrower agrees to pay all normal and customary charges of Lender for maintaining Depository Accounts.

(e) Automatic Debit. Borrower hereby authorizes Lender to charge Borrower's Depository Accounts for any payment when due hereunder. Payments received will be applied to charges, fees and out-of-pocket expenses (including reasonable attorneys' fees), accrued interest and principal in any order Lender may choose, in Lender's sole discretion, but in all events consistent with the payment schedule provided for in this Note.

**5. REGARDING ENDORSEMENTS.** Borrower agrees not to send Lender any payments marked "paid in full," "without recourse," or containing similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument indicating that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount, must be mailed or delivered to Lender at the address set forth above.

**6. APPLICATION; BUSINESS DAY.** Borrower shall make all payments on this Note to Lender at its address stated above or at such other place as the holder of this Note may designate. All payments shall be made absolutely net of, without deduction or offset and free and clear of taxes, deductions, charges or withholding of any kind. Lender shall apply all payments received on this Note to any accrued and unpaid interest then due and owing, then to the reduction of principal of this Note, then to other sums due hereunder in such order and in such amounts as Lender may determine from time to time. The sum or sums shown on Lender's records shall be evidence of the correct unpaid balances of principal and interest on this Note, absent manifest error. If any payment comes due on a day that is not a Business Day, Borrower may make the payment on the first Business Day following the payment date and pay the additional interest accrued to the date of payment.

**7. PREPAYMENT.**

(a) In General. This Note may be prepaid, in whole or in part at any time upon no less than thirty (30) days' prior written notice to Lender of Borrower's intent to prepay, without premium or penalty.

(b) Mandatory Prepayment. If, on any date (such date, a "Trigger Date"), the Board of Governors of the Federal Reserve System or a designee thereof has, after consultation with Lender, notified Lender in writing that Borrower has materially breached, made a material misrepresentation with respect to or otherwise failed to comply with certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certification) of the Borrower Certifications and Covenants Addendum appended to the Loan Agreement in any material respect or that any such certification has failed to be true and correct in

any material respect, then Lender shall promptly so notify Borrower and Borrower shall, no later than two (2) Business Days after such Trigger Date, prepay the Loan in full, along with any accrued and unpaid interest thereon.

**8. FEES.**

(a) Late Fee.

(i) If any payment due under this Note is unpaid for ten (10) days or more (but excluding any payment due at maturity), Borrower shall pay in addition to any other sums due under this Note (and without limiting Lender's other remedies on account thereof), a late charge in an amount equal to six percent (6.00%) of such unpaid amount. The Late Fee shall be immediately due and payable retroactively as of the date on which the late payment was due, without demand by Lender, and shall be payable in addition to any interest payable on such overdue payment.

(ii) Borrower acknowledges that its failure to pay any amount due hereunder within such ten (10) day period will result in Lender incurring additional expense in servicing the Loan, the loss of the use of the money due and frustration to Lender in meeting its loan commitments, that the damages to Lender in connection with such late payment are extremely difficult and impractical to ascertain, and that the Late Fee is a reasonable estimate of the damages incurred by Lender in connection with any such late payment. The amount of any such Late Fee not paid promptly following demand therefor shall be deemed outstanding principal and payable pursuant to this Note. The grace period provided herein shall not be construed in any way to extend the due date of any payment and further shall not apply to the Maturity Date or any other date on which the principal balance of this Note is due and payable, by acceleration or otherwise.

(b) Loan Fee. On the Start Date, in consideration for Lender making the Loan, Borrower shall pay Lender a loan fee as set forth in the Loan Agreement.

**9. USE OF PROCEEDS.** The Loan made by Lender to Borrower and evidenced by this Note shall be used by Borrower solely to pay off existing indebtedness, invest in real estate projects, buy-out investors in various projects, pay off SBA -EIDL loan, for working capital and other purposes as permitted by the Main Street Priority Loan Facility ("MSPLF") and to pay related closing costs.

**10. EVENTS OF DEFAULT AND REMEDIES.**

(a) Loan Agreement. This Note is executed and delivered subject to the terms of the Loan Agreement and reference is hereby made to the Loan Agreement for the provisions relating to (i) Lender's rights of acceleration of the principal hereof upon the occurrence of an Event of Default, as defined in the Loan Agreement, and (ii) Lender's remedies.

(b) Election. Borrower agrees that the election by Lender of any right or remedy provided to it upon the occurrence of any Event of Default shall be conclusively presumed to be done in good faith by Lender notwithstanding any prior course of dealing or otherwise, including without limitation the acceptance by Lender of any partial payments on the Indebtedness evidenced by this Note.

(c) Remedies.

(i) If an Event of Default exists, Lender may exercise any right, power or remedy permitted by law or as set forth herein or any of the Loan Documents, including, without limitation, the right to confess judgment as set forth below. Without limiting the generality of the foregoing, Lender shall have the right to declare the entire unpaid principal amount hereof and all other sums secured by the Loan Documents, or any of them, immediately due and payable in full, with interest to accrue on such sum at the Default Rate, without further notice of any kind or demand on Borrower. Lender may immediately and without notice exercise its right of setoff and other rights or remedies granted herein, in the Loan Documents or under applicable law, all of which shall be cumulative and concurrent. The election by Lender of any right or remedy available shall be conclusively presumed to have been done in good faith notwithstanding any prior course of dealing or otherwise, including without limitation, the acceptance of any partial payments of the indebtedness represented by this Note.

(ii) If Lender shall refer this Note or any of the other Loan Documents to counsel because of any Event of Default hereunder or thereunder, then Borrower shall reimburse Lender promptly after demand for reasonable attorneys' fees and out-of-pocket costs actually incurred whether or not there is a lawsuit, payment of which shall be deemed secured by the Loan Agreement. This includes Lender's reasonable attorneys' fees and out-of-pocket costs for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction) and appeals and out-of-pocket costs of collection. All such sums shall be added to the principal amount of this Note and bear interest at the Default Rate from the date of the respective expense until payment in full.

(iii) If Borrower fails to keep, observe and perform any of the terms, covenants, and conditions contained herein or in the any of the other Loan Documents, Lender may in its discretion, and without any obligation or duty to do so and without waiving any default, perform any of such terms, covenants or conditions in part or in whole. Any sums advanced or expended by Lender toward the fulfillment of such terms, covenants and conditions shall be due and payable promptly after demand and become a part of and added to the indebtedness due under this Note. Interest shall accrue at the Default Rate from the date of the respective advance or expenditure. The Default Rate shall apply to such sums and to any other sum due or payable after an Event of Default even after the entry of a judgment against Borrower. Any judgment shall bear interest at the Default Rate until it is satisfied in full.

(d) No Waiver. Lender shall not be deemed, by any act or omission, delay or commission, or by any failure to insist upon strict performance of any term of any Loan Document, to have elected to proceed under any one right to the exclusion of any other right or to have waived any of its rights or remedies hereunder or thereunder unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth in writing. A waiver of one event shall not be construed as continuing, or as a bar to, or waiver of, any right or remedy to a subsequent event.

(e) Cumulative. The remedies of Lender as provided herein and in the Loan Documents or now or hereafter existing at law or in equity or by statute or other legislative enactment, shall be cumulative and concurrent and may be exercised as often as occasion therefor shall occur. The failure to exercise any such right or remedy shall in no event be construed as a waiver or release

thereof. No right or remedy is intended or shall be construed to be exclusive of any other right or remedy, and each may be pursued singly, concurrently, consecutively or otherwise as Lender may elect in Lender's sole discretion.

(f) Interest Rate. The exercise by Lender of its rights and remedies and the entry of any judgment by Lender shall not affect in any way the interest rate payable hereunder or under any of the other Loan Documents on any amounts due to Lender. Interest shall continue to accrue on such amounts at the Default Rate.

(g) Discretion. Borrower agrees that Lender may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents to which Borrower is not a party (and Borrower hereby waives any notice of any of the foregoing), and that the Loan Documents to which Borrower is not a party may be Modified by Lender and the other signatory parties thereto without in any way being construed as a waiver or release of any right or remedy of Lender, or of any Event of Default, or of any liability or obligation of Borrower under any of the Loan Documents, except to the extent a waiver or release in connection with such action is embodied in a writing signed by Lender.

(h) Cross-Collateralization. *Intentionally omitted.*

(i) Cross-Default. *Intentionally omitted..*

(j) Cross-Acceleration. Borrower acknowledges and agrees that Borrower's or any Subsidiary's failure to (i) make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Debt (as defined herein) (other than Indebtedness under the Loan Documents) owing to Lender or any commonly controlled Affiliate of Lender, in each case beyond the applicable grace period with respect thereto, if any, or (ii) observe or perform any other agreement or condition relating to any such Debt or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure to make a payment, default or other event described in clause (i) or (ii) is to cause such Debt to become due or be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or any offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity; provided that clause (ii) shall not apply to secured Debt that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Debt, if such sale or transfer is permitted hereunder and under the documents providing for such Debt and such Debt is repaid when required under the documents providing for such Debt; shall constitute an Event of Default under this Note and upon the occurrence of any of the foregoing, Lender has the right to exercise all of its rights and remedies under the Loan Documents, including acceleration of this Note. As used in this Section 10(j), the term "Debt" shall mean all debt for borrowed money and any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, and any guarantee of any of the foregoing.

**12. SETOFF.** If the unpaid principal amount of this Note, interest accrued on the unpaid principal amount thereof or other amount owing by Borrower under this Note or the other Loan Documents shall have become due and payable (on the Maturity Date or by acceleration or otherwise), Lender will have the right, in addition to all other rights and remedies available to it, without notice to Borrower, to setoff against and to appropriate and apply to such due and payable amounts any obligations owing to, and any other funds held in any manner for the account of, Borrower by Lender

or any other direct or indirect subsidiary of Lender ("Lender's Subsidiary"), including, without limitation, all funds in all Depository Accounts (whether time or demand, general or special, provisionally credited or finally credited, or otherwise) now or in the future maintained by Borrower. Borrower consents to and confirms the foregoing arrangements and confirms the rights of banker's lien and setoff. Nothing in this Note will be deemed a waiver or prohibition of or restriction on such rights of banker's lien or setoff. Borrower also hereby grants Lender a lien upon and a security interest in, and a right of setoff against, any and all present, future and after acquired funds, monies, balances, deposit accounts, and other personal property of any nature whatsoever in which Borrower has any interest and which is now or hereafter in the possession or custody of, or in transit to, Lender, including without limitation any balance or share belonging to Borrower of any deposit account with Lender and any other amounts which may be owing from time to time by Lender to Borrower.

**13. CHANGE OF LAW.** If, after the Start Date of this Note, the adoption of, any change in or any change in the interpretation of, any law, regulation or guideline applicable to financial institutions including, without limitation, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and (b) the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, by any governmental authority exercising control over Lender or Lender's Subsidiary (a "Governmental Rule"), or the compliance by Lender with the Governmental Rule (including, without limitation, Regulation D of the Board of Governors of the Federal Reserve System and regulations of the Securities Exchange Commission relating to financial instruments), imposes any reserve, deposit, allocation of capital or similar requirement or any tax (other than taxes on Lender's income) on Lender or Lender's Subsidiary which reduces the rate of return on Lender's capital or increases the amount of capital required to be maintained by Lender then, and in each such case, Lender may require Borrower to pay the amount necessary to compensate Lender or Lender's Subsidiary for such reduced rate of return or increased capital requirement. Lender will deliver to Borrower a statement of the justification for the payment(s), and the determination by Lender shall be conclusive absent obvious error and shall be payable by Borrower to Lender upon Lender's demand. In determining any such amount, Lender may use reasonable averaging and attribution methods.

**14. PAYMENT OF FEES AND EXPENSES.** Borrower agrees to pay, upon demand, costs of collection of all amounts due under this Note, including, without limitation, principal, interest and fees, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses.

**15. GOVERNING LAW.** This Note shall be interpreted and the rights and liabilities of the parties shall be governed by the laws of the Commonwealth of Pennsylvania, without regard to principles of the conflict of laws. This Note has been delivered to and accepted by Lender and will be deemed to be made in the Commonwealth of Pennsylvania.

**16. GENERAL PROVISIONS.**

(a) Waivers. Borrower waives presentment, demand, notice, protest and all other demands and notices in connection with delivery, acceptance, performance or enforcement of this Note.

(b) Entire Agreement. This Note, together with any related Loan Documents, contain the entire agreement between Lender and Borrower with respect to the subject matter hereof, and supersedes every course of dealing, other conduct, oral agreement, commitment letter or other correspondence related thereto and representation previously made by Lender.

(c) Copy. Borrower agrees that in any legal proceeding, a copy of this Note kept in Lender's course of business may be admitted into evidence as an original.

(d) Binding Effect. This Note is a binding obligation enforceable against Borrower and Borrower's permitted heirs, representatives, successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower may not assign any of Borrower's rights or obligations hereunder without the prior written consent of Lender. If a court deems any provision of this Note invalid, the remainder of this Note shall remain in effect.

(e) Information. At any time, promptly upon the reasonable request of Lender, Borrower shall furnish to Lender all information relating to Borrower' business, operations, assets and condition, including without limitation, verification of liquidity on an ongoing basis.

(f) Joint and Several. If there is more than one Borrower, each of them shall be jointly and severally liable for all amounts and obligations which become due under this Note and the term "Borrower" shall include each as well as all of them.

(g) Collateral. *Intentionally omitted.*

(h) No Waiver. No failure by the holder hereof to exercise, and no delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by such holder of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of the holder hereof as herein specified are cumulative and not exclusive of any other rights or remedies which such holder may otherwise have.

(i) Notices. All notices, demands, or other communications hereunder must be in writing and will be effective when delivered or mailed to the address set forth herein or such other address as provided by such party via overnight delivery service or personal service or, if mailed, three (3) days after deposit, postage prepaid, in an official depository maintained by the United States Post Office.

(j) Indemnity. Borrower agrees to indemnify Lender and its affiliates and their respective officers, directors and employees (collectively, "Indemnitees") and hereby holds Indemnitees harmless against all liabilities, claims, actions, suits, proceedings, penalties, costs, expenses, brokerage or other fees (including, without limitation, reasonable legal fees and expenses), losses, damages and liabilities of any kind or nature including in tort, penalties and interest, which Lender may incur as a result of or in connection with an Event of Default under this Note or otherwise in furtherance of the exercise of Lender's rights under the Loan Documents, in any manner other than Lender's own active gross negligence or willful misconduct, by reason of any matter relating, directly or indirectly, to this Note and the related Loan Documents. This indemnity shall survive the termination of this Note.

(k) Damage Waiver. To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waives any claim against Lender, on any theory of liability, for special, indirect, consequential or punitive damages (but excluding direct or actual damages) arising out of, in connection with or as a result of, this Note, any related Loan Documents, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds.

(l) USA Patriot Act. Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56), Lender is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the USA Patriot Act.

(m) Authorization to Obtain Credit Reports. By signing below, any Borrower who is an individual provides written authorization to Lender or its designee (and any assignee or potential assignee hereof) to obtain such Borrower's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Note and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

(n) Anti-Money Laundering/International Trade Law Compliance.

(i) Borrower represents and warrants to Lender, as of the Start Date of this Note, the date of any advance of proceeds under the Loan, the date of any Modification of the Loan, and at all times until the Loan has been terminated and all amounts thereunder have been indefeasibly paid in full, that: (A) no Covered Entity (1) is a Sanctioned Person; (2) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (3) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority; (B) the proceeds of the Loan will not be used to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority; (C) the funds used to repay the Loan are not derived from any unlawful activity; and (D) each Covered Entity is in compliance with, and no Covered Entity engages in any dealings or transactions prohibited by, any laws of the United States, including but not limited to any Anti-Terrorism Laws. Borrower covenants and agrees that it shall immediately notify Lender in writing upon the occurrence of a Reportable Compliance Event.

(ii) As used herein: "Anti-Terrorism Laws" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "Compliance Authority" means each and all of the (A) U.S. Treasury Department/Office of Foreign Assets Control, (B) U.S. Treasury Department/Financial Crimes Enforcement Network, (C) U.S. State Department/Directorate of Defense Trade Controls, (D) U.S. Commerce Department/Bureau of Industry and Security, (E) U.S. Internal Revenue Service, (F) U.S. Justice Department, and (G) U.S. Securities and Exchange Commission; "Covered Entity" means Borrower, its affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of Borrower acting in any capacity in connection with the Loan; "Reportable Compliance Event" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or

receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "Sanctioned Country" means a country subject to a sanctions program maintained by any Compliance Authority; and "Sanctioned Person" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**17. JURISDICTION AND VENUE.** BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY (A) CONSENTS IN EACH ACTION AND OTHER LEGAL PROCEEDING COMMENCED BY LENDER AND ARISING OUT OF OR OTHERWISE RELATING TO THIS NOTE TO THE JURISDICTION OF ANY COURT THAT IS EITHER A COURT OF RECORD OF THE COMMONWEALTH OF PENNSYLVANIA OR A COURT OF THE UNITED STATES LOCATED IN THE COMMONWEALTH OF PENNSYLVANIA AND (B) WAIVES EACH OBJECTION TO THE LAYING OF VENUE OF ANY SUCH ACTION OR OTHER LEGAL PROCEEDING.

**18. WAIVER OF JURY TRIAL.** BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO, AND IN, ANY ACTION OR OTHER LEGAL PROCEEDING OF ANY NATURE, RELATING TO (A) THIS NOTE OR ANY RELATED LOAN DOCUMENT, (B) ANY TRANSACTION CONTEMPLATED BY ANY SUCH DOCUMENTS OR (C) ANY NEGOTIATION, PERFORMANCE OR ENFORCEMENT OF THIS NOTE. BORROWER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL AS NECESSARY AND APPROPRIATE.

**19. POWER TO CONFESS JUDGMENT. BORROWER HEREBY IRREVOCABLY EMPOWERS THE PROTHONOTARY, ANY ATTORNEY OR ANY CLERK OF ANY COURT OF RECORD, AFTER THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, TO APPEAR FOR AND, WITH OR WITHOUT COMPLAINT FILED, CONFESS JUDGMENT AGAINST BORROWER FOR SUCH SUMS AS ARE DUE AND/OR MAY BECOME DUE UNDER THIS NOTE, WITH COSTS OF SUIT, WITHOUT STAY OF EXECUTION AND WITH AN AMOUNT EQUAL TO FIVE PERCENT (5%) OF THE AMOUNT OF SUCH JUDGMENT, BUT NOT LESS THAN $1,000.00, ADDED FOR ATTORNEYS' COLLECTION FEES. NOTWITHSTANDING THE ATTORNEY'S COMMISSION PROVIDED FOR IN THE PRECEDING SENTENCE (WHICH IS INCLUDED IN THE WARRANT FOR PURPOSES OF ESTABLISHING A SUM CERTAIN), THE AMOUNT OF ATTORNEYS' FEES THAT LENDER MAY RECOVER FROM BORROWER AND RETAIN SHALL NOT EXCEED THE ACTUAL REASONABLE ATTORNEYS' FEES INCURRED BY LENDER AT SUCH ATTORNEYS' NORMAL HOURLY RATES. THIS NOTE OR A COPY VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. BORROWER FOREVER WAIVES AND RELEASES ALL PROCEDURAL ERRORS IN SUCH PROCEEDINGS. NO SINGLE EXERCISE OF THE FOREGOING POWER SHALL EXHAUST THE POWER, AND MAY BE EXERCISED AS OFTEN AS THE HOLDER SHALL FIND IT NECESSARY AND**

**DESIRABLE. THE HOLDER HEREOF MAY CONFESS ONE OR MORE JUDGMENTS IN THE SAME OR DIFFERENT JURISDICTIONS FOR ALL OR ANY PART OF THE AMOUNT OWING HEREUNDER. IF ANY JUDGMENT CONFESSED HEREUNDER IS STRICKEN OR OPENED FOR ANY REASON, HOLDER IS HEREBY AUTHORIZED AND EMPOWERED TO AGAIN APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER FOR ANY PART OR ALL OF THE AMOUNTS OWING HEREUNDER, IF DOING SO WILL CURE ANY ERRORS OR DEFECTS IN SUCH PRIOR PROCEEDINGS. IT IS UNDERSTOOD AND AGREED THAT ANY EXERCISE OF THIS AUTHORIZATION BY THE HOLDER HEREOF SHALL BE ON BEHALF OF THE HOLDER HEREOF AND NOT ON BEHALF OF BORROWER.**

**20. TIME.** Time is of the essence of the provisions of this Note.

[*Signatures on the following page*]

**IN WITNESS WHEREOF**, Borrower has caused this Note to be executed as of the date first written above.

Borrower:

COULBEE LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION, LLC

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION MANAGEMENT, LLC

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SOLUTIONS ACQUISITIONS, LLC

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE REALTY, LLC

By:________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE PARTNERS, LLC

By:________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE HOME MANAGEMENT, LLC

By:________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL DEVELOPMENT, LLC

By:________________________(SEAL)
Name: Michael Stillwell
Title: President

*Issued on July 31, 2020*

**CO-LENDER AGREEMENT UNDER**
**THE MAIN STREET LENDING PROGRAM**

**TRANSACTION SPECIFIC TERMS**

THIS CO-LENDER AGREEMENT UNDER THE MAIN STREET LENDING PROGRAM is dated as of the Agreement Date and entered into by and between the Initial Lender, the New Lender, the other Lenders from time to time parties hereto, the Administrative Agent, the Borrower and the other Loan Parties from time to time parties hereto (if any) to govern the rights and obligations of the Lenders, the Administrative Agent, the Borrower and the other Loan Parties (if any) under the Credit Agreement and the other Loan Documents (the "Transaction"), in accordance with the terms, conditions and agreements set forth in the Standard Terms and Conditions for Co-Lender Agreements under the Main Street Lending Program (the "Standard Terms") published as of July 31, 2020 on the website of the Federal Reserve Bank of Boston (the "Federal Reserve Bank of Boston's Website"), which is currently at http://www.bostonfed.org. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through C below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Co-Lender Agreement under the Main Street Lending Program. For good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| **Agreement Date:** | ____________________[1] |
| **Initial Lender:** | **HUNTINGDON VALLEY BANK** |
| **Administrative Agent:** | **The Initial Lender in its capacity as administrative agent under this Co-Lender Agreement** |
| **New Lender:** | ____________________[2] |
| **Credit Agreement Date:** | **December 11, 2020** |
| **Borrower:** | **COULBEE LIMITED LIABILITY COMPANY, LION CONSTRUCTION, LLC, LION CONSTRUCTION MANAGEMENT, LLC, STREAMLINE GROUP, LLC, STREAMLINE SOLUTIONS ACQUISITIONS, LLC, STREAMLINE REALTY, LLC, STREAMLINE PARTNERS, LLC, STREAMLINE HOME MANAGEMENT, LLC and STREAMLINE COMMERCIAL DEVELOPMENT, LLC** |
| **Main Street Term Loan Tranche:** | **The Loan referred to in the Loan Agreement** |

## A. DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

[1] Agreement Date to remain blank until filled in by the New Lender.

[2] Name of the New Lender to remain blank until filled in by the New Lender.

**B. WIRE INSTRUCTIONS**

New Lender's Wire Instructions:[3]

Bank: ________________
ABA No.: ______________
Acct.: _________________
Acct. No.: _____________
Attn.: ________________
Ref.: __________________

Initial Lender's Wire Instructions:[4]

Bank: Huntingdon Valley Bank
ABA No. [redacted]
Acct.: HVB Main Street Lending Acct.
Acct. No. [redacted]
Attn.: Joe O'Neil, CFO
Ref.: Coulbee Limited Liability Company MS Loan

Administrative Agent's Wire Instructions:[5]

Bank: Huntingdon Valley Bank
ABA No. [redacted]
Acct.: HVB Main Street Lending Acct.
Acct. No. [redacted]
Attn.: Joe O'Neil, CFO
Ref.: Coulbee Limited Liability Company MS Loan

**C. NOTICE INFORMATION**

New Lender's Address for Notices and Delivery:[6]

__________________________
__________________________
__________________________
Attention:
Telephone:
Facsimile:
Electronic Mail Address:

---

[3] To remain blank until completed by New Lender.

[4] To be completed by Initial Lender.

[5] To be completed by Administrative Agent.

[6] To remain blank until completed by New Lender.

Initial Lender's Address for Notices and Delivery:[7]

2005 S. Easton Road, Suite 304
Doylestown, PA 18901
Attention: Hugh Connelly, EVP
Telephone: 609-668-5679
Electronic Mail Address: hconnelly@myhvb.com

Administrative Agent's Address for Notices and Delivery:[8]

2005 S. Easton Road, Suite 304
Doylestown, PA 18901
Attention: Hugh Connelly, EVP
Telephone: 609-668-5679
Electronic Mail Address: hconnelly@myhvb.com

[7] To be completed by Initial Lender.

[8] To be completed by Administrative Agent.

**IN WITNESS WHEREOF**, Initial Lender, Administrative Agent, Borrower, the other Loan Parties (if any) and New Lender have executed this Agreement by their duly authorized officers or representatives.

**INITIAL LENDER**

**HUNTINGDON VALLEY BANK**

By:________________________________
Name: Hugh Connelly
Title: Executive Vice-President

**ADMINISTRATIVE AGENT**

**HUNTINGDON VALLEY BANK**

By:________________________________
Name: Hugh Connelly
Title: Executive Vice-President

**BORROWER**

COULBEE LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION
MANAGEMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SOLUTIONS
ACQUISITIONS, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE REALTY, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE PARTNERS, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE HOME MANAGEMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL DEVELOPMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

**LOAN PARTIES OTHER THAN A BORROWER**[9]
**NAME OF LOAN PARTIES**

______________________________(SEAL)
MICHAEL STILLWELL

STREAMLINE RESIDENTIAL
CONSTRUCTION LIMITED LIABILITY
COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RENTALS LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE CONSTRUCTION
MANAGEMENT LIMITED LIABILITY
COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL CONSULTING LIMITED LIABILITY
COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

[9] If there are any Guarantors or Grantors (other than a Borrower), each such Guarantor or Grantor is required to sign.

STREAMLINE QOZB MANAGER LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE QOZB INVESTOR LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE TECHNOLOGIES LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SALES AND MARKETING LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL CONSTRUCTION LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

IRON CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 5 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

IRON CAPITAL INVESTMENTS 6 LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 7 LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 8 LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PUTTER CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 5 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 6 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 9 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

WOOD CAPITAL INVESTMENTS 10 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 11 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 14 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 1 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 2 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PRS 3 LIMITED LIABILITY COMPANY

By:________________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 4 LIMITED LIABILITY COMPANY

By:________________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 5 LIMITED LIABILITY COMPANY

By:________________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RIDGE LIMITED LIABILITY COMPANY

By:________________________________(SEAL)
Name: Michael Stillwell
Title: President

**NEW LENDER**

________________________________[10]

By:______________________________________
Name:
Title:

[10] To be left blank until completed by New Lender.

*Issued on July 31, 2020*

ASSIGNMENT AND ASSUMPTION
FOR THE MAIN STREET LENDING PROGRAM

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between the Assignor identified in item 1 below (the "Assignor") and the Assignee identified in item 2 below (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in (i) the Co-Lender Agreement identified below (as amended, the "Co-Lender Agreement") and (ii) to the extent not defined in the Co-Lender Agreement, the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions, the Co-Lender Agreement and the Credit Agreement, as of the Effective Date (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount identified in Section 8 below of all of such outstanding rights and obligations of the Assignor under the facility identified in Section 8 below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: Huntingdon Valley Bank

2. Assignee: ______________________________ [1]

3. Borrower: COULBEE LIMITED LIABILITY COMPANY, LION CONSTRUCTION, LLC, LION CONSTRUCTION MANAGEMENT, LLC, STREAMLINE GROUP, LLC, STREAMLINE SOLUTIONS ACQUISITIONS, LLC, STREAMLINE REALTY, LLC, STREAMLINE PARTNERS, LLC, STREAMLINE HOME MANAGEMENT, LLC and STREAMLINE COMMERCIAL DEVELOPMENT, LLC [2]

4. Administrative Agent: Assignor, as the administrative agent pursuant to the Co-Lender Agreement

5. Credit Agreement: The credit agreement, loan agreement, business loan agreement, promissory note, note or other analogous or similar agreement or agreements (or any combination of the foregoing), dated as of the Credit Agreement Date, by and among Borrower, as borrower, Assignor, as the lender or a lender, the Administrative Agent (if applicable), and any other entities party thereto from time to time (including all intercreditor agreements, subordination agreements, waivers and amendments entered into from time to time pursuant thereto or in connection therewith and the note(s) (if any) evidencing the loans issued thereunder), in each case, as amended, supplemented or otherwise

---

[1] Name of the Assignee to remain blank until filled in by the SPV.

[2] List each Borrower if there are multiple Borrowers.

modified from time to time, including any such agreement or agreements that have been delivered by Assignor to MS Facilities LLC in connection with the Participation Agreement (as defined in the Co-Lender Agreement)

Credit Agreement Date: December 11, 2020

Co-Lender Agreement: The Co-Lender Agreement, dated as of the Effective Date, by and among the Borrower, the Assignor, the Assignee and the Administrative Agent

Main Street Term Loan Tranche: Has the meaning set forth in the Co-Lender Agreement.

6. Participation Date: December 11, 2020[3]

7. Participated Interest as of the Participation Date:

| FACILITY ASSIGNED | AGGREGATE AMOUNT OF LOANS FOR ALL LENDERS IN SUCH FACILITY AS OF THE PARTICIPATION DATE | AMOUNT OF SUCH LOANS PARTICIPATED AS OF THE PARTICIPATION DATE | PERCENTAGE OF SUCH LOANS PARTICIPATED AS OF THE PARTICIPATION DATE |
|---|---|---|---|
| Main Street Term Loan Tranche | $14,800,000 | $14,060,000 | 95% |

8. Assigned Interest as of the Effective Date:

| FACILITY ASSIGNED | AGGREGATE AMOUNT OF LOANS FOR ALL LENDERS IN SUCH FACILITY AS OF THE EFFECTIVE DATE | AMOUNT OF SUCH LOANS ASSIGNED AS OF THE EFFECTIVE DATE | PERCENTAGE OF SUCH LOANS ASSIGNED AS OF THE EFFECTIVE DATE |
|---|---|---|---|
| Main Street Term Loan Tranche | $____________[4] | $____________[5] | ________%[6] |

9. Effective Date: ________________, 20___.[7]

---

[3] The date the participation request was submitted to the SPV.

[4] Field to be left blank at the time the participation request is submitted to the SPV. Amount to be inserted by the SPV upon submission to the Administrative Agent for effectiveness. This amount should be the aggregate amount of loans (the "Loans") for all Lenders under the applicable facility as of the Effective Date. While the amount set forth in section 7 lists the aggregate amount of the Loans for all Lenders as of the Participation Date, such outstanding amounts could change over time as the Borrower prepays or repays principal or as certain interest payments are capitalized and added to the principal amount of the Loans, among other reasons (such increases or decreases to the principal amount of the Loans, the "Principal Amount Adjustments"). The amount listed should reflect any such Principal Amount Adjustments following the Participation Date.

[5] Field to be left blank at the time the participation request is submitted to the SPV. Amount to be inserted by the SPV upon submission to the Administrative Agent for effectiveness. This amount should be the aggregate amount of Loans being assigned by the Assignor to the Assignee on the Effective Date and should reflect any Principal Amount Adjustments following the Participation Date. This amount should not be greater than the amount of the Loans participated to the SPV as of the Participation Date after giving effect to any Principal Amount Adjustments thereto following the Participation Date (i.e. while the SPV can elevate or elevate and transfer less than its participated share of such Loans it may not transfer the portion of such Loans required to be retained by the Assignor).

[6] Field to be left blank at the time the participation request is submitted to the SPV. Percentage to be inserted by the SPV upon submission to the Administrative Agent for effectiveness. This percentage should not be greater than the percentage set forth in section 7.

[7] Field to be left blank at the time the participation request is submitted to the SPV. Effective Date to be completed by the Administrative Agent upon recordation of this Assignment and Assumption in the Register.

10. The parties hereto agree that the Effective Date shall not occur until the Administrative Agent has accepted this Assignment and Assumption and recorded it in the Register.

[Page break]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

HUNTINGDON VALLEY BANK

By:______________________________
Name: Hugh Connelly
Title: Executive Vice-President

ASSIGNEE[8]

__________________________

By:______________________________
Name:
Title:

Consented to:

HUNTINGDON VALLEY BANK, as
Administrative Agent under the Co-Lender Agreement

By:______________________________
Name: Hugh Connelly
Title: Executive Vice-President

Consented to:

COULBEE LIMITED LIABILITY COMPANY

By:______________________________(SEAL)

Name: Michael Stillwell
Title: President

LION CONSTRUCTION, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[8] Field to be left blank at the time the participation request is submitted to the SPV.

[Signature Page to Assignment Executed in Blank]

LION CONSTRUCTION MANAGEMENT,
LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SOLUTIONS
ACQUISITIONS, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE REALTY, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE PARTNERS, LLC

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE HOME MANAGEMENT,
LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL
DEVELOPMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

Accepted for Recordation by:

[NAME OF ADMINISTRATIVE AGENT], as [9]
Administrative Agent under the Co-Lender Agreement

By:______________________________
Name:
Title:

[9] Field to be left blank at the time the participation request is submitted to the SPV.

ANNEX 1

# STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2 Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and the Co-Lender Agreement, (ii) it meets all the requirements to be an assignee under the Co-Lender Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the Co-Lender Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement and the Co-Lender Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements by the Borrower and other obligors, as applicable, delivered pursuant thereto and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest and (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

The words "executed," signed," "signature," and words of like import as used above and elsewhere in this Assignment and Assumption shall include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

*Issued on July 31, 2020*

ASSIGNMENT AND ASSUMPTION
FOR THE MAIN STREET LENDING PROGRAM

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between the Assignor identified in item 1 below (the "Assignor") and the Assignee identified in item 2 below (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in (i) the Co-Lender Agreement identified below (as amended, the "Co-Lender Agreement") and (ii) to the extent not defined in the Co-Lender Agreement, the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions, the Co-Lender Agreement and the Credit Agreement, as of the Effective Date (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount identified in Section 8 below of all of such outstanding rights and obligations of the Assignor under the facility identified in Section 8 below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: Huntingdon Valley Bank

2. Assignee: ______________________________[1]

3. Borrower: COULBEE LIMITED LIABILITY COMPANY, LION CONSTRUCTION, LLC, LION CONSTRUCTION MANAGEMENT, LLC, STREAMLINE GROUP, LLC, STREAMLINE SOLUTIONS ACQUISITIONS, LLC, STREAMLINE REALTY, LLC, STREAMLINE PARTNERS, LLC, STREAMLINE HOME MANAGEMENT, LLC and STREAMLINE COMMERCIAL DEVELOPMENT, LLC [2]

4. Administrative Agent: Assignor, as the administrative agent pursuant to the Co-Lender Agreement

5. Credit Agreement: The credit agreement, loan agreement, business loan agreement, promissory note, note or other analogous or similar agreement or agreements (or any combination of the foregoing), dated as of the Credit Agreement Date, by and among Borrower, as borrower, Assignor, as the lender or a lender, the Administrative Agent (if applicable), and any other entities party thereto from time to time (including all intercreditor agreements, subordination agreements, waivers and amendments entered into from time to time pursuant thereto or in connection therewith and the note(s) (if any) evidencing the loans issued thereunder), in each case, as amended, supplemented or otherwise

---

[1] Name of the Assignee to remain blank until filled in by the SPV.

[2] List each Borrower if there are multiple Borrowers.

modified from time to time, including any such agreement or agreements that have been delivered by Assignor to MS Facilities LLC in connection with the Participation Agreement (as defined in the Co-Lender Agreement)

Credit Agreement Date: December 11, 2020

Co-Lender Agreement: The Co-Lender Agreement, dated as of the Effective Date, by and among the Borrower, the Assignor, the Assignee and the Administrative Agent

Main Street Term Loan Tranche: Has the meaning set forth in the Co-Lender Agreement.

6. Participation Date: December 11, 2020[3]

7. Participated Interest as of the Participation Date:

| FACILITY ASSIGNED | AGGREGATE AMOUNT OF LOANS FOR ALL LENDERS IN SUCH FACILITY AS OF THE PARTICIPATION DATE | AMOUNT OF SUCH LOANS PARTICIPATED AS OF THE PARTICIPATION DATE | PERCENTAGE OF SUCH LOANS PARTICIPATED AS OF THE PARTICIPATION DATE |
|---|---|---|---|
| Main Street Term Loan Tranche | $14,800,000 | $14,060,000 | 95% |

8. Assigned Interest as of the Effective Date:

| FACILITY ASSIGNED | AGGREGATE AMOUNT OF LOANS FOR ALL LENDERS IN SUCH FACILITY AS OF THE EFFECTIVE DATE | AMOUNT OF SUCH LOANS ASSIGNED AS OF THE EFFECTIVE DATE | PERCENTAGE OF SUCH LOANS ASSIGNED AS OF THE EFFECTIVE DATE |
|---|---|---|---|
| Main Street Term Loan Tranche | $____________[4] | $____________[5] | ________%[6] |

9. Effective Date: ________________, 20___.[7]

---

[3] The date the participation request was submitted to the SPV.

[4] Field to be left blank at the time the participation request is submitted to the SPV. Amount to be inserted by the SPV upon submission to the Administrative Agent for effectiveness. This amount should be the aggregate amount of loans (the "Loans") for all Lenders under the applicable facility as of the Effective Date. While the amount set forth in section 7 lists the aggregate amount of the Loans for all Lenders as of the Participation Date, such outstanding amounts could change over time as the Borrower prepays or repays principal or as certain interest payments are capitalized and added to the principal amount of the Loans, among other reasons (such increases or decreases to the principal amount of the Loans, the "Principal Amount Adjustments"). The amount listed should reflect any such Principal Amount Adjustments following the Participation Date.

[5] Field to be left blank at the time the participation request is submitted to the SPV. Amount to be inserted by the SPV upon submission to the Administrative Agent for effectiveness. This amount should be the aggregate amount of Loans being assigned by the Assignor to the Assignee on the Effective Date and should reflect any Principal Amount Adjustments following the Participation Date. This amount should not be greater than the amount of the Loans participated to the SPV as of the Participation Date after giving effect to any Principal Amount Adjustments thereto following the Participation Date (i.e. while the SPV can elevate or elevate and transfer less than its participated share of such Loans it may not transfer the portion of such Loans required to be retained by the Assignor).

[6] Field to be left blank at the time the participation request is submitted to the SPV. Percentage to be inserted by the SPV upon submission to the Administrative Agent for effectiveness. This percentage should not be greater than the percentage set forth in section 7.

[7] Field to be left blank at the time the participation request is submitted to the SPV. Effective Date to be completed by the Administrative Agent upon recordation of this Assignment and Assumption in the Register.

10. The parties hereto agree that the Effective Date shall not occur until the Administrative Agent has accepted this Assignment and Assumption and recorded it in the Register.

[Page break]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

HUNTINGDON VALLEY BANK

By:______________________________
Name: Hugh Connelly
Title: Executive Vice-President

ASSIGNEE[8]

__________________________

By:______________________________
Name:
Title:

Consented to:

HUNTINGDON VALLEY BANK, as
Administrative Agent under the Co-Lender Agreement

By:______________________________
Name: Hugh Connelly
Title: Executive Vice-President

Consented to:

COULBEE LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION, LLC

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

[8] Field to be left blank at the time the participation request is submitted to the SPV.

[Signature Page to Assignment Executed in Blank]

LION CONSTRUCTION MANAGEMENT, LLC

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SOLUTIONS ACQUISITIONS, LLC

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE REALTY, LLC

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE PARTNERS, LLC

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE HOME MANAGEMENT,
LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL
DEVELOPMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

Accepted for Recordation by:

[NAME OF ADMINISTRATIVE AGENT], as [9]
Administrative Agent under the Co-Lender Agreement

By:______________________________
Name:
Title:

[9] Field to be left blank at the time the participation request is submitted to the SPV.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2 Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and the Co-Lender Agreement, (ii) it meets all the requirements to be an assignee under the Co-Lender Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the Co-Lender Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement and the Co-Lender Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements by the Borrower and other obligors, as applicable, delivered pursuant thereto and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest and (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

The words "executed," signed," "signature," and words of like import as used above and elsewhere in this Assignment and Assumption shall include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

## AFFIDAVIT FOR PURPOSE OF CLOSING LOAN

Each of the undersigned (together, "Obligors"), being duly sworn according to law, hereby affirms, deposes and says that the following representations are true and correct as of the date hereof:

1. This Affidavit is given for the purpose of inducing HUNTINGDON VALLEY BANK ("Lender") to make a commercial loan to Borrower which will be a Main Street Priority Loan Facility in the principal sum of Fourteen Million Eight Hundred Thousand Dollars ($14,800,000) (the "Loan"):

Borrower: COULBEE LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company ("Coulbee"), LION CONSTRUCTION, LLC, a Pennsylvania limited liability company ("Lion"), LION CONSTRUCTION MANAGEMENT, LLC, a Pennsylvania limited liability company ("Lion Management"), STREAMLINE GROUP, LLC, a Delaware limited liability company ("Streamline"), STREAMLINE SOLUTIONS ACQUISITIONS, LLC, a Pennsylvania limited liability company ("Streamline Solutions"), STREAMLINE REALTY, LLC, a Pennsylvania limited liability company ("Streamline Realty"), STREAMLINE PARTNERS, LLC, a Pennsylvania limited liability company ("Streamline Partners"), STREAMLINE HOME MANAGEMENT, LLC, a Pennsylvania limited liability company ("Streamline Home")and STREAMLINE COMMERCIAL DEVELOPMENT, LLC, a Pennsylvania limited liability company ("Streamline Commercial"), each with a mailing address at 2301 Washington Avenue, Suite 111, Philadelphia, PA 19146 (collectively, Coulbee, Lion, Lion Management, Streamline, Streamline Solutions, Streamline Realty, Streamline Partners, Streamline Home and Streamline Commercial, the "Borrower")

Individual Guarantor: MICHAEL STILLWELL, an adult individual ("Stillwell" or "Individual Guarantor")

Entity Guarantors: STREAMLINE RESIDENTIAL CONSTRUCTION LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, SL RENTALS LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE CONSTRUCTION MANAGEMENT LIMITED LIABILITY

COMPANY, a Pennsylvania limited liability company, SL CONSULTING LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE QOZB MANAGER LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE QOZB INVESTOR LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE TECHNOLOGIES LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE SALES AND MARKETING LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE COMMERCIAL CONSTRUCTION LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 5 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 6 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 7 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 8 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 5 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 6 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 9 LIMITED

LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 10 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 11 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 14 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 1 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 2 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 3 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 4 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 5 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company and SL RIDGE LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company

Borrower, Individual Guarantor and Entity Guarantors are hereinafter collectively referred to as "Obligors." That certain promissory note of even date herewith from Borrower and payable to the order of Lender in the principal amount of the Loan is hereinafter referred to as the "Note." The Loan is more fully described in a Loan Agreement of even date by and between Borrower and Lender (the "Loan Agreement"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

2. There has been no material adverse change in the financial condition of any Obligor since the date of the Historical Financial Statements previously submitted to Lender.

3. There is no pending or, to the best of Obligors' knowledge, written threat of litigation against any Obligor which could reasonably be expected to affect the ability of an Obligor to comply with the terms of the Note, Loan Agreement and any other Loan Documents evidencing the Loan or to violate any of the covenants and conditions applicable to any Obligor as set forth in the Loan Documents.

4. The Loan does not violate any contractual obligation of any Obligor, or any judicial decision or administrative order or decree to which any Obligor is bound.

5. There is not pending against any Obligor, a petition in bankruptcy, whether voluntary or otherwise, any assignment for the benefit of creditors, any

petition seeking reorganization or arrangement under the Federal Bankruptcy Code or any similar statute, or any other action brought under such bankruptcy laws.

6. To Obligors' actual knowledge, the photostatic or other copies of all documents delivered to Lender relating to the Loan or any Obligor (including, without limitation, any leases, contracts, financial statements or any documents relating to any existing mortgage or loan or any Permitted Indebtedness), are true and materially correct copies of the entirety of each such document or statement, none of such documents have been amended, cancelled or otherwise changed except in writing and as provided to Lender and no party to any of such documents is in default thereunder.

7. Each Borrower and each Entity Guarantor has been duly authorized and has obtained all consents and approvals required to execute and deliver the Loan Documents to be signed by it. True, correct and complete copies of the (i) Certificate of Organization, (ii) Operating Agreement; (iii) Subsistence Certificate and (iv) Resolution for each Borrower and each Entity Guarantor are attached hereto as Exhibits 1- 42.

8. Obligors hereby agree with Lender named therein that any material and adverse misrepresentation in this Affidavit shall be deemed an Event of Default under the terms of the Loan Documents. Lender may rely on these representations without further inquiry.

9. Obligors further represent and warrant that no Obligor has entered into any agreement with any broker or other intermediary which would entitle such Person to a commission or fee on account of Lender's issuance of a commitment to make the Loan or the making of such Loan and further agree, jointly and severally, to indemnify and hold Lender harmless from and against any and all claims arising from any breach of the foregoing representation and warranty.

[*Signatures on the following page*]

IN WITNESS WHEREOF, the undersigned have executed this Affidavit the date set forth below and made it effective as of December 11, 2020.

Borrower:

COULBEE LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION MANAGEMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE SOLUTIONS
ACQUISITIONS, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE REALTY, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE PARTNERS, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE HOME
MANAGEMENT, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL
DEVELOPMENT, LLC

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

Individual Guarantor: ______________________________(SEAL)
MICHAEL STILLWELL

Entity Guarantors

STREAMLINE RESIDENTIAL CONSTRUCTION LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RENTALS LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE CONSTRUCTION MANAGEMENT LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL CONSULTING LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE QOZB MANAGER
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE QOZB INVESTOR
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE TECHNOLOGIES LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SALES AND
MARKETING LIMITED LIABILITY
COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE COMMERCIAL CONSTRUCTION LIMITED LIABILITY COMPANY

By:_________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY

By:_________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY

By:_________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY

By:_________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY

By:_________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 5
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 6
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 7
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 8
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PUTTER CAPITAL INVESTMENTS 1
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 2
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 3
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 4
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 5
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 6
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 9
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 10
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 11
LIMITED LIABILITY COMPANY

By:__________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

WOOD CAPITAL INVESTMENTS 14
LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 1 LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 2 LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 3 LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 4 LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PRS 5 LIMITED LIABILITY COMPANY

By:______________________(SEAL)
Name: Michael Stillwell
Title: President

SL RIDGE LIMITED LIABILITY
COMPANY

By:______________________(SEAL)
Name: Michael Stillwell
Title: President

COMMONWEALTH OF PENNSYLVANIA :
: SS
COUNTY OF PHILADELPHIA :

Sworn to and subscribed before me
the 11th day of December, 2020.

______________________
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rhiannon Gatto, Notary Public
Bensalem Twp., Bucks County
My Commission Expires Dec. 29, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

**ERRORS AND OMISSIONS COMPLIANCE AGREEMENT**

**Guarantor:** MICHAEL STILLWELL, an adult individual, STREAMLINE RESIDENTIAL CONSTRUCTION LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, SL RENTALS LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE CONSTRUCTION MANAGEMENT LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, SL CONSULTING LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE QOZB MANAGER LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE QOZB INVESTOR LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE TECHNOLOGIES LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE SALES AND MARKETING LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, STREAMLINE COMMERCIAL CONSTRUCTION LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 5 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 6 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 7 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, IRON CAPITAL INVESTMENTS 8 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 1 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 2 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 3 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 4 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PUTTER CAPITAL INVESTMENTS 5 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL

INVESTMENTS 6 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 9 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 10 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 11 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, WOOD CAPITAL INVESTMENTS 14 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 1 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 2 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 3 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 4 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company, PRS 5 LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company and SL RIDGE LIMITED LIABILITY COMPANY, a Pennsylvania limited liability company (collectively, "Guarantor")

**Borrower:** COULBEE LIMITED LIABILITY COMPANY., a Pennsylvania limited liability company ("Coulbee"), LION CONSTRUCTION, LLC, a Pennsylvania limited liability company ("Lion"), LION CONSTRUCTION MANAGEMENT, LLC, a Pennsylvania limited liability company ("Lion Management"), STREAMLINE GROUP, LLC, a Delaware limited liability company ("Streamline"), STREAMLINE SOLUTIONS ACQUISITIONS, LLC, a Pennsylvania limited liability company ("Streamline Solutions"), STREAMLINE REALTY, LLC, a Pennsylvania limited liability company ("Streamline Realty"), STREAMLINE PARTNERS, LLC, a Pennsylvania limited liability company ("Streamline Partners"), STREAMLINE HOME MANAGEMENT, LLC, a Pennsylvania limited liability company ("Streamline Home")and STREAMLINE COMMERCIAL DEVELOPMENT, LLC, a Pennsylvania limited liability company ("Streamline Commercial"), each with a mailing address at 2301 Washington Avenue, Suite 111, Philadelphia, PA 19146 (collectively, Coulbee, Lion, Lion Management, Streamline, Streamline Solutions, Streamline Realty, Streamline Partners, Streamline Home and Streamline Commercial, the "Borrower")

**Lender:** **HUNTINGDON VALLEY BANK**

**Loan Amount:** $14,800,000

**Loan Date:** December 11, 2020

IN CONSIDERATION of the above-referenced loan ("Loan") made by Lender to Borrower, Guarantor, intending to be legally bound, does hereby promise and agree that, upon request by Lender, Guarantor will:

1. Re-execute and deliver Loan Documents and any other documents and instruments which (a) were incorrectly prepared or signed; and/or (b) are necessary or required for accurate, complete and internally consistent documentation of the above Loan;

2. Fully cooperate and correct, or permit Lender to correct, any clerical errors or complete and fill-in blanks in any Loan Documents executed in relation to the above Loan necessary or desirable in the reasonable discretion of Lender;

3. Execute and deliver standard form Loan Documents and other documents and instruments which should have been signed by Guarantor; and

4. Deliver evidence and documentation necessary or required to show compliance with the terms and conditions contained in any documentation between Borrower or Guarantor and Lender.

Guarantor will fully cooperate and comply with all requests by Lender pursuant to the above paragraphs within five (5) days of request or as soon thereafter as is reasonably possible. Failure to comply with the obligations set forth herein may constitute, at Lender's discretion, a default under the Guaranty of even date herewith between Guarantor and Lender and under the Loan Agreement of even date herewith between Borrower and Lender ("Loan Agreement") and shall entitle Lender to the remedies available under the terms of such Loan Documents. Capitalized terms used herein shall have the meaning set forth in the Loan Agreement.

[*Signatures on following page.*]

**IN WITNESS WHEREOF**, Guarantor has duly executed this Agreement effective as of December 11, 2020.

Guarantor:

_______________________________ (SEAL)
MICHAEL STILLWELL

STREAMLINE RESIDENTIAL CONSTRUCTION LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RENTALS LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE CONSTRUCTION MANAGEMENT LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL CONSULTING LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE QOZB MANAGER
LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE QOZB INVESTOR
LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE TECHNOLOGIES
LIMITED LIABILITY COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SALES AND
MARKETING LIMITED LIABILITY
COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL
CONSTRUCTION LIMITED LIABILITY
COMPANY

By:___________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 1
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 2
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 3
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 4
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 5
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 6
LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 7
LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

IRON CAPITAL INVESTMENTS 8
LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 1
LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 2
LIMITED LIABILITY COMPANY

By:_______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 3
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 4
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PUTTER CAPITAL INVESTMENTS 5
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 6
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 9
LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

WOOD CAPITAL INVESTMENTS 10
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 11
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

WOOD CAPITAL INVESTMENTS 14
LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 1 LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 2 LIMITED LIABILITY COMPANY

By:____________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

PRS 3 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 4 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

PRS 5 LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

SL RIDGE LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

Acknowledged by Borrower:

COULBEE LIMITED LIABILITY COMPANY

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

LION CONSTRUCTION, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

LION CONSTRUCTION
MANAGEMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE GROUP, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE SOLUTIONS
ACQUISITIONS, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE REALTY, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

[*signatures continued on the following page*]

STREAMLINE PARTNERS, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE HOME
MANAGEMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President

STREAMLINE COMMERCIAL
DEVELOPMENT, LLC

By:______________________________(SEAL)
Name: Michael Stillwell
Title: President